# EXHIBIT A

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

## DEBTOR-IN-POSSESSION BUSINESS LOAN AGREEMENT

This **DEBTOR-IN-POSSESSION BUSINESS LOAN AGREEMENT** ("Agreement") is made this _____ day of _____, 2017, by and between **ISLAND VIEW CROSSING II, L.P.** (the "Borrower"), as a Debtor-In-Possession, with an address of 1 South State Street, Newtown, Pennsylvania 18940, and **COMMONWEALTH CAPITAL, LLC,** with an address at 2 Bala Plaza, Suite 714, Bala Cynwyd, PA 19004 (the "Lender").

## BACKGROUND

**A.**     On June 30, 2017 (the "Petition Date"), the Borrower filed a voluntary petition under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") as Case No. 17-14454 ("Bankruptcy Proceeding").

**B.**     The Borrower desires to borrow from the Lender and the Lender, subject to the terms and conditions set forth herein and in the remaining DIP Loan Documents (as defined in Section 1(j) below), is prepared to lend the Borrower the maximum principal amount of Four Million One Hundred Thousand Dollars ($4,100,000.00) (the "DIP Loan").

**C.**     Given the pendency of the Bankruptcy Proceeding, the Lender shall make the DIP Loan as Debtor-in- Possession financing subject to and in accordance with the DIP Loan Documents and a final order issued by the Bankruptcy Court approving the DIP Loan (the "Final Order"). The Lender intends to convey participation interests in the DIP Loan and, as used herein, the term "Lender" shall include any participant in the DIP Loan.

**D.**     As a condition and inducement to the Lender to make the DIP Loan, and as expressly set forth in this Agreement, the Borrower has agreed to provide the Lender with a first-lien security interest in all of its personal property and business assets, and to deliver, or cause to be delivered, various documents and instruments, including a collateral assignment of certain tort claims as well as an assignment of leases, rents and other agreements, and a Mortgage on property known as ***Radcliffe Street in the Borough of Bristol, County of Bucks and Commonwealth of Pennsylvania*** (which shall, as context requires, be referred to herein as a "Mortgagor") as more particularly described on Exhibit A hereto (the "Real Property"), together with the fixtures and buildings located and too be constructed thereon (the "Improvements"). The proceeds of the DIP Loan shall be used in part to fund the construction of 22 separate dwelling units to be constructed in Buildings 2, 4, 10 and 11 of the Real Property, as described more fully in certain approved development plans for the Real Property (each, a "Unit" and collectively, the "Units").

**NOW THEREFORE,** with the foregoing Background incorporated herein as if fully set forth at length, in consideration of the premises, and of the mutual promises and undertakings of the parties set forth herein, and with the intention of being legally bound hereby, the parties hereto agree as follows:

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

1.  <u>THE LOAN.</u>

    (a)   <u>Loan Amount; Interest; Loan Payments.</u>

          (i)    Subject to the terms and conditions of this Agreement and the remaining DIP Loan Documents, the Lender shall loan the Borrower the maximum principal amount of Four Million One Hundred Thousand Dollars ($4,100,000.00) for the period beginning on the Closing Date (as defined in Section 4 below) and ending on the Termination Date (as defined in Section 8(b) below) with and subject to the terms and conditions set forth in the DIP Loan Documents.

          (ii)    Unless the DIP Loan is terminated on an earlier date, the DIP Loan shall mature and all of the DIP Loan Obligations (as defined in subpart (iii) below) shall be paid by the Borrower to the Lender on the date that is two years after the Closing Date (the "Maturity Date").

          (iii)    Interest shall accrue on (1) all sums advanced by the Lender to the Borrower under the DIP Loan, (2) all fees, costs, expenses and other charges that are to be paid by the Borrower under the DIP Loan Documents, and (3) any other obligations of the Borrower to the Lender under the DIP Loan Documents (collectively, the "DIP Loan Obligations") at the annual rate of 12% through the first anniversary of the Closing Date and thereafter at an annual rate equal to the greater of (x) the *Wall Street Journal* Prime Rate plus 8% or (y) 12%. Upon the occurrence of an Event of Default, interest on the DIP Loan Obligations shall accrue at the rate of 24% per annum (the "Default Interest Rate").

          (iv)    If the Lender does not receive the entire amount of any payment required under the DIP Loan Documents within ten (10) days of its due date, the Borrower shall pay a late fee of five percent (5%) of the payment amount. The Borrower shall be charged a returned payment fee in the amount of twenty dollars ($20.00) for any payments returned for non-sufficient funds.

          (v)    During the entire term of the DIP Loan, the Borrower shall pay the Lender monthly interest payments in arrears on the last business day of the month, beginning on the first calendar month to occur after the Closing Date (the "Interest Payment Date") in the amount of all accrued and outstanding interest on the DIP Loan Obligations calculated as of the Interest Payment Date. Interest payments shall be paid on or before each Interest Payment Date, either from the Interest Reserve as set forth in this Agreement or in cash.

          (vi)    Prior to the Termination Date, the Borrower shall pay the DIP Loan Obligations at closing on the sale of a Unit in the amounts listed on Exhibit B hereto for each Unit that is sold  (each, a "Sale Release Price") until the DIP Loan Obligations are paid in full. The minimum sale price for each Unit shall be the amounts set forth on Exhibit C hereto. Upon obtaining a sale of a Unit that satisfies the conditions under this Agreement, the Borrower shall provide the Lender for execution a partial release of the Mortgage lien limited to the Unit that is being sold, which release, including the legal description for the Unit, shall be reviewed and verified by the Lender at the Borrower's expense, which expense shall be paid at closing of the sale of the Unit in addition to the Sale Release Price.

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

(b)    Interest Reserve. The amount of Four Hundred Ninety-Two Thousand Dollars ($492,000.00) of the total amount of the DIP Loan shall be reserved from the Borrower's availability under the DIP Loan by the Lender as an interest reserve (the "Interest Reserve"). The Borrower's required interest payments under the DIP Loan Documents shall be advanced to the Borrower from the Interest Reserve and added to the DIP Loan Obligations on the Interest Payment Date until the Interest Reserve is exhausted, unless, prior to an Interest Payment Date, the Borrower has paid the interest payment due to the Lender on such Interest Payment Date in cash. Upon application of the full amount of the Interest Reserve to the Borrower's required interest payments, the Borrower shall pay interest due under the DIP Loan Documents in cash.

