## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | **CHAPTER 11** |
| | : | |
| **ISLAND VIEW CROSSING II, L.P.** | : | **BANKRUPTCY NO. 17-14454(ELF)** |
| | : | |
| **Debtor** | : | |
| | : | |

**MOTION OF TRUSTEE FOR ENTRY OF FINAL ORDER AUTHORIZING (I) TRUSTEE TO OBTAIN SECURED POSTPETITION FINANCING PURSUANT TO §§105, 361, 364(c)(1) AND 364(d)(1) OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001, (II) TRUSTEE TO ENTER INTO THE LOAN DOCUMENTS; (III) GRANTING AN ALLOWED SUPER PRIORITY ADMINISTRATIVE EXPENSE CLAIM WITH PRIORITY OVER ANY AND ALL ADMINISTRATIVE EXPENSES OF THE KIND SPECIFIED IN BANKRUPTCY CODE SECTION 503(b) OR 507(b); (IV) GRANTING A LIEN ON ALL ASSETS OF THE ESTATE (EXCEPT FOR THE EXCLUDED ASSETS) SENIOR TO ALL OTHER LIENS (EXCEPT FOR THE PERMITTED LIENS) PURSUANT TO SECTION 364(d)(1) OF BANKRUPTCY CODE; (V) APPROVING THE RELEASE OF LIENS AGREEMENT BETWEEN THE TRUSTEE AND PRUDENTIAL BANK PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; AND (VI) GRANTING RELATED RELIEF**

Kevin O'Halloran, the Trustee ("Trustee") for Island View Crossing II, L.P. (the "Debtor"), by and through his counsel, Karalis PC, hereby moves this Court for the entry of a final order authorizing (i) Trustee to obtain secured post-petition financing pursuant to §§105, 361, 364(c)(1) and 364(d)(1) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001; (ii) Trustee to enter into the loan documents; (iii) granting an allowed super priority administrative expense claim with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Section 503(b) or 507(b);  (iv) granting a lien on all assets of the estate (except for the Excluded Assets (as hereinafter defined)) senior to all other liens (except for the Permitted Liens (as hereinafter defined)) pursuant to section 364(d)(1) of Bankruptcy Code; (v) approving the Release of Liens Agreement (as hereinafter defined) between the Trustee and Prudential Bank ("Prudential") pursuant to Federal Rule of Bankruptcy Procedure

9019; and (vi) granting related relief (the "Motion").  In support of these requests, the Trustee states as follows:

## Bankruptcy Rule 4001(c)(1)(B) Concise Statement

Below is the Trustee's Concise Statement pursuant to Bankruptcy Rule 4001(c)(1)(B) with cross references to the applicable paragraphs in Loan Agreement (also referred to at times as "LA").  The Loan transaction, if approved by this Court, provides for the following:[1]

a. *Borrower:*  Island View Crossing II, L.P. (by the Trustee on behalf of the Debtor).

b. *Lender:*  BKRE Investments LLC, an Ohio limited liability company ("Lender").

c. *Loan Amount:* $4,700,000.00 on a revolving basis. *See LA at 2.1.*

d. *Use of Proceeds:* The proceeds of the Loan shall be used to fund the costs to complete the construction of (i) the 14 buildings, including existing buildings numbered 4 and 2, in Phase 1 containing a total of 73 Residential Units, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition precedent to the Trustee being able to sell and settle on the 73 Residential Units in Phase 1, and (iv) a clubhouse (to be designed) which will be located in Phase 2, payment of real estate taxes, principal and interest payments to RDA, fees and expenses associated with retention of architectural, engineering, surveyor, and design service professionals to prepare all applicable plans required for the approval and construction of Phase 2 of the Project, and the Carve-Out for the Trustee and his professionals.  *See LA at 2.3.*

e. *Fees and Costs:* An origination fee in the amount of $45,000.00; the cost of an appraisal report for the Project and Lender's legal fees not to exceed $25,000 will be paid on the Closing Date as Loan Advances under the Loan. *See LA at 4.2.*

f. *Interest Rate:* Interest on outstanding Loan Advances will accrue quarterly from the date of each Loan Advance until final payment thereof at the fixed rate of nine and one-quarter percent (9.25%) per annum.  Default Rate of Interest is 10.25%. *See LA at 3.1 and 3.2.*

---

[1] This summary of the Loan Documents is intended only to assist interested parties in examining the key aspects of the Loan and are qualified in their entirety by reference to the Loan Documents the terms of which shall govern.

g.   *Interest Accrual:* No quarterly interest payments shall be due or payable to Lender until after Trustee has closed on the sale of no less than thirty (30) Residential Units with all such unpaid monthly interest payments to accrue until paid. At the Trustee's sole discretion and subject to available cash flow, the Trustee may commence making monthly interest payments to Lender at any time prior to closing on the thirtieth (30th) Residential Unit. Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed. *See LA at 3.1.*

h.   *Mandatory Release Payments:* The mandatory release payments from the proceeds of sale of each Residential Unit in Phase 1 are as follows:

   i.   the Lender shall release its lien on the first fifteen (15) Residential Units sold for no payment to Lender, subject to the mandatory release payments to RDA and Prudential at the closing of each Residential Unit **(see below sections on Adequate Protection Payments to RDA and Prudential)**. *See LA at 8.1.*

   ii.   the Lender shall release its lien at the time of the sale of the sixteenth (16th) to thirtieth (30th) Residential Units for the payment of fifteen thousand Dollars ($15,000.00) to Lender at time of each closing to be applied to reduce the principal balance of the Loan, subject to the mandatory release payments to RDA and Prudential at the closing of each Residential Unit **(see below sections on Adequate Protection Payments to RDA and Prudential)**. *See LA at 8.2.*

   iii.   the Lender shall release its lien at the time of the sale of the thirty first (31st) Residential Unit and for each Unit thereafter for the payment of thirty thousand Dollars ($30,000.00) to Lender at time of each closing to be applied to reduce the principal balance of the Loan, subject to the mandatory release payments to RDA and Prudential at the closing of each Residential Unit **(see below sections on Adequate Protection Payments to RDA and Prudential)**. *See LA at 8.3.*

   iv.   Notwithstanding, anything otherwise contained herein, upon the sale of Residential Units in Building 11 (Residential Units numbered 31, 32, 33, 34, 35 & 36), Building 12 (Residential Units numbered 25, 26, 27 28, 29 & 30), and Building 13 (Residential Units numbered 22, 23 & 24), the Lender will  only release its lien on each of these Residential Units subject to the receipt of seventy (70%) of the Net Proceeds from the sale of each Residential Unit in Buildings 11, 12 and 13 to be applied to reduce the principal balance of the Loan.   For purposes of this section, "Net Proceeds" shall mean the proceeds from the sale of each said Residential

3

Unit remaining after (i) payment of $12,350.00 to RDA in accordance with the Existing Cross Subordination Agreement to be applied to reduce the principal balance of the Existing RDA Loan, (ii) payment of the amount of $25,000 or $45,000 to Prudential, as applicable in accordance with the Release of Liens Agreement to be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, (iii) payment of any approved broker's fee associated with the sale of the Residential Unit, (iv) payment of any post-petition municipal claim or real estate taxes due for the Residential Unit and (v) any normal and customary closing costs. *See LA at 8.4.*

i.   *Loan Term:* 30 months with an option to extend for additional 6 months at the request of the Trustee, so long as Loan is not in default. There is no fee due for the exercise of the 6 month extension. *See LA at 4.7.*

j.   *Grant of Administrative Expense Claim:* Pursuant to Bankruptcy Code Section 364(c)(1) the Loan shall be secured by an allowed administrative expense claim with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b). *See LA at 5.1.*

k.   *Grant of Liens:* As further security for the Loan but junior to the Permitted Liens (as hereinafter defined), the Loan shall also be secured in accordance with Section 364(d)(1) of the Bankruptcy Code by the Mortgage encumbering the Project senior and superior to all other existing liens, claims, and/or security interests, and proceeds thereof including, (i) the Existing Mortgages of Prudential, (ii) Existing Judgment of McElderry Drywall, Inc., (iii) Existing Judgment of Bohler Engineering, (iv) Existing Judgments of Former Prospects and (v) the Existing Borough Judgment.  Notwithstanding anything otherwise contained herein to the contrary, the lien of the Lender's Mortgage shall not prime the Permitted Liens. *See LA at 5.2.*

l.   *Permitted Liens:*  shall mean (i) the liens created by the Existing Real Estate Taxes, (ii) the liens created by the Existing Mortgages of the RDA and (iii) the encumbrances created by the Existing Cross Subordination Agreement. *See LA at 1.1.(oo).*

m.   *Assets that remain Unencumbered*:  The Claim and Lien granted to Lender to secure the Loan shall not encumber (i) any claims arising under Chapter 5 of the Bankruptcy Code and proceeds thereof, (ii) any claims and defenses of the Debtor/Trustee against Prudential including the lender liability litigation/adversary proceeding pending before the Bankruptcy Court and

