# EXHIBIT A

## Construction Loan and Security Agreement

## CONSTRUCTION LOAN AND SECURITY AGREEMENT

**THIS CONSTRUCTION LOAN AND SECURITY AGREEMENT ("Agreement")** is made this _____ day of August, 2018 by and between **ISLAND VIEW CROSSING II, L.P.**, a Pennsylvania limited partnership (**"Borrower" at times also referred to as the "Debtor"**) by and through **KEVIN O'HALLORAN**, in his capacity as the Chapter 11 Trustee (**"Trustee"**) for the Debtor and **BKRE INVESTMENTS, LLC**, an Ohio limited liability company (**"Lender"**).

## BACKGROUND

A.      On June 30, 2017 (the "**Petition Date**"), the Borrower filed a voluntary petition for relief pursuant to Chapter 11 of the **Bankruptcy Code**.      After the Petition Date, the Borrower remained in possession of its assets and continued in the management of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code until a Chapter 11 Trustee was appointed.

B.      On December 18, 2017, the Bankruptcy Court entered an Order directing the appointment of a Chapter 11 Trustee.  On December 21, 2017, the United States Trustee for Region 3 filed an application for entry of an order approving the appointment of an interim trustee which application was approved pursuant to an Order entered by the Court on the same day.

C.      A meeting of creditors commenced on January 11, 2018 which was continued and concluded on January 29, 2018 for the purpose of electing a Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(b)(1) and Fed.R.Bankr.P. 2007.1.  On January 30, 2018, the United States Trustee for Region 3 filed its Report of Undisputed Election which provided, *inter alia*, that **Trustee** was elected to serve as the trustee for the Borrower.

D.      The Borrower owns a residential subdivision containing approximately 17.51 acres located at 1600 Radcliff Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119), which was approved for development in two phases, Phase 1 is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements and Phase 2 is currently approved for six (6) buildings containing a total of 96 condominiums units and certain site improvements, as may be amended.  In Phase 1, two buildings, building number 4 (townhouse units 41, 42, 43, 44, 45, 46 and 47) and building number 2 (townhouse units 7, 8, 9, 10 and 11) are at different stages of completion.  The terms townhouse(s) and condominium unit(s) are hereinafter individually referred to as a "Residential Unit" and collectively, as "Residential Units".

E.      Trustee has requested that Lender extend a revolving credit facility to Borrower to be used for the development and the construction of (i) the 14 buildings in Phase 1 which will contain a total of 73 Residential Units including, partially completed buildings numbered 4 and 2, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition to the Owner being able to sell and settle on the 73 Residential Units in Phase 1, and (iv) a clubhouse (to be designed) which will be located in Phase 2, which Lender is willing to do on the terms set forth herein.

F.    Capitalized terms used herein and unless otherwise defined will have the meanings set forth therefor in **Section 1** of this Agreement.

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any extensions of credit now or hereafter made to or for the benefit of Borrower by Lender, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    **DEFINITIONS**

1.1 **Defined Terms.**  The following words and phrases as used in capitalized form in this Agreement, whether in the singular or plural, shall have the meanings indicated:

(a)    **"Administrative Claim"** means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date preserving the Debtor's estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services); and (b) all fees and charges assessed against the Debtor's estate pursuant to section 1930 of chapter 123 of the Judicial Code.

(b)    **"Agreement"** means this Construction Loan and Security Agreement, as the same may be amended, modified or supplemented from time to time.

(c)    **"Affiliate"**, as to any Person, means (i) each other Person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person in question and (ii) any Person who is an officer, director, member, manager or partner of (A) such Person, (B) any Subsidiary of such Person, or (C) any Person described in the preceding clause (i).

(d)    **"Bankruptcy Code"**  means title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended from time to time.

(e)    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(f)    **"Bankruptcy Case"** means that certain case filed under Chapter 11 of the United States Bankruptcy Code, known as Case No. 17-14454(ELF) in the Bankruptcy Court on the Petition Date.

(g)    **"Borough"** shall mean the Borough of Bristol.

(h)    **"Borrower"** shall have the meaning given such term in the introductory paragraph of this Agreement and shall include all permitted successors and assigns of such Person.

(i)    **"Borrower Obligations"** shall mean all obligations  of Borrower to Lender under the Loan Documents, together with all interest and other sums payable in connection with  the Loan Documents.

2

(j)    **"Business Day"** means any day except a Saturday, Sunday or other day on which Lenders in Philadelphia, Pennsylvania are authorized by law to close.

(k)    **"Claim"** means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor.

(l)    **"Closing"** means the execution and delivery of the Loan Documents by Borrower to Lender.

(m)    **"Closing Date"** means the date of Closing.

(n)    **"Collateral"** shall have the meaning given such term in **Section 5.3** of this Agreement.

(o)    **"Corporation"** means a corporation, partnership, limited liability company, trust, unincorporated organization, association, joint stock company or joint venture.

(p)    **"Default"** means any event which with the giving of notice, passage of time or both, would constitute an Event of Default.

(q)    **"Default Rate"** shall have the meaning given such term in **Section 3.2** hereof.

(r)    **"Event of Default"** means each of the events specified in **Section 13.1**.

(s)    **"Existing Prudential Construction Loan"** means an existing development construction loan agreement in the original amount of $5,541,468.00 from Prudential to Borrower made on November 26, 2014 as thereafter amended, restated or modified.

(t)    **"Existing Borough Judgment"** means an existing judgment against Borrower in favor of the Borough filed on April 22, 2016 (No. 2016-71251) in the amount of $56,239.22.

(u)    **"Existing Cross Subordination Agreement"** shall mean the cross subordination agreement by and among the RDA, Borrower and Prudential dated December 10, 2014. A copy of the Existing Cross Subordination Agreement is attached hereto as Exhibit "A".

(v)    **"Existing Judgments of Former Prospects"** means the three (3) below stated existing judgments held by certain former prospects:

(1)    In favor of Monica Caione against Borrower, Americorp Homes and Island View Crossing II, Inc. filed on February 28, 2017 (No. 2016-04021) in the amount of $30,990.00;

(2)    In favor of Samira Ranganathan and Khandulans Ranganathan against Borrower filed on June 19, 2017 (No. 2016-05724) in the amount of $49,980.00; and

3

(3)     In favor of Frank Del Grasso against Borrower, Island View Crossing II, Inc., Americorp Realty LLC, Americorp Homes LLC, and Americorp Real Estate Development LLC filed on March 23, 2017 (No. 2016-06685) in the amount of $27,250.00.

