# EXHIBIT D

## Release of Liens Agreement

Recording Requested By,
And After Recording, Return To:
Aris J. Karalis, Esquire
Karalis PC
1900 Spruce Street
Philadelphia, PA 19103

---

## AGREEMENT

**THIS AGREEMENT** (the **"Agreement"**) is made this _____ day of August, 2018 by and between **ISLAND VIEW CROSSING II, L.P.**, a Pennsylvania limited partnership (**"Debtor"**), by and through **KEVIN O'HALLORAN**, solely in his capacity as the Chapter 11 Trustee ("**Trustee**") for the Debtor, and **PRUDENTIAL BANK** (the "**Bank**").

## BACKGROUND

A.     On June 30, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. After the Petition Date, the Debtor remained in possession of its assets and continued in the management of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code until the Trustee was appointed.

B.     On December 18, 2017, the Bankruptcy Court entered an Order directing the appointment of a Chapter 11 Trustee. On December 21, 2017, the United States Trustee for Region 3 filed an application for entry of an order approving the appointment of an interim trustee which application was approved pursuant to an Order entered by the Bankruptcy Court on the same day.

C.     A meeting of creditors commenced on January 11, 2018 which was continued and concluded on January 29, 2018 for the purpose of electing a Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(b)(1) and Fed. R. Bankr. P. 2007.1. On January 30, 2018, the United States Trustee for Region 3 filed its Report of Undisputed Election which provided, *inter alia*, that Trustee was elected to serve as the trustee for the Debtor.

D.     The Debtor owns a residential subdivision containing approximately 17.51 acres located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119), which was approved for development in two phases, Phase 1 is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements (hereinafter defined as Phase 1) and Phase 2 is currently approved for six (6) buildings containing a total of 96 condominiums units and certain site improvements, as may be amended (hereinafter defined as Phase 2). In Phase 1, two buildings, building number 4 (townhouse units 41, 42, 43, 44, 45, 46 and 47) and building number 2 (townhouse units 7, 8, 9, 10 and 11) are at different stages of completion. The terms townhouse(s) and condominium unit(s) are hereinafter individually referred to as a "Residential Unit" and collectively, as "Residential Units".

E.     The Trustee has determined that the best method by which to maximize the value of the Debtor's assets is to initially develop, construct and sell the Residential Units in Phase 1.

1

F.      In order to develop, construct and sell the Residential Units in Phase 1, the Trustee has entered into a Construction Loan and Security Agreement ("Loan Agreement") with BKRE Investments, LLC ("Lender") for a post-petition revolving credit facility in the amount of $4,700,000.00 (hereinafter defined as the Loan) to be used for the development and the construction of (i) the 14 buildings in Phase 1 which will contain a total of 73 Residential Units including, partially completed buildings numbered 4 and 2, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition to the Trustee being able to sell and close on the sale of the 73 Residential Units in Phase 1, and (iv) a clubhouse (to be designed) which will be located in Phase 2. A copy of the Loan Agreement is attached hereto and made a part hereof.

G.      The Loan Agreement <u>inter alia</u> provides that the Loan will be secured by a super-priority administrative claim with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

H.      As further security for the full and timely performance of the obligations of the Debtor under the Loan but junior to the Permitted Liens (as hereinafter defined), the Loan shall be secured in accordance with Section 364(d)(1) of the Bankruptcy Code by the Mortgage (as hereinafter defined) encumbering the Mortgaged Property senior and superior to all other existing liens, claims, and/or security interests, and proceeds thereof including, (a) the Existing Mortgages of Bank, (b) Existing Judgment of McElderry Drywall, Inc., (c) Existing Judgment of Bohler Engineering, (iv) Existing Judgments of Former Prospects and (d) the Existing Borough Judgment.

I.      The Trustee and Bank have engaged in negotiations regarding the Loan and the requirement of Lender that the Loan be secured by senior claims and liens with priority over the Bank's existing claims and Existing Mortgages of Bank.

J.      The Trustee and Bank have reached an agreement regarding the Loan, whereby the Bank will consent to the Loan subject to the terms memorialized herein.

K.      Capitalized terms used herein and unless otherwise defined will have the meanings set forth therefor in **Section 1** of this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## 1.  DEFINITIONS

1.1     **Defined Terms**.  The following words and phrases as used in capitalized form in this Agreement, whether in the singular or plural, shall have the meanings indicated:

1.1.1    **"Administrative Claim"** means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date preserving the Debtor's estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services); and (b) all fees and charges assessed against the Debtor's estate pursuant to section 1930 of chapter 123 of the Judicial Code.

2

1.1.2   **"Aqua Letter of Credit"** shall mean the Irrevocable Standby Letter of Credit No. IVC-2 for $293,445.50 issued by Bank to Aqua Pennsylvania, Inc. for the Island View Crossing II, LP Public Improvements in connection with that certain builder's extension agreement dated September 4, 2015 by and between the Debtor and Aqua Pennsylvania, Inc. for the construction of a water main extension to provide water to the Project.

