# EXHIBIT "C"

# PUBLIC OFFERING STATEMENT

## FOR

## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE

## A PLANNED COMMUNITY

# EACH PURCHASER OF A UNIT SHOULD READ THIS DOCUMENT CAREFULLY FOR HIS OR HER OWN PROTECTION.

EVERY PROSPECTIVE PURCHASER SHOULD READ THIS PUBLIC OFFERING STATEMENT CAREFULLY BEFORE SIGNING AN AGREEMENT OF SALE

PUBLIC OFFERING STATEMENT FOR
THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE, A PLANNED COMMUNITY

IMPORTANT NOTICE:   The following statements are made in compliance with the requirements of Section 5402(a)(13) of the Pennsylvania Planned Community Act (the "Act").

A.   WITHIN SEVEN (7) DAYS AFTER RECEIPT OF THIS PUBLIC OFFERING STATEMENT OR AN AMENDMENT TO THIS PUBLIC OFFERING STATEMENT WHICH MATERIALLY AND ADVERSELY AFFECTS THE RIGHTS OF THE PURCHASER, THE PURCHASER,

BEFORE CONVEYANCE, MAY CANCEL ANY CONTRACT HE OR SHE HAS PREVIOUSLY EXECUTED FOR THE PURCHASE OF A UNIT IN THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE (THE "COMMUNITY") FROM THE DECLARANT.   IF THE PURCHASER ELECTS TO CANCEL THE CONTRACT FOR THE PURCHASE OF A UNIT (THE "PURCHASE CONTRACT") PURSUANT TO THE IMMEDIATELY PRECEDING SENTENCE, HE OR SHE MAY DO SO BY HAND DELIVERING NOTICE OF CANCELLATION TO THE DECLARANT (IN WHICH CASE A RECEIPT SHOULD BE OBTAINED) OR BY MAILING THE NOTICE BY POSTAGE PREPAID UNITED STATES MAIL, RETURN RECEIPT REQUESTED.   THIS CANCELLATION OF THE PURCHASE CONTRACT IS WITHOUT PENALTY AND ALL PAYMENTS MADE BY THE PURCHASER BEFORE THIS CANCELLATION WILL BE REFUNDED PROMPTLY BY THE DECLARANT.

B.    IF THE DECLARANT FAILS TO PROVIDE A PUBLIC OFFERING STATEMENT (AND ANY AND ALL AMENDMENTS THERETO) TO A PURCHASER BEFORE CONVEYING A UNIT, THAT PURCHASER MAY RECOVER FROM THE DECLARANT, IN ADDITION TO ANY OTHER RELIEF, DAMAGES AS PROVIDED IN SECTION 5406(C) OF THE PLANNED COMMUNITY ACT, CONSISTING OF AN AMOUNT EQUAL TO 5% OF THE SALE PRICE OF THE UNIT UP TO THE MAXIMUM OF $2,000, OR ACTUAL DAMAGES, WHICHEVER IS THE GREATER AMOUNT; PROVIDED, HOWEVER, THAT A MINOR OMISSION OR ERROR IN THE PUBLIC OFFERING STATEMENT (OR IN AN AMENDMENT THERETO) THAT IS NOT WILLFUL SHALL ENTITLE THE PURCHASER TO RECOVER ONLY ACTUAL DAMAGES, IF ANY.

15743/1/5888498v6

C.    IF A PURCHASER RECEIVES THE PUBLIC OFFERING STATEMENT MORE THAN SEVEN (7) DAYS BEFORE SIGNING THE PURCHASE CONTRACT, HE OR SHE CANNOT CANCEL THE PURCHASE CONTRACT, EXCEPT THAT, IN ACCORDANCE WITH PARAGRAPH A ABOVE, HE OR SHE SHALL HAVE THE RIGHT TO CANCEL THE PURCHASE CONTRACT, BEFORE CONVEYANCE, WITHIN SEVEN (7) DAYS AFTER RECEIPT OF ANY AMENDMENT TO THE PUBLIC OFFERING STATEMENT THAT WOULD HAVE A MATERIAL AND ADVERSE EFFECT ON THE RIGHTS OR OBLIGATIONS OF THAT PURCHASER.

## GENERAL INFORMATION

NAME OF PLANNED COMMUNITY:   The Townhomes at Radcliffe Court on the Delaware, a planned community

LOCATION OF PLANNED COMMUNITY: Bristol Borough, Bucks County, Pennsylvania

NAME OF DECLARANT: Island View Crossing II, L.P.

ADDRESS OF DECLARANT: 1600 Radcliffe Street, Bristol Borough, PA 19007.

EFFECTIVE DATE OF PUBLIC OFFERING STATEMENT: May 1, 2019

The Pennsylvania Uniform Planned Community Act ("Act") requires that the original developer and seller of units in a planned community (called the "Declarant") disclose the characteristics of the planned community and the units being offered for sale.  This Public Offering Statement is the means by which such disclosure is to be made.

15743/1/5888498v6

# PUBLIC OFFERING STATEMENT

## FOR

## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE

a planned community

## NARRATIVE DESCRIPTION

### 1.  INTRODUCTION

Island View Crossing II, L.P.  (the "Declarant") is developing certain real estate adjacent to Radcliffe Street in Bristol Borough, Bucks County, Pennsylvania (the "Property") as a flexible planned community known as "The Townhomes at Radcliffe Court on the Delaware" ("Community") having up to seventy-three (73) semi-attached single family homes ("Homes") in up to fourteen (14) buildings.  The Homes will be constructed by Declarant pursuant to its construction contract with McGrath & Sons Development, LLC ("Builder"), a company not related to the Declarant. The Declarant is the owner of the Property.

This Public Offering Statement consists of a narrative description of information about the Community and exhibits identified throughout this Public Offering Statement.  The exhibits include the legal documents relating to the creation, marketing and operation of the Community, plans of the Property and a proposed first annual budget for the Community.  The narrative section of this Public Offering Statement is intended to summarize the significant features of the exhibits and to present other information of importance to prospective purchasers of the Homes. If there is any inconsistency between the exhibits and the narrative section of this Public Offering Statement, the text of the exhibits will control.

Any capitalized terms used in this Public Offering Statement and not otherwise defined herein will have the meanings given to such terms in the Pennsylvania Uniform Planned Community Act, 68 P.S. §5101, et. Seq. ("Act") and in the Declaration of Planned Community ("Declaration"), a copy of which is attached as Exhibit "A-1".

### 2.  PLANNED COMMUNITIES GENERALLY

The term "planned community" refers to a type of real estate development in which the homeowners are obligated to pay periodic assessments to a homeowners' association or similar organization, which then uses the amounts collected from homeowners to pay the costs of operating, maintaining, repairing, replacing, insuring and managing parts of the development that are for the common benefit of the homeowners, which are called "Common Facilities". Common Facilities generally include all parts of the Property and the improvements other than the homes and lots themselves and facilities owned by or dedicated to the public or to utility

companies (such as sanitary sewer facilities). In addition, homeowners in a planned community are subject to the payment of periodic assessments for the payment of the costs of operating, maintaining, repairing, replacing and managing elements in the planned community which are not "Common Facilities," such as the homes and lots themselves.

When used in this Public Offering Statement, a person who buys a Unit is called a "Unit Owner". The term "Unit" refers to the Unit Owner's part of the Community designated for separate ownership and occupancy and the house constructed on that Unit ("Home").

A Unit Owner in a planned community automatically becomes a member of the association created to own, manage, operate and maintain the Common Facilities. Such associations are governed by an executive board ("Executive Board"), the members of which are appointed by the Declarant (during the development stage) and later elected by the Unit Owners. Subject to the Declarant's right to control the association while the Community is being developed, Unit Owners have the right to participate in the control and management of the association through the election of members of the Executive Board.

In the Community, Unit ownership includes the obligation to pay a share of the expenses of operating and maintaining the Common Facilities and other common elements (the "Common Expenses"), as well as any assessments and charges authorized under the Declaration for expenses allocable to Controlled Facilities, and the Units themselves, defined in the Declaration to include "Common Expenses" and "Limited Common Expenses." Common Expenses, and Limited Common Expenses are allocated among, or assessed against the Unit Owners as provided in the Declaration and in the Responsibility Chart appended thereto.

## 3. THE DECLARANT

The Declarant is Island View Crossing II, L.P., a Pennsylvania limited partnership.

On June 30, 2017, the Declarant filed a voluntary petition in the Eastern District of Pennsylvania pursuant to chapter 11 of the Bankruptcy Code, case no. 17-14454(ELF). On January 30, 2018, Kevin O'Halloran was appointed to serve as the chapter 11 trustee for the Declarant. The Declarant will file a plan of reorganization with the bankruptcy court to reorganize its affairs under the provisions of the Bankruptcy Code.

## 4. GENERAL DESCRIPTION OF THE COMMUNITY

The Community is being developed as a residential planned community consisting of up to seventy three (73) townhomes with certain Common Facilities consisting generally of open space and walking trails.

The Community is located off of Radcliffe Street in Bristol Borough Bucks County Pennsylvania. The Community constitutes one (1) of two (2) units in Island View Crossing, a Master Planned Community ("Master Planned Community").

The Master Planned Community, like the Community, will have an association ("Master Association") and, like the Community, common facilities ("Master Common Facilities"). The

2

15743/1/5888498v6

Master Common Facilities are depicted on the Master Planned Community Plat, but generally consist of entrance improvements, a walking trail, connecting road, stormwater management system (including a pump station) and common utilities. The cost to maintain, repair and replace the Master Common Facilities shall be borne by each Unit in the Master Planned Community; which costs shall be passed through to each Unit Owner through Common Expenses (hereinafter defined). The Master Planned Community will be created by recording of the Declaration of Master Planned Community for Island View Crossing, a planned community, a copy of which is attached hereto as Exhibit "A-2."

The Master Community is currently planned to consist of the Community and a residential multi-building condominium complex consisting of six (6) five (5) story buildings ("**Condo Project**"). The Declarant cannot and does not represent or warrant that the Condo Project will be constructed; only that these uses have been contemplated. The Declarant, who is also the declarant under the Master Planned Community, has received land development approval for the Condo Project.

Declarant plans to develop the Community in multiple phases, with the Homes to be constructed in sequence as determined by the Declarant. Construction began in 2015 and resumed in 2018. A model home is finished, furnished and open to the public.

The Declarant contemplates that the Community will consist of a maximum of seventy-three (73) Units. However, pursuant to the terms of the Declaration and subject to the right of the Declarant to create Convertible Units up to the stated maximum, the Community will include initially those Units shown on the Plans of the Community and Exhibits to the Declaration.

Certain sections of the property shown on the Plans and included in the Community are designated as Convertible Real Estate. The Declarant has the right under the Declaration to create Units, Common Facilities and Limited Common Facilities in the Convertible Real Estate. Until the creation of the Units, Common Facilities and/or Limited Common Facilities, the Convertible Real Estate is a part of the Common Facilities of the Community.

The Declarant has the option to create Units, Common Facilities and Limited Common Facilities in the Convertible Real Estate for a period of ten (10) years from the initial recording of the Declaration.

The Declaration sets forth the provisions relating to the Convertible Real Estate. Barring changes in the currently applicable governmental land use approvals, in no event will the Community consist of more property than is designated in the Declaration when recorded as included or includable in the Community or more than seventy- three (73) Units. In addition, however, the Declarant reserves the right not to create any Units, Common -Facilities or Limited Common Facilities in the Convertible Real Estate.

The Declaration and the Act describe the procedure that the Declarant must follow for the creation of Units, Common Facilities or Limited Common Facilities in the Convertible Real Estate. Also described is the effect such an addition has on the Common Expense Percentages and votes associated with Units already included in the Community. The Common Expense

3

Percentages, both being based upon the then current number of Units in the Community, will be adjusted to reflect the Convertible Units included in the Community. Therefore, as Units are created in the Convertible Real Estate both the Common Element Percentages and Common Expense Percentages will be reduced.

## 5. THE UNITS

Each Unit consists of a Home to be constructed on a lot by the Builder. A "Home" is the single family semi-attached or attached residential dwelling constructed on a lot. The configuration and description of the Units are as shown on the Plans of the Community attached to the Declaration, and the recorded plans filed with the Bucks County Recorder of Deeds. Such plans may be supplemented from time to time during construction, and upon the completion of construction of the Community, in order to reflect any changes in lot lines necessary to address field conditions.

The Declarant intends to offer various models of Homes for sale at different prices. Model descriptions, specifications and current base pricing of Homes are available from the Declarant. The Declarant reserves the right to change the exterior elevations, plans, specifications and materials for Homes offered for sale from time to time. The base models presently offered by the Declarant are town homes ranging in size from approximately one thousand eight hundred sixty (1860) square feet to approximately two thousand twenty (2020) square feet of space, with a minimum of three (3) bedrooms and two and one half (2.5) bathrooms. The Homes include a variety of alternative first floor and second floor main bedroom layouts. Each Unit offers, as standard amenities, a garage, and two-story living.

Prices for the Units may be increased or decreased from time to time by the Declarant. Prices paid by purchasers for substantially similar Units may vary. The Declarant may, from time to time, offer the Units under special promotional pricing programs all of which are subject to change by the Declarant from time to time without notice (provided that the Declarant cannot change the price of a Unit established in a fully executed agreement of sale for the Unit between the Declarant and a purchaser unless permitted by that agreement).

The Declarant intends to offer certain optional features and upgrades that may be included in the Homes at additional cost. Not all options or upgrades may be available on all Home models, and the availability of certain selections may depend on particular features of the lot on which the Home will be built. The Declarant reserves the right to change the types and pricing of available options and upgrades, and to determine final pricing at the time of entering into an agreement of sale, from time to time without notice.

Units will be conveyed to purchasers in fee simple at the time of settlement by customary special warranty deed, subject to the Declaration and other easements and matters of record affecting the Units and the Community (see "Easements and Title Matters" below).

Each Unit will be taxed separately for real estate tax purposes. No Unit owner is liable for the payment of real estate taxes on any other Unit. The assessed value of the completed Units

4

15743/1/5888498v6

for real estate tax purposes is not yet known. The assessed value of the Units may vary depending on their size, features and cost.

The Declarant has contracted with the Builder to construct the Homes and related improvements in compliance with its agreements with Unit buyers. When a Unit is conveyed to a purchaser, the Unit will be substantially complete, connected to all necessary utilities and will have been issued a certificate of occupancy. Further, any Common Facilities reasonably necessary for the use and enjoyment of the Unit will have been substantially completed.

The estimated completion schedule for each individual Unit will be determined when the agreement of sale for the purchase of that Unit is signed between the Declarant and the Unit buyer. Declarant presently intends to commence construction of the Units, including model homes and spec homes, prior to receipt of agreements of sale from Unit buyers, but reserves the right to complete or construct Unit in the Community only after an Agreement of Sale with a purchaser has been signed; therefore, it is not possible to provide a schedule of completion for the Unit in the Community. Ultimately the schedule of completion of the Unit is subject to consumer demand and other market conditions.

The maximum number of Units that may be included in the Community is seventy three (73). The Declarant reserves the right to rent Units.

The Declarant is not obligated to build any minimum number of Units in the Community.

The Declarant is not offering or arranging financing for the purchase of Units, but reserves the right to do so.

## 6. COMMON ELEMENTS

The Community will include Common Elements that are described in the Declaration. Common Elements fall into two categories -- those parts of the real estate or improvements that will be owned by the Association ("Common Facilities") and other parts of the Community (including certain components of the Units) that are controlled, maintained, governed and/or insured, but not owned, by the Association ("Controlled Facilities").

The Common Facilities generally include all parts of the Property other than the Units (excluding improvements owned or to be dedicated to governmental authorities or utility providers and Master Common Facilities) and include the open space, walking trail and gazebos located within Unit 1. These Common Facilities are for the benefit of the Community as a whole.

The Master Association will be responsible for snow removal, as needed, from the streets and common sidewalks serving the Units and certain other maintenance as described on the Component and Responsibility Chart attached hereto as Exhibit "B" ("Responsibility Chart"). Homeowners will be responsible for some maintenance activities also set forth in the Responsibility Chart, including, but not limited to exterior maintenance. Lawns will be mowed by the Association.

5

15743/1/5888498v6

The Community will also have certain "Controlled Facilities". These will include certain parts of the exteriors of the Units that will be regulated by the Association.

The Association is generally responsible for operation, maintenance, repair, replacement and insurance of the Common Facilities. The expenses of managing, maintaining, repairing and insuring of Common Facilities will be a Common Expense assessed pro rata against all Units. All Units will be assessed the same fees for Common Expenses regardless of size, model or comparable amenities or features. The expense of performing the Association's maintenance obligations with respect to the Controlled Facilities will be "Limited Common Expenses" and charged to the Unit Owners receiving the benefit of such service as and when the service is provided. Certain other costs of repair, maintenance or repair will be charged directly to the Unit Owner receiving the service as a limited charge allocated solely to that Unit Owner and will not be part of the regular monthly assessment, as described in the Responsibility Chart.

The Association will carry insurance on the Common Facilities as required by the Act, but will not cover Units or the personal property of a Unit. Each Unit owner is responsible to obtain insurance for those items at his or her cost.

The Responsibility Chart lists and describes the services to be provided by the Association for various amenities and components, how the expenses of providing such services will be charged to the Unit Owners, and the responsibilities of the Unit Owners for maintenance, repair and replacement items relating to the Units.

The Common Facilities depicted on the Plans will be constructed by the Declarant. Controlled Facilities serving individual Units will be constructed in connection with the construction of those Units. The Declarant may, in its discretion, provide additional facilities or amenities not required by the Declaration or the approved plans and designate such facilities as Common Facilities or Controlled Facilities.

The completion of certain Common Facilities will be secured by an agreement with Bristol Borough, pursuant to the Pennsylvania Municipalities Planning Code, requiring that financial security be provided by the Declarant to secure the completion of some of the Common Facilities if the Declarant fails to do so. However, the Declarant is not providing any bond, letter of credit or other security directly to the Association or to the Unit Owners. The Declarant has, however, obtained construction financing that the Declarant has determined will be sufficient (together with other funds of the Declarant) to finance the completion of the Common Facilities as well as the Units.

The Common Facilities will be conveyed to the Association at no expense to the Association. The Association will assume the responsibility for maintaining, insuring, repairing and replacing such Common Facilities once they are completed, as provided in the Act. Until a Common Facility has been substantially completed, the Declarant (and not the Association) is responsible for all maintenance and all costs and taxes associated with such Common Facility.

15743/1/5888498v6

## 7. THE ASSOCIATION

The Community and the Common Elements will be governed and managed by the The Townhomes at Radcliffe Court on the Delaware Community Association ("Association") which has been organized as a Pennsylvania non-profit corporation. The Unit Owners (including the Declarant) will be the only Members of the Association. The Association will be responsible to manage, maintain, repair, replace and insure the Common Facilities and to perform the Association's limited maintenance obligations with respect to the Controlled Facilities. The Association will levy and collect Common Expense Assessments from the Unit Owners to pay the Common Expenses and will levy and collect the Limited Common Expenses Assessments.

The Association will be governed by an executive board consisting of (3) Executive Board members. The Declarant shall have the right to appoint and remove a majority or all of the Executive Board members during the Declarant Control Period, and thereafter a majority or all of the Executive Board members of the Association will be elected by the Unit Owners. Each Unit will have one (1) vote on any matters on which Members of the Association are entitled to vote. Cumulative voting is not permitted (cumulative voting is a process by which members may vote for the election of Executive Board members by multiplying the number of votes they have by the number of Executive Board members to be elected, and then casting the resulting number of votes in favor of any one or more candidates in such proportion as the voting member may determine).

The Executive Board will designate officers who will have the authority to carry out decisions of the board and to manage the ordinary day-to-day operations of the Association.

The Association is authorized to engage an independent management firm to assist in the management of the Community and the Common Elements. The initial manager will be selected prior to the conveyance of the first Unit. The manager will be compensated by the Association, and that compensation will be a Common Expense.

The Association will be governed by the Declaration as well as its by-laws. A current copy of the By-Laws is attached as Exhibit "C". The By-Laws govern the internal workings and procedures applicable to the Association, the executive board and the officers (see the discussion of "By-Laws" below).

The Association will have the authority to make rules and regulations ("Regulations") governing the use and enjoyment of the Common Elements as well as architectural policies and guidelines with respect to matters subject to approval under the Declaration. No Regulations have yet been adopted or proposed, and copies of any proposed or adopted Regulations will be provided to prospective Unit purchasers when available.

## 8. FINANCIAL MATTERS; FINANCING

A preliminary proposed first annual budget of the Association is attached as Exhibit "D". The budget was prepared by Declarant. The budget includes an estimate of the Common Expenses and Common Expense Assessments to be made by the Association against each Unit for such period of time. The budget includes reserves for future repairs and replacements of

7

15743/1/5888498v6

certain Common Facilities based on the estimated cost to repair and replace those Common Facilities and includes the pro-rata cost to repair, replace and maintain the Master Common Facilities. The budget is only a projected budget, is based on certain assumptions which are more fully set forth on Exhibit "D", and is subject to change as more Units are completed and as the Association assumes responsibility for maintenance and repair of the Common Elements.

On the date hereof, the Association has no material assets or liabilities and, therefore, no balance sheet is provided for the Association.

Except for those accounted for in the budget, there are no services, or personal property not owned by the Association, being provided by the Declarant, that will be required to be obtained by the Association for the operation or enjoyment of the Common Elements when the Declarant ceases to furnish such services or property.

At the time of settlement, each purchaser of a Unit from the Declarant or Homeowner shall pay a one-time contribution in the amount of Four Hundred Ninety Five Dollars ($495.00). This contribution is in addition to the regular Common Expense Assessment applicable to the Unit.

The Declarant does not contemplate that any user fees will be charged for the use of any Common Elements or other facilities in the Community that are provided for the common benefit of the Unit Owners except for the Common Expense Assessments.

## 9. LIENS AND TITLE MATTERS

The Property is subject to mortgages and other security documents in favor of Declarant's construction lenders, Prudential Savings Bank and Redevelopment Authority of the County of Bucks (the "Construction Mortgages"). Before a Unit is conveyed to a purchaser, that Unit will be released from the Construction Mortgages and any other mortgage liens and before Common Facilities are conveyed to the Association the Declarant will either satisfy the Construction Mortgages or obtain the release of such Common Facilities therefrom.

The Property, the Units and the Common Facilities are also subject to the easements and other matters of record described in the Declaration and under the Act. The Declarant reserves the right to create additional easements through the Property as necessary for the development of the Community, including easements in favor of utility companies and others furnishing utility, sewer and water service to the Community.

The Property is also subject to the Master Declaration, a copy of which is attached hereto as Exhibit "A-2". The Community is also subject to that certain Parking Easement Agreement, between Declarant and Island View Crossing I, L.P., an entity that owns property adjacent to the Master Planned Community ("Adjacent Property"), a copy of which is attached hereto and made a part hereof as Exhibit "A-3" ("Parking Easement"). Exhibit A-4 sets forth a list of title exceptions existing as of the date hereof. The Parking Easement provides for parking and access between the Master Community and the Adjacent Property. The Community may be subject to

15743/1/5888498v6

other easements of record, and each purchaser is encouraged to obtain a title report which should show all exceptions of record.

The Property will be subject to an Environmental Covenant with the Pennsylvania Department of Environmental Protection for the Environmental Matters set forth herein.

## 10. JUDGMENTS AND LITIGATION

As of the date hereof, there are no judgments against the Association and there is no pending litigation against or affecting the Community, except the bankruptcy previously described.

## 11. ENVIRONMENTAL MATTERS

Background

Extensive investigations of the Property have been performed which have been reviewed by the Pennsylvania Department of Environmental Protection ("DEP"). DEP has determined that the Property, upon the completion of the remediation described herein, will be suitable for residential housing and that the Property will not pose an unacceptable health risk.

The Declarant owned property is located on the east side of Radcliffe Street, immediately north of Monroe Street in Bristol Borough ("Site"). The Site was originally part of a larger former forty (40) acre property known locally as the Riverfront North Site. The Site was originally proposed to be developed for non-residential purposes, though surrounding property has and is currently being used for residential purposes.

As part of the proposed development of the Site, in 1998 the previous owner of the Site retained Penn Environmental & Remediation, Inc. ("Penn E&R") to prepare a baseline investigation in accordance with Pennsylvania's Land Recycling and Environmental Remediation Standards Act ("Act 2"). After Declarant purchased the Site, it determined that it would develop the Site for residential use. Based on the change in use, the Declarant retained Penn E&R to re-evaluate the site in terms of residential land use and to implement the remedial measures necessary to demonstrate attainment of either the Statewide Health or Site-Specific standards based on a residential use.

Penn E&R submitted a Remedial Investigation /Clean Up Plan Report for the Former Dial North Property DEP dated to February 18, 2005 ("Original Report")

Penn E&R submitted an addendum to Original Clean Up Plan on February 1, 2006 ("Addendum"), as well as a Final Report on April 30th, 2019 ("Final Report") (together with the Original Report, the "Report")

Five areas of concern were identified which required (or will require) implementation of remedial activities; soils in certain areas, a soil stockpiles and associated surface soil areas, and two underground storage tanks.

9

15743/1/5888498v6

Tanks

A 10,000 gallon underground storage tank was located in the southwest corner of the site and a 20,000 gallon underground storage tank was located in the north-central portion of the Site.

The tanks were properly cleaned and removed. Following the tank closure activities, post-excavation samples were collected to ensure that the past use of the tank had not adversely impacted the surrounding soils. No compounds of concern were detected above their Act 2 residential medium specific concentrations ("MSC").

Soil

There is an existing landscaped berm that runs along the edge of the Site adjacent to Radcliffe Street ("Berm"). The Berm was created as part of earlier remediation of the Site. Soil stockpiled on the Site, perhaps as a result of demolition activities (the exact source is not known) was tested by Penn E&R for the presence of volatile and semi volatile organic compounds. The results indicated the present of benzo(a)pyrene, antimony, lead, selenium, thallium and zinc at concentrations above their Act 2 residential direct contact and/or soil to ground water MSC. Following this characterization, the stockpiled and surrounding material was remediated in accordance with a DEP approved cleanup plan. The materials in the stock pile were excavated, transported, placed in the Berm and capped. To ensure that all potentially impacted materials were removed, the materials below and adjacent to the stockpile were excavated two feet below ground surface. The Berm will be maintained in place.

Based on the Reports, trichloroethylene ("TCE"), benzo(a)pyrene, antimony, arsenic, cadmium and lead at above Act 2 residential standards were detected in the soil at the site. No other compounds of concern were detected at concentrations exceeding their Act 2 residential direct contact and/or soil groundwater standards.

Based on the Reports, the soil to groundwater pathway was shown not to be a complete exposure pathway at the Site. The proposed remedial action includes the use of engineering controls to prevent direct contact with impacted soils. Specifically, a capping mechanism will be used. In some areas, a one (1) foot clean soil buffer will be placed on top of the affected areas; in other areas the spot will be covered by macadam. Additionally, deeds to the Site will include a restriction prohibiting the disturbance or excavation of surface and subsurface soils at the Site, expect as required for development activities or utility maintenance.

Soil Gas

With the exception of TCE in one sample, no other compounds of concern were detected above their Act 2 soil gas medium specific concentrations. However, based on the findings, the migration of vapors from soil into indoor air quality does not pose an unacceptable risk and is not an exposure pathway that requires any further evaluation or mitigation.

Groundwater

15743/1/5888498v6

Two volatile organic compounds, TCE and vinyl chloride were detected above their Act 2 MSC in the ground water below the Site. Upon investigation, Penn E&R determined that neither that the TCE nor vinyl chloride are of concern in relation to air quality. Further, direct contact and ingestion of ground water at the Site is not a potential exposure pathway or receptor that needs to be addressed. Finally, the leaching of potential contaminates from the Soil at the Site to the ground water is not an exposure pathway that needs to be addressed. Therefore, remediation of the ground water is not required or warranted. <u>Notwithstanding the foregoing, deeds to the Site will contain a restriction prohibiting the use of ground water on the Site for any purpose.</u> Each Unit will be connected to the public water system which is not affected by groundwater.

<u>Vapor Intrusion</u>

Although several VOCs were detected in the soil samples collected, based on the Report, the migration of vapors from soil into indoor air quality does not pose an unacceptable risk. Additionally, each Home will have an active radon system installed that will prevent vapor intrusion. The active radon system will be a common element maintained by the Association. Costs to maintain the system will be included in the Budget.

Declarant has completed the remediation and implementation of the engineering (clean fill/capping) and institutional (deed notification) controls set forth above for the Community. Penn E&R has submitted a final report to DEP to document attainment of the Act 2 state-wide and/or site-specific standards for residential use. All engineering controls will be maintained by the Association.

## 12.  VIOLATIONS

To the best of the Declarant's actual knowledge, there are no outstanding and uncured notices of violations of any governmental requirements affecting the Community or any buildings and improvements thereon.

## 13.  PERMITS AND APPROVALS

Declarant either has obtained or will obtain, at its expense, all governmental approvals and permits necessary for the development, use and occupancy of the Community. The Property has received final subdivision and land development approval from Bristol Borough. The Declarant may seek additional approvals to make minor modifications to the design of the Townhouse Community. A list of permits and approvals obtained by the Declarant and the expiration date of each (if applicable) is attached on <u>Exhibit "E"</u>. The Declarant, at its expense, will obtain a building permit and any other related permits for each individual Unit before construction and will obtain a certificate of occupancy for each Unit upon its completion and before conveyance to a Unit purchaser. No other permits are required for the use and enjoyment of the Units.

## 14.  RESTRAINTS ON ALIENATION OR LEASING

The Units are not subject to any restrictions on sale or rights of first refusal. The Declaration contains certain restrictions on leasing of Units. Generally, leases must be for a term

11

15743/1/5888498v6

of at least twelve (12) months and must obligate the tenant(s) to comply with the Declaration and applicable Regulations. Leases must also satisfy certain other specific requirements as provided in the Declaration.

## 15. ROADS; UTILITIES

Roads within the Master Association Community and connecting to Radcliffe Street will be constructed by the Builder and, upon completion, conveyed to and maintained by the Master Association as part of the Master Common Facilities.

Utilities serving the Community will include public water service furnished by Aqua Pennsylvania, Inc., public sanitary sewer service provided by Bristol Borough Water and Sewer Authority, electric and natural gas service provided by PECO Energy Company, telephone service provided by Verizon and, at the option of each Unit Owner, cable television service provided by Comcast/Verizon. The utility delivery systems serving the Community will be installed either by the Declarant or by the utility provider. Such utility installations will not be maintained by the Association and will be the responsibility of the utility companies, except for laterals and lines connecting individual Units to such services for which the Association are responsible. Each Unit Owner will be responsible for the costs to repair any and all sewer and water laterals located on the Property, and the Association will have the responsibility of maintaining and repairing any other portions of the sanitary sewer or water system serving the Community until dedicated to the Borough.

All of the structural components and utility installations will be essentially new when the Declarant sells Units to purchasers. Estimates of replacement costs set forth in the proposed budget are based on the cost of replacing the system or item in question in current dollars, and are limited to those facilities for which the Association will be responsible. Such costs may, however, be subject to inflationary and other increases. The replacement cost figures represent the Declarant's estimate of such costs but are not a guaranty that the actual costs will not be higher.

## 16. WARRANTIES

The Declarant will warrant the Common Facilities against structural defects as required by the Act for two (2) years after the date on which the first Unit is conveyed by the Declarant.

Pursuant to the Act, the Declarant will warrant the Units against structural defects for two (2) years after the date of transfer of the Unit from the Declarant to the purchaser at closing and will warrant the Common Facilities against structural defects for a period of two (2) years after the date the first unit is conveyed.   In addition, purchasers of Units from the Declarant may receive a non-assignable limited warranty with respect to the Units from the Builder. A sample of the Builder's limited warranty is attached as Exhibit "F".   Declarant will provide to each purchaser copies of any warranties received by Declarant with respect to equipment or appliances included in the Units. The Declarant's limited warranty is subject to change from time to time (provided that the Declarant cannot change the terms of the warranty with respect to a Unit after the Declarant enters into an Agreement of Sale to sell that Unit). The Builder's limited warranty

15743/1/5888498v6

is subject to the limitations and exclusions contained in the warranty document. Generally, the Builder's liability is limited to the repair or replacement of the defect covered by the warranty, and a purchaser releases the Builder from any other damages that the purchaser may suffer as a result of such defect, including any loss of or damage to personal property or personal injuries caused directly or indirectly by such defect.

No warranty is given with respect to normal wear and tear or any items of maintenance with respect to the Units or the Common Elements.

**EXCEPT FOR THE EXPRESS WARRANTIES REQUIRED BY THE ACT AND ANY OTHER EXPRESS WARRANTIES INCLUDED IN AN AGREEMENT OF SALE FOR A UNIT, THE DECLARANT IS SELLING THE UNITS AND ANY PERSONAL PROPERTY THEREIN "AS-IS".**

## 17. <u>CONVERTIBLE REAL ESTATE</u>

The Declarant has designated certain parts of the Property as "Convertible Real Estate". Convertible Real Estate is real property on which the Declarant reserves the right to create Units. Until such time as the Declarant elects to create Units within the Convertible Real Estate, the Declarant is responsible for all costs associated with the ownership and maintenance of the Convertible Real Estate. Once the Declarant creates Units or Common Elements within the Convertible Real Estate, which the Declarant does by amending the Declaration, then those Units become part of the Community. Any Units showing as being proposed for construction within the Convertible Real Estate are not subject to assessments until those units are, in fact, created.

## 18. <u>ESCROW OF DEPOSITS; PAYMENTS FOR EXTRAS</u>

Any deposits made by a purchaser in connection with the purchase of a Unit shall be held by Declarant or an escrow agent approved by Declarant in escrow in compliance with Section 5408 of the Act and will be returned to the purchaser if the purchaser cancels the contract pursuant to Section 5406 (relating to the purchaser's right to cancel within seven (7) days after delivery of the Public Offering Statement). If the Agreement of Sale is canceled or terminated for any other reason, the rights of the parties with respect to the deposit shall be determined by the Agreement of Sale and applicable law.

Amounts to be paid by a purchaser for extras, options and upgrades will not be deposited in escrow. Such charges shall be separately set forth in the Agreement of Sale or in a change order that will be made a part of the Agreement of Sale. Deposits or payments for the cost of extras (as determined under the Agreement of Sale) will be payable in advance directly to the Declarant, will not earn interest and may be commingled with Declarant's other funds. Unless settlement under an Agreement of Sale fails to take place as a result of a default by Declarant, such amounts are <u>non-refundable</u> except to the extent provided in the Agreement of Sale between the purchaser and the Declarant.

15743/1/5888498v6

## 19. INSURANCE FOR COMMON FACILITIES

The Association will obtain casualty insurance with respect to Common Facilities owned by the Association for which such coverage is customarily obtained. The Association will obtain general liability insurance insuring the Association against liability for personal injury (including death) and property damage occurring on or about the Community and attributable to the acts or omissions of the Association or property owned by the Association. Such insurance shall have limits of not less than Five Hundred Thousand Dollars ($500,000.00) per occurrence and One Million Dollars ($1,000,000.00) in the aggregate, and shall otherwise comply with the Act.

## 20. UNIT INSURANCE

As elsewhere provided in this Public Offering Statement, the Association will initially carry blanket fire and casualty insurance with respect to the "base model" of the Units conveyed by the Declarant. This insurance will not cover upgrades to such models, or additions to Units by Unit Owners after they have purchased a Unit from the Declarant, and will not cover personal property or contents in the Unit. Each Unit Owner will have to purchase and procure separate insurance covering the upgrades and any post-conveyance additions, as well as insurance for such Unit Owner's personal property and contents of the Units, and personal homeowners' liability. The Association reserves the right to discontinue such blanket coverage by giving advance written notice to the Unit Owners. If that happens, the Unit Owners will be required to obtain individual policies insuring their respective Units against loss at their own expense. While the Association maintains such insurance, the cost of such insurance will be a Common Expense and will be included in budgeted common expenses or separately assessed to the Unit Owners as a separate insurance assessment, at the discretion of the Executive Board. Certificates evidencing coverage under such blanket policy will be provided to Unit Owners and their mortgagees upon request. Any supplemental insurance that may be required by Unit Owners and/or their mortgagees must be provided by the Unit Owners at their expense. Unit Owners are responsible for carrying general liability insurance with respect to their Units and injuries or damages to persons or property that may occur on or about their Units.

## 21. UNIT RESERVATION FORM

Declarant may, but need not, offer potential purchasers of the Units the opportunity to reserve a particular Unit for a limited time by signing a reservation form in substantially the form attached as Exhibit "G" attached hereto. If Declarant sells or conveys the Unit subject to a Unit reservation, Declarant's only liability is to refund the reservation deposit paid by the purchaser. If the purchaser elects not to purchase a Unit, the reservation deposit paid by the purchaser will be refunded without interest. This reservation procedure is intended to provide prospective purchasers with the opportunity to review this Public Offering Statement as well as other information pertaining to the Community in order to finalize their decision to purchase a Unit but does not give the potential purchaser any equitable interest in the Unit or bind the prospective purchaser or Declarant.

14

## 22. AGREEMENT OF SALE

To purchase a Unit a prospective purchaser must enter into an Agreement of Sale to buy the Unit from Declarant. The Agreement of Sale is substantially in the form attached as Exhibit "H" hereto. Declarant reserves the right to make changes to the form of Agreement of Sale from time to time, but the Declarant cannot modify an Agreement of Sale after it is signed by all parties without the consent of all parties. In summary, the Agreement of Sale sets forth:

(1)     Parties to the agreement;
(2)     Location of the Unit being purchased;
(3)     Purchase price and deposit schedule;
(4)     Background;
(5)     The Lot;
(6)     Condition of title;
(7)     Mortgage contingency;
(8)     Settlement Costs;
(9)     Settlement;
(10)    Default by Seller;
(11)    Default by Buyer;
(12)    Sample and plans;
(13)    Grubbing, clearing and grading;
(14)    Possession;
(15)    Waiver of Tender;
(16)    Time is of the essence;
(17)    Risk of loss;
(18)    Conditions to Seller's obligations;
(19)    Terms for entry on the to the property;
(20)    Selections;
(21)    Warranty;
(22)    Integration
(23)    Offsets;
(24)    No assignment;
(25)    Notices;
(26)    Captions;
(27)    Homeowners' Association;
(28)    Governing Law and jurisdiction;
(29)    Broker;
(30)    Environmental Disclosure;
(31)    Interstate land sales act;
(32)    Representations
(33)    Exhibits

15

### 23. DECLARATION

The Declaration is the document that, together with the "plats and plans" of the Community, creates the Community and subjects the Property to the Act. In summary, the Declaration addresses the following:

Section 1 defines the property subject to the Declaration.

Section 2 submits the Property to the Act, identifies the location of the Property, identifies certain easements and encumbrances that affect the Property, and describes the type of Unit ownership to be conveyed.

Section 3 sets forth certain defined terms that are used throughout the Declaration and that are used in the By-laws and in this Public Offering Statement.

Section 4 provides the applicability of the Declaration and determines that in the event of a conflict, the Declaration supercedes the By-Laws.

Section 5 describes the Units, Common Facilities, Controlled Facilities and provisions applicable thereto, including maintenance responsibilities.

Section 6 identifies the plats and plans.

Section 7 provides for the creation of the Association and sets forth a general statement of the Association's powers and responsibilities. Section 8 describes the obligation of Unit Owners as members of the Association and provides that each Unit is allocated one vote in the Association. Article III further provides for the manner of electing members of the Executive Board of the Association both during and after the Declarant Control Period. Generally, the Declarant will elect all Executive Board until 25% of the Units have been conveyed, at which point at least one director will be elected by the Unit Owners. When 75% of the Units have been conveyed to Unit Owners, all of the Executive Board shall be elected by the Unit Owners.

Section 8 sets forth the obligations of Unit Owners and the Association with respect to insurance. Insurance maintained by the Association shall satisfy the minimum requirements of the Act and shall be maintained by the Association for the benefit of the Association and all Unit Owners and Eligible Mortgagees. The Association is responsible for carrying liability and casualty insurance with respect to the Common Facilities.

Section 9 sets forth certain easements established for the benefit of the Association and the Declarant in connection with the development of the Community, and sets forth certain rights of the Declarant which include, but are not limited to, the right to create and grant easements for utility services and the right to maintain model homes, sales offices, construction offices and other facilities in connection with the construction, marketing and sale of the Units. Section 9 sets forth the maximum number of units which can be built at seventy three (73).

Section 10 generally sets forth the obligation of Unit Owners to pay their proportionate share of Common Expenses. The Declarant provides that such Common Expenses shall

16

15743/1/5888498v6

constitute a lien on each Unit Owner's Unit and that a Unit Owner's failure to pay Common Expenses when due may result in the imposition of late charges, interest and other costs of collection. Article V further sets forth the obligation of Unit Owners purchasing Units directly from the Declarant to pay a one time assessment in the amount of $500.00. Section 11 further sets forth the general procedures for budgeting and computing General Common Expenses and Common Expenses and describes the Board's authority to make special assessments from time to time for certain purposes including, but not limited to, to pay for unforeseen capital expenditures.

Section 11 and 12 sets forth certain building and use restrictions applicable to the Units, including various restrictions applicable to the exterior modification or improvement of the Units, and includes provisions requiring approval by the Architectural Review Committee/Board of Executive Board or an architectural review committee appointed by the Board with respect to certain exterior changes or improvements.

Section 13 sets forth the provisions regarding compliance and default.

Section 14 explains the indemnification of the officers, executive board and committee members of the Community Association.

Section 15 explains the rights of mortgagees.

Section 16 contains the general provisions including amendments to the Declaration, notice, effective date and governing law.

Section 17 discusses the Master Association.

## 24. BY-LAWS

The By-laws generally govern the internal workings of the Association. In summary, the By-laws provide (in addition to provisions similar to those contained in the Declaration) as follows:

The procedure for calling meetings of Executive Board and Members of the Association;

The procedure for electing the Executive Board, removing Executive Board and filling vacancies on the Executive Board;

The titles and general description of duties of the primary officers of the Association, and the method for appointing and removing such officers and filling vacancies in such positions;

The procedure for creating committees of the Executive Board to oversee specific functions of the Association, the duties of such committees and the authority thereof;

The rights and liabilities of officers and Executive Board of the Association, and the obligation of the Association to indemnify representatives of the Association who are subject to claims, liabilities or suits by reason of having served as officers or Executive Board of the Association, under certain circumstances; and

17

15743/1/5888498v6

The procedure for amending the By-laws.

The annual budget for the Community is proposed and adopted by the Executive Board, which also determines the amounts of the assessments for Common Expenses. The Executive Board is also authorized to determine and assess any special assessment required for the benefit, maintenance, upkeep and repair of the Community and any elements thereof, including the Controlled Facilities.

## 25.  REVIEW OF DOCUMENTS

Each prospective purchaser of a Unit is encouraged to read this Public Offering Statement and each of the Exhibits in its entirety for his or her own protection. Each purchaser may consult legal counsel of his or her choice and obtain legal advice regarding such documents.

## 26.  MODIFICATIONS TO PUBLIC OFFERING STATEMENT

The Declarant reserves the right, from time to time, to make changes to this Public Offering Statement and the various Exhibits attached hereto. Any modification to this Public Offering Statement will be given to each person who has entered into an agreement to buy a Unit but who has not yet purchased the Unit. A purchaser receiving a modification to this Public Offering Statement that materially and adversely affects the rights or obligations of the purchaser may have the right to cancel a contract for the purchase of a Unit as provided in the Act.

## 27.  NO OTHER REPRESENTATIONS

NO REAL ESTATE BROKER, REAL ESTATE SALESPERSON OR ANY MEMBER OF THE DECLARANT'S CONSTRUCTION OR SALES STAFF IS AUTHORIZED TO MAKE ANY STATEMENTS OR REPRESENTATIONS THAT ARE NOT CONTAINED IN THIS PUBLIC OFFERING STATEMENT.  NO OTHER REPRESENTATION OR STATEMENT MAY BE RELIED ON BY PURCHASERS AND NO SUCH OTHER REPRESENTATION OR STATEMENT IS BINDING ON THE DECLARANT OR BUILDER.

## 28.  CONFLICTING PROVISIONS

Any references to or summaries of the provisions of the Declaration, By-laws or other documents contained in this Public Offering Statement are qualified by reference to the entire documents to which such statements refer. If there is any conflict or inconsistency between the statements made in this Public Offering Statement and the provisions of the applicable document, the applicable document is controlling.

## 29.  END OF PUBLIC OFFERING STATEMENT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

15743/1/5888498v6

| **List of Exhibits**<br>**to**<br>**Public Offering Statement** | |
|---|---|
| Exhibit A-1 | Declaration of Planned Community<br>for The Townhomes at Radcliffe Court on the Delaware, a Planned Community |
| Exhibit A-2 | Declaration of Master Planned Community<br>for Island View Crossing, A Planned Community |
| Exhibit A-3 | Parking Easement Agreement |
| Exhibit A-4 | Title Exceptions |
| Exhibit B | Responsibility Chart |
| Exhibit C | By-Laws of The Townhomes at Radcliffe Court on the Delaware Homeowners Association |
| Exhibit D | First Proposed Budget of The Townhomes at Radcliffe Court on the Delaware Homeowners Association |
| Exhibit E | Schedule of Permits |
| Exhibit F | Declarant's Limited Warranty |
| Exhibit G | Declarant's Reservation/Deposit Form |
| Exhibit H | Standard Form of Agreement of Sale |

## EXHIBIT "A-1"

## DECLARATION OF PLANNED COMMUNITY

## FOR

## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE, A PLANNED COMMUNITY

**[Attached]**

## DECLARATION OF PLANNED COMMUNITY
## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE

**THIS DECLARATION OF THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE**, a planned community ("**Declaration**") made this _____ day of _____, 2019, by **ISLAND VIEW CROSSING II, L.P.**, a Pennsylvania limited partnership ("**Declarant**").

### ARTICLE I
### THE PROPERTY

1.1.    The Property.  Declarant is the owner of an approximately _____ (_____) acre parcel of the real estate located in Bristol Borough ("**Borough**"), Bucks County, Pennsylvania, which is described on **Exhibit "A"** attached hereto and made a part hereof ("**Property**"), a portion of which is more fully described on **Exhibit "A-1"** attached hereto and made a part hereof ("**Convertible Real Estate**").  The Property and Convertible Real Estate constitute Master Unit 1 of the Radcliffe Court on the Delaware Master Association ("**Master Association**") and is bound by the terms and conditions of the Master Association Declaration of Radcliffe Court on the Delaware recorded on _____ \_\_\_\_, 2019, at Deed Book _____, Page _____ ("**Master Declaration**").

### ARTICLE II
### SUBMISSION OF THE PROPERTY

2.1.    Submission of the Property.  Declarant hereby submits the Property and all easements, rights and appurtenances belonging thereto to the provisions of the Pennsylvania Uniform Planned Community Act, Act No. 1996-180, 68 Pa. Cons.Stat. § 5101 et. seq., as amended ("**Act**") which Act is hereby incorporated by reference and hereby creates a planned community ("**Community**").

2.2.    The Community.  The Community which shall be established on the Property shall be known as The Townhomes at Radcliffe Court on the Delaware, a Planned Community.

2.3.    Easements and Licenses.  The Property is submitted under and subject to the matters of record listed on **Exhibit "B"** attached hereto and made a part hereof, only to the extent such matters continue to affect the Property and the easements listed in Article IX in perpetuity.

2.4.    Provisions of the Act.  The provisions of the Act shall apply to and control the operation and governance of the Community and the Association except to the extent that contrary provisions not prohibited by the Act are contained in one or more of this Declaration, the Plans or the By-Laws.

### ARTICLE III
### INTERPRETATION/DEFINITIONS

3.1.    Interpretation of Declaration and By-Laws.  In the event of a conflict of interpretation between the provisions set forth in the By-Laws and this Declaration, this Declaration shall govern, except to the extent this Declaration is inconsistent with applicable law.

In the event that the Internal Revenue Code is hereafter amended or changed, this Declaration and By-Laws shall be interpreted as to conform to the provisions of the Internal Revenue Code with respect to non-profit entities, it being the intention to preserve the lawful status of the Association as a bona fide non-profit entity.

    3.2.   <u>Definitions</u>.  The following terms when used in this Declaration and in the By-Laws of the Association have the meanings set forth in this <u>Section 3.2</u>:

        (a)   **"Architectural Review Committee"** means the committee created pursuant to Article XII hereof.

        (b)   **"Assessments"** means those assessments or sums payable to the Association by the Owners of the Units in the Community from time to time as provided herein or in the Act.

        (c)   **"Association"** means The Townhomes at Radcliffe Court on the Delaware Community Association, a Pennsylvania nonprofit corporation, organized on a non-stock basis, the Members of which are the Owners and the Declarant.

        (d)   **"Board"** means the Board of Directors of the Association.

        (e)   **"By-Laws"** and **"Articles"** mean the By-laws and the Articles of Incorporation of the Association, which have been or shall be adopted by the Board, as amended from time to time.

        (f)   **"Common Elements"** means the Common Facilities and the Controlled Facilities.

        (g)   **"Common Expenses"** means and includes expenses for which the Owners are liable, subject to the terms of this Declaration, including, but not limited to:

            (i)   Expenses of administration, maintenance, repair and replacement of the Common Facilities and Controlled Facilities;

            (ii)   Expenses or liabilities agreed upon as common by the members of the Association;

            (iii)   Expenditures made or liabilities incurred by or on behalf of the Association, together with any allocations to reserves;

            (iv)   All other expenses or charges levied or to be levied pursuant to this Declaration or the By-Laws against the Owners; and

            (v)   All Common Expenses and charges of the Property under the Master Declaration.

        (h)   **"Common Facilities"** means and includes all of those portions of the Property depicted on the Plan which are or shall be owned by or leased to Association (other than

2

the Units) including, but not limited to the following, as may be amended from time to time, the interior walking trails and gazebos. The roads, landscaping, stormwater management facilities, the active radon systems and any other portion of Property not included within the title lines of any Unit, and not depicted on the Plan as Common Facilities are Master Common Elements.

      (i)    **"Common Receipts"** means and includes the funds collected from the Owners as Assessments and receipts designated as common by the provisions of this Declaration of Covenants and the By-Laws.

      (j)    **"Controlled Facilities"** means and includes any portion of the Community that is not a Common Facility and is regulated, maintained, improved, repaired, replaced, managed, insured or controlled by the Association. The Controlled Facilities include the Units but only to the extent: (i) maintained by the Association; (ii) regulated by the use restrictions in Article XI hereof; or (iii) subject to those easements as set forth in Article IX hereof.

      (k)    **"Convertible Real Estate"** shall have the meaning ascribed in the Act and for purposes of the Community shall consist of the real property described on **Exhibit "A-1"**, attached hereto and made a part hereof (**"Convertible Real Estate"**).

      (l)    **"Declarant Control Period"** means the period of time from the date of the first conveyance of a Unit to a person other than the Declarant until the earliest of the following to occur: (i) seven (7) years; (ii) sixty (60) days after conveyance of seventy-five percent (75%) of the Units which may be created from the Declarant to a person other than the Declarant; (iii) two (2) years after the Declarant has ceased to offer Units for sale in the ordinary course of business; and (iv) two (2) years after the Declarant last exercised any right to add new Units.

      (m)    **"Director"** means a member of the Board.

      (n)    **"Dwelling"** means single family attached residential building, including wood decks or patios attached to the rear of such Dwelling, constructed on a Unit.

      (o)    **"Limited Common Expense"** shall have the meaning set forth in the Act.

      (p)    **"Limited Charge"** means Association costs which are excluded from the budget (and monthly fees) and will be charged directly to the one or more Owners who receive the benefit.

      (q)    **"Limited Common Facility"** means any real estate that is allocated by this Declaration for the exclusive use of one or more, but fewer than all Units.

      (r)    **"Master Assessments"** means Common Expenses levied by the Master Board.

      (s)    **"Master Association"** means the unit owners' association of the Master Planned Community.

      (t)    **"Master Board"** means the executive board of the Master Planned Community.

3

(u)    **"Master Common Elements"** means common elements of the Master Planned Community.

(v)    **"Master Planned Community"** means Radcliffe Court on the Delaware, a Planned Community, in which the Property is a Unit.

(w)    **"Master Governing Documents"** means the declaration, bylaws and rules and regulations of the Master Planned Community, as they may be amended from time to time.

(x)    **"Master Unit"** means a unit in the Master Planned Community.

(y)    **"Member"** means each Owner and the Declarant for so long as the Declarant owns or reserves the right to build any Unit in the Property.

(z)    **"Owner"** means a person or entity who is a record owner of a fee or undivided fee interest in a Unit subject to the Declaration, but excluding (i) those persons or entities who hold an interest merely as security for the performance of an obligation and (ii) the Declarant.  Multiple owners of a Unit shall together be deemed one Owner for the purposes of this Declaration.

(aa)    **"Permitted Mortgage"** means a first mortgage from an Owner to (i) the Declarant; (ii) the seller of a Unit; (iii) a bank, trust company, savings bank, savings and loan association, mortgage service company, insurance company, credit union, pension fund, real estate investment trust or similar institutional investor or lender; and (iv) any other mortgage approved by the Board.

(bb)    **"Permitted Mortgagee"** means the holder of a Permitted Mortgage.

(cc)    **"Person"** means a natural individual, corporation, partnership, association, trust or other legal entity or any combination thereof.

(dd)    **"Plan"** refers to the Plan entitled Townhouse Planned Community Plan prepared by Bohler Engineering, Inc., dated February 26, 2015, as last revised, a reduced-size copy of which is attached hereto as **Exhibit "C"**.

(ee)    **"Project"** means the development and improvement of the Property in accordance with the Plan, as may be amended as specified herein, and the construction and sale of Units.

(ff)    **"Rules and Regulations"** means such rules and regulations as are promulgated by the Board from time to time, with respect to various details of the use of all or any portion of the Property, either supplementing or elaborating upon the provisions in the Declaration or the By-Laws.

(gg)    **"Special Assessment"** means an Assessment, either for Common Expense or Limited Common Expense, as applicable, which may be made by the Association for the purpose of defraying an unforeseen or unbudgeted Common Expense.

15743/1/5879677v5

(hh)    **"Sanitary Sewer Lateral"** means the laterals which connect a Dwelling to the Sanitary Sewer System.

(ii)    **"Sanitary Sewer System"** means the system to be constructed by or on behalf of the Declarant on the Property for collection and conveyance of sanitary sewage, (but not including the Sanitary Sewer Laterals).

(jj)    **"Special Declarant Rights"** has the meaning given to such term in the Act and includes any rights reserved for the benefit of the Declarant hereunder or under the Act which includes the rights to: complete the improvements shown on the Plan; maintain offices, signs and models; use and grant easements through the Property for the purpose of making improvements and constructing utilities within the Community; appoint or remove an officer of the Association or a Director during the period of Declarant control; modify the size, design and appearance of the Units located within a Unit (prior to conveyance of the Unit); convert a Unit into Common Facilities, or two (2) or more Units and Common Facilities, or change the boundary lines between Units and Common Facilities.

(kk)    **"Storm Water Management System"** means all storm water drainage facilities to collect or control water on the Property and facilities related thereto such as detention basins, drainage easements, drainage swales and related facilities shown on the plan of the Master Association from time to time located outside of legal rights-of-way of dedicated streets. The Stormwater Management System shall be maintained, repaired and replaced by the Master Association and the Association shall be charged its prorata percentage of the costs to maintain, repair and replace the Storm Water Management System.

(ll)    **"Surplus"** means and includes the excess of all Assessments over all Common Expenses.

(mm)    **"Unit"** the separate parcel of land on which Dwellings will be constructed together with the Dwelling now or hereafter constructed thereon, as shown on the Plan.

(nn)    **"Water Company"** means Aqua Pennsylvania, Inc., its successors and assigns.

(oo)    **"Water Line"** means the system owned and maintained by the Water Company for the provision of water to the Units.

(pp)    **"Water Line Lateral"** means the laterals which connect a Dwelling to the Water Line owned and maintained by the Association.

# ARTICLE IV
## APPLICABILITY

4.1.    Applicability. This Declaration shall be applicable to the Property. All present and future Owners and occupants or tenants of any Unit, their guests, licensees, servants, agents, employees, and (except as provided herein) any other person or persons who shall be permitted to use the Common Facilities or a Unit shall be subject to this Declaration, the Articles and By-

15743/1/5879677v5

Laws and Rules and Regulations of the Association promulgated from time to time to govern the conduct of its Owners and occupancy of the Property. Ownership, rental or occupancy of any Unit in the Property shall be conclusively deemed to mean that the Owner, tenant or occupant has accepted, ratified and will comply with this Declaration, the Articles, the By-Laws and any Rules and Regulations of the Association.

    4.2.   <u>Transfer of Units</u>. If an Owner transfers all of his ownership in a Unit which is subject to this Declaration, the transfer shall automatically include his membership in the Association.

**ARTICLE V**
**DESCRIPTION OF UNITS; COMMON FACILITIES;**
**CONTROLLED FACILITIES AND PROVISIONS APPLICABLE THERETO**

    5.1.   <u>Unit Boundaries</u>. Each Unit shall consist of the area of land designated on the Plan ("**Lot**"), together with the Dwelling constructed thereon. Each Unit consists of:

        (a)    The Lot and the Dwelling, provided that where an interior party wall is between two Dwellings, the horizontal boundary shall be the mid-point of such party wall.

        (b)    the duct work and faces of the heating/air conditioning vents serving the Unit;

        (c)    any pipes, ducts, wires, cables, flues, meters, sewer or water lines, conduits or other installations for services and utilities serving only the particular Unit (whether or not located within the Unit as described in this <u>Section 5.1</u>) shall be part of that Unit;

        (d)    each Unit shall also include, to the extent any of the following are purchased by Unit Owner and situated within the Unit, any ovens, ranges, dishwashers, garbage disposals, washers, dryers, sinks, tubs, showers, cabinets, lavatories, water closets, exhaust fans, light fixtures, floor coverings and all heating, air conditioning and ventilation equipment; and any other appliances situated within the Unit and serving only the same;

        (e)    any deck, patio, or terrace serving only that Unit.

    5.2.   <u>Common Facilities</u>. Common Facilities has the meaning set forth in Section 3.2(h).

    5.3.   <u>Construction and Transfer of Common Facilities</u>.

        (a)    Declarant shall construct or cause to be constructed, the Common Facilities on the Property within seven (7) years from the date of the conveyance of the first Unit and convey same to the Association no later than sixty (60) days after conveyance of the last Unit in the Property owned by Declarant, or such time as mandated by the Act. Declarant reserves the right to convey the Common Facilities at any time prior to this event and in the event the Common Facilities are not substantially complete at the time of conveyance, Declarant covenants that it shall substantially complete the Common Facilities. These Declarant obligations shall be a covenant running with the Property. Until such time as the Common Facilities are conveyed to

6

the Association, they shall be owned by the Declarant. Declarant shall be entitled to reasonable extensions of time to complete the Common Facilities if such extension becomes necessary due to weather conditions or other conditions beyond Declarant's control.

       (b)    The Declarant shall convey to the Association, and the Association shall accept, the Common Facilities by deed and/or bill of sale, as applicable, for no consideration. The Declarant shall be responsible for recording fees and transfer taxes, if any. Acceptance of the Common Facilities shall not constitute a waiver of the Declarant's obligation to complete the Common Facilities.

       (c)    The Declarant shall be responsible for the real estate taxes on property designated to be Common Facilities, if any, until conveyed to the Association.

    5.4.    <u>Use of Common Facilities</u>.  Except as their use may otherwise be limited by this Declaration or the Bylaws or otherwise by the Board pursuant to its powers, each Owner, tenant and occupant of a Unit, and the family members and guests of such Owner, tenant and occupant, may use the Common Facilities in common with all other Owners and tenants or occupants of other Units and their respective family members and guests in accordance with the purposes for which they are intended without hindering or encroaching upon the lawful rights of the other Owners.  Owners or occupants shall not obstruct the Common Facilities in any way including, but not limited to, interfering with any storm water drainage.  Owners or occupants may not store anything in or on the Common Facilities.

    5.5.    <u>Maintenance and Repair of Common Facilities and Other Items</u>. The Association shall be responsible, at the Association's expense, for the maintenance and repair of any Common Facilities and other items as set forth on the responsibility checklist attached hereto as **Exhibit "D"** and made a part hereof ("**Responsibility Checklist**").  The cost and expense of the foregoing shall be a Common Expense and the Board shall include in the annual budget of the Association as part of the Assessments reasonable reserves for periodic maintenance, repair and replacement of Common Facilities.

    5.6.    <u>Alteration to Common Facilities By Owner</u>.  Without limiting the rights of the Declarant in connection with all construction and improvements to be made in or to the Community by the Declarant, no Owner may make any improvements or alterations or do any work to any of the Common Facilities.  No Owner shall impair any easement or hereditament related to the Common Facilities.

    5.7.    <u>Common Expense Liability</u>.

       (a)    The Common Expenses incurred or to be incurred for the administration and governance of the Community and the maintenance, repair, replacement, insurance, administration, management, operation and use of the Common Elements and the making of any additions or improvements thereto and the charges for common utility services, if any, shall be assessed by the Association against, and collected from, the Owners; provided, however, that until the Association charges its first assessments to the Owners, the Declarant shall pay all Common Expenses of the Community.  Common Expenses benefiting fewer than all of the Units may be assessed as Limited Common Expenses exclusively against the Units benefited.

7

(b)    Each Owner, by accepting title to a Unit, covenants and agrees to pay the Association its share of the Common Expenses.  The obligation to pay Assessments is a covenant running with the Property, inseparable from each Unit, and any conveyance, lease, devise or other disposition or mortgage or other encumbrance of any Unit shall extend to and include the Assessment liability, whether or not expressly referred to in the instrument effecting such transfer.

(c)    No Owner may exempt himself from liability with respect to the payment of Assessments by waiver of the enjoyment of the right to use any of the Common Elements or by abandonment of his Unit or otherwise.  The obligation to pay Assessments is absolute and unconditional and shall not be subject to set-offs or counterclaims.

5.8.    Common Expense Percentage.  The allocation of Common Expenses appurtenant to each Unit shall have a permanent character, shall be inseparable from each Unit and shall not be altered or changed except by the recording of an amendment to this Declaration executed by the Declarant in accordance with Declarant's Special Declarant's Rights or duly executed by all of the Owners affected thereby and their Eligible Mortgagees.  The Common Expense Percentage for a particular Unit once Seventy Three (73) Units have been added to the Community will be 1.39%.

5.9.    Controlled Facilities.  The Controlled Facilities are subject to regulation by the Association as provided in this Declaration.

5.10.    Maintenance and Repair of Controlled Facilities.

(a)    The Association shall have the obligation to maintain, repair and replace those portions of Controlled Facilities set forth the Responsibility Checklist, otherwise the Association will have no obligation for the maintenance, repair or replacement of Controlled Facilities. The Responsibility Checklist sets forth the manner in which the Association will bill the cost of the maintenance, repair, and replacement of the Controlled Facilities.  The maintenance responsibilities of the Association shall be performed at such times and in such manner as the Board may, in its sole discretion, determine.

(b)    The Association shall be responsible for repairing, maintaining and replacing the shingles and other roof materials on the roof of each Unit at the end of the anticipated life of such shingles or such other time as determined by the Board in its sole discretion ("**Roof Maintenance**").  In the event the contractor hired by the Association to replace the shingles advises the Association that additional repair or replacement of any part of the roof or exterior of the Unit is required to keep the roof and the exterior of such Unit watertight, the Association shall have the right to have any recommended work done ("**Roof Repair**").  All costs of Roof Maintenance and Roof Repair shall be a Limited Common Expense during the Declarant Control Period and a Common Expense charged against all of the Units thereafter. Roof Maintenance and Roof Repair shall include the decking, flashing (or other water seepage prevention system) and shingles only.  All other costs associated with Roof Maintenance or Roof Repair, including, but not limited to insulation, shall be charged as a Limited Charge.

8

(c)    Each Owner shall be responsible for repairing, maintaining and replacing the stucco, hardiplank, masonry siding, stone or other material, as applicable, covering the exterior of a Dwelling and shall be maintained in accordance with standards of a first class residential development at such time as determined by the Board in its sole discretion. All costs of repair, maintenance or replacement of Exterior Materials shall be a Limited Charge charged against the specific Units.

(d)    Neither the Storm Water Management System nor Common Facilities, may be offered for dedication to the Borough, but, unless and until accepted by the Borough, shall be maintained by the Master Association (or the Unit Owners as applicable) in accordance with this Declaration.

5.11.    Obligation of the Owners.

(a)    Subject to the obligations of the Association as provided herein and on the Responsibility Checklist, it shall be the duty of each Owner, at such Owner's sole cost and expense, to maintain and repair such Owner's Unit in a neat, safe, sanitary and attractive condition including, but not limited to, all exterior maintenance of the Unit.

(b)    The Bristol Borough Water and Sewer Authority ("**Authority**") owns the main which comes in to the Community and connects at Radcliffe Street. The Authority will own and maintain only the Sanitary Sewer System main. Each Unit Owner shall be responsible to repair, replace, and maintain the connection to the main from the main to the curb, the individual lateral, the clean-out and the line which runs from the street to the Unit.

(c)    The Water Company owns the Water Lines in the streets. Each Unit Owner owns, and shall be responsible to repair, replace, and maintain the portion of the Water Lines which run from the curb stop to the Unit.

(d)    If all or any portion of any Unit is damaged, falls into disrepair it shall be the duty of the Owner to rebuild, repair or reconstruct the Unit in a manner which will restore the Unit substantially to its appearance and condition immediately prior to the casualty. If the Owner shall fail to rebuild, repair or reconstruct, the Association may undertake such repair or reconstruction and may levy a Special Assessment against the Owner.

5.12.    Owners' Negligence.

(a)    Any costs incurred by the Association in connection with any maintenance, repair or replacement obligations as may arise in connection with the negligence of the Owner(s) or occupant(s) of any particular Unit(s) shall be charged as a Special Assessment to the Owner(s) and against the Owner's Unit.

(b)    To the extent maintenance, repair and replacement of a Unit by an Owner may involve the possible damage to the Common Facilities or to any other property other than such Unit, the work shall be performed only with the prior written consent of the Board or its duly authorized agent except in the case of an emergency. The work may be performed only by a person or entity who shall deliver to the Board prior to the commencement of any work, in form satisfactory to the Board, the following:

15743/1/5879677v5

(i)    A release of the Board and its agents, servants and employees for all claims that such person or entity or their respective agents, servants or employees may assert in connection with work to be performed;

(ii)    An indemnification of the Association, Board and their agents, servants and employees holding each and all of them harmless from and against any claims asserted for loss or damage to person or property, including, but not limited to, the Common Facilities, other Units or any other property included in the Community;

(iii)    A certificate or other acceptable evidence of insurance, including liability and workmen's compensation coverage, in amounts and companies reasonably acceptable to the Board; and

(iv)    Any other information and protection which the Board may reasonably require.

5.13.    <u>Water Features</u>.  Owner shall be prohibited from installing swimming pools, spas, or hot tubs.

## ARTICLE VI
## THE PLAN

6.1.    <u>Plan</u>.  The Plan depicts the Property.  The Plan and all amendments thereto shall be recorded in the Office for Recording of Deeds in and for Bucks County, Pennsylvania.

## ARTICLE VII
## THE ASSOCIATION; MEMBERSHIP; VOTING RIGHTS; POWERS AND DUTIES

7.1.    <u>Organization</u>.  The Association is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania charged with the duties and vested with the powers prescribed by law and set forth in the Declaration, the Articles and the By-Laws.

7.2.    <u>Membership</u>.

(a)    <u>Membership in Association</u>.

(i)    Unit Owners upon acceptance of a deed to a Unit shall become members of the Association and the Declarant shall become members upon this Declaration being recorded.  Membership in the Association shall be limited to the Unit Owners of the Community.

(ii)    Every Unit Owner who shall be a member of the Association shall be entitled to all of the rights and shall be bound by all of the obligations accompanying membership, provided that any Unit Owner who is holding the interest in a Unit merely as a security for the performance of an obligation shall not be a member.

(iii)    Each Unit in the Community shall have one (1) vote associated with such Unit.  When more than one Person holds an interest or interests in any Unit, all such

10

Persons shall be members, and the vote for such Unit shall be exercised as provided in Section 7.2 hereof and in the Bylaws, but in no event shall more than one (1) vote be cast with respect to any Unit.

(iv)    Only Unit Owners in "good standing" shall be entitled to vote, considered for purposes of obtaining a quorum, determining the percentage of Unit Owners voting on a matter, entitled to serve as a Director or have the right to submit plans for Board approval. A Unit Owner shall be deemed to be "in good standing" if, and only if, he shall have fully paid all Assessments made or levied against the Owner and against his Unit by the Board together with all interest, costs, attorneys' fees, penalties and other expenses, if any, chargeable to the Owner and against his Unit not less than ten (10) days prior to such vote and has not be notified by the Association of any violations of this Declaration or the Rules and Regulations which has not been cured to the reasonable satisfaction of the Board.

(v)    In the event an Owner shall lease or permit another to occupy his Unit in accordance with the provisions of this Declaration, the tenant or occupant shall be permitted to use the Common Elements of the Association (subject to such limitations on such use as would be applicable to the Owner) but shall not vote in the affairs of the Association, except as the Owner shall permit the tenant or occupant to exercise the proxy vote of the member.

(vi)    Every lawful transfer of title to a Unit shall include membership in the Association and, upon making such transfer, the previous Unit Owner's membership shall automatically terminate.    Except as otherwise expressly provided herein or in the Act, membership in the Association may not be assigned or transferred without the transfer of legal title to a Unit and any attempt at such assignment or transfer thereof shall be void and of no effect.

(vii)    Membership in the Association shall automatically terminate when a Unit Owner sells, transfers or otherwise conveys his Unit.

(b)    Certificate of Voting.

(i)    If a Unit is owned by one Person, the Owner's right to vote shall be established by the recorded title to the Unit. If a Unit is owned by more than one Person, the Person entitled to cast a vote for the Unit shall be designated in a Certificate signed by all of the record owners of the Unit and filed with the Secretary of the Association. If a Unit is owned by a corporation or partnership, the officer, partner or employee thereof, entitled to cast the votes of the Unit for the corporation or partnership shall be designated in a certificate for this purpose, signed by the president or vice-president, and (as to a corporation) attested to by the secretary or assistant secretary of the corporation, and filed with the Secretary of the Association (the "**Corporate Certificate**"). The Person designated in the Corporate Certificate, who is entitled to cast votes for a Unit shall be known as the "**Voting Member**". If such a Corporate Certificate is not on file with the Secretary of the Association for a Unit owned by more than one Person or by a corporation or partnership, the votes of the Unit concerned shall not be considered in determining the requirement for a quorum, or for any purpose requiring the approval of a Person entitled to cast votes for the Unit except if such Unit is owned by spouses. A Corporate

11

Certificate shall be valid until revoked in writing by any owner of the Unit, or until superseded by a subsequent Corporate Certificate, or until a change in the ownership of the Unit concerned.

(ii)    If a Unit is owned by spouses, the following three provisions are applicable to voting by such Unit:

(iii)    The Unit Owners may, but they shall not be required to, designate a voting member.

(iv)    If they do not designate a voting member, and both spouses are present at a meeting and are unable to concur in their decision upon any subject requiring a vote, they shall lose their right to vote on that subject at that meeting.

(v)    If a voting member is not designated and only one Person is present at a meeting, the Person present may cast the vote for the Unit, without establishing the concurrence of the absent Person, just as though he or she owned the Unit.

7.3.    The Board.

(a)    Subject to the provisions of the Act, this Declaration and the By-Laws, the Executive Board shall have the power to act on behalf of the Association. The Executive Board shall consist of three (3) members. The members of the initial Executive Board shall be appointed, removed and replaced from time to time by the Declarant without the necessity of obtaining resignations. The Declarant-appointed members of the Executive Board shall be replaced with Owners (or if an Owner is a corporation, an officer, director or employee thereof duly authorized by the corporation to serve on the corporation's behalf), other than the Declarant, in accordance with the provisions of Section 7.3 (b).

(b)    For purposes of this Section 7.3(b), the term **First Election Meeting** shall mean the first meeting of the Association which shall occur no later than sixty (60) days after conveyance of twenty-five percent (25%) of the maximum number of Units permitted to be created by this Declaration to an Owner other than the Declarant. The term "**Transitional Meeting**" shall mean the meeting of the Association which shall be held no later than on the first to occur of the following: (i) sixty (60) days after conveyance of seventy-five (75%) of the maximum number of Units permitted to be created by this Declaration other than the Declarant; (ii) seven (7) years after the date of the first conveyance of a Unit to a party other than the Declarant; (iii) two (2) years after Declarant has ceased to offer Units for sale in the ordinary course of business; and (iv) two (2) years after any development right to add new Units was last exercised. Subject to the right of the Declarant to alter the following procedure so as to have all or part of the transition from an Executive Board comprised solely of members appointed by the Declarant to an Executive Board comprised of members elected by the Owners, the transition of the Executive Board to an Executive Board comprised of members elected by Owners shall occur as follows:

(i)    At the First Election Meeting, the Owners other than the Declarant shall elect one (1) Owner to serve as a member and replace one (1) member selected by the Declarant. This one (1) elected Owner shall serve until the next annual meeting of the Association which is at least one hundred eighty (180) days after the First Election Meeting, at

15743/1/5879677v5

which time successors to such Owner–voted member shall be elected by the Owners other than the Declarant to serve three (3) year terms.

        (ii)     At the Transitional Meeting, the Owners (including the Declarant) shall elect two (2) Owners who shall replace the remaining two (2) Declarant-appointed members.  These elected members shall serve until the annual meeting of the Association next following the annual meeting at which the member elected pursuant to <u>Section 7.3(b)(i)</u> above was elected or reelected, at which time successors shall be elected by the Owners to serve for three (3) year terms.

        (iii)     After the Transitional Meeting and until the Declarant has conveyed the last Unit in the Community in the ordinary course of business, the Board shall notify the Declarant in advance of all meetings of the Board and the Association at the same time as notices are given to the Board members or the Owners as the case may be.  Notwithstanding any other provision of the Declaration or the By-Laws, until the Declarant conveys the last Unit in the Community in the ordinary course of business, the Declarant shall be entitled to send representatives to observe all meetings of the Executive Board and the Association.

        (c)     <u>Powers and Duties</u>.

        (i)     The Board shall have all of the powers for the conduct of the affairs of the Association which are established by the Act, the Declaration, the By-Laws and the Articles and which are not specifically reserved to Owners or the Declarant including, without limitation, the power to levy Assessments and Special Assessments and to establish and enforce reasonable rules and regulations for the use of the Property and to impose fines for the violation thereof.

        (ii)     The Board shall exercise its power in accordance with the Articles, the By-Laws and this Declaration.

        (iii)     The Association, acting through the Board, shall also have the power and duty to:

        (A)     Repair, manage and maintain the Common Facilities and Controlled Facilities as set forth herein.

        (B)     Grant easements or rights-of-way, where necessary, for utilities and sewer facilities in, over or under the Property.

        (C)     Grant easements to the Borough and others of ingress, egress and regress over the Common Facilities for the purpose of inspection, maintenance and repair thereof.

        (D)     Maintain such policy or policies of comprehensive general liability insurance with respect to the Common Facilities, including personal property, if any, owned by the Association as provided herein in furthering the purposes of and protecting the interests of the Association and Members and as directed by this Declaration and the By-Laws.

15743/1/5879677v5

(E)    Maintain directors and officers liability insurance, if available, and delegate its powers to directors, officers, committees and employees of the Association.

(F)    Adopt and implement rules and regulations which are not inconsistent with the terms of this Declaration.

(G)    Take and carry out all actions reasonably necessary and proper to enforce the provisions of this Declaration, including the right to impose reasonable fines upon any Owner for violation thereof.

(H)    Perform any other acts necessary or proper to carry out any of the duties and obligations of the Association.

(I)    Amend this Declaration in accordance with the terms and provisions hereof.

(J)    Suspend the voting rights of an Owner and the right of an Owner to use any of the Common Facilities for the failure to pay in full any Assessment within thirty (30) days after the due date or for the infraction of any rules and regulations of the Association after the Board determines that an infraction has occurred and notifies the Member or Unit Owner of the infraction.

(K)    Notify any mortgagee of a Unit of a default in the payment of any Assessment by any Owner.

(L)    Enter upon any Unit during reasonable hours to inspect said Unit for violations of this Declaration, the By-Laws and any Rules and Regulations and/or compliance with approved Plans for alterations and improvements provided the Owner of such Unit is given written notice of the purpose and time of the inspection at least three (3) days in advance and to perform such maintenance as is required or permitted by this Declaration.

(M)    Repair any damage to the Common Facilities or any improvements in the Common Facilities caused by an Owner or any of his family, guests, tenants, or invitees.  In such case, the Association shall repair the damage in good and workmanlike manner and conformance with the original plans and specifications of the area involved or as the area may have been modified or altered subsequently by the Association in the sole discretion of the Association.  The cost of such repairs shall become a Special Assessment upon the Owner of said Unit.

(N)    Establish parking and no-parking areas within the Common Elements as well as to enforce these parking limitations by all means lawful for such enforcement on public streets including the removal of any violating vehicle by those sole empowered.

(O)    The right to acquire, provide and pay for water, sewage, garbage disposal, electrical, telephone, gas, cable, fire hydrant service and street lighting and other necessary utility services for the Units and the Property and to pass such costs through to the Owners.

15743/1/5879677v5

(P)    Comply with all matters of record to which the Property is subject.

(Q)    The power to adopt operating and capital budgets of the Association and to make amendments thereto from time to time as necessary or desirable.

(R)    The power to engage and compensate legal counsel, accountants and other professional advisors in connection with any matters affecting the Association.

(S)    Establish the Architectural Review Committee.

(T)    Purchase the insurance set forth in this Declaration or permitted under the Act and charge the Unit Owners therefore.

(d)    Controlled Facilities.  The Controlled Facilities include all exterior surfaces of a Dwelling and other exterior improvements on a Unit including the roof and exterior siding of a Dwelling as well as all lawns, shrubs, trees, patios, porches, decks and personal property outside of a Dwelling but within the title lines of a Unit.  The Association, acting through the Board shall have the authority to promulgate reasonable Rules and Regulations concerning the Controlled Facilities and the maintenance, repair or alteration thereof.  Except as shown on the Responsibility Chart, each Owner is responsible for all other maintenance, repair or replacement of the Controlled Facilities located on or compromising a part of his Unit or Dwelling.  The costs incurred by the Association for repair, maintenance, replacement or other services with respect to the Controlled Facilities shall be charged to Units conveyed to Unit Owners (other than a Declarant) as generally shown on the Responsibility Chart.  However, notwithstanding the manner in which such charges are to be levied as shown on the Responsibility Chart, the Board shall have the right, in its sole discretion, to change the manner in which such costs or expenses are budgeted for and billed to Unit Owners.

## ARTICLE VIII
## INSURANCE

8.1.    Liability Insurance.  The Board shall obtain and continuously maintain or cause to be obtained and continuously maintained "broad-form" comprehensive public liability and property damage insurance covering liability for loss or damage to persons or property in those amounts, against those risks written by those insurance companies which the Board shall determine from time to time, but with limits in no event less than Two Million Dollars ($2,000,000.00) for bodily injury (including death) to persons and property damage arising out of a single occurrence.  This insurance shall include protection against bodily injury and property damage that results from the operation, maintenance, repair, replacement or use of the Common Facilities, any legal liability that results from lawsuits related to employment contracts to which the Association is a party, liability for non-owned and hired automobiles, liability for property of others, host liquor liability and such other insurance covering any and all other risks customarily covered in similar policies for associations similar to the Association, including, without limitation, liabilities arising out of or in connection with the Association's maintenance, repair and replacement responsibilities.  All liability insurance policies shall contain severality of

15

interest provisions and cross liability endorsements to cover liabilities of the Association or the Owners as a group to an individual Owner.

8.2.    Property Insurance.

(a)    Generally: The Board shall acquire (if and to the extent available) and pay for insurance as required by the Act in addition to and subject to the following:

(i)    Such insurance as the Board deems advisable in the operation, and for the protection, of the Common Elements and the Units, including, without limitation, flood insurance to the extent appropriate and available.

(ii)    The amount of property insurance obtained shall be equal to the full insurable value replacement cost of the insured property (excluding land, foundations, excavations or other items that are usually excluded from coverage), without deduction for depreciation. Full insurance value replacement cost coverage is to be assured by either (i) a Guaranteed Replacement Cost Endorsement (pursuant to which the insurer agrees to replace the insurance property regardless of the cost) and an Agreed Amount Endorsement (which waives the requirement for coinsurance) if a coinsurance clause is included or (ii) a Replacement Cost Endorsement (pursuant to which the insurer agrees to pay up to 100% of the property's insurable replacement cost, but no more) and an Agreed Amount Endorsement if a coinsurance clause is included. It shall insure against all risks of direct physical loss commonly insured against and covered by the standard "all risk" endorsement, if available, and such other risks as FNMA, FHLMC, the Federal Housing Administration or the Veterans Administration (or their respective successors) may require by reason of their holding of one or more Permitted Mortgages. If an "all risk" endorsement is not available, a "broad form" policy will be obtained. Such insurance policy(ies) may, at the option of the Board, contain a "deductible" provision in an amount determined by the Board but not to exceed (unless a higher amount is required by Pennsylvania law) the lesser of the maximum sum permitted by the then applicable FNMA or FHLMC regulations (or their successors), $10,000 or one percent (1%) of the policy face amount. Policies will contain standard mortgage clauses or endorsements naming either specifically or generically the Posted Mortgagees or their services followed by "its successors and assigns". Property insurance shall be written by carriers (or reinsured by companies) that at least meet the requirements for a Best's rating of B or financial performance index of 6 or an A rating from Demotech, Inc. or such other minimum requirement as may be acceptable to FNMA from time to time.

(iii)    Each Unit Owner and the Board hereby waives and releases any and all claims which he or it may have against any other Unit Owner, the Association, the Board and members thereof, the Declarant and their respective employees and agents, for damage to the Common Elements, the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty or any act or omission of any such party to the extent that such damage is covered by fire or other form of hazard insurance.

(iv)    If the act or omission of a Unit Owner, or of a member of his family, a household pet, guest, occupant or visitor of such Unit Owner, shall cause damage to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs or

15743/1/5879677v5

replacements shall be required which would otherwise be a Common Expense, then such Unit Owner shall pay for such damage and such maintenance, repairs and replacements, as may be determined by the Board, to the extent such payment is not waived or released under the provisions of subparagraph "iii" above.

(v)    Any release or waiver referred to in subparagraphs "iii" and "iv" hereof shall be valid only if such release or waiver does not affect the right of the insured under the applicable insurance policy to recover thereunder. The Unit Owners and the Board, with regard to the insurance carried by each of them, shall use their best efforts to see that their insurance carriers agree that such release or waiver does not affect their rights to recover.

(vi)    If the Board fails within sixty (60) days of an insured loss to initiate a claim for damages recoverable under the property insurance policy(ies) obtained pursuant to the Act, the holder of any Posted Mortgage may initiate such a claim on behalf of the Board. The Board, shall from time to time at such times as it shall deem appropriate, cause an appraisal of the Property to be made for the purpose of determining the current full insurable replacement value of the insured property, without considering depreciation, and the Board shall change the amount of hazard insurance on the Property to the amount of the then current full insurable replacement value of the Property as established by such appraisal.

(a)    The Association's property insurance shall cover damage to the Common Facilities and all personal property owned by the Association (the aforesaid are referred to hereinafter as the "Insured Property"), against all common risks of direct physical loss covering the interests of the Association, the Board and the Unit Owners, as their interests may appear. The total amount of insurance (after application of any deductibles) shall be one hundred percent (100%) of the replacement cost of the Insured Property (exclusive of land, excavations and other items normally excluded from such casualty policies), provided that the Board shall be authorized to require the Association to acquire such greater coverage as shall in such Board's judgment be necessary to adequately insured the Insured Property to protect the Unit Owners and Permitted Mortgagees against loss.

(vii)    Commercial general liability and property damage insurance for the Common Facilities as required by the Act shall be in such limits as the Board shall deem desirable provided that such limit shall not be less than One Million Dollars ($1,000,000.00) per occurrence, for bodily injury and/or property damage, insuring the Association, the Board members, the managing agent, if any, and their respective agents and employees, and the Units Owners from any liability to the public or to the Unit Owners, their tenants or invitees, relating in any way to the ownership and/or use of the Property or any part thereof. The policy shall cover bodily injury and property damage that results from the operation, maintenance, or use of the Community's Common Elements, and any legal liability that results from lawsuits related to employment contracts in which the Association is a party. If the policy does not include "severability of interest" in its terms, it must include a specific endorsement to preclude the insurer's denial of a Unit Owner's claim because of negligent acts of the Association or of other Unit Owners.

15743/1/5879677v5

(viii)    The Board may obtain such other forms of insurance as the Board shall elect to effect including Board members' and officers' liability insurance and such Worker's Compensation insurance as may be necessary to comply with applicable laws.

(ix)    The Association shall obtain fidelity insurance to protect against dishonest acts on the part of the Board members, officers, agents, employees, volunteers and all others who handle, or are responsible for handling, funds of the Association. Such insurance shall name the Association as the insured and shall be in such amount as the Board deems appropriate, but not less than the greater of (i) the maximum funds that will be in the custody of the Association or its agents at any time, or (ii) the sum of three (3) months' Common Expense assessments against all Units. Notwithstanding the foregoing, in the event that the FNMA and the FHLMC reduces or increases the required amount of the fidelity insurance which the Association must maintain to less or more than the amount set forth above, the Board may decrease or increase the amount of the fidelity insurance to the amount required by such entities. Such insurance shall contain a waiver of defense based upon the exclusion of persons who serve without compensation from the definition of "employee" or such endorsement or provision as shall accomplish the same result. Any managing agent shall be required to carry its own insurance with the same coverage as set forth above.

(x)    Except as otherwise provided in this Declaration, premiums for all insurance obtained or maintained by the Board, fees and expenses of the insurance trustee ("**Insurance Common Expense**"), if any, and the cost of any appraisal which the Board deems advisable in connection with any insurance, shall be Common Expenses. The Board may bill the Insurance Common Expense either on an annual basis or as part of the monthly Assessment.

(xi)    The Board shall use commercially reasonable efforts to secure policies providing that the policies cannot be cancelled, invalidated or suspended on account of the conduct of any one or more individual Unit Owners or any officer or employee of the Board or managing agent, if any, without a prior demand in writing that the Board or managing agent, as the case may be, cure the defect and without a reasonable period of time thereafter in which to cure the same. Association policies shall provide that the policy will be primary, even if a Unit Owner has other insurance that covers the same loss. The policy must require the insurer to notify in writing the Association, any Insurance Trustee and each mortgagee named in a mortgage clause at least ten (10) days before it cancels or substantially changes coverage.

(xii)    Insurance coverage on the furnishings and other items of personal property belonging to a Unit Owner and insurance for his personal liability to the extent not covered by insurance maintained by the Board shall be the responsibility of each such Unit Owner.

(xiii)    All physical damage insurance policies purchased by the Board shall be for the benefit of and name as insured the Association for the use and benefit of the Unit Owners and their Posted Mortgagees, as their interests may appear, and shall provide that, with respect to any single loss, if the proceeds thereof exceed $250,000, then all such proceeds shall be paid in trust to such lending institution in the metropolitan Philadelphia area with trust powers as may be designated by the Board (which trustee is herein referred to as the Insurance Trustee) and the policy loss payable provision shall provide that such proceeds are payable to the

18

Insurance Trustee as trustee for each Unit Owner and each Unit's mortgagees. If such proceeds do not exceed $250,000, then the policy loss payable provision shall provide that all such proceeds shall be paid to the Board to be applied pursuant to the Act as trustee for each Unit Owner and each Unit's mortgages. If proceeds are payable to the Insurance Trustee, the Board shall enter into an Insurance Trust Agreement with the Insurance Trustee which may provide that the Insurance Trustee shall not be liable for payment of premiums, the renewal of the policies, the sufficiency of coverage, the form of contents of the policies, the correctness of any amounts received on account of the proceeds of any insurance policies nor for the failure to collect any insurance proceeds. The sole duty of the Insurance Trustee shall be to receive such proceeds as are paid to it and to hold the same in trust for the purposes elsewhere stated in this Declaration and the Act, for the benefit of the insureds and their beneficiaries thereunder.

(xiv)    The name of the insured under each policy required pursuant to this Article 8 shall be stated in form and substance similar to the following:

> The Townhomes at Radcliffe Court on the Delaware
> Community Association, for the use and benefit of the
> individual owners, or their authorized representatives, of
> the Units in The Townhomes at Radcliffe Court on the
> Delaware, a Planned Community

(xv)    If any part of the improvements in the Community is in a special flood hazard area, the Association shall maintain a "master" or "blanket" policy of flood insurance, the premiums to be paid as common expenses. The amount of flood insurance shall be equal to the lesser of 100% of the insurable value of the improvements or the maximum coverage available under the appropriate National Flood Insurance Administration program. The maximum deductible amount for such policy shall be the lesser of $5,000 or 1% of the policy face amount.

(xvi)    Each Owner shall be responsible for the purchase and payment of insurance to protect his Unit, his own personal property and all personal liability not provided for above all personal property owned by the Association, including, but not limited to roofs, exterior components, walls, foundations and Unit improvements of the Units. The Owner's insurance shall be in an amount equal to the full replacement value of the Unit (i.e., one hundred percent (100%) of the current replacement costs), such insurance to afford protection against at least the following: (1) loss or damage by fire or other hazards covered by the standard extended coverage endorsement and by sprinkler leakage, debris removal, cost of demolition, vandalism, malicious mischief, wind, storm and water damage; and (2) such other risks as shall customarily be covered with respect to similar improvements and projects similar in construction, location and use. Each Owner shall provide to the Association a Certificate of Insurance evidencing that said insurance is maintained and in full force and effect. No Owner shall do or permit any act which would void or impair the coverage afforded by any policies held by the Association or would result in an increase in the premium therefore, and any Owner so doing or permitting any such act shall be liable to the Association for any increase which shall be assessed as an Assessment.

19

8.3.    Repairs and Reconstruction After Fire or Other Casualty.

(a)    When Repair and Reconstruction are Required.  Except as otherwise provided in subparagraph (c) of this § 8.3, in the event of damage to or destruction of the Units or any part thereof as a result of fire or other casualty, the Board, under the direction of the Insurance Trustee if an Insurance Trustee is required, shall arrange for and supervise the prompt repair and restoration of the Buildings as required by the Act.  Notwithstanding the foregoing, each Unit Owner shall have the right to supervise the redecorating of his own Unit.

(b)    Procedure for Reconstruction and Repair.

(i)    Cost Estimates.  Immediately after a fire or other casualty causing damage to the Buildings, the Board shall obtain reliable and reasonably detailed estimates of the cost of repairing and restoring the Buildings as required by the Act to a condition as good as that existing before such casualty.  Such costs may also include professional fees and premiums for such bonds as the Board or Insurance Trustee (if any) determines to be necessary.

(ii)    Assessments.  If the proceeds of insurance are not sufficient to defray such estimated costs of reconstruction and repair, or if upon completion of reconstruction and repair the funds for the payment of the costs thereof are insufficient, the amount necessary to complete such reconstruction and repair may be obtained from the appropriate reserve for replacement funds and/or shall be deemed a Common Expense (and/or Direct Charge) and special monthly assessments therefor shall be levied.  The funds shall be paid out of the Common Receipts funds, or both, depending on whether or not the source of the shortfall can be properly determined in the opinion of the Board.  If such source cannot be so determined, then the shortfall shall be allocated among the funds referred to above in proportion to the relative costs of restoration in each of the categories.  Costs of restoration of a Unit to the extent required to be done by the Board shall be paid out of the Common Receipts unless the shortfall is due to failure of the Unit Owner to notify the Association of improvements made to his Unit, in which event the shortfall so caused shall be assessed against the particular Unit Owner.  Unit Owners may apply the proceeds from their individual property insurance policies, if any, to the share of such Common Expense or Direct Charges, or both, as may be assessed to them.  The Board shall be responsible for restoring the Property only to substantially the same condition as it was immediately prior to the damage, and each Unit Owner shall personally assume the additional expense of any improvements to his Unit which he desires, to restore it beyond such condition.

(iii)    Plans and Specifications.  Any such reconstruction or repair shall be substantially in accordance with the construction of the Property as it existed immediately prior to the casualty.

(c)    Disbursements of Construction Funds.

(i)    Construction Fund and Disbursement.  The proceeds of insurance collected on account of casualty, and the sums received by the Board or Insurance Trustee from collections of assessments against Unit Owners on account of such casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner:

20

15743/1/5879677v5

(ii)    If the estimated cost of reconstruction and repair is less than $250,000, then the construction fund shall be disbursed in payment of such costs upon order of the Board.

(iii)    If the estimated cost of reconstruction and repair is $250,000, or more, then the construction fund shall be disbursed in payment of such costs upon approval of an architect qualified to practice in Pennsylvania and employed by the Insurance Trustee to supervise such work, payment to be made from time to time as the work progresses. The architect shall be required to furnish a certificate giving a brief description of the services and materials furnished by various contractors, subcontractors, materialmen, the architect and other persons who have rendered services or furnished materials in connection with the work and stating that: (a) the sums requested by them in payment are justly due and owing and that such sums do not exceed the value of the services and materials furnished; (b) there is no other outstanding indebtedness known to such architect for the services and materials described; and (c) the cost as estimated by such architect for the work remaining to be done subsequent to the date of such certificate does not exceed the amount of the construction fund remaining after payment of the sum so requested, taking into account retainage.

(iv)    Surplus. It shall be presumed that the first monies disbursed in payment of the cost of reconstruction and repair shall be from insurance proceeds and, if there is a balance in the construction fund after the payment of all of the costs of the reconstruction and repair for which the fund is established, such balance shall be used first to reimburse Unit Owners for sums paid to cover shortfalls under subparagraph (b) (ii) above in proportion to the sums so paid until full reimbursement and any remaining balance shall be divided among all Unit Owners in proportion to their Percentage Interests and shall be distributed in accordance with the priority of interests at law or in equity in each Unit.

(v)    Certificate. The Insurance Trustee shall be entitled to rely upon a certificate executed by the President or Vice President, and the Secretary, certifying: (i) whether the damaged Property is required to be reconstructed and repairs; (ii) the name of the payee and the amount to be paid with respect to disbursement from any construction fund or whether surplus funds to be distributed are less than the assessments paid by the Unit Owners; and (iii) all other matters concerning the holding and disbursing of any construction fund. Any such certificate shall be delivered to the Insurance Trustee promptly after request.

(vi)    When Reconstruction Is Not Required. In the event of insubstantial damage to the Common Elements and if the Board shall elect not to repair the same or in the event there is to be no repair or replacement pursuant to the Act, then in either such event any insurance proceeds received on account of such damage shall be expended and/or distributed in accordance with the Act.

## ARTICLE IX
## EASEMENTS AND SPECIAL DECLARANT'S RIGHTS

9.1.    Utility Easements. All Property subjected to this Declaration shall be subject to an easement for the present and future installation, maintenance, inspection, repair and replacement of electric service, master and/or cable television service, telephone service, water service, storm

21

water and sanitary sewage services, gas service, television service (including cable television) and other utility services and the facilities and appurtenances necessary or desirable to any portion of the Property, which easement shall run in favor of the Declarant, the Association and the entity or entities owning or operating these facilities and providing the aforementioned services. All utility companies shall have an easement for access to read and repair the utility meters. The Declarant and the Board shall have the right to grant to third parties additional utility easements which are deemed reasonable by the Declarant or Board in connection with the supply of utility services to the Units and other portions of the Property. Such easement shall also include rights of access as may be granted to the Borough for access to the Stormwater Management System, Sanitary Sewer System and Water Line.

9.2.    Declarant's Easement for Marketing.    The Declarant reserves the right with respect to its marketing of Units to use the Common Facilities for the ingress and egress of itself, its officers, employees, agents, contractors, subcontractors, prospective purchasers and residents. The Declarant shall also have the right, in connection with its marketing of Units until the conveyance of the last Unit it has the right to build or own in the Property, to erect signs on the Property subject to compliance with all applicable Borough codes. The Declarant shall have the right to maintain one or more sales offices, management offices, rental offices and Model Units on the Property, subject to compliance with all applicable Borough codes. Any damage to the Property resulting from this easement shall be repaired by the Declarant within a reasonable time after the completion of its sale of all of the Units in the Property. The Declarant agrees to indemnify and to hold the Association harmless from liability for personal injuries and property damage resulting from the use of the Property in conjunction with the marketing of Units. The rights reserved for the Declarant by this Section 9.2 shall remain in effect for as long as the Declarant shall remain the owner of a Unit in the Property or has the right to build a Unit. This section shall not be amended without the prior written consent of the Declarant.

9.3.    Declarant's Easement to Correct Drainage.    For a period of five (5) years from the date of conveyance of each Unit the Declarant reserves an easement and right on, over and under the Unit to maintain and to correct drainage of surface water in order to maintain reasonable standards of health, safety and appearance. Such right expressly includes the right to cut any trees, bushes, or shrubbery, make any gradings of the soil or to take any other similar action reasonably necessary, following which the Declarant shall restore the affected property to its original condition as near as practicable. The Declarant shall give timely notice of intent to take such action to all affected Owners, unless in the opinion of the Declarant an emergency exists which precludes such notice, in which event, such reasonable notice shall be given as the circumstances shall allow.

9.4.    Declarant's Easement for Construction.    Notwithstanding any provision of this Declaration to the contrary, so long as the Declarant, its successors and assigns, employees, agents, subcontractors, contractors, independent contractors and other persons acting by, through or under the Declarant, are engaged in developing or improving, maintaining or repairing any portion of the Property, such persons shall have an easement to go upon any and all of the Property for purposes of construction, reconstruction, maintenance, repair and renovation, replacement or construction, correction of the Common Facilities, Units or other improvements. The Declarant agrees to indemnify and hold the Association and each Owner harmless from

22

liabilities for personal injuries and physical damage resulting from the exercise of this easement. This easement shall be appurtenant and shall pass with title to every Unit.

9.5.    Easement for Governmental Personnel.    A right of entry to the Common Facilities is hereby granted to the Borough and to law enforcement officers, fire and rescue and local animal control personnel as needed to carry out their duties.

9.6.    Easement for the Association and the Board.    The Association and the Board, its officers, agents and employees shall have the irrevocable right and easement of access to each Unit as may be necessary for the inspection, maintenance, repair or replacement of any facilities in the Common Facilities to make repairs thereto if these repairs are deemed necessary for public safety and to prevent damage or to abate any violation of this Declaration or any rules or regulations of the Association or any violation of any laws or orders of any governmental authorities having jurisdiction over the Property.

9.7.    Storm Water Management System.

(a)    The surface of all storm water facilities shown on the Plan shall remain unencumbered by buildings, structures or trees of any kind and the grade of any such areas shall not be changed or altered in any way except as shown on the Plan without first obtaining the written approval of the Borough.

(b)    The Declarant has created and hereby imposes upon the Property an easement and right-of-way on, over and under the Units in favor of the Declarant, the Association, the Master Association and the Borough for the purpose of maintenance, repair and/or replacement of the Storm Water Facilities so that all such Storm Water Facilities shall be kept in good working order and repair at all times.

(c)    The maintenance, repair and replacement responsibility with regard to the Storm Water Management System is set forth in Section 5.10 hereof.

9.8.    Owners' Easement of Enjoyment.    Every Owner  shall have the right of ingress, egress and regress over and the right of enjoyment in and to the Common Facilities which right shall be appurtenant to each Unit and shall pass with title to every Unit subject, nevertheless, to:

(a)    The right of the Association to assess each Owner for the use of any or all of the Common Facilities, and the obligation of the Owners to contribute to the expense of maintenance, repair and replacement of such Common Facilities.

(b)    The right of the Association to suspend the voting rights and the right of an Owner to use any of the Common Facilities for failure to pay in full any assessment within thirty (30) days of the due date or after a determination by the Board of Directors that the Owner violated the Declaration or any of the rules and regulations of the Community.

(c)    The right of the Association to convey all or any part of the Common Facilities in accordance with Section 5.3 hereof.

23

(d)    The right of the Association to establish rules and regulations governing the use of the Common Facilities.

9.9.    <u>Easement Related to Units</u>.    Each Unit is subject to the following rights, easements, restrictions and covenants in favor of each adjoining Unit and the Association:

(a)    An easement for the installation, maintenance, use, repair, removal and replacement of electric, telephone, plumbing, cable television, security alarm or utility equipment of any kind pertaining to and servicing or benefiting any Unit which passes across or through any other Unit or any Unit Line, provided that such acts will not unreasonably interfere with the area burdened hereunder or the use thereof or impair or structurally weaken any load bearing walls, ceilings or floors and provided that no Owner shall enter any adjoining Unit for any such purpose except at reasonable hours upon reasonable notice to the Owner thereof and with the consent of such Owner and the Association, which consent shall not be unreasonably withheld. All damage caused by such installation, maintenance, use, removal, repair and replacement shall be repaired at the expense of the Owners benefiting therefrom.

(b)    An easement for lateral and surface support, in, through, under, over and alongside each Unit.

(c)    The obligation of each Owner to maintain all portions of his Unit in such condition as to insure the structural support, sanitary hygienic condition, habitability and soundness and maintain or repair the Unit whether after damage by fire or otherwise so as not to materially impair the value of any other Unit.

9.10.    <u>Easement to Facilitate Completion</u>.    The Declarant shall have an easement through the Common Elements as may be reasonably necessary for the purpose of discharging a Declarant's obligations or exercising Declarant's rights hereunder, including any obligations to the Borough. In addition, without affecting the rights of any of each Owner with respect to the use and enjoyment of the Common Elements, subject to the provisions of this Declaration, each Owner and its agents, contractors and invitees shall have a non-exclusive access easement through the Common Elements as may be reasonably necessary for the purpose of construction, repair and renovations of the Unit. The Association shall not have the power to impose any fees or charges or required financial security including, but not limited to, surety bonds, letters of credit or escrow deposits for the use of the easement rights described in this section. The Association shall be entitled to recover costs and expenses incurred by the Association for the repair or damage caused to Common Elements in the exercise of any easement rights.

9.11.    <u>Continuing Easements</u>.    The foregoing easements and conditions in <u>Sections 9.1</u> through 9.10 shall run with the land and inure to the benefit of and be binding upon the Association, each Owner and each tenant, occupant or other person having any interest in any Unit or in the Common Facilities or any part of the Property at the time of reference.

9.12.    <u>Other Conditions of Record</u>.    In addition to the easements set forth above, the rights of each Owner shall be subject to, and each Owner shall be bound by, all documents recorded with respect to the Property, including, without limitation, the notes, restrictions and conditions set forth on the Plan and the Improvements Agreement intended to be recorded prior

24

to the recordation of this Declaration and the list of recording data for recorded easements and licenses appurtenant to or included in the Community or to which any portion of the Community is or may be subject as set forth on **Exhibit "B"**.

9.13.    Encroachments.    If any portion of the Common Elements hereafter encroaches upon any Unit, or if any Unit hereafter encroaches upon any other Unit or upon any portion of the Common Elements, as a result of settling or shifting of any building or buildings in which they are located or for other reasons, other than as a result of the purposeful or negligent act or omission of the Unit Owner of the encroaching Unit, or of the Condominium Association in the case of encroachments by the Common Elements, a valid easement appurtenant to the encroaching Units or Common Elements for the encroachment and for the maintenance of the same shall exist for so long as the encroachment shall exist.    In the event that any building or buildings shall be partially destroyed as a result of fire or other casualty or as a result of a taking by the power of or in the nature of eminent domain or by an action or deed in lieu of the condemnation, and then is rebuilt, encroachments of a portion or portions of the Common Elements upon any Unit or of any Unit upon such rebuilding, shall be permitted, and valid easements appurtenant to the encroaching Units or Common Elements for such encroachments and the maintenance thereof shall exist so long as that building as so rebuilt shall stand.

9.14.    Special Declarant Rights.    Unless otherwise expressly provided in this Section 9, the covenants, restrictions and prohibitions set forth in this Section 9 shall be applicable only to Unit Owners other than the Declarant.    Dwellings and other improvements constructed by the Declarant shall not be subject to the restrictions and architectural review provisions set forth in this Declaration.    Declarant reserves the right to change, from time to time, the style, models, configuration, elevation and other features of the Dwellings which the Declarant reserves the right to build on the Property.

9.15.    Reservation of Special Declarant Rights.    Declarant reserves for itself (and any successor Declarant) all special Declarant rights set forth in the Act, including, but not limited to the following rights:

(a)    The right to maintain and relocate, from time to time, one (1) or more (but not more than ten (10)) construction and/or sales offices on the Common Elements (without limitation as to size or location);

(b)    Subject to compliance with all Borough ordinances and/or the Borough's approval, the right to maintain signs on Units owned by the Declarant and on the Common Elements, including promotional and directional signs, as the Declarant may desire in connection with the marketing and/or sale of Units and the construction of Dwellings and other improvements on the Property;

(c)    The right to maintain, locate and relocate offices and models used in connection with the management of and sale or rental of Units owned by the Declarant on the Declarant's Units;

25

(d)    The right and easement to complete all improvements and Dwellings planned or contemplated for construction within the Property including, but not limited to, the Common Elements;

(e)    The right to relocate the boundaries between Units and Common Elements, together with the right to prepare, execute and record such amendments to this Declaration and the Plats as may be necessary to show the altered boundaries, to the fullest extent permitted by Section 5214 of the Act;

(f)    The right to use and enjoy all easements through the Common Elements for the purpose of constructing, maintaining and/or repairing any improvements required or permitted to be constructed within the Property;

(g)    The right to appoint, remove and replace officers and Directors of the Association during the Declarant Control Period, to the fullest extent permitted hereunder and by the Act;

(h)    The right to transfer any or all of the Special Declarant Rights reserved by the Declarant herein in the manner provided for in the Act; and

(i)    The right to convert the Convertible Real Estate as hereinafter set forth.

9.16.    Declarant's Rights as to Convertible Real Estate. Declarant hereby reserves the right to create additional Units, Common Elements, Limited Common Elements (or all four) within the Convertible Real Estate. Such right may be exercised at any time within seven (7) years after this Declaration is recorded, after which time said option shall lapse as to any part of the Convertible Real Estate with respect to which the Declarant has not, on or before that date, exercised its option hereunder. There are no limitations on the options reserved by the Declarant hereunder, except those created by or imposed by operation of law and those expressly set forth in this Declaration.

(a)    If additional Units are created within the Convertible Real Estate, the voting power in the Association and the Common Expenses appurtenant to each Unit shall be reallocated as provided herein.

(b)    The Declarant reserves the right to convert parts of the Convertible Real Estate at different times and in any order the Declarant may determine. No assurances are made with regard to the order in which, or boundaries of, parts of the Convertible Real Estate that may be converted at any time.

(c)    The maximum number of Units that may be created within the Property, including those that may be created within the Convertible Real Estate, is seventy-three (73). All Units created within the Convertible Real Estate shall be restricted exclusively to residential use.

(d)    All restrictions in this Declaration affecting use, occupancy and alienation of the Units shall apply to Units created within the Convertible Real Estate, subject to reasonable differentiations that the Declarant may deem appropriate based on the different character, style or

26

type of Units created within the Convertible Real Estate, which differentiation the Declarant reserves the right to make in the Declarant's sole and absolute discretion.

(e)   The right to convert the Convertible Real Estate shall in no way affect, diminish, reduce, alter, modify or otherwise amend the obligations of the Declarant to build, construct and install all of the improvements (other than Units within the boundaries of the Convertible Real Estate) depicted on the Plans and as to which Declarant has obligated itself to construct pursuant to its development agreement and financial security agreements with the Borough.

9.17.   Assignment of Special Declarant Rights. The Declarant may assign some or all of its rights contained in this Section to one or more builders. The assignment of the Special Declarant Rights to a Builder does not preclude the Declarant from retaining said rights and assigning any of the Special Declarant Rights to other Builders.

## ARTICLE X
## COVENANT FOR ASSESSMENTS

10.1.   Owners' Assessment Obligation.

(a)   Each Owner, by acceptance of the deed for his Unit, whether or not it shall be so expressed in the deed or other conveyance, shall be deemed to covenant and agree to pay to the Association all Assessments and any other charges or costs levied by the Association pursuant to this Declaration, including, but not limited to:

(i)   Base Assessments to fund Common Expenses for the benefit of all members of the Association and Limited Common Expenses;

(ii)   Special Assessments as described in Section 10.2(b) below;

(iii)   Any other charges or Assessments which may be determined by the Association from time to time to be due and payable by an Owner in accordance with this Declaration; and

(iv)   Any interest, late charges, collection costs, attorneys' fees, penalties or fines levied by the Board for non-payment of Assessments or for noncompliance with the terms and provisions of this Declaration, the By-Laws or any rules or regulations created by the Board. The Base and Special Assessments, together with any interest thereon, fines, late charges, attorneys' fees, penalties and costs of collection thereof, as hereinafter provided, shall be a charge on the Unit and shall be a continuing lien upon the Unit against which each Assessment is made from the time the Assessments, fines, penalties, late charges, attorneys' fees or costs of collection become due. Each Assessment, together with interest thereon, fines, late charges and costs of collection thereof, as hereinafter provided, shall also be the personal obligation of the Owner of the Unit at the time when the Assessment becomes due. The obligations of each Owner hereunder with respect to Assessments, interest, late charges, fines, attorneys' fees and costs of collection shall be absolute and unconditional obligations of each Owner. No Owner may exempt himself from Assessments or other charges due under this Declaration by waiver of the use or enjoyment of the Common Facilities.

15743/1/5879677v5

10.2.    Base Assessments.

(a)    Base Assessments shall be levied on all Units in accordance with a Unit's Common Expense percentage as set forth on **Exhibit "E"**. The Board shall, at least forty-five (45) days before the beginning of each fiscal year, prepare a budget covering the estimated Common Expenses and Limited Common Expenses of the Association during the coming year. As applicable and appropriate, the budget shall include reserve funds adequate for the periodic maintenance, repair and replacement of improvements upon the Common Facilities and all other parts of the Property which do not consist of Units. The Base Assessment to be levied against each Unit shall be computed by dividing the budgeted Common Expenses by the total number of Units contained on the Property. The Board shall cause a copy of the Community Expense budget and notice of the amount of the Base Assessment to be levied against each Unit for the following year to be delivered to each Owner at least thirty (30) days prior to the beginning of the fiscal year. Such budget and Assessment shall become effective upon passage by the Board. In the event the Board fails for any reason so to determine the budget for any year, then and until such time as a budget shall have been determined as provided herein, the budget in effect for the immediately preceding year shall continue for the current year.

(b)    Special Assessments. In addition to the Base Assessments, the Board may levy a Special Assessment or Special Assessments from time to time in amounts which the Board deems proper, whenever the Board is of the opinion it is necessary to do so in order to meet increased operating or maintenance costs, additional capital expenses, or because of emergencies. The obligation to pay Special Assessments for the benefit of all Owners shall be computed on the same basis as for Base Assessments, except with respect to Limited Charges which will be charged to the Unit Owners Limited Charges is incurred. In the event a Unit shall not be properly maintained by an Owner as required under this Declaration, the Association shall have the right, after giving the Owner at least fifteen (15) days written notice to cure any maintenance problems or deficiencies, and the Board shall have the right to assess as a Special Assessment the particular Owner for the cost of such maintenance. If the Association incurs any expenses to repair or replace any part of a Unit or the Community damaged by the act, omission or negligence of an Owner, the Board shall have the right to levy upon such Owner a Special Assessment to cover the expenses incurred by the Association to effectuate such remedial action.

10.3.    Date of Commencement of Assessments. The Assessments provided for herein shall commence not later than the date the first Unit is conveyed by the Declarant to an Owner.

10.4.    Reserve Funds. The Association shall establish one (1) or more Reserve Funds, in an amount or amounts which the Association deems appropriate, to pay the cost of maintenance, repair and replacement of Common Facilities, Controlled Facilities, and any other parts of the Property that are anticipated to require maintenance, repair or replacement on a periodic basis ("**Reserve Funds**"). The Owner shall pay such amounts as the Association may direct as part of any Base Assessment or Special Assessment to be applied to any such Reserve Funds. The Board shall have the right to invest the Reserve Funds in banks or investment accounts, using commercially reasonable discretion.

10.5.    Surplus Funds. Any Surplus of the Association remaining after the payment of or provision for Common Expenses and any prepayment of reserves may be used by the Association

28

as determined by the Board and, to the extent not so used, may be credited to the Owners to reduce their future Assessments.

10.6.    Time of Payment.  Assessments shall be paid in such manner and on such dates as may be fixed by the Board which may include, without limitation, acceleration of the annual Base Assessment for delinquents.  Unless the Board otherwise provides, the Base Assessment shall be paid in monthly installments.

10.7.    Effect of Nonpayment of Assessments: Remedies of the Association.    Any assessment not paid within ten (10) days after the due date may upon resolution of the Board bear late fees and charges, and alternatively or additionally, interest from the due date, in amounts and at a rate to be set by the Board for each assessment period.  The Association may bring an action at law against the Owner personally obligated to pay the same or an action to foreclose the lien against his Unit and there shall be added to the amount due the cost of preparing and filing the complaint in such action, advertising and other costs, and in the event a judgment is obtained, such judgment shall include interest on the amount due as herein provided and reasonable attorney's fees to be fixed by the court together with costs of the action.  If the Board has provided for collection of assessments in installments, upon default in the payment of any one or more installments, the Board may accelerate payment and declare the entire balance of said assessment due and payable in full.  The Board may notify any institutional or other lender holding a mortgage lien on such Unit of the nonpayment of assessments.  In the event of a delinquency in the payment of any assessment when due, the Board shall have the right to accelerate and call due any assessments which will become due and payable within the next succeeding twelve (12) month period and suspend the voting rights of an Owner or Member and the right of an Owner or Member to use any of the Common Facilities.

10.8.    Power to Confess Judgment to Collect Delinquent Assessments.  AS A MEANS OF ENFORCING THE OBLIGATION OF THE OWNERS TO PAY ALL ASSESSMENTS LEVIED PURSUANT TO THIS DECLARATION TO THE EXTENT PERMITTED BY LAW THE BOARD SHALL HAVE THE RIGHT AND POWER TO OBTAIN A JUDGMENT OR JUDGMENTS FOR DELINQUENT ASSESSMENTS BY CONFESSION AGAINST THE OWNER AGAINST WHOM SUCH DELINQUENT ASSESSMENTS HAVE BEEN LEVIED. ACCORDINGLY, EACH OWNER, BY SUCH OWNER'S ACCEPTANCE OF THE DEED TO HIS OR HER UNIT, SHALL BE DEEMED TO HAVE APPOINTED ANY ONE OR MORE MEMBERS OF THE BOARD (DURING SUCH MEMBER'S TERM OF OFFICE) AS THE ATTORNEY-IN-FACT FOR SUCH OWNER TO CONFESS JUDGMENT AGAINST SUCH OWNER IN ANY COURT OF COMPETENT JURISDICTION IN THE COMMONWEALTH OF PENNSYLVANIA FOR ANY DELINQUENT ASSESSMENT OR ASSESSMENTS, FOR THE PURPOSE OF WHICH A COPY OF THIS SECTION AND A COPY OF THE OWNER'S DEED TO HIS OR HER UNIT (BOTH VERIFIED BY THE AFFIDAVIT OF ANY MEMBER OF THE BOARD) SHALL BE SUFFICIENT WARRANT.  THE AUTHORITY HEREIN GRANTED TO CONFESS JUDGMENT SHALL NOT BE EXHAUSTED BY ANY EXERCISE THEREOF BUT SHALL CONTINUE AND BE EFFECTIVE AT ALL TIMES WITH RESPECT TO EACH AND EVERY DELINQUENT ASSESSMENT.    SUCH AUTHORITY TO CONFESS JUDGMENT AND THE AFORESAID APPOINTMENT OF ATTORNEYS-IN-FACT, BEING FOR SECURITY, SHALL BE IRREVOCABLE.    THE BOARD SHALL NOT EXERCISE ITS RIGHT TO OBTAIN A JUDGMENT BY

29

CONFESSION AGAINST ANY INSTITUTIONAL LENDER WHO HAS ACQUIRED TITLE TO A UNIT BY FORECLOSURE SALE OR DEED OR ASSIGNMENT IN LIEU OF FORECLOSURE, NOR SHALL SUCH RIGHT BE EXERCISED AGAINST ANY OWNER EXCEPT AFTER THE BOARD SHALL HAVE GIVEN THE DELINQUENT OWNER AT LEAST TEN (10) DAYS' NOTICE OF ITS INTENTION TO DO SO.

10.9.  Subordination and Release of Lien to Mortgagee.  Any Unit subject to the lien of the Assessments provided for herein shall be relieved of such lien to the extent hereinafter described upon the exercise by a Permitted Mortgagee of the remedies provided in a Permitted Mortgage which results in the Permitted Mortgagee obtaining possession of such Unit by foreclosure or a Deed or assignment in lieu of foreclosure.  The release of lien shall be applicable only to the extent that such lien relates to assessments or charges which have accrued prior to the mortgagee taking possession by foreclosure of the Mortgage or Deed or assignment in lieu of foreclosure.  The lien of the assessments provided for herein shall be subordinate to the lien of any mortgage now or hereafter placed upon the Unit.

10.10.  Initial Contribution.  Every Owner, at the time of such Owner's purchase of the Unit from the Declarant, shall pay to the Association the nonrefundable sum of Four Hundred Ninety Five Dollars ($495.00) as an initial assessment, such sums to be applied by the Association as determined by the Board.  Upon any resale of a Unit and purchase by a subsequent owner, the purchasing owner shall pay the Association a nonrefundable sum of Four Hundred Ninety Five Dollars ($495.00), or such other amount as the Association may establish from time to time.

10.11.  No Waiver of Use.   No Owner may exempt himself from the payment of assessments levied by the Association or release his Unit from the liens created for nonpayment of assessments by waiver of the use or enjoyment of the Common Facilities, or by abandonment of his Unit or by any conveyance of covenant severing the rights and benefits from the Unit or otherwise.  The obligation to pay assessments is absolute and unconditional and in addition to being a covenant running with the land, is a personal obligation to each Owner and shall not be subject to set-off or counter-claim.

10.12.  Governmental Fines, Etc.  All local government fines, penalties and assessments against a Unit or the Common Facilities may be imposed and liened directly against the responsible Owner or the Owner's Unit or the Association or the Common Elements without reference to any duties or functions of the Association or the Board.

10.13.  Mortgage Foreclosure.  If a mortgagee or other purchaser of a Unit acquires title to the Unit as a result of foreclosure of the first mortgage lien, or by deed in lieu of foreclosure or otherwise, the acquirer of title, his successors and assigns, shall not be liable for the share of Common Expenses or other charges by the Association pertaining to the Unit or chargeable to the Owner who previously owned the Unit which have accrued in the six (6) months prior to acquisition of title as a result of the foreclosure.  The unpaid share of the charges shall be a Common Expense collectible for all Owners including the acquirer of the Unit by foreclosure, his successors and assigns.

30

10.14. <u>Monthly Payments of Base Assessments</u>. All Base Assessments made in order to meet the requirements of the Association's annual budget shall be deemed to be adopted and assessed on a monthly basis (rather than on an annual basis payable in monthly installments) and shall commence and be due and payable in advance on the first day of each month after settlement by the Owner on the Unit.

## ARTICLE XI
## USE RESTRICTIONS

11.1.   <u>Use Restrictions</u>.  The Property shall be held, used and enjoyed subject to the following limitations and restrictions, subject to the exemption of Declarant contained herein.

11.2.   <u>Use</u>.  Units shall be used for residential and no-impact home based business purposes only.  The Declarant, its successors and assigns, may use any portion of the Property for a model home site and display, sales and/or construction office during the construction and sales period of the Community.

11.3.   <u>Maintenance</u>.  Except as otherwise set forth herein, each Unit shall be maintained by its Owner or occupants in a safe, clean and sanitary condition, in good order and repair, and in accordance with all applicable restrictions, conditions, ordinances, ordinances, codes and any rules or regulations which may be applicable under this Declaration or under law.

11.4.   <u>Nuisances</u>.  No noxious or offensive activity (including but not limited to the repair of motor vehicles) shall be carried on, in or upon any Unit or Common Elements nor shall anything be done therein which may be or become an unreasonable annoyance or a nuisance to any other Owner.  No loud noises or noxious odors shall be permitted on the Property, and the Board shall have the right to determine if any noise, odor or activity producing such noise, odor or interference constitutes a nuisance.  Without limiting the generality of any of the foregoing provisions, no exterior speakers, horns, whistles, bells or other sound devices (other than security devices used exclusively for security purposes), noisy or smoky vehicles, large power equipment or large power tools, unlicensed off-road motor vehicles or other items which may unreasonably interfere with television or radio reception of any Owner in the Property, shall be located, used or placed on any portion of the Property, or exposed to the view of other Owners without the prior written approval of the Architectural Review Committee.

11.5.   Parking and Vehicular Restrictions.

(a)      No Owner or occupant shall leave any non-operating vehicle, any vehicle not currently registered and licensed, any vehicle having an invalid and expired state motor vehicle inspection sticker parked anywhere on the Property except if entirely enclosed in the garage.  No Owner or guest shall park on the streets of the Community.

(b)      Driveways, streets and other exterior parking areas on the Property shall be used by Owners, occupants and guests for four wheel passenger vehicles, two wheel motorized bicycles and standard bicycles only.  No recreational vehicles, vans (other than non-commercial passenger vans), mobile homes, trailers, boats or trucks which are (i) used for commercial purposes; (ii) contain commercial lettering or commercial equipment; or (iii) other than sport utility vehicles having a capacity in excess of three-quarters of a ton (whether or not registered as

31

a commercial vehicle with the State Department of Transportation) shall be permitted to be parked on the Property, except on a day-to-day temporary basis in connection with repairs, maintenance or construction work, if entirely enclosed in a Unit Owner's garage. Motorcycles must be parked in the garage attached to the Dwelling.

(c)    No motor vehicles including, but not limited to, mini-bikes, snowmobiles and golf carts, may be driven on the Property and driveways by any Owner, occupant or guest.

11.6.    <u>Animal Restriction</u>.  No animals, livestock, reptiles or poultry of any kind shall be raised, bred or kept in any Unit, except usual and ordinary dogs, cats, fish, birds and other household pets may be kept in Units subject to Rules and Regulations adopted by the Association, provided that they are not kept, bred or maintained for commercial purposes or in unreasonable quantities.  As used in this Declaration, "**unreasonable quantities**" shall mean more than three (3) cats or two (2) dogs, or more than one (2) cats and one (1) dog, or any other domestic animal of similar or larger size, per household.  The Association, acting through the Board, shall have the right to prohibit maintenance of any animal which constitutes, in the opinion of the Board, a nuisance to any other Owner.  Animals belonging to Owners, occupants or their licensees, tenants or invitees within the Property must be either kept in a Unit or on a leash being held by a person capable of controlling the animal.  Should any animal belonging to an Owner be found unattended out of the Unit and not being held on a leash by a person capable of controlling the animal, such animal may be removed by the Association or a person designated by the Association to do so, to an animal shelter.  Furthermore, any Owner shall be absolutely liable to each and all remaining Owners, their families, guests, tenants and invitees, for any unreasonable noise or damage to person or property caused by any animals brought or kept upon the Property by an Owner or by members of his family, his tenants or his guests; and it shall be the absolute duty and responsibility of each Owner to clean up after such animals which have used any portion of the Property.  Dog and pet houses are prohibited.

11.7.    <u>Outdoor Activities</u>.  No garbage, refuse or rubbish shall be deposited on the Common Facilities unless placed in a suitable container located and screened from view from other Units.  Trash cans and any other refuse container must be removed after pick up, the day of said pick up.  No refuse or any personal effects are to be stored on the side of the house facing the street, or in the front yard.  The Board shall have the right to enact rules and regulations regarding trash removal.  Each Unit shall be kept free and clear of rubbish, debris and unsightly materials.  No building material or equipment of any kind or character shall be placed or stored upon the Units except within the confines of an enclosed structure or except in connection with construction on the Unit, which construction shall be promptly commenced and diligently prosecuted to completion within a reasonable time.  No household fabrics shall be hung, aired or dried outside the Unit.  No swimming pool, spas, hot tubs or other water features shall be installed or kept on any Unit.

11.8.    <u>Outside Installations</u>.  No attachments or installations (including, but not limited to exterior lighting) shall be placed on the exterior of any Unit unless approved by the ARC (hereinafter defined).  The Board shall have the right to regulate the installation of antenna or satellite signal reception devices in accordance with the Federal law.  No tents, storage tanks or accessory buildings, fences or structures shall be erected or permitted to remain on a Unit or the Common Facilities.  No basketball or other sports equipment shall be installed upon any portion

32

15743/1/5879677v5

of any Unit.  No clothes lines or lawn ornaments, holiday lights (with the exception of non-blinking white lights between Thanksgiving and New Year's Day) or seasonal decorations shall be permitted in the Community if visible from the street.

11.9.  Resales.

(a)  Reference to Declaration.  The deed or instrument transferring title to any Unit shall contain a provision incorporating by reference the Covenants, Easements and Restrictions and the Declaration Plan set forth in this Declaration.

(b)  Notification.  The Seller of a Unit shall notify the Board as to his intent to sell the Unit so that an Estoppel Certificate may be prepared.

(c)  Estoppel Certificate.  Within ten (10) days of the receipt of such notification, the Board shall prepare an Estoppel Certificate which shall set forth any assessments and charges due upon such Unit at the time of conveyance and certify as to whether or not there are violations remaining on the Unit as of the date of preparation of such certificate.  This certificate shall be mailed to the place designated by Seller.  Payment of outstanding assessments, if any, and a reasonable charge to cover the cost of providing such certificate shall be transmitted directly to the Association by the closing attorney or title company.

(d)  Act.  Owners and the Association must comply with the requirements of the Act.

11.10.  Fences.  No fences shall be permitted on the Property.

11.11.  Signs.  No signs, posters, displays, billboards or other advertising device of any kind shall be displayed to the public view on any portion of the Property, except that an Owner shall be allowed to erect a "for sale" or "for rent" sign subject to compliance with all Borough Ordinances.  The Declarant and the Association shall have the right to maintain a community sign and entrance features in the Common Facilities including planting beds and entrance signage as the Declarant or the Board shall determine.  Nothing contained herein shall prevent the Declarant from installing such development signs as the Declarant deems necessary during the construction and sales phase of the Project.

11.12.  Leasing of Units.  Except as expressly provided in this Section, there shall be no restrictions on the leasing of Units.  No transient tenants may be accommodated in any Unit, and no Lease shall be for less than a whole Unit, nor for an initial term of less than one (1) year.  Each Lease shall be in writing and shall provide the terms of the Lease, shall be subject in all respects to the provision of the Act, this Declaration, the By-Laws and the Rules and Regulations of the Association, and that any failure by the Lessee to comply with the terms of such document shall be an event of default under the Lease.  Each Owner or tenant of such Owner shall be subject to the limitations for guest set forth herein.  The Association shall be a third party beneficiary of such covenants in any Lease and shall have the right to enforce them.  An Owner shall not engage in the leasing of his Unit except after having his lessee execute a Lease which contains the following provision:

"Lessee hereby agrees to be bound by all terms and conditions contained in the

33

Declaration of Covenants, Easements and Restrictions for The Townhomes at Radcliffe Court on the Delaware, By-Laws and Rules and Regulations of the Association as the same shall apply to the Unit leased hereunder, and agrees to assume all duties and responsibilities and be jointly and severally liable to the Owner for all of the liabilities and for the performance of all of the obligations applicable to the Owners under the Act, the Declaration, the Articles and the By-Laws or otherwise during the term of the Lease."

The Declarant shall be expressly exempt from this Section 11.12. However, the Declarant shall not market the Units in blocks to investors who intend to rent the Units.

11.13. <u>Changes to Exterior of Unit</u>. Owner shall not make any changes to the exterior of a Unit, including, but not limited to the construction of a deck or patio not constructed during the initial construction of the Unit, except in accordance with Article XII hereof.

11.14. <u>Declarant Exemption</u>. Declarant or its successors or assigns will undertake the work of constructing and developing all of the Unit and Common Facilities included within the Property. The completion of that work and sale, rental and other disposal of Units is essential to the establishment and welfare of the Property as a residential community. As used in this Section and its subparagraphs, the words "its successors and assigns" specifically do not include purchasers of Units improved with Units. In order that said work may be completed and the Community be completed and established as a fully occupied residential community as rapidly as possible, no Owner nor the Association shall do anything to interfere with, and nothing in this Declaration shall be understood or construed to:

(a)  Prevent Declarant, its successors or assigns, or the contractors or subcontractors, from doing on any Unit or Common Facilities whatever it determines to be necessary or advisable in connection with the completion of said work, including without limitation the alteration of its construction plans and designs as Declarant deems advisable in the course of development.

(b)  Prevent Declarant, its successors or assigns, or their representatives, from erecting, constructing and maintaining on any Unit, Common Facilities or portion thereof, owned or controlled by Declarant, or its successors or assigns, or its or their contractors or subcontractors, such structures and equipment as may be reasonably necessary for the conduct of its or their business of completing said work and establishing the Property as a residential community and disposing of the same in Units by sale, lease or otherwise.

(c)  Prevent Declarant, its successors or assigns, or its contractors or subcontractors, from maintaining such signs on any Unit or Common Facilities as may be necessary including, but not by way of limitation, safety and Unit identification signs in connection with the sale, lease or other marketing of Units in the Property.

(d)  Prevent Declarant, its successors or assigns, from granting additional licenses, reservations and rights-of-way to itself, to utility companies, or to others as may from time to time be reasonably necessary for the proper development and disposal of the Property.

The provisions herein restricting Owners and the Association from interfering

34

15743/1/5879677v5

with the construction activities of the Declarant shall survive turnover of control of the Association.

## ARTICLE XII
## ARCHITECTURAL REVIEW AND APPROVAL

12.1.    Architectural Review and Approval.

(a)    Each Owner, by accepting a deed or other instrument conveying any interest in any portion of the Property, acknowledges that Declarant has a substantial interest in ensuring that the improvements within the Property enhance Declarant's reputation as a community developer and do not impair Declarant's ability to market, sell, or lease its property. Therefore, each Owner agrees that no activity within the scope of this Article shall be commenced on such Owner's Unit unless and until Declarant or its designee has given its prior written approval for such activity, which approval may be granted or withheld in Declarant's or its designee's sole discretion. In reviewing and acting upon any request for approval, Declarant or its designee shall be acting solely in Declarant's interest and shall owe no duty to any other person. Declarant's rights reserved under this Article shall continue so long as Declarant owns any portion of the Property unless earlier terminated in a recorded instrument executed by Declarant. Declarant may, in its sole discretion, designate one or more persons from time to time to act on its behalf in reviewing applications hereunder. Declarant may from time to time, but shall not be obligated to, delegate all or a portion of its reserved rights under this Article to (i) an Architectural Review Committee ("**ARC**") appointed by the Board, (ii) a design professional appointed by the Declarant to review and approve the construction of buildings on the Property (the "**Town Architect**") or (iii) a committee comprised of architects, engineers, or other persons who may or may not be Members of the Association. Any such delegation shall be in writing, shall specify the scope of responsibilities delegated, and shall be subject to (i) Declarant's right to revoke such delegation at any time and reassume jurisdiction over the matters previously delegated and (ii) Declarant's right to veto any decision which Declarant determines, in its sole discretion, to be inappropriate or inadvisable for any reason. So long as Declarant has any rights under this Article, the jurisdiction of the foregoing entities shall be limited to such matters as Declarant specifically delegates to it.

(b)    Upon delegation by Declarant or upon expiration or termination of Declarant's rights under this Article, the Association, acting through the ARC, shall assume jurisdiction over architectural matters. The ARC, when appointed, shall consist of at least three (3), but not more than seven (7), persons who shall serve and may be removed and replaced in the Board's discretion. The members of the ARC need not be Members of the Association or representatives of Members, and may, but need not, include architects, engineers, or similar professionals, who may be compensated in such manner and amount, if any, as the Board may establish. Unless and until such time as Declarant delegates all or a portion of its reserved rights to the ARC or Declarant's rights under this Article terminate, the Association shall have no jurisdiction over architectural matters.

(c)    For purposes of this Article, the entity having jurisdiction in a particular case is referred to as the "**Reviewer**".

35

15743/1/5879677v5

(d)    The Reviewer may establish and charge reasonable fees for review of applications and may require such fees to be paid in full prior to review of any application. Such fees may include the reasonable costs incurred in having any application reviewed by architects, engineers, or other professionals. Declarant and the Association may employ architects, engineers, or other persons as deemed necessary to perform the review. The Board may include the compensation of such persons in the Association's annual operating budget.

(e)    The standards and procedure established by this Article are intended as a mechanism for maintaining and enhancing the overall aesthetics of the Property; they do not create any duty to any person. Review and approval of any application pursuant to this Article may be based on aesthetic considerations only. The Reviewer shall not bear any responsibility for ensuring the structural integrity or soundness of approved construction or modifications, nor for ensuring compliance with building codes and other governmental requirements, nor for ensuring that all dwellings are of comparable quality, value, or size, of similar design, or aesthetically pleasing or otherwise acceptable to neighboring Owners.

(f)    Declarant, the Association, the Board, any committee, or any member of the Board or any committee shall not be held liable for soil conditions, drainage, or other general site work; any defects in plans revised or approved hereunder; any loss or damage arising out of the action, inaction, integrity, financial condition, or quality of work of any contractor or its subcontractors, employees, or agents, whether or not Declarant has approved or featured such contractor as a builder; or any injury, damages, or loss arising out of the manner or quality or other circumstances of approved construction on or modifications to any Unit or Dwelling. In all matters, the Board, the Reviewer, and the members of each shall be defended and indemnified by the Association as provided in Article 16.

(g)    Any Owner may request that the Reviewer issue a certificate of Architectural compliance certifying that there are no known violations of this Article. The Association shall either grant or deny such request within thirty (30) days after receipt of a written request and may charge a reasonable administrative fee for issuing such certificates. Issuance of such a certificate shall estop the Association from taking enforcement action with respect to any condition as to which the Association had notice as of the date of such certificate.

(h)    Without obtaining approval as provided herein, no building, landscaping (including, but not limited to, berming, grading, trees, shrubs and plantings, water features) "**Landscaping**") wall or other structure or improvements shall be commenced, erected, installed or maintained upon a Unit (other than those features constructed or installed by the Declarant), nor shall any exterior addition to, change or replacement (including change of external color scheme) or alteration or addition be made to any Unit (other than alterations or changes or additions installed or constructed by the Declarant) which alters the external appearance of the Dwelling or the Unit.

(i)    An Owner seeking review and approval of the structure or improvements described herein shall submit plans and specifications showing the nature, kind, shape, height, materials, finish, colors and location of the same, as well as proof of compliance with all applicable codes, laws and ordinances by certified mail to the ARC.

36

(j)    The ARC must approve, in writing, with or without conditions, any request received by the ARC within fifteen (15) days after all plans and specifications, including additional information, plans and materials which may have been requested by the ARC have been submitted, or the request is deemed denied.

(k)    In making a determination as to the acceptability of any proposed alteration, change or addition, the ARC shall consider the effect the alteration, change or addition will have on the maintenance, repair and replacement obligations of the Association, including the costs of fulfilling these obligations. The ARC shall have the right to impose conditions on any approval given including, without limitation, providing all maintenance, repair and replacement of any such change, addition or alteration and paying to the Association any additional cost that may be incurred by the Association in performing its obligations due to such change, addition or alteration.

(l)    The ARC shall have the right to request additional information, plans and materials concerning any proposed alterations, additions and improvements.

(m)    The ARC, with the approval of the Board, shall have the right to establish design criteria and standards for alterations, additions and improvements within the Property.

(n)    Notwithstanding the above, the ARC shall have the power to grant waivers from architectural design criteria and standards according to procedures and subject to the conditions established by the Board.

(o)    The provisions of this Section shall not apply to the Declarant.

(p)    Any decision of the ARC may be appealed to the Board within thirty (30) days of the Committee's decision.

(q)    Approval by the ARC shall not constitute an endorsement or precedent for any design.

(r)    Each Owner, subsequent to approval from the ARC, shall obtain the necessary approvals and permits from the appropriate Borough and governmental entities.

## ARTICLE XIII
## COMPLIANCE AND DEFAULT

13.1.    Compliance and Default.

(a)    Each Owner shall be governed by and shall comply strictly with the terms, covenants, conditions and restrictions of this Declaration, the By-Laws, and any rules and regulations adopted pursuant thereto, and the same as they may be amended from time to time.

(b)    The Board shall have the power to adopt, amend and enforce compliance with any reasonable rules and regulations relative to the operation, use and occupancy of the Property consistent with the provisions of this Declaration, including, but not limited to enforcement procedures and penalties for violations of this Declaration, the By-Laws and any

37

rules and regulations adopted pursuant thereto which the Board shall deem appropriate. Any rules and regulations shall be adopted or amended, from time to time, by means of appropriate resolutions duly approved by the Board in accordance with the By-Laws. A copy of the rules and regulations and copies of any amendments thereto shall be delivered or mailed to each Owner and occupant of a Dwelling promptly after the adoption thereof and shall become binding upon all Owners, their successors in title and assigns, and occupants of Units.

(c)    Failure of the Owner to comply with any provisions of this Declaration or the By-Laws or any rules and regulations adopted pursuant thereto shall entitle the Association or Owners to the remedies provided in this Declaration, and also to the following relief, none of which shall be exclusive of any other remedies:

(i)    Suits. Failure to comply with the terms of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto shall entitle the Association or any aggrieved Owner or any Permitted Mortgagee to sue for the recovery of damages or for injunctive relief, or both. This relief shall not be exclusive of other remedies provided by law.

(ii)    Costs and Attorneys' Fees. In any proceeding arising because of an alleged failure of an Owner to comply with the terms of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto, the prevailing party shall be entitled to recover the costs of the proceeding and reasonable attorneys' fees; provided, however, that no costs or attorneys' fees may be recovered against the Board in any action unless the court shall first expressly find that the Board acted in bad faith.

(iii)    No Waiver of Rights. The failure of the Declarant or the Board, or any Owner to enforce any covenant, restriction or other provision of this Declaration, the By-Laws or any rules and regulations adopted pursuant thereto, shall not constitute a waiver of the right to do so thereafter.

13.2.    Complaint and Hearing Procedure.

(a)    Unless the internal remedies provided by this Section and any rules and regulations promulgated by the Board shall be expressly waived by the Association, or the Association fails or refuses to act, no action at law or in equity shall be commenced by any Owner or occupant of a Unit until this internal remedy is pursued to exhaustion.

(b)    The Board shall hear complaints from Owners or occupants of Units of alleged violations of this Declaration (other than violations with respect to Assessment obligations), the By-Laws and any rules and regulations of the Association.

(c)    The Board shall hold a hearing on any complaint within thirty (30) days after the receipt by the Board of a formal notice of complaint from an Owner or occupant of a Unit. A decision shall be issued in writing by the Board of Directors within ten (10) day after the conclusion of the hearing.

(d)    The Board shall have the right to establish various rules and procedures governing the operation and administration of the complaint and hearing process and the enforcement of this Declaration, the By-Laws and any rules and regulations.

15743/1/5879677v5

(e)    In hearings before the Board, all parties shall be entitled to be represented by counsel.

## ARTICLE XIV
## INDEMNIFICATION OF OFFICERS, MEMBERS OF THE BOARD AND COMMITTEE MEMBERS

14.1.    <u>Indemnification</u>.  The Association shall indemnify each of its Directors, officers and employees whether or not then in service as such (and his or her executor, administrator and heirs) against all reasonable expenses actually and necessarily incurred by him or her in connection with the defense of any litigation to which the individual may have been a party because he or she is or was a Director, officer or employee of the Association.  The individual shall have no right to reimbursement, however, in relation to matters as to which he or she has been adjudged liable to the Association in the performance of his or her duty as director, officer or employee by reason of willful misconduct, bad faith, gross negligence or reckless disregard of the duties of his or her office or employment.  The right to indemnify for expenses shall also apply to the expenses of suits which are compromised or settled if the court having jurisdiction of the matter shall approve such settlement.  The foregoing right of indemnification shall be in addition to, and not exclusive of, all other rights to that which such director, officer or employee may be entitled.

14.2.    <u>Limited Liability of Directors</u>.

(a)    <u>Fiduciary Relationship</u>.  A Director of this Association shall stand in a fiduciary relation to this Association and shall perform his duties as a Director, including his duties as a member of any committee of the Board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of this Association, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.  In performing his duties, a Director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(i)    One or more Directors or employees of this Association whom the Director reasonably believes to be reliable and competent in the matters presented;

(ii)    Counsel, public accountants or other persons as to matters which the Director reasonably believes to be within the professional or expert competence of such persons; and

(iii)    A committee of the Board upon which he does not serve, duly designated in accordance with law, as to matters within its designated authority, which committee the Director reasonably believes to merit confidence.  A Director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted.

(b)    <u>Reliance</u>.  In discharging the duties of their respective positions, the Board, committees of the Board and individual Directors may, in considering the best interests of this

15743/1/5879677v5

Association, consider the effects of any action upon employees, upon suppliers and customers of this Association and upon communities in which offices of other establishments of this Association are located, and all other pertinent factors. The consideration of these factors shall not constitute a violation of Section 15.2 hereof.

(c)    Presumption.  Absent breach of fiduciary duty, lack of good faith or self-dealing, actions taken as a Director or any failure to take any action shall be presumed to be in the best interests of this Association.

(d)    Limited Liability.  A Director of this Association shall not be personally liable for monetary damages as such for any action taken, or any failure to take any action, unless:

(i)    The Director has breached or failed to perform the duties of his office under Section 14.02 hereof; and

(ii)    The breach or failure to perform constitutes self-dealing, willful misconduct or recklessness.

(e)    Exclusion to Limited Liability.  The provisions hereof shall not apply to:

(i)    The responsibility or liability of a Director pursuant to any criminal statute; or

(ii)    The liability of a Director for the payment of taxes pursuant to local, state or federal law.

## ARTICLE XV
## MORTGAGEE PROVISIONS

15.1.   Reports and Notices.  Upon the specific written request of a holder of a Permitted Mortgage on a Unit, the Permitted Mortgagee shall be entitled to receive some or all of the following as designated in the request to the same extent as an Owner:  copies of budgets, notice of assessment; audited or unaudited financial statements; notices of meetings; notice of decision of Owners to make any material amendment to this Declaration; notices of the commencement of any condemnation or eminent domain proceedings with respect to any part of the Property; and the right to examine the books and records of the Association.  Failure to comply with the requirements set forth above shall in no way invalidate otherwise proper actions of the Association and/or the Board.

15.2.   Subordination of Assessment Lien to Mortgages.  The lien of the assessments provided for herein shall be subject and subordinate to the lien of any Permitted Mortgage held by a Permitted Mortgagee.  Sale or transfer of any Unit shall not affect the assessment lien. However, the sale or transfer of any Unit pursuant to mortgage foreclosure or any Deed or proceeding in lieu of foreclosure (other than foreclosure by the Association of its own assessment lien) shall extinguish the lien of such assessments as to payments which become due prior to such sale or transfer, except for claims for a share of such assessments resulting from a reallocation

15743/1/5879677v5

thereof among all Owners and Units including the Unit so sold.  No sale or transfer shall release such Unit from liability for any assessment thereafter becoming due or from the lien thereof.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1.  <u>Amendments Generally</u>.  Subject to the other provisions of this Declaration relative to amendment, this Declaration in the following manner:

(a)  <u>Before Last Conveyance</u>.  Prior to the transfer of all of the Units owned by the Declarant to an Owner, the Declarant may amend this Declaration in accordance with the Act.

(b)  <u>After Last Conveyance</u>.  After the last transfer of title to the Units by the Declarant, each of the following conditions shall apply; provided, however, that any other provisions of this Declaration setting forth other conditions of amendment shall take precedence:

(i)  <u>Notice</u>.  Notice of the subject matter of a proposed amendment shall be included in the notice of any annual or special meeting of the Association in which a proposed amendment is considered, and shall be served upon all Members in the manner hereinafter provided for service of notices.

(ii)  <u>Resolution</u>.  An amendment may be proposed by either the Board or by at least fifty percent (50%) of the Members.  No resolution of the Board adopting a proposed amendment shall be effective until it has the affirmative vote of at least seventy-five percent (75%) of the Owners.

(iii)  <u>Agreement</u>.  In the alternative, an amendment may be made by an agreement signed and acknowledged by at least seventy-five percent (75%) of the Members in the manner required for the execution of a deed, and this amendment shall be effective when recorded.

(c)  <u>Amendment to Correct Errors</u>.  If any amendment to this Declaration or the By-Laws is necessary in the judgment of the Board to correct any ambiguity or to change, correct or supplement anything appearing or failing to appear therein which is incorrect, defective or inconsistent with anything in this Declaration or the By-Laws or to the requirements of the municipality in which the Property is located, the Board may, at any time and from time to time effect an appropriate corrective amendment without the approval of the Owners of all or part of the Property, upon receipt by the Board of an opinion from independent legal counsel to the effect that the proposed amendment is permitted by the terms of this paragraph.  Each amendment shall be effective upon its recording.

(d)  <u>Proviso</u>.  For so long as Declarant continues to own any Unit or continues to have any right to build any Unit, no amendment of this Declaration shall make any changes which would in any way affect any of the rights, privileges, powers and options of the Declarant unless the Declarant shall join in the execution or amendment.

(e)  <u>Execution and Recording</u>.  A copy of each amendment shall be executed and acknowledged by the officers of the Association with the formalities of a deed.  The

15743/1/5879677v5

amendment shall be effective when the amendment is recorded in the Office of the Recorder of Deeds in and for Bucks County, Pennsylvania.

16.2.  <u>Duration</u>.  The covenants and restrictions of the Declaration shall run with and bind the land perpetually. The Declaration shall not be terminated without the prior written approval of the Borough.

16.3.  <u>Enforcement</u>.  The Borough shall have all rights of enforcement as otherwise set forth herein, and any and all rights of enforcement which may now exist or may hereinafter be established by law.

16.4.  <u>Severability</u>.  Invalidation of any one of those covenants or restrictions by judgment or court order shall in no way affect any other provisions which shall remain in full force and effect.

16.5.  <u>Effective Date</u>.  This Declaration shall become effective when duly entered of record in the Office of the Recorder of Deeds of Bucks County, Pennsylvania.

16.6.  <u>Governing Law</u>.  This Declaration and any questions concerning its validity, construction or performance shall be governed by the laws of the Commonwealth of Pennsylvania.

16.7.  <u>Notification</u>.  The Borough Manager shall be provided with notification of the mailing address of the Association, the Board and the names and addresses of the members of the Board and the officers of the Association, and such mailing information shall be kept current.

16.8.  <u>Headings</u>.  The headings herein are for reference purposes only and shall not affect the meaning or interpretation of this Declaration.

16.9.  <u>Binding</u>.  This Declaration shall run with the Property and all of the Units and shall further inure to the benefit of and shall be binding upon the Declarant's successors or assigns.

**ARTICLE XVII**
**MASTER ASSOCIATION**

17.1.  <u>Reservation of Right</u>.  Any of the powers of the Association may be exercised by or may be delegated by the Executive Board to the Master Association in which event all provisions of the Act applicable to the Association shall apply to the Master Association insofar as its actions affect the Planned Community

17.2.  <u>Liability of Executive Board Members and Officers</u>.  The members of the Executive Board have no liability for the acts or omissions of the Master Association with respect to those powers delegated to Master Association.

17.3.  <u>Delegation of All Powers</u>.  If all of the powers of the Association are delegated to the Master Association, then the Board of Directors of the Master Association may act in all

42

respects as the Executive Board of the Condominium and no separate Executive Board shall be elected or exist.

17.4    <u>Rights of Declarant</u>.    Declarant hereby explicitly reserves the right from time to time, until the seventh (7th) anniversary of the recording of the Declaration, to cause the delegation of additional powers or all powers of the Association to the Master Association.

**IN WITNESS WHEREOF**, the Declarant, Island View Crossing II, L.P., a Pennsylvania limited partnership, has caused these presents to be duly executed by its <u>CHAPTER 11 TRUSTEE</u>, this __18th__ day of __DECEMBER__ 2019.

DECLARANT:

**ISLAND VIEW CROSSING II, L.P.**

By: _____
Name/Title:  Kevin O'Halloran
                Chapter 11 Trustee

STATE OF TEXAS                          :
                                        : ss
COUNTY OF DALLAS                        :

On this **18** day of **DECEMBER**, 2019, before me, the undersigned officer, a Notary Public duly commissioned by the State of Texas, personally appeared Kevin O'Halloran, known to me or proven to be the person(s) who executed the above instrument, and who acknowledged himself to be the Chapter 11 Trustee for Island View Crossing II, L.P., a Pennsylvania limited partnership, and that he, as such Trustee, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of said limited partnership by himself as such Trustee.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

MICHELLE Z. FORREST
Notary Public, State of Texas
Comm. Expires 09-26-2023
Notary ID 10888140

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit "A" | Legal Description of the Property |
| Exhibit "A-1" | Convertible Real Estate |
| Exhibit "B" | Easements and Licenses |
| Exhibit "C" | Reduced Size Copy of the Plan |
| Exhibit "D" | Responsibility Checklist |
| Exhibit "E" | Common Expense Percentages |

## EXHIBIT "A"

## LEGAL DESCRIPTION OF THE PROPERTY

Units 7, 8, 9, 10, 41, 42, 43, 44, 45, 46, 47 as depicted on the Plan entitled Townhouse Planned Community Plan (Exhibit "C") prepared by Bohler Engineering dated February 26, 2015.

**EXHIBIT "A-1"**
**CONVERTIBLE REAL ESTATE**

Master Unit 1 as described below, less the Property as described on **Exhibit "A."**



CONTROL POINT
ASSOCIATES, INC.
*traditional methods | modern approaches*

New Britain Corporate Center
1600 Manor Drive, Suite 210,
Chalfont, PA 18914
Tel. 215.712.9800
Fax. 215.712.9802
www.cpasurvey.com

FEBRUARY 26, 2015
REVISED March 3, 2015
CP05063.03

METES AND BOUNDS DESCRIPTION
MASTER UNIT 1
PART OF T.M.P. 4-27-119
LANDS NOW OR FORMERLY
ISLAND VIEW CROSSINGS II, L.P.
BRISTOL BOROUGH, BUCKS COUNTY
COMMONWEALTH OF PENNSYLVANIA

BEGINNING AT A POINT ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF RADCLIFFE STREET
(A.K.A. S.R. 2002, 60 FOOT WIDE RIGHT-OF-WAY), AT THE INTERSECTION OF THE DIVIDING LINE
BETWEEN MASTER UNIT 1 AND MASTER UNIT 2, AND FROM SAID POINT OF BEGINNING RUNNING, THENCE;

1.  ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF RADCLIFFE STREET, NORTH 35 DEGREES -
    55 MINUTES - 10 SECONDS EAST, A DISTANCE OF 669.94 FEET TO A POINT, THENCE;

2.  ALONG THE DIVIDING LINE BETWEEN MASTER UNIT 1 AND T.M.P. 4-27-119-1, LANDS NOW OR
    FORMERLY RIVERBIRCH ENTERPRISES, L.P., SOUTH 54 DEGREES - 04 MINUTES - 50 SECONDS
    EAST, A DISTANCE OF 499.01 FEET TO A POINT, THENCE;

THE FOLLOWING FIFTEEN (15) COURSES AND DISTANCES ALONG THE DIVIDING LINE BETWEEN
MASTER UNIT 1 AND MASTER UNIT 2:

3.  SOUTH 35 DEGREES - 55 MINUTES - 01 SECONDS WEST, A DISTANCE OF 39.36 FEET TO A
    POINT, THENCE;

4.  NORTH 54 DEGREES - 04 MINUTES - 50 SECONDS WEST, A DISTANCE OF 29.96 FEET TO A
    POINT, THENCE;

5.  SOUTH 35 DEGREES - 54 MINUTES - 38 SECONDS WEST, A DISTANCE OF 31.05 FEET TO A
    POINT, THENCE;

6.  SOUTH 13 DEGREES - 58 MINUTES - 39 SECONDS WEST, A DISTANCE OF 41.09 FEET TO A
    POINT, THENCE;

7.  SOUTH 30 DEGREES - 05 MINUTES - 53 SECONDS WEST, A DISTANCE OF 28.61 FEET TO A
    POINT, THENCE;

8.  SOUTH 03 DEGREES - 16 MINUTES - 09 SECONDS EAST, A DISTANCE OF 71.13 FEET TO A
    POINT, THENCE;

9.  SOUTH 14 DEGREES - 51 MINUTES - 13 SECONDS WEST, A DISTANCE OF 75.13 FEET TO A
    POINT, THENCE;

10. SOUTH 33 DEGREES - 07 MINUTES - 57 SECONDS WEST, A DISTANCE OF 92.70 FEET TO A
    POINT, THENCE;



February 26, 2015
Revised March 3, 2015
CP05061.03
Bristol Borough, Bucks County, PA
Page 2

11.    SOUTH 42 DEGREES - 25 MINUTES - 49 SECONDS WEST, A DISTANCE OF 155.75 FEET TO A POINT, THENCE;

12.    SOUTH 26 DEGREES - 39 MINUTES - 07 SECONDS WEST, A DISTANCE OF 76.30 FEET TO A POINT, THENCE;

13.    SOUTH 35 DEGREES - 53 MINUTES - 25 SECONDS WEST, A DISTANCE OF 47.20 FEET TO A POINT, THENCE;

14.    SOUTH 29 DEGREES - 25 MINUTES - 42 SECONDS WEST, A DISTANCE OF 15.95 FEET TO A POINT, THENCE;

15.    NORTH 54 DEGREES - 04 MINUTES - 50 SECONDS WEST, A DISTANCE OF 113.19 FEET TO A POINT, THENCE;

16.    NORTH 82 DEGREES - 18 MINUTES - 41 SECONDS WEST, A DISTANCE OF 46.58 FEET TO A POINT, THENCE;

17.    NORTH 54 DEGREES - 04 MINUTES - 50 SECONDS WEST, A DISTANCE OF 406.00 FEET TO THE POINT AND PLACE OF BEGINNING.

CONTAINING 356,638 SQUARE FEET OR 8.187 ACRES

THIS PROPERTY SUBJECT TO RESTRICTIONS, COVENANTS AND/OR EASEMENTS EITHER WRITTEN OR IMPLIED.

THIS DESCRIPTION WAS WRITTEN BASED UPON A MAP ENTITLED "MASTER PLANNED COMMUNITY PLAN, ISLAND VIEW CROSSING II, L.P., PROPOSED RESIDENTIAL LAND DEVELOPMENT, 1600 RADCLIFFE STREET, BRISTOL BOROUGH, BUCKS COUNTY, PENNSYLVANIA", PREPARED BY BOHLER ENGINEERING PA, LLC, DATED 2/24/2015, LAST REVISED 2/26/15, PROJECT NO. P131250, SHEET 1 OF 1.

CONTROL POINT ASSOCIATES, INC.

3/3/2015

JAMES F. HENRY, P.L.S.                    DATE
COMMONWEALTH OF PENNSYLVANIA
PROFESSIONAL LAND SURVEYOR # SU056807

DH/SF: _____
Prepared by: DH
Reviewed by: JA

15743/1/5879677v5

## EXHIBIT "B"

## EASEMENTS AND LICENSES

Any document of record which may be found in a title report for the Planned Community or depicted on a recorded plan.

EXHIBIT "C"

REDUCED-SIZE COPY OF THE PLAN



## EXHIBIT "D"

### THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE, COMMUNITY ASSOCIATION
### RESPONSIBILITY CHECKLIST

**Ownership Key:**

H =        Home - owned by one or more Homeowners, a dwelling.  Includes the Lot under and around the Dwelling as shown on the Plan.  A "Unit" under the PA UPCA.

H-CTF =    Controlled Facility - Those components of the Home which receive one or more services from the Association.

CF =       Common Facility - owned by the Association to which all Homeowners are members. A "Common Element" under the Pennsylvania Uniform Planned Community Act.

LCF =      Limited Common Facility - portions of the Common Facilities which are limited in use or access to one or more Homeowners.

P =        Public - components owned by a Public Utility Company.

B =        Borough owned

**Assessment Key:**

CE =       Common Expense - fees charged to cover the Association costs which are shared equally by all Homeowners.

LCE =      Limited Common Expense - fees charged for Association costs which are shared equally only by those Homeowners of conveyed homes for services to Controlled Facilities and Limited Common Facilities. Once all homes are conveyed, these Limited Common Expenses will become Common Expenses

LC =       Limited Charge – direct charges to Homeowners for Association costs which are excluded from the budget (and monthly fees), charged only to one or more Homeowners who derive the benefit <u>when</u> the service will be provided.

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Roofing Flashing | H-CTF | Repair Replacement | LCE | None |
| Gutters Downspouts | H-CFT | None | | Repair Maintenance Replacement |
| Stucco and Stone exterior | H-CTF | None | | Repair Eventual replacement |
| Handiplank or similar siding material | H-CTF | None | | Repainting Replacement |
| Gas fireplaces | H-CTF | None | | Full Cleaning Repair Eventual replacement |
| Fireplaces, Hearths | H | None | | Repair Replacement |
| Windows Window glass, Sliding glass doors Patio doors | H | None | | Cleaning Repair Replacement (1) |
| Front Entrance Door Patio or Balcony door | H-CFT | Repainting Exterior side | LCE | Repair Replacement (1) |
| Locks, hinges or other hardware on windows and doors | H | None | | Repair Replacement |
| Garage Door | H-CTF | Repainting exterior side | LCE | Repair Replacement (1) |
| Garage door lock, Hardware, mechanicals | H | None | | Maintenance Repair Replacement |
| Front Porch, entranceway landing, stoop (brick with concrete | H-CTF | None | | Clearing Ice Melting Snow clearing Replacement |
| Exterior entrance lighting, controlled inside Home | H | None | | Repair Maintenance Electricity |

15743/1/5879677v5

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| | | | | Replacement (1) |
| Privacy fencing | H-CTF | Repair, Maintenance, Replacement, Restraining | LC | None |
| Foundation Walls | H | None | | None |
| Basement, internal structural components | H | None | | None |
| Interior components or everything inside "exterior surface side" or having an "interior aspect" | H | None | | Repair Maintenance Replacement |
| Attic space, non-structural components beneath roof sheathing, including insulation | H (access only with Board approval | None | | Cleaning Repair |
| Plumbing and electrical-if services one Home, regardless of location | H | None | | Repair Maintenance Replacement |
| HVAC units (wherever located) | H | None | | Repair Maintenance Operation Replacement |
| Sidewalks to main entry of individual Homes | H-CTF | None | | Cleaning Ice melting Snow clearing Repair Replacement |
| Driveways | H-CTF | Clearing Ice Melting Snow Clearing | | Repair Sealcoating Replacement |

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Common sidewalk near entrance to the property | H | Snow clearing Repair Replacement | CE | None |
| Planted beds directly adjacent to homes | H-CTF | None | | Watering Planting Mulching Maintenance |
| All other landscape on the property. | CF | Maintenance Replacement | CE | None |
| [Name of internal roads] as well as the parking spaces locate | Owned by Master Association | Reimbursement to Master Association for: Repair Resurfacing Snow clearing (2) | CE | None |
| Curbing along roads | CF | Repair Replacement | CE | None |
| Street Lighting along [name of internal roads]. | Owned by Master Association | Reimbursement to Master Association for: Electricity Repair Maintenance Replacement | CE | None |
| Mailboxes | CF | Repair Replacement | CE | None |
| Storm Water Management | Owned by Master Association | Reimbursement to Master Association for: Operation Maintenance Replacement | CE | None |
| Main Entrance Road Landscaping | Owned by Master Association | Reimbursement to Master Association for: Maintenance | CE | None |

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| | | Replacement | | |
| Active Radon System | CF | Repair, Maintain, Replace | CE | None |

(1) Items to be replaced by Owner which must first be approved by the Association

(2) Snow will be cleared where there are no vehicles are parked in area when contractor is present to do the work.

## EXHIBIT "E"

## COMMON EXPENSE PERCENTAGES

9.09%, which shall be amended as Units are added to the Townhouse Planned Community.

**EXHIBIT "A-2"**

**DECLARATION OF MASTER PLANNED COMMUNITY**

**FOR**

**ISLAND VIEW CROSSING, A PLANNED COMMUNITY**

**[Attached]**

## *BUCKS COUNTY RECORDER OF DEEDS*

**55 East Court Street**
**Doylestown, Pennsylvania   18901**
**(215) 348-6209**

**Instrument Number - 2019073988**
**Recorded On 12/19/2019 At 3:25:05 PM**                    **\* Total Pages - 35**
**\* Instrument Type - DEED AGREEMENT - NO PROPERTY TRANSFER**
**Invoice Number - 1048331          User -  SMC**
**\* Grantor - ISLAND VIEW CROSSING II L P**
**\***
**\* Customer - SIMPLIFILE LC E-RECORDING**
**\* <u>FEES</u>**
```
RECORDING FEES        $188.75
TOTAL PAID            $188.75
```

+---------------------------------------------------+
|        Bucks County UPI Certification             |
|        On December 19, 2019 By TF                 |
+---------------------------------------------------+

+---------------------------------------------+
|                                             |
|     This is a certification page            |
|                                             |
|          DO NOT DETACH                      |
|                                             |
|         This page is now part               |
|        of this legal document.              |
|                                             |
+---------------------------------------------+

<u>RETURN DOCUMENT TO:</u>
KAPLIN STEWART
910 HARVEST DRIVE&#10;POST OFFICE
BLUE BELL, PA 19422

I hereby CERTIFY that this document is
recorded in the Recorder of Deeds Office
of Bucks County, Pennsylvania.




**Robin M. Robinson**
**Recorder of Deeds**

**\* - Information denoted by an asterisk may change during**
**the verification process and may not be reflected on this page.**

162A2B

```
CERTIFIED PROPERTY IDENTIFICATION NUMBERS
04-027-119-        -       BRISTOL BOR
         CERTIFIED 12/19/2019 BY TF
```

PREPARED BY:
Kaplin Stewart Meloff Reiter & Stein, P.C.
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
Attn: Simi Kaplin Baer, Esquire
Tel.: 610-941-2657

RETURN TO:
Kaplin Stewart Meloff Reiter & Stein, P.C.
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
Attn: Simi Kaplin Baer, Esquire
Tel.: 610-941-2657

Parcel Identification Number 04-027-119

# MASTER ASSOCIATION DECLARATION

## OF

## RADCLIFFE COURT ON THE DELAWARE

**Pursuant to the provisions of the
Pennsylvania Uniform Planned Community Act,
68 Pa. C.S.A. Section 5101 et seq.**

**Date:** December 18, 2019

## ARTICLE I
## DECLARATION OF PLANNED COMMUNITY
## SUBMISSION; DEFINED TERMS

1.1    **DECLARANT; PROPERTY; COUNTY; NAME**. Island View Crossing on the

Delaware II, L.P. (**"Declarant"**), is the owner of an approximately seventeen (17) acre parcel of

land located in Bristol Borough (**"Borough"**), Bucks County, Pennsylvania, as more specifically

described in **Exhibit "A"** attached hereto (**"Real Estate"**).  Declarant has obtained the approvals

required to develop the Real Estate as a residential community.  Declarant intends to create a

Master Planned Community consisting of two (2) Units (as defined herein) and develop the units

in accordance with that certain "Preliminary/Final Land Development Plan prepared by Bohler

Engineering (**"Land Development Plan"**), as said Land Development Plan may be amended.

Declarant, in its capacity as the developer of the Townhouse Planned Community (hereinafter

defined) (**"Townhouse Developer"**) will subject Master Unit 1 to a Planned Community

Declaration under the Pennsylvania Uniform Planned Community Act, 68 Pa.C.S.A. §5101, et

seq. (the **"Act"**), pursuant to which Townhouse Developer will create The Townhomes at

Radcliffe Court on the Delaware (**"Townhouse Planned Community."**)    The Townhouse

Developer will construct certain site improvements and seventy-three (73) Homes (as defined

herein) on Master Unit 1, as depicted on the Land Development Plan.  In conjunction with the

creation of the Townhouse Planned Community, Townhouse Developer will create The

Townhomes at Radcliffe Court on the Delaware Community Association, (**"Townhouse**

**Association"**).    The Townhouse Association will control the operation, improvement and

maintenance of the Townhouse Planned Community.

Declarant has also obtained preliminary approval to construct six (6) five (5) story multi-

family buildings (**"Multi-Family Building and collectively the "Multi-Family Buildings"**) to

2

15743/1/5877035v3

contain an aggregate of ninety-six (96) Homes on Master Unit 2 (as defined herein).  Declarant intends to construct the Multi-Family Buildings on Master Unit 2 as depicted on the Land Development Plan.  Declarant reserves the right to amend the Land Development Plan to revise the configuration of the Multifamily Buildings and Homes contained therein.  If the Declarant elects to sell one or more of the Homes to be constructed in the Multi-Family Building the Declarant may subject the Multi-Family Buildings to the Condominium form of ownership (**"Multi-Family Building Condominium"**).  In connection with the creation of the Multi-Family Building Condominium, the Declarant will create an association (**"Multi-Family Building Association"**) which will control the operation, improvements and maintenance of the Multi-Family Building Condominium.  In the event the Declarant, or its successors or assigns, elects not to sell one or more of the homes in the Multi-Family Buildings, but rather to retain ownership of the Multi-Family Buildings as a rental property, then Declarant, or its successors or assigns, shall control the operation, improvements and maintenance of the Multi-Family Building and Master Unit 2.

Declarant hereby submits the Real Estate, including all easements, rights, and appurtenances thereto to the provisions of the Pennsylvania Uniform Planned Community Act, 68 Pa. C.S.A. § 5101 et seq. (the **"Act"**), and hereby creates a residential planned community, to be known as "Radcliffe Court on the Delaware Planned Community" (**"Master Planned Community"**) as depicted on the Plats and Plans.

1.2    **DEFINED TERMS**.  Capitalized terms not otherwise defined herein or in the Plats and Plans shall have the meaning specified or used in the Act.  The following terms shall have specific meanings:

3

A.    **"Assessments"** means those levies, charges or sums payable to the Master Association by the Master Unit Owners (or their Unit Owner successors in a proportionate amount to the percentage of their Unit to the overall Total Units in the Community) from time to time as provided herein or in the Act.

B.    **"Association"** means the Unit Owners' Association of the Master Planned Community and shall be known as " Radcliffe Court Master Association."

C.    "**Berm**" means the landscaped berm located along the Radcliffe Street edge of the Property.

D.    **"Bylaws"** means the document providing for the governance of the Association pursuant to Section 5306 of the Act, as such document may be amended from time to time.

E.    **"Entrance Improvements"** means the main entrance, landscaping, and Berm depicted on the Plats and Plans.

F.    **"Common Elements"** means those parts of the Property designated as such on the Plats and Plans.

G.    **"Common Expenses"** means expenditures made or liabilities incurred by or on behalf of the Association together with any allocation to a reserve.

H.    **"Common Expense Liability"** means the liability for Common Expenses allocated to a Unit in accordance with the Act and this Declaration.

I.    **"Common Facilities"** means the Entrance Improvements, Walking Trail, Connecting Road, stormwater management system, including, but not limited to the Pump Station (to the extent not dedicated or owned by the Borough or any utility agency), common utilities, and other items depicted as such on the Plats and Plans.

15743/1/5877035v3

**J.**    **"Connecting Road"** means the area depicted on the Plats and Plans as the "Connecting Road" which will connect the Entrance Improvements to and through the Units.

**K.**    **"Declarant"** means the Declarant described in Section 1.1 above except that any successor to such Declarant as to Special Declarant Rights shall, as to such Special Declarant Rights, be the "Declarant".

**L.**    **"Declaration"** means this document and the Plats and Plans, as the same may be amended from time to time.

**M.**    **"Executive Board"** means the Executive Board of the Association.

**N.**    **"Home"** means an individual residential dwelling constructed on any Unit, whether free-standing, attached, or contained in the Multi-Family Building.

**O.**    **"Identifying Number"** means the distinct number that identifies each Unit as shown on the Plats and Plans.

**P.**    **"Joint Entrance Improvements"** means an identification sign and landscaping located at the main entrance to the Master Planned Community.

**Q.**    **"Master Association"** means the association which shall govern the Master Planned Community created pursuant to Section 5222 of the Act.

**R.**    **"Master General Common Expense Percentage"** means the percentage that each Master Unit Owner shall pay of the General Common Expenses of the Master Association pursuant to Section 2.2 hereof.

**S.**    **"Master Planned Community"** means the Master Planned Community described in Section 1.1 above.

**T.**    **"Master Unit 1"** means that area of land depicted on the Plats and Plans as Master Unit 1.

15743/1/5877035v3

U.    "**Master Unit 2**" means that area of land depicted on the Plats and Plans as Master Unit 2.

V.    "**Multi-Family Building**" means teach of the multi-family residential depicted on the Plats and Plans.

W.    "**Overall Development**" means the development of all the Real Estate as depicted on the revisions to the Land Development Plans which are approved by the Borough.

X.    "**Permitted Mortgage**" means any mortgage to (i) the seller of the Unit; (ii) a bank, trust company, savings bank, savings and loan association, mortgage service company, insurance company, credit union, pension fund, real estate investment trust or like institutional investor or lender; and (iii) any other mortgagee approved by the Executive Board.

Y.    "**Permitted Mortgagee**" means the holder of a Permitted Mortgage.

Z.    "**Plats and Plans**" means the Plats and Plans attached hereto as **Exhibit "B"** and made a part hereof, as the same may be amended from time to time.

AA.    "**Property**" means the Real Estate described in Section 1.1 above.

BB.    "**Pump Station**" shall mean the pump station located in the Common Area which serves the sanitary sewer system which shall be maintained by the Association until dedicated to the Borough.

CC.    "**Rules and Regulations**" means such rules and regulations as are promulgated by the Association from time to time with respect to various matters relating to the use of all or any portion of the Master Planned Community, which either supplement or elaborate upon the provisions of this Declaration or the Bylaws.

6

DD.    **"Special Assessment"** means an individual Unit's share of any assessment made by the Association in addition to the Annual Assessment.  A Special Assessment may be made against less than all of the Units as more specifically provided herein.

EE.    **"Subassociations"** means the Townhouse Association and the Multi-Family Building Association.

FF.    **"Unit"** means a portion of the Master Planned Community designated for separate ownership, the boundaries of which are depicted in the Plats and Plans as Master Unit 1 or Master Unit 2.

GG.    **"Unit Owner"** means the Declarant or any other person who owns a Unit but excluding a person having an interest in a Unit solely as security for the performance of an obligation.

HH.    **"Walking Trail"** means the exterior, perimeter walking trail depicted on the Plats and Plans, exclusive of the internal walking trail located on the Townhouse Planned Community.

## ARTICLE II
## ALLOCATION OF PERCENTAGE INTERESTS AND COMMON EXPENSE LIABILITIES; VOTING RIGHTS; UNIT BOUNDARIES.

2.1    **DESCRIPTION OF COMMON ELEMENTS**.  The Common Elements consist of all portions of the Property as so designated on the Plats and Plans.

2.2    **PERCENTAGE INTEREST**.    The Master General Common Expense Percentage allocated to a Unit is the quotient obtained by dividing the number of Homes to be constructed on a Unit by the aggregate number of Homes approved by the Borough to be constructed in the Overall Development.

2.3    **ALLOCATION OF UNIT OWNERS' VOTING RIGHTS**.    During the Declarant Control Period there shall be two (2) members of the Executive Board each with one

7

vote, two of which shall be appointed by Declarant.    When the Declarant Control Period

terminates, the number of members of the Executive Board shall be increased to three (3).    At

such time, the Executive Board Member shall be one (1) officers from each of the

Subassociations and one member elected at large from the Master Planned Community (the "**At**

**Large Member**").    Each owner of a House shall have one (1) vote with regard to the election of

the "At Large Member."

      **2.4**      **UNIT BOUNDARIES.**

      **A.**      The Plats and Plans show the location and dimensions of the Units and

Common Elements comprising the Property, and which are hereby created.

      **B.**      The vertical boundaries of the Unit shall be vertical planes without any

upper or lower boundaries, which vertical planes shall be located on the lines showing the

dimensions and location of Units, as more particularly shown on the Plats and Plans.

      **2.5**      **Creation of Additional Unit**.

      **A.**      A Unit owned by the Declarant or by an assignee of the Declarant's

Special Declarant Right (hereinafter defined) to subdivide or convert Units which had been

owned by the Declarant may be subdivided or converted into two or more Units.

      **B.**      Upon application of the Declarant or an assignee of the Declarant's

Special Declarant Right to subdivide or convert a Unit, the Association shall prepare, execute

and record an amendment to this Declaration, including the Plan, so subdividing or converting

the Unit.

      **C.**      The amendment to the Declaration shall be executed by the Declarant or

an assignee of Declarant's Special Declarant Rights and shall assign an identifying number to

each Unit created and reallocate the Percentage Interest, votes in the Association and Common

8

Expense liability formerly allocated to the subdivided Unit to the new Units in any reasonable manner prescribed by the Declarant or assignee of Special Declarant Rights.

**D.**    In addition, if the Declarant or assignee of the Declarant's Special Declarant Right to convert Units, converts any Unit into two or more Units, the Declarant or assignee of the Declarant's Special Declarant Right to subdivide or convert Units shall record a new Plan or portion thereof showing the location and dimensions of any new Units and Common Elements thus created, as well as the location and dimensions of any portion of that space not being converted.

**E.**    The boundaries between adjoining units may be relocated by an amendment to the declaration upon application to the Association by the owners of those Units. If the owners of the adjoining Units have specified a reallocation between their Units of their common element interests, votes in the Association and common expense liabilities, the application must state the proposed reallocations. Unless the executive board determines, within 30 days, that the reallocations are unreasonable, the Association shall prepare an amendment that identifies the Units involved, states the reallocations, is executed by those unit owners, contains words of conveyance between them and, upon recordation, is indexed in the name of the grantor and the grantee.

**ARTICLE III**
**RESTRICTION ON USE, SALE AND LEASE OF UNITS;**
**RELOCATION OF UNIT BOUNDARIES; PARKING**

**3.1**    **GENERAL PROVISIONS**.  The provisions of this Declaration are designed to create a uniform plan for the orderly development and operation of an attractive and efficient residential community.  Accordingly, the use of the Units and Common Elements are restricted exclusively to residential use; provided, however, that any of the Multi-Family Buildings may

9

contain a business center for the use of occupants, which may contain a computer center, telecommunications facilities, copy/production facilities, and not more than two thousand (2,000) square feet of retail or professional office space.

**3.2    SIGNS**.  One sign shall be erected at the main entrance to the Master Planned Community.   The construction and location of this or any additional signs (hereinafter collectively **"Signs"**) are subject to the approval of the Borough.  Each Sign shall be a Common Element for the use of all of the Units in accordance with this Declaration.  Each Subassociation may construct additional signs so long as such signs are approved by the Borough.

**3.3    RULES AND REGULATIONS.**   Reasonable, non-discriminatory Rules and Regulations, not in conflict with the provisions of this Declaration, concerning the use and enjoyment of the Master Units and the Common Elements, may be promulgated from time to time by the Executive Board.   Copies of the then current Rules and Regulations and any amendments thereto shall be furnished to all of the owners of the Homes constructed in the Units (**"Home Owners"**) by the Executive Board promptly after adoption of such Rules and Regulations or any amendments thereto.

**3.4    QUIET ENJOYMENT**.  The Common Elements shall be used only for the benefit and enjoyment of the Unit Owners and the Home Owners and their invitees.  No Unit Owner or Home Owner may carry on any practice or permit any practice to be carried on, which unreasonably interferes with the quiet enjoyment by the occupants of the Homes located in any of the Units, except for generally accepted construction practices of Declarant and Townhouse Developer which may interfere with quiet enjoyment during construction of the Units.

**3.5    FIRE HAZARDS; COMPLIANCE WITH LAWS**.  No Unit or any part thereof nor any part of the Common Elements shall be used, occupied or kept in a manner which violates

10

any law, statute, ordinance or regulation of any governmental body or which leads to the cancellation of any hazard insurance policy or policies on the Property.

   3.6    **EASEMENT INTEGRITY**.  Nothing shall be done or be permitted to be done by any Unit Owner, Home Owner or other occupant of a Home which will impair any easement or hereditament therein without the consent of the Executive Board.

   3.7    **REPAIR, CONDITION AND APPEARANCE OF UNITS**.  Except as herein otherwise provided, Unit Owners shall be responsible for maintaining their Units in good order, repair and attractive appearance at their own expense.

## ARTICLE IV
## EASEMENTS

   4.1    **ADDITIONAL EASEMENTS**.  In addition to the easements provided for by Sections 5216, 5217 and 5218 of the Act, the following easements are hereby created:

   A.    The Units and Common Elements are subject to easements in favor of the Unit Owners, the Declarant and appropriate utility and service companies and governmental agencies or authorities for such utility and service lines and equipment as may be necessary or desirable to serve any portion of the Property.  The easements created in this Section 4.1(A) shall include, without limitation, rights of the Declarant, Unit Owners, or the providing utility or service company, or governmental agency or authority to install, lay, maintain, repair, relocate and replace gas lines, pipes and conduits, water mains and pipes, sanitary sewer, stormwater management facilities, telephone wires and equipment, television equipment and facilities (cable or otherwise), electric wires, conduits and equipment, over, under, through, along and on the Common Elements, and the roads for sub associations.

   B.    The Executive Board shall have an easement, on, over and under the Common Elements for the purpose of maintaining and controlling drainage of stormwater in

11

15743/1/5877035v3

order to maintain reasonable standards of health, safety and appearance. The easement created

by this Section 4.1(B) expressly includes the right to cut or remove any vegetation, to grade the

soil, or to take any other action reasonably necessary to achieve this purpose, which does not

materially interfere with the use and occupancy of the area by any Unit Owner, following which

the Executive Board shall restore the affected area as closely to its original condition as

practicable.

     C.    The Executive Board shall have an easement over the Common Elements

for inspection, operation, maintenance, repair, improvement and replacement of the Common

Elements and for correction of emergency conditions or casualties to the Common Elements.

     D.    Declarant reserves an easement to use portions of the Common Elements

and any Unit owned by Declarant for construction related purposes including the storage of

tools, machinery, equipment, building materials, appliances, supplies and fixtures, and the

performance of work respecting the Property, subject only to the condition that such activities of

Declarant shall not unreasonably impair any Unit Owner's right to quiet enjoyment of its Unit.

     E.    Each Unit Owner and each Home Owner is hereby granted an easement in

common with each other Unit Owner and each Home Owner for ingress and egress through all

Common Elements, subject to such reasonable rules, regulations and restrictions as may be

imposed by the Association. Each Unit is hereby burdened with and subjected to an easement

for ingress and egress through all Common Elements by persons lawfully using or entitled to the

same.

     F.    Each Unit Owner and Home Owner and their tenants and invitees is

hereby granted an easement in common with each other for use of all sidewalks located in any

Unit.

15743/1/5877035v3

G.     The Planned Community is subject to any easements described in the Overall Plans.

**4.2     UNITS AND LIMITED COMMON ELEMENTS EASEMENT IN FAVOR OF ASSOCIATION**.  The Units are hereby made subject to the following easements in favor of the Association and its agents, employees and independent contractors:

A.     For inspection of the Units in order to verify the performance by Unit Owners of all items of maintenance and repair for which they are responsible;

B.     For inspection, maintenance, repair and replacement of the Common Elements situated in or accessible from such Units;

C.     For correction of emergency conditions in one or more Units, or casualties to the Common Elements, and/or the Units.

**4.3     COVENANTS RUN WITH LAND**.   All easements, rights and restrictions described herein are easements appurtenant, running with the Property and shall continue in full force and effect until the termination of this Declaration, as it may be amended from time to time.

**ARTICLE V**
**AMENDMENT OF DECLARATION**

**5.1     AMENDMENT GENERALLY**.  This Declaration may be amended only in accordance with the procedures specified in Section 5219 of the Act and the express provisions of this Declaration.  Notwithstanding any other provisions of this Declaration to the contrary, if any amendment is necessary in the judgment of the Executive Board to cure any ambiguity or to correct or supplement any provisions of this Declaration that are defective, missing or inconsistent with any other provisions thereof then at any time and from time to time the Executive Board may affect an appropriate corrective amendment without the approval of any of

15743/1/5877035v3

the Unit Owners or the holders of any liens on all or part of the Property, upon receipt by the

Executive Board of an opinion from independent legal counsel to the effect that the proposed

amendment is permitted by the terms of this sentence. Each amendment of the type described in

this Section 5.1 shall be effective upon the recording of an appropriate instrument setting forth

the amendment and its due adoption, which instrument has been executed and acknowledged by

one or more officers of the Executive Board.

## ARTICLE VI
## MORTGAGES AND INSURANCE

**6.1    PERMITTED MORTGAGES**.  Whether or not they expressly so state, all

mortgages and the obligations secured thereby shall be deemed to provide, generally, that the

mortgage, and the rights and obligations of the parties thereto, shall be subject to the terms and

conditions of the Act and this Declaration.

**6.2    SUBORDINATION OF MORTGAGES TO DECLARATION**.  The lien of

any mortgage, whether or not the mortgage shall expressly so state, shall be subordinate and

subject to the terms and conditions of the Act and this Declaration.  Provided, however, that,

subject to applicable law, the lien of any assessment in accordance with the Act, Declaration and

Bylaws shall be subordinate and subject to the lien of any mortgage now or hereafter

encumbering any Unit.

**6.3    REPORTS AND NOTICES TO PERMITTED MORTGAGEES**.  Upon the

specific written request of a Mortgagee (or its servicer) to the Executive Board, a Mortgagee

shall be entitled to receive some or all of the following as designated in the request:

       **A.**    Copies of budgets, notices of assessment, or any other notices or

statements provided under this Declaration by the Executive Board to the Unit Owner whose

Unit is encumbered by the Mortgage;

14

15743/1/5877035v3

**B.**     Any audited or unaudited financial statements of the Association which are prepared for the Association and distributed to the Unit Owners;

**C.**     Copies of notices of meetings of the Unit Owners and the right to designate a representative to attend such meetings;

**D.**     Notice of the decision of the Unit Owners to make any material amendment to this Declaration;

**E.**     Notice of substantial damage to or destruction of any part of the Common Elements (the repair of which would cost in excess of Ten Thousand Dollars ($10,000.00));

**F.**     Notice of the commencement of any condemnation or eminent domain proceedings with respect to any part of the Property;

**G.**     Notice of any violation under this Declaration by the Unit Owner whose Unit is encumbered by the Mortgage if such violation is not cured by the Unit Owner within thirty (30) days after the giving of notice by the Association to the Unit Owner of the existence of the violation;

**H.**     The right to examine the books and records of the Executive Board at any reasonable time; or

**I.**     The request of a Mortgagee (or its servicer) shall specify which of the above items it desires to receive and shall indicate the address to which any notices or documents shall be sent by the Executive Board.  The Executive Board need not inquire into the validity of any request made by a Mortgagee hereunder.  Failure to comply with the requirements set forth above shall in no way invalidate otherwise proper actions of the Association and the Executive Board.

15743/1/5877035v3

6.4    **INSURANCE.**

A.    Each Unit Owner shall maintain fire and extended coverage insurance in amounts equal to the replacement cost of the site improvements located on or comprising its Unit.  Copies of such policies shall be delivered by the Unit Owner to the Executive Board.  Any restoration of any site improvements contained in the Unit necessitated by fire or other casualty shall be in accordance with all governmental codes, ordinances and requirements, as applicable.  All restoration shall be commenced as soon as reasonably possible and be prosecuted diligently.  Each Unit Owner acknowledges that failure to restore any damage as soon as reasonably possible shall cause substantial damage to other Unit Owners by making the Property less attractive.

B.    Each Unit Owner shall maintain public liability insurance on its Unit with an insurer and in amounts satisfactory to the Executive Board and naming the Association as an additional insured.  Copies of such policies shall be delivered by the Unit Owner to the Executive Board.

C.    The Association shall maintain public liability insurance on the Common Elements in the amount of at least Two Million Dollars ($2,000,000.00) and may obtain such other types and amounts of insurance with respect to the Common Elements as it deems appropriate.  In addition, the Association shall maintain such insurance as require by any recorded easement, including, but not limited to that certain Parking Easement between Island View Crossing I, L.P. and Island View Crossing, II, L.P. and easements in favor of the public for use of walking trails.  Such public liability policy shall be reviewed annually and the policy amount increased as required to maintain an appropriate level of insurance comparable to office/retail facilities of similar use and size.

16

**D.**    If the insurance premiums or charges for any insurance procured by the Association are increased, or established at a higher premium than would otherwise be payable, as the result of the act or omission of a particular Unit Owner or a Home Owner of a Home within such unit, the Executive Board shall have the right, but shall have no obligation, to bill such Unit Owner the amount of the additional insurance premium or charge resulting therefrom as a Special Assessment.

**E.**    Each Unit Owner, Home Owner, and the Executive Board hereby waives and releases any and all claims which he or it may have against any other Unit Owner, Home Owner, the Association, the Executive Board and members thereof, the Declarant and their respective employees and agents, for damage to the Common Elements, the Units, the Homes, the site improvements located on any Unit, or to any personal property located on the Units, Common Elements, or Homes caused by fire or other casualty or any act or omission of any such party to the extent that such damage is covered by fire or any other form of hazard insurance.

**F.**    If the act or omission of a Unit Owner, Home Owner, or of the tenants, employees, agents, customers,  guests or employees of such Unit Owner or Home Owner, shall cause damage to the Common Elements or to a Unit or Units, Home or Homes owned by others, or maintenance, repairs or replacements shall be required which would otherwise be a Common Expense, then such Unit Owner or Home Owner shall pay for such damage and such maintenance, repairs and replacements, as may be determined by the Executive Board to the extent such payment is not waived or released.

**G.**    Any release or waiver shall be valid only if such release or waiver does not affect the right of the insured under the applicable insurance policy to recover thereunder. The Unit Owners, the Executive Board, and Home Owners with regard to the insurance carried

17

15743/1/5877035v3

by each of them, shall use commercially reasonable efforts to convince their insurance carriers to agree that such release or waiver does not affect their rights to recover.

## ARTICLE VII
## BUDGETS; COMMON EXPENSES; ASSESSMENTS AND ENFORCEMENT

7.1    **DECLARATION OF COMMON EXPENSES**.    Master General Common Expenses, as defined in Section 1.2 hereof, shall include, but not necessarily be limited to, the total cost and expense incurred by the Association in operating, managing, equipping, furnishing, lighting, repairing, replacing and maintaining the Common Facilities specifically including any necessary gardening and landscaping, trail and trail appurtenance maintenance, storm drainage systems and other utility systems, traffic control equipment, the cost of public liability and property damage insurance on the Common Elements, repairs, parking lot striping, lighting, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, rentals of machinery and equipment used in such maintenance, the cost of personnel to implement such services and the cost of any managing agent retained to oversee the daily operations of the Common Facilities.

7.2    **ANNUAL BUDGET**.    The Executive Board shall cause to be prepared an estimated Annual Budget for each fiscal year of the Association in accordance with the provisions of the Act, Declaration and Bylaws.

7.3    **SPECIAL ASSESSMENTS**.    If the cash requirement estimated at the beginning of any fiscal year shall prove to be insufficient to cover the actual Common Expenses for such fiscal year for any reason (including, by way of illustration and not limitation, any Unit Owner's non-payment of his assessment), the Executive Board shall have the power, at any time (and from time to time) it deems necessary and proper, to levy one or more Special Assessments against each Unit Owner.

18

**7.4    QUARTERLY PAYMENTS**.    All Common Expense Assessments made in order to meet the requirements of the Association's annual budget shall be payable in quarterly installments and shall be due and payable in advance on the first day of January, April, July and October of each year.    Special Assessments shall be due and payable as determined by the Executive Board.    Common Expense Assessments not paid when due shall bear interest at the rate set forth on Section 7.8.

**7.5    SUBORDINATION OF CERTAIN CHARGES**.    Any fees, charges, late charges, fines and interest which may be levied by the Executive Board shall be subordinate to the lien of a mortgage constituting a first lien on a Unit.

**7.6    FAILURE TO FIX NEW ASSESSMENTS**.    If the Executive Board fails to fix new assessments for Common Expenses for the subsequent fiscal year before the expiration of any fiscal year, the Unit Owners shall continue to pay the same sums they were paying for such assessments during the fiscal year just ended and such sum shall be deemed to be the new assessments for the succeeding fiscal year.    If the Executive Board changes the assessment at a later date, such new assessment shall be treated as if it were a Special Assessment under Section 7.3 above.

**7.7    NO EXEMPTION BY WAIVER**.    No Unit Owner may exempt himself from liability with respect to the Common Expenses by waiving the right to use or enjoy any of the Common Elements or by abandoning his Unit or otherwise.

**7.8    INTEREST AND CHARGES**.    All sums assessed by the Executive Board against any Unit Owner as a regular or special assessment shall bear interest thereon at the then maximum legal rate (but not more than fifteen percent (15%) per annum) from the tenth (10th) day following default in payment of any assessment when due.    Further, any assessment not paid

19

15743/1/5877035v3

within ten (10) days after its due date shall accrue a late charge at such rate as may be

determined by the Executive Board (but not more than Fifty Dollars ($50.00) per day).  Any

delinquent Owner shall also be obligated to pay (i) all expenses of the Board, including

reasonable attorneys' fees, incurred in the collection of the delinquent assessments by legal

proceedings or otherwise, and (ii) any amounts paid by the Board for taxes or on account of

superior liens or otherwise to protect its liens, which expenses and amounts, together with

accrued interest and late charges, shall be deemed to constitute part of the delinquent

assessments and shall be collectible as such, subject to Section 7.5 above.

### ARTICLE VIII
### EXECUTIVE BOARD

**8.1**    **MEMBERS.**

    **A.**    The initial Executive Board shall consist of the members appointed

pursuant to Section 2.3 above.

**8.2**    **POWERS OF EXECUTIVE BOARD**.  The Executive Board of the Association

shall possess all of the duties and powers granted to the Executive Board by the Act.

**8.3**    **ABATING AND ENJOINING VIOLATIONS BY UNIT OWNERS**.  The

violation of any of the Rules and Regulations, the breach of any provision contained in the

Bylaws or the breach of any provision of this Declaration or any applicable provision of the Act

by any Unit Owner, Home Owner or occupant of a Home, shall give any Unit Owner and/or the

Executive Board the right, in addition to any other rights to which it may be entitled, and subject

to the provisions of Article IX below, to enjoin, abate, or remedy by appropriate legal

proceedings, either at law or in equity, the continuance of any such breach, and all costs so

incurred, including accrued attorneys' fees, and all damages resulting therefrom, shall be

15743/1/5877035v3

assessed against the Unit Owner, Home Owner, or occupant of a Home committing or permitting the breach.

## ARTICLE IX
## LIMITATION OF LIABILITY

**9.1** **LIMITED LIABILITY OF THE EXECUTIVE BOARD**.   The Executive Board, and its members in their capacity as members, officers and employees of the Association:

**A.**     Shall not be liable for the failure of any service to be obtained by the Executive Board and paid for by the Association, or for injury or damage to persons or property caused by the elements or by a Unit Owner, Home Owner, occupant of a Home or person on the Property, or resulting from electricity, gas, water, rain, dust or sand which may leak or flow from the outside or from any part of the Unit(s), or from any of the pipes, drain conduits, appliances, or equipment, or from any other place unless in each such injury or damage has been caused by the willful misconduct or gross negligence of the Association or the Executive Board;

**B.**     Shall not be liable to the Unit Owners or Home Owners as a result of the performance of the Executive Board members' duties for any mistake of judgment, negligence or otherwise, except for the Executive Board members' own willful misconduct or gross negligence;

**C.**     Shall have no personal liability in contract to a Unit Owner, Home Owner, or any other person or entity under any agreement, check, contract, deed, lease, mortgage, instrument or transaction entered into by them on behalf of the Executive Board or the Association in the performance of the Executive Board members' duties;

**D.**     Shall not be liable to a Unit Owner, a Home Owner or such Home Owner's tenants, employees, agents, customers or guests, for loss or damage caused by theft of or damage to personal property left by any Unit Owner, Home Owner or such Home Owner's  tenants,

15743/1/5877035v3

employees, agents, customers or guests in a Home, or in or on the Common Elements except for the Executive Board members' own willful misconduct or gross negligence;

**E.**     Shall have no personal liability in tort to a Unit Owner, Home Owner, occupant of a home, or any other person or entity, direct or imputed, by virtue of acts performed by or for them, except for the Executive Board members' own willful misconduct or gross negligence in the performance of their duties; and

**F.**     Shall have no personal liability arising out of the use, misuse or condition of any buildings or other improvements located on the Property, or which might in any other way be assessed against or imputed to the Executive Board members as a result of or by virtue of their performance of their duties, except for the Executive Board members' own willful misconduct or gross negligence.

**9.2**     **INDEMNIFICATION**.  Each member of the Executive Board, in his capacity as an Executive Board member, and each officer of the Association, in his capacity as an officer of the Association, shall be indemnified by the Association against all expenses and liabilities, including attorneys' fees, reasonably incurred by or imposed upon him in connection with any proceeding in which he may become involved by reason of his being or having been a member and/or officer of the Executive Board or Association, or any settlement of any such proceeding, whether or not he is an Executive Board member, officer or both at the time such expenses are incurred, except in such cases where such Executive Board member and/or officer is adjudged guilty of willful misconduct or gross negligence in the performance of his duties; provided that, in the event of a settlement, this indemnification shall apply only if and when the Executive Board (with the affected member abstaining if he is then an Executive Board member) approves such settlement and reimbursement as being in the best interest of the Association; and provided

22

further that, indemnification hereunder with respect to any criminal action or proceeding is permitted only if such Executive Board member and/or officer had no reasonable cause to believe his conduct was unlawful.  The indemnification set forth in this Section 9.2 shall be paid by the Association on behalf of the Unit Owners and shall constitute a Common Expense and shall be assessed and collectible as such.  Such right of indemnification shall not be deemed exclusive of any of the rights to which such Executive Board member and/or officer may be entitled as a matter of law or agreement or by vote of the Unit Owners or otherwise.

     **9.3**    **DEFENSE OF CLAIMS**.    Complaints brought against the Association, Executive Board or officers, employees or agents thereof in their respective capacities as such, or the Master Community as a whole shall be directed to the Executive Board, which shall promptly give written notice thereof to the Unit Owners and the holders of any Mortgages and such complaints shall be defended by the Association.  The Unit Owners and the holders of mortgages on Units shall have no right to participate in such defense other than through the Association, unless such Unit Owner or holder of a mortgage on such Unit is named as a defendant in such action.  Complaints against one or more but less than all Unit Owners or Units shall be defended by such Unit Owners who are defendants themselves and such Unit Owners shall promptly give written notice of the institution of any such suit to the Association and to the holders of any Permitted Mortgages encumbering such Units.

**ARTICLE X**
**SPECIAL DECLARANT RIGHTS**

     **10.1**    **SPECIAL DECLARANT RIGHTS**.    Anything in this Declaration or in the Bylaws to the contrary notwithstanding, Declarant reserves the Special Declarant Rights as defined in Section 5103 of the Act, those set forth elsewhere in this Declaration and as follows (collectively, the **"Special Declarant Rights"**):

23

A.    Subject to the terms of this Declaration, Declarant shall have the right to control the actions of the Executive Board and its officers for the period specified below (**"Period of Declarant Control"**), subject only to the rights of the Unit Owners other than Declarant to elect that number of members to the Executive Board at the times and in the manner set forth below and in Section 10.1.  As used in the preceding sentence and elsewhere in this Declaration, the following words and phrases shall have the meanings ascribed to them below:

(i)    **"Declarant Control"** refers to the right of the Declarant, at any time and from time to time during the Period of Declarant Control, to appoint and remove the representatives who have been designated by Declarant to serve as members of the Executive Board and as its officers;

(ii)    **"Period of Declarant Control"** shall have the meaning set forth in the Act.

(A)    Declarant reserves the unrestricted right to sell, lease and/or mortgage any Units which it continues to own after the recording of this Declaration.

B.    Declarant reserves the unrestricted right to maintain advertising and sales information signs and promotional displays in, about or on any portion of the Common Elements and to relocate or remove the same, all at the sole discretion of Declarant and without the necessity for approval of the Executive Board.

C.    Declarant shall have the right to maintain sales offices and management offices.

D.    Townhouse Developer shall have the right to exercise in common with Declarant the following Special Declarant Rights;

24

(i)     completion of the Common Facilities.

(ii)    conversion of Master Unit 1 into Homes and/or Common Facilities;

(iii)   conversion of Master Unit 2 into Homes and/or Common Facilities;

(iv)    use of easements through Common Facilities; and

(v)     appointment or removal of one Executive Board member pursuant to Section 2.3 hereof.

(vi)    unrestricted right to sell, lease and/or mortgage any Units which it continues to own after the recording of this Declaration.

(vii)   unrestricted right to maintain advertising and sales information signs and promotional displays in, about or on any portion of the Common Elements and to relocate or remove the same, all at the sole discretion of Townhouse Developer and without the necessity for approval of the Executive Board.

(viii)  the right to maintain sales offices and management offices on Master Unit 1 and Master Unit 2.

**10.2    EASEMENTS**.  The Declarant and Townhouse Developer hereby reserves for itself, its employees, agents or other representatives and its customers and other invitees, as well as its successors and assigns, such easements and licenses as may be necessary or desirable, in the judgment of Declarant or Townhouse Developer, to realize all of the intended benefit of the Special Declarant Rights.

**10.3    ASSIGNMENT**.  Any one or more of the Special Declarant Rights, as created and reserved under this Article X may be transferred by Declarant to any other party and that

25

transfer shall be effective as to all persons or parties affected thereby if at such time the instrument evidencing such transfer is executed both by the transferor and the transferee of the subject Special Declarant Rights and is recorded in the Office for the Recording of Deeds in and for Bucks County.  The holder of any mortgage obligation may succeed to the Special Declarant Rights.

**ARTICLE XI**
**AVERTING PUBLIC DEDICATION**

All or any portion of the Common Elements may be temporarily closed to such extent as the Executive Board shall determine to be legally necessary and sufficient to prevent a dedication thereof or any accrual of any rights in any person other than the Unit Owners and Home Owners, or in the public generally therein.

**ARTICLE XII**
**WAIVER OF CHAPTER 34 OF ACT**

Each and every immediate and subsequent purchaser of a Unit waives each and every provision contained in Chapter 54 of the Act.

**ARTICLE XIII**
**UNITS SUBJECT TO MASTER PLANNED COMMUNITY DOCUMENTS; EMINENT DOMAIN**

**13.1    UNITS AND HOMES SUBJECT TO MASTER PLANNED COMMUNITY DOCUMENTS**.  Each present and future owner, lessee, occupant and mortgagee of a Unit and each Home Owner and its tenants and invitees shall be subject to and shall comply with the provisions of the Act, this Declaration, the Plats and Plans, the Bylaws and the Rules and Regulations and with the covenants, conditions and restrictions as set forth in this Declaration and the deed to such Units and Homes; provided that nothing contained herein shall impose upon any lessee or mortgagee of a Unit any obligation which the Act or one or more of such documents, or both, make applicable only to Unit Owners (including, without limitation, the

26

obligation to pay assessments for Common Expenses).  The acceptance of a deed or mortgage to any Unit or any Home, or the entering into of a lease or the entering into occupancy of any Unit or any Home shall constitute an agreement that the provisions of the Act, this Declaration, the Plats and Plans, the Bylaws, the Rules and Regulations and the covenants, conditions and restrictions set forth in the deed to such Unit or Home are accepted and ratified by such grantee or lessee, and are deemed unobjectionable by such mortgagee.  All of such provisions shall be covenants running with the land and shall bind any person having at any time any interest or estate in such Unit or Home, as though such provisions were recited and stipulated at length in each and every deed, conveyance, mortgage or lease thereof.

13.2    **EMINENT DOMAIN**.  Whenever all or part of the Common Elements shall be taken, injured or destroyed by eminent domain, each Unit Owner and Home Owner shall be entitled to notice thereof and to participate in the proceedings incident thereto, but in any proceedings for the determination of damages, such damages shall be determined for such taking, injury or destruction as a whole and not for each Unit Owners or Home Owner's interest therein.  The award or proceeds of settlement shall be payable to the Association for the use and benefit of the Unit Owners and Home Owners and their mortgagees as their interests may appear.

**ARTICLE XIV**
**MANAGEMENT**

The Association in its discretion may employ a professional, experienced managing agent who shall oversee the daily operation of the Master Association, in accordance with the provisions of the Act, Declaration, Bylaws and Rules and Regulations.

**ARTICLE XV**
**CLAIMS**

Each Unit Owner and Home Owner (hereinafter called the **"Contracting Owner"**) will defend, indemnify and save harmless, at its expense, the Association and any other Unit Owner

27

and Home Owner, against and from all liabilities, penalties, damages, expenses and judgments, including attorneys' fees, which may be imposed upon or incurred by or asserted against the Association or such other Unit Owner or Home Owner by any architect, contractor, sub-contractor, engineer, attorney, real estate broker, supplier or any other employee or agent of the Contracting Owner, except for specific work or services contracted for in writing by the Association or such other Unit Owner or the Home Owner with such employee or agent of the Contracting Owner.

**ARTICLE XVI**
**GENERAL PROVISIONS**

16.1   **HEADINGS**.  The headings used in this Declaration and the table of contents are inserted solely as a matter of convenience for the readers of this Declaration and shall not be relied upon or used in construing the effect or meaning of any of the provisions of this Declaration.

16.2   **SEVERABILITY**.   The provisions of this Declaration shall be deemed independent and severable, and the invalidity or unenforceability of any provision or portion thereof shall not affect the validity or enforceability of any other provision or portion thereof unless such deletions shall destroy the uniform plan of development and operation of the Master Planned Community which this Declaration is intended to create.

16.3   **APPLICABLE LAW**.   This Declaration shall be governed by and construed according to the laws of the Commonwealth of Pennsylvania.

16.4   **INTERPRETATION**.   The provisions of this Declaration shall be liberally construed in order to affect Declarant's desire to create a uniform plan for development and operation of the Property.

28

**16.5    EFFECTIVE DATE**.  This Declaration shall become effective when it and the Plats and Plans have been recorded.

**16.6    NOTICES**.  All notices, demands, bills, statements or other communications under this Declaration and the Bylaws shall be in writing and shall be deemed to have been duly given if delivered personally or five (5) days after sent by registered or certified mail, return receipt requested, postage prepaid (or otherwise as the Act may permit), (i) if to a Unit Owner, at the address which the Unit Owner shall designate in writing and file with the Secretary or, if no such address is designated, at the address of the Unit of such Unit Owner, (ii) if to a Home Owner at the address which the Home Owner shall designate in writing and file with the secretary, or if no such address is designated, at the address of the Home of the Home Owner, or (iii) if to the Association or to the Executive Board, at the principal office of the Association or at such other address as shall be designated by notice in writing to the Unit Owners pursuant to this Section.  If a Unit or Home is owned by more than one (1) person, each such person who so designates a single address in writing to the Secretary shall be entitled to receive all notices hereunder.

**16.7    EXHIBITS**.  All exhibits attached to this Declaration are hereby made a part of this Declaration.

-SIGNATURE PAGE FOLLOWS-

29

**IN WITNESS WHEREOF**, the Declarant has caused these presents to be duly executed as of this _____ day of _____, 2019.

DECLARANT:

**ISLAND VIEW CROSSING II, L.P.**

By: _____
Name/Title:  Kevin O'Halloran
                   Chapter 11 Trustee

STATE OF TEXAS                                    :
                                                  : ss
COUNTY OF DALLAS                                  :

     On this 18 day of DECEMBER _____, 2019, before me, the undersigned officer, a Notary Public duly commissioned by the State of Texas, personally appeared Kevin O'Halloran, known to me or proven to be the person(s) who executed the above instrument, and who acknowledged himself to be the Chapter 11 Trustee for Island View Crossing II, L.P., a Pennsylvania limited partnership, and that he, as such Trustee, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of said limited partnership by himself as such Trustee.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

MICHELLE Z. FORREST
Notary Public, State of Texas
Comm. Expires 09-26-2023
Notary ID 10888140

## SCHEDULE OF EXHIBITS

Exhibit "A"        -        Property Description

Exhibit "B"        -        Plats and Plans

## EXHIBIT "A"
## Property Description

METES AND BOUNDS DESCRIPTION
TAX MAP PARCEL 4-27-119
LANDS NOW OR FORMERLY ISLAND CROSSING II, L.P.
BRISTOL BOROUGH, BUCKS COUNTY
COMMONWEALTH OF PENNSYLVANIA

BEGINNING AT A POINT ON THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET (A.K.A.  S.R. 2002, 60 FOOT WIDE RIGHT-OF-WAY), AT THE INTERSECTION OF THE DIVIDING LINE BETWEEN TAX MAP PARCEL 4-27-119, LANDS NOW OR FORMERLY ISLAND CROSSING II, L.P. AND TAX MAP PARCEL 4-27-119-1, LANDS NOW OR FORMERLY RIVERBIRCH ENTERPRISES L.P., AND FROM SAID POINT OF BEGINNING RUNNING, THENCE;

1. ALONG THE DIVIDING LINE BETWEEN TAX MAP PARCEL 4-27-119 AND TAX MAP PARCEL 4-27-119-1, SOUTH 54 DEGREES 04 MINUTES 50 SECONDS EAST, A DISTANCE OF 693.86 FEET TO A POINT ON THE PIERHEAD AND BULKHEAD LINE OF THE DELAWARE RIVER (NAVIGABLE WATERS) AS ESTABLISHED JANUARY 5, 1894 AND APPROVED BY THE SECRETARY OF WAR, SEPTEMBER 10, 1940, THENCE;

THE FOLLOWING TWO (2) COURSES AND DISTANCES ALONG THE PIERHEAD AND BULKHEAD LINE OF THE DELAWARE RIVER:

2. SOUTH 21 DEGREES 17 MINUTES 52 SECONDS WEST, A DISTANCE OF 271.95 FEET TO A POINT, THENCE;

3. SOUTH 33 DEGREES 23 MINUTES 27 SECONDS WEST, A DISTANCE OF 718.45 FEET TO A PO THENCE;

THE FOLLOWING THREE (3) COURSES AND DISTANCES ALONG THE DIVIDING LINE BETWEEN TAX MAP PARCEL 4-27-119 AND TAX MAP PARCEL 47-22-49, LANDS NOW OR FORMERLY ISLAND VIEW CROSSING II, L.P.;

4. NORTH 54 DEGREES 04 MINUTES 50 SECONDS WEST, A DISTANCE OF 450.19 FEET TO A POINT, THENCE;

5. SOUTH 35 DEGREES 55 MINUTES 10 SECONDS WEST, A DISTANCE OF 36.10 FEET TO A POINT, THENCE;

6. NORTH 54 DEGREES 04 MINUTES 50 SECONDS WEST, A DISTANCE OF 344.02 FEET TO A POINT ON THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET, THENCE;

7. ALONG THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET, NORTH 35 DEGREES 55 MINUTES 10 SECONDS EAST, A DISTANCE OF 1,016.99 FEET TO THE POINT AND PLACE OF BEGINNING.

CONTAINING 762,702 SQUARE FEET OR 17.509 ACRES

THIS PROPERTY SUBJECT TO RESTRICTIONS, COVENANTS AND/OR EASEMENTS AS CONTAINED IN A TITLE COMMITMENT REPORT PREPARED BY COMMONWEALTH LAND TITLE INSURANCE COMPANY, ORDER NO. PH146454MA, REFERENCE NO. 10650617/05-018923, WITH AN EFFECTIVE DATE OF 3/18/2005.

# EXHIBIT "B"

## Plats and Plans



<u>**EXHIBIT "A-3"**</u>

<u>**PARKING EASEMENT AGREEMENT**</u>

**[Attached]**

## PARKING EASEMENT AGREEMENT

THIS PARKING EASEMENT AGREEMENT (this "Agreement") is dated June 22, 2006, by and between ISLAND VIEW CROSSING I, L.P., a Pennsylvania limited partnership, with offices c/o Preferred Real Estate Investments, Inc., 1001 Hector Street, Suite 100, Conshohocken, PA 19428 (the "Office Owner") and ISLAND VIEW CROSSING II, L.P., a Pennsylvania limited partnership, with offices c/o Preferred Real Estate Investments, Inc., 1001 Hector Street, Suite 100, Conshohocken, PA 19428 (the "Residential Owner") and is joined in by THE BOROUGH OF BRISTOL (the "Borough")

### RECITALS

A.    The Office Owner is the owner of the property located in Bristol Township, Bucks County, Pennsylvania, which property is described on Exhibit A attached hereto and made a part hereof (the "Office Parcel").

B.    The Residential Owner is the owner of the property located in Bristol Township, Bucks County, Pennsylvania, which property is described on Exhibit B attached hereto and made a part hereof (the "Residential Parcel").

C.    The Office Parcel and the Residential Parcel are parcels of land adjacent and contiguous to each other.

D.    The Office Owner has agreed to grant to the Residential Owner, and the Residential Owner has agreed to receive from the Office Owner, a non-exclusive easement for the benefit of Residential Benefited Parties (as defined herein) for the purpose of parking up to 100 vehicles on or in those 100 parking spaces located within the Residential Parking Easement Area (as defined herein) limited to overflow parking during evening and weekend hours and only related to residential use (the "Permitted Use"), together with reasonable rights of access over the Office Parcel, as more fully set forth herein (the "Residential Easement"). The term "Permitted Use" specifically excludes primary parking for the Residential Owner and the Residential Benefited Parties (as defined below) and the parking spaces designated for overflow use shall be shared parking and as such shall continue to be counted towards the Office Parcel's satisfaction of the Borough's off-street parking requirements.

E.    The Residential Parcel is intended to be developed with a single-family residential project and/or a residential condominium project.

NOW, THEREFORE, in consideration of the foregoing, the Residential Owner's purchase from Office Owner of the Residential Parcel and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Office Owner and the Residential Owner hereby agree for the benefit of one another as follows:

### AGREEMENT

1.    Grant of Residential Easement.

DMEAST #9413282 v8

(a)    The Office Owner for itself and its successors and assigns, effective from and after the date hereof, does hereby grant and convey to the Residential Owner and all tenants, occupants, invitees, guests, and patrons of the Residential Parcel (collectively, the "Residential Benefited Parties"), for the benefit of and as an easement appurtenant to the Residential Parcel, (i) a perpetual, non-exclusive easement on, through, over and across that portion of the Office Parcel designated as the "Residential Parking Easement Area" on Exhibit C attached hereto (the "Residential Parking Easement Area") for the Permitted Use, (ii) a perpetual, non-exclusive easement on, through, over, and across the Office Parcel to the extent reasonably necessary to permit pedestrian and vehicular access between the Residential Parking Easement Area and the Residential Parcel, (iii) a perpetual non-exclusive easement over and across the Office Parcel for vehicular and pedestrian ingress and egress, and (iv) such temporary easements over, across and under the Office Parcel upon the occurrence of an emergency as are necessary for the preservation of life and property.  The Residential Benefited Parties use and enjoyment of the Residential Parking Easement Area and the easements granted pursuant to this Section 1 shall be concurrent with the use and enjoyment of the Office Owner.

(b)    Pursuant to that certain lease between the Borough and the Office Owner (the "Lease"), the Borough has the right to use, on a non-exclusive bases, up to fifteen (15) parking spaces located in the Residential Easement Area during the day Monday through Friday and all parking spaces located in the Residential Easement Area during evenings and weekends. The Borough hereby acknowledges and agrees that the Residential Easement and the Permitted Use do not conflict with the Lease in any respect and the Borough and its invitees, tenants and occupants shall not interfere with, diminish or disturb the Residential Owner's Permitted Use or its access to the Residential Parking Easement Area as described herein.

2.    Maintenance and Repair of Residential Parking Easement Area.

(a)    Commencing on the date of commencement of construction on the Residential Parcel (the "Commencement Date"), the Office Owner shall repair and replace the Residential Parking Easement Area which it deems advisable in its sole and exclusive discretion, but in no event greater than a standard for office use in connection with the ownership and/or operation thereof (the "Parking Maintenance").  The Residential Owner's pro rata share of the Parking Maintenance shall equal $1,000 per annum which such amount shall be increased every five (5) years (as adjusted from time to time, the "Maintenance Fee") by a fraction, which fraction shall not be less than one (1.00), (x) the numerator of which shall be the Index (as hereinafter defined) as of the month immediately preceding such adjustment date for which such calculation is being made, and (y) the denominator of which shall be the Index as of the month of the date of this Agreement, in the case of the first adjustment date, or the month in which the last adjustment date occurred, in the case of adjustment dates after the first adjustment date.  For purposes of the foregoing, (i) "CPI" means the United States Department of Labor, Bureau of Labor Statistics Revised Consumer Price Index for All Urban Consumers (1982-84 = 100) all items (CPI-U), or if such index shall cease to be published such reasonably comparable commercially-recognized, governmental or non-partisan alternative publication as Landlord shall select; and (ii) "Index" means the CPI number for the applicable month in the column for Philadelphia, Pennsylvania.  On and after the Commencement Date, the Residential Owner shall pay the Maintenance Fee in equal quarterly installments (or a pro rata portion thereof in the case of the first payment), in advance and without further notice, on the Commencement Date or by

no later than ten (10) days before the start of each calendar quarter (i.e., January 1, April 1, July 1 and October 1), as applicable. In the event that the Residential Owner shall fail to pay any installments of the Maintenance Fee when due, it shall be charged a late fee of ten percent (10%) of such past due amount together with interest on such past due amount at a per annum rate of twelve percent (12%) accruing from and after the date due until repayment in full. Notwithstanding anything to the contrary contained herein or otherwise, the amounts owed by the Residential Owner under this Agreement including pursuant to this Section 2(a) (including all late charges and interest thereon) shall represent a lien on the Residential Parcel and shall be senior to all other liens against the Residential Parcel except for those existing as of the date of this Agreement.

(b)    Subject to Section 2(c) below, in the event the Residential Owner enters into an agreement to transfer the Residential Parcel to a third party purchaser, the Office Owner shall require the Residential Owner and such purchaser to execute and deliver an assignment and assumption agreement in connection with such transfer in order to assign the Residential Owner's rights and obligations hereunder.

(c)    The Residential Owner shall be liable for the performance of all covenants, obligations and undertakings under this Agreement during the period of such ownership, and such liability shall continue until the Office Owner is provided with written notice that the Residential Owner has transferred the Residential Parcel and that the transferee has assumed all of the obligations under this Agreement from and after the date of transferee and which notice shall include the name and address of the transferee. Until such notice of transfer is given and the requirements of Section 2(b) above are satisfied, the transferring Residential Owner shall remain primarily liable under this Agreement. Once the notice of transfer is given and the requirements of Section 2(b) above are satisfied, the transferring Residential Owner shall be released from all obligations pertaining to the Residential Parcel transferred first arising subsequent to the date of the subject transfer. If the Residential Parcel is owned by more than one (1) party, all of the parties shall be jointly and severally responsible for the Residential Obligations, however, the party owning at least Fifty and 1/100th percent (50.1%) or more of the Residential Parcel (the "Primary Residential Owner") shall be primarily liable to the Office Owner for the Residential Obligations, in full, and the Office Owner shall have the right to proceed solely against such Primary Residential Owner for the full payment and performance of such Residential Obligations. In the event no party owns Fifty and 1/100th percent (50.1%) or more of the Residential Parcel, the last party owning Fifty and 1/100th percent (50.1%) or more of the Residential Parcel shall remain the Primary Residential Owner for purposes of this Section 2(c) unless otherwise agreed to in writing by the Office Owner. Notwithstanding the foregoing, if a master, homeowners or condominium association (as the case may be, the "Association") is formed in connection with the development of the Residential Parcel, the Residential Obligations may be assigned to and assumed by such Association, provided, such Association is financially capable of meeting such Residential Obligations and enters into an assignment and assumption agreement with the then Primary Owner in form and substance acceptable to the Office Owner in accordance with Section 2(b) above.

3.    Relocation. Subject to any required prior approval of the Borough, the Office Owner shall have the right, at its sole cost and expense, to relocate the Residential Parking Easement Area with thirty (30) days notice, provided such relocation does not materially and

adversely interfere with or diminish the Residential Owner's access to parking as described herein.

4. <u>Insurance</u>. The Residential Owner shall carry commercial liability insurance coverage with respect to the Permitted Use of the Residential Easement Area. The Residential Owner's liability policies shall name the Office Owner and its mortgagee (as may exist from time to time) of which it receives written notice, as additional insureds. The Residential Owner shall provide the Office Owner with insurance certificates evidencing such coverage not less frequently than once each twelve (12) month period. All of the foregoing insurance policies shall be written with reputable companies licensed to do business in the Commonwealth of Pennsylvania and shall provide that the Office Owner shall be given a minimum of thirty (30) days prior written notice by any such insurance company prior to the cancellation, termination, alteration or expiration of the terms or limits of such coverage. The Residential Owner shall deliver to the Office Owner the foregoing insurance policies or certificates thereof at or prior to the date that same are required to be in effect and evidence of all renewals or replacements of same not less than thirty (30) days prior to the expiration date of such policies. The amount of such insurance shall be adjusted annually by the mutual agreement of the parties to reflect the insurance coverage prudently carried by owners of similar properties.

5. <u>Indemnity</u>.

(a)    The Residential Owner shall defend, indemnify and save harmless the Office Owner, its affiliates, and their officers, directors, shareholders and partners, against all claims, liabilities, losses, fines, penalties, damages, costs and expenses (including reasonable attorneys' fees and other costs of litigation) because of injury, including death, to any person, or damage or loss of any kind to any property to the extent caused by or resulting from (A) the negligence of the Residential Owner or any other Residential Benefited Party done on or about the Residential Parking Easement Area or any other portion of the Office Parcel, (B) any failure on the part of the Residential Owner to perform its obligations under this Agreement, or (C) the use of the Residential Parking Easement Area by the Residential Owner or any of the other Residential Benefited Parties, all except to the extent caused by the negligence or intentional misconduct of the Office Owner or any of its tenants, occupants, invitees, guests, and patrons.

(b)    The Office Owner shall defend, indemnify and save harmless the Residential Owner, its affiliates, and their officers, directors, shareholders and partners, against all claims, liabilities, losses, fines, penalties, damages, costs and expenses (including reasonable attorneys' fees and other costs of litigation) because of injury, including death, to any person, or damage or loss of any kind to any property to the extent caused by or resulting from any failure on the part of the Office Owner to perform its obligations under this Agreement, all except to the extent caused, in whole or in part, by the negligence or intentional misconduct of the Residential Owner or any of the Residential Benefited Parties.

6. <u>Liens</u>. The Residential Owner shall not be permitted to grant, or otherwise cause, a lien, claim or other encumbrance to be recorded, filed or entered against the Office Parcel or any portion thereof including the Residential Parking Easement Area, the Residential Owner shall promptly discharge or cause to be discharged any and all liens, claims or other encumbrances so recorded, filed or entered against such property and shall indemnify and hold

the other harmless from and against all liabilities, losses, claims, demands, costs and expenses (including reasonable attorneys' fees) and judgments occurring from or in connection with such lien, claim or other encumbrance including, without limitation, such costs incurred (including reasonable attorneys' fees) in causing such lien, claim or other encumbrance to be removed and discharged of record.

7.    No Rights in Other Land.    Nothing herein is intended, nor shall it be construed, held or taken, as an easement on, over or across, or the grant of any rights with respect to the use or occupancy of, any lands of the Office Owner other than the Residential Parking Easement Area by the Residential Owner together with the access rights over the Office Parcel, as set forth in Section 1(a).

8.    Entire Agreement.    This Agreement is the complete agreement of the parties hereto with respect to the subject matter hereof.  This Agreement may be modified only in writing signed by the then fee owners of the Office Parcel and the Residential Parcel.

9.    Easement Runs with the Land.    The easement created hereby shall run with the land and be binding upon, and shall inure to the benefit of, the Office Owner and the Residential Owner and their respective successors and assigns.

10.    Severability.    If any clause, paragraph, sentence or portion of the terms, covenants, and provisions of this Agreement shall be deemed illegal, null or void for any reason whatsoever, or if any of same are held by any court of competent jurisdiction to be so, the remaining portion of this Agreement shall remain in full force and effect.

11.    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their authorized members as of the day and year first set forth above.

**RESIDENTIAL OWNER:**

ISLAND VIEW CROSSING II, L.P.

By: _____
Name: _____
        John R. Ahle Jr, SCSM
Title: _____
        Vice President


**OFFICE OWNER:**

ISLAND VIEW CROSSING I, L.P.

By: _____
Name: _____
        John R. Ahle Jr, SCSM
Title: _____
        Vice President


<u>JOINDER</u>

**THE BOROUGH OF BRISTOL**

By: _Ralph D. Giuseppe_____
Name: _Ralph DiGuiseppe_____
Title: _President of Council_____

COMMONWEALTH OF PENNSYLVANIA:

                                     : ss

COUNTY OF _Montgomery_         :

         On this _2nd_ day of _June_ , 2006, before me, the undersigned, officer, personally appeared _John R. Ahle Jr_ , who acknowledged himself to be the _VP_ of _Island View Crossing + LP_, a _____, and that he as such _VP_, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of such limited liability company by himself as such _VP_ .

         WITNESS, my hand and official seal in the above County and State.

                                 _____
                                 Notary Public

My Commission Expires: _____

```
NOTARIAL SEAL
JANIEN M. PERRY, NOTARY PUBLIC
WHITEMARSH TWP., COUNTY OF MONTGOMERY
MY COMMISSION EXPIRES JULY 22, 2006
```

COMMONWEALTH OF PENNSYLVANIA:

                                     : ss

COUNTY OF _Montgomery_         :

         On this _2nd_ day of _June_ , 2006, before me, the undersigned, officer, personally appeared _John R. Ahle Jr_ , who acknowledged himself to be the _VP_ of _Island View Crossing II LP_, a _____, and that he as such _VP_, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of such limited liability company by himself as such _VP_ .

         WITNESS, my hand and official seal in the above County and State.

                                 _____
                                 Notary Public

My Commission Expires: _____

```
NOTARIAL SEAL
JANIEN M. PERRY, NOTARY PUBLIC
WHITEMARSH TWP., COUNTY OF MONTGOMERY
MY COMMISSION EXPIRES JULY 22, 2006
```

COMMONWEALTH OF PENNSYLVANIA:

                                                    : ss

COUNTY OF _Bucks_                               :

        On this _29th_ day of _June_, 2006, before me, the undersigned officer, personally appeared _RALPH DiGUISEPPE_, who acknowledged himself to be the _PRESIDENT_ of _BRISTOL BORO COUNCIL_, a _____, and that he as such _PRESIDENT_, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of such limited liability company by himself as such _PRESIDENT_

        WITNESS, my hand and official seal in the above County and State.

                                   _Anna L. Larrisey_
                                   Notary Public

My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANNA L. LARRISEY, Notary Public
Bristol Boro., Bucks County
My Commission Expires April 15, 2010

**EXHIBIT A**

Description of the Office Parcel

See Attached

A-1

## PREMISES "A"

**ALL THAT CERTAIN** lot or parcel of land situated in the Borough of Bristol, County of Bucks, Commonwealth of Pennsylvania, bounded and described as shown on a "Boundary Survey for Dial Corporation," Project Number M-828, Sheet 1 of 1, dated December 2000, last revised December 7, 2000, prepared by Unitech Engineers Inc., Langhorne, PA 19047, as follows to wit:

**BEGINNING** at a point, said point being at the intersection of the Northeasterly Right-of-Way line of Pine Grove Street (variable width) with the Southeasterly Right-of-Way line of Radcliffe Street (60 feet wide) (SR 2002); Thence, along said Right-of-Way of Radcliffe Street North 36 degrees 23 minutes 00 seconds East for a distance of 729.84 feet to a point; Thence along the lands now or formerly of Bucks County Redevelopment Authority, Bucks County Tax Parcel Number 04-022-049, the following four courses and distances: (1) South 53 degrees 37 minutes 00 seconds East for a distance of 345.70 feet to a point; Thence (2) South 36 degrees 23 minutes 33 seconds West for a distance of 152.61 feet to a point; Thence (3) South 53 degrees 37 minutes 00 seconds East for a distance of 389.38 feet to a point on the High Water Line, a corner of an Easement in favor of the Commonwealth of Pennsylvania; Thence (4) along said Easement South 53 degrees 37 minutes 00 seconds East for a distance of 26.54 feet to a point on the Low Water Line, a corner of said Easement; Thence, along the Low Water Line, the Southeasterly edge of an Easement in favor of the Commonwealth of Pennsylvania, the following four courses and distances:  (1) South 43 degrees 35 minutes 38 seconds West for a distance of 181.13 feet to a point; Thence, (2) South 43 degrees 58 minutes 10 seconds West for a distance of 191.32 feet to a point; Thence (3) South 45 degrees 02 minutes 50 seconds West for a distance of 191.21 feet to a point; Thence (4) South 45 degrees 42 minutes 18 seconds West for a distance of 184.85 feet to a point, a corner; Thence, along the lands now or formerly of Pamela Kuhn, Bucks County Tax Parcel Number 04-04-22-50, North 34 degrees 07 minutes 00 seconds West for a distance of 8.71 feet to a point on the High Water Line, a corner of an Easement in favor of the Commonwealth of Pennsylvania; Thence, continuing along the same lands of Kuhn, North 34 degrees 07 minutes 00 seconds West for a distance of 415.84 feet to a point; Thence, continuing along the lands now or formerly of Pamela Kuhn, and along the Easterly Right-of-Way line of the aforesaid Pine Grove Street, North 01 degrees 15 minutes 00 seconds East for a distance of 85.70 feet to a point; Thence continuing along the aforesaid Northeasterly Right-of-Way line of Pine Grove Street, the following two courses and distances; (1) North 64 degrees 15 minutes 00 seconds West for a distance of 84.50 feet to a point; Thence, (2) North 68 degrees 34 minutes 00 seconds West for a distance of 126.58 feet to a point, the point and place of beginning.

**CONTAINING** 503,631 square feet or 11.5618 acres, more or less.

**TOGETHER WITH** the perpetual free and uninterrupted use, liberty and privilege of and passage in and along a right of way over and across two certain strips or pieces of land included in the land conveyed by Merchant-Sterling Corporation to George N. Maroney by deed dated April 5, 1926 (now of Superior Zinc Corporation) in common with said Merchant-Sterling Corporation and Huff, Daland & Company, Incorporated, their respective successors and assigns, tenant and undertenants, occupiers and possessors of land owned by either of them, subject to the reservations and upon the terms and conditions stated in the deed dated April 5, 1926, from George N. Maroney to Merchant-Sterling Corporation.

**TOGETHER WITH** the perpetual, free and uninterrupted use, liberty, privilege of and passage in and along a right of way over and across a certain strip or piece of land included in lands conveyed by Merchant-Sterling Corporation to the said Huff, Daland & Company, Incorporated, by deed dated May 29, 1925, for a perpetual right of way for a railroad of one or two tracks over and across the said premises, as surveyed and laid out by Charles Henry Moon, shown on the map or plan annexed to another deed also dated May 29, 1925, from Huff, Daland & Company, Incorporated, to the said Merchant-Sterling Corporation, conveying the right of way herein described in common with the said Merchant-Sterling Corporation and Huff, Daland & Company, Incorporated, their respective successors and assigns, tenants and undertenants, occupiers and possessors of land owned by either of them, subject to the reservations and upon the terms and conditions stated in the reservations and upon the terms and conditions stated in said deed, dated May 29, 1925, from said Huff, Daland & Company, Incorporated to the said Merchant-Sterling Corporation.

**TOGETHER WITH** the perpetual, free and uninterrupted use, liberty and privilege of and passage in and along all that certain 50 feet wide right or way extending from the premises of Huff, Daland & Company, Incorporated, in a Northwesterly direction to the property and right of way of the Pennsylvania Railroad Company, as surveyed and laid out by Charles Henry Moon, Surveyor, May 20, 1925, the boundaries and limits thereof being shown and fixed by the red lines on the map or plan, marked "Right of Way Map A" attached to the deed dated May 29, 1925 from said Merchant Sterling Corporation to Huff, Daland & Company, Incorporated, their respective successors and assigns.

The rights of way mentioned in the three foregoing paragraphs are appurtenant to the premises herein conveyed and run with said land.

**COUNTY PARCEL NO. 4-22-48**

**BEING** the same premises which The Dial Corporation, a Delaware Corporation by deed dated April 6, 2001 and recorded April 9, 2001 in Bucks County, in Land Record Book 2262, Page 268, granted and conveyed unto the Redevelopment Authority of the County of Bucks, in fee.

PREMISES "B"

**ALL THAT CERTAIN** lot or piece of ground with the buildings and improvements thereon erected situated in the Borough of Bristol, Bucks County, Pennsylvania, and described according to a survey made thereof by C.H. Noon on February 17, 1926, as follows:

**BEGINNING** at an iron pipe in the center line of Radcliffe Street in line of land of Huff and Deland Company; thence extending Southwardly along the same 53 degrees 37 minutes East 375.7 feet; thence extending Northwardly 36 degrees 23 minutes East 36.1 feet; thence extending Southwardly 53 degrees 37 minutes East 455.7 feet to a point in the United States Government pier head and bulkhead line of the Delaware River; thence along the same Southwardly 33 degrees; 49 minutes West 446.85; thence extending Northwardly 53 degrees 37 minutes West 475.5 feet; thence extending Northwardly 36 degrees 23 minutes East 152.6 feet; thence extending Northwardly 53 degrees 37 minutes West 375.7 feet to a point in the center line of

2

Radcliffe Street; thence along the same Northwardly 36 degrees 23 minutes East 257.7 feet to the place of beginning.

**COUNTY PARCEL NO.** 4-22-49.

**BEING** the same premises which the Bucks County Redevelopment Authority acquired title to premises identified as Bucks County Tax Parcel No. 4-22-49 by Declaration of Taking filed 03/23/1989 as No. 89-02313-14-4 and a Notice of Filing recorded in Land Record Book 30 Page 117.

3

DM2\724468.1

## EXHIBIT B

Description of the Residential Parcel

See Attached

June 21, 2005
CP05063

METES AND BOUNDS DESCRIPTION
TAX MAP PARCEL 4-27-119
LANDS NOW OR FORMERLY ISLAND CROSSING II, L.P.
BRISTOL BOROUGH, BUCKS COUNTY
COMMONWEALTH OF PENNSYLVANIA

BEGINNING AT A POINT ON THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET (A.K.A. S.R. 2002, 60 FOOT WIDE RIGHT-OF-WAY), AT THE INTERSECTION OF THE DIVIDING LINE BETWEEN TAX MAP PARCEL 4-27-119, LANDS NOW OR FORMERLY ISLAND CROSSING II, L.P. AND TAX MAP PARCEL 4-27-119-1, LANDS NOW OR FORMERLY RIVERBIRCH ENTERPRISES L.P., AND FROM SAID POINT OF BEGINNING RUNNING, THENCE;

1.  ALONG THE DIVIDING LINE BETWEEN TAX MAP PARCEL 4-27-119 AND TAX MAP PARCEL 4-27-119-1, SOUTH 54 DEGREES 04 MINUTES 50 SECONDS EAST, A DISTANCE OF 693.86 FEET TO A POINT ON THE PIERHEAD AND BULKHEAD LINE OF THE DELAWARE RIVER (NAVIGABLE WATERS) AS ESTABLISHED JANUARY 5, 1894 AND APPROVED BY THE SECRETARY OF WAR, SEPTEMBER 10, 1940, THENCE;

THE FOLLOWING TWO (2) COURSES AND DISTANCES ALONG THE PIERHEAD AND BULKHEAD LINE OF THE DELAWARE RIVER:

2.  SOUTH 21 DEGREES 17 MINUTES 52 SECONDS WEST, A DISTANCE OF 271.95 FEET TO A POINT, THENCE;

3.  SOUTH 33 DEGREES 23 MINUTES 27 SECONDS WEST, A DISTANCE OF 718.45 FEET TO A POINT, THENCE;

THE FOLLOWING THREE (3) COURSES AND DISTANCES ALONG THE DIVIDING LINE BETWEEN TAX MAP PARCEL 4-27-119 AND TAX MAP PARCEL 47-22-49, LANDS NOW OR FORMERLY ISLAND VIEW CROSSING II, L.P.:

4.  NORTH 54 DEGREES 04 MINUTES 50 SECONDS WEST, A DISTANCE OF 450.19 FEET TO A POINT, THENCE;

5.  SOUTH 35 DEGREES 55 MINUTES 10 SECONDS WEST, A DISTANCE OF 36.10 FEET TO A POINT, THENCE;

6.  NORTH 54 DEGREES 04 MINUTES 50 SECONDS WEST, A DISTANCE OF 344.02 FEET TO A POINT ON THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET, THENCE;

7.  ALONG THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET, NORTH 35 DEGREES 55 MINUTES 10 SECONDS EAST, A DISTANCE OF 1,016.99 FEET TO THE POINT AND PLACE OF BEGINNING.

CONTAINING 762,702 SQUARE FEET OR 17.509 ACRES

THIS PROPERTY SUBJECT TO RESTRICTIONS, COVENANTS AND/OR EASEMENTS AS CONTAINED IN A TITLE COMMITMENT REPORT PREPARED BY COMMONWEALTH LAND TITLE INSURANCE COMPANY, ORDER NO. PH146454MA, REFERENCE NO. 10650617/05-018923, WITH AN EFFECTIVE DATE OF 3/18/2005.

NRG/jw
S:\05\CP05063\DESCRIPTIONS\METES & BOUNDS DESCRIPTIONS\TMP 4-27-119.doc

**EXHIBIT C**

Residential Parking Easement Area

See Attached

# CONTROL POINT
## A S S O C I A T E S, I N C.

BOUNDARY & TOPOGRAPHIC SURVEYS  •  SUBDIVISIONS  •  CONSTRUCTION STAKEOUT

New Britain Corporate Center
1600 Manor Drive
Suite 120
Chalfont, PA 18914
215.712.9800
215.712.9802 fax
www.cpasurvey.com

June 2, 2006
CP05063.01

METES AND BOUNDS DESCRIPTION
PARKING EASEMENT
PART OF TMP 4-22-49
LANDS NOW OR FORMERLY ISLAND VIEW CROSSING I, L.P.
BRISTOL BOROUGH, BUCKS COUNTY
COMMONWEALTH OF PENNSYLVANIA

BEGINNING AT A POINT ON THE DIVIDING LINE BETWEEN TMP 4-22-49, LANDS NOW OR FORMERLY ISLAND VIEW CROSSING I, L.P. AND TMP 4-27-119, LANDS NOW OR FORMERLY ISLAND VIEW CROSSING II, L.P., SAID POINT BEING DISTANT SOUTH 54 DEGREES 04 MINUTES 50 SECONDS EAST, A DISTANCE OF 307.30 FEET, FROM THE INTERSECTION WITH THE SOUTHEASTERLY LEGAL RIGHT-OF-WAY LINE OF RADCLIFFE STREET (A.K.A. S.R. 2002, 60 FOOT WIDE RIGHT-OF-WAY), AND FROM SAID POINT OF BEGINNING RUNNING, THENCE;

THE FOLLOWING THREE (3) COURSES AND DISTANCES ALONG THE DIVIDING LINE BETWEEN TMP 4-22-49 AND TMP 4-27-119:

1.   SOUTH 54 DEGREES 04 MINUTES 50 SECONDS EAST, A DISTANCE OF 36.72 FEET TO A POINT, THENCE;

2.   NORTH 35 DEGREES 55 MINUTES 10 SECONDS EAST, A DISTANCE OF 36.10 FEET TO A POINT, THENCE;

3.   SOUTH 54 DEGREES 04 MINUTES 50 SECONDS EAST, A DISTANCE OF 308.20 FEET TO A POINT, THENCE;

THE FOLLOWING SIX (6) COURSES AND DISTANCES ALONG A LINE RUNNING THROUGH TMP 4-22-49:

4.   SOUTH 35 DEGREES 55 MINUTES 10 SECONDS WEST, A DISTANCE OF 193.22 FEET TO A POINT, THENCE;

5.   NORTH 54 DEGREES 06 MINUTES 08 SECONDS WEST, A DISTANCE OF 44.95 FEET TO A POINT, THENCE;

6.   NORTH 35 DEGREES 53 MINUTES 52 SECONDS EAST, A DISTANCE OF 22.95 FEET TO A POINT, THENCE;

7.   NORTH 54 DEGREES 06 MINUTES 43 SECONDS WEST, A DISTANCE OF 150.16 FEET TO A POINT, THENCE;

8.   NORTH 35 DEGREES 55 MINUTES 14 SECONDS EAST, A DISTANCE OF 19.40 FEET TO A POINT, THENCE;

9.   NORTH 54 DEGREES 00 MINUTES 07 SECONDS WEST, A DISTANCE OF 149.89 FEET TO A POINT, THENCE;

10.  ALONG A LINE RUNNING THROUGH TMP 4-22-49 AND ALONG THE SOUTHEASTERLY SIDE OF A CROSS ACCESS EASEMENT, NORTH 35 DEGREES 57 MINUTES 56 SECONDS EAST, A DISTANCE OF 114.66 FEET TO THE POINT AND PLACE OF BEGINNING.

CONTAINING 55,542 SQUARE FEET OR 1.275 ACRES

THIS PROPERTY SUBJECT TO RESTRICTIONS, COVENANTS AND/OR EASEMENTS, EITHER WRITTEN OR IMPLIED.

*Other Office Locations:*

| ☒ Watchung, NJ | ☒ Towson, MD | ☒ Sterling, VA |
| 908.668.0099 | 410.494.9445 | 703.904.9400 |



CONTROL POINT
A S S O C I A T E S . I N C .

June 2, 2006
CP05063.01
Bristol, Bucks Co., PA
Page 2

THIS DESCRIPTION WAS WRITTEN BASED UPON A MAP ENTITLED "EASEMENT PLAN EXHIBIT, ISLAND VIEW CROSSING II, L.P., PROPOSED RESIDENTIAL DEVELOPMENT, RADCLIFFE STREET, BRISTOL BOROUGH, BUCKS COUNTY, COMMONWEALTH OF PENNSYLVANIA, EASEMENT PLAN EXHIBIT", PREPARED BY BOHLER ENGINEERING, INC., PROJECT NO. P05-0676, REVISION NO. 1, DATED 6/2/06, SHEET 1 OF 1.

6/2/06

JOSEPH J. WRIGHT, P.L.S.
PENNSYLVANIA PROFESSIONAL
LAND SURVEYOR NO. SU-031826-E
JAA/br
S:\05\CP05063\DESCRIPTIONS\METES & BOUNDS DESCRIPTIONS\Parking Easement.doc

# EXHIBIT A-4

# TITLE EXCEPTIONS

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date of the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this form.

2. Rights or claims of parties in possession of the land not shown by the public record.

3. Any lien, or right to a lien, for services, labor or materials heretofore or hereafter furnished, imposed by law and not shown by the public records.

4. Easements, encroachments, overlaps, shortages of area, boundary line disputes and other matters affecting title that an accurate and complete survey would disclose.

5. Real estate taxes for the current and prior tax years which are hereafter assessed and are not yet due and payable.

6. Company assumes no liability by reason of failure of taxing authorities to assess premises.

7. Right of Way Agreement for railroad and siding, which includes ingress, egress and regress as in Deed Books 525 page 238.

8. Release and Quit Claim which includes fifty (50) foot right of way and passage, terms, any License granted by Philadelphia and Trenton Railroad Company and Pennsylvania Railroad Company, privileges, siding, ingress, egress and regress and reverter if railroad abandoned as in Deed Book 659 page 430.

9. Rights granted to Philadelphia Electric Company as in Deed Book 703 page 246.

10. Reservations, terms, conditions, easements, access and mineral rights to United States of America as in Deed Book 890 page 389.

11. Agreement to the Borough of Bristol of right of way for sewer purposes, which contains terms and access as in Deed Book 593 page 207.

12. Subject to laws and regulations of the Federal & State Government, their political subdivision and agencies over a portion of premises extending beyond low water mark of Delaware River to regulate, change, revise and relocate all lines or marks as well as exert governmental title and ownership vested in the State in area between original low water mark and the present pierhead line and to the rights of the public between high and low water mark.

13. Easement of pipe line as in Deed Book 1696 page 461.

14. Easement of Railroad right of way through the premises.

## EXHIBIT A-4 (continued)

## TITLE EXCEPTIONS (continued)

15. Easement Agreement to Borough of Bristol, which includes terms, conditions, maintenance, repair, duties, obligations and ingress and egress as in Land Record Books <u>1357 page 2310</u>.

16. Parking Easement Agreement by and between Island View Crossing I, L.P. and Island View Crossing II, L.P. and The Borough of Bristol, which includes covenants, obligations, rights, pro-rata share of maintenance and access as in Land Record Book <u>5212 page 1993</u>.

17. Restrictions as in Land Record Book <u>3537 page 234</u>.

18. Consent Order and Agreement by and between the Commonwealth of Pennsylvania - Department of Environmental Protection, the Redevelopment Authority of the County of Bucks and Island View Crossing I, L.P. and Island View Crossing II, L.P., which includes obligations, covenants, restrictions, terms, conditions and access as in Land Record Book <u>3537 page 241</u>.

19. Restrictions and Pennsylvania Land Recycling and Environmental Remediation Standards Act as to hazardous waste notice as in Land Record Book <u>5172 page 342</u>.

20. Declaration of Easement by and between Island View Crossing I, L.P. and Island View Crossing II, L.P. and  Borough for public and pedestrian walkway/river trail, which includes rights, easements, access, maintenance and repair as in Land Record Book <u>5212 page 2012</u>.

21. Parking Lot Lease Agreement by and between Island View TCI, L.P. and The Borough of Bristol which includes rights, duties, access, maintenance, repair and reference to Ground Lease dated June 27, 2003, as in Land Record Book <u>5212 page 2058</u>.

22. Highway Occupancy Permit as in Land Record Book <u>5409 page 607</u>.

23. Declaration of Restrictive Covenant - Island View Crossing II, L.P. (Declarant) as in Land Record Book <u>5433 page 627</u>.

24. Rights granted to PECO Energy Company, Verizon Pennsylvania, Inc. and Comcast Cable Company recorded as Instrument # <u>2015041393</u>.

25. Notes, conditions, setback lines, easements, reservations, covenants and restrictions as shown in Plan Book 300 page 96 and in Instrument # <u>2015041670</u>.

26. Declaration of Homeowners Association recorded in Instrument # _____. (to be recorded)

## EXHIBIT "B"

## RESPONSIBILITY CHART

**THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE, COMMUNITY ASSOCIATION
RESPONSIBILITY CHART**

**Ownership Key:**

H =            Home - owned by one or more Homeowners, a dwelling. Includes the Lot under and around the Dwelling as shown on the Plan. A "Unit" under the PA UPCA.

H-CTF =        Controlled Facility - Those components of the Home which receive one or more services from the Association.

CF =           Common Facility - owned by the Association to which all Homeowners are members. A "Common Element" under the Pennsylvania Uniform Planned Community Act.

LCF =          Limited Common Facility - portions of the Common Facilities which are limited in use or access to one or more Homeowners.

P =            Public - components owned by a Public Utility Company.

B =            Borough owned

**Assessment Key:**

CE =           Common Expense - fees charged to cover the Association costs which are shared equally by all Homeowners.

LCE =          Limited Common Expense - fees charged for Association costs which are shared equally only by those Homeowners of conveyed homes for services to Controlled Facilities and Limited Common Facilities. Once all homes are conveyed, these Limited Common Expenses will become Common Expenses

LC =           Limited Charge – direct charges to Homeowners for Association costs which are excluded from the budget (and monthly fees), charged only to one or more Homeowners who derive the benefit <u>when</u> the service will be provided.

15743/1/5888498v6

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Roofing Flashing | H-CTF | Repair Replacement | LCE | None |
| Gutters Downspouts | H-CFT | None | | Repair Maintenance Replacement |
| Stucco and Stone exterior | H-CTF | None | | Repair Eventual replacement |
| Handiplank or similar siding material | H-CTF | None | | Repainting Replacement |
| Gas fireplaces | H-CTF | None | | Full Cleaning Repair Eventual replacement |
| Fireplaces, Hearths | H | None | | Repair Replacement |
| Windows Window glass, Sliding glass doors Patio doors | H | None | | Cleaning Repair Replacement (1) |
| Front Entrance Door Patio or Balcony door | H-CFT | Repainting Exterior side | LCE | Repair Replacement (1) |
| Locks, hinges or other hardware on windows and doors | H | None | | Repair Replacement |
| Garage Door | H-CTF | Repainting exterior side | LCE | Repair Replacement (1) |
| Garage door lock, Hardware, mechanicals | H | None | | Maintenance Repair Replacement |
| Front Porch, entranceway landing, stoop (brick with concrete | H-CTF | None | | Clearing Ice Melting Snow clearing Replacement |
| Exterior entrance lighting, controlled | H | None | | Repair Maintenance |

15743/1/5888498v6

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| inside Home | | | | Electricity Replacement (1) |
| Privacy fencing | H-CTF | Repair, Maintenance, Replacement, Restraining | LC | None |
| Foundation Walls | H | None | | None |
| Basement, internal structural components | H | None | | None |
| Interior components or everything inside "exterior surface side" or having an "interior aspect" | H | None | | Repair Maintenance Replacement |
| Attic space, non-structural components beneath roof sheathing, including insulation | H (access only with Board approval | None | | Cleaning Repair |
| Plumbing and electrical-if services one Home, regardless of location | H | None | | Repair Maintenance Replacement |
| HVAC units (wherever located) | H | None | | Repair Maintenance Operation Replacement |
| Sidewalks to main entry of individual Homes | H-CTF | None | | Cleaning Ice melting Snow clearing Repair Replacement |
| Driveways | H-CTF | Clearing | | Repair |

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| | | Ice melting Snow clearing | | Sealcoating Replacement |
| Common sidewalk near entrance to the property | H | Snow clearing Repair Replacement | CE | None |
| Planted beds directly adjacent to homes | H-CTF | None | | Watering Planting Mulching Maintenance |
| All other landscape on the property. | CF | Maintenance Replacement | CE | None |
| [Name of internal roads] as well as the parking spaces locate | Owned by Master Association | Reimbursement to Master Association for: Repair Resurfacing Snow clearing (2) | CE | None |
| Curbing along roads | CF | Repair Replacement | CE | None |
| Street Lighting along [name of internal roads]. | Owned by Master Association | Reimbursement to Master Association for: Electricity Repair Maintenance Replacement | CE | None |
| Mailboxes | CF | Repair Replacement | CE | None |
| Storm Water Management | Owned by Master Association | Reimbursement to Master Association for: Operation Maintenance Replacement | CE | None |

| COMPONENT | OWNER-SHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Main Entrance Road Landscaping | Owned by Master Association | Reimbursement to Master Association for:<br>Maintenance<br>Replacement | CE | None |
| Active Radon System | CF | Repair, Maintain, Replace | CE | None |

(1) Items to be replaced by Owner which must first be approved by the Association

(2) Snow will be cleared where there are no vehicles are parked in area when contractor is present to do the work.

# EXHIBIT "C"

# BY-LAWS

# OF

# THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE COMMUNITY ASSOCIATION

## (A PENNSYLVANIA NON-PROFIT CORPORATION)

### [Attached]

15743/1/5888498v4

**BY-LAWS**
**OF**
**THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE,**
**A PLANNED COMMUNITY**

**ARTICLE I**
**INTRODUCTORY PROVISIONS**

1.    Applicability.  These By-Laws provide for the governance of the Association created pursuant to the Declaration filed by Island View Crossing II, L.P. in the Office of the Recorder of Deeds of Bucks County in Deed Book _____ at Page _____, et seq. ("**Declaration**").

2.    Definitions.  Capitalized terms used herein without definition shall have the meanings specified for such terms in the Declaration to which these By-Laws pertain, except as otherwise provided herein.

3.    Compliance.  Every Member of the Association shall comply with these By-Laws.

**ARTICLE II**
**OFFICES**

1.    Registered Office.  The name of the Association's commercial registered office provider and the county of venue in the Commonwealth of Pennsylvania shall be:  The Townhomes at Radcliffe Court on the Delaware Community Association, 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania (for venue and official publication purposes), until otherwise established be an amendment of the Articles of Incorporation or by the Executive Board and a record of such change is filed with the Department of State in the manner provided by law.

2.    Other Offices.  The Association may also have offices at such other places within or without the Commonwealth of Pennsylvania as the Executive Board may from time to time appoint or the business of the Association may require.

**ARTICLE III**
**CORPORATE SEAL**

The corporate seal shall have inscribed therein the name if the Association, the year of its organization and the words "Corporate Seal, Pennsylvania."

**ARTICLE IV**
**MEETINGS OF MEMBERS**

1.    Membership.  Every Owner of the Unit, including Declarant, shall be a Member ("**Member**") of the Association.  Membership in the Association shall be appurtenant to each of

the Units and the transfer of title to each Unit shall automatically transfer membership in the Association without the necessity of the delivery of any document.

      2.   <u>Place of Meeting</u>.  Meetings of the Members shall be held at the registered office of the Association or at such other place or places, either within or without the Commonwealth of Pennsylvania, as may from time to time be fixed by the Executive Board.

      3.   <u>Annual Meeting</u>.  The annual meeting of the Members shall be held on the first Wednesday of March of each year if not a legal holiday, and if on a legal holiday then in the next full business day following, at 7:00 p.m., when they shall elect an Executive Board and transact such other business as may properly be brought before the meeting.  If the annual meeting shall not be called and held within six (6) months after the designated time, any Member may call such meeting.

      4.   <u>Special Meetings</u>.  Special meetings of the Members may be called at any time by the President, or the Executive Board, or upon written request of the Members who are entitled to cast at least ten percent (10%) of the votes which Members are entitled to cast at the particular meeting.  At any time, upon written request of any person who has called a special meeting, it shall be the duty of the Secretary to fix the time of the meeting, which shall not be held  more than sixty (60) days after the receipt of the request.  If the Secretary shall neglect or refuse to fix the time of the meeting, the person or persons calling the meeting may do so. Business transacted at all special meetings shall be confined to the objects stated in the call and matters germane thereto, unless consented to in person or by proxy by twenty percent (20%) of all Members entitled to attend or vote at such meeting.

      5.   <u>Method of Voting</u>.  Questions to be submitted to Members may be decided at a meeting or by valid vote, by mail or at polling places designated by the Executive Board, or any reasonable means determined by the Executive Board.  The Executive Board shall determine, by resolution, the method of voting and give notice thereof as provided herein.  Elections for Members need not be by secret written ballot, except upon demand made by a Member at the election and before the voting begins.

      6.   <u>Notice of Meetings.</u>

          (a)     Written notice of every meeting of the Members, stating the time, place and object thereof, shall be given by, or at the direction of, the Secretary to each Member of record entitled to vote at the meeting, at least five (5) days prior to the day named for the meeting, unless a greater period of notice is required by statue in a particular case.  If the Secretary shall neglect or refuse to give notice of the meeting, the person or persons calling the meeting may do so.  In the case of a special meeting, the notice shall specify the general nature of the business to be transacted.

          (b)     Notice as provided for in these By-Laws shall be addressed to Members at each Member's respective Unit or at such other address as any such Member may from time to time specify in writing to the association's Secretary.  Notices to co-Owners shall be addressed to all but need only be sent to one address.

2

(c)    Persons authorized or required to give notice of a meeting of Members may, in lieu of any written notice of a meeting of Members required to be given, give notice of such meeting by causing notice of such meeting to be officially published.  If eighty percent (80%) of the Members of record entitled to vote at the meeting do not have addresses of record within the territory of general circulation of the newspapers required for official publication, the notice shall also be published in newspapers which have an aggregate territory or general circulation which includes the addresses of record of at least eighty percent (80%) of such Members of record.

7.    <u>Quorum</u>.   A meeting of Members duly called shall not be organized for the transaction of business unless a quorum is present.  The presence at the  meeting of Members entitled to cast, or of proxies of cast, ten percent (10%) of the votes of each class of membership shall constitute a quorum for any action, except as otherwise provided in the Declaration, the Articles of Incorporation, these By-Laws or by statute.   The Members present at a duly organized meeting can continue to do business until adjournment, not withstanding the withdrawal of enough Members to leave less than a quorum.  If a meeting cannot be organized because a quorum, has not attended, those present may, except as otherwise provided by statute, adjourn the meeting to such time and place as they may determine; but in the case of any meeting called for the election of members, those who attend the second of such adjourned meetings, although less than a quorum, shall nevertheless constitute a quorum for the purpose of electing members.  In the case of any meeting called for any other purpose those who attend the second of such adjourned meetings, if written notice of such second adjourned meeting, stating that those Members who attend shall constitute a quorum for the purpose a quorum for the purpose of acting upon such resolution or other matter, is given to each Member of record entitled to vote at such second adjourned meeting at least ten (10) days prior to the day named for the second adjourning meeting.

8.    <u>Action by Consent</u>.  Any action which may be taken at a meeting of the Members, or of a class of Members, may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Members who would be entitled to voted at a meeting for such purpose and shall be filed with the Secretary of the Association.

9.    <u>Voting Rights</u>.  Every Member of the Association shall be entitled to one (1) vote for each Unit, unless otherwise provided in the Declaration.  No Member shall sell his vote for money or anything of value.  Upon request of a Member, the books or records of membership shall be produced at any regular or special meeting of the Association.  If at any meeting the right of a person to vote is challenged, the presiding officer shall require such books or records to be produced as evidence of the right of the person challenged to vote, and all persons who appear by such books or records to be Members entitled to vote may vote.  The rights of a Member to vote, and his right, title and interest in or to the Association or its Property, shall cease on the termination of his membership.

10.    <u>Proxies</u>.  At all meetings of Members, each Member may vote in person, by mailed ballot or by proxy.  All proxies shall be in writing and filed with the Secretary prior to the time of the meeting.  Every proxy shall be revocable and shall automatically cease upon

15743/1/5909949v1

conveyance by the Member of his Unit, or upon receipt of written notice by the Association of the death or judicially declared incompetence of the grantor of the proxy.

11.    Judges of Election.  In advance of any meeting or Members, the Executive Board may appoint judges of election, who need not be Members, to act at such meeting or any adjournment thereof.  If judges of election are not so appointed, the presiding officer of any such meeting may, and on the request of any Member shall, make such appointment at the meeting.  The number of judges shall be one (1) or three (3).  No person who is a candidate for office shall act as a judge.

## ARTICLE V
## MEMBERS

1.    Number.  The business and affairs of the Association shall be managed by its Executive Board, three (3) in number, who shall be natural persons of full age.

2.    Appointed Executive Board.  Until the end of the Declarant Control period the Executive Board shall consist of appointed Members who have been appointed by the Declarant.  Appointed Members shall serve at the pleasure of the Declarant and may be removed and replaced by the Declarant at any time and from time to time at the Declarant's sole discretion.  Appointed Members need not be Members of the Association.

3.    Elected Executive Board.

      (a)    The Executive Board shall be elected pursuant to Section 7 of the Declaration.

      (b)    Elected Members shall be Members of the Association.

4.    Meetings, Generally.  The meetings of the Executive Board may be held at such times and at such place or places within this Commonwealth or elsewhere as a majority of the members may from time to time appoint, or as may be designated in the notice calling the meeting.

5.    Regular Meetings.  Regular meetings of the Executive Board shall be held without notice immediately following the annual meeting of the Members in each year at the registered office of the Association, or at such other time and place as shall be determined by the Executive Board.  In no event shall more than three hundred ninety (390) days elapse between regular meetings.

6.    Special Meetings.  Special meetings of the Executive Board shall be held when called by the President of the Association or by any two (2) Members.

7.    Notice.

      (a)    Notice of every special meeting of the Executive Board shall be given to each Member by telephone or in writing at least twenty-four (24) hours (in the case of notice by

15743/1/5909949v1

telephone, facsimile or e-mail), or forty-eight (48) hours (in the case of notice by courier service or express mail), or five (5) days (in the case of notice by first class mail) before the time at which the meeting is to be held. Every such notice shall state the time and place of the meeting.

(b)    Before or at any meeting of the Executive Board, any Member may, in writing, waive notice of such meeting, and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a Member at any such meeting shall be a wavier of notice by him of the time and place thereof unless such attendance is solely for the purpose of objecting to the notice given. If all of the Members then serving on the Executive Board are present at any meeting thereof, no notice shall be required and business may be transacted at such meeting unless one (1) or more of the Members are attending solely for the purpose of objecting to the notice given.

8.    Quorum. A majority of the Members in office shall be necessary to constitute a quorum for the transaction of business, and the acts of a majority of the Members present at a meeting at which a quorum is present shall be the acts of the Executive Board.

9.    Effects of Presence. Any Member present at any meeting shall be deemed to have assented to any action taken at such meeting unless his dissent is entered in the minutes or unless his written dissent is filed with the Secretary at or immediately following the adjournment thereof, provided that no Member may dissent for any action from which he voted in favor at the meeting.

10.    Action by Written Consent. Any action which may be taken at a meeting of the Members may be taken without a meeting if consent or consents in writing, setting forth the action so taken, shall be signed by all of the Executive Board Members in office and shall be filed with the Secretary of the Association.

11.    Committees. The Executive Board may, by resolution adopted by a majority of the Members in office, establish one (1) or more committees to consist of one (1) or more Members of the Association. Any such committee, to the extent provided in the resolution of the Executive Board or in these By-Laws, shall have and may exercise all of the powers and authority of the Executive Board, except that no such committee shall have any power or authority as to the following:

(a)    The submission to Members of any action required by statute to be submitted to the Members for their approval;

(b)    The filling of vacancies in the Executive Board;

(c)    The adoption, amendment or repeal of the By-Laws;

(d)    The amendment or repeal of any resolution of the Executive Board; or

(e)    Action on matters committed by the By-Laws or resolution of the Executive Board to another committee of the Executive Board.

15743/1/5909949v1

Each committee of the Executive Board shall serve at the pleasure of the Executive Board, and its Members shall be indemnified from liability to the extent hereinafter afforded the Members of the Association pursuant to <u>Article XVI</u>.

      12.   <u>Alternate Committee Members.</u>  The Executive Board may designate one (1) or more Members as alternate Members of any committee, who may replace any absent or disqualified Member at any meeting of a committee, the number of Members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another Member to act at the meeting in the place of any such absent or disqualified Member.

      13.   <u>Removal.</u>

      (a)   The entire Executive Board, or a class of the Executive Board where the Executive Board is classified with respect to the power to select Members, or any individual Member, may be removed from office without assigning any cause by the vote of Members entitled to cast at least a majority of the votes which all Members present would be entitled to case at any annual or other regular election of the Members or of such class of Members.  In case the Executive Board, such a class of the Executive Board or any one (1) or more Members are so removed, new Members may be elected at the same meeting.

      (b)   The unexcused absence of any Member from three (3) consecutive regular meetings of the Executive Board shall be deemed a resignation.

      (c)   The Executive Board may declare vacant the office of a Member if he is declared of unsound mind by an order of court or is convicted of felony, or of within sixty (60) days after notice of his selection he does not accept such office, either in writing or by attending a meeting of the Executive Board, and fulfill such other requirements of qualification as these By-Laws may specify.

      14.   <u>No Compensation</u>.  No Member shall be compensated by the Association for acting as such; provided, that nothing herein contained shall be construed to preclude any Member from serving the Association in any other capacity and receiving compensation therefore.

      15.   <u>Rules of Order</u>.  When not otherwise provided herein, the Executive Board and the Association shall conduct their respective business in accordance with Robert's Rules of Order, or such other rules as it may adopt from time to time for such propose.

      16.   <u>Members' Right to Attend Meetings</u>.  Members shall have no right to attend meetings of the Executive Board, but the Executive Board may, in its sole discretion, alert to allow Members to attend a particular meeting or meetings, and shall post or cause to be posted a notice of such meeting in such places as it thinks appropriate at least ten (10) days prior to such meeting; provided, however, that the failure to give such notice shall neither invalidate any actions taken at said meeting or impose any liability on the Executive Board, the Association or any or its officers or servants for failure to give such notice.

15743/1/5909949v1

17.    <u>Consent</u>.  Whenever any provision of the Declaration, these By-Laws or the rules and regulations shall require permission of the Executive Board, such permission shall consist of a written statement setting forth the action or activity for which such permission is granted, signed be at least two (2) Members of the Executive Board who shall have been authorized to sign such permission on behalf of the Executive Board by a vote thereof.  This action or activity for which permission is granted shall be noted by the Secretary in the records of the Executive Board.

## ARTICLE VI
## NOMINATION AND ELECTION OF MEMBERS

1.    <u>Nomination</u>.  Nominations for election to the Executive Board may be made from the floor at the annual meeting of the Members, as well as solicited by reasonable means from the Members prior to the annual meeting.  The Nominating Committee, if any, shall be appointed by the Executive Board prior to each annual meeting of the Members, to serve from the close of such annual meeting until the close of the next annual meeting, and such appointment shall be announced at each annual meeting.  The Nominating Committee, if any, shall make as many nominations for election to the Executive Board as it shall in its discretion determine, but not less than the number of vacancies that are to be filled.

2.    <u>Election</u>.  Elections for Member need not be by secret written ballot, except upon demand made by a Member at the election and before the voting begins.  At such election, the Members may cast, in person, by mailed ballot or by proxy, in respect to each vacancy, as many votes as they are entitled to exercise under the provisions of the Declaration.  The persons receiving the largest number of votes shall be elected.  Cumulative voting is permitted.

## ARTICLE VII
## POWERS AND DUTIES OF THE EXECUTIVE BOARD

1.    <u>Powers</u>.    The Executive Board, in addition to the powers granted in the Declaration, shall have power to:

(a)    adopt and publish rules and regulations governing the use of the Common Area and Units, and the personal conduct of the Members and their guests thereon, and to establish penalties or the infraction thereof;

(b)    suspend the voting rights and right to use of the Common Area facilities of a Member during any period in which such Member shall be in default in the payment of any assessment levied by the Association.  Such rights may also be suspended after notice and hearing, for a period not to exceed ninety (90) days for infraction of published rules and regulations;

(c)    exercise for the Association all powers, duties and authority vested in or delegated to this Association and not reserved to the membership by other provisions of these By-Laws or by the Declaration, the Articles of Incorporation or by statute;

15743/1/5909949v1

     (d)    declare the office of a Member of the Executive Board to be vacant in the event such Member shall be absent from three (3) consecutive regular meetings of the Executive Board;

     (e)    employ a manager, an independent contractor or such other employees as they deem necessary, and to prescribe their duties (the "**Manager**");

     (f)    commence and maintain actions and suits to restrain and enjoin any breach or threatened breach of the Declaration, these By-Laws or the rules and regulations, and to enforce, by mandatory injunction or otherwise, all of the provisions thereof;

     (g)    grant easements, rights-of-way or strips of land, where necessary, for utilities and sewer facilities over the Common Area or to serve the Common Area;

     (h)    grant necessary easements to Bristol Borough for ingress and egress over the Common Area of the Property;

     (i)    subject to the provisions of the Declaration, contract and pay for, or otherwise provide for, the maintenance and repair of the Common Area, including but not limited to roadways and street lights, and to contract for lawn mowing of all grass areas and to contract for snow removal to common sidewalk areas, including the payment of any taxes that may be due and taking any and all action to recover for losses sustained by casualty, condemnation or otherwise;

     (j)    contract and pay for, or otherwise provide for, the maintenance, restoration and repair of all improvements of whatsoever kind and for whatever purpose from time to time located within the Common Area and facilities;

     (k)    contract and pay for, or otherwise provide for, the services of architects, engineers, attorneys, accountants, and such other professional and non-professional services as the Association deems necessary or desirable;

     (l)    contract and pay for, or otherwise provide for, fire and other protective services as the Association shall from time to time deem appropriate for the benefit of the Property, the Owners, their tenants and guests;

     (m)    maintain members and officers liability insurance, if available, and delegate its powers to members, officers, committees and employees of the Associations;

     (n)    employ or contract with a professional Manager to perform all or any part of the duties and responsibilities of the Association. Any such agreement shall be for a term not in excess of two (2) years, subject to cancellation by the Association for cause at any time upon not less than thirty (30) days' written notice, and renewable by agreement of the parties for successive one (1) year periods;

     (o)    contract and pay for, or otherwise provide for, such materials, supplies, furniture, equipment and labor as is necessary;

15743/1/5909949v1

(p)    pay for, or otherwise provide for, such materials, supplies, furniture, equipment and labor as necessary;

(q)    cause its agents, independent contractors and employees, after reasonable notice and without liability against the Association, to enter upon any Unit for the purpose of maintaining and repairing any portion of the Property if, for any reason, the Owner thereof fails to maintain it in good condition and repair so as to present an attractive exterior appearance as required to promote or protect the general health, safety and welfare of the residents and users of the Property;

(r)    pay and discharge any and all liens from time to time placed or imposed upon any portion of the Common Area and facilities on account of any work done or performed for the Association in the fulfillment of any of its obligations and duties of maintenance, repair, operation or administration; and

(s)    perform such other duties and acts necessary to conduct the business of the Association.

2.    It shall be the duty of the Executive Board to:

(a)    cause to be kept a complete record of all of its acts and corporate affairs and to present a statement thereof to the Members at the annual meeting of the Members, or at any special meeting, when such statement is requested in writing by twenty percent (20%) of the Members who are entitled to vote;

(b)    supervise all officers, agents and employees of the Association and to see that their duties are properly performed;

(c)    as more fully provided in the Declaration, to:

(i)    fix the amount of the annual assessment against each Unit at least thirty (30) days in advance of each annual assessment period;

(ii)    send written notice of each assessment to every Owner subject thereto at least thirty (30) days in advance of each annual assessment period;

(iii)    commence an action to place a lien against any property for which assessments are not paid within thirty (30) days after due date or to bring an action at law against the Owner personally obligated to pay the same.

(d)    issue, or to cause an appropriate officer to issue, upon demand by any person, a certificate setting forth whether or not any assessment has been paid. A reasonable charge may be made by the Executive Board for the issuance of these certificate states an assessment has been paid, such certificate shall be conclusive evidence of such payment;

(e)    procure and maintain adequate liability and hazard insurance on Property owned by the Association;

9

(f)    cause all officers or employees having fiscal responsibilities to be bonded, as it may deem appropriate;

(g)    cause the Common Elements and Limited Common Elements (to the extent provided for in the Declaration) to be maintained;

(h)    adopt and follow procedures for adoption and publication of Executive Board resolutions and rules and regulations;

(i)    keep a complete record of all resolutions of the Executive Board and make such record available for inspection by any Member;

(j)    designate depositories for Association funds, designate those officers, agents and employees who shall have authority to withdraw funds from such accounts on behalf of the Association, and cause such persons to be bonded, as it may deem appropriate;

(k)    appoint such committees as it shall deem necessary to carry out its powers and duties;

(l)    establish late charges for failure to pay assessments on a timely basis; and

(m)    establish and assess fines for non-compliance with rules and regulations adopted by the Association.

## ARTICLE VIII
## OFFICERS

1.    <u>Enumeration of Offices.</u>  The executive officers of the Association shall be chosen by the Executive Board, and shall be a President, who shall at all times be a Member of the Executive Board, a Secretary and Treasurer, and such other officers and assistant officers as the needs of the Association may require.  The President and Secretary shall be natural persons of full age.  The Treasurer, however, may be a corporation; but if a natural person, shall be of full age.  The Executive Board may secure the fidelity of any or all such officers by bond or otherwise.

2.    <u>Election of Officers</u>.  The election of officers shall take place at the first meeting of the Executive Board following each annual meeting of the Members.

3.    <u>Multiple Offices</u>.  During the period of Declarant Control of the Executive Board any person may simultaneously hold multiple offices.  After such time as the Declarant Control of the Executive Board has terminated, only the offices of Secretary and Treasurer may be held by the same person.  No person shall simultaneously hold more than one (1) of any of the other offices, except in the case of special offices created pursuant to <u>Section 1</u> of this Article.

4.    <u>Term</u>.  The officers of the Association shall be elected annually by the Executive Board and shall each hold office for a term of one (1) year unless he shall sooner resign or shall be removed or otherwise disqualifies to serve.

15743/1/5909949v1

5.    Duties.  The officers shall have such authority and shall perform such duties as are provided by these By-Laws and as shall from time to time be prescribed by the Executive Board.  The duties of the officers are as follows;

(a)    President.  The President shall be the chief executive officer of the Association.  He shall preside at all meetings of the Members and Executive Board; he shall have general and active management of the affairs of the Association; he shall see that all orders and resolutions of the Executive Board are carried into effect, subject, however, to the right of the Members to delegate and specific powers, except such as may be by statute exclusively conferred on the President, to any other officer of officers of the Association.  He shall execute bonds, mortgages, leases, deeds and other written instruments and documents (if requiring a seal, under the seal of the Association).  He shall be EX-OFFICIO a member of all committees, and shall have the general powers and duties of supervision and management usually vested in the office of President.

(b)    Vice President.  The Vice President, if any, shall act in all cases for and as the President in the latter's absence, inability or refusal to act, and shall perform such other duties as may be required of him from time to time by the Executive Board.

(c)    Secretary.  The Secretary shall attend all sessions of the Executive Board and all meetings of the Members and act as clerk thereof, and record all the votes of the Association and the minutes of all its transactions in a book to be kept for that purpose, and shall perform like duties for all committees of the Executive Board when required.  He shall give, or cause to be given, notice of all meetings of the Members and of the Executive Board, and shall perform such other duties as may be prescribed by the Executive Board or President, under whose supervision he shall be.  He shall keep in safe custody the corporate seal of the Association, and when authorized by the Executive Board, affix the same to any instrument requiring it.

(d)    Treasurer.  The Treasurer shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Association, and shall keep the money of the Association in a separate account to the credit of Association.  He shall disburse the funds of the Association as may be ordered by the Executive Board, taking proper vouchers for such disbursements, and shall render to the President and Members, at the regular meetings of the Executive Board or whenever they may require it, an account of all his transactions as Treasurer and of the financial conditions of the Association.  He shall cause an annual audit of the Association books to be made by a public accountant at the completion of each fiscal year.

6.    Delegation of Duties to Manager.  Certain specific duties of the Secretary and Treasurer of the Association may be designated be the Executive Board to a Manager designated by the Executive Board.

7.    Compensation.  The compensation, if any, of officers shall be fixed by the Executive Board.

15743/1/5909949v1

8.    <u>Execution of Instruments</u>.  No agreement, check, deed, lease or other instrument shall be binding upon the Association unless entered into on its behalf and signed by two (2) officers of the Association; provided, however, that the Executive Board may authorize the Manager, if any, or specified employees of the Manager to execute checks and other documents without the signature of an Association officer, subject to such conditions and limitations as may from time to time be imposed by the Executive Board.

**ARTICLE IX**
**VACANCIES**

1.    If the office of any officer or agent, one (1) or more, becomes vacant for any reason, the Executive Board may choose a successor or successors, who shall hold office for the unexpired term in respect of which such vacancy occurred.

2.    Any officer or agent may be removed from office with or without cause by the Executive Board by an affirmative vote of the majority of the entire Executive Board whenever in its judgment the interest of the Association will be served thereby, but such removal shall be without prejudice to the contract rights of any person so removed.  Any officer may resign at any time giving written notice to the Executive Board, the President or the Secretary.  Such resignation shall take effect in the date or receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

3.    Vacancies in the Executive Board, including vacancies resulting from an increase in the number of members, the death resignation or removal of a Member, shall except as otherwise specifically provided at <u>Article V</u>, <u>Section 13(a)</u> above, be filled by a majority of the remaining members of the Executive Board, though less than a quorum, and each person so elected shall be Member until his successor is elected by the Members, who may make such election at the next annual meeting the Members or at any special meeting duly called for that purpose and held prior thereto, except that any vacancy occurring as a result of the death, resignation or removal of an appointed Member shall, until the period of Declarant Control has ended, be filled by appointment by the Declarant.

**ARTICLE X**
**BOOKS AND RECORDS**

1.    The Association shall keep an original or duplicate record of the proceedings of the Members, the original or a copy of these By-Laws, including all amendments thereto to date, certified by the Secretary of the Association, and an original or a duplicate membership register, giving the names of the Members of showing their respective addresses and the class and other details of the membership of each.  The Association shall also keep appropriate, complete and accurate books or records of account.  The records provided for herein shall be kept at either the registered office of the Association in this Commonwealth or at its principal place of business wherever situated.

2.    Every Member shall, upon written demand stating the purpose thereof, have a

12

15743/1/5909949v1

right to examine, in person or by agent or attorney, during the usual hours for business for any proper purpose, the membership register, books and records of account, and records of the proceedings of the Members, and to make copies or extracts therefrom at reasonable cost. The Declaration and these By-Laws of the Association shall be available for inspection by any Member at the principal office of the Association, where copies may be purchased at reasonable cost. A proper purpose shall mean a purpose reasonably related to the interest of such person as a Member. In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the Member. The demand shall be directed to the Association at its registered office in this Commonwealth or at its principal place of business wherever situated.

## ARTICLE XI
## MEMBERSHIP CERTIFICATES

Membership in the Association may be evidenced by certificates of membership in which case they shall be in such form and style as the Executive Board may determine. The fact that the Association is a nonprofit corporation shall be noted conspicuously on the face of each certificate. They shall be signed by the President and by the Secretary, and shall bear the corporate seal.

## ARTICLE XII
## TRANSACTION OF BUSINESS

1.    The Association shall make no purchase of real property and shall not sell, mortgage, lease away or otherwise dispose of its real property unless authorized by a vote of two-thirds (2/3) of the Members in office of the Executive Board. Unless otherwise restricted in these By-Laws, no vote or consent of the Members shall be required to make effective such action by the Executive Board. If the real property is subject to a trust, the conveyance away shall be free of trust and the trust shall be impinged upon the proceeds of such conveyance.

2.    Whenever the lawful activities of the Association involve, among other things, the charging of fees or prices for its services or products, it hall have the right to receive such income and, in so doing, may make an incidental profit. All such incidental profits shall be applied to the maintenance an operation of the lawful activities of the Association, and in no case shall be divided or distributed in any manner whatsoever among the Members or officers of the Association.

## ARTICLE XIII
## ANNUAL REPORT

1.    The Executive Board shall present annually to the Members a report, verified by the President and Treasurer or by a majority of the Members, showing in appropriate detail the following:

15743/1/5909949v1

(a)    The assets and liabilities, including trust funds, of the Association as of the end of the fiscal year immediately preceding the date of the report;

(b)    The principal changes in assets and liabilities, including trust funds, during the year immediately preceding the date of the report;

(c)    The revenue or receipts of the Association, both unrestricted and restricted to particular purposes, for the year immediately preceding the date of the report, including separate data with respect to each trust fund held by or for the Association;

(d)    The expenses or disbursements of the Association, for both general and restricted purposes, during the year immediately preceding the date of the report, including separate data with respect to each trust fund held by or for the Associations; and

(e)    The number of Members of the Association as of the date of the report, together with a statement of increase or decrease in such number during the year immediately preceding the date of the report, and a statement of the place where the names and addresses of the current Members may be found.

This report shall be filed with the minutes of the meeting of Members.

2.    At least thirty (30) days prior to the beginning of each fiscal year, the Executive Board shall prepare and distribute to the membership of the Association, upon request, a written, itemized estimate (budget) of the expenses to be incurred by the Association during such year in performing its functions hereunder and under the Declaration.  At the end of any fiscal year of the Association, the Executive Board may determine that all excess funds remaining in the Operating Fund, over and above the amounts used for the operation of the Property, may be returned to the Members proportionately or may be retained by the Association and used to reduce the following year's Common Assessments.

## ARTICLE XIV
## NOTICES

1.    Except as otherwise specifically provided herein, whenever written notice is required to be given to any person, it may be given to the person either personally or by sending a copy thereof by first class express mail, postage prepaid, (with messenger service specified), email or facsimile (with answerback received) or courier service, charges prepaid, or by facsimile to the address (or to the email or facsimile or telephone number) of the person appearing on the books of the Association, or, in the case of members, supplied by the members to the Association for the purpose of notice; and a certificated or affidavit by the Secretary or an Assistant Secretary shall be prima facie evidence of the giving of any notice required by these By-Laws.  If the notice is sent by mail, email or facsimile service, it shall be deemed to have been given to the person entitled there to when deposited in the United States mail or with a courier service for delivery to that person; or, in the case of email or facsimile when received. Delivery shall also be deemed to have been made when the notice is placed in the Member's mailbox.  A notice of meeting shall specify the place, day and hour of the meeting and any other

15743/1/5909949v1

information required by statute or these By-Laws.  Except as may be otherwise specifically provided herein, when a special meeting is adjourned, it shall not be necessary to give any notice of the adjourned meeting or of the business to be transacted at an adjourned meeting, other than by announcement at the meeting at which such adjournment is taken.

2.    Whenever any written notice is required to be given under the provisions of statue or by the Articles of Incorporation or by these By-Laws, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.  Except as otherwise required by statute, neither the business to be transacted at nor the purpose of a meeting need to specified in the wavier of notice of such meeting.  In the case of a special meeting of Members, such waiver of notice shall specify the general nature of the business to be transacted. Attendance of a person at any meeting shall constitute a wavier of notice of such meeting, except where a person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because of meeting was not lawfully called or convened.

### ARTICLE XV
### MISCELLANEOUS PROVISIONS

1.    The fiscal year of the Association shall begin on the first day of January in each year.

2.    One (1) or more persons may participate in a meeting of the Executive Board or of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

3.    So long as the Association shall continue to be organized on a nonstock basis, the Executive Board shall have authority to provide for the Members to make capital contributions in such amounts and upon such terms as are fixed by the Members in accordance with the provisions of Section 5541 of the Nonprofit Corporation Law of 1988, as amended.

4.    The Executive Board, by resolution, may authorize the Association to accept subventions from Members or non-Members on terms and conditions not inconsistent with the provisions of Sections 5542 of the Nonprofit Corporation Law of 1988, as amended, and to issue certificates therefore.

5.    The provisions hereof shall be deemed independent and severable, and the invalidity, partial invalidity or unenforceability or any one provision or a portion hereof shall not affect the validity or enforceability of any other portion or portions here of unless such deletion shall destroy the uniform plan for development and operation of the Property.

6.    The headings introducing the text of several sections of these By-Laws are solely for the convenience of reference and shall not constitute part of these By-Laws or affect their meaning on any way.

7.    All pronouns and any variations thereof shall be deemed to refer to the masculine,

15743/1/5909949v1

feminine, neuter, singular and plural, as the identity of the person or persons or entities may require.

## ARTICLE XVI
## LIABILITY AND INDEMNIFICATION

1.    Members and Officers:

(a)    shall not be liable to any Member, Owner or other resident of the Property as a result of any actions taken of omitted to be taken in such capacities, for any mistake in judgment, negligence or otherwise, except for their willful misconduct or gross negligence;

(b)    shall have no personal liability in contract to a Member or Owner, or to any other person or entity, under any Agreement, instrument or transaction entered into or executed by them on behalf of the Association;

(c)    shall have no personal liability, direct or imputed, to a Member or Owner, or any other person or entity, by virtue of acts performed by themselves or by agents, employees or contractors employed or retained by the, on their behalf, in their official capacity, except for their own willfulness, conduct or gross negligence; and

(d)    shall have no personal liability arising out of the use, misuse or condition of the Property or any part thereof, which might in any way be assessed to imputed to them as a result, or by virtue of, their capacities as such.

2.    An Executive Board Member of the Association shall stand in a fiduciary relation to the Association and shall perform his duties as a Member, including his duties as a Member of any committee of the Executive Board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the Association, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his duties, a Member shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared by any of the following: (a) one (1) or more officers or employees of the Association whom the Member reasonably believes to be reliable and competent in the matters presented; (b) counsel, public accountants or other persons as to matter which the Member reasonably believes to be within the professional or expert competence of such person; or (c) a committee or the Executive Board upon which he does not serve, duly designated in accordance with law, as to matter within its designated authority, which the Member reasonably believes to merit confidence. A Member shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted. In discharging the duties of their respective positions, the Executive Board, committees of the Executive Board and individual members may, in considering the best interests of the Association, consider the effects action upon employees, upon suppliers and customers of the Association and upon communities in which offices or other establishments of the Association are located, and all other pertinent factors. The consideration of these factors shall not constitute a violation of this section. Absent breach of fiduciary duty, lack of good

15743/1/5909949v1

faith or self-dealing, actions taken as a Member or any failure to take any action shall be presumed to be in the vest interests of the Association. A Member of the Association shall not be personally liable for monetary damages as such for any action taken, or any failure to take any action, unless: (a) the Member has breached or failure to perform the duties of his office under this section; or (b) the breach or failure to perform constitutes self-dealing, willful misconduct or recklessness.   The provisions of this section shall not apply to: (a) the responsibility or liability of a Member pursuant to any criminal statue; or (b) the liability of a Member for the payment of taxes pursuant to Federal, state or local law.

3.      The Association shall indemnify each of its members, officers, employees and committee persons, whether or not then in service as such (and his executor, administrator and heirs), against all reasonable expenses actually and necessarily incurred by him in connection with the defense of any litigation to which the individual may be been a party because he is or was a member, officer or employee of the Association.  The individual shall have no right to reimbursement, however, in relation to matter as to which he has been adjudged liable to the Association.  The right to indemnity for expenses shall also apply to the expenses of suits which are compromised or settled if the court having jurisdiction of the matter shall approve such settlement.  The foregoing right of indemnification shall be in addition to, and not exclusive of, all other right to that which such member, officer, employee or committee person may be entitled.

## ARTICLE XVII
## ASSESSMENTS

As more fully provided in the Declaration, each Member is obligated to pay to the Association Annual and Special Assessments.  Any assessments which are not paid when due shall be delinquent.  If the assessment is not paid within thirty (30) days after the due date, or such earlier time as set by the rules and regulations adopted by the Association, if any, such penalties as adopted by the Executive Board may be assessed, including interest from the date of delinquency at the rate as set forth at Article 7 of the Declaration, and the Association is authorized to bring an action at law against the Owner personally to pay the same and/or obtain a lien against the Property, and interest, costs and reasonable attorney's fees of any such action shall be added to the amount of such assessment.

## ARTICLE XVIII
## AMENDMENTS

1.      Except as otherwise provided by statute, the Executive Board shall have the authority to adopt, amend and repeal these By-Laws, subject to the power of the Members to change such action.  The powers hereby conferred shall be exercised by a majority vote of the members in office of the Executive Board, or by the votes of the Members entitled to cast at least a majority of the votes which all Members present are entitled to cast thereon, as the case may be, at any regular or special meeting duly convened after notice to the Members of that purpose.

2.      In the case of any conflict between the Articles of Incorporation and these

15743/1/5909949v1

By-Laws, the Articles shall control; and in the case of any conflict between the Declaration and these By-Laws, the Declaration shall control.

3.    No amendment of these By-Laws shall make any change which would affect any of the rights, privileges, powers and options of the Declarant or the Declarant's assigns in the development of the Property and the development and sale of Units unless the Declarant shall join in the execution of such amendment.

4.    Special Amendments. Notwithstanding anything contained herein to the contrary, the Declarant, by the Declarant's own action, shall have to right to amend these By-Laws during the three (3) year period commencing on the date of these By-Laws solely in order to comply with the rules and requirements of any governmental or quasi-governmental body or any institution purchasing, holding or insuring a security interest in any portion of the Property.

## ARTICLE XIX
## ADOPTION OF BY-LAWS AND RECORD OF AMENDMENTS THERETO

1.    Adoption. These By-Laws have been adopted as the By-Laws of the Association as of the _____ day of _____, 2015, and shall be effective as of said date.

2.    Amendments to By-Laws:

| Section Amended | Date Amended | Adopted By |
|---|---|---|
|  |  |  |
|  |  |  |

15743/1/5909949v1

## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE, A PLANNED COMMUNITY

UNANIMOUS CONSENT IN WRITING IN LIEU OF
ORGANIZATION OF MEETING OF THE INCORPORATOR

Dated: As of _____, 2019

The undersigned, being the sole Incorporator named in the Articles of Incorporation of The Townhomes at Radcliffe Court on the Delaware, a Planned Community, a nonprofit corporation organized under the laws of Commonwealth of Pennsylvania, does hereby consent to and adopt the following resolutions in accordance with the Pennsylvania Nonprofit Corporation Law of 1988, as amended:

RESOLVED, that this action shall be in lieu of the organization meeting prescribed by Section 5310(a) of the Pennsylvania Nonprofit Corporation Law of 1988, as amended.

RESOLVED, that the Articles of Incorporation of the Corporation filed with the Department of State of the Commonwealth of Pennsylvania of _____, 2015 be and they hereby are accepted, that the filing of such Articles of Incorporation by duly advertised as required by law, that the Secretary of the Corporation cause the Articles of Incorporation and Proofs of Publication to be filed in the Charter section of the minute book of the Corporation; and that the Corporation proceed to do business thereunder.

RESOLVED, that the form of By-Laws submitted to this Incorporator for the regulation of the affairs of the Corporation be and they hereby are adopted as the By-Laws of the Corporation; and that the Secretary of the Corporation cause such By-Laws to be filed in the By-Laws sections of the minute book of the Corporation.

15743/1/5909949v1

RESOLVED, that the following named persons be and they hereby are designated to constitute the Executive Board of the Corporation, to hold office, subject to the provisions of the By-Laws, for the ensuing year and until their respective successors are chosen and qualified:

_____

_____

FURTHER RESOLVED, That the one (1) remaining position on the Executive Board shall be filled in accordance with the By-Laws of the Corporation.

Dated: As of _____, 2019

_____
[_____, **Incorporator**]

20

## EXHIBIT "D"

## FIRST PROPOSED BUDGET

## OF

## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE COMMUNITY ASSOCIATION

**[Attached]**

## RADCLIFFE COURT ON THE DELAWARE MASTER ASSOCIATION BUDGET

**INCOME**

| | |
|---|---:|
| Assessments | $ 33,288 |
| **TOTAL INCOME** | **$ 33,288** |

**EXPENSES**

| | |
|---|---:|
| Building & Grounds Maintenance | |
| Management Service | $ 14,100 |
| Trash Removal | |
| Snow Removal | |
| Repairs & Maintenance | |
| Site Lighting | |
| Office & Administrative | $ 1,668 |
| Insurance | $ 1,242 |
| Legal & Accounting | $ 805 |
| Tax Preparation | $ 425 |
| **TOTAL EXPENSES** | **$ 18,240** |
| CAPITAL RESERVE & CONTRIBUTED CAPITAL | $ - |
| **TOTAL EXPENSES & RESERVE** | **$ 18,240** |

NOTE:   Assessments are based on $ 189 per month for 73 to Townhomes (with $ 151 and $ 38 to Master Assn)
Capital Contributions are based on $ 495 per unit.

## THE TOWNHOMES AT RADCLIFFE COURT ON THE DELAWARE TOWNHOME ASSOCIATION BUDGET

**INCOME**

| | |
|---|---:|
| Assessments | $ 132,276 |
| Interest | $ 450 |
| Resale Capital | $ 500 |
| **TOTAL INCOME** | **$ 133,226** |

**EXPENSES**

| | |
|---|---:|
| Building & Grounds Maintenance | $ 35,510 |
| Management Service | |
| Trash Removal | $ 13,156 |
| Snow Removal | $ 6,498 |
| Repairs & Maintenance | $ 2,243 |
| Site Lighting | $ 874 |
| Office & Administrative | |
| Insurance | |
| Legal & Accounting | |
| Tax Preparation | |
| **TOTAL EXPENSES** | **$ 58,281** |
| CAPITAL RESERVE & CONTRIBUTED CAPITAL | $ 74,945 |
| **TOTAL EXPENSES & RESERVE** | **$ 133,226** |

## RADCLIFFE COURT ON THE DELAWARE COMBINED ASSOCIATION BUDGET

**INCOME**

| | |
|---|---:|
| Assessments | $ 165,564 |
| Interest | $ 450 |
| Resale Capital | $ 500 |
| **TOTAL INCOME** | **$ 166,514** |

**EXPENSES**

| | |
|---|---:|
| Building & Grounds Maintenance | $ 35,510 |
| Management Service | $ 14,100 |
| Trash Removal | $ 13,156 |
| Snow Removal | $ 6,498 |
| Repairs & Maintenance | $ 2,243 |
| Site Lighting | $ 874 |
| Office & Administrative | $ 1,668 |
| Insurance | $ 1,242 |
| Legal & Accounting | $ 805 |
| Tax Preparation | $ 425 |
| **TOTAL EXPENSES** | **$ 76,521** |
| CAPITAL RESERVE & CONTRIBUTED CAPITAL | $ 74,945 |
| **TOTAL EXPENSES & RESERVE** | **$ 151,466** |

## EXHIBIT "E"

## SCHEDULE OF PERMITS

1.   Bristol Borough – Land Development
2.   Bristol Borough Water & Sewer Authority
3.   Bristol Borough Fire Department
4.   PADOT – Highway Occupancy Permit
5.   AQUA Pennsylvania, Inc.
6.   PADEP/Bristol Borough Water & Sewer Authority – Part II Permit
7.   PADEP – NPDES
8.   PADEP – GP3 & GP4
9.   PADEP – Sewage Facilities Planning Module Exemption
10.  PADEP – ACT 2 – approved cleanup plan in 2006, as will be amended as set forth in Section 11 hereof.
11.  Bristol Borough Water & Sewer Authority - Pump Station Improvement Agreement
12.  Bucks County Conservation District – E&S Adequacy Letter
13.  Building Permits for the Units

## EXHIBIT "F"

## DECLARANT'S LIMITED WARRANTY

**[Attached]**

O.K,
to release for exhibit: John McGrath 5/14/19

**McGrath & Son**
BUILDING ON INTEGRITY

**WARRANTY FROM McGRATH & SON DEVELOPMENT LLC, a Pennsylvania limited liability
company, d/b/a McGRATH HOMES ("BUILDER") TO BUYER**

Builder has built the Units and agrees to guarantee and warrant all work and materials to the Buyer against any defects in workmanship or materials provided such defects do not result from work or alterations by Buyer or other on Buyer's behalf. Buyer agrees to notify Builder in writing of all complaints or defects in workmanship or materials. Builder shall make reasonable and necessary repairs or adjustments without cost to Buyer within sixty (60) days, weather and labor conditions permitting and emergencies excepted. Buyer shall not be entitled to any damages, monetary or otherwise, from Builder for defective workmanship or materials unless buyer notifies Builder of said defects and grants Builder the right to repair and correct said defects pursuant to the paragraph. The provisions of this warranty shall not apply if there is any money due and owing to Builder pursuant to this Agreement.

The provisions of this warranty shall cover all phases of construction for a period of one ( 1 ) year from date of occupancy or date of conveyance of Buyer's dwelling to Buyer, whichever occurs first, except as otherwise specified by the manufacturer's warranty on individual equipment incorporated in the dwelling, i n that case the manufacturer's warranty shall apply.

THE LIMITED WARRANTY OF THIS AGREEMENT IS THE ONLY WARRANTY APPLICABLE TO THE PREMISES. NO IMPLIED WARRANTY (WHETHER OF MERCHANTABILITY, HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE), IS GIVEN ON PORTIONS OF THE PREMISES OTHER THAN CONSUMER PRODUCTS. THE BUILDER DOES NOT ASSUME ANY LIABILITY OR OBLIGATION ON ACCOUNT OF REPRESENTATIONS MADE BY ANY OTHER PERSON. THE OBLIGATION OF BUILDER IS LIMITED SOLELY TO THE REPAIROR REPLACEMENT OF THE DEFECTIVE COMPONENT AND DOES NOT EXTEND TO ANY DAMAGE OR HARM RESULTING THEREBY OR THEREFROM. EXCEPT AS SET FORTH ABOVE, THE PREMISES IS BEING SOLD "AS IS". NEITHER THE DECLARANT NOR THE BUILDER SHALL BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES OR PERSONAL INJURIES ARISING FROM BREACH OR ANY OF THE LIMITED WARRANTIES DESCRIBED IN THIS AGREEMENT. IF ANY DEFECT IS DISCOVERED DURING THE APPLICABLE WARRANTY PERIOD, THE BUILDER SHALL HAVE THE EXCLUSIVE RIGHT TO DETERMINE WHETHER THE DEFECT SHALL BE CORRECTED BY REPAIR, ADJUSTMENT OR REPLACEMENT. NO LIMITED WARRANTY CONTAINED HEREIN COVERS A DEFECTIVE PORTION OF THE PREMISES WHICH HAS BEEN SUBJECT TO ALTERATION, MISUSE OR ACCIDENTAL DAMAGE (CAUSED BY PERSONS OTHER THAN BUILDER'S EMPLOYEES AND AGENTS), OR HAS NOT BEEN AFFORDED REASONABLE CARE. BUYER AGREES THAT NEITHER THE DECLARANT NOR THE BUILDER SHALL NOT BE RESPONSIBLE FOR ANY DAMAGES, LIABILITIES, CLAIMS OR LOSSES INCURRED BY BUYER ARISING OUT OF OR RELATING TO MOLD OR ANY OTHER FUNGUS OR AGENT, WHETHER OR NOT ASSOCIATED WITH ALLEGED DEFECTS IN CONSTRUCTION, INCLUDING, BUT NOT LIMITED TO, PROPERTY DAMAGES, PERSONAL INJURY, ADVERSE HEALTH EFFECTS, LOSS OF INCOME, EMOTIONAL DISTRESS, DEATH, LOSS OF USE OR LOSS OR VALUE AND BUYER HEREBY RELEASES DECLARANT AND BUILDER FROM SAME.

The limited warranty set forth herein above is provided to protect Buyer from faulty construction and defective materials. Warranties on appliances, equipment and other items which are consumer products for purposes of the Magnuson-Moss Warranty Act will not be effective after the stated term of the manufacturer's warranty on that item. Buyer understands and agrees that shrinkage, settlement and items of a similar nature, and the results thereof; are a normal development of new construction and are not an indication of poor workmanship or defective materials. Buyer also understands and agrees that the repair thereof is normal maintenance. The parties hereto agree that the cost of these repairs are not included in this limited warranty and shall be responsibility of Buyer.

---

**McGrath & Son Development  668 Woodbourne Road Langhorne, Pa 19047 Suite #109
Office:(215)970-5942 Fax: (267)358-5937**

5923258v2

# EXHIBIT "G"

## DECLARANT'S RESERVATION/DEPOSIT FORM

### [Attached]

## RESERVATION AGREEMENT

# Radcliffe Court
### *By McGrath & Son Homes*

**Date:** _____

**Address:** _____

**Purchase Price:** _____

**Deposit:** _____

We hereby acknowledge receipt of your deposit in the above amount, as evidence of your interest to purchase the above referenced home. This reservation deposit is not binding on you, but merely serves as an expression of your intention to purchase the above property. The deposit paid today will be refunded to you upon request at any time prior to the execution of a binding Agreement of Sale.

This reservation expires seven (7) days from the date listed above, unless extended by us. On or before the expiration date, you will be given an opportunity to review our Agreement of Sale to purchase the above property.

**Name:** _____

**Address:** _____

**Home Phone:** _____ **Cell Phone:** _____

**Signature:** _____ **E-mail:** _____

**Sales Manager:** _____

## EXHIBIT "H"

## STANDARD FORM OF AGREEMENT OF SALE

### [Attached]

## ISLAND VIEW CROSSING II, LP
## RADCLIFFE COURT ON THE DELAWARE
## ("RADCLIFFE COURT")

**AGREEMENT OF SALE ("Agreement")**          **DATE:** _____

**1.   NAMES AND ADDRESS:**

(a)    Seller: Kevin O'Halloran, Chapter 11 Trustee for the Estate of Island Crossing II, L.P. Bankruptcy No. 17-14454(ELF) pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(b)    Address: 1600 Radcliffe Street, Bristol Borough, PA 19007 _____

(c)    Telephone: _____

(d)    Buyer: _____ cell # _____ e-mail: _____
       Buyer: _____ cell # _____ e-mail: _____

(e)    Home Address: _____

(f)    Home Phone: _____

(g)    Business Address: _____

(h)    Business Phone: _____

(i)    Broker: _____

(j)    Subagent: _____

(k)    Address: _____

(l)    Telephone: _____

**2.   LOT BEING PURCHASED AS NOTED ON THE SITE PLAN ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF (the "Lot")**

(a)    Lot Number: _____

(b)    Legal Address: _____

(c)    Model Type : _____

**3.   PRICE AND TERMS**

(a)    Purchase Price:
       I. Home: _____
       II. Lot Premium: _____
       III. Extras Per Attached: _____
       Total Purchase Price:                         $_____

(b)    Deposit amount paid directly to Seller at the execution of this Agreement to be held in escrow without interest pending Closing:                         $_____

(c)    Amount to be paid directly to Seller on or Before: _____ $_____

(d)    Balance Due at Settlement:                    $_____

(e)    Settlement Date (subject to Section 9 hereof): _____ $_____

Buyer's Initials _____

1

**4.    BACKGROUND**

On June 30, 2017, Island View Crossing II, L.P. filed for protection under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"), which bankruptcy case is being administered as Case No. 17-14454(ELF).  The Seller was elected Trustee on January 30, 2018 and is so acting.

**5.    THE LOT**

Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller the Lot with dwelling to be erected as described above (collectively, the "Property"). Buyer agrees to pay to Seller the purchase price as set in Paragraph 3 above.

**6.    TITLE**

Title to said Property shall be conveyed by a special warranty deed and shall be good and marketable and such as will be insured by a reputable title company at regular rates.  The Property shall be conveyed free and clear of any and all liens (statutory or otherwise), claims, community property interests, mortgages, conditions, encumbrances, security interests, pledges, restrictions, charges, indentures, loan agreements, options, rights of first refusal, offsets, recoupments, rights of recovery, judgments, orders and decrees of any court or governmental entity, interests, successor, products, tax and other liabilities and claims against the Seller or its property, of any kind or nature, whether secured or unsecured, choate, or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, disputed or undisputed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, known or unknown (the "Encumbrances") except:  (a) existing restrictions, conditions and easements, especially those set forth in the Declarations of Covenants and Restrictions for Radcliffe Court Homeowners Association; (b) restrictions, conditions, covenants, and easements, if any, required to be placed on the Property including under Pennsylvania Act 2; (c) restrictions, conditions, and easements created by Seller at or prior to settlement hereunder and reasonably necessary for the development by Seller of the Property and adjoining properties; (d) the possibility of the filing of mechanics' liens or municipal liens; (e) zoning ordinance and any other act, ordinance, or regulation affecting the use of an improvement to said Property; (f) easements with respect to public or private sewers, storm sewer or surface water courses; and (g) agreements and easements with telephone, gas, water, catv, electric and other public utility companies (collectively the "Permitted Exceptions"). In the event of any violation of any such restrictions, conditions, easements, agreements and provisions after settlement hereunder, Seller is irrevocably authorized and empowered by Buyer to enter upon the Property and forthwith terminate any such violation, and the Buyer assumes full liability for, and agrees to indemnify Seller against any loss or damages resulting from such violation.  This provision shall survive settlement hereunder and at the option of the Seller may be included in the deed to Buyer.  Seller, its agents or contractors, shall have an easement across and upon the Lot being purchased in order to complete any work which may be required to be done by Seller after the date of settlement.  Seller shall use due care not to unduly injure the Property in the course of construction, but Seller shall not be liable to Buyer for such damage to the Property or property as is ordinarily incident to such construction (including, but not limited to, change of grade and earth and tree removal) whether caused by Seller, its agents or contractors.

If Seller cannot deliver title as herein provided, Buyer shall have the option of taking such title as Seller can give without abatement of price or of being repaid all monies paid by Buyer, without interest, and in the latter event, this Agreement shall terminate, and neither party shall have any further liability to the other.

At or prior to the time of Settlement, a restrictive covenant shall be placed on the Property providing that prior to the date of the last settlement at Radcliffe Court which Seller sells its last

lot, Buyer shall not display or permit to be displayed on the Property any sign, including but not limited to a real estate "for sale" sign.

## 7. MORTGAGE CONTINGENCY.

This sale and settlement hereunder are NOT CONDITIONED OR CONTINGENT IN ANY MANNER UPON THE SALE OR SETTLEMENT OF ANY OTHER REAL ESTATE nor subject to any mortgage or financing except as herein provided.  The insertion of a condition on sale or settlement of Buyer's present home by Buyer's Lender in Buyer's mortgage commitment shall not relieve Buyer of Buyer's obligation to proceed to settlement.

(a.)    It is mutually agreed and understood that within five (5) business days from the date hereof, Buyer will prepare and file written application and cooperate fully with a recognized mortgage lending institution for a first mortgage loan to be secured upon the property in the amount of $_____ for a total term of no more than _____ years and at an initial interest rate that the lender is willing to specify, not to exceed _____.  Buyer agrees to pay for any request from a recognized mortgage lending institution for credit report, appraisal and service charges (loan origination fees, placement fees).  The Buyer herein agrees to comply with any conditions that may be contained in the mortgage commitment.  Additionally Buyer agrees that Seller may at its option extend settlement up to 120 days beyond date which Seller receives written notice of Buyer's mortgage commitment.

(b.)    Should Buyer be unable to obtain a written commitment for a mortgage loan on the terms set forth above, valid until date of settlement, Buyer shall advise Seller and Sellers agent, in writing by registered or certified mail (return receipt requested) and/or by personal delivery on or before _____of such a condition.  Seller shall at his sole option thereupon have a period of sixty days (60) from the date of receipt of such notice within which to obtain such a mortgage commitment for and on behalf of the Buyer, and Settlement shall, if required, be automatically extended for a further period of one hundred twenty (120) days after delivery to Buyer of  a written mortgage commitment.  Buyer agrees to execute an application at Seller's request and Buyer agrees to pay any request from and cooperate fully with a recognized mortgage lending institution for credit report, appraisal and service charges (loan origination fees, placement fees, discount points, etc.) not to exceed _____.

(c.)    If Buyer fails to make application for such mortgage loan or notify Seller of his inability to obtain a written commitment as herein set forth or fails to execute any application for such mortgage loan at Seller's request, the condition and contingency provided for shall no longer prevail and this Agreement shall be and remain in full force and effect according to its terms in the same manner as if the condition and contingency were not a part hereof.

(d.)    Should neither Buyer nor Seller be able to obtain such a mortgage commitment on the terms set forth above within the period above referred  to, Buyer at Buyer's election may (i) proceed with the  consummation of this Agreement without regard to the failure of the  condition or (ii) may cancel this Agreement, in which event all monies paid hereunder by Buyer on account of the purchase price will be returned to Buyer upon receipt by Seller of (1) Buyer's written notice of intention to cancel, (2) the return to Seller of all copies of this Agreement.  Thereafter all rights and liabilities of these parties shall cease and determine, anything herein contained to the contrary notwithstanding. Buyer shall notify Seller and Seller's Agent of Buyer's election under (i) or (ii) within three (3) days by registered mail (return receipt requested) or by personal delivery after being notified by Seller that a mortgage commitment was not

Buyer's Initials _____

obtained.   In the event that Buyer fails to notify Seller of this election to cancel this Agreement under (ii) above within the prescribed time limit, Buyer shall be obligated to proceed with the consummation of this Agreement, as if the condition and contingency were not a part hereof.

(e.)    Seller agrees to permit inspection of the Property, for purposes of appraisal, by agents of any lending institution to which an application has been made hereunder.

(f.)    Seller shall be under no obligation to commence construction until Buyer has supplied Seller with a copy of the commitment called for herein.

(g.)    Buyer agrees not to incur additional debt after the execution of this Agreement which would interfere with Buyer's ability to obtain a mortgage commitment or keep it in effect.    If Buyer incurs such debt and the mortgage application is rejected or the mortgage commitment is canceled as a result thereof, then Seller may elect to cancel this Agreement and retain all deposit monies.

(h.)    If Buyer's mortgage commitment expires after Seller has commenced construction on Buyer's Lot and the mortgage commitment is not renewed or extended, then Seller may elect to cancel this Agreement and retain all deposit monies.

## 8.   SETTLEMENT COSTS AND APPORTIONMENT.

At the time of Settlement, Buyer agrees to pay all settlement charges, including title insurance, fire insurance, a reasonable service and conveyancing charge, and recording and acknowledgment fees.   Buyer shall also pay $495.00 to the Homeowner's Association for the capital startup fee as called for in the Declaration and Covenants.   If applicable, Buyer agrees to execute the note, mortgage, and any other related loan documents at such time and pay any costs and fees charged by Buyer's lender.   Buyer agrees to comply with all terms and conditions of the mortgage commitment. Taxes, water, and sewer charges shall be apportioned pro rata as of the date of Settlement, which apportionments shall be based upon the fiscal years of the taxing authorities for which the subject taxes are levied.   Applicable realty transfer taxes shall be borne equally by Buyer and Seller.

## 9.   SETTLEMENT.

(a.)    Subject to satisfactions of the conditions set forth in Paragraph 18 hereof, Settlement hereunder shall be held in accordance with the date set forth in Paragraph 3(e) hereof at Seller's office or at such other locations as Seller shall designate. The actual date of settlement shall be set by Seller and notice of said settlement date shall be sent to Buyer at least thirty (30) days before said settlement date. The Seller as authorized by the Bankruptcy Court has the authority and right to sell, assign and deliver (subject to laws and regulations regarding the transfer of title in the jurisdiction where the Property is located) title to the Property free and clear of all Encumbrances and subject to the Permitted Exceptions.   At the Closing, Buyer will obtain title to the Property free and clear of all Encumbrances and subject to the Permitted Exceptions.

(b.)    In the event completion of construction is delayed due to inclement weather, strikes, government regulations, delay in obtaining or issuance of permits or mortgage commitments or approvals or inspection, or any act of God, storm, wind, or fire damage, unavailability of materials or failure of delivery of materials called for in the plans and specifications or any changes, alterations, additions, or modifications which are agreed to by the parties after the date of this Agreement, or for any other reason, the settlement date shall be extended until such as completion of the dwelling may require. However, at the time of settlement, Property shall have been substantially completed

Buyer's Initials _____

which shall mean at such time as a Use and Occupancy Certificate is issued. Buyer hereby acknowledges that the above estimated time of completion on the part of the Seller is made as an accommodation to Buyer to assist Buyer in formulating further plans, but said settlement date shall not be considered of the essence of this Agreement. Seller is not responsible for and is hereby released from any loss, liability, expense, costs or incidental or consequential damages which may result by reasons of delay. If at the time of settlement, the dwelling is sufficiently complete to obtain a Use and Occupancy Certificate but minor work is incomplete or minor defects exist, Buyer agrees nevertheless to complete settlement, provided the Seller, at settlement, delivers to Buyer a letter whereby Seller agrees to complete or correct any such work or defects within a reasonable time. Seller will not escrow for any items not completed at the time of settlement. If the Buyer's mortgage lender requires an escrow, it will be the Buyer's responsibility to fund such escrow.

## 10. DEFAULT BY SELLER.

If Seller shall default hereunder, Buyer's sole remedy shall be to be repaid the amounts theretofore paid by Buyer on account of the purchase price and of being reimbursed for reasonable title insurance company charges and reasonable mortgage application fees heretofore incurred, in which event this agreement shall terminate and neither of the parties shall have any further rights or obligations hereunder, provided, however, that if such default shall consist solely of Seller being unable at settlement to convey title as and to the extent set forth in paragraph 6 hereof, Buyer shall have the option of taking such title that Seller can give without abatement of price.

## 11. DEFAULT BY BUYER.

If Buyer violates or fails to fulfill or perform any of the terms or conditions of this Agreement, all sums paid by Buyer on account of the sales price herein may be retained by Seller (a) as liquidated damages for such breach or (b) on account of the purchase price with a balance being recovered through a suit for specific performance or (c) as partial damages in the event Seller should elect to resell the property and claim against Buyer the amount of damages which Seller has incurred as a result of Buyer's breach. Seller shall have the option to elect any of the above remedies.

## 12. SAMPLE DWELLING AND PLANS.

The dwelling shall be completed substantially similar to the sample dwelling (less any upgrades or decorator furnishings), which is situated at Radcliffe Court and shall be in accordance with the "Standard Features" list attached hereto as Exhibit "B" and made a part hereof. It is expressly understood and agreed that the furniture and dwelling furnishings including without limitation, all special decorating effects, drapes, refrigerators, washers and dryers, landscaping, sod, signage, security systems, optional lighting, furnishings, wall paper, upgraded floor coverings, bath fixtures, other decorative features or extra cost items, as shown in or about any model homes are for display purposes only and are not considered a part of the Property being sold under this Agreement unless specifically itemized on Seller's Home Selection Form attached hereto as Exhibit "C" and made a part hereof. If the dwelling to be constructed herein is not similar to the sample dwelling, it will be completed substantially similar to the floor plans and elevations shown on the sales brochure, for the applicable model and shall also be in accordance with the "Standard Features". SELLER HAS THE RIGHT AT SELLER'S SOLE DISCRETION, TO MAKE SUBSTITUTIONS OF MATERIAL OF SUBSTANTIALLY EQUAL, OR BETTER QUALITY WHENEVER SELLER SHALL FIND IT NECESSARY OR EXPEDIENT TO DO SO, AND SELLER SHALL HAVE THE RIGHT TO MAKE ANY CHANGE IN THE CONSTRUCTION OF THE SAID PROPERTY THAT SELLER MAY FIND NECESSARY IN THE COURSE OF CONSTRUCTION OF WHICH ARE REQUIRED

Buyer's Initials _____

BY GOVERNMENT REGULATION. Buyer hereby acknowledges that the dwelling which Buyer has selected may be constructed as [either a "right hand" dwelling or a "left hand" dwelling (i.e., a dwelling having a front elevation with the garage door to the right is a "right hand" dwelling or a "left hand" dwelling (i.e., a dwelling having a front elevation with the garage door to the left \is a "left hand" dwelling).   Buyer cannot be guaranteed, prior to construction, which "hand" the dwelling will be.   Seller has the sole discretion to establish all vertical and horizontal contours of grading.   It is agreed that the plans for said building and/or sample dwelling referred to above have been inspected by Buyer or Buyer's duly authorized agent, and that the above Property are being purchased by Buyer as a result of said inspection and not upon any representation made by Seller, or any salesman or selling agent or any other person whatsoever.

## 13.   GRUBBING, CLEARING, GRADING AND SEEDING.

The grounds shall be finish graded using on site sod and the areas disturbed shall be seeded for grass. All grading and seeding shall be completed in a manner within the sole discretion of Seller.

As to quantity or quality of growth of grass, it is Buyer's responsibility to water, fertilize and reseed as necessary. Any soil washouts from rain or melting snow or burnouts due to droughts after settlement are the sole responsibility of Buyer.   Further, if such grading, seeding and walkways cannot be completed prior to settlement due to inclement weather, settlement shall nonetheless take place in accordance with the terms hereto; and seller's only obligation shall be to complete same at such time after settlement as weather and Seller's scheduling permit, with Buyer agreeing that escrow for same is not required.

## 14.   POSSESSION.

Possession will be given by Deed upon completion of final settlement and full payment of the balance of the funds called for under this agreement together with all costs of settlement.  THE ACCEPTANCE OF KEY OR DEED OR ENTRY INTO POSSESSION OF ANY PART OF THE PROPERTY BY BUYER IS AN ACCEPTANCE BY BUYER OF COMPLETION. IT IS HEREBY AGREED THAT, AFTER SETTLEMENT IS MADE AND/OR KEY IS ACCEPTED AND/OR ENTRY INTO POSSESSION OF ANY PART OF THE PROPERTY BY BUYER, CLAIMS OR DEMANDS OF ANY KIND WILL BE LIMITED TO THOSE PROVIDED FOR HEREIN.

## 15.   WAIVER OF TENDER.

Formal tender of deed and tender of monies are hereby waived.

## 16.   TIME OF ESSENCE.

Except where stated to the contrary, time, wherever mentioned herein shall be of the essence of this Agreement.

## 17.   RISK OF LOSS.

Damage by fire or other casualty prior to settlement shall not void this Agreement provided that Seller shall rebuild the dwelling as quickly as is reasonably practical and the date of settlement shall be automatically extended by the appropriate period required to allow Seller to rebuild the dwelling a aforesaid.

Buyer's Initials _____

6

## 18.  CONDITIONS TO SELLER'S OBLIGATIONS.

(a.)    If Seller for any reason, cannot construct or complete the Property due to any present or future rules, regulations, or restrictions by Federal, State or Municipal Government s, or any agency thereof (or if the terms of this Agreement do not comply with such rules, regulations, or restrictions), or if Seller is unable to construct or complete the Property by reasons of unanticipated sub-surface drainage and/or latent conditions at the site or as a result of any conditions beyond Seller's control or as a result in a change in circumstances occurring after the date of the Agreement which would impose a severe hardship on Seller, Seller shall have the right to cancel this Agreement upon written notice to Buyer, delivered prior to settlement, in which event Seller shall return to Buyer, without interest, the full deposit monies, and in such event Seller shall have no further liability whatsoever to Buyer.

(b.)    If Buyer has made a misstatement of material fact relating to this Agreement, or the mortgage application, Seller, at its option, may cancel this Agreement by returning to Buyer the sum or sums paid on account of the purchase price, without interest and this Agreement shall therefore become null and void, neither party shall have any further liability to the other.

(c.)    Trustee shall have obtained approval from the Bankruptcy Court to sell the Property.

## 19.  NO ENTRY.

Because of dangers involved in construction areas, Buyer agrees not to enter upon the Property or into any portion of the dwelling to be constructed thereon or at any time to, interfere in any manner with construction upon the Property unless and until accompanied by a representative of the Seller.   Buyer shall, in advance, contact Seller or Seller's representative at Seller's office or such sub office or location as Seller may designate in order to arrange any inspection of the Property or the dwelling to be constructed.    Seller shall not be responsible for any physical injury or damage to property caused by any unauthorized entry by Buyer and Buyer hereby relieves Seller and Seller's agents, employers, or workmen of any liability and holds Seller and Seller's agents, employees and workmen harm less from any and all   liability or claims arising out of any unauthorized entry.   Buyer further agrees not to do any work on the Property or have anyone do work on Buyer's behalf on the Property, prior to settlement.

## 20.  SELECTIONS.

(a.)    Selections and/or options as listed on the Home Selection Form shall be made by Buyer within thirty (30) days after execution of this Agreement or within five (5) days after notice from Seller directing Buyer to do so.   In the event Buyer fails to make such selections within the stipulated time, Seller is hereby authorized to make selections for Buyer at Seller's discretion within the standard allowances.   If material colors are unavailable as selected by Buyer, Seller will substitute with like colors. If like colors are unavailable, a change order must be agreed to in writing between Seller and Buyer for a color substitution.   If a color substitution is necessary, Seller will advise Buyer of the necessary substitution.   Buyer must immediately accept or reject the substitution offered.   If no response is received from Buyer, the Seller reserves the right to substitute colors as Seller so chooses.

(b.)    Buyer may select such options only by submitting to Seller, on Seller's form, a written authorization of Seller for such options together with payment of one-half (1/2) of the cost of the Seller's standard options (the "Extras Agreement").   Any custom options would be paid for in full prior to the start of construction.   Seller promises to convey as part of the dwelling, such extras as shall be scheduled and agreed upon be the

Buyer's Initials _____

7

parties.    Except for the inclusion of the enumerated extras as fully set forth, no changes in construction or in completion ordered by Buyer will be made unless authorized in writing by Buyer at a cost agreed upon and approved by Seller in writing. In the event Buyer desires to select any additional extras or to make any other changes after this Agreement and Extras Agreement have been signed by both parties, they may do so under the following conditions:

(i)    Buyer will immediately pay to Seller the exact cost of such changes or extras. In the event that the Seller does not obtain said money, the extras or changes will not become part of the Agreement.

(ii)    In the event that settlement is not held under the terms of this Agreement for any reason other than default by Seller, any monies paid to Seller for extras ordered shall in no instance be refunded.

(iii)    Seller's responsibility for omission of any option shall be limited to the cost paid by Buyer therefore, any such omission shall not invalidate the Agreement.

(iv)    Buyer will be charged ONE HUNDRED FIFTY DOLLARS ($150.00) to be paid to Seller, to amend the related documents and change orders. Said payment is due upon the signing of the Agreement regarding the changes or extras if approved by Seller.

## 21.  WARRANTY PROVISION.

(a.)    In accordance with the Pennsylvania Uniform Planned Community Act, 68 Pa. C.S. et seq. (the "Act"), Seller will cause to be corrected "structural defects" on the Property for two (2) years from the date the Property is conveyed to the Buyer at closing. The Act defines the term "structural defects" as defects in any structure which is a component of the Property or any other portion of the Property constructed, modified, altered or improved by or on behalf of the Seller; any of which reduce the stability or safety of the structure below accepted standards or restrict the normal intended use of the structure and which require repair, renovation, restoration or replacement.

(b.)    In addition to the warranties provided by the Act, subject to paragraph 14 of the Agreement, Seller agrees to guarantee and warrant all work and materials for a period of one (1) year against any defects in workmanship or materials provided such defects do not result from work or alterations by Buyer or others on Buyer's behalf.    Buyer agrees to notify Seller in writing of all complaints or defects in workmanship or materials.    Seller shall make reasonable and necessary repairs or adjustments without cost to Buyer within sixty (60) days, weather and labor conditions permitting and emergencies excepted.    Buyer shall not be entitled to any damages, monetary or otherwise, from Seller for defective workmanship or materials unless buyer notifies Seller of said defects and grants Seller the right to repair and correct said defects pursuant to the paragraph.    The provisions of this warranty shall not apply if there is any money due and owing to Seller pursuant to this Agreement.

(c.)    The provisions of this warranty shall cover all phases of construction for a period of one (1) year from date of occupancy or date of completion of Buyer's dwelling, whichever occurs first, except as otherwise specified by the manufacturer's warranty on individual equipment incorporated in the dwelling, in that case the manufacturer's warranty shall apply.

Buyer's Initials _____

8

THE LIMITED WARRANTY OF THIS AGREEMENT IS THE ONLY WARRANTY APPLICABLE TO THE PROPERTY. NO IMPLIED WARRANTY (WHETHER OF MERCHANTABILITY, HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE), IS GIVEN ON PORTIONS OF THE PROPERTY OTHER THAN CONSUMER PRODUCTS. THE SELLER DOES NOT ASSUME ANY LIABILITY OR OBLIGATION ON ACCOUNT OF REPRESENTATIONS MADE BY ANY OTHER PERSON. THE OBLIGATION OF SELLER IS LIMITED SOLELY TO THE REPAIR OR REPLACEMENT OF THE DEFECTIVE COMPONENT AND DOES NOT EXTEND TO ANY DAMAGE OR HARM RESULTING THEREBY OR THEREFROM. EXCEPT AS SET FORTH ABOVE, THE PROPERTY IS BEING SOLD "AS IS". THE SELLER SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES OR PERSONAL INJURIES ARISING FROM BREACH OR ANY OF THE LIMITED WARRANTIES DESCRIBED IN THIS AGREEMENT. IF ANY DEFECT IS DISCOVERED DURING THE APPLICABLE WARRANTY PERIOD, THE SELLER SHALL HAVE THE EXCLUSIVE RIGHT TO DETERMINE WHETHER THE DEFECT SHALL BE CORRECTED BY REPAIR, ADJUSTMENT OR REPLACEMENT. NO LIMITED WARRANTY CONTAINED HEREIN COVERS A DEFECTIVE PORTION OF THE PROPERTY WHICH HAS BEEN SUBJECT TO ALTERATION, MISUSE OR ACCIDENTAL DAMAGE (CAUSED BY PERSONS OTHER THAN SELLER'S EMPLOYEES AND AGENTS), OR HAS NOT BEEN AFFORDED REASONABLE CARE. BUYER AGREES THAT SELLER SHALL NOT BE RESPONSIBLE FOR ANY DAMAGES, LIABILITIES, CLAIMS OR LOSSES INCURRED BY BUYER ARISING OUT OF OR RELATING TO MOLD OR ANY OTHER FUNGUS OR AGENT, WHETHER OR NOT ASSOCIATED WITH ALLEGED DEFECTS IN CONSTRUCTION, INCLUDING, BUT NOT LIMITED TO, PROPERTY DAMAGES, PERSONAL INJURY, ADVERSE HEALTH EFFECTS, LOSS OF INCOME, EMOTIONAL DISTRESS, DEATH, LOSS OF USE OR LOSS OR VALUE AND BUYER HEREBY RELEASES SELLER FROM SAME.

(d.)    The limited warranty set forth herein above is provided to protect Buyer from faulty construction and defective materials. Warranties on appliances, equipment and other items which are consumer products for purposes of the Magnuson-Moss Warranty Act will not be effective after the stated term of the manufacturer's warranty on that item. Buyer understands and agrees that shrinkage, settlement and items of a similar nature, and the results thereof; are a normal development of new construction and are not an indication of poor workmanship or defective materials. Buyer also understands and agrees that the repair thereof is normal maintenance. The parties hereto agree that the cost of these repairs are not included in this limited warranty and shall be responsibility of Buyer.

## 22. ENTIRE AGREEMENT.

This writing and the Exhibits attached here to, contains the entire agreement between the parties and no agent, representatives, salesman or officer of the parties hereto has the authority to make or has made any statement, agreement, representation, or contemporaneous agreement, oral or written, in connection therewith modifying, adding to or changing the terms and conditions set forth herein, No dealing between the parties shall be permitted to delete, contradict, vary or add to the term thereof. No modification of this Agreement shall be binding unless such modification shall be in writing and signed by the parties hereto.

## 23. OFFSETS.

Anything herein above to the contrary notwithstanding, Seller may at its option deduct from any deposit monies to be refunded under provision of this Agreement to Buyer, any unpaid charges for which Buyer may be liable, including but not limited to the unpaid costs of any changes and or additions ordered by Buyer .

Buyer's Initials _____

9

**24. NO ASSIGNMENT.**

This Agreement shall not be assigned or transferred by the Buyer without the written consent of the Seller being first had and obtained.   Subject to the provision regarding assignment by the Buyer, this Agreement shall extend to and bind the heirs, administrators, successors and assigns of the respective parties hereof.

**25. NOTICES.**

Notices to Seller hereunder, shall be given by registered or certified mail, postage prepaid, return receipt requested, addressed to Seller at the address on page one hereof.

**26. CAPTIONS.**

The headings in the Agreement are for convenience of reference only and shall not affect the construction hereof.

**27. HOMEOWNERS' ASSOCIATION.**   Seller has advised Buyer that the Property is subject to the terms and conditions of a Homeowners' Association and Buyer acknowledges that prior to execution of this Agreement, it has received a copy of the Public Offering Statement and all exhibits thereto pertaining to the Homeowners' Association for which  Buyer has acknowledged receipt by executing a Declaration Receipt, a copy of which is attached hereto as Exhibit "D" and made a part hereof.

**28. GOVERNING LAW; JURISDICTION.**

This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania. Any and all disputes, disagreements or matters concerning the interpretation or consummation and enforcement of this Agreement shall be and remain in the exclusive jurisdiction of the Bankruptcy Court for resolution, provided that, if jurisdiction cannot be had in the Bankruptcy Court, such dispute shall be submitted to the United States District Court for the Eastern District of Pennsylvania, provided if jurisdiction cannot be had in the District Court, such dispute shall be submitted to the Court of Common Pleas in Bucks County.

**29. BROKER.**

(a.)   It is expressly understood and agreed between the parties that the within named agent, broker and any sub-agent, broker and their sales people, employees, officers and/or partners are the agents for Seller, not Buyers.  Said individual will in no case be liable to either party for the performance of any of the terms or covenants of the Agreement or for damages for non-performance thereof. Furthermore, no Agent of Seller has any authority to make any representations, covenants, agreements, or the like, in respect of the Property. Agent, however, may perform services for the Buyer in connection with financing, insurance and document preparation.   Although Buyer is free to order title insurance from any company it chooses, the Buyer is hereby specifically authorizing the Broker to place title insurance for said purchase with _____, an agent for Commonwealth Land Title Insurance Company. Buyer further authorizes Seller's agent to prepare documents and other conveyancing services for settlement.

(b.)   Buyer warrants and represents that Buyer has made no agreement and has had no dealings, negotiations or communications with any brokers, finders or other intermediaries, nor has Buyer taken any action which may cause anyone to become entitled to a commission as a result of the purchase and sale contemplated by this Agreement. Buyer will indemnify, defend and hold seller harmless from any claims, actual or threatened, for compensation by reason of Buyer's breach of its representation, warranty or obligation contained in this section.   This provision shall

Buyer's Initials _____

survive closing and any termination of the Agreement.

(c.) The legislature and the State Real Estate Commission require that certain language be included in all agreements of sale, whether or not it is applicable.  Those disclosures are as follows:

    i.    A Real Estate Recovery Fund exists to reimburse any person who has obtained a final civil judgment against a Pennsylvania real estate licensee owing to fraud, misrepresentation, or deceit in a real estate transaction and who has been unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about this Fund, call (717) 783-3658.

    ii.    The broker is the agent of the Seller.

    iii.    The failure of an agreement of sale to contain the zoning classification of the property shall render the Agreement void and deposits tendered by the Buyer shall be returned to the Buyer without a requirement of court action.  The zoning classification of the property is MX-Mixed Use.

    iv.    Access to a public road may require issuance of a Highway Occupancy Permit from the Department of Transportation.  Seller has arranged all necessary Highway Occupancy Permits.

## 30. ENVIRONMENTAL DISCLOSURE.

Property will be sold subject to a Deed Notification.  A copy of the Deed Notification is available upon request.

## 31. INTERSTATE LAND SALES ACT.

Buyer and Seller recognize that this sale is exempt from the Interstate Land Sales act by reason of Seller's absolute obligation to erect the dwelling within two years of the date Buyer signs this contract.  Should Seller for any reason fail to so construct the improvements within this two year period, Buyer's sole remedy shall be to be repaid the deposit and option payments and to be reimbursed for reasonable title insurance company charges and loan application fees paid by Buyer.  Should such delay be excused under State law by Acts of God, casualty or other delays completely beyond the control of Seller, such delay shall not excuse Seller's performance, but may delay their same only by the number of days of delays as outlined herein.

## 32. REPRESENTATIONS.

All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licensees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement.  This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale.  This Agreement will not be altered, amended, changed or modified except in writing executed by the parties.

Buyer's Initials _____

## 33.    EXHIBITS:

Exhibit "A" = Site Plan
Exhibit "B" = Standard Feature List
Exhibit "C" = Home Selection Form (to be completed in accordance with paragraph 20)
Exhibit "D" = Declaration Receipt

Buyer's Initials _____

12

IN WITNESS W HEREOF, the said parties hereto, intending to be legally bound hereby, have hereunto set their hands and seals the day and year below written.

The above Agreement is hereby approved.

Seller:

Buyer:_____

KEVIN O' HALLOREN IN HIS CAPACITY
AS CHAPTER 11 TRUSTEE OF
ISLAND VIEW CROSSING II, L.P.

By: _____
     Kevin O'Halloren, Chapter 11 Trustee of
     Island View Crossing II, L.P.

By:_____

Date:_____

Date:_____

Co-Buyer:_____

By: _____

Date:_____

Buyer's Initials _____

Exhibit A - Site Plan



Exhibit B - Standard Features List

# Distinctive Design Features included in Every Home

**ELEGANT DESIGNER INTERIORS**
- Classic 9' ceilings
- Open concept Living Room, Dining Room & Kitchen
- Hardwood flooring in entrance foyer, Kitchen & Powder Room
- Three spacious bedrooms including luxurious Owner's Suite
- 2 1/2 Baths
- Quality wall-to-wall carpeting in a variety of colors
- Crown molding in Living Room & Dining room (Radcliffe Model)
- Crown molding in Owner's Suite (Harrinton Model)
- Oversized baseboard on first level
- Vinyl coated ventilated shelving system in Owner's Suite
- Laundry Dryer on first or second level
- Levered Hardware

**STATE-OF-THE-ART KITCHENS**
- Center Island Kitchens
- Granite countertops in select styles
- Stainless steel self-cleaning oven/gas range
- Stainless steel Spacesaver microwave
- Stainless steel pot scrubber dishwasher
- Waste disposal
- Stainless steel undermount sink
- Convenient pantry cabinets
- Single lever faucets
- Ice maker water line
- Oversized 42" Kitchen cabinets, choice of finishes
- Recessed lighting package (3)
- Hardwood flooring in kitchen

**LUXURIOUS BEDROOMS AND BATHS**
- Owner's Suite on first or second level with
- Fabulous walk-in closet
- Double bowl vanity in Owner's Bath
- 6"x 6" Ceramic tiled floors in Owner's Bath

- Centrally located H2B Bathroom 6'x 5' ceramic flooring
- Hardwood flooring in Powder Room
- Dramatic lighting in all baths
- Pedestal sink in Powder Room
- Oversized mirrors
- Conveniently located linen closets
- Exhaust fans in all baths
- Elongated toilets

**MCGRATH QUALITY CONSTRUCTION STANDARDS**
- Covered front porch on all homes
- Attached garage with direct entry into home
- Electronic garage door opener
- 30 year architectural roof shingles
- Brick front on every home, as per models
- Classic six panel doors, triple hinged
- Single lever faucets
- Durable seamless aluminum gutters, downspouts, soffits and fascia, virtually maintenance free
- Insulated entry door
- Front door chimes
- Exterior lighting at front entry, garage door & rear entry
- Frost free hose connection in garage
- All drywall screwed, glued and nailed
- All garages drywalled, spackled & painted in carriage homes
- Washer and Gas Dryer outlets with exhaust vents
- Electric smoke detectors w/ battery back up system
- Dishwasher hardware on front doors

**MCGRATH HOMES "COMMITMENT TO QUALITY"**

**ENERGY EFFICIENT DESIGN**
- Clean, economical natural gas heating for year round comfort
- 92% efficiency rated Energy Seer Package
- Energy efficient, oversized vinyl windows with low E, insulated glass, grills and screens

- Central air conditioning system
- Quick recovery 50 gallon gas hot water heater
- Water saving plumbing features
- Full thick insulation in walls and ceiling
- All windows and doors caulked and fully insulated
- TYVEK wrap on all exteriors for added energy efficiency

**LANDSCAPING, UTILITIES AND IMPROVEMENTS**
- Professionally landscaped, sodded and seeded lawns
- Belgian block curbing throughout
- Public water and sewer
- 200 Amp electrical service
- Underground telephone, electric and gas lines
- Prewired for (2) telephone outlets
- Prewired for (2) cable TV outlets
- Street lighting throughout

**CAREFREE LIVING**
- Snow Removal from sidewalks, driveways & roads
- Lawn mowing on front, side and rear of all homes
- Mulching and planting-bed maintenance provided
- Tree and shrub maintenance and self removal provided
- Trash removal and recycling provided
- Exterior painting provided
- Roof maintenance provided
- Maximum luxury with minimum maintenance

**<u>EXHIBIT "C"</u>**

Home Selection Form

Page 1                    CUSTOMIZER_SalesTeam_McGrath^MSOn_J4^M4^M19.xlsx

| DATE: | | | LOT: | | |
| NAME: | | | MODEL: | | |

# HOME SELECTIONS FORM

**Radcliffe Court on the Delaware**

RADCLIFFE COURT

| CODE | DESCRIPTIONS BELOW | SELECTIONS | SELECTIONS | Retail | |
|---|---|---|---|---|---|
| | DOOR COLOR: | | | | |
| | GAS FIREPLACE OPTION 1 | | | | |
| | TRIMMED GAS FIREPLACE with SHELF and SLATE Surround 3 SIDES | | | | |
| | ADD TRIM DETAIL ABOVE (Radcliffe Model TOP PART) | Manila only not above | | | |
| | STONE GAS FIREPLACE with SHELF (Hartman Model) | | | | |
| | ADD BEADED BOARD ABOVE | | | | |
| | FIREPLACE BLOWER | | | | |
| | | | | | |
| | ATTIC STORAGE Includes Floored Area | | | | |
| | and Attic Stairs (STD Unit Corner with Attic Access No | | | | |
| | stairs and no Storage) | | | | |
| | | | | | |
| | OAK STAIRS (PINE STD) | | | | |
| | RAILING STAIN COLOR | | | | |
| | | | | | |
| | POWDER ROOM | | | | |
| | PEDESTAL SINK STD HARTMAN MODELS (ALL) | | | | |
| | VANITY (Radcliffe Only) | | | | |
| | HARDWARE | | | | |
| | CULTURED MARBLE SINK/TOP | | | | |
| | UPGRADE VANITY TOP | | | | |
| | GRANITE / EDGE | | | | |
| | PEDESTAL SINK | | | | |
| | OVAL MIRROR FOR PEDESTAL SINK | | | | |
| | FIXTURE COLOR | | | | |
| | FAUCETS STANDARD | | | | |
| | OPTIONAL FAUCETS | MODEL # | | | |
| | TOILET PAPER HOLDER/TOWEL BAR | MODEL # | | | |
| | | | | | |
| | FLOOR TILE | | | | |
| | TILE ON DIAGONAL | | | | |
| | THRESHOLD | | | | |
| | ELONGATED TOILET | | | | |
| | COMFORT HEIGHT ELONGATED TOILET | | | | |
| | | | | | |
| | HARDWOOD #1 LIEU OF TILE | | | | |
| | | | | | |
| | HALL BATH | | | | |
| | HALL BATH VANITY | | | | |
| | HALL BATH HARDWARE | | | | |
| | CULTURED MARBLE SINK/TOP | | | | |
| | CULTURED MARBLE - UPGRADE | | | | |
| | GRANITE TOP WITH UNDERMOUNT SINK | | | | |
| | GRANITE EDGE | | | | |
| | FIXTURE COLOR | | | | |
| | HALL BATH FAUCETS STANDARD | MODEL # | | | |
| | FAUCET UPGRADE | MODEL # | | | |
| | TUB / SHOWER FAUCET | MODEL # | | | |
| | TOWEL BAR / TOILET PAPER HOLDER | | | | |
| | HALL BATH TILE FLOOR | | | | |
| | TILE FLOOR ON DIAGONAL | | | | |
| | THRESHOLD COLOR | | | | |
| | ELONGATED TOILETS | | | | |
| | COMFORT HEIGHT ELONGATED | | | | |
| | FIBERGLASS TUB/SHOWER ENCLOSURE | | | | |
| | TILE SHOWER WALLS - STD HEIGHT | | | | |
| | TILE SHOWER WALLS TO CEILING | | | | |
| | GRAB BARS (see misc) | | | | |
| | MASTER BATH | | | | |
| | VANITY | | | | |
| | HARDWARE | | | | |
| | CULTURED MARBLE SINK/TOP | | | | |
| | UPGRADE CULTURE MARBLE TOP | | | | |
| | GRANITE TOP WITH UNDERMOUNT SINK | | | | |
| | GRANITE EDGE | | | | |
| | FIXTURE COLOR | | | | |
| | | | | | |
| | FAUCETS STANDARD | | | | |
| | UPGRADE FAUCET PACKAGE | MODEL # | | | |
| | SHOWER FAUCET | MODEL # | | | |
| | | MODEL # | | | |
| | BATH TILE FLOOR | | | | |
| | BATH TILE FLOOR ON DIAGONAL | | | | |
| | SHOWER TILE | | | | |
| | TILE TO CEILING | | | | |

Page 2

CUSTOMIZER_SalesTeam_McGrath^MSOn_[14^M1^M19.xlsx

| CODE | DESCRIPTIONS BELOW | SELECTIONS | SELECTIONS | Retail | |
|---|---|---|---|---|---|
| | CERAMIC SOAP DISH | | | | |
| | CORNER SHELF | | | | |
| | SEAT FOR SHOWER (corner) | | | | |
| | OPTIONAL BUILT SEAT | | | | |
| | FIBERGLASS SHOWER PAN | | | | |
| | TILE WEDGED | | | | |
| | SHOWER SEL | | | | |
| | THRESHOLD COLOR | | | | |
| | SHOWER DOOR | | | | |
| | UPGRADE SHOWER DOOR | | | | |
| | TOILET PAPER HOLDER / TOWEL BAR | | | | |
| | ELONGATED TOILETS | | | | |
| | COMFORT HEIGHT ELONATED | | | | |
| | GRAB BAR (see area) | Areas | | | |
| | LAUNDRY ROOM | | | | |
| | LAUNDRY ROOM CABINETS | | | | |
| | HARDWARE | | | | |
| | CABINET LAYOUT | | | | |
| | | | | | |
| | VINYL FLOOR SELECTIONS | | | | |
| | HARDWOOD LAMINATE FLOOR UPGRADE | | | | |
| | CERAMIC TILE | | | | |
| | TILE ON DIAGONAL | | | | |
| | THRESHOLD | | | | |
| | | | | | |
| | KITCHEN LAYOUT (Hanaman or Redcliffe) | | | | |
| | BATHHOUSE HOUSE CABINETS | STANDARD LEVEL CABIN | | | |
| | CARRIAGE HOUSE CABINETS | | | | |
| | | UPGRADE (SEE PRICING ATTACHED) | | | |
| | HARDWARE | | | | |
| | DRAWERS | | | | |
| | DOORS | | | | |
| | CROWN MOLDING | | | | |
| | LIGHT RAIL MOLDING | | | | |
| | | | | | |
| | KITCHEN APPLIANCES | | | | |
| | (SS+STD FINISH COLOR | | | | |
| | DISHWASHER | MODEL# | | | |
| | DISPOSAL | MODEL# | | | |
| | RANGE | MODEL# | | | |
| | MICROWAVE | MODEL# | | | |
| | COOK TOP (ELECT) (requires the purchase of a 220 Line) | MODEL# | | | |
| | KITCHEN COUNTERTOPS | | | | |
| | GRANITE COUNTERTOP | | | | |
| | EDGE PROFILE | | | | |
| | BREAKFAST BAR & EDGE | | | | |
| | | | | | |
| | SINK SELECTION | | | | |
| | UNDERMOUNT STAINLESS SNK | | | | |
| | FAUCET SELECTION | | | | |
| | MOON FAUCET - CHROME STANDARD MODELS | | | | |
| | OPTIONAL FAUCET | MODEL# | | | |
| | TILE BACKSPLASH (Kitchen) | | | | |
| | TILE SELECTION | | | | |
| | | | | | |
| | KITCHEN FLOOR | | | | |
| | HARDWOOD STANDARD | | | | |
| | CERAMIC TILE Upgrade | | | | |
| | | | | | |
| | ELECTRIC GARAGE DOOR OPENER | | | | |
| | EXTRA REMOTE | | | | |
| | KEYLESS ENTRY | | | | |
| | UPGRADE GARAGE OPENER | | | | |
| | ELECTRICAL OPTIONS | | | | |
| | TRANSFER | | | | |
| | Unitied HVAC SYSTAM/VERY QUIET UNIT (LOT#11 has one...) | | | | |
| | SECURITY SYSTEM (THYMIO SYSTEM | | | | |
| | GLASS BREAK WIRED - 1 | | | | |
| | ADDITIONAL KEYPAD | | | | |
| | MOTION DETECTOR | | | | |
| | CONTACT WIRELESS - EXTRA DOOR OR WINDOW (1) | | | | |
| | WIRELESS KEY FOB | | | | |
| | Electric Options (Also, See Electrical Walk thru Change Order) | | | | |

Customer Initials _____

Confidential

Page 2

Page 3                    CUSTOMIZER_SalesTeam_McGrath*MSOs_J4*M1*M19.xls

| CODE | DESCRIPTIONS BELOW | SELECTIONS | SELECTIONS | Retail | |
|---|---|---|---|---|---|
| | SURGE SUPRESSION-WHOLE HOME SURGE PROTECTOR | | | | |
| | 220 LINE for RANGE | | | | |
| | 220 LINE for DRYER | | | | |
| | JUNCTION BOX w/ SWITCH | | | | |
| | | | | | |
| | LED RECESSED LIGHT - 1 | | | | |
| | LED RECESSED LIGHTS - 2 PKG. | | | | |
| | LED RECESSED LIGHTS - 3 PKG. | | | | |
| | LED RECESSED LIGHTS - 4 PKG. | | | | |
| | LED RECESSED LIGHTS - 5 PKG | | | | |
| | LED RECESSED LIGHTS - 6 PKG. | | | | |
| | LOW 4" LED RECESSED LIGHT | | | | |
| | 2 SCONCE ADS ON 1 SWITCH - PENDANTS (2) | | | | |
| | 3 SCONCE ADS ON 1 SWITCH - PENDANTS (3) | | | | |
| | LED EYEBALL LIGHTS | | | | |
| | PHONE OUTLETS (2) | | | | |
| | CABLE OUTLETS (2) | | | | |
| | | | | | |
| | LED WATERPROOF RECESSED | | | | |
| | DIMMER SWITCH | | | | |
| | DIMMER SWITCH - 3 WAY | | | | |
| | FAN & LIGHT SEPARATE SWITCH | | | | |
| | EXTERIOR JUNCTION BOX | | | | |
| | ELECTRICAL OUTLETS | | | | |
| | ELECTRICAL OUTLET W/ SWITCH | | | | |
| | CAPPED BOX/SWITCH for fan | | | | |
| | OVER CABINET LED LIGHTING | | | | |
| | UNDER CABINET LED LIGHTS | | | | |
| | DIMMER FOR UNDER CABINET LIGHTS | | | | |
| | DEDICATED CIRCUIT (NON gfi) | | | | |
| | GFI FREEZER LINE | | | | |
| | ATTIC FAN | | | | |
| | WHOLE HOUSE SURGE PROTECTOR | | | | |
| | | | | | |
| | TRIM OPTIONS | | | | |
| | Window Casing Upgrade (Does not include window PKG) | | | | |
| | WINDOW PKG   (INTERIOR UNIT) | | | | |
| | A.   Colonial | | | | |
| | B.   Windsor | | | | |
| | | | | | |
| | WINDOW PKG   (END UNIT) | | | | |
| | A.   Colonial | | | | |
| | B.   Windsor | | | | |
| | LIVING RM & DINING RM 2 PIECE CROWN (1 PIECE STD.) | | | | |
| | MASTER BEDROOM CROWN UPPER & LOWER AREAS | | | | |
| | A.   1 PIECE | | | | |
| | B.   2 PIECE | | | | |
| | | | | | |
| | UP STAIRS HALLWAY & STAIRWELL CROWN | | | | |
| | | | | | |
| | BEDROOM 2 OR 3 CROWN (1 PIECE) | | | | |
| | | | | | |
| | BOX WINDOW PANEL DETAIL | | | | |
| | | | | | |
| | BEADED BOARD Dining Room and Kitchen | | | | |
| | | | | | |
| | BEADED BOARD DINING RM & KITCHEN | | | | |
| | BEADED BOARD living rooms | | | | |
| | | | | | |
| | DINING ROOM WAINSCOTING TO CEILING | | | | |
| | A.   1 SIDE | | | | |
| | B.   2 SIDES | | | | |
| | | | | | |
| | DINING ROOM ONE BOX CEILING | | | | |
| | | | | | |
| | WAINSCOTING LIVING RM | | | | |
| | WAINSCOTING FAMILY RM | | | | |
| | WAINSCOTING DINING ROOM KITCHEN | | | | |
| | | | | | |
| | SHADOW BOXES DINING RM & KITCHEN | | | | |
| | Shadow boxes LIVING ROOM | | | | |
| | Shadow boxes family rooms | | | | |
| | | | | | |
| | LIVING RM | | | | |
| | 45"X7' HIGH WAINSCOTING WITH TOP CAP | | | | |

| CODE | DESCRIPTIONS BELOW | SELECTIONS | SELECTIONS | Retail | Rev'tich |
|---|---|---|---|---|---|
| | MASTER BDRM. | | | | |
| | 12'X7' HIGH WEINSCOTING WITH TOP CAP | | | | |
| | LIVING RM & LOFT | | | | |
| | 1 PIECE CROWN | | | | |
| | LIVING RM CEILING | | | | |
| | OGEE PANEL WITH 9 BOXES | | | | |
| | MASTER BDRM | | | | |
| | READ PIECE OVER SLIDING DR W 1 OGEE PANEL | | | | |
| | AND TOP CAP | | | | |
| | ADD OGEE TO DOWNSTAIRS CROWN TO MAKE 2 PIECE | | | | |
| | SHADOW BOXES IN MASTER BDRM | | | | |
| | BUILD 2 POSTS FLOOR TO CEILING W/ OGEE PANELS | | | | |
| | AND UNDER AND OVER DOUBLE WINDOW | | | | |
| | 2 OGEE PANELS 8' ON EITHER SIDE OF FIRE PLACE | | | | |
| | | | | | |
| | WEINSCOTING DETAIL ON FIREPLACE FROM | | | | |
| | MANTLE DOWN | | | | |
| | WEINSCOTING DETAIL ON FIREPLACE FROM | | | | |
| | MANTLE UP | | | | |
| | KITCHEN CROWN & LIGHT RAIL | | | | |
| | OGEE DETAIL ON RM. CEILING SINGLE | | | | |
| | OGEE DETAIL ON RM. CEILING DOUBLE | | | | |
| | OGEE DETAIL ON MAS. BDRM. | | | | |
| | TRAY CEILING SINGLE | | | | |
| | OGEE DETAIL ON MAS. BDRM. | | | | |
| | TRAY CEILING DOUBLE | | | | |
| | MISC OPTIONS | | | | |
| | INSULATE GARAGE | | | | |
| | Insulate Bath/Powder/W/Laundry Interior Partitions | | | | |
| | Insulate Master Bedroom Interior Partitions | | | | |
| | Insulate with Mineral Wool / Sound Buffering for Laundry Room Interior Partitions | | | | |
| | PAINT GARAGE | | | | |
| | GRAB BARS | | | | |
| | INTERIOR DOOR HARDWARE upgrade to Oil Rubbed Bronze (STD - Satin Nickel) | | | | |
| | Upgraded High Efficiency FURNACE in Mechanical RM | | | | |
| | UNUPDATED PAVERS | | | | |
| | (THIN) 1'X 1' (carriage house) | | | | |
| | (THIN) 1'X 2' (carriage house) | | | | |
| | UNUPDATED PLENUM W/WALL | | | | |
| | (THIN) 1'x 1' 12 pack | | | | |
| | (THIN) 1'x 2' 12 pack | | | | |
| | LANDSCAPE OPTIONS | | | | |
| | | | | | |
| | PKG A - SIDE OF END UNIT | | | | |
| | PKG B - (100) FOR 12 X 20 PATIO | | | | |
| | PKG C - (150) FOR 12 X 12 PATIO | | | | |
| | LIGHT FIXTURE OPTIONS | | | | |
| | CHROME VANITY LIGHTS / DINING ROOM - BRUSHED NICKEL CHANDELIER | | | | |
| | UPGRADE TO BRUSHED NICKEL | | | | |
| | UPGRADE TO ANTIQUE BRONZE | | | | |
| | **FLOORING SELECTIONS** | **FLOORING SELECTIONS DESCRIPTIONS** | | | |
| | HARDWOOD in the Following Locations | | | | |
| | FOYER | | | | |
| | KITCHEN | | | | |
| | FRONT FAMILY ROOM | | | | |
| | Middle of House DINING ROOM | | | | |
| | BACK LIVING ROOM | | | | |
| | 1st FL HALLWAY FROM Garage Door to Dining RM | | | | |
| | POWDER ROOM-1st FL | | | | |
| | CLOSET UNDER STAIRS (STD IS CARPET) | | | | |
| | STAIRWELL | | | | |
| | 2nd FLOOR HALLWAY | | | | |
| | LAUNDRY ROOM | | | | |
| | BEDROOM #2 | | | | |
| | BEDROOM #3 | | | | |
| | MASTER BEDROOM/CLOSET | | | | |
| | HALL BATH - 2nd FL | | | | |
| | **CARPET in the Following LOCATIONS:** | **DESCRIPTIONS:** | | | |

Page 5

CUSTOMIZER_SalesTeam_McGrath^MSOn_J^M1^ML9.xlsx

| CODE | DESCRIPTIONS BELOW | SELECTIONS | SELECTIONS | Retail | Mac U35 |
|---|---|---|---|---|---|
| | FOYER | | | | |
| | KITCHEN | | | | |
| | FRONT FAMILY ROOM | | | | |
| | Middle of House DINING ROOM | | | | |
| | BACK LIVING ROOM | | | | |
| | 1st FL HALLWAY (from Garage Door to Dining Rd) | | | | |
| | POWDER ROOM-1st FL) | | | | |
| | CLOSET UNDER STAIRS (STO IS CARPET) | | | | |
| | STAIRWELL | | | | |
| | 2nd FLOOR HALLWAY | | | | |
| | LAUNDRY ROOM | | | | |
| | BEDROOM #2 | | | | |
| | BEDROOM #3 | | | | |
| | MASTER BEDROOM/CLOSET | | | | |
| | HALL BATH - 2nd FL | | | | |
| | RUNNER FOR STAIRS (OAK STAIRS ONLY STO PINE STAIRS if unfinish/ Carpet) | | | | |
| | UPGRADE PADDING FOR CARPET | | | | |

TO CHANGE A SELECTION, BUYER AGREES TO PAY A $150.00 CHANGE ORDER FEE.
BUILDER NOT RESPONSIBLE FOR COLOR VARIATIONS IN NATURAL WOOD, CERAMIC
OR MARBLE. OPTION PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE.

DATE: _____
LOT #: _____    TOTAL DUE

Sales Signature: _____/_____

BUYER: _____    RADCLIFFE    50% DEPOSIT DUE
COURT
On the Delaware

BUYER: _____    BALANCE DUE AT
SETTLEMENT

# EXHIBIT D
# DECLARATION RECEIPT

DATE:_____

HOMEBUYERS:_____

LOT:_____

We hereby acknowledge receipt of a copy of the below listed documents affecting the Community:

1. Public Offering Statement;
2. Declaration of A Planned Community, the Townhomes at Radcliffe Court on the Delaware;
3. Bylaws for Radcliffe Court on the Delaware, a planned community; and
4. Master Association Declaration of Radcliffe Court on the Delaware

HOMEBUYER:_____ DATE: _____

HOMEBUYER:_____ DATE: _____

# INFORMATION FOR PROSPECTIVE BUYERS

The following items are provided in order to assist you to a more complete understanding of the real estate transaction and to fulfill our responsibility as required by law. Please read them and sign where indicated. Thank you for your cooperation.

1.      Agency. As a buyer(s), you should know that the listing and selling brokers and sales associates are licensed agents for the Seller unless otherwise specified.   They have a fiduciary responsibility to the Seller who is their client and will pay their commission.

However, both listing and selling brokers and sales associates are obliged by law to treat you fairly and honestly.   They must;   (1)   present all offers to the Seller as soon as possible and (2) respond honestly and completely to questions concerning the property.

2.      Equal Housing Opportunity.   Brokers and sales associates are required by law and/or the National Association of Realtors Code of Ethics to treat all parties in a real estate transaction fairly without regard to race, religion, national origin, ancestry, sex, age, marital status, sexual orientation, presence of children, physical or mental handicaps or familial status.

3.      Real Estate Recovery Fund.  "A Real Estate Recovery Fund exists to reimburse any person who has obtained a final civil judgment against a Pennsylvania real estate licensee owing to fraud, misrepresentation, or deceit in a real estate transaction and who has been unable to collect the judgment after exhausting all legal and inequitable remedies.  For complete details about the fund, call (717) 783-3658."

4.      Legal Requirement.   All contracts for real property are required to be in writing in order to be enforceable and to comply with the law.  The Agreement of Sale will be a legally binding document. You may wish to have legal counsel review all documentation prior to signing and to represent you pertaining to all legal documentation and its interpretation.

I/We have received a copy of this information and have read and understood it.

BUYER: _____ DATE: _____

BUYER: _____ DATE: _____