(c)    DIP Loan Advances. Advances on the DIP Loan shall be for purposes set forth in the IVC Budget (as defined in Section 1(g)(i) below) and shall be submitted by the Borrower to the Lender on the form attached hereto as Exhibit D (the "Draw Request"), and shall be accompanied by a certification of the Borrower that the Borrower is in compliance with the DIP Loan Documents. The DIP Loan advance requested in a Draw Request shall fully comply with the instructions included in the Draw Request form attached as Exhibit D. The Lender shall not be obligated to provide any advance on the DIP Loan that does not comply with the Draw Request form. Before making any advance based on a properly submitted Draw Request related to the construction of a Unit, the Lender shall require a continuation search and an inspection of the Real Property by a property inspector retained by the Lender (the "Property Inspector"). All fees and costs of the Property Inspector shall be paid by the Borrower. All Draw Requests shall be conditioned upon (1) the absence of any liens claims or encumbrances on any of the Collateral that were recorded or filed after the Closing Date that were not previously approved by the Lender in writing, and (2) a certification of the Property Inspector that (i) the Draw Request is for purposes that are consistent with the IVC Budget, (ii) if the Draw Request is for construction costs related to a Unit, that the work covered by the Draw Request is completed, and (iii) there is no material adverse change with the Real Property that would prevent the completion of construction of the Units. Draw Requests that do not involve payment of construction costs for a Unit shall be advanced after submission of the Draw Request form accompanied by an invoice for an item included on the IVC Budget and, in the case of the Borrower's professional fees, an order of the Bankruptcy Court allowing the fees.

(d)    Collateral. To secure the prompt repayment of the DIP Loan Obligations and the observance and performance by the Borrower of all of the conditions, warranties, obligations, covenants, promises and agreements contained in this Agreement and the other DIP Loan Documents, the Borrower hereby grants a continuing first priority lien and security interest, senior to any and all other liens, claims and encumbrances, in, and hereby mortgages, pledges and collaterally assigns to the Lender, all of its right, title and interest, whether such right, title or interest is now or hereafter existing or acquired, in all of its assets, including, but not limited to, each of the following items of property, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds thereof, wherever located (collectively, the "DIP Liens"):

(i)    accounts;

(ii)    the Real Property;

(iii)    chattel paper (whether tangible or electronic);

(iv)    commercial tort claims including, but not limited to, the Borrower's claims against Prudential Savings Bank;

(v)    deposit accounts;

(vi)    documents;

(vii)    goods (including inventory, equipment, and any accessions thereto) ;

(viii)    instruments (including promissory notes);

(ix)    investment property;

(x)    letter of credit rights (whether the letter of credit is evidenced by writing);

(xi)    money;

(xii)    oil and gas and other minerals before extraction;

(xiii)    general intangibles (including payment intangibles);

(xiv)    insurance and insurance claims; and

(xv)    supporting obligations and proceeds (collectively, the "Collateral").

(e)    Lien Perfection.    The Borrower shall take all actions and make all filings necessary in order to perfect the DIP Liens in the Collateral subject to the Uniform Commercial Code ("UCC") as adopted in any state. The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any UCC jurisdiction financing statements (including amendments and continuations thereto) that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower (if required by the applicable jurisdiction) and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Borrower agrees to furnish any such information to the Lender promptly upon the Lender's request. In addition, the Borrower hereby authorizes the Lender to take such other actions as the Lender deems necessary or appropriate in order to protect or perfect its security interest in the Collateral including the taking of any action by the Lender to perfect the DIP Liens in any deposit account, investment account or other bank account by control under the UCC.    In addition to and without limitation to the Lender's rights in this Agreement, the Final Order shall include provisions acceptable to the Lender that provide for the automatic perfection of the DIP Liens.

(f) <u>Superpriority Claims and Liens.</u> The Borrower covenants, represents and warrants that, upon entry of the Final Order, and except as expressly set forth in the Final DIP Order, the DIP Loan Obligations:

(i)  pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses of the kind specified in Sections 503(b), 507(a), 507(b) or any other provision of the Bankruptcy Code, it being understood that such claim in respect of the DIP Loan Obligations shall be paid before any administrative expense claims, except as otherwise expressly provided in the DIP Loan Documents or the Final Order;

(ii)  pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority lien on all Collateral and the proceeds of all Collateral that is unencumbered by an existing lien, claim or encumbrance;

(iii)  pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority lien on the Collateral, senior and priming to any and all existing liens, claims and encumbrances on the Collateral.

(g) <u>Use of Proceeds.</u> Provided that no Event of Default shall have occurred, the DIP Loan shall be available to the Borrower only for the following purposes:

(i)  to fund an origination fee payable to the Lender in the amount of $164,000; and

(ii)  to fund the amounts included in the budget attached hereto and incorporated herein by reference as Exhibit E hereto (the "IVC Budget") in accordance with the terms of the DIP Loan Documents.

(h) <u>Exit Fee.</u> As additional consideration to the Lender, the Borrower shall pay an Exit Fee in the amount of Forty-One Thousand Dollars ($41,000.00) on the Termination Date.

(i) <u>Lender's Costs and Fees.</u> The Borrower shall pay or reimburse the Lender for all costs and expenses (including, but not limited to, attorney's fees) incurred by the Lender and any participant of the Lender in the DIP Loan, in connection with the preparation, review, modification or enforcement of the Final Order and any of the DIP Loan Documents and the administration and collection of the DIP Loan ("Lender's Fees"). Lender's Fees shall either be paid in full at closing on the DIP Loan or added to the DIP Loan Obligations.

(j) <u>DIP Loan Documents.</u> The Borrower's obligation to repay the DIP Loan Obligations and the terms of the DIP Loan shall be set forth in the following documents (collectively with this Agreement, the "DIP Loan Documents"), the form and substance of which will be acceptable to the Lender at its sole discretion, and all necessary filing and recording fees with respect thereto shall be paid by the Borrower:

(i)  Commercial Note executed by the Borrower in favor of the Lender;

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

(ii)   An Open End Mortgage ("Mortgage") to be executed and delivered by the Mortgagor, covering the Real Property, the Improvements, and all building materials, fixtures, machinery and equipment necessary or incidental to the construction or general operation and maintenance of the Real Property and Improvements, and all renewals and replacements thereof or additions thereto, and such other property as the Lender may be reasonably require, all as more specifically described in the Mortgage;

(iii)   An assignment by Mortgagor of all of the right, title and interest in and to any and all present and future leases and agreements of lease affecting the Real Property, or Improvements or any part thereof;

(iv)   An assignment by the Borrower to the Lender of commercial tort claims;

(v)   Such security agreements, financing statements, continuation statements and other security instruments as the Lender shall require in order to create valid and perfected first-lien security interests in the Collateral;

(vi)   An Unlimited Guaranty of the DIP Loan Obligations from Island View Properties, Inc., AmeriCorp Homes Inc. and Renato J. Gualtieri (each a "Guarantor" and collectively, the "Guarantors") in favor of the Lender;

(vii)   Such security agreements, financing statements, continuation statements and other security instruments as the Lender shall require in order to create valid and perfected first-lien security interests in all assets of the Guarantors;

(viii) An environmental indemnification agreement; and

(ix)   Such additional documents and instruments as the Lender shall require in order to perfect the Lender's interest in any of the Collateral or as otherwise may be required to give effect to the transactions contemplated in the DIP Loan Documents.

2.   REPRESENTATIONS AND WARRANTIES. The Borrower hereby represents and warrants to the Lender (which representations and warranties shall survive until the DIP Loan has been paid in full) that:

(a)   Existence. The Borrower is a limited partnership formed and in good standing in the Commonwealth of Pennsylvania.