4

proceeds thereof, and (iii) any claims and defenses of the Debtor/Trustee against any creditor, affiliate of the Debtor, or other person and proceeds thereof. *See LA at 5.3.*

n.   *Adequate Protection to RDA:* From the Loan, the Debtor will cure post-petition interest and principal arrearages owing to the RDA and will remain current on all future quarterly interest and annual principal payments required under the RDA loan documents and at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, make a payment of $12,350.00 to RDA be applied to reduce the principal balance of the Existing RDA Loan. *See LA at 8.*

o.   *Adequate Protection to Prudential:* At the time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Release of Liens Agreement, make a payment of $25,000 to Prudential be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and at the time of closing on the sale of each of the remaining thirty-eight (38) Residential Units in Phase 1 in accordance with the Release of Liens Agreement, a payment of $45,000 to Prudential be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58. *See LA at 8.*

p.   *Events of Default:* Events of default include (i) failure to make payments when due and which is unremedied for a period of 15 days after the due date; (ii) failure to pay the principal, any unpaid interest or other sums payable hereunder at the stated maturity date; (iii) failure to duly perform or observe any obligation, covenant or agreement on its part contained with the Loan Agreement and such failure continues unremedied for a period of 30 days after written notice; (iv) untrue representations or warranties; (v) if Debtor seeks to amend, supplement, stay, vacate or modify the Final Order approving the Loan, (vi) if the Bankruptcy Case is dismissed or converted or the Bankruptcy Court enters an order granting relief from the automatic stay to any party other than Lender with respect to any property of the Debtor's estate having a value in the aggregate of more than One Hundred Thousand Dollars ($100,000.00); (vii) the occurrence of an Event of Default under the Mortgage; or (viii) a plan is filed with the Bankruptcy Court that is inconsistent with the terms of the Loan Agreement or any of the Loan Documents. *See LA at 13.1.*

q.     *Carve-Out:* The liens and security interests granted to the Lender and the Super-Priority Administrative Claim conferred upon the Lender to secure the Loan shall all be subject and subordinate to the payment of the following expenses that have been incurred prior to an Event of Default (to the extent that there are not sufficient, unencumbered funds in the Debtor's estate to pay such amounts at the time payment is required to be made): (i) the Professional Fees and Expenses identified in Section 5.5 of the Loan Agreement and approved by the Bankruptcy Court for the Trustee and the Professional Persons retained and employed by the Trustee; (ii) the Trustee's commission pursuant to 11 U.S.C. §326 based on the Trustee's disbursements (the "Trustee's Commission"); (iii) fees required to be paid to the Clerk of the Bankruptcy Court; and (iv) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts described in the preceding clauses (i), (ii), (iii) and (iv) are collectively called the "Carve-Out"). *See LA at 5.5.*

r.     *Professional Person:* shall mean each professional retained and employed by the Trustee pursuant to Sections 327 or 1103 of the Bankruptcy Code, including, without limitation, Karalis P.C. ("KPC"), the attorneys for Trustee and Newbridge Management, LLC ("Newbridge"), financial advisors for Trustee, any accountant retained to prepare tax returns for the Debtor, and any broker retained to market and sell the Residential Units. *See LA at 1.1.(vv).*

s.     *Perfection of Mortgage Lien:* The entry of the Final Order will grant the Lender a valid and perfected first priority lien on the Project owned by the Debtor subordinate only to the Permitted Liens and authorize Lender to record the Open-End Mortgage and Assignment of Rents and Leases against the real property owned by the Debtor to secure the Loan in favor of Lender. *See LA at 1.1.(jj) and 5.2.*

## Preliminary Statement

By this Motion, the Trustee is requesting the entry of a final order (a) authorizing the Trustee on behalf of the Debtor to enter into the Construction Loan and Security Agreement ("Loan Agreement"), the Promissory Note ("Note"), and the Open-End Mortgage and Assignment of Rents ("Mortgage") attached hereto as Exhibits "A", "B" and "C", respectively (collectively, the "Loan Documents") with BKRE Investments, LLC, an Ohio limited liability company ("Lender"), to obtain a post-petition revolving credit facility in the amount of $4,700,000 ("Loan") as set forth in the Loan Documents and (b) approving the Release of Liens

Agreement (as hereinafter defined) providing *inter alia* Prudential's consent to the Loan, mandatory release payments, release of liens, subordination of certain Prudential mortgages recorded against the Project (as hereinafter defined), treatment of existing letters of credit, and reservation of rights of Trustee, Debtor and Prudential.  The Release of Liens Agreement is attached hereto as Exhibit "D" (the "Release of Liens Agreement").  The Final Order (the "Final Order") is attached as Exhibit "E".

## Debtor's Residential Subdivision Project

The Debtor owns a residential subdivision (the "Project") containing approximately 17.51 acres located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119), which was approved for development in two phases, Phase 1 is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements (hereinafter defined as Phase 1) and Phase 2 is currently approved for six (6) buildings containing a total of 96 condominiums units and certain site improvements, as may be amended (hereinafter defined as Phase 2).  In Phase 1, two buildings, building number 4 (townhouse units 41, 42, 43, 44, 45, 46 and 47) and building number 2 (townhouse units 7, 8, 9, 10 and 11) are at different stages of completion.  The terms townhouse(s) and condominium unit(s) are hereinafter individually referred to as a "Residential Unit" and collectively, as "Residential Units"

## Financing will enable Completion and Sale of Phase 1 of the Project

The proposed financing will enable the Trustee, among other things, to complete the construction of (i) the 14 buildings, including existing buildings numbered 4 and 2, in Phase 1 containing a total of 73 Residential Units, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition precedent to the Trustee being able to sell and settle on the 73 Residential Units in Phase 1, and (iv) a clubhouse (to be designed) which will be located in Phase 2.  The projected period to construct and sell the 73 Residential Units is

30 months.  The Trustee has prepared a budget ("Budget") identifying the projected revenues and costs associated with the completion and sale of the 73 Residential Units in Phase 1 of the Project and the proposed release payments on account of the Loan, the RDA Loan (as hereinafter defined) and Prudential's Existing Construction Loan (as hereinafter defined).  A copy of the Budget is attached to this Motion as Exhibit "F".

The Budget reflects that the construction and sale of the 73 Residential Units in Phase 1 of the Project will result in inter alia the following:

1.      The Loan being repaid in full;

2.      All post-petition real estate taxes and municipal claims being paid;

3.      Subject to the terms of the Existing Cross Subordination Agreement (as hereinafter defined), the RDA (as hereinafter defined) being paid:

    i.      release of lien payments totaling $901,550.00 from the sale of the 73 Residential Units in Phase 1 (73 x $12,350.00),

    ii.     the amount required to cure post-petition interest and principal arrearages owing to the RDA, and

    iii.    all future quarterly interest and annual principal payments required under the RDA Loan.

    After the sale of the 73 Residential Units in Phase 1, the RDA loan balance will be approximately $277,000.00;

4.      Subject to the terms of the Release of Liens Agreement, Prudential being paid release of lien payments totaling $2,585,000.00 from the sale of the 73 individual Residential Units in Phase 1 (35 units x $25,000.00; and 38 units x $45,000) to be applied to reduce the principal balance of the Existing Prudential Construction Loan (as hereinafter defined) as set forth in the proof of claim filed by Prudential Bank in this Bankruptcy Case identified on the Bankruptcy Court's claim register as secured claim no. 23 in the amount of $4,092,443.58.  After the sale of the 73 Residential Units in Phase 1, the Existing Prudential Construction Loan principal balance will be approximately $1,507,443.58;

5.      After the above stated payments are paid, the Trustee projects he will also have the following remaining assets in the Debtor's estate to monetize and/or liquidate for the benefit of creditors:

8

    i.       Phase 2 of the Project which is approved for 96 condominium units;

    ii.      any claims and defenses of the Debtor/Trustee against Prudential including the lender liability litigation/adversary proceeding pending before the Bankruptcy Court and proceeds thereof;

    iii.     any claims arising under Chapter 5 of the Bankruptcy Code; and

    iv.     any claims and defenses of the Debtor/Trustee against any creditor, affiliate of the Borrower, principal, or other person and proceeds thereof.

### <u>Jurisdiction & Venue</u>

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 361, 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### <u>Background</u>

#### <u>The Bankruptcy Case</u>

4.      The Debtor was formed as a Pennsylvania limited partnership in June of 2003. Upon information and belief, in September of 2011, the original general and limited partners of the Debtor sold their interests in the Debtor to Island View Properties, Inc., which became the Debtor's general partner, and Renato J. Gualtieri who became the Debtor's sole limited partner.

5.      On June 30, 2017 (the "Petition Date"), the Debtor filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code.

6.      The Debtor owns the Project. Since the Petition Date, the Debtor has been operating its businesses and managing its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code until the Interim Trustee was appointed and the

Debtor was removed from possession.

7.    As of the date of the filing of this Motion, no official committee of creditors has been appointed or designated.

8.    On December 18, 2017, this Honorable Court entered an Order directing the appointment of a Chapter 11 Trustee.

9.    On December 21, 2017, the United States Trustee filed an Application for Order Approving the Appointment of Christine C. Shubert as the interim Chapter 11 Trustee (the "Interim Trustee") which application was approved pursuant to a Court Order entered on the same day.

10.    A meeting of creditors commenced on January 11, 2018 which was continued and concluded on January 29, 2018 for the purpose of electing a Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(b)(1) and Fed.R.Bankr.P. 2007.1.