(w)     **"Existing Judgment of Bohler Engineering"** means the judgment entered in favor of Bohler Engineering PA, LLC against Borrower filed on January 5, 2017 (No. 2017-00032) in the amount of $48,853.63.

(x)     **"Existing Judgment of McElderry Drywall Inc."** means the judgment entered in favor of McElderry Drywall, Inc. against Americorp Homes, Inc. and Borrower filed **after the Petition Date** on August 10, 2017 (No. 2016-06868) in the amount of $42,730.16.

(y)     **"Existing Mortgages of Prudential"** shall mean collectively, the four (4) below stated mortgages, assignment of rents and leases, recorded against the Property in favor of Prudential and the and UCC-1's filed by Prudential with Department of State of the Commonwealth of Pennsylvania:

(1)     Collateral mortgage in the amount of $3,911,250 dated September 20, 2011 and recorded on October 19, 2011 in Land Record Book 6838, Page 230 (Instrument No. 2011070888) (the "Steeple Run Collateral Mortgage");

(2)     Mortgage in the amount of $1,400,000 dated September 22, 2013 and recorded on September 27, 2013, instrument number 2013080879 (the "IVC- Durham Mortgage");

(3)     Collateral mortgage in the amount of $5,136,000 dated May 30, 2014 and recorded on July 23, 2014, instrument number 2014038527(the "Calnshire Collateral Mortgage");

(4)     Open-End Mortgage and Security Agreement in the amount of $5,541,468 dated November 26, 2014 and recorded on January 7, 2015 as instrument number 2015001098 (the "Mortgage for Existing Prudential Construction Loan");

(5)     Assignment of Rents and Leases and Agreements of Sale recorded as instrument number 2015001143 filed in conjunction with the Mortgage for Existing Prudential Construction Loan;

(6)     UCC-1 filed on September 27, 2013 in the Bucks County Recorder of Deeds Office as instrument number 2013080881 naming Island View Crossing, II, L.P. as Debtor and Prudential Savings Bank as Secured Party; and

(7)     UCC-1 filed on January 4, 2015 in the Bucks County Recorder of Deeds Office as instrument number 2015001161 naming Island View Crossing, II, L.P. as Debtor and Prudential Savings Bank as Secured Party.

(z)     **"Existing Mortgages of RDA"** shall mean the two (2) below stated mortgages recorded against the Property in favor of the RDA:

4

(1)    Mortgage in the amount of $2,500,000.00 dated June 13, 2003 and recorded on August 25, 2003 in land record Book 3537, Page 792 (Instrument No. 20030163787); and

(2)    Open-End Mortgage and Security Agreement in the amount of $127,627.83 dated July 21, 2016 and recorded on July 22, 2016 as instrument number 2016043135).

(aa)    **"Existing Pre-Petition Property Taxes"** shall mean the pre-petition property tax claims due to the Bucks County Tax Claim Bureau for the delinquent Real Estate Taxes for the Property as of the Petition Date.

(bb)    **"Existing RDA Loan"** shall mean an existing acquisition loan in the original amount of $2,500,000 from RDA to Borrower made on June 13, 2003 as thereafter amended, restated or modified.

(cc)    **"GAAP"** means generally accepted accounting principles in the United States of America, in effect from time to time, consistently applied and maintained.

(dd)    **"Lender"** shall have the meaning given such term in the introductory paragraph of this Agreement and shall include all permitted successors and assigns of such Person.

(ee)    **"Loan"** means a revolving loan in the principal amount of up to Four Million and Seven Hundred Thousand Dollars ($4,700,000.00).

(ff)    **"Loan Advances"** shall mean each advance on account of the Loan made by Lender from time to time pursuant to this Agreement.

(gg)    **"Loan Documents"** shall mean collectively, this Agreement, the Note, the Mortgage, and all other documents, executed or delivered by the Trustee on behalf of the Borrower in connection with the Loan, as they may be amended, modified or supplemented from time to time.

(hh)    **"Loan Fees"** shall mean the fees payable by Borrower to Lender.

(ii)    **"Maturity Date"** shall have the meaning given such term in **Section 4.7** of this Agreement.

(jj)    **"Mortgage"** means that certain Open-End Mortgage and Assignment of Rents and Leases securing the Loan executed by Borrower in favor of Lender dated of even date herewith.

(kk)    **"Mortgaged Property"** shall means the real property located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119), as more particularly described on Exhibit "B" attached hereto and made a part hereof which is a residential subdivision of approximately 17.51 acres, wherein Phase 1 is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements and Phase 2 is currently approved for six (6) buildings containing a total of 96 condominiums units and certain site improvements, as may be amended by the parties and all improvements thereon

5

and all rights, licenses, permits and approvals relating thereto, together with an assignment of all rents and leases related thereto.

(ll)    **"Note"** shall mean the Borrower's promissory Note to Lender dated the date hereof, in the original principal amount of Four Million Seven Hundred Thousand Dollars ($4,700,000.00) as said Note may be extended, renewed, refinanced, amended, modified, or supplemented from time to time.

(mm)    **"Obligations"** shall mean all amounts at any time owing or payable under the Note, all costs and expenses incurred by Lender in the collection or enforcement of any of the Loan Documents, including reasonable attorney's fees; all future advances made by Lender for taxes, levies, insurance and repairs to or maintenance of the Property, and any other indebtedness, liability or obligation of Borrower to Lender under any of the Loan Documents.

(nn)    **"Official Body"** shall mean any governmental or political subdivision or any agency, authority, bureau, central bank, commission, department or instrumentality of either, or any court, tribunal, grand jury or arbitrator, in each case whether foreign or domestic.

(oo)    **"Permitted Liens"** shall mean (i) the liens created by the Existing Real Estate Taxes, (ii) the liens created by the Existing Mortgages of the RDA and (iii) the encumbrances created Existing Cross Subordination Agreement.

(pp)    **"Petition Date"** shall mean June 30, 2017, the date upon which the Borrower filed its petition for relief pursuant to Chapter 11 of Title 11 of the United States Code.

(qq)    **"Phase 1"** means the area of the Mortgaged Property that is approved for the construction of fourteen (14) buildings containing a total of 73 townhouses and certain site improvements.