1.1.3   **"Bank"** means Prudential Bank.

1.1.4   **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended from time to time.

1.1.5   **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

1.1.6   **"Bankruptcy Case"** means that certain case filed under Chapter 11 of the United States Bankruptcy Code, known as Case No. 17-14454(ELF) in the Bankruptcy Court on the Petition Date.

1.1.7   **"Borough"** shall mean the Borough of Bristol.

1.1.8   **"Borough Letter of Credit"** shall mean the Irrevocable Standby Letter of Credit No. IVC-1 for $2,090,381.19 issued by Bank to the Borough of Bristol and Bristol Borough Water and Sewer Authority for the Island View Crossing II, LP Subdivision Development Improvements in connection with the Subdivision Financial Security Agreement dated March 4, 2015 by and among the Borough, Bristol Borough Water & Sewer Authority, the Debtor and the Bank for the installation of the public improvements required for development of the Project.

1.1.9   **"Business Day"** means any day except a Saturday, Sunday or other day on which Lenders in Philadelphia, Pennsylvania are authorized by law to close.

1.1.10   **"Claim"** means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor.

1.1.11   **"Maturity Date"** means the maturity date of the Loan which is thirty (30) months after the Closing Date; provided, however if the Loan is not in default, at the request of Trustee, the term may be extended for an additional period of six (6) months at no additional cost to the Trustee.

1.1.12   **"Existing Bank Construction Loan"** means an existing development construction loan agreement in the original amount of $5,541,468.00 from Bank to Debtor made on November 26, 2014 as thereafter amended, restated or modified.

1.1.13   **"Existing Borough Judgment"** means an existing judgment against Debtor in favor of the Borough filed on April 22, 2016 (No. 2016-71251) in the amount of $56,239.22.

1.1.14   **"Existing Cross Subordination Agreement"** shall mean the cross subordination agreement by and among the RDA, Debtor and Bank dated December 10, 2014. A copy of the Existing Cross Subordination Agreement is attached hereto as Exhibit "A".

1.1.15 "**Existing Judgments of Former Prospects**"    means the three (3) below stated existing judgments held by certain former prospects:

1.1.15.1    In favor of Monica Caione against Debtor, Americorp Homes and Island View Crossing II, Inc. filed on February 28, 2017 (No. 2016-04021) in the amount of $30,990.00;

1.1.15.2    In favor of Samira Ranganathan and Khandulans Ranganathan against Debtor filed on June 19, 2017 (No. 2016-05724) in the amount of $49,980.00; and

1.1.15.3    In favor of Frank Del Grasso against Debtor, Island View Crossing II, Inc., Americorp Realty LLC, Americorp Homes LLC, and Americorp Real Estate Development LLC filed on March 23, 2017 (No. 2016-06685) in the amount of $27,250.00.

1.1.16 "**Existing Judgment of Bohler Engineering**" means the judgment entered in favor of Bohler Engineering PA, LLC against Debtor filed on January 5, 2017 (No. 2017-00032) in the amount of $48,853.63.

1.1.17 "**Existing Judgment of McElderry Drywall Inc.**" means the judgment entered in favor of McElderry Drywall, Inc. against Americorp Homes, Inc. and Debtor filed **after the Petition Date** on August 10, 2017 (No. 2016-06868) in the amount of $42,730.16.

1.1.18 "**Existing Mortgages of Bank**" shall mean collectively, the four (4) below stated mortgages, assignment of rents and leases, recorded against the Property in favor of Bankand the and UCC-1's  filed by Bank with Department of State of the Commonwealth of Pennsylvania:

1.1.18.1    Collateral mortgage in the amount of $3,911,250 dated September 20, 2011 and recorded on October 19, 2011 in Land Record Book 6838, Page 230 (Instrument No. 2011070888) (the "Steeple Run Collateral Mortgage");

1.1.18.2    Mortgage in the amount of $1,400,000 dated September 22, 2013 and recorded on September 27, 2013, instrument number 2013080879 (the "IVC- Durham Mortgage");

1.1.18.3    Collateral mortgage in the amount of $5,136,000 dated May 30, 2014 and recorded on July 23, 2014, instrument number 2014038527(the "Calnshire Collateral Mortgage");

1.1.18.4    Open-End Mortgage and Security Agreement in the amount of $5,541,468 dated November 26, 2014 and recorded on January 7, 2015 as instrument number 2015001098 (the "Mortgage for Existing Bank Construction Loan");

1.1.18.5    Assignment of Rents and Leases and Agreements of Sale recorded as instrument number  2015001143 filed in conjunction  with the Mortgage for Existing Bank Construction Loan;

**1.1.18.6**       UCC-1 filed on September 27, 2013 in the Bucks County Recorder of Deeds Office as instrument number 2013080881 naming Island View Crossing, II, L.P. as Debtor and Bank Savings Bank as Secured Party; and

**1.1.18.7**       UCC-1 filed on January 4, 2015 in the Bucks County Recorder of Deeds Office as instrument number 2015001161 naming Island View Crossing, II, L.P. as Debtor and Bank Savings Bank as Secured Party.