(b)   Power and Authority; Authorization; Enforceability. Subject to the entry of the Final Order, the Borrower has full power, authority and legal right to execute, deliver and comply with each of the DIP Loan Documents and any other document or instrument relating to the DIP Loan to be executed by it, all actions of the Borrower and other authorizations necessary or appropriate for the execution and delivery of and compliance with the DIP Loan Documents, including without limitation the Final Order and such other documents and instruments have been taken or obtained and, upon their execution, the DIP Loan Documents and such other documents and instruments shall constitute the valid and legally binding obligations of the Borrower enforceable against it in accordance with their respective terms.   The Borrower

acknowledges that the DIP Loan is for business purposes only and shall not be used for individual, family or household purposes.

(c)    <u>Governmental Approval of DIP Loan Documents.</u> Other than the Final Order, no consent, approval or other authorization of or by any court, administrative agency or other governmental authority is required in connection with the Borrower's execution and delivery of or compliance with any of the DIP Loan Documents or any other document or instrument relating to the DIP Loan executed by the Borrower.

(d)    <u>Conflict; Breach.</u> The Borrower's execution and delivery of and compliance with the DIP Loan Documents or any other documents and instruments relating to the DIP Loan will not conflict with or result in a breach of any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority, or of any agreement or other document or instrument to which the Borrower is a party or by which it is bound, and such action by the Borrower will not result in the creation or imposition of any lien, charge or encumbrance upon any property of the Borrower in favor of anyone other than the Lender.

(e)    <u>Litigation.</u> Other than the Bankruptcy Proceeding or as otherwise disclosed in the Motion or in the schedules filed in the Bankruptcy Proceeding, there is no action, suit or proceeding pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or the Real Property or improvements before or by any court, administrative agency or other governmental authority, or which brings into question the validity of the transactions contemplated hereby.

(f)    <u>Financial Statements.</u> The financial statements of the Borrower, copies of which have been furnished to the Lender, have been prepared in accordance with generally accepted accounting principles consistently applied and fairly and accurately reflect the financial condition of the Borrower as of and for the period shown therein, and there has been no material adverse change in the financial condition or business of the Borrower since the date thereof.

(g)    <u>Tax Returns.</u> Any and all federal, state and local income tax returns through 2014 have been filed by the Borrower, and all taxes reflected upon any such tax returns, all past due taxes, interest and penalties and all estimated payments required to be paid have been paid.

(h)    <u>Title to Real Property and Improvements.</u> The Mortgagor giving the Mortgage has good and marketable title to an indefeasible fee simple estate in the Real Property and Improvements, subject to no lien, charge or encumbrance except as disclosed to and approved by the Lender.

(i)    <u>Title to Personal Property.</u> All personal property with respect to which the Borrower has granted to the Lender a security interest pursuant to any of the DIP Loan Documents is owned by the Borrower free and clear of all liens, encumbrances and security interests except for the security interests filed by Prudential Savings Bank.

(j)    <u>Environmental Matters.</u>

(i)    To the best of the Borrower's knowledge, information and belief and as otherwise disclosed in any reports provided by the Borrower to the Lender: (A) neither the Real Property nor the Improvements has been used for the generation, manufacture, storage or disposal of, and there has not been transported to or from the Real Property or Improvements, any Hazardous Substances or Wastes (as those terms are hereinafter defined); (B) there are no Hazardous Substances or Wastes present on the Real Property or in the Improvements other than in compliance with applicable environmental laws and regulations; (C) the Real Property does not consist in whole or in part of any soils or vegetation that would be considered to be protected wetlands as defined in applicable federal, state and local laws and regulations ("Wetlands"); (D) there has been no use of the Real Property or Improvements that may, under any federal, state or local law or regulation, require any closure or cessation of the use of the Real Property or Improvements or impose upon the Borrower or its successors any monetary obligations; (E) the Borrower has not been identified in any litigation, proceeding or investigation as a responsible party or potentially responsible party for any liability for disposal or release of any Hazardous Substances or Wastes; (F) no lien or super lien has been recorded, asserted or threatened against the Real Property for any liability in connection with any environmental contamination; and (G) the Real Property and Improvements are in compliance with all federal, state or local laws and regulations relating to environmental matters.

(ii)    For the purpose hereof: (A) "Hazardous Substances" shall mean any flammable explosives, radioactive materials, asbestos, urea-formaldehyde, hazardous wastes, toxic substances or any other elements or compounds designated as a "hazardous substance", "pollutant", "contaminant" or "regulated substance" in the Comprehensive Environmental Response, Compensation and Liability Act, or in the Resource Conservation and Recovery Act, both as amended by the Superfund Amendments and Reauthorization Act of 1986, or the Toxic Substance Control Act, or any other applicable federal, state or local law or regulation and (B) "Wastes" shall mean any hazardous wastes, residual wastes, solid wastes or other wastes as those terms are defined in the applicable federal, state or local laws or regulations.

(k)    Development Approvals.  To the best of the Borrower's knowledge, all licenses approvals, plans, permits or other actions to be taken by any government or regulatory authority (collectively, "Development Authorities") to allow for the subdivision of the Real Property, the construction of the Improvements and the construction and sale of the Units (the "Development Approvals") have been obtained, except for Development Approvals that (A) solely require the payment of a fee by the Borrower and such fee is included in the IVC Budget, or (B) can only be obtained after construction of Improvements or Units has been completed.

(l)    Bankruptcy; Insolvency.  Other than the Bankruptcy Proceeding, the Borrower has not applied for or consented to the appointment of a receiver, trustee or liquidator of itself or himself or any of its or his property, admitted in writing its or his inability to pay its or his debts as they mature, made a general assignment for the benefit of creditors, been adjudicated a Bankrupt or insolvent or filed a voluntary petition in Bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any Bankruptcy, reorganization, insolvency, readjustments of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it or him in any proceeding under any such law, and no action has been taken by it or him for the purpose of effecting any of the foregoing. Other than those issued by the Bankruptcy Court in the Borrower's Bankruptcy

Proceeding, no order, judgment or decree has been entered by any court of competent jurisdiction approving a petition seeking reorganization of the Borrower or all or a substantial part of the assets of the Borrower, or appointing a receiver, sequestrator, trustee or liquidator of it or him or any of its or his property.

(m)    <u>Material Adverse Change.</u>  Since the Petition Date, nothing has occurred that has had or could reasonably be expected to result in a material adverse change in the Borrower's financial condition.

(n)    <u>Lien Priority.</u>  After the execution and delivery thereof, upon entry of the Final Order, the DIP Loan Documents create in favor of the Lender legal, valid and enforceable fully perfected DIP Liens on all right, title and interest of the Borrower in the Collateral described therein with priority described therein senior to all other liens.

3.    <u>COVENANTS.</u> The Borrower covenants and agrees that, until the DIP Loan has been paid in full:

(a)    <u>Leases.</u> The Borrower shall not enter into any lease for less than fair market rent affecting the Real Property or Improvements without in each case obtaining the Lender's prior written approval of all of the terms and conditions thereof and, once approved, the Borrower shall not amend or modify any such lease other than in the normal course of business or cancel any such lease without obtaining the Lender's prior written approval.