11.    On January 30, 2018, the United States Trustee for Region 3 filed its Report of Undisputed Election which provided, inter alia, that the Trustee was elected to serve as the trustee in this bankruptcy proceeding.

12.    The Trustee engaged in negotiations with Prudential and the Lender to obtain post-petition financing to complete Phase 1 of the Project.  The Trustee kept the Redevelopment Authority of Bucks County (the "RDA") informed of the status of the discussions regarding the post-petition financing to develop Phase 1 of the Project.

13.    After many hours of negotiation, the Trustee reached an agreement with the Lender to advance the Loan which is reflected in the Loan Documents.

14.    Also after many hours of negotiation, the Trustee reached an agreement with Prudential on critical issues that resulted in Prudential consenting under certain conditions set forth in the Release of Liens Agreement between the Trustee and Prudential, to the Trustee

10

obtaining the Loan and the grant of a priority mortgage lien to Lender that will prime all of the

Existing Prudential Mortgages, the release of the Prudential existing liens subject to the payment

of a stipulated release price to allow for the sale of Residential Units at the Project, the

subordination of certain Prudential mortgages so as to create a path towards the formulation of a

plan of reorganization all of which are set forth in the Release of Liens Agreement.    The

provisions of the Release of Liens Agreement are explained in greater detail later in this Motion.

**Construction and Sale of Residential Units in Phase 1 of the Project**

15.    The Trustee also engaged in negotiations with McGrath & Son Development

LLC, d/b/a McGrath Homes, an independent contractor, who the Trustee will retain as his

"Construction Manager" to (i) construct and complete the 73 Residential Units in Phase 1 of the

Project, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are

required as a condition to being able to sell and settle on the 73 Residential Units in Phase 1, and

(iv) a clubhouse (to be designed) which will be located in Phase 2.

16.    In connection with the Trustee's construction and sale of the Residential Units in

Phase 1 of the Project, the Trustee will need to hire and compensate the Construction Manager

and various subcontractors, engineers, architects and tradespeople.    These entities and

individuals are not "professionals" as that term is used in Section 327 of the Bankruptcy

Code, whose retention must be approved by this Honorable Court.  For this reason, these

entities will be employed by the Trustee as normal course vendors required in operation of

the business and therefore are not required to file fee applications for approval or

payment of their fees. *See, e.g., In re Napoleon,* 233 B.R. 910, 913 (Bankr. D. N.J. 1999)

("In order to be considered a 'professional person' within the meaning of § 327, it is not

enough that the party be a professional by education or training.  Instead he or she must also

play an integral role in the administration of the bankruptcy case."); *In re That's Entm't*

11

*Mktg Grp., Inc.,* 168 B.R. 226, 230 (N.D. Cal. 1994) (only the retention of professionals whose duties are central to the administration of the estate require prior court approval under section 327 of the Bankruptcy Code); *In re Madison Mgmt. Grp., Inc.,* 137 B.R. 275, 283 (Bankr. N.D. 111. 1992) (same); *In re Sieling Assocs. Ltd. P'ship,* 128 B.R. 721, 723 (Bankr. E.D. Va. 1991) (same); *In re Johns-Manville Corp),* 60 B.R. 612, 619-21 (Bankr. S.D.N.Y. 1986) (stating that only those professionals involved in the actual reorganization effort, rather than debtor's ongoing business, require approval under Section 327 of the Bankruptcy Code); *In re Seatrain Lines, Inc.,* 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981) ("[P]ersons in occupations ordinarily considered professions are not necessarily professionals whose retention by the estate requires court approval.  For the purposes of section 327(a), 'professional person' is limited to persons in those occupations which play a central role in the administration of the debtor proceeding").

17.    The Trustee also explored other strategic options regarding the Project including an auction sale of the Project subject to higher and better bids but determined that the highest and best value is to complete the construction and to sell the 73 Residential Units in Phase 1 of the Project and thereafter, explore how best to maximize the value for Phase 2 of the Project.  Other than as set forth in the Release of Liens Agreement, Prudential and the Trustee have not reached an agreement on the development of Phase 2 of the Project or with respect to Prudential's liens and claims on Phase 2.

**Existing Mortgages against the Project and Letters of Credit for Site Improvements**

18.    The Debtor acquired the Project from the RDA.  The RDA provided an acquisition loan to the Debtor in the original principal amount of $2,500,000 (the "RDA Loan").  In connection with the RDA Loan, the Debtor granted to RDA the two (2) below stated mortgages recorded against the Project in favor of the RDA:

12

a.      Mortgage in the amount of $2,500,000.00 dated June 13, 2003 and recorded on August 25, 2003 in land record Book 3537, Page 792 (Instrument No. 20030163787); and

b.      Open-End Mortgage and Security Agreement in the amount of $127,627.83 dated July 21, 2016 and recorded on July 22, 2016 as instrument number 2016043135).

19.     The liens securing the RDA loan shall be senior to the liens being granted to the Lender to secure the Loan.

20.     Prior to the Petition Date, the Debtor granted to Prudential the four (4) below stated mortgages, assignment of rents and leases, recorded against the Project in favor of Prudential and UCC-1's filed by Prudential with Department of State of the Commonwealth of Pennsylvania (collectively, hereinafter referred to as the "Existing Mortgages of Prudential"):

a.      Collateral mortgage in the amount of $3,911,250 dated September 20, 2011 and recorded on October 19, 2011 in Land Record Book 6838, Page 230 (Instrument No. 2011070888) (the "Steeple Run Collateral Mortgage");

b.      Mortgage in the amount of $1,400,000 dated September 22, 2013 and recorded on September 27, 2013, instrument number 2013080879 (the "IVC- Durham Mortgage");

c.      Collateral mortgage in the amount of $5,136,000 dated May 30, 2014 and recorded on July 23, 2014, instrument number 2014038527(the "Calnshire Collateral Mortgage");

d.      Open-End Mortgage and Security Agreement in the amount of $5,541,468 dated November 26, 2014 and recorded on January 7, 2015 as instrument number 2015001098 (the "Mortgage for Existing Prudential Construction Loan");

e.      Assignment of Rents and Leases and Agreements of Sale recorded as instrument number  2015001143 filed in conjunction  with the Mortgage for Existing Prudential Construction Loan;

f.      UCC-1 filed on September 27, 2013 in the Bucks County Recorder of Deeds Office as instrument number 2013080881 naming Island View Crossing, II, L.P. as Debtor and

Prudential as Secured Party; and

g.    UCC-1 filed on January 4, 2015 in the Bucks County Recorder of Deeds Office as instrument number 2015001161 naming Island View Crossing, II, L.P. as Debtor and Prudential as Secured Party.

21.    In accordance with the Release of Liens Agreement, Prudential has consented to the liens being granted to the Lender to secure the Loan shall be senior to the Existing Mortgages of Prudential.

22.    The Trustee and Debtor  have reserved their rights, claims and defenses as to all the Existing Mortgages of Prudential as more fully set forth in the Release of Liens Agreement. Prudential has also reserved all of its rights, claims and defenses with respect to the Existing Mortgages of Prudential, including the right to assert that these mortgages are valid, binding and unavoidable, as well as any claim for accrued and accruing post-petition interest, costs and attorney's fees under Section 506 of the Bankruptcy Code.

23.    Prior to the Petition Date, Prudential issued two (2) letters of credit in connection with the development of site improvements at the Project as follows:

a.    an irrevocable standby letter of credit No. IVC-2 for $293,445.50 issued by Prudential to Aqua Pennsylvania, Inc. for the Island View Crossing II, LP Public Improvements in connection with that certain builder's extension agreement dated September 4, 2015 by and between the Debtor and Aqua Pennsylvania, Inc. for the construction of a water main extension to provide water to the Project ("Aqua Letter of Credit"); and

b.    an irrevocable standby letter of credit No. IVC-1 for $2,090,381.19 issued by Prudential to the Borough of Bristol and Bristol Borough Water and Sewer Authority for the Island View Crossing II, LP Subdivision Development Improvements in connection with the Subdivision Financial Security Agreement dated March 4, 2015 by and among the Borough, Bristol Borough

14

Water & Sewer Authority, the Debtor and the Prudential for the installation of the public improvements required for development of the Project (the "Borough Letter of Credit").

24.    The undrawn balances under each letter of credit are as follows:

a.    Borough Letter of Credit is $1,231,087.02; and

b.    Aqua Letter of Credit is $30,000.00.

25.    Prior to the Petition Date, the Debtor, Prudential and RDA entered into a cross subordination agreement dated December 10, 2014 memorializing certain agreements among the parties dated December 10, 2014 (the "Existing Cross Subordination Agreement"). A copy of the Existing Cross Subordination Agreement is attached as Exhibit "G".