(rr)    **"Phase 2"** means the area of the Mortgaged Property that is approved for the construction six (6) buildings containing a total of 96 condominiums units and certain site improvements.

(ss)    **"Person"** means an individual, a Corporation or a government or any agency or subdivision thereof, or any other entity.

(tt)    **"Project"** shall means the design, engineering, and construction of (i) the 14 buildings, including existing buildings numbered 4 and 2, in Phase 1 which will contain a total of 73 Residential Units, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition to the Borrower being able to sell and settle on the 73 Residential Units in Phase 1, and (iv) the construction of a clubhouse (to be designed) which will be located in Phase 2.

(uu)    **"Property"** shall mean collectively, the land, the improvements, the site improvements, and the other tangible property covered by the Mortgage on the Mortgaged Property.

(vv)    "**Professional Person**" shall mean each professional retained and employed by the Trustee pursuant to Sections 327 or 1103 of the Bankruptcy Code, including, without limitation, Karalis P.C. ("**KPC**"), the attorneys for Trustee and Newbridge Management, LLC ("**Newbridge**"), financial advisors for Trustee, any accountant retained to prepare tax returns for the Debtor, and any broker retained to market and sell the Residential Units.

(ww)    "**Prudential**" shall mean Prudential Savings Bank.

(xx)    "**RDA**" means the Redevelopment Authority of Bucks County.

(yy)    "**Secured**" means when referring to a Claim: (a) secured by a lien on property in which the Debtor's estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a permissible setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtor's estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as secured pursuant to any plan confirmed by the Bankruptcy Court.

(zz)    "**Site Improvements**" shall mean site improvements to the land including, but not limited to the following:  road overlay, curbing, earthwork, paving, storm drainage, sanitary sewer, water, electric, excavation, street lighting, layout, engineering and inspection to be constructed in accordance with the Site Plans, together with all equipment, fixtures and other personal property attached thereto or used in connection therewith.

(aaa)    "**Site Plans**"  shall mean the final plans and specifications for the construction of the Site Improvements on the Property approved by all Official Bodies, as the same may be amended, modified or supplemented from time to time.

(bbb)    "**Special Materials**" means any and all materials which, under Environmental Requirements, require special handling in use, generation, collection, storage, treatment or disposal, or payment of costs associated with responding to the lawful directives of any court or agency of competent jurisdiction.  Special Materials shall include, without limitation: (i) any flammable substance, explosive, radioactive material, hazardous material, hazardous waste, toxic substance, solid waste, pollutant, contaminant or any related material, raw material, substance, product or by-product of any substance specified in or regulated or otherwise affected by any Environmental Requirements (including but not limited to any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended or any similar state or local law), (ii) any toxic chemical or other substance from or related to industrial, commercial or institutional activities, and (iii) asbestos, gasoline, diesel fuel, motor oil, waste and used oil, heating oil and other petroleum products or compounds, polychlorinated biphenyls, radon, urea formaldehyde and lead-containing materials.

(ccc)    "**Trustee**" means Kevin O'Halloran, in his capacity as Chapter 11 Trustee for Borrower in the Bankruptcy Case.

(ddd)    "**Trustee-Prudential Release, Subordination, and Reservation Agreement**" means the agreement by and between the Trustee and Prudential dated July __, 2018 whereby Prudential consents to inter alia this Agreement, the Loan, release prices for the release of the Existing Prudential Construction Loan and the subordination of the Steeple Run Collateral

7

Mortgage, Calnshire Collateral Mortgage, and IVC-Durham Mortgage subject to the reservation of rights of the Trustee, Debtor and Prudential as set forth therein.

       1.2    **Accounting Terms.** As used in this Agreement, or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined elsewhere in this Agreement shall have the respective meanings given to them under GAAP.

## 2. THE LOAN; USE OF PROCEEDS

       2.1    **Agreement to Lend.** Subject to the terms and conditions hereof, Lender agrees to make the Loan to Borrower, the proceeds of which will be advanced pursuant to the terms hereof and shall not exceed the aggregate principal amount of Four Million Seven Hundred Thousand Dollars ($4,700,000.00). Except for the mandatory repayments set forth in **Section 8**, interest only on the outstanding principal balance of the Loan shall be due and payable, in arrears as set forth in **Section 3** and all other amounts payable hereunder, shall be due and payable on the Maturity Date.

       2.2    **Requests for Loan Advances.** The Trustee will be able to submit to Lender a request for a Loan Advance on a bi-weekly basis as needed to complete the Project, however, Lender will not be required to make Loan Advances more frequently than two (2) times each month. Subject to the terms and conditions hereof, Borrower may, from time to time, borrow, repay and re-borrow to the principal sum of Four Million Seven Hundred Thousand Dollars ($4,700,000.00) for the purpose of financing the completion of the Project. Each Loan Advance shall be subject to all terms and conditions set forth in all of the Loan Documents, which terms and conditions are incorporated herein.

       2.3    **Use of Proceeds.** Borrower agrees to use Loan Advances and proceeds generated from the sale of the Residential Units for working capital purposes as set forth in the Budget; including, without limitation, as follows:

       (a)    Fund, all unpaid accrued post-petition real estate taxes;

       (b)    Fund, a cash deposit or an irrevocable letter of credit for the benefit of PECO Energy Company ("PECO") in the amount of $108,555.50, or such other amount as invoiced by PECO for the installation of electric and gas facilities at the Project;

       (c)    Fund, the post-petition principal and interest payments due the RDA under the Existing RDA Loan as they come due including any unpaid accrued post-petition amounts:

       (d)    Fund, concurrently the following:

       (1)    the completion of Building 4 (townhouse units 41, 42, 43, 44, 45, 46 and 47) and Building 2 (townhouse units 7, 8, 9. 10, and 11); and

       (2)    the construction of Building 1 (townhouse units 1, 2, 3, 4, 5 and 6), Building 10 (townhouse units 37, 38, 39 and 40) and Building 3 (townhouse units 12, 13, 14 and 15). Trustee reserves the right to switch any one of these buildings for another building at the Project;

(3)     thereafter, after Buildings 1, 2, 3, 4, and 10 are completed, as requested by Trustee on a rolling basis the construction of the remaining nine (9) Buildings in Phase 1 of the Project which contain an additional 47 townhouse units for total of seventy-three (73) townhouse units in Phase 1 of the Project; and

(4) the construction of a clubhouse (to be designed) which will be located in Phase 2.