1.1.19  **"Existing Mortgages of RDA"** shall mean the two (2) below stated mortgages recorded against the Property in favor of the RDA:

**1.1.19.1**       Mortgage in the amount of $2,500,000.00 dated June 13, 2003 and recorded on August 25, 2003 in land record Book 3537, Page 792 (Instrument No. 20030163787); and

**1.1.19.2**       Open-End Mortgage and Security Agreement in the amount of $127,627.83 dated July 21, 2016 and recorded on July 22, 2016 as instrument number 2016043135).

1.1.20  **"Existing Pre-Petition Property Taxes"** shall mean the pre-petition property tax claims due to the Bucks County Tax Claim Bureau for the delinquent Real Estate Taxes for the Property as of the Petition Date.

1.1.21  **"Existing RDA Loan"** shall mean an existing acquisition loan in the original amount of $2,500,000 from RDA to Debtor made on June 13, 2003 as thereafter amended, restated or modified.

1.1.22  **"Loan"** means a revolving loan in the principal amount of up to Four Million and Seven Hundred Thousand Dollars ($4,700,000.00).

1.1.23  **"Mortgage"** means that certain Open-End Mortgage and Assignment of Rents and Leases securing the Loan executed by Debtor in favor of Lender dated of even date herewith.

1.1.24  **"Mortgaged Property"** shall means the real property located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119), as more particularly described on Exhibit "B" attached hereto and made a part hereof which is a residential subdivision of approximately 17.51 acres, wherein Phase 1 is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements and Phase 2 is currently approved for six (6) buildings containing a total of 96 condominiums units and certain site improvements, as may be amended by the parties and all improvements thereon and all rights, licenses, permits and approvals relating thereto, together with an assignment of all rents and leases related thereto.

1.1.25  **"Official Body"** shall mean any governmental or political subdivision or any agency, authority, bureau, central bank, commission, department or instrumentality of either, or any court, tribunal, grand jury or arbitrator, in each case whether foreign or domestic.

1.1.26  **"Permitted Claims"**  shall mean claims arising from (i) the Loan, (ii) allowed Administrative Claims, (iii) allowed Priority Tax Claims, (iv) allowed secured

claims, (v) allowed Priority Non-Tax Claims, and (vi) allowed general unsecured claims excluding claims held by insiders (as that term is defined by the Bankruptcy Code and applicable case law); provided however, allowed fee claims of counsel retained by the Debtor are specifically excluded.

1.1.27 **"Permitted Liens"** shall mean (i) the liens created by the Existing Real Estate Taxes, (ii) the liens created by the Existing Mortgages of the RDA and (iii) the encumbrances created by the Existing Cross Subordination Agreement.

1.1.28 **"Petition Date"** shall mean June 30, 2017, the date upon which the Debtor filed its petition for relief pursuant to Chapter 11 of Title 11 of the United States Code.

1.1.29 **"Phase 1"** means the area of the Mortgaged Property that is approved for the construction of fourteen (14) buildings containing a total of 73 townhouses and certain site improvements.

1.1.30 **"Phase 2"** means the area of the Mortgaged Property that is approved for the construction six (6) buildings containing a total of 96 condominiums units and certain site improvements.

1.1.31 **"Pre-Petition Project Advances"** means (i) monies advanced by the Bank pre-petition to the Debtor under the Existing Bank Construction Loan, and (ii) monies advanced by the Bank pre-petition to the Debtor and other non-debtor borrowers under that certain loan dated September 20, 2013 in the amount of $1,400,000.00.

1.1.32 **"Priority Non-Tax Claim"** means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.1.33 **"Priority Tax Claim"** means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.1.34 **"Project"** shall means the design, engineering, and construction of (i) the 14 buildings in Phase 1 which will contain a total of 73 Residential Units, including existing buildings numbered 4 and 2, (ii) the site improvements in Phase 1, (iii) the site improvements in Phase 2 that are required as a condition to the Debtor being able to sell and settle on the 73 Residential Units in Phase 1, and (iv) the construction of a clubhouse (to be designed) which will be located in Phase 2.

1.1.35 **"Property"** shall mean collectively, the land, the improvements, the site improvements, and the other tangible property covered by the Mortgage on the Mortgaged Property.

1.1.36 **"RDA"** means the Redevelopment Authority of Bucks County.

1.1.37 **"Site Improvements"** shall mean site improvements to the land including, but not limited to the following: road overlay, curbing, earthwork, paving, storm drainage, sanitary sewer, water, electric, excavation, street lighting, layout, engineering and inspection to be constructed in accordance with the Site Plans, together with all equipment, fixtures and other personal property attached thereto or used in connection therewith.