(b)    <u>Limitation on Indebtedness.</u> The Borrower shall not suffer, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any indebtedness, except (1) to the extent permitted by the Final Order or the DIP Loan Documents or (2) unsecured trade terms extended to Borrower in the ordinary course by Borrower's vendors, subcontractors and suppliers.

(c)    <u>DIP Loan Proceeds.</u>  No part of the proceeds of the DIP Loan shall be used by the Borrower to purchase or carry publicly traded stocks, investment commodities or to extend credit to others.

(d)    <u>Status of Title to Real Property.</u> The Borrower shall not transfer control or ownership of the Real Property or Improvements or any part thereof, directly or indirectly, voluntarily or involuntarily, without the prior written approval of the Lender. The Borrower shall not create or permit to exist any lien, encumbrance or security interest in favor of any third party with respect to the Real Property, Improvements or any item or property, whether or not a fixture, installed thereon or stored thereat and the Borrower shall keep all such property free from any such lien or security interest other than those created in favor of the Lender pursuant to the DIP Loan Documents and liens for taxes not yet due and payable. In general, the Borrower shall keep the title to the Real Property and the Improvements free of any matter which would, at the time of completion of the Improvements, prevent any title insurance company from certifying the lien of and mortgage to be executed in favor of another mortgagee in substitution for or in payment of the DIP Loan, as other than a good and valid first lien upon the Real Property and the Improvements.

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

(e)    Tax Returns. Any and all federal, state and local income tax returns for 2015 and 2016 shall be filed by the Borrower and provided to the Lender on or before January 1, 2018.

(f)    Use of Cash Collateral. The Borrower covenants and agrees that any and all cash representing the proceeds of the Collateral, including, but not limited to, cash proceeds from the sale of the Units, constitutes Lender's "cash collateral" within the meaning of Section 363 of the Bankruptcy Code ("Lender Cash Collateral"). The Borrower shall not use, spend, pledge, dissipate or otherwise convey Lender Cash Collateral except as provided in this Agreement. In the event the Borrower desires to use Lender Cash Collateral for any purpose, the Borrower shall submit to the Lender a proposed order for use of Lender Cash Collateral and a cash flow budget for the proposed period of Lender Cash Collateral use (the "Lender Cash Collateral Request"). The Borrower covenants and agrees that it shall (1) confer with the Lender on the terms of the Lender Cash Collateral Request and shall make reasonable changes to the terms of the proposed cash use that are requested by the Lender and (2) not file any motion or make any request to the Bankruptcy Court for the non-consensual use of Lender Cash Collateral, under section 363 of the Bankruptcy Code or otherwise, unless (i) the Lender has not consented to the Lender Cash Collateral Request within ten (10) days after Lender receives the Lender Cash Collateral Request and (ii) the Termination Date has not occurred. Except as provided herein, the Borrower irrevocably waives any right to request non-consensual use of Lender Cash Collateral. Should the Borrower request non-consensual use of Lender Cash Collateral in accordance with this Agreement, all of Lender's rights and objections, under the Bankruptcy Code or otherwise, are expressly reserved.

(g)    General Contractor. Americorp Homes is the general contractor for the Real Property (the "General Contractor") and shall remain as the General Contractor of the Real Property for the duration of the DIP Loan. The General Contractor shall not assign, transfer or otherwise convey any of its rights and responsibilities with respect to the Real Property without the Lender's consent until the DIP Loan Obligations have been paid in full.

(h)    Development Approvals. All Development Approvals are in place to allow for constriction and sale of the Units and none of the Development Authorities have taken any action to prevent the construction and sale of the Units.

(i)    Mechanics Liens and Other Encumbrances. The Borrower shall pay, discharge or obtain release bonds from a reputable surety company satisfactory to the Lender for any mechanic's liens or other encumbrances which may be filed or recorded against the Real Property or Improvements within ten (10) days after it receives notice thereof, from the Lender or otherwise. In the event that the Borrower shall fail to pay or discharge any such mechanic's lien or other encumbrance, the Lender, in addition to such other rights as may be available to it, may pay and discharge such mechanic's lien or other encumbrance or deposit in escrow an amount sufficient to do so or cause a mechanic's lien or stop notice release bond to be issued with respect thereto and pay such amounts as may be necessary in connection therewith, and all amounts so paid or deposited shall be treated as an advance of the DIP Loan from the Lender to the Borrower.

(j)    Environmental Matters. The Borrower will not, nor permit any tenant or other occupant of the Real Property or Improvements to, store, use, generate, treat or dispose of any

Hazardous Substances or Wastes on the Real Property or in the Improvements other than in compliance with applicable environmental laws and regulations. The Borrower shall promptly advise the Lender in writing of and with respect to any pending or threatened claim, demand or action by any governmental authority or third party relating to any Hazardous Substances or Wastes affecting the Real Property or Improvements or the discovery of any Hazardous Substances or Wastes on the Real Property or in the Improvements or any real property adjoining or in the vicinity of the Real Property. The Lender shall have the right to join in or participate in any legal proceedings or actions initiated in connection with any Hazardous Substances or Wastes directly or indirectly affecting the Real Property or Improvements. The Borrower shall reimburse the Lender for attorney's fees in connection therewith and the Borrower shall indemnify, defend and hold harmless the Lender from and against any claim, demand, loss or liability, including but not limited to costs of remedial action, response costs, personal injury and property damage, directly or indirectly arising out of or attributable to the use, generation, deposit, storage, release, threatened release, discharge, disposal, burial, dumping, spilling, leaking or other presence of Hazardous Substances or Wastes on, under or about the Real Property or in the Improvements or arising as the result of the existence of Wetlands on the Real Property. The foregoing indemnity shall specifically survive the repayment of the DIP Loan. The Borrower shall prohibit any Mortgagor, without obtaining the Lender's prior written consent, from entering into any settlement agreement, consent decree or other compromise in respect to any Hazardous Substances, Wastes or Wetlands directly or indirectly affecting the Real Property or Improvements if, in the Lender's reasonable judgment, such action could impair the value of the Lender's security.  The Lender may, in its discretion, retain an environmental consultant at the Borrower's expense to advise the Lender regarding the Borrower's compliance with the environmental covenants of the DIP Loan Documents, the environmental condition of the Real Property and any other environmental regulatory matter related to the Real Property, the Improvements or the Units.

(k)    Financial Statements. The Borrower shall deliver, or cause to be delivered to the Lender annually on or before April 30, the prior year's financial statement of the Borrower, which shall be prepared in accordance with generally accepted accounting principles consistently applied and fairly and accurately reflect the financial condition of the Borrower as of and for the period shown therein, and there has been no material adverse change in the financial condition or business of the Borrower since the date thereof.

(l)    Tax Returns. The Borrower shall deliver, or cause to be delivered to the Lender annually on or before April 30, the prior year's signed income tax returns and all schedules thereto for the Borrower.