**Existing Judgments against the Project and Real Estate Taxes**

26.    A commitment for title insurance as of February 2, 2018 was procured by the Trustee which reveals inter alia the below stated judgments (a) through (f) as liens against the Project (collectively, the "Judgments"), a copy of the title report is attached as Exhibit "H":

a.    a judgment against Debtor in favor of the Borough of Bristol filed on April 22, 2016 (No. 2016-71251) in the amount of $56,239.22  ("Existing Borough Judgment");

b.    a judgment entered in favor of Bohler Engineering PA, LLC against Debtor filed on January 5, 2017 (No. 2017-00032) in the amount of $48,853.63 ("Existing Judgment of Bohler Engineering");

c.    a judgment entered in favor of Monica Caione against Debtor, Americorp Homes and Island View Crossing II, Inc. filed on February 28, 2017 (No. 2016-04021) in the amount of $30,990.00 ("Caione Judgment");

d.    a judgment entered in favor of Samira Ranganathan and Khandulans Ranganathan against Debtor filed on June 19, 2017 (No. 2016-05724) in the amount of $49,980.00 ("Ranganathan Judgment");

      e.     a judgment entered in favor of Frank Del Grasso against Debtor, Island View Crossing II, Inc., Americorp Realty LLC, Americorp Homes LLC, and Americorp Real Estate Development LLC filed on March 23, 2017 (No. 2016-06685) in the amount of $27,250.00 ("Del Grasso Judgment" and at times, collectively, with the Caione Judgment, and Ranganathan Judgment the "Existing Judgments of Former Prospects"); and

      f.     a judgment entered in favor of McElderry Drywall, Inc. against Americorp Homes, Inc. and Debtor filed **after the Petition Date** on August 10, 2017 (No. 2016-06868) in the amount of $42,730.16.  This judgment appears to be voidable under the Bankruptcy Code.  However, McElderry Drywall, Inc. also filed a proof of claim identifying $33,286.00 as due it based on a default judgment entered on February 22, 2017 (No. 2016-05868) ("Existing Judgment of McElderry Drywall Inc.").  See POC No. 17.

27.     The liens being granted to the Lender to secure the Loan shall prime and be senior to the Existing Borough Judgment, Existing Judgement of Bohler Engineering, the Existing Judgments of Former Prospects and the Existing Judgment of McElderry Drywall Inc.

28.     The Borough of Bristol and Bohler Engineering have advised the Trustee that they will not object to the Existing Borough Judgment and Existing Judgment of Bohler Engineering being primed by the lien to be granted to the Lender to secure the Loan.

29.     The Bucks County Tax Claim Bureau has filed a proof of claim identifying $118,436.82 of unpaid pre-petition real estate taxes for the Project.  See POC No. 1.

30.     After the Petition Date, real estate taxes in connection with the Project have been accruing.

31.     The liens securing unpaid real estate taxes shall remain senior to the liens being granted to the Lender to secure the Loan.

**Claims asserted by Debtor and Prudential against each Other**

16

32.     Prior to the Petition Date, the Debtor asserted claims against Prudential in a state court complaint filed on or about March 31, 2016 in the matter of, *Island View Properties, Inc. trading as Island View Crossing II, LP, and Renato J. Gualtieri v. Prudential Savings Bank*, Case No. 160303161 (C.C.P., Phila. Cty.), that has since been removed to the Bankruptcy Court and assigned Adversary No. 17-00202(ELF) (the "Adversary Proceeding" and at times also referred to as the "Lender Liability Litigation/Adversary Proceeding").

33.     Prudential has asserted claims against the Debtor, having filed the following proofs of claim: (i) Claim No. 23 in the amount of $4,092,443.58 (filed as secured) and (ii) Claim No. 24 in the amount of $1,470,569.25 (filed as secured) (collectively, the "Proofs of Claim"). In the Lender Liability Litigation/Adversary Proceeding, Prudential asserts claims against the Debtor in excess of Twelve Million Dollars ($12,000,000.00), some of which relate to the alleged debts covered by the Proofs of Claim and some of which relate to loans to entities other than the Debtor for which collateral mortgages were granted by the Debtor, including the Steeple Run Collateral Mortgage, and the Calnshire Collateral Mortgage (collectively, the "Collateral Mortgages"). The Proofs of Claim, Prudential's rights/claims under the Collateral Mortgages and any other current or future claims of Prudential against the Debtor are referred to collectively as the "Prudential Claims."

34.     The Trustee has retained Steven M. Coren, Esquire and Kaufman, Coren & Ress, P.C. (collectively, "KC&R") as his special litigation counsel, on a contingent fee basis, in connection with the Lender Liability Litigation/Adversary Proceeding (as existing or as may be amended) and the dispute over and/or challenge to the Prudential Claims, including any such challenge in the Adversary Proceeding or other proceedings (which may include a request to avoid and/or equitably subordinate the Prudential Claims).

35.     The Trustee, Debtor and Prudential have each reserved all claims and defenses against each other as to Lender Liability Litigation/Adversary Proceeding and the Prudential Claims as more fully set forth in the Release of Liens Agreement, including the rights of each party to seek to add additional claims and parties.

**The Agreement between Prudential and Trustee Providing for the Release of Liens, Subordination of Certain Mortgages and Related Relief**

36.     As set forth above, the Trustee and Prudential entered into the Release of Liens Agreement whereby <u>inter alia</u> Prudential consents to the Trustee obtaining the Loan with the Lender to complete Phase 1 of the Project, release of certain of Prudential's liens in exchange for the release payments, subordination of certain Prudential mortgages and related relief.   The Trustee seeks approval of the Release of Liens Agreement.

37.     The Release of Liens Agreement provides, <u>inter alia</u> as follows:

       (a)    <u>Prudential's Consent to Loan</u>.  Subject to the mandatory release payments set forth therein, Prudential consents to the Loan, Trustee entering into the Loan Agreement and the granting of senior claims and liens to Lender to secure the Loan that will be senior and with priority over Prudential's existing liens arising from the Existing Mortgages of Prudential, and reservation of rights of Trustee, Debtor and Prudential as set forth in the Release of Liens Agreement.

       (b)    <u>Release payments to RDA</u>.  Mandatory release payment of $12,350 to RDA from the sale of each Residential Unit in Phase 1 of the Project in accordance with, and in full satisfaction of the Prudential obligations with respect to each unit, under the Existing Cross-Subordination Agreement to be applied to reduce the principal balance of the Existing RDA Loan and to release the RDA lien on the Residential Unit sold.

       (c)    <u>Release Payments to Prudential</u>.  Mandatory release payment of $25,000 to Prudential from the sale of each of the first 35 Residential Units in Phase 1 of the Project and $45,000 to Prudential from the sale of each of the remaining 38 Residential Units in Phase 1 of the Project which will be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Prudential as secured in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

       (d)    <u>Balance of Existing Prudential Construction Loan</u>.  The unpaid balance due under the Existing Prudential Construction Loan shall be due and payable to Prudential on

the last business day of the forty-second (42nd) month after the entry of a final order approving the Loan (the "Existing Prudential Construction Loan Maturity Date").

(e)    <u>Subordination of Steeple Run Collateral Mortgage</u>.  Concurrent with the execution of the Release of Liens Agreement, Prudential shall deliver to Trustee (in recordable form) a subordination agreement of the Steeple Run Collateral Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims (as defined in the Release of Liens Agreement) in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  The Subordination Agreement will also provide that at the time of each closing on the sale of a Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of this mortgage to the Trustee without any charge or payment. The Trustee/Debtor preserves its claim to void or otherwise invalidate the Steeple Run Collateral Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

(f)    <u>Subordination of Calnshire Collateral Mortgage</u>.    Concurrent with the execution of this Agreement, Prudential shall deliver to Trustee (in recordable form) a subordination agreement of the Calnshire Collateral Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.   The Subordination Agreement will also provide that at the time of each closing on the sale of each Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of this mortgage to the Trustee without any charge or payment.  The Trustee/Debtor preserves its claim to void or otherwise invalidate the Calnshire Collateral Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

(g)    <u>Subordination of IVC-Durham Mortgage</u>.  Concurrent with the execution of this Agreement, Prudential shall deliver to Trustee (in recordable form) a subordination agreement of the IVC-Durham Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.   The Subordination Agreement will also provide that at the time of each closing on the sale of each Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of this mortgage to the Trustee without any charge or payment.   The Trustee/Debtor preserves its claim to void or otherwise invalidate the IVC-Durham Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

(h)    <u>Permitted Claims</u>.  Permitted Claims is defined in the Release of Liens Agreement to mean: claims arising from (i) the Loan, (ii) allowed Administrative Claims, (iii) allowed Priority Tax Claims, (iv) allowed secured claims, (v) allowed Priority Non-Tax Claims, and (vi) allowed general unsecured claims excluding claims held by insiders (as that term is defined by the Bankruptcy Code and applicable case law); provided however, allowed fee claims of counsel retained by the Debtor are specifically excluded.

(i)    <u>Release of Clubhouse and Common Elements</u>.  In addition to the above releases and subordination of Existing Mortgages of Prudential, Prudential shall deliver to Trustee (in recordable form) for no charge or payment, a release of its liens arising from (i) the Steeple Run Collateral Mortgage, (ii) the Calnshire Collateral Mortgage, and (iii) the IVC-Durham Mortgage in connection with the clubhouse (to be designed and built) and the common elements at the Project at the time that the Trustee is legally obligated to, and in fact conveys said clubhouse and common elements to the applicable master association, homeowners' association and/or condominium association for the Project as set forth in the Release of Liens Agreement.