(e)     Fund, installation of top soil over entire Project (Phases 1 and 2) as required to be compliant with the applicable requirements of the Pennsylvania Department of Environmental Protection;

(f)     Fund, completion of site improvement for Phase 1 of the Project and Phase 2, to the extent the Borough or any Official Body imposes such completion as a condition precedent to being able to close on the sale of townhouse units in Phase 1 of the Project;

(g)     Fund, the administrative costs requested by Trustee related to the development, maintenance, construction and sale of the townhouse units at the Project including but not limited to, fees for the construction manager, all fees and costs associated with permits, project administration, construction management, project director, maintenance of an office for project management and sales, marketing and advertising, insurance, furnishing and decorating the model townhouse units, onsite security, maintenance for the Project, and quarterly fees of the United States Trustee;

(h)     Fund, fees and expenses associated with retention of architectural, engineering, surveyor, and design service professionals to prepare all applicable plans required for the approval and construction of Phase 2 of the Project; and

(i)     Fund, the Carve-Out (as hereinafter defined) for (i) the Trustee's commission pursuant to 11 U.S.C. §326; (ii) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. 1930(a)(6) in this Bankruptcy Case; and (iii) payment of professional fees and expenses of KPC and Newbridge (the **"Professional Fees and Expenses"**) but only as set forth in **Section 5.5**; provided that such Professional Fees and Expenses are approved by the Bankruptcy Court.

2.4     **Prior Loan Advance.**  Prior to the filing of the motion to approve the Loan, the Lender at the request of Trustee advanced the amount of $10,000 to order an updated appraisal report for the Project and to compensate the appraiser if testimony is needed (the **"Prior Loan Advance"**).  The Prior Loan Advance shall be considered a Loan Advance under this Agreement.

3.   **INTEREST RATE**

3.1     **Interest on the Loan**.  Interest on outstanding Loan Advances will accrue quarterly from the date of each Loan Advance until final payment thereof at the fixed rate of nine and one-quarter percent (9.25%) per annum.  No quarterly interest payments shall be due or payable to Lender until after Trustee has closed on the sale of no less than thirty (30) Residential Units with all such unpaid monthly interest payments to accrue until paid.  At the Trustee's sole discretion and subject to available cash flow, the Trustee may commence making monthly interest

9

payments to Lender at any time prior to closing on the thirtieth (30th) Residential Unit. Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed.

3.2    **Default Interest**. Interest will accrue on the principal balance of the Loan after the occurrence of an Event of Default or expiration of the Maturity Date at a rate which is one percent (1%) in excess of the applicable rate of interest in effect for such Loan from time to time (the **"Default Rate"**).

3.3    **Post Judgment Interest**. Any judgment obtained for sums due hereunder or under the Loan Documents will accrue interest at the Default Rate set forth above until paid.

4.  **PAYMENTS, FEES AND TERM**

4.1    **Payments of Loan Advances**. Loan Advances shall be paid to Trustee.

4.2    **Loan Fees**. In consideration of Lender's agreements contained herein, Borrower shall pay to Lender a loan fee in the amount of Forty-Five Thousand Dollars ($45,000.00) (the **"Loan Fee"**), the cost of an appraisal report for the Property, and Lender's legal fees and costs not to exceed $25,000, all of which shall be paid on the Closing Date as Loan Advances under the Loan.

4.3    **Late Charge**. In the event that Borrower fails to pay any interest payable hereunder for a period of at least fifteen (15) days after any such payment is first due, in addition to paying such sums, Borrower will pay to Lender a late charge equal to five percent (5%) of such past due payment as compensation for the expenses incident to such past due payment.

4.4    **Prepayment of Loan**. Borrower may prepay all or any part of the principal balance of the Loan at any time without penalty or premium.

4.5    **Note**. The obligation of Borrower to repay the principal of the Loan and to pay interest thereon shall be evidenced by the Note.

4.6    **Loan Account**. Lender will open and maintain on its books a loan account (the **"Loan Account"**) with respect to Loan Advances made, repayments, prepayments, the computation and payment of interest and fees and the computation and final payment of all other amounts due and sums paid to Lender under this Agreement. Except in the case of manifest error in computation, the Loan Account will be conclusive and binding on the Borrower as to the amount at any time due to Lender from Borrower under this Agreement or the Note.

4.7    **Maturity Date**. The term of this Loan shall expire thirty (30) months after the Closing Date (the **"Maturity Date"**); provided, however if the Loan is not in default, at the request of Trustee, the term may be extended for an additional period of six (6) months at no additional cost to the Trustee.

5.  **SECURITY; COLLECTION OF RECEIVABLES AND PROCEEDS OF COLLATERAL**

5.1    **Super-Priority Administrative Claim**. As security for the full and timely payment and performance of the Borrower Obligations, subject and subordinate to Section 5.5, the Loan shall be secured in accordance with Section 364(c)(1) with a super-priority Administrative

10

Claim with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

5.2    **Senior Secured Lien on Real Property**.  As further security for the full and timely payment and performance of the Borrower Obligations but junior to the Permitted Liens,  the Loan shall also be secured in accordance with Section 364 (d)(1) of the Bankruptcy Code by the Mortgage encumbering the Mortgaged Property senior and superior to all other existing liens, claims, and/or security interests, and proceeds thereof including, (i) the Existing Mortgages of Prudential, (ii) Existing Judgment of McElderry Drywall, Inc., (iii) Existing Judgment of Bohler Engineering, (iv) Existing Judgments of Former Prospects and (v) the Existing Borough Judgment.  Notwithstanding anything otherwise contained herein to the contrary, the lien of the Mortgage shall not prime the Permitted Liens.

5.3    **Collateral.**  The collateral described above in **Sections 5.1 and 5.2** is collectively referred to herein as the **"Collateral"**.  The Collateral shall not include (i) any claims arising under Chapter 5 of the Bankruptcy Code and proceeds thereof, (ii) any claims of the Debtor/Trustee against Prudential Savings Bank including the Lender Liability Litigation/Adversary Proceeding and proceeds thereof, and (iii) any claims and defenses of the Debtor/Trustee against any creditor, Affiliate of the Borrower or other Person and proceeds thereof.  IT IS EXPRESSLY UNDERSTOOD THAT THE COLLATERAL SHALL ONLY SECURE OBLIGATIONS OF THE BORROWER TO LENDER UNDER THE THIS AGREEMENT, THE NOTE AND THE MORTGAGE.