6

1.1.38 **"Site Plans"** shall mean the final plans and specifications for the construction of the Site Improvements on the Property approved by all Official Bodies, as the same may be amended, modified or supplemented from time to time.

1.1.39 **"Trustee"** means Kevin O'Halloran, solely in his capacity as Chapter 11 Trustee for Debtor in the Bankruptcy Case.

1. **BANK'S CONSENT TO LOAN.**   Subject to the mandatory release payments set forth in Section 2, the Bank consents to (i) the Loan, (ii) Trustee entering into the Loan Agreement for the Loan, (ii) the granting of senior claims and liens to Lender to secure the Loan that will be senior and with priority over the Bank's existing liens arising from the Existing Mortgages of Bank and (iv) the reservation of rights of the Trustee, Debtor, and Bank set forth in **Section 4** below in connection with any payments to be paid to Bank under this Agreement.

2. **MANDATORY RELEASE PAYMENTS; RELEASE OF LIENS AND SUBORDINATION OF MORTGAGES.**

2.1 **Release Prices for First 35 Residential Units in Phase 1**. The Bank agrees to release all of its liens arising from the Existing Mortgages of Bank at the time of sale of each of the first thirty-five (35) Residential Unit in Phase 1 for the payment of twenty-five thousand Dollars ($25,000.00) to Bank at time of each closing which will be applied to reduce the principal balance of the Existing Bank Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

2.2 **Release Prices for Remaining 38 Residential Units in Phase 1**. The Bank agrees to release all of its liens arising from the Existing Mortgages of Bank at the time of sale of each of the remaining thirty-eight (38) Residential Unit in Phase 1 for the payment of forty-five thousand Dollars ($45,000.00) to Bank at time of each closing which will be applied to reduce the principal balance of the Existing Bank Construction Loan as set forth in the proof of claim filed by Bank in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

2.3 **Release Prices for RDA**. The Bank consents to the Trustee paying to the RDA at time of closing on the sale of each Residential Unit in accordance with the Existing Cross Subordination Agreement, a payment of $12,350.00 to be applied to reduce the principal balance of the Existing RDA Loan and to release the RDA lien on the Residential Unit sold.

2.4 **Balance of Existing Bank Construction Loan**. The unpaid balance due under the Existing Bank Construction Loan, shall be due and payable to the Bank on the last business day of the forty-second (42nd) month after the entry of a final order approving the Loan (the "Effective Date").

2.5 **Subordination of Steeple Run Collateral Mortgage**. Concurrent with the execution of this Agreement, Bank shall deliver to Trustee (in recordable form) a subordination agreement of the Steeple Run Collateral Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the

7

Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court. The Subordination Agreement will also provide that at the time of each closing on the sale of a Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, the Bank will deliver a release of the lien of this mortgage to the Trustee without any charge or payment. The Trustee/Debtor preserves its claim to void or otherwise invalidate the Steeple Run Collateral Mortgage and the Bank likewise preserves all of its claims and defenses to any such claim.

2.6     **Subordination of Calnshire Collateral Mortgage.**  Concurrent with the execution of this Agreement, Bank shall deliver to Trustee (in recordable form) a subordination agreement of the Calnshire Collateral Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  The Subordination Agreement will also provide that at the time of each closing on the sale of each Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, the Bank will deliver a release of the lien of this mortgage to the Trustee without any charge or payment.  The Trustee/Debtor preserves its claim to void or otherwise invalidate the Calnshire Collateral Mortgage and the Bank likewise preserves all of its claims and defenses to any such claim.

2.7     **Subordination of IVC-Durham Mortgage.**  Concurrent with the execution of this Agreement, Bank shall deliver to Trustee (in recordable form) a subordination agreement of the IVC-Durham Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  The Subordination Agreement will also provide that at the time of each closing on the sale of each Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, the Bank will deliver a release of the lien of this mortgage to the Trustee without any charge or payment.  The Trustee/Debtor preserves its claim to void or otherwise invalidate the IVC-Durham Mortgage and the Bank likewise preserves all of its claims and defenses to any such claim.

2.8     **Release of Clubhouse and Common Elements.**  In addition to the above releases and subordination of its Existing Mortgages, Bank shall deliver to Trustee (in recordable form) for no charge or payment, a release of its liens arising from (i) the Steeple Run Collateral Mortgage, (ii) the Calnshire Collateral Mortgage, and (iii) the IVC-Durham Mortgage in connection with the clubhouse (to be designed and built) and the common elements at the Project at the time that the Trustee is legally obligated to, and in fact conveys said clubhouse and common elements to the applicable master association, homeowners' association and/or condominium association for the Project.