(m)    Principal Office. The Borrower shall maintain its principal office and/or the office where it keeps its books and records in the same location unless it provides the Lender prior written notice of any proposed change in location thereof.

(n)    Books and Records. The Borrower shall keep complete and accurate books and records in accordance with generally accepted accounting principles consistently applied. The Borrower shall furnish to the Lender all such written information relating to its affairs as may be requested by the Lender from time to time. The Borrower shall provide online access to view all debtor-in-possession bank accounts to the Lender and the Lender's participant.

(o)    Audit. The Lender shall have the right at any time and from time to time to audit the books and records of the Borrower and the Borrower shall be obligated to make available for any such audit all books, records and other information that the Lender may request for such purpose and to cooperate fully with the Lender in connection therewith. The cost of such audit shall be paid for by the Borrower.

(p)    Changed Circumstances. The Borrower shall promptly notify the Lender of any change in any fact or circumstance represented or warranted by the Borrower herein and in any other documents furnished to the Lender in connection with this Agreement.

(q)    Maintenance of Existence; Single Purpose. The Borrower shall not make or permit any substantial change in, or cease in whole or in part, its present business, or engage in any other activities apart from its present business.

(r)    Bank Account. Once the Interest Reserve is depleted, the Lender is authorized to withdraw monthly installments of interest due under the Note from the Borrower's Debtor-In-Possession account.

(s)    Advances. The Borrower covenants and agrees with the Lender that unless the Lender otherwise consents in writing, so long as any DIP Obligations are outstanding, it shall only use advances made under the DIP Loan for the purposes stated in the DIP Loan Documents and shall not use such funds for any other purpose including commencing any action against the Lender or its affiliates, note holders, investors and their respective shareholders, members, managers, officers, principals, directors, employees, participants, advisors, representatives, fiduciaries and agents (collectively, "Related Persons").

(t)    No Conveyance of Liens or Other Superiority Claims. The Borrower shall not incur or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any indebtedness secured by a lien or security interest in the Collateral or having the priority afforded by section 364(c) or (d) of the Bankruptcy Code (including any superpriority claims) other than the DIP Loan, unless the DIP Loan Obligations are to be irrevocably paid in full, in cash with the proceeds thereof.

(u)    No Set Off or Recoupment. As more fully set forth in the Final Order, the Borrower further covenants and agrees that no DIP Loan Obligations shall be subject to set off or recoupment or any such rights under Bankruptcy Code §553 or otherwise with respect to any claim the Borrower may have against the Lender or any of the Lender's respective affiliates arising on or before the Petition Date.

(v)    Site Visits and Inspection. The Borrower further covenants and agrees that it shall (i) permit the Lender and its representatives and designees to visit and inspect the Collateral, properties, books and records of the Borrower upon reasonable notice at the Borrower's expense; (ii) pay all taxes, assessments, contributions and other governmental charges imposed upon the Borrower or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Bankruptcy Proceeding; (iii) maintain insurance with respect to the business and property of the Borrower against loss of the kind and in amounts maintained by the Borrower as of the Petition

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

Date; (iv) comply in all material respects with the requirements of all application laws; (v) promptly upon request execute and deliver such documents and do such other acts as the Lender may reasonably request in connection with the DIP Loan and in accordance with the DIP Loan Documents (including but not limited to execution of any additional security documents that may be required by the Lender to perfect the DIP Liens; (vi) maintain compliance with the construction plans and draw schedule and all other provisions of the DIP Loan Documents; (vii) include the Lender and its participants (and their respective related persons) as released and exculpated parties in the release and exculpation provisions of any plan pursued by the Borrower in the Bankruptcy Proceeding and to the extent provided for in the Budget; (viii) perform all obligations of the Borrower under the DIP Loan, the DIP Loan Documents and the Final Order as applicable; (ix) to the extent the Borrower is not required to take any action pursuant to clause (ii), (iii) or (iv) above and failure to take such action could reasonably be expected to result in a material adverse change or otherwise be adverse to the interests of the Lender, then the Borrower shall promptly notify the Lender who may (but shall not be obligated to), in its sole discretion, advance funds to be applied by the Borrower to take such action as designated by the Lender (and any such advances shall constitute DIP Loan Obligations).

(w)    Certifications of Compliance. The Borrower shall (A) as soon as possible and in any event within three (3) business days after an officer or director of the Borrower obtains actual knowledge of the occurrence of any condition, occurrence or event, which, after notice or lapse of time or both, would constitute an Event of Default, provide the Lender with a statement of an officer or director of the Borrower setting forth details of such Event of Default and the action which the Borrower has taken or proposes to take with respect thereto; and (B) as soon as possible and in any event within three (3) business days after an officer or director of the Borrower obtains actual knowledge of the occurrence of any material adverse development with respect to any loss, damage, investigation, claim, litigation, action, proceeding or controversy involving the Borrower, the Collateral, a Guarantor or any Guarantor Collateral, notice thereof and as soon as practicable thereafter to the extent the Lender requests, copies of all documentation relating thereto.

4.    CLOSING. The closing of the DIP Loan, and the Lender's obligations to make advances to the Borrower thereunder shall occur on the first business day after the satisfaction of the following conditions precedent (the "Closing Date"):

(a)    Leases. The Borrower shall cause each Mortgagor to furnish copies of all leases presently affecting the Real Property and Improvements, which leases shall be in form and substance satisfactory to the Lender.

(b)    Representations and Warranties. Each and all of the representations and warranties set forth in the DIP Loan Documents shall be true and correct in all respects.

(c)    Fees, Charges and Premiums. The Borrower shall have paid all premiums on insurance policies and bonds, all recording and conveyancing costs assessed against the Borrower (including, without limitation, title insurance premiums), and the legal fees and disbursements of the Lender's counsel in connection with the DIP Loan.

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

(d)  <u>Delivery of DIP Loan Documents.</u> The DIP Loan Documents shall have been duly executed and delivered to the Lender and, where applicable, shall have been recorded or filed in the appropriate public office.

(e)  <u>Final Order.</u> A Final Order entered by the Bankruptcy Court in the Bankruptcy Proceeding in a form acceptable to the Lender at its sole discretion, which shall not have been reversed, stayed, modified or amended without the express written consent of the Lender and no application or motion shall have been made to the Court for any stay, modification or amendment of the Final Order and no stay, or appeal or leave to appeal with respect to the same shall be pending.