(j)    <u>Existing Letters of Credit Issued by Prudential</u>.  Prudential represents that the Borough Letter of Credit and the Aqua Letter of Credit are irrevocable and it will not cancel either letter of credit without the prior written consent of the Trustee.  Prudential further agrees that it will take no action that will cause the Borough or Aqua of Pennsylvania to draw monies under either letter of credit.  Any advances made by the Prudential after the date of the Release of Liens Agreement (the "Advances") to the Borough under the Borough Letter of Credit (not to exceed the undrawn balance of $1,231,087.02) or to Aqua of Pennsylvania under the Aqua Letter of Credit (not to exceed the undrawn balance of $30,000.00) shall constitute an allowed claim under the Existing Prudential Construction Loan and will increase the principal amount due under the Existing Prudential Construction Loan by the amount of the advance but will not impact or change the release prices set forth above; provided, however the Prudential must deliver written notice to Trustee and his counsel no later than five (5) business days before it makes any advance under the Borough Letter of Credit or the Aqua Letter of Credit.  Advances, if any, by Prudential as set forth above shall be due and payable on the Existing Prudential Construction Loan Maturity Date, as set forth in the Release of Liens Agreement, and not subject to challenge, deduction or setoff.

(k)    <u>Reservation of Rights of Trustee, Debtor and Prudential</u>.

i.    The Trustee, the Debtor and its estate preserve, retain and may hereafter assert any and all claims and defenses of the Debtor and its estate against Prudential arising out of or in connection with the Debtor's relationship with Prudential, including but not limited to: (i) the pre-petition claims asserted in a state court complaint filed on or about March 31, 2016  in the matter of, *Island View Properties, Inc. trading as Island View Crossing II, LP, and Renato J. Gualtieri v. Prudential Savings Bank*, Case No. 160303161 (C.C.P., Phila. Cty.), that has since been removed to the Bankruptcy Court and assigned Adversary No. 17-00202(ELF) (the "Adversary Proceeding"); (ii) additional claims to be asserted in the Adversary Proceeding or in any other proceeding such as, by way of example only, avoidance claims under Chapter 5 of the Bankruptcy Code (as relate to the Pre-Petition Project Advances or otherwise), and/or equitable subordination claims under the Bankruptcy Code (as relate to the Pre-Petition Project Advances or otherwise); and, (iii) the right to assert by way of claim or defense that

Prudential is not entitled to recover or to be paid for the Pre-Petition Project Advances and/or that Prudential's rights as to the Pre-Petition Project Advances should be equitably subordinated to the claims of others. Prudential likewise reserves and preserves all of its rights claims and defenses, including any defenses under the terms of the all of the prepetition loan documents and applicable law, as well as the right to bring additional claims or join in third parties into any proceeding, or to assert additional rights, or claims in the Bankruptcy Case or Adversary Proceeding.

ii.    The payments paid under the Release of Liens Agreement on account of the Existing Prudential Construction Loan shall not constitute a waiver, release or discharge of any claims or defenses of the Trustee or the Debtor all of which are expressly preserved, including the Trustee/Debtor's right to challenge Prudential's entitlement to be repaid for any or all of the Pre-Petition Project Advances. Prudential likewise reserves and preserves all of its rights claims and defenses, including any defenses under the terms of the prepetition loan documents and applicable law, as well as the right to bring additional claims or join in third parties into any proceeding.

iii.    The  payments paid under the Release of Liens Agreement on account of the Existing Prudential Construction Loan shall not prejudice or impair any of the Trustee/Debtor's claims or defenses in any manner or based on any theory whatsoever, and Prudential waives any right to assert the defenses of waiver, release, collateral estoppel, issue preclusion or res judicata as relates to the Trustee/Debtor's claims or defenses, including any such claims or defenses related to the Pre-Petition Project Advances, and similarly Prudential preserves and reserves its rights to claim the same adverse to the Trustee or the  Debtor regarding any actions pre-petition.

iv.    Notwithstanding sub-paragraphs (k)(i), (k)(ii) and (k)(iii) above, to the extent any payments are paid under the Release of Liens Agreement on account of the Existing Prudential Construction Loan, they shall not be subject to set off by the Debtor or Trustee, even in the event that the recovery arising from the prosecution of the claims of the Debtor in the Adversary Proceeding, or otherwise, exceeds the Pre-Petition Project Advances. The Debtor therefore waives and confirms that it shall have no right to set off against any payments paid under this Agreement on account of the Existing Prudential Construction Loan. Prudential retains the rights, claims and defenses it has under its loan documents, and applicable law, which shall not be waived by virtue of the Prudential's agreement to enter into the Release of Liens Agreement, as well as the right to assert additional claims against the Debtor relating to the prepetition relationship between the Debtor and Prudential. Prudential waives any claim, defense or right to assert that by agreeing to the Release of Liens Agreement or the payment of the payments on account of the Existing Prudential Construction Loan, that the Debtor is waiving any right or claim that its alleged damages exceed the Pre-Petition Project Advances. To the extent the payments on account of the Existing Prudential Construction Loan are paid under the Release of Liens Agreement before the Debtor/Trustee's claims and defenses have been finally adjudicated, such payments shall be deemed made under protest and shall be subject to recovery (but not by way of setoff) if the Debtor/Trustee prevails, as well as any applicable defenses raised by Prudential to same.

38.    The discussion of the terms contained in the Release of Liens Agreement is intended as a summary only and all parties in interest are encouraged to read the Release of Liens Agreement.  To the extent that there are any discrepancies between the summary contained in the Motion and the terms contained in the Release of Liens Agreement, the terms of the Release of Liens Agreement shall control.

### Need for Post-Petition Financing

39.    The Trustee does not have the working capital and financing needed to complete the construction of the 73 Residential Units in Phase 1 of the Project and to administer the Debtor's bankruptcy estate, and has been unsuccessful in his attempt to obtain financing more favorable from sources other than the Lender or on more favorable terms than those set forth in the Loan Agreement.

40.    The Trustee, absent receipt of funds from the Loan, will be unable to complete Phase 1 of the Project and to pay the post-petition operating expenses associated with the completion of Phase 1 as they come due.

41.    Based on the foregoing, the Trustee has requested that the Lender provide the Loan in order to, inter alia, (i) allow the Trustee to pay the post-petition obligations required to complete the construction and sale of Phase 1 of the Project, (ii) to pay the post-petition obligations as they come due, and (iii) to allow for the administration of the Debtor's estate.

42.    The ability for the Project to remain viable depends upon obtaining the Loan requested by this Motion.

43.    The Budget attached as Exhibit "G" reflects the expected revenue from the construction and sale of Phase 1 of the Project, the operating costs and payment of existing secured claims.

44.     The Trustee projects, subject to the Loan being approved, that the completion and sale of the 73 Residential Units in Phase 1 of the Project shall result, in a substantial reduction of the existing secured debt and remaining assets that would be available to pay the remaining creditors.  The Trustee's analysis is set forth in the Preliminary Statement on pages 7 to 9 of this Motion.

### The Proposed Loan

45.     The Trustee has determined in the exercise of his business judgment, that the Debtor's estate requires a post-petition credit facility in amount of $4,700,000.00 in order to complete and sell the 73 approved Residential Units in Phase 1 of the Project.

46.     Subject to this Court's approval, the Trustee has determined to enter into Note, Loan Agreement, and Mortgage with the Lender to finance the completion of Phase 1 of the Project.

47.     The Lender has agreed to make the Loan to the Trustee but only in accordance with, and on the terms and conditions set forth in, the Loan Documents.  The material terms of the Loan Documents are summarized below.[2]

48.     **The Loan**.  Lender agrees to make the Loan to Trustee, the proceeds of which will be advanced pursuant to the terms of the Loan Agreement and shall not exceed the aggregate principal amount of Four Million Seven Hundred Thousand Dollars ($4,700,000.00).   The Trustee may borrow from time to time, repay and re-borrow to the principal sum of $4,700,000.00 on a revolving basis pursuant to the terms of the Loan Agreement.

---

[2]  This summary of the Loan Documents is intended only assist interested parties in examining the key aspects of the Loan and are qualified in their entirety by reference to the Loan Documents the terms of which shall govern.

Case 17-14454-elf   Doc 341   Filed 08/17/18   Entered 08/17/18 17:16:06   Desc Main
Document    Page 24 of 43

49.   **Interest Rate**.   Interest shall accrue at an annual rate of 9.25%.   Upon the

occurrence and during the continuation of any event of default by the Debtor, interest on the

Loan shall be payable at an annual rate of 10.25% .

50.   **Collateral**.  All obligations under the  Loan Documents will be secured by grant

of the priority administrative claim and senior priming lien on all property of the Debtor and its

estate identified below (the "Collateral"):

a.   <u>Priority Administrative Claim</u>.   Pursuant to Bankruptcy Code Section

364(c)(1) the Loan shall be secured by an allowed administrative expense claim with priority

over any and all administrative expenses of the kind specified in Bankruptcy Code Sections

503(b) or 507(b).

b.   <u>Senior Priming Mortgage Lien</u>.  As further security for the Loan but junior

to the Permitted Liens, the Loan shall also be secured in accordance with Section 364(d)(1) of

the Bankruptcy Code by the Mortgage encumbering the Project senior and superior to all other

existing liens, claims, and/or security interests, and proceeds thereof including, (i) the Existing

Mortgages of Prudential, (ii) Existing Judgment of McElderry Drywall, Inc., (iii) Existing

Judgment of Bohler Engineering, (iv) Existing Judgments of Former Prospects and (v) the

Existing Borough Judgment.   Notwithstanding anything otherwise contained herein to the

contrary, the lien of the Lender's Mortgage shall not prime the Permitted Liens.  Permitted Liens

means (i) the liens created by the Existing Real Estate Taxes, (ii) the liens created by the Existing

Mortgages of the RDA and (iii) the encumbrances created by the Existing Cross Subordination

Agreement.   The Collateral shall not include (i) any claims arising under Chapter 5 of the

Bankruptcy Code and proceeds thereof, (ii) any claims of the Debtor/Trustee against Prudential

Savings Bank including the Lender Liability Litigation/Adversary Proceeding and proceeds

thereof, and (iii) any claims and defenses of the Debtor/Trustee against any creditor, Affiliate of the Borrower or other Person and proceeds thereof.