5.4    **Fees and Expenses of Trustee and his Professionals.**  The Trustee is authorized to use proceeds of the Loan and the cash from the sale of the Residential Units to pay (i) the Trustee's Commission (as hereinafter defined), pursuant to 11 U.S.C. §326 based on the Trustee's disbursements and (ii) the fees and expenses of the Professional Persons except as otherwise limited by the terms as set forth in Sections 2.3(i) and 5.5, to the extent that such compensation and expense reimbursement is approved by the Bankruptcy Court.

5.5    **Carve-Out.**  Notwithstanding anything to the contrary contained in this Agreement, the Note, or the Mortgage, the liens and security interests granted to the Lender and the Super-Priority Administrative Claim conferred upon the Lender to secure the Loan shall all be subject and subordinate to the payment of the following expenses that have been incurred prior to an Event of Default (to the extent that there are not sufficient, unencumbered funds in the Debtor's estate to pay such amounts at the time payment is required to be made): (i) the Professional Fees and Expenses identified in this Section 5.5 and approved by the Bankruptcy Court for the Trustee and the Professional Persons retained and employed by the Trustee; (ii) the Trustee's commission pursuant to 11 U.S.C. §326 based on the Trustee's disbursements (the "**Trustee's Commission**"), (iii) fees required to be paid to the Clerk of the Bankruptcy Court; and (iv) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) (the amounts described in the preceding clauses (i), (ii), (iii) and (iv) are collectively called the "**Carve-Out**"); provided, however, that no proceeds of the Loan and no amounts received pursuant to the Carve-Out shall be used to pay any professional fees and expenses or any other costs incurred in connection with (1) commencing any claims, causes of actions or contested matters against the Lender, including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (2) preventing, hindering or delaying performance or enforcement by Lender of its rights or remedies under the Order approving the Loan or any of

11

the Loan Documents; or (3) challenging the Liens granted to Lender to secure the Loan.  The Carve-Out shall be reduced by the sum of (i) the amount of unencumbered funds in the Debtor's estate which are used to satisfy the unpaid allowed fees and expenses of the Trustee's Professional Persons and the Trustee's Commission, and (ii) payments paid by the Debtor's estate on account of the allowed professional fees and expenses of the Trustee's Professional Persons and the Trustee's Commission.  Upon entry of the Final Order (as hereinafter defined), Lender shall make a Loan Advance against Professional Fees and Expenses in the amount of $100,000 to KPC on account of its fees and costs incurred in connection with this Bankruptcy Case as allowed by the Bankruptcy Court.  Within 90 days after the entry of the Final Order, Lender  shall make an additional Loan Advance against Professional Fees and Expenses in the amount of $50,000 to be used by Trustee to pay allowed fees and expenses of the Trustee's Professional Persons and the Trustee's Commission.  Within 180 days after the entry of the Final Order, Lender  shall make an additional Loan Advance against Professional Fees and Expenses in the amount of $50,000 to be used by Trustee to pay allowed fees and expenses of the Trustee's Professional Persons and the Trustee's Commission.  Thereafter, additional Loan Advances to fund payment of fees and expenses of the Trustee's Professional Persons and the Trustee's Commission will be released only at the sole discretion of Lender after receipt of a request from Borrower.  The Lender's Carve-Out obligations shall survive the termination or expiration of this Agreement.

6.    **REPRESENTATIONS AND WARRANTIES**. Borrower represents and warrants as follows:

6.1    **Organization and Qualification.**  Borrower is a limited partnership duly formed and validly existing under the laws of the Commonwealth of Pennsylvania, and in accordance with the Bankruptcy Court Order approving the Loan the Trustee has full power and authority to execute, deliver and comply with the Loan Documents.

6.2    **Title to Collateral.**  The Collateral is and will be owned by Borrower.

6.3    **Litigation against Prudential.**  Prior to the Petition Date, the Borrower asserted claims against Prudential in a state court complaint filed on or about March 31, 2016  in the matter of, *Island View Properties, Inc. trading as Island View Crossing II, LP, and Renato J. Gualtieri v. Prudential Savings Bank*, Case No. 160303161 (C.C.P., Phila. Cty.), that has since been removed to the Bankruptcy Court and assigned Adversary No. 17-00202(ELF) (the "**Adversary Proceeding**" and at times also referred to as the "**Lender Liability Litigation/Adversary Proceeding**").

6.4    **Prudential Claims**.  Prudential asserts claims against the Borrower, having filed the following proofs of claim: (i) Claim No. 23 in the amount of $4,092,443.58 (filed as secured) and (ii) Claim No. 24 in the amount of $1,470,569.25 (filed as secured) (collectively, the "**Proofs of Claim**").  In the Lender Liability Litigation/Adversary Proceeding, Prudential asserts claims against the Debtor in excess of Twelve Million Dollars ($12,000,000.00), some of which relates to the alleged debts covered by the Proofs of Claim and some of which relates to loans to entities other than the Debtor for which collateral mortgages were granted by the Debtor, including the Steeple Run Collateral Mortgage, and the Calnshire Collateral Mortgage (collectively, the "**Collateral Mortgages**").  The Proofs of Claim,

Prudential's rights/claims under the Collateral Mortgages and any other current or future claim of Prudential against the Debtor are referred to collectively as the "**Prudential Claims**."

      6.5    **Trustee's Special Litigation Counsel**.  The Trustee has retained Steven M. Coren, Esquire and Kaufman, Coren & Ress, P.C. (collectively, "**KC&R**") as his special litigation counsel in connection with the Lender Liability Litigation/Adversary Proceeding (as existing or as may be amended) and the dispute over and/or challenge to the Prudential Claims, including any such challenge in the Adversary Proceeding or other proceedings (which may include a request to avoid and/or equitably subordinate the Prudential Claims).

      6.6    **Accuracy of Representations and Warranties.**  No representation or warranty by Borrower contained herein or in any certificate or other document furnished by Borrower pursuant hereto or in connection herewith fails to contain any statement of material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.  There is no fact which Borrower knows or should know and has not disclosed to Lender, which does or may materially and adversely affect Borrower, or any of its operations.