3.  **EXISTING LETTERS OF CREDIT ISSUED BY BANK**.  The Bank represents that the Borough Letter of Credit and the Aqua Letter of Credit are irrevocable and it will not cancel either letter of credit without the prior written consent of the Trustee.  The Bank further agrees that it will take no action that will cause the Borough or Aqua of Pennsylvania to draw monies under either letter of credit.  Any advances made by the Bank after the date of this Agreement (the "Advances") to the Borough under the Borough Letter of Credit (not to exceed the undrawn balance of $1,231,087.02) or to Aqua of Pennsylvania under the Aqua Letter of Credit (not to exceed the undrawn balance of $30,000.00) shall constitute an allowed claim under the Existing Bank Construction Loan and will increase the principal amount due under the Existing Bank Construction Loan by the amount of the advance but will not impact or change the release prices set forth above; provided, however the Bank must deliver written notice to Trustee and his counsel no later than five (5) business days before it makes any advance under the Borough Letter of Credit or the Aqua Letter of Credit.  Advances, if any, by the Bank as set forth above shall be due and payable on the Effective Date and not subject to challenge, deduction or setoff.

4.  **RESERVATION OF RIGHTS OF TRUSTEE, DEBTOR AND BANK.**

4.1   The Trustee, the Debtor and its estate preserve, retain and may hereafter assert any and all claims and defenses of the Debtor and its estate against the Bank arising out of or in connection with the Debtor's relationship with the Bank, including but not limited to: (i) the pre-petition claims asserted in a state court complaint filed on or about March 31, 2016 in the matter of, *Island View Properties, Inc. trading as Island View Crossing II, LP, and Renato J. Gualtieri v. Prudential Savings Bank*, Case No. 160303161 (C.C.P., Phila. Cty.), that has since been removed to the Bankruptcy Court and assigned Adversary No. 17-00202(ELF) (the "Adversary Proceeding"); (ii) additional claims to be asserted in the Adversary Proceeding or in any other proceeding such as, by way of example only, avoidance claims under Chapter 5 of the Bankruptcy Code (as relate to the Pre-Petition Project Advances or otherwise), and/or equitable subordination claims under the Bankruptcy Code (as relate to the Pre-Petition Project Advances or otherwise); and, (iii) the right to assert by way of claim or defense that the Bank is not entitled to recover or to be paid for the Pre-Petition Project Advances and/or that the Bank's rights as to the Pre-Petition Project Advances should be equitably subordinated to the claims of others.  The Bank likewise reserves and preserves all of its rights claims and defenses, including any defenses under the terms of the prepetition loan documents and applicable law, as well as the right to bring additional claims or join in third parties into any proceeding.

4.2   The payments paid under this Agreement on account of the Existing Bank Construction Loan shall not constitute a waiver, release or discharge of any claims or defenses of the Trustee or the Debtor all of which are expressly preserved, including the Trustee/Debtor's right to challenge the Bank's entitlement to be repaid for any or all of the Pre-Petition Project Advances.  The Bank likewise reserves and preserves all of its rights claims and defenses, including any defenses under the terms of the prepetition loan documents and applicable law, as well as the right to bring additional claims or join in third parties into any proceeding.

4.3   The payments paid under this Agreement on account of the Existing Bank Construction Loan shall not prejudice or impair any of the Trustee/Debtor's claims or defenses in any manner or based on any theory whatsoever, and the Bank waives any right to assert the defenses of waiver, release, collateral estoppel, issue preclusion or res judicata as relates to the Trustee/Debtor's claims or defenses, including any such claims or defenses related to the Pre-Petition Project Advances, and similarly the Bank preserves and reserves its rights to claim the same adverse to the Trustee or the Debtor regarding any actions pre-petition.

9

4.4     Notwithstanding paragraphs 4.1, 4.2 and 4.3 above, to the extent any payments are paid under this Agreement on account of the Existing Bank Construction Loan, they shall not be subject to set off by the Debtor or Trustee, even in the event that the recovery arising from the prosecution of the claims of the Debtor in the Adversary Proceeding, or otherwise, exceeds the Pre-Petition Project Advances.  The Debtor therefore waives and confirms that it shall have no right to set off against any payments paid under this Agreement on account of the Existing Bank Construction Loan.  The Bank retains the rights, claims and defenses it has under its loan documents, and applicable law, which shall not be waived by virtue of the Bank's agreement to enter into this Agreement, as well as the right to assert additional claims against the Debtor relating to the prepetition relationship between the Debtor and the Bank.  The Bank waives any claim, defense or right to assert that by agreeing to the this Agreement or the payment of the payments on account of the Existing Bank Construction Loan, that the Debtor is waiving any right or claim that its alleged damages exceed the Pre-Petition Project Advances.  To the extent the  payments on account of the Existing Bank Construction Loan are paid under this Agreement before the Debtor/Trustee's claims and defenses have been finally adjudicated, such payments shall be deemed made under protest and shall be subject to recovery (but not by way of setoff) if the Debtor/Trustee prevails, as well as any applicable defenses raised by the Bank to same.