(f)  <u>Delivery of Other Documents.</u> The following documents shall have been delivered by or on behalf of the Borrower to the Lender:

(i)  <u>Appraisals.</u> An appraisal of the Real Property and Improvements indicating a fair market value of at least $17,850,000. The appraisal shall be paid for by the Borrower, prepared by an appraiser selected by or acceptable to the Lender, and be acceptable in form and substance to the Lender. In addition, if the term of the DIP Loan is renewed or extended at any and the Lender determines there has been an adverse change in the real estate market since the date of this Agreement or if the Lender determines that the value of the Real Property may have diminished since the date of this Agreement, the Lender shall have the right to require the Borrower to furnish an updated appraisal meeting the same terms and conditions set forth herein with respect to the initial appraisal;

(ii)  <u>Property, Liability and Other Insurance.</u> Evidence of such insurance as the Lender may require, covering any loss, damage or defect to the Real Property and the Improvements or to persons or to other property in, on or about the Real Property and the Improvements, which insurance may be procured through a draw against the DIP Loan and effective as of the Closing Date, including, but not limited to:

(A)  A certificate to the effect that the Mortgagor has procured insurance policies protecting the Mortgagor against any liability for loss or damage to persons or property in, on or around the Real Property and Improvements;

(B)  A certificate evidencing a policy of all risk insurance (with a standard mortgagee clause in favor of the Lender), in an amount and with a company satisfactory to the Lender;

(C)  A certificate evidencing a policy of flood insurance to the extent required by any applicable federal, state or local law, including without limitation the Flood Disaster Protection Act of 1973 (P.L. 93-234) or evidence that the Real Property and Improvements do not lie within a 100-year flood plain;

(D)  If required by the Lender, a certificate evidencing business interruption insurance with rent loss coverage in an amount and with a company acceptable to the Lender.

The aforesaid certificates shall contain the agreement of the insurer to give not less than

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

thirty (30) days notice to the Lender prior to cancellation of such policies or material change in the coverage thereof, and confirmation that no cancellation or change made in the absence of such notice shall be effective as to the Lender. Receipt of the aforesaid certificates of insurance shall not bar the Lender from acquiring other or additional insurance which the Lender reasonable requires due to changed circumstances. The Borrower shall provide an endorsement from each insurer no later than fourteen (14) days after closing.

(iii)   Title Insurance.  At the Borrower's expense, the Mortgage shall be insured by a title insurer acceptable to the Lender as a first line in the amount of $4,500,000.

In the event that the Closing Date does not occur on or before the date that is 90 days after the date of this Agreement, the DIP Loan Documents and the Lender's obligations to make the DIP Loan shall terminate and be of no further force or effect whatsoever.

5.   MAXIMUM RATE OF INTEREST ON LOAN.  Notwithstanding anything to the contrary contained herein or in any other document executed in connection with the DIP Loan, the effective rate of interest on the DIP Loan shall not exceed the maximum effective rate of interest permitted by applicable law or regulation. The Borrower hereby agrees to give the Lender written notice in the event that the Borrower has actual knowledge that an interest payment made to the Lender with respect to this DIP Loan will cause the total interest payments collected in any one year to be usurious under applicable law, and the Lender hereby agrees not to collect knowingly any interest from the Borrower in the form of fees or otherwise which will render this DIP Loan usurious. In the event that such interest would be usurious in the Lender's opinion, the Lender reserves the right to reduce the interest payable by the Borrower or refund any such interest to the Borrower. This provision shall survive Closing hereunder and the repayment of the DIP Loan.

6.   LIMITATION OF LENDER'S LIABILITY.  Except as otherwise provided in the DIP Loan Documents, the rights and benefits of this Agreement shall not inure to the benefit of any third party. Notwithstanding anything to the contrary contained in this Agreement or in any of the other DIP Loan Documents, or any conduct or course of conduct by the Borrower or the Lender or their respective affiliates, agents or employees, neither this Agreement nor any DIP Loan Documents shall be construed as creating any rights, claims or causes of action against the Lender in favor of any other person or entity other than the Borrower.

7.   INDEMNITY.  The Borrower, for itself and all those claiming under or through it, agrees to protect, indemnify, defend and hold harmless the Lender, its participants, and their respective directors, officers and employees, from and against any and all liability, expense, or damage of any kind or nature and from any suits, claims or demands, including reasonable legal fees and expenses, arising out of this Agreement or in connection herewith except on account of the gross negligence or willful misconduct of the Lender. This obligation specifically shall survive the repayment of the DIP Loan Obligations.

8.   DEFAULT.

(a)   Event of Default. The occurrence of any one or more of the following events shall, at the sole option of the Lender, constitute an "Event of Default" hereunder:

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

(i)    The Borrower shall fail to make any payment of principal, interest, costs and/or fees due to the Lender under any of the DIP Loan Documents when due and payable, whether on the Maturity Date or by acceleration or otherwise, and fails to cure same within five (5) calendar days of receipt of written notice thereof from the Lender;

(ii)    The Borrower shall fail to observe or perform any of the non-monetary covenants or agreements on its part to be observed and performed under this Agreement or under any of the other DIP Loan Documents, provided that, to the extent the breach of such non-monetary covenant is curable, the Lender shall provide the Borrower with thirty (30) days notice during which such breach may be cured;

(iii)    Any representation or warranty of the Borrower under the DIP Loan Documents shall be untrue in any material respect when made or shall become untrue in any material respect during the term of the DIP Loan;

(iv)    Any other Event of Default shall occur under any of the DIP Loan Documents;

(v)    Any default by the Borrower under any loan, extension of credit, security agreement, or any other agreement, in favor of any other creditor or person that may materially affect the Collateral or ability to repay the DIP Obligations, or perform their respective obligations under the DIP Loan Documents;

(vi)    Any default by any Guarantor on any of the DIP Loan Documents;

(vii)    A proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, or receivership law shall have been filed by or against any Guarantor.

(viii)    There shall be a material adverse change in the financial condition of the Borrower as determined by the Lender;

(ix)    The entry of an order (a) appointing an interim or permanent trustee in the Bankruptcy Proceeding or the appointment of an examiner or other responsible person with expanded powers in the Bankruptcy Proceeding, (b) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (c) amending, supplementing, staying, reversing, vacating or otherwise modifying the Final Order or any of the DIP Loan Documents; or (d) approving a sale of any assets of the Borrower pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor inconsistent with the terms of this Agreement;

(x)    The filing of a plan in the Bankruptcy Proceeding that (a) does not provide for repayment of the DIP Loan Obligations in full on or before its effectiveness, (b) is not accompanied by a financing commitment or funding source satisfactory to the Lender that is sufficient to satisfy the DIP Loan Obligations and other expenses needed to be paid by the

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

Borrower on or before its effectiveness, or (c) that is not likely to become effective before the Termination Date.

       (xi)  the termination or modification of the Borrower's exclusivity as to the proposal of any plan or reorganization or liquidation;

       (xii)  The Improvements shall be materially injured or destroyed by fire or other casualty for which the cost of restoration is not fully insured and if not fully insured, the Borrower has failed to deposit with the Lender the difference between the insurance proceeds received and the cost of restoration with the Lender in accordance with the terms of the Mortgage;

       (xiii) The death or adjudicated incompetency the individual Guarantor, the dissolution, liquidation, or transfer or disposition (by operation of law or otherwise) for less than adequate consideration of a substantial portion of the assets of the Borrower or any Guarantor;

       (xiv) Without the prior written express consent of the Lender, the direct or indirect transfer (by operation of law or otherwise) of the Real Property of the Borrower or of a substantial part of the assets of the Borrower;

      (b)  <u>Termination.</u> The DIP Loan will be terminated, all of the DIP Loan Obligations shall be immediately due and payable and the Lender shall have no further obligation to make advances on the DIP Loan upon the earlier to occur of (1) the Maturity Date or (2) the date of an Event of Default (the "Termination Date").