51.    **Use of Proceeds**.    The proceeds of the Loan shall be used to fund the costs to complete the construction of (i) the 14 buildings, including existing buildings numbered 4 and 2, in Phase 1 containing a total of 73 Residential Units, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition precedent to the Trustee being able to sell and settle on the 73 Residential Units in Phase 1, and (iv) a clubhouse (to be designed) which will be located in Phase 2, fees and expenses associated with retention of architectural, engineering, surveyor, and design service professionals to prepare all applicable plans required for the approval and construction of Phase 2 of the Project, and the Carve-Out for the Trustee and his professionals pursuant to the provisions of the Loan Documents and the Final Order.

52.    **Loan Payments**.

a.    Interest Accrual. No quarterly interest payments shall be due or payable to Lender until after Trustee has closed on the sale of no less than thirty (30) Residential Units with all such unpaid monthly interest payments to accrue until paid.  At the Trustee's sole discretion and subject to available cash flow, the Trustee may commence making monthly interest payments to Lender at any time prior to closing on the thirtieth (30th) Residential Unit.  Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed and will accrue quarterly.

b.    Mandatory Release Payments.    The Trustee shall pay the following mandatory release payments from the proceeds of sale of each Residential Unit in Phase 1:

i.    the Lender agrees to release its lien on the first fifteen (15) Residential Units sold for no payment to Lender, subject to the following terms and conditions: the Trustee (i) paying the RDA at time of closing on the sale of each Residential Unit in

accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan, and (ii) paying to Prudential at time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Release of Liens Agreement, a payment of $25,000 to be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

ii.      the Lender agrees to release its lien at the time of the sale of the sixteenth (16th) to thirtieth (30th) Residential Units for the payment of fifteen thousand Dollars ($15,000.00) to Lender at time of each closing to be applied to reduce the principal balance of the Loan, subject to the following terms and conditions: the Trustee (i) paying the RDA at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan, and (ii) paying to Prudential at time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Release of Liens Agreement, a payment of $25,000 to be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

iii.      the Lender agrees to release its lien at the time of the sale of the thirty first (31st) Residential Unit and for each Unit thereafter for the payment of thirty thousand Dollars ($30,000.00) to Lender at time of each closing to be applied to reduce the principal balance of the Loan, subject to the following terms and conditions: the Trustee (i) paying the RDA at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan, (ii) paying to Prudential at time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Release of Liens Agreement, a payment of $25,000 to be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and (iii) paying to Prudential at time of closing on the sale of each of the remaining thirty-eight (38) Residential Units in Phase 1 in accordance with the Release of Liens Agreement, a payment of $45,000 to be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

iv.      Notwithstanding, anything otherwise contained herein, upon the sale of Residential Units in Building 11 (Residential Units numbered 31, 32, 33, 34, 35 & 36), Building 12 (Residential Units numbered 25, 26, 27 28, 29 & 30), and Building 13 (Residential Units numbered 22, 23 & 24), the Lender will  only release its lien on each of these Residential

Units subject to the receipt of seventy (70%) of the Net Proceeds from the sale of each Residential Unit in Buildings 11, 12 and 13 to be applied to reduce the principal balance of the Loan. For purposes of this section, "Net Proceeds" shall mean the proceeds from the sale of each said Residential Unit remaining after (i) payment of $12,350.00 to RDA in accordance with the Existing Cross Subordination Agreement to be applied to reduce the principal balance of the Existing RDA Loan, (ii) payment of the amount of $25,000 or $45,000 to Prudential, as applicable in accordance with the Release of Liens Agreement to be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, (iii) payment of any approved broker's fee associated with the sale of the Residential Unit, (iv) payment of any post-petition municipal claim or real estate taxes due for the Residential Unit, and (v) any normal and customary closing costs.

53.    **Maturity Date**. The term of the Loan is thirty (30) months after the closing date on the Loan; provided however, if the Loan is not in default, at the request of the Trustee, the term may be extended for an additional period of six (6) months at no additional cost to the Trustee.

54.    **Events of Default**. The events of default under the Loan include (i) failure to make payments when due and which is unremedied for a period of 15 days after the due date; (ii) failure to pay the principal, any unpaid interest or other sums payable hereunder at the stated maturity date; (iii) failure to duly perform or observe any obligation, covenant or agreement on its part contained with the Loan Agreement and such failure continues unremedied for a period of 30 days after written notice; (iv) untrue representations or warranties; (v) if Debtor seeks to amend, supplement, stay, vacate or modify the Final Order approving the Loan, (vi) if the Bankruptcy Case is dismissed or converted or the Bankruptcy Court enters an order granting relief from the automatic stay to any party other than Lender with respect to any property of the Debtor's estate having a value in the aggregate of more than One Hundred Thousand Dollars ($100,000.00); (vii) the occurrence of an Event of Default under the Mortgage; or (viii) a plan is

filed with the Bankruptcy Court that is inconsistent with the terms of the Loan Agreement or any
of the Loan Documents.

55.   **Fees and Costs**.   The Trustee shall pay the Lender on the closing date of the
Loan, an origination fee in the amount of $45,000.00, the cost of the appraisal report for the
Project, and Lender's legal fees not to exceed $25,000 as Loan Advances under the Loan.

56.   **Carveout for Trustee and his Professionals**.   The liens, security interests and
administrative claim granted to the Lender to secure the Loan shall all be subject and subordinate
to the payment of the following expenses that have been incurred prior to an Event of Default (to
the extent that there are not sufficient, unencumbered funds in the Debtor's estate to pay such
amounts at the time payment is required to be made): (i) the Professional Fees and Expenses
identified in Section 5.5 of the Loan Agreement and approved by the Bankruptcy Court for the
Trustee and the Professional Persons retained and employed by the Trustee; (ii) the Trustee's
commission pursuant to 11 U.S.C. §326 based on the Trustee's disbursements (the "Trustee's
Commission"); (iii) fees required to be paid to the Clerk of the Bankruptcy Court; and (iv)
quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts described in
the preceding clauses (i), (ii), (iii) and (iv) are collectively called the "Carve-Out"); provided,
however, that no proceeds of the Loan and no amounts received pursuant to the Carve-Out shall
be used to pay any professional fees and expenses or any other costs incurred in connection with
(1) commencing any claims, causes of actions or contested matters against the Lender, including,
without limitation, discovery proceedings subsequent to the commencement of any such claims
or causes of action; (2) preventing, hindering or delaying performance or enforcement by Lender
of its rights or remedies under the Final Order approving the Loan or any of the Loan
Documents; or (3) challenging the Liens granted to Lender to secure the Loan.   The Carve-Out
shall be reduced by the sum of (i) the amount of unencumbered funds in the Debtor's estate

28

which are used to satisfy the unpaid allowed fees and expenses of the Trustee's Professional

Persons and the Trustee's Commission, and (ii) payments paid by the Debtor's estate on account

of the allowed professional fees and expenses of the Trustee's Professional Persons and the

Trustee's Commission.  Upon entry of the Final Order, Lender shall make a Loan Advance

against Professional Fees and Expenses in the amount of $100,000 to Karalis PC on account of

its fees and costs incurred in connection with this Bankruptcy Case, to be paid as and when

allowed by the Bankruptcy Court.  Within 90 days after the entry of the Final Order, Lender shall

make an additional Loan Advance against Professional Fees and Expenses in the amount of

$50,000 to be used by Trustee to pay allowed fees and expenses of the Trustee's Professional

Persons and the Trustee's Commission.  Within 180 days after the entry of the Final Order,

Lender shall make an additional Loan Advance against Professional Fees and Expenses in the

amount of $50,000 to be used by Trustee to pay allowed fees and expenses of the Trustee's

Professional Persons and the Trustee's Commission. Thereafter, additional Loan Advances to

fund payment of fees and expenses of the Trustee's Professional Persons and the Trustee's

Commission will be released only at the sole discretion of Lender after receipt of a request from

Borrower.  The Lender's Carve-Out obligations shall survive the termination or expiration of the

Loan Agreement.

### Request for Approval of Loan

57.    It is essential that the Trustee obtain access to post-petition financing, without

which the Trustee will be unable to complete and sell the 73 Residential Units in Phase 1 of the

Project.  The continuing viability of the Debtor's estate and its ability to reorganize depend upon

the expeditious approval of the Loan and the related relief.

58.    The Loan Agreement requires that the Trustee grant Lender an allowed

administrative expense claim pursuant to Bankruptcy Code Section 364(c)(1) with priority over

any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b) as security for the Loan.