      7.    **GENERAL COVENANTS**.  Except with the prior written consent of Lender, Borrower will comply with the following:

      7.1    **Payment of Principal, Interest and Other Amounts Due**.  Borrower will pay when due the Borrower's Obligations.

      7.2    **Disposition of Residential Units**.  Borrower will not sell, lease, transfer or otherwise dispose of any Residential Unit other than in the ordinary course of its business for fair consideration.

      7.3    **Liens**.  Borrower will not create, or incur any new mortgage, pledge, encumbrance, lien, security interest or charge of any kind  on its Property or assets, whether now owned or hereafter acquired, or upon any income, profits or proceeds therefrom, except for the lien and security interests granted under the Loan in favor of Lender.

      7.4    **Maintenance of Property**.  Borrower will maintain, preserve, protect and keep or cause to be maintained, preserved, and protected its Property in good condition, reasonable wear and tear excepted, and will pay and discharge when due the cost of repairs to and maintenance of the same.

      7.5    **Insurance.**  Borrower will carry adequate insurance issued by an insurer acceptable to Lender, in amounts acceptable to Lender (at least adequate to comply with any co-insurance provisions) and against all such liability and hazards as are usually carried by entities engaged in the same or a similar business similarly situated or as may be required by Lender, and in addition, will carry business interruption insurance in such amounts as may be required by Lender. In the case of insurance on any of the Collateral, Borrower shall carry insurance in the full insurable value thereof and cause Lender to be named as insured mortgagee with respect to all real property, loss payee (with a lender's loss payable endorsement) with respect to all personal property, and additional insured with respect to all liability insurance, as its interests may appear with thirty (30) days' notice to be given Lender by the insurance carrier prior to cancellation or material modification of such insurance coverage.

Borrower shall cause to be delivered to Lender the insurance policies therefor or, in the alternative, evidence of insurance and at least thirty (30) business days prior to the expiration of any such insurance, additional policies or duplicates thereof or, in the alternative, evidence of insurance evidencing the renewal of such insurance and payment of the premiums therefor.

      7.6    **Additional Documents and Future Actions.**  Borrower will, at its sole cost, take such actions and provide Lender from time to time with such agreements, financing statements and additional instruments, documents or information as the Lender may in its discretion deem necessary or advisable to perfect, protect, maintain or enforce the security interests in the Collateral, to permit Lender to protect or enforce its interest in the Collateral, or to carry out the terms of the Loan Documents.

    8.    **RELEASE OF LIENS.**

      8.1    Subject to the provisions of Section 8.4, the Lender agrees to release its lien on the first fifteen (15) Residential Units sold for no payment to Lender, **subject to the following terms and conditions:** the Trustee (i) paying the RDA at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan, and (ii) paying to Prudential at time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Trustee-Prudential Release, Subordination, and Reservation Agreement, a payment of $25,000 to be applied to reduce the the the principal balance of the Existing Bank Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and designated by Bank as secured.

      8.2    Subject to the provisions of Section 8.4, the Lender agrees to release its lien at the time of the sale of the sixteenth (16th) to thirtieth (30th) Residential Units for the payment of fifteen thousand Dollars ($15,000.00) to Lender at time of each closing to be applied to reduce the principal balance of the Loan, **subject to the following terms and conditions:** the Trustee (i) paying the RDA at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan, and (ii) paying to Prudential at time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Trustee-Prudential Release, Subordination, and Reservation Agreement, a payment of $25,000 to be applied to reduce the principal balance of the Existing Bank Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and designated by Bank as secured.

      8.3    Subject to the provisions of Section 8.4, the Lender agrees to release its lien at the time of the sale of the thirty first (31st) Residential Unit and for each Unit thereafter for the payment of thirty thousand Dollars ($30,000.00) to Lender at time of each closing to be applied to reduce the principal balance of the Loan, **subject to the following terms and conditions:** the Trustee (i) paying the RDA at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan, (ii) paying to Prudential at time of closing on the sale of each of the first thirty-five (35) Residential Units in Phase 1 in accordance with the Trustee-Prudential Release, Subordination, and Reservation Agreement, a payment of $25,000 to be applied to reduce the principal balance of the Existing Bank Construction

14

Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and designated by Bank as secured, and (iii) paying to Prudential at time of closing on the sale of each of the remaining thirty-eight (38) Residential Units in Phase 1 in accordance with the Trustee-Prudential Release, Subordination, and Reservation Agreement, a payment of $45,000 to be applied to reduce the principal balance of the Existing Bank Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and designated by Bank as secured.

8.4    Notwithstanding, anything otherwise contained herein, upon the sale of Residential Units in Building 11 (Residential Units numbered 31, 32, 33, 34, 35 & 36), Building 12 (Residential Units numbered 25, 26, 27 28, 29 & 30), and Building 13 (Residential Units numbered 22, 23 & 24), the Lender will  only release its lien on each of these Residential Units subject to the receipt of seventy (70%) of the Net Proceeds from the sale of each Residential Unit in Buildings 11, 12 and 13 to be applied to reduce the principal balance of the Loan.  For purposes of this section, "Net Proceeds" shall mean the proceeds from the sale of each said Residential Unit remaining after (i) payment of $12,350.00 to RDA in accordance with the Existing Cross Subordination Agreement to be applied to reduce the principal balance of the Existing RDA Loan, (ii) payment of the amount of $25,000 or $45,000 to Prudential, as applicable in accordance with the Trustee-Prudential Release, Subordination, and Reservation Agreement to be applied to reduce the principal balance of the Existing Bank Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58, and designated by Bank as secured, (iii) payment of any approved broker's fee associated with the sale of the Residential Unit, (iv) payment of any post-petition municipal claim or real estate taxes due for the Residential Unit and (v) any normal and customary closing costs.

9.    **ACCOUNTING RECORDS, REPORTS AND FINANCIAL STATEMENTS**. Borrower will maintain books of record and account in which full, correct and current entries in accordance with GAAP will be made of all of its dealings, business and affairs, and Borrower will deliver to Lender the following:

9.1    **Monthly Reports**.  Within the tenth (10th)  Business Day of the following month, a monthly report of Residential Units for the previous week.

9.2    **Bankruptcy Case.**  With reasonable promptness, copies of all such financial reports, statements and returns which Borrower or Trustee shall file in connection with the Bankruptcy Case.