5.     **COMMUNICATIONS AND NOTICES.**

5.1     **Communications and Notices.**     All notices, requests and other communications made or given in connection with this Agreement shall be in writing and, unless receipt is stated herein to be required, shall be deemed to have been validly given if delivered personally to the individual or division or department to whose attention notices to a party are to be addressed, or by private carrier, or registered or certified mail, return receipt requested, or by telecopy with the original forwarded by first-class mail, in all cases, with charges prepaid, addressed as follows, until some other address (or individual or division or department for attention) shall have been designated by notice given by one party to the other:

To Debtor:

> Kevin O'Halloran, Chapter 11 Trustee
> P.O. Box 723307
> Atlanta, GA 31139
> E-mail:  kevinnm@bellsouth.net

With a copy to:

> Aris J. Karalis, Esquire
> Karalis PC
> 1900 Spruce Street
> Philadelphia, PA 19103
> E-mail:  akaralis@karalislaw.com

To Bank:

> Prudential Bank
> Att: Gary Reilly, Chief Credit Officer/Senior Vice President
> 3993 Huntingdon Pike
> Huntingdon Valley, PA 19006
> E-mail: greilly@prudentialbanker.com

With a copy to:

> Edmond M. George, Esquire
> Obermayer Rebmann Maxwell & Hippel, LLP
> Centre Square West
> 1500 Market Street, Suite 3400
> Philadelphia, PA 19102
> E-mail: edmond.george@obermayer.com

6.   **SUBMISSION TO JURISDICTION.**

6.1   **Submission to Jurisdiction.** Debtor and Bank hereby consent to the exclusive jurisdiction of the United States Bankruptcy Court and all actions or proceedings relating to this Agreement or the transactions contemplated hereunder shall be litigated in such court; provided, however, in the event the Bankruptcy Case is dismissed, Debtor and Bank hereby consent to the exclusive jurisdiction of the Court of Common Pleas of Bucks County, or the federal courts located within the Eastern District of Pennsylvania, and agree that all actions or proceedings relating to this Agreement or the transactions contemplated hereunder shall be litigated in such courts.

7.   **MISCELLANEOUS.**

7.1   **Survival.** All covenants, agreements, representations and warranties made by Trustee or Bank in this Agreement in connection with the transactions contemplated herein shall be true at all times this Agreement is in effect and shall survive the execution and delivery of this Agreement

7.2   **Binding Effect.** This Agreement and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

7.3   **No Third Party Beneficiaries.** The rights and benefits of this Agreement and this Agreement shall not inure to the benefit of any third party.

7.4   **Modifications.** No modification of this Agreement shall be binding or enforceable unless in writing and signed by or on behalf of the party against whom enforcement is sought.

7.5   **Holidays.** If the day provided herein for the payment of any amount or the taking of any action falls on a Saturday, Sunday or public holiday at the place for payment or action, then the due date for such payment or action will be the next succeeding Business Day.

11

7.6 **Law Governing**. This Agreement has been made, executed and delivered in the Commonwealth of Pennsylvania and will be construed in accordance with and governed by the laws of such State without regard to conflict of law principles.

7.7 **Integration**. This Agreement contain the entire understanding of the parties thereto with respect to the matters contained herein and supersedes all prior agreements and understandings between the parties with respect to the subject matter hereof.

7.8 **Exhibits and Schedules**. All exhibits and schedules attached hereto are hereby made a part of this Agreement.

7.9 **Headings**. The headings of the Articles, Sections, paragraphs and clauses of this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

7.10 **Recording**. This Agreement shall be recorded by Trustee.

7.11 **Counterparts**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

7.12 **Waiver of Right to Trial by Jury**. **DEBTOR AND LENDER WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF DEBTOR OR LENDER WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. DEBTOR AND LENDER AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF DEBTOR AND LENDER TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. DEBTOR ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT IT FULLY UNDERSTANDS ITS TERMS, CONTENT AND EFFECT, AND THAT IT VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS SECTION.**

7.13 **No Liability; Non-Recourse as to Trustee**. Notwithstanding anything otherwise contained herein, Kevin O'Halloran is acting solely as a Trustee on behalf of Debtor under the Bankruptcy Case and Bank's recovery under this Agreement shall be limited to the assets of Debtor and its estate including the Mortgaged Property and Trustee will have no individual liability to Bank under this Agreement, or for the repayment of the Bank's claims, Existing Mortgages of Bank, or any loans in connection therewith.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

ISLAND VIEW CROSSING II, L.P.

By: _____

Name/Title: Kevin O'Halloran,
Chapter 11 Trustee

**PRUDENTIAL BANK**

By: _____
Name/Title: _____

13

STATE OF _____       :

                                                             : ss

COUNTY OF _____       :

       On this \_\_\_\_\_ day of August, 2018, before me, the undersigned officer, a Notary Public duly commissioned by the State of _____, personally appeared Kevin O'Halloran, known to me or proven to be the person(s) who executed the above instrument, and who acknowledged himself to be the Chapter 11 Trustee for the Estate of Island View Crossing II, L.P. and that he, as such Chapter 11 Trustee, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the his name as such Chapter 11 Trustee.

       IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

                                  _____(SEAL)
                                  Notary Public

STATE OF _____    :

                                               : ss

COUNTY OF _____    :

On this _____ day of August, 2018, before me, the undersigned officer, a Notary Public duly commissioned by the State of _____, personally appeared _____, known to me or proven to be the person(s) who executed the above instrument, and who acknowledged himself to be the _____ of Prudential Bank and that he, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the his name as such _____.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____(SEAL)
Notary Public

15

# EXHIBIT A

**Existing Cross Subordination Agreement**

CROSS SUBORDINATION AGREEMENT

**THIS CROSS SUBORDINATION AGREEMENT** (the "Agreement") is by and among The Redevelopment Authority of Bucks County (the "Authority"), Island View Crossing, LP ("Island View") and Prudential Savings Bank ("Prudential").

WITNESSETH:

**WHEREAS,** Island View is the owner of a certain lot or piece of ground in Bristol Borough, Bucks County, Pennsylvania situate on Radcliffe Street and being Tax Parcel No. 4-27-119 (the "Premises"); and,

**WHEREAS,** the Authority has a Two Million Five Hundred Thousand ($2,500,000.00) Dollar first mortgage lien on the Premises; and,

**WHEREAS,** Island View desires to develop the Premises in three phases, the first being to make site improvements to the Premises as required by a certain Subdivision Development Improvement Agreement between Island View and Borough of Bristol; the second phase being the construction of town houses on that portion of the Premises designated on a certain Phasing Plan Exhibit of Proposed Residential Development of Island View Crossing II LP (the Phasing Plan") as "Phase I" and the third phase being the construction of condominium units on the portion of the Premises designated on the Phasing Plan as Phase II; and,

**WHEREAS,** the parties to the Agreement desire to set forth their rights, responsibilities and obligations with respect to development of the Premises.

AGREEMENT

**NOW THEREFORE,** in consideration of the mutual promises hereinafter set forth and for other good and valuable consideration, the receipt of which is acknowledge, the parties hereto agree as follows:

1. <u>Incorporation of Recitals</u>.  The recitals hereinbefore set forth are incorporated into and are a part of the Agreement as though they were set forth herein at length.

2. <u>The Phasing Plan</u>.  By execution of the Agreement, the parties agree to development of the Premises as set forth on the Phasing Plan.

3. <u>Development Plan</u>.  Island View shall obtain a final approved plan for development of

the Premises from Bristol Borough (the "Development Plan") and present it to the Authority and Prudential for their approval, which approval shall not be unreasonably withheld or delayed.

4. Site Improvements. Island View shall present a schedule of proposed improvements to the Premises to Prudential and the Authority (the "Site Improvements Schedule") for their approval, which approval shall not be unreasonably withheld or delayed.

5. Construction of Houses. Island View shall present to Prudential for its approval a Schedule of the cost of construction of the houses in Phase 2 of the Phasing Plan (the "House Construction Schedule"), which approval shall not be unreasonably withheld or delayed.

6. Financing.

6.1 (a) Prudential Subject to its approval of the Development Plan as hereinbefore set forth in Section 3, the Site Improvements Schedule as hereinbefore set forth in Section 4 and the House Construction Schedule as hereinbefore set forth in Section 5 and subject to compliance by Island View with Prudential's construction loan mortgage underwriting policy shall issue its commitment to Island View to provide mortgage financing for the cost of site improvements and construction of houses in Phase 1 of the Phasing Plan and Site Improvements in Phase 2 of the Phasing Plan. The financing from Prudential shall be secured by a second lien mortgage on the Premises under and subject to the Authority's first mortgage aforesaid.

6.1 (b) Prudential now has or may in the future have collateral mortgage liens on the Premises which are junior in lien priority to the Authority's first mortgage lien and to Prudential's mortgage liens hereinbefore set forth in Section 6.1 (a). In the event that Prudential forecloses on its collateral mortgage, it will cause the Authority's mortgage to be paid in full.

6.2 (a) The Authority consents to Prudential's second mortgage lien on the Premises.

6.2 (b) The Authority consents to Prudential's collateral mortgage liens hereinbefore set forth in Section 6.1 (b).

6.3 (a) Island View, until its loan from the Authority secured by the Authority's Mortgage on the Premises is paid in full, shall continue to make all required mortgage payments and comply with all terms and conditions of the mortgage loan.

6.3. (b) Island View shall provide Prudential with such evidence as it may require that it has or will have at time of settlement on its mortgage loan from Prudential sufficient funds to pay for costs of the Site Improvements and construction of houses in excess of the funds to be provided by Prudential pursuant to Section 6.1 (a).

7. Repayment of Financing
7.1. The Authority Mortgage Loan. Upon settlement on the sale of each town house

and each condominium unit constructed on the Premises, Island View shall pay the Authority Twelve Thousand Three Hundred Fifty ($12,350.00) Dollars in reduction of the principal balance of the Authority's mortgage loan and in consideration of the payment, the Authority shall release the town house or condominium unit as the case may be, from the lien of its mortgage, all costs for preparation and filing of the release to be paid by Island View. Upon receipt of full payment of the mortgage loan, the Authority shall cause its mortgage to be marked satisfied of record.

      7.2.  Prudential's Mortgage Loan.  Upon settlement on the sale of each town house constructed on the Premises, Island View, after the payment to the Authority as hereinbefore set forth in section 7.1, shall pay Prudential the net proceeds of the sale in reduction of the principal balance and interest due on Prudential's mortgage loan and in consideration of the payment, Prudential shall release the town house from the lien of its mortgage, all costs for preparation and filing of the release to be paid by Island View. For purposes of this sub-paragraph, net proceeds shall mean the sale price of the town house less the seller's cost of sale and settlement, all as authorized and approved by Prudential.

    8.  Choice of Law  The Agreement will be governed, construed, and enforced in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflict of law rules.

    9.  Counterparts  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, and all of which taken together will constitute one and the same instrument.

    10.  Entire Agreement  This Agreement contains the entire understanding of the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.  This Agreement may be amended and modified only by a written instrument duly executed by the parties hereto.

    11.  Successors and Assigns  All other terms and provisions hereof will be binding on and insure to the benefit of and be enforceable by the successors and assigns of the parties hereto.

    12.  Waiver  No waiver of an provision of this Agreement and no waiver of any breach or default under this Agreement will be considered valid unless it is in writing and signed by the party giving the waiver.  No sch waiver will be deemed a waiver of any other provision or any subsequent breach or default of a similar nature.

    13.  Severability  The invalidity or unenforceability of any particular provision of this Agreement will not affect the other provisions hereof, and this Agreement will be construed in all respects as if the invalid or unenforceable provisions were omitted.  Anything to the contrary notwithstanding, the invalidity or unenforceability of any provision as aforesaid, shall have no effect on the validity or enforceability of the Authority's mortgage loan aforesaid.

IN WITNESS WHEREOF, the parties hereto, being duly authorized so to do, have caused this Agreement to be executed by their duly authorized officers on the date set forth beneath their names.

ISLAND VEW CROSSING II, L.P.
by: Island View Properties, Inc.,
    its General Partner

by: _____
    Renato J. Gualtieri, President

DATE: _____11/26/2014_____

REDEVELOPMENT AUTHORITY OF
BUCKS COUNTY

by: _____
    Robert White, Executive Director

DATE: _____11/10/2014_____

PRUDENTIAL SAVINGS BANK

by: _____
    Salvatore Fratanduono
    Sr. VP/CLO

DATE: _____11/26/14_____

## EXHIBIT B

**Legal Description**

ALL THAT CERTAIN lot or piece of land situate in Bristol Borough, Bucks County, Pennsylvania, described according to Plan of Subdivision, dated 3/29/2000, revised 5/1/2000 and recorded in Plan Book 300 page 96, as follows, to wit:

BEGINNING at a point on the Southeasterly side of Radcliffe Street (SR 2002), a corner of Lot 2 on said Plan; thence extending from said point of beginning, along said Lot 2, South 54 degrees 04 minutes 10 seconds East, 694.13 feet to a point in line of the Delaware River; thence extending along the same the two following courses and distances; (1) South 21 degrees 17 minutes 52 seconds West, 271.88 feet and (2) South 33 degrees 23 minutes 27 seconds West, 718.45 feet to a point, a corner of lands now or late of Bucks County Redevelopment Authority; thence extending along the same the three following courses and distances, viz: (1) North 54 degrees 04 minutes 50 seconds West, 450.19 feet; (2) South 35 degrees 55 minutes 10 seconds West, 36.63 feet; and (3) North 54 degrees 04 minutes 10 seconds West, 344.47 feet to a point on the Southeasterly side of Radcliffe Street, aforesaid; thence extending along the same, North 35 degrees 55 minutes 50 seconds East, 1017.52 feet to the first mentioned point and place of beginning.

BEING Lot 1 on said Plan.


Tax ID / Parcel No.: 04-027-119 and 04-027-119-002 thru and including 04-027-119-074

Being the same premises which Redevelopment Authority of The County of Bucks by Deed dated 6/5/2003 and recorded 6/13/2003 in Bucks County in Land Record Book 3537 Page 234 conveyed unto Island View Crossing II, L.P., a Pennsylvania limited partnership, in fee.

Being the same premises which Redevelopment Authority of The County of Bucks by Corrective Deed dated 10/17/2006 and recorded 11/09/2006 in Bucks County in Land Record Book 5172 Page 342 conveyed unto Island View Crossing II, L.P., a Pennsylvania limited partnership, in fee.