      (c)  <u>Acceleration and Remedies.</u> Upon the occurrence of an Event of Default hereunder, in addition to any other rights or remedies available to it hereunder or under any of the DIP Loan Documents or at law or in equity, and without notice, the Lender may exercise any or all of the following rights and remedies as it may deem necessary or appropriate:

       (i)  the DIP Loan Obligations will be immediately due and payable in full;

       (ii)  set off all property of the Borrower now or hereafter at any time in its possession in any capacity whatsoever including but not limited to, any balance or share of any deposit, trust or agency account, as to all of which property the Borrower hereby grants the Lender a lien and security interest;

       (iii)  terminate the Borrower's use of Lender Cash Collateral;

      (d)  <u>Relief from the Automatic Stay.</u> On the date that is five (5) business days after the Termination Date without full payment of the DIP Loan Obligations in full (the "Stay Relief Date"), the Lender shall have relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the DIP Loan Obligations, occupy the Borrower's premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law and may occupy, sell, foreclose upon or otherwise dispose of the Real Property, the Improvements and the Units. During the period from the Termination Date to the Stay Relief Date, the Lender shall not oppose an emergency hearing before the Bankruptcy Court for the sole

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

purpose of contesting whether the Termination Date has occurred. Unless during such period the Bankruptcy Court has entered an order determining that the Termination Date has not occurred and/or is not continuing, the automatic stay, as to the Lender, shall automatically terminate on the Stay Relief Date, without further notice or order.

**LENDER DRAFT
SEPTEMBER 29, 2017**

(e)    Remedies Cumulative, etc.

(i)    No right or remedy conferred upon or reserved to the Lender under any of the DIP Loan Documents, now or hereafter existing at law or in equity or by statute or other legislative enactment, is intended to be or shall be deemed exclusive of any other such right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of the Lender, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefore shall occur. No act of the Lender shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of the Lender shall be separate distinct and cumulative any none shall be given effect to the exclusion of any other. The failure to exercise or delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the DIP Loan Documents, shall not be construed as a waiver or release of the same, or of any Event of Default thereunder, or of any obligation or liability of the Borrower thereunder. Nothing herein, however, shall be construed to prevent the Lender from waiving any condition, obligation or default it should so elect. In the event of such election by the Lender, any waiver, in order to be effective, must be in writing and signed by the Lender, and any such waiver shall be strictly limited in its effect to the condition, obligation or default specified therein and shall not extend to any subsequent condition, obligation or default or impair any right of the Lender with respect thereto.

(ii)    The recovery of any judgment by the Lender and/or the levy of execution under any judgment shall not affect in any manner or to any extent, liens or other security interests in any Collateral, or any rights, remedies or powers of the Lender under any of the DIP Loan Documents or with respect to any Collateral, but such liens and security interests, and such rights, remedies and powers of the Lender shall continue unimpaired as before. Further, the entry of any judgment by the Lender shall not affect in any way the interest rate payable under any of the DIP Loan Documents on any amounts due to the Lender, but interest shall continue to accrue on such amounts at the Default Rate.

(iii)    The Borrower hereby waives presentment, demand, notice of nonpayment protest notice of protest, or other notice of dishonor, and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, the DIP Loan. To the extent permitted by law, Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. The Borrower further waives and releases all procedural errors, defects and imperfections in any proceedings instituted by the Lender under the terms of any of the DIP Loan Documents or with respect to any Collateral.

(iv)    The Borrower agrees that the Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the DIP Loan Documents (and the Borrower hereby waives any notice of any of the foregoing), and that the DIP Loan Documents may be amended, supplemented or modified by the Lender and the other signatory parties and that the Lender may resort to any Collateral in such order and manner as it may think fit, or accept the assignment, substitution, exchange, pledge, or release of all or any portion of any Collateral, for such consideration, or none, as it may require, without in any way affecting

19

the validity of any liens over or other security interest in the remainder of any such Collateral (or the priority thereof or the position of any subordinate holder of any lien or other security interest with respect thereto); and any action taken by the Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Lender, or of any Event of Default, or of any liability or obligation of the Borrower, under any of the DIP Loan Documents.

(f)   Costs and Expenses. Following the occurrence of any Event of Default, the Borrower shall pay upon demand all costs and expenses (including all amounts paid to attorneys, accountants, real estate brokers and other advisors employed by the Lender), incurred by the Lender in the exercise of any of its rights, remedies or powers under any of the DIP Loan Documents or with respect to any Collateral with respect to such Event of Default and any amount thereof not paid promptly following demand therefor together with interest thereon at the Default Rate from the date of such demand, shall become part of the DIP Loan Obligations and shall be secured by the Mortgage and all other Collateral. In connection with and as part of the foregoing, in the event that any of the DIP Loan Documents is placed in the hands of an attorney for the collection of any sum payable thereunder, the Borrower agrees to pay reasonable attorneys fees for the collection of the amount being claimed under the DIP Loan Documents, as well as all costs, disbursements and allowances provided by law, the payment of which sums shall be secured by the Mortgage and all other Collateral.

9. RENEWAL. Provided that the Borrower is in full compliance with all of the terms and conditions of the DIP Loan Documents, and there has been no prior default by the Borrower on any of the DIP Loan Documents, at the Lender's sole discretion, the DIP Loan may be renewed for an additional six months beyond the Maturity Date, upon the same terms and conditions provided in this Agreement, upon the payment by the Borrower of a renewal fee of one percent (1%) of the then-outstanding balance of the DIP Loan paid on the date of the renewal. To the extent required by the Lender, the Borrower shall obtain Bankruptcy Court approval for any renewal period.

10. MISCELLANEOUS.

(a)   Time of the Essence. All dates and time for the performance of the Borrower's obligations set forth herein shall be deemed to be of the essence of this Agreement.

(b)   Broker's and Finder's Fees. The Borrower represents and warrants that it has not dealt with or through any broker or other intermediary in connection with the DIP Loan other than Dorchester Capital, and agrees to indemnify, defend and hold the Lender harmless from and against any loss, liability or damage (including attorneys fees and expenses) arising from any claim for a brokerage fee or finder's fee in connection with the DIP Loan.

(c)   Publicity. The Lender may at its option and in such manner as it may determine, announce and publicize the source of the financing for the Real Property and Improvements to the Borrower.