59.     As further security for the full and timely payment and performance of the Debtor's obligations under the Loan but junior to the Permitted Liens, the Loan must also be secured in accordance with Section 364 (d)(1) of the Bankruptcy Code by the Mortgage to be recorded against the Project and which will be senior and superior to all other existing liens, claims, and/or security interests, and proceeds thereof.

60.     Section 364(d)(1) and (2) provides inter alia as follows:

(d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)  In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

See 11 U.S.C. § 364(d)(1) and (2).

61.     The Permitted Liens will not be primed by the senior lien to be granted to the Lender to secure the Loan. As set forth above, "Permitted Liens" mean (i) the liens created by the Existing Real Estate Taxes, (ii) the liens created by the Existing Mortgages of the RDA, and (iii) the encumbrances created by the Existing Cross Subordination Agreement.

62.     In accordance with the Release of Liens Agreement, Prudential consents to all of its existing liens including the liens of the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, the Calnshire Collateral Mortgage, and the Mortgage for Existing Prudential Construction Loan being primed by the senior lien to be granted to the Lender to secure the

Loan.  Subject to the Release of Liens Agreement, Prudential reserves all rights and claims arising from the Subordinated Mortgages.

63.    In addition, the Borough of Bristol and Bohler Engineering have advised the Trustee that they will not object to the Existing Borough Judgment and Existing Judgment of Bohler Engineering being primed by the lien to be granted to the Lender to secure the Loan.

64.    Therefore, the only existing liens that have not taken a position to being primed by the senior lien to be granted to the Lender (collectively, the "Judgments being Primed") are as follows:

| | | |
|---|---|---|
| (a) | Caione Judgment | $ 30,990.00 |
| (b) | Ranganathan Judgment | $ 49,980.00 |
| (c) | Del Grasso Judgment | $ 27,250.00 |
| (d) | McElderry Drywall Inc. | $ 33,286.00 |
| | Total | $141,506.00 |

65.    Except for Judgments being Primed, the Trustee believes that no other person or entity currently holds an interest in the Project that has not responded yet to the relief requested by the Motion and, therefore, the Lender is not being granted security interests senior to any other existing creditor except for the four (4) judgments set forth in the immediately preceding paragraph.

66.    The Trustee has been unable to obtain financing on more favorable terms from sources other than the Lender pursuant to, and for the purposes set forth in the Loan Documents. Specifically, the Trustee is unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections

503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, (d) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, (e) credit for money borrowed secured by a lien equal to the existing liens on property of the estate that is subject to a lien, or (f) credit for money borrowed secured by a lien senior to the existing liens on property of the estate subject to a lien, in each case, on more favorable terms and conditions than those provided in the Loan Documents and this Final Order. The Trustee also is not able to obtain credit for borrowed money without granting the Lender the senior lien set forth in this Motion. The Lender was not willing to make the Loan on any basis other than as set forth in the Loan Agreement.

67.    The Trustee has concluded that he could not have obtained a post-petition credit facility to meet the financing needs of the Debtor on terms more favorable than those contained in the Loan Agreement, or with liens to collateralize the Loan with a lesser priority than those being required by Lender. The Trustee believes that the Judgments being Primed by the Loan are adequately protected.

68.    It is essential that the Trustee immediately instill in the subcontractors, suppliers, and potential buyers of Residential Units a confidence in the Debtor's ability to complete and sell Phase 1 of the Project. Absent such confidence, the Trustee will not have the resources or support necessary to preserve the value of the Debtor's business as a going concern.

69.    If this Motion is denied or delayed, the Trustee's ability to sell the Debtor's Residential Units in Phase 1 as a going concern will be impaired.

70.    In the Trustee's business judgment, the Loan is the best financing option available under the circumstances for the Debtor. The terms of the Loan are fair and reasonable and are in the best interest of the Debtor's estate.

71.    The terms of the Loan are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Therefore, the Lender should be afforded the benefits of § 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the Loan, or any Final Order of this Court in connection with the Loan, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## Adequate Protection

### Release of Liens Agreement Adequately Protects the Judgments being Primed

72.    The Trustee believes that _inter alia_ the Judgments being Primed are adequately protected because of the provisions of the Release of Liens Agreement.

73.    Presently, the Judgments being Primed are subordinate and junior to the liens of all the Existing Mortgages of Prudential.

74.    Subject to approval of the Loan and the Release of Liens Agreement, the distribution priority of the Judgments Being Primed is improved because of the provisions of the Release of Liens Agreement.

75.    For example, the subordination agreements to be delivered to the Trustee under the Release of Liens Agreement in connection with the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, and the Calnshire Collateral Mortgage provide for the subordination of the Prudential liens and claims of these mortgages for priority, distribution and payment purposes to all Permitted Claims[3] so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from

---

[3] Permitted Claims is defined in the Release of Liens Agreement to mean: claims arising from (i) the Loan, (ii) allowed Administrative Claims, (iii) allowed Priority Tax Claims, (iv) allowed secured claims, (v) allowed Priority Non-Tax Claims, and (vi) allowed general unsecured claims excluding claims held by insiders (as that term is defined by the Bankruptcy Code and applicable case law); provided however, allowed fee claims of counsel retained by the Debtor are specifically excluded.

the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.

76.    All of the Judgments being Primed including the Existing Borough Judgment and Existing Judgment of Bohler constitute Permitted Claims under the subordination agreements to be delivered by Prudential to the Trustee.

77.    The subordination agreements will also provide that at the time of each closing on the sale of a Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, the Bank will deliver a release of the lien of these mortgages to the Trustee without any charge or payment. The Trustee/Debtor also preserved its claim to void or otherwise invalidate the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, and the Calnshire Collateral Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

78.    The subordination agreements improve the distribution priority of the Judgments being Primed including the Existing Borough Judgment and Existing Judgment of Bohler because they will only be subordinate to the Prudential Existing Construction Loan which has a balance due of $4,092,443.58.  A benefit in lien position for distribution purposes valued in excess of $8.3 million.

79.    In comparison, if the Loan and the Release of Liens agreement are not approved, the Judgments being Primed will remain junior and subordinate to all the Existing Prudential Mortgages debt including the mortgage liens of the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, or the Calnshire Collateral Mortgage which are asserted by Prudential to be in excess of $12,409,975.65.

80.    The Release of Liens Agreement also provides the mechanism by which the Trustee may sell each Residential Unit subject only to the payment of the mandatory release

price set forth therein, leaving the balance of the sale proceeds available to the Trustee to complete Phase 1 of the Project and to fund a plan. This release mechanism enhances the probability that the completion of Phase 1 of the Project will be successful.

81.    Approval of the Loan and the Release of Liens agreement will put the Trustee on track to complete and sell Phase 1 of the Project and will enhance the likelihood that the Judgments being Primed will be paid under a plan of reorganization.

82.    Accordingly, the Trustee believes that the interests of the holders of Judgments being Primed are adequately protected.

**Existing Equity Cushion in the Project Adequately Protects the Judgments being Primed**

83.    The Bankruptcy Court in its oral bench opinion issued on December 18, 2017, in connection with four related cases, the Debtor's case, Calnshire Estates, LLC, Steeple Run, LP and One State Street Associates, L.P. indicated that the Debtor's own appraiser opined that the present value of the Project is $17.8 million while Prudential offered expert testimony that the present value of the Project is $11,940,000. The Court further indicated that it believes the value of the Project falls somewhere between the two appraisals.

84.    Assuming the value of the Project is an amount equal to the average of the two appraisals presented to this Court at the prior hearing when the Debtor sought to obtain post-petition financing, the approximate value would be $14,870,000. The Trustee believes that the value of the Project is greater than the average of the two prior appraisal reports.

85.    Subject to the Loan and the Release of Liens Agreement being approved, the following is a summary of the Trustee's estimation of the amounts owing as of the Petition Date on account of all liens on the Project with all such claims being set forth in their expected order of priority:

| Lienholder | Amount |
|---|---|
| Bucks County Tax Claim Bureau | $   118,436.82 |
| RDA | $2,054,023.87 |
| Steeple Run Collateral Mortgage | $          .00[4] |
| IVC-Durham Mortgage | $          .00[4] |
| Calnshire Collateral Mortgage | $          .00[4] |
| Existing Prudential Construction Loan | $4,092,443.58 |
| Existing Borough Judgment | $    56,239.22 |
| Existing Judgment of Bohler Engineering | $    48,853.63 |
| Existing Judgment of McElderry Drywall Inc. | $    33,286.00 |
| Caione Judgment | $    30,990.00 |
| Del Grasso Judgment | $    27,250.00 |
| Ranganathan Judgment | $    49,980.00 |
| Total | $6,511,503.12 |

86.     Even though the total liens against the project total $6,511,503.12, the existing

liens of the Bucks County Tax Claim Bureau ($118,436.82) and the RDA ($2,054,023.87) which

---

[4] This claim is at zero because the subordination agreements in connection with the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, and the Calnshire Collateral Mortgage to be delivered to the Trustee upon approval of the Release of Liens Agreement, inter alia provide that Prudential subordinated the liens and claims of these mortgages for priority, distribution and payment purposes to all Permitted Claims (as defined below) so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court. The subordination agreements also provide that so long and to the extent the Permitted Claims have not been paid in full, the Bank will deliver a release of the lien of these mortgages to the Trustee without any charge or payment. Finally, the Trustee/Debtor also preserves its claim to void or otherwise invalidate the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, and the Calnshire Collateral Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

total $2,172,461 will retain their senior lien position and are not being primed by the liens being granted to the Lender to secure the Loan.