9.3    **Requested Information**.  With reasonable promptness, all such other data and information in form and content satisfactory to Lender in respect of the condition, operation and affairs of Borrower, as Lender may reasonably request from time to time.

10.    **ENVIRONMENTAL INDEMNITY.**

10.1    **Environmental Indemnity**.  Borrower agrees to indemnify, defend and hold harmless Lender, its parents, subsidiaries, successors and assigns, and any officer, director, shareholder, employee, or agent of Lender, for all loss, liability, damage, cost and expenses, including, without limitation, reasonable attorney's fees and disbursements (including the reasonable

allocated cost of in-house counsel and staff) arising from or related to (a) the release of any Special Materials at any facility at any time owned, leased or operated by Borrower, (b) the release of any Special Materials treated, stored, transported, handled, generated or disposed of by or on behalf of Borrower at any third party owned site, (c) any claim against Borrower that it has failed to comply with any and all applicable federal, state or local laws, statutes, ordinances, regulations or standards, administrative or court orders or decrees, common law doctrines or private agreements, relating to the pollution or protection of the environment and natural resources.

        10.2   **Survival.**  The representations and covenants of Borrower contained in this **Section 10**, including without limitation the indemnification obligation of Borrower, shall survive the occurrence of any event whatsoever, including the payment of the Borrower Obligations or any investigation by or knowledge of Lender.

       11.   **CONDITIONS OF CLOSING.**  The obligation of Lender to make available the Loan is subject to the performance by Borrower of all of its agreements to be performed hereunder and to the following further conditions (any of which may be waived by Lender):

        11.1   **Loan Documents.**  Trustee will have executed and delivered to Lender the Loan Documents.

        11.2   **Representations and Warranties.**  All representations and warranties of Borrower set forth in the Loan Documents will be true at and as of the date hereof.

        11.3   **No Default.**  No condition or event shall exist or have occurred which would constitute a Default or Event of Default hereunder.

        11.4   **Budget**.  Trustee and Lender have agreed upon the budget of the estimated revenues, costs and expenses for the Project (the "**Budget**"), which is attached hereto as Exhibit "C", as the same may be amended, modified or supplemented from time to time by the mutual agreement of the Trustee and Lender.

        11.5   **Interim Order.**  Borrower shall have delivered to Lender an interim order of the Bankruptcy Court (the "**Interim Order**") approving the Loan on an interim basis to the extent of One Million Five Hundred Thousand Dollars ($1,500,000.00), in form and substance satisfactory to Lender and Lender's counsel.  The Order shall be in full force and effect and shall not have been or hereinafter be reversed, modified, amended, stayed or vacated without the prior written consent of Lender.

        11.6   **Final Order**.  Borrower shall have delivered to Lender a final order of the Bankruptcy Court (the "**Final Order**") approving the Loan in the full amount of Four Million Seven Hundred Thousand Dollars ($4,700,000.00), in form and substance satisfactory to Lender and Lender's counsel.  The Order shall be in full force and effect and shall not have been or hereinafter be reversed, modified, amended, stayed or vacated without the prior written consent of Lender

        11.7   **Payment of Fees**.  Borrower shall have paid to Lender the Loan Fee, all fees and expenses of Lender's counsel not to exceed $25,000, and  the appraisal fee  which shall be paid on the Closing Date as a Loan Advance under the Loan.

       12.   **Intentionally Left Blank.**

13.    **DEFAULT AND REMEDIES.**

13.1    **Events of Default.**   The occurrence of any one or more of the following events shall constitute an Event or Events of Default hereunder:

(a)    The failure of Borrower to pay any amount of interest due on the Note or on any fee or other sums payable hereunder, on the date on which such payment is due, and such failure continues unremedied for a period of fifteen (15) days after the date such payment is first due;

(b)    The failure of Borrower to pay the principal, any unpaid interest or other sums payable hereunder at the stated maturity date;

(c)    The failure of Borrower to duly perform or observe any obligation, covenant or agreement on its part contained herein or in any other Loan Document not otherwise specifically constituting an Event of Default under this **Section 13.1** and such failure continues unremedied for a period of thirty (30) days after written notice from Lender to Borrower of the existence of such failure;

(d)    If Borrower seeks to amend, supplement, stay, vacate or modify the Interim Order or the Final Order approving the Loan;

(e)    If the Bankruptcy Case is dismissed or converted or the Bankruptcy Court enters an order granting relief from the automatic stay to any party other than Lender with respect to any property of the Borrower's estate having a value in the aggregate of more than One Hundred Thousand Dollars ($100,000.00);

(f)    The occurrence of an Event of Default under the Mortgage; or

(g)    A plan is filed with the Bankruptcy Court that is inconsistent with the terms of this Loan Agreement or any of the Loan Documents.

13.2    **Remedies.**   At the option of the Lender, upon the occurrence of an Event of Default, or at any time thereafter:

(a)    The entire unpaid principal of the Loan, or any part thereof, all interest accrued thereon, and all fees due hereunder will become immediately due and payable without any further demand or notice;

(b)    Lender may increase the interest rate on the Loan to the Default Rate, without notice; and/or

(c)    In the event that the Bankruptcy Case has been dismissed, Lender may exercise each and every right and remedy granted to it under the Loan Documents and under any other applicable law or at equity.

13.3    **Delay or Omission Not Waiver.**   Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege under the Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power or privilege.  No waiver of any Event of Default shall affect any later Event of Default or shall impair any rights of Lender.  No single, partial or full exercise of any rights, remedies, powers and privileges by the Lender shall preclude further or other exercise thereof.  No

17

course of dealing between Lender and Borrower shall operate as or be deemed to constitute a waiver of Lender's rights under the Loan Documents or affect the duties or obligations of Borrower.

13.4    **Remedies Cumulative; Consents.**    The rights, remedies, powers and privileges provided for herein shall not be deemed exclusive, but shall be cumulative and shall be in addition to all other rights, remedies, powers and privileges in Lender's favor at law or in equity. Whenever Lender's consent or approval is required, such consent or approval shall be at the sole and reasonable discretion of Lender.

13.5    **Time is of the Essence.**    Time is of the essence in Borrower's performance of its obligations under the Loan Documents.