(d)   Severability. In the event that for any reason one or more of the provisions of this Agreement or their application to any person or circumstance shall be held to be invalid, illegal or unenforceable in any respect or to any extent, such provisions shall nevertheless remain

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

valid, legal and enforceable in all other respects and to such extent as may be permissible. In addition, any such invalidity, illegality or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(e)   Successors and Assigns. This Agreement inures to the benefit of and binds the parties hereto and their respective successors and assigns, and the words "Borrower" and "Lender" where ever occurring herein shall be deemed to include such respective successors and assigns. However, the Borrower shall not involuntarily, or by operation of law, assign or transfer any interest which it may have under this Agreement or convey the Real Property or the Improvements, or any part thereof, without the prior written approval of the Lender, except as otherwise expressly permitted in this Agreement. The Lender may assign or otherwise transfer the DIP Loan and any or all of the DIP Loan Documents to any other person, and such other person shall thereupon become vested with all of the benefits in respect thereof granted to the Lender herein or otherwise. The Lender shall have the right to sell participations in the DIP Loan to any other persons or entities without the consent of or notice to the Borrower under such terms and conditions as the Lender shall deem appropriate at its sole discretion, including, but not limited to, assigning the Lender's rights and remedies after the occurrence of an Event of Default to a participant.  Without the consent of or notice to the Borrower, the Lender may disclose to any prospective purchaser of any securities issued or to be issued by the Lender, and any prospective or actual purchaser of any participation or other interest in the DIP Loan or any other loans made by the Lender to the Borrower, any financial or other information, data or material in the Lender's possession relating to the Borrower, the DIP Loan or the construction of the Improvements.

(f)   Notices. All notices required or desired to be given to either of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when transmitted by electronic mail to the following persons at the following email addresses:

| Borrower: | **ISLAND VIEW CROSSING II, L.P.**<br>**1 SOUTH STATE STREET**<br>**NEWTOWN, PA 18940**<br>**Email: rjg@americorphomes.com** |
|---|---|
| **With a**<br>**Copy to:** | **SMITH KANE HOLMAN, LLC**<br>**112 MOORES ROAD, STE 300**<br>**MALVERN, PA 19355**<br>**ATTENTION: DAVID B. SMITH, ESQUIRE**<br>**Email: dsmith@skhlaw.com** |
| Lender: | **COMMONWEALTH CAPITAL, LLC**<br>**2 BALA PLAZA, SUITE 714**<br>**BALA CYNWYD, PA 19004**<br>**Email: _____** |

with a

copy to:        **EISENBERG, GOLD & AGRAWAL, P.C.**
**1040 NORTH KINGS HIGHWAY, SUITE 200**
**CHERRY HILL, NJ 08034**
**ATTENTION: JANET L. GOLD, ESQUIRE**
Email: jgold@egalawfirm.com

**KLEHR HARRISON HARVEY BRANZBURG, LLP**
**1835 MARKET ST.**
**SUITE 1400**
**PHILADELPHIA, PA 19103**
Email: rbeck@klehr.com

Such notice shall be deemed to be given when transmitted. Whenever the giving of notice is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

(g)    <u>Definitions; Number and Gender.</u> In the event the Borrower consists of more than one person or entity, the obligations and liabilities hereunder of each of such persons and entities shall be joint and several, and the word "Borrower" shall mean all or some or any of them. For purposes of this Agreement, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require.

(h)    <u>Captions.</u> The captions or headings of the paragraphs of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

(i)    <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

(j)    <u>Waiver of Jury Trial; Consent to Jurisdiction and Venue; Consent to Service of Process.</u> **THE BORROWER WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS RELATED TO ANY OF THE DIP LOAN DOCUMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE BORROWER AND THE BORROWER ACKNOWLEDGES THAT NEITHER THE LENDER NOR ANY PERSON ACTING ON BEHALF THEREOF HAS OR HAVE MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THE BORROWER FURTHER ACKNOWLEDGES THAT THE BORROWER HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED BY THE BORROWER'S OWN FREE WILL, AND THAT THE BORROWER HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. THE BORROWER AGREES THAT THIS IS A BUSINESS LOAN AND THAT THE OBLIGATIONS EVIDENCED BY THIS AGREEMENT ARE EXEMPTED**

LENDER DRAFT
SEPTEMBER 29, 2017

TRANSACTIONS UNDER THE TRUTH-IN-LENDING ACT, 15 U.S.C. SECTION 1601, ET SEQ. THE BORROWER FURTHER ACKNOWLEDGES THAT THE BORROWER HAS READ AND UNDERSTANDS THE MEANING OF THIS WAIVER PROVISION. THE BORROWER HEREBY CONSENTS TO THE JURISDICTION OF THE COURT OF COMMON PLEAS OF BUCKS OR MONTGOMERY COUNTY PENNSYLVANIA OR THE UNITED STAES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA FOR ANY PROCEEDING IN CONNECTION HEREWITH. IF THE LENDER BRINGS ANY ACTION OR SUIT TO ENFORCE ANY OR ALL OF THE BORROWER'S OBLIGATIONS UNDER THE DIP LOAN DOCUMENTS, SERVICE OF PROCESS MAY BE MADE UPON THE BORROWER BY MAILING A COPY OF THE SUMMONS BY PREPAID CERTIFIED FIRST CLASS MAIL, RETURN RECEIPT REQUESTED, TO THE BORROWER, AND IN SUCH EVENT THE BORROWER HEREBY WAIVES ANY AND ALL OBJECTIONS TO SUFFICIENCY OF SERVICE OF PROCESS. THE FOREGOING SHALL BE DEEMED INDEPENDENT COVENANTS.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above set forth.

ISLAND VIEW CROSSING II, L.P.
By Its General Partner,
Island View Properties, Inc.

ATTEST:

By:_____          By:_____ (SEAL)
           , Secretary                          Renato Gualtieri, President


COMMONWEALTH CAPITAL, LLC


By:_____          By:_____ (SEAL)
                                                Chandler Hoopes, Vice President

**LENDER DRAFT**
**SEPTEMBER 29, 2017**

## EXHIBIT A

**Exhibit A to Debtor-In-Possession Business Loan Agreement between Commonwealth Capital, LLC and Island View Crossing II, L.P. dated \_\_\_, 2017.**

**ALL THAT CERTAIN** lot or piece of land, situate in Bristol Borough, Bucks County, Pennsylvania described according to Plan of Subdivision dated March 29, 2000, revised May 1, 2000 and recorded in Plan Book 300 Page 96, as follows, to wit:

**BEGINNING** at a point on the Southeasterly side of Radcliffe Street (SR 2002), a corner of Lot No. 2 on said Plan; thence extending from said point of beginning along said Lot No. 2, South 54 degrees 04 minutes 10 seconds East 694.13 feet to a point in line of the Delaware River; thence extending along the same, the two following courses and distances: (1) South 21 degrees 17 minutes 52 seconds West 271.88 feet; and (2) South 33 degrees 23 minutes 27 seconds West 718.45 feet to a point, a corner of lands now or late of Bucks County Redevelopment Authority; thence extending along the same the three following courses and distances, viz: (1) North 54 degrees 04 minutes 50 seconds West 450.19 feet; (2) South 35 degrees 55 minutes 10 seconds West 36.63 feet; and (3) North 54 degrees 04 minutes 10 seconds West 344.47 feet to a point on the Southeasterly side of Radcliffe Street, aforesaid; thence extending along the same, North 35 degrees 55 minutes 50 seconds East 1017.52 feet to the first mentioned point and place of beginning.

**BEING** Lot No. 1 on said Plan.