87.    Prudential by the provisions of the Release of Liens Agreement has agreed to limit any recovery on its asserted liens for the purposes of the Financing Motion to the $4,092,443.58 Existing Construction Loan Mortgage and consents to being primed by the liens granted to the Lender to secure the Loan.  The disputes, claims and defenses among the Debtor, Trustee and Prudential as to the Subordinated Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, and the Calnshire Collateral Mortgage Mortgages are subject to the Reservation of Rights language contained in the Release of Liens Agreement.

88.    Likewise, the Borough of Bristol and Bohler Engineering have advised the Trustee that they will not object to the Existing Borough Judgment and Existing Judgment of Bohler Engineering being primed by the lien to be granted to the Lender to secure the Loan.

89.    Therefore, the total value of the Judgments being Primed that have not responded yet to the relief requested by the Motion is only $141,506.00.  As set forth above, the subordination agreements to be provided by Prudential to the Trustee improve the distribution priority of the Judgments being Primed because if the Loan and Release of Liens Agreement are approved, the Judgments being Primed will only be subordinate to the Prudential Existing Construction Loan which has a balance due of $4,092,443.58.  A benefit in lien position for distribution purposes excess of $8.3 million.  Further, all of the Judgments being Primed constitute Permitted Claims under the subordination agreements to be delivered by Prudential to the Trustee.  Therefore, the probability of the Judgments being Primed being paid under a plan of reorganization has been increased exponentially.

90.    The Loan if approved will increase the amount of the total liens against the Project from $6,511,503.12 to $11,211,503.12.  However, since the Judgments being Primed

(that have not responded to the relief requested) total only $141,506 and the Release of Liens Agreement provides for a greater likelihood that they will be paid under a plan, the equity cushion should be sufficient.

91.    To provide a 20% equity cushion for these claims, an additional $2,242,301 of value is needed or a collateral value of $13,453,804.  Based on the prior appraisal reports, the collateral value for the Project provides more than an adequate equity cushion for all the liens against the Project (inclusive of the Loan).

92.    Equally as important, the major creditors of this bankruptcy case are supportive of the Trustee's efforts to complete Phase 1 of the Project.  Further, the terms of the Loan are reasonable and favorable to the Trustee and support the Trustee's ability to successfully complete Phase 1 of the Project.

93.    In addition, the provisions of the Release of Liens agreement alone and the Prudential subordination agreements to be delivered in connection therewith, provide a substantial enhancement to all holders of existing liens (including the Judgments being Primed) and constitute adequate protection of their interests.

94.    Without post-petition funding, the Trustee lacks the cash to build out and ultimately complete Phase 1 of the Project, which is the first step required in order to maximize the value of Phase 1, Phase 2, and to maximize the return to creditors in this case.

95.    In the sound exercise of its business judgment and fiduciary duties, the Trustee has determined to proceed to seek this Court's authorization to obtain the Loan.

### Notice

96.    Bankruptcy Rule 4001 provides that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than 14 days

after service of such motion.  The scheduled date for the Hearing allows for greater than a 14 day notice period.

97.    Concurrent with the filing of this Motion, the Trustee, through his counsel, is serving this Motion and notice of the hearing via ECF transmission, e-mail, or first class mail upon (a) the Office of the United States Trustee, (b) counsel for the Lender, (c) counsel for Prudential, (d) counsel for RDA, (e) each creditor that is being primed or their counsel, (f) all applicable taxing authorities, including (i) the Internal Revenue Service; (ii) the Commonwealth of Pennsylvania, Department of Labor and Industry; (iii) the Commonwealth of Pennsylvania, Department of Revenue; (iv) counsel for the Bucks County Tax Claim Bureau; and (g)   all parties who have requested notice pursuant to Bankruptcy Rule 2002.

98.    In addition, concurrent with the filing of this Motion, the Trustee, through his counsel, is serving notice of the hearing on this Motion and deadline to respond by first class mail, postage prepaid, upon all creditors listed on the Debtor's matrix mailing list in this Bankruptcy Case.

## BASIS TO APPROVE THE RELEASE OF LIENS AGREEMENT

99.    Federal Rule of Bankruptcy procedure 9019(a) provides "on motion by the trustee and after notice and a hearing, the Court may approve a compromise or settlement.  The decision to approve or disapprove a settlement is within the sound discretion of the bankruptcy judge." *See*, *In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996).

100.    The Trustee seeks approval, pursuant to Bankruptcy Code § 105 and Fed.R.Bankr.P. 9019, of the settlement of the claims among the Parties as set forth in the Agreement.

101.    In *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, *reh'g denied*, 391 U.S. 909 (1968), the Supreme Court instructed as

to those factors to be considered in determining whether to approve a settlement.  The factors

outlined by the Supreme Court in *Anderson* have been uniformly summarized as follows:

      a.      the probability of success in the litigation;

      b.      the complexity of the litigation involved and the expense, inconvenience and
delay necessarily attending it;

      c.      the difficulties, if any, to be encountered in the matter of collection; and

      d.      the paramount interest of the creditors.

*See*, *Martin*, 91 F.3d at 393 (3d. Cir. 1996); *In re Marvel Entertainment Group, Inc.*, 222

B.R. 243, 249 (D. Del. 1998); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997); *In re*

*Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir.

1993); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

102.     Bankruptcy Rule 9019 authorizes this Court to approve the settlement entered into

by the Plaintiff.  The decision whether to accept or reject a compromise is committed to the

sound discretion of the Bankruptcy Court, "which must determine if the compromise is fair,

reasonable, and in the interest of the estate."  *See*, *Louis's*, 211 B.R. at 801.  *See also*, *In re*

*Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

103.     The settlement need not be the best that the debtor could have achieved, but must

only fall "within the reasonable range of litigation possibilities."  *See*, *In re Penn Central Transp.*

*Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979).  In making its determination, a court is not to substitute

its own judgment for that of the debtor.  *See*, *Neshaminy Office Bldg.*, 63 B.R. at 803.  Moreover,

it is not necessary for the court to conduct a truncated trial of the facts of the merits underlying

the dispute.  *See*, *Grant Broadcasting*, 71 B.R. at 396.  *See also*, *In re A&C Properties*, 784 F.2d

1377, 1384 (9th Cir.), cert. denied, 479 U.S. 854 (1986).  Rather, the court need only "canvass the

issues to see whether the settlement fall[s] below the lowest point in the range of

reasonableness." *See*, *Neshaminy Office Bldg.*, 62 B.R. at 803, quoting, *In re W.T. Grant Co.*, 4 B.R. 53, 69 (S.D.N.Y. 1977).

104.    In the present case, the Agreement clearly falls within the range of reasonableness for purposes of satisfying Rule 9019 criteria.

105.    The dispute between the Parties involves numerous issues and the Release of Liens Agreement only resolves certain disputes whereby <u>inter alia</u> Prudential consents to the Trustee obtaining the Loan with the Lender to complete Phase 1 of the Project, release of Prudential's liens as stated in the Release of Liens Agreement, in exchange for the release payments, subordination of certain Prudential mortgages and the related relief as set forth in the Release of Liens Agreement.  The other disputes, claims and defenses among the Debtor, Trustee and Prudential are subject to the Reservation of Rights language contained in the Release of Liens Agreement.

106.    The Release of Liens Agreement allows the Trustee to obtain approval of the Loan and to complete Phase 1 of the Project with Prudential consenting to the both the Loan and to the request that the liens being granted to secure the Loan shall prime and be senior to the Existing Mortgages of Prudential.

107.    Not only would litigation with Prudential over the value of the Collateral and adequate protection  be costly and time consuming for the Trustee and its estate, there are uncertainties and the potential for appeals, which could delay the final determination of these matters for a significant period of time.

108.    The Release of Liens Agreement represents countless hours of negotiations between the Trustee and his professionals and Prudential and its professionals.  Even though it does not resolve all the issues, claims and defenses between the Debtor, its estate, the Trustee and Prudential, it does provide the mechanism by which the Trustee can complete the

41

construction and the sale of Phase 1 of the Project for the benefit of all creditors of the Debtor

and its estate and a basis to formulate a plan of reorganization.

      **WHEREFORE,** the Trustee respectfully requests entry of (i) the Final Order in the form

attached hereto and (ii) such other and further relief as is just and proper.

                   **Respectfully submitted,**

                   **KARALIS PC**

                   By:     /s/ Aris J. Karalis
                         ARIS J. KARALIS
                         ROBERT W. SEITZER
                         1900 Spruce Street
                         Philadelphia, PA 19103
                         (215) 546-4500
                         Attorneys for the Trustee

Dated:  August 17, 2018

## **List of Exhibits**

| | |
|---|---|
| Exhibit A | Construction Loan and Security Agreement |
| Exhibit B | Promissory Note |
| Exhibit C | Open-End Mortgage and Assignment of Rents |
| Exhibit D | Release of Liens Agreement |
| Exhibit E | Final Order |
| Exhibit F | Budget |
| Exhibit G | Existing Cross Subordination Agreement |
| Exhibit H | Title Report |