## 14.    **COMMUNICATIONS AND NOTICES.**

14.1    **Communications and Notices.**    All notices, requests and other communications made or given in connection with the Loan Documents shall be in writing and, unless receipt is stated herein to be required, shall be deemed to have been validly given if delivered personally to the individual or division or department to whose attention notices to a party are to be addressed, or by private carrier, or registered or certified mail, return receipt requested, or by e-mail with the original forwarded by first-class mail, in all cases, with charges prepaid, addressed as follows, until some other address (or individual or division or department for attention) shall have been designated by notice given by one party to the other:

To Borrower:

    Kevin O'Halloran, Chapter 11 Trustee
    P.O. Box 723307
    Atlanta, GA 31139
    E-mail: kevinnm@bellsouth.net


With a copy to:

    Aris J. Karalis, Esquire
    Karalis PC
    1900 Spruce Street
    Philadelphia, PA 19103
    E-mail: akaralis@karalislaw.com


To Lender:

    BKRE Investments, LLC
    c/o Jerry E. Peer, Jr., Esq
    Peterson Conners, LLP
    545 Metro Place South, Suite 435
    Dublin, OH 43017
    Email: jpeer@petersonconners.com

With a copy to:

> Jerry E. Peer, Jr., Esq
> Peterson Conners, LLP
> 545 Metro Place South, Suite 435
> Dublin, OH 43017
> Email: jpeer@petersonconners.com

15.    **INTENTIONALLY LEFT BLANK.**

16.    **SUBMISSION TO JURISDICTION.**

16.1    **Submission to Jurisdiction.** Borrower and Lender hereby consent to the exclusive jurisdiction of the United States Bankruptcy Court and all actions or proceedings relating to the Loan Documents or the transactions contemplated hereunder shall be litigated in such court; provided, however, in the event the Bankruptcy Case is dismissed Borrower hereby consents to the exclusive jurisdiction of any state or federal court located within the Commonwealth of Pennsylvania, and irrevocably agrees that, subject to the Lender's election, all actions or proceedings relating to the Loan Documents or the transactions contemplated hereunder shall be litigated in such courts, and Borrower waives any objection which it may have based on lack of personal jurisdiction, improper venue or forum non conveniens to the conduct of any proceeding in any such court and waives personal service of any and all process upon it, and consents that all such service of process be made by mail or messenger directed to it at the address set forth in **Section 14.1**.  Nothing contained in this **Section 16.1** shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction.

17.    **MISCELLANEOUS.**

17.1    **No Joint Venture.**  Nothing contained herein is intended to permit or authorize Borrower to make any contract on behalf of Lender, nor shall this Agreement be construed as creating a partnership, joint venture or making Lender an investor in Borrower.

17.2    **Survival**.  All covenants, agreements, representations and warranties made by Borrower in the Loan Documents or made by or on its behalf in connection with the transactions contemplated herein shall be true at all times this Agreement is in effect and shall survive the execution and delivery of the Loan Documents, any investigation at any time made by Lender or on its behalf and the making by Lender of the loans or advances to Borrower.  All statements contained in any certificate, statement or other document delivered by or on behalf of Borrower pursuant hereto or in connection with the transactions contemplated hereunder shall be deemed representations and warranties by Borrower.

17.3    **No Assignment by Borrower.**  Borrower may not assign any of its rights hereunder without the prior written consent of Lender, and Lender shall not be required to lend hereunder except to Trustee for Borrower as it presently exists.

17.4    **Assignment or Sale by Lender.**  Lender may sell, assign or participate all or a portion of its interest in the Loan Documents and in connection therewith may make available to

any prospective purchaser, assignee or participant any information relative to Borrower in its possession.

       17.5   **Binding Effect.**  This Agreement and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

       17.6   **Severability.**  The provisions of this Agreement and all other Loan Documents are deemed to be severable, and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions which shall continue in full force and effect.

       17.7   **No Third Party Beneficiaries.**  The rights and benefits of this Agreement and the Loan Documents shall not inure to the benefit of any third party.

       17.8   **Modifications.**  No modification of this Agreement or any of the Loan Documents shall be binding or enforceable unless in writing and signed by or on behalf of the party against whom enforcement is sought.

       17.9   **Holidays.**  If the day provided herein for the payment of any amount or the taking of any action falls on a Saturday, Sunday or public holiday at the place for payment or action, then the due date for such payment or action will be the next succeeding Business Day.

       17.10  **Law Governing.**  This Agreement has been made, executed and delivered in the Commonwealth of Pennsylvania and will be construed in accordance with and governed by the laws of such State without regard to conflict of law principles.

       17.11  **Integration.**  The Loan Documents shall be construed as integrated and complementary of each other, and as augmenting and not restricting Lender's rights, powers, remedies and security.  The Loan Documents contain the entire understanding of the parties thereto with respect to the matters contained therein and supersede all prior agreements and understandings between the parties with respect to the subject matter thereof and do not require parol or extrinsic evidence in order to reflect the intent of the parties.  In the event of any inconsistency between the terms of this Agreement and the terms of the other Loan Documents, the terms of this Agreement shall prevail.

       17.12  **Exhibits and Schedules.**  All exhibits and schedules attached hereto are hereby made a part of this Agreement.

       17.13  **Headings.**  The headings of the Articles, Sections, paragraphs and clauses of this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

       17.14  **Counterparts.**  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

       17.15  **Waiver of Right to Trial by Jury.**  **BORROWER AND LENDER WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER ANY OF THE LOAN DOCUMENTS OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWER OR LENDER WITH RESPECT TO ANY OF THE LOAN DOCUMENTS**

OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. BORROWER AND LENDER AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWER AND LENDER TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.   BORROWER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT IT FULLY UNDERSTANDS ITS TERMS, CONTENT AND EFFECT, AND THAT IT VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS SECTION.

      17.16   **No Liability; Non-Recourse as to Trustee**.   Notwithstanding anything otherwise contained herein, Kevin O'Halloran is acting solely as a Trustee on behalf of Borrower under the Bankruptcy Case and Lender's recovery under this Agreement, the Note and Mortgage shall be limited to the assets of Borrower and its estate including the Mortgaged Property and Trustee will have no individual liability to Lender under this Agreement, the Note and/or the Mortgage, or for the repayment of the Loan.

      **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

        **ISLAND VIEW CROSSING II, L.P.**

        By: _____
        Name/Title: Kevin O'Halloran, Chapter 11
        Trustee

        **BKRE INVESTMENTS, LLC**

        By: _____
        Name/Title: