## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | **CHAPTER 11** |
| | : | |
| **ISLAND VIEW CROSSING II, L.P.** | : | **BANKRUPTCY NO. 17-14454(ELF)** |
| | : | |
| **Debtor** | : | |
| | : | |

**MOTION OF KEVIN O'HALLORAN, CHAPTER 11 TRUSTEE, FOR ENTRY OF AN ORDER UNDER 11 U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 2002 AND 6004 (I) AUTHORIZING THE SALE OF A RESIDENTIAL UNIT IN PHASE 1 FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS, (II) AUTHORIZING THE PROCEDURES FOR THE APPROVAL OF FUTURE SALES OF RESIDENTIAL UNITS IN PHASE 1, (III) LIMITING NOTICE OF FUTURE SALES OF RESIDENTIAL UNITS, AND (IV) FOR RELATED RELIEF**

Kevin O'Halloran, Chapter 11 Trustee (the "Trustee") for the estate of Island View Crossing, II, L.P. (the "Debtor"), by and through his counsel, Karalis PC, submits this motion for entry of an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 **(i)** authorizing the sale of a residential unit in Phase 1 free and clear of all liens, claims, and interests, (ii) authorizing procedures for the approval of future sales of residential units in Phase 1 free and clear of all liens, claims and interests, (iii) limiting notice of future sales of residential units, and (iv) granting related relief (the "Motion"), and in support thereof, respectfully represents as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue of this proceeding and this Application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief sought herein are 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 2002 and 6004.

## BACKGROUND

### A.    Procedural Background

3.    On June 30, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4.    The Debtor remained in possession of its assets and continued in the management of its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code until a Chapter 11 Trustee was appointed.

5.    On December 18, 2017, this Honorable Court entered an Order directing the appointment of a Chapter 11 Trustee. On December 21, 2017, the United States Trustee filed an Application for Order Approving the Appointment of Christine C. Shubert as the interim Chapter 11 Trustee which application was approved pursuant to a Court Order entered on the same day.

6.    A meeting of creditors commenced on January 11, 2018 which was continued and concluded on January 29, 2018 for the purpose of electing a Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(b)(1) and Fed. R. Bankr. P. 2007.1.

7.    On January 30, 2018, the United States Trustee for Region 3 filed its Report of Undisputed Election which provided, *inter alia*, that the Trustee was elected to serve as the trustee in this bankruptcy proceeding.

### B.    The Project

8.    The Debtor's bankruptcy estate owns a residential subdivision (the "Project") containing approximately 17.51 acres located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119), which was approved for development in two phases. Phase 1 is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements ("Phase 1") and Phase 2 is currently approved for six

2

(6) buildings containing a total of 96 condominiums units and certain site improvements, as may

be amended ("Phase 2").   The terms townhouse(s) and condominium unit(s) are hereinafter

individually referred to as a "Residential Unit" and collectively, as "Residential Units"

     9.     Phase 1 is known as "The Townhomes at Radcliffe Court on the Delaware", a

planned community.

     10.     The status of the vertical construction in Phase 1 of the Project is as follows:

     i.     The Trustee retained McGrath & Son Development LLC as his construction manager for Phase 1.

     ii.     Five (5) buildings (Nos. 2, 3, 4, 8 and 10) have been constructed in Phase 1 containing a total of 26 Residential Units at different stages of completion.  Twelve of the twenty-six Residential Units are 100% complete and available for sale.

     iii.     Two buildings (Nos. 2 & 4) are 100% complete.

     (a)     Building 2 has 5 Residential Units (nos. 7 to 11). Residential Units Nos. 10 and 11 are fully furnished model homes; and

     (b)     Building 4 has 7 Residential Units (nos. 41 to 47).

     ii.     Vertical construction has also begun for three additional buildings (building nos. 3, 8 and 10).

     (a)     Building 3 contains 4 Residential Units (nos. 12 to 15). This building is framed, and the roof and exterior are installed.  The rough mechanicals are also completed. The next task at this building is framing and mechanical inspections.

     (b)     Building 8 contains 6 Residential Units (nos. 16 to 21). This building is framed, and the roof and exterior are installed. The next task at this building will be the interior framing and rough mechanicals.

     (c)     Building 10 contains 4 Residential Units (nos. 37 to 40). This building is framed, and the roof and exterior are installed.   The rough mechanicals are completed and have

been inspected and the building is insulated. Final plumbing, electric, HVAC need to be installed.

11.     The Pennsylvania Department of Environmental Protection ("DEP") approved the final Act 2 Report for Phase 1 on October 9, 2019 and issued the environmental covenant ("EC") for Phase 1 on December 16, 2019. The EC was recorded against Phase 1 with the Recorder of Deeds for Bucks County on December 17, 2019.

12.     The Trustee has finalized the Public Offering Statement for the Residential Units in Phase 1 (the "POS"). A copy of the POS is provided to each prospective buyer of a Residential Unit in Phase 1.

13.     While the Trustee was improving Phase 1 and seeking the DEP approval, the Trustee was also marketing the Residential Units in Phase 1 for sale. During this process the Trustee accepted reservations and token deposits of $100 from prospective buyers.

14.     On January 14, 2020, the Trustee filed an Application (the "Application to Employ Trustee's Broker") to Employ Ralph DiGuiseppe III designated agent of Long and Foster Real Estate as Real Estate Broker for the Residential Units in Phase 1 (the "Trustee's Broker") in accordance with an Exclusive Right to Sell Agreement (the "Broker's Agreement"). [D.I. 428].

15.     On January 30, 2020, this Honorable Court entered an Order approving the Application to Employ Trustee's Broker [D.I. 438].

16.     Except for the excluded prospects listed on Schedule 1 to the Broker's Agreement, the fee structure of the Trustee's Broker is as follows:

(a)     If the Trustee's Broker acts as exclusive broker for both the Trustee and the buyer of a Residential Unit, the Trustee's Broker shall earn a two and one-quarter percent (2.25%) brokerage commission in connection with the

4

sale of a Residential Unit based on the purchase price of the Residential Unit.  "Purchase Price" is defined as the base sale price of the Residential Unit, excluding any "Extras", options and lot premiums, less any sales discount.

(b)     If a third-party broker represents the buyer of a Residential Unit, the third party broker shall earn a three quarter of one percent (.75%) cooperating brokerage commission based on the Purchase Price and the Trustee's Broker shall earn a two and a quarter percent (2.25%) brokerage commission based on the Purchase Price.

(c)     Notwithstanding, anything otherwise contained in an agreement of sale, the total of all brokerage commissions to be paid on the sale of a Residential Unit shall not exceed three percent (3%) of the Purchase Price of the Residential Unit.

(d)     All commissions will be paid at the settlement of the Residential Unit.

17.     The Trustee has also begun to contact each prospective buyer that signed a reservation to determine if they are prepared to execute an agreement of sale for a Residential Unit.

18.     The Trustee may receive additional agreements of sale for Residential Units prior to the hearing date on this Motion and will supplement this Motion by adding the additional agreements of sale as additional exhibits to this Motion.  In such case, notice will be provided to all creditors and parties in interest of the additional agreements of sale to be considered for approval at the hearing on this Motion.

19.     The Trustee in his business judgment believes that the value of the assets of the estate will be maximized for the benefit of all constituencies if the Trustee is permitted to sell the approved Residential Units in Phase 1.

**C.     Pre-Petition Mortgages recorded against the Project and Letters of Credit issued for Site Improvements**

20.     The Debtor acquired the Project from the Redevelopment Authority of Bucks County (the "RDA").  The RDA provided an acquisition loan to the Debtor in the original

principal amount of $2,500,000 (the "RDA Loan").  In connection with the RDA Loan, the

Debtor granted to RDA the two (2) below stated mortgages recorded against the Project in favor

of the RDA:

    (a)    Mortgage in the amount of $2,500,000.00 dated June 13, 2003 and recorded on August 25, 2003 in land record Book 3537, Page 792 (Instrument No. 20030163787) and

    (b)    Open-End Mortgage and Security Agreement in the amount of $127,627.83 dated July 21, 2016 and recorded on July 22, 2016 as instrument number 2016043135).

21.    Prior to the Petition Date, the Debtor granted to Prudential Bank ("Prudential")

the four (4) below-stated mortgages, assignment of rents and leases, recorded against the Project

in favor of Prudential and UCC-1's filed by Prudential with Department of State of the

Commonwealth of Pennsylvania (collectively, hereinafter referred to as the "Existing Mortgages

of Prudential"):

    (a)    Collateral mortgage in the amount of $3,911,250 dated September 20, 2011 and recorded on October 19, 2011 in Land Record Book 6838, Page 230 (Instrument No. 2011070888) (the "Steeple Run Collateral Mortgage");

    (b)    Mortgage in the amount of $1,400,000 dated September 22, 2013 and recorded on September 27, 2013, instrument number 2013080879 (the "IVC- Durham Mortgage");

    (c)    Collateral mortgage in the amount of $5,136,000 dated May 30, 2014 and recorded on July 23, 2014, instrument number 2014038527(the "Calnshire Collateral Mortgage");

    (d)    Open-End Mortgage and Security Agreement in the amount of $5,541,468 dated November 26, 2014 and recorded on January 7, 2015 as instrument number 2015001098 (the "Mortgage for Existing Prudential Construction Loan");

    (e)    Assignment of Rents and Leases and Agreements of Sale recorded as instrument number 2015001143 filed in conjunction  with the Mortgage for Existing Prudential Construction Loan;

(f) UCC-1 filed on September 27, 2013 in the Bucks County Recorder of Deeds Office as instrument number 2013080881 naming Island View Crossing, II, L.P. as Debtor and Prudential as Secured Party; and

(g) UCC-1 filed on January 4, 2015 in the Bucks County Recorder of Deeds Office as instrument number 2015001161 naming Island View Crossing, II, L.P. as Debtor and Prudential as Secured Party.

22. Prior to the Petition Date, Prudential issued two (2) letters of credit in connection with the development of site improvements at the Project as follows:

(a) an irrevocable standby letter of credit No. IVC-2 for $293,445.50 issued by Prudential to Aqua Pennsylvania, Inc. for the Island View Crossing II, LP Public Improvements in connection with that certain builder's extension agreement dated September 4, 2015 by and between the Debtor and Aqua Pennsylvania, Inc. for the construction of a water main extension to provide water to the Project ("Aqua Letter of Credit") and

(b) an irrevocable standby letter of credit No. IVC-1 for $2,090,381.19 issued by Prudential to the Borough of Bristol and Bristol Borough Water and Sewer Authority for the Island View Crossing II, LP Subdivision Development Improvements in connection with the Subdivision Financial Security Agreement dated March 4, 2015 by and among the Borough, Bristol Borough Water & Sewer Authority, the Debtor and the Prudential for the installation of the public improvements required for development of the Project (the "Borough Letter of Credit").

23. The undrawn balances under each letter of credit are as follows:

(a) Borough Letter of Credit is $1,231,087.02[1] and

(b) Aqua Letter of Credit is $30,000.00.[2]

24. Prior to the Petition Date, the Debtor, Prudential and RDA entered into a cross subordination agreement dated December 10, 2014 memorializing certain agreements among the parties dated December 10, 2014.

---

[1] As a result of site improvement work performed by the Trustee at the Project, Bristol Borough issued certificate of completion No. 7 dated February 10, 2020 in the amount of $143,381.70 less a ten percent (10%) retention by the Borough, which authorized the Borough to reduce the Deposit of this project by the sum of ($129,043.53) pursuant to the site improvement security agreement.

[2] By letter dated February 7, 2020, Aqua has confirmed to the Trustee that the original letter of credit issued by Prudential Savings Bank, LOC #IVC-2, was released in its entirety and returned to Ron J. Gualtieri of Americorp on October 18, 2017.

**D.**  **Pre-Petition Judgments against the Project and Real Estate Taxes**

25.    The Trustee ordered a commitment for title insurance for the Project as of February 2, 2018 which reveals, *inter alia*, the below-stated judgments (a) through (f) as liens against the Project (collectively, the "Judgments"), a copy of the title report is attached hereto as Exhibit "A":

(a)    a judgment against Debtor in favor of the Borough of Bristol filed on April 22, 2016 (No. 2016-71251) in the amount of $56,239.22 ("Existing Borough Judgment");

(b)    a judgment entered in favor of Bohler Engineering PA, LLC against Debtor filed on January 5, 2017 (No. 2017-00032) in the amount of $48,853.63 ("Existing Judgment of Bohler Engineering");

(c)    a judgment entered in favor of Monica Caione against Debtor, Americorp Homes and Island View Crossing II, Inc. filed on February 28, 2017 (No. 2016-04021) in the amount of $30,990.00 ("Caione Judgment");

(d)    a judgment entered in favor of Samira Ranganathan and Khandulans Ranganathan against Debtor filed on June 19, 2017 (No. 2016-05724) in the amount of $49,980.00 ("Ranganathan Judgment");

(e)    a judgment entered in favor of Frank Del Grasso against Debtor, Island View Crossing II, Inc., Americorp Realty LLC, Americorp Homes LLC, and Americorp Real Estate Development LLC filed on March 23, 2017 (No. 2016-06685) in the amount of $27,250.00 ("Del Grasso Judgment" and at times, collectively, with the Caione Judgment, and Ranganathan Judgment the "Existing Judgments of Former Prospects"); and

(f)    a judgment entered in favor of McElderry Drywall, Inc. against Americorp Homes, Inc. and Debtor filed **after the Petition Date** on August 10, 2017 (No. 2016-06868) in the amount of $42,730.16. This judgment appears to be voidable under the Bankruptcy Code. However, McElderry Drywall, Inc. also filed a proof of claim identifying $33,286.00 as due it based on a default judgment entered on February 22, 2017 (No. 2016-05868) ("Existing Judgment of McElderry Drywall Inc.").

26.    The Bucks County Tax Claim Bureau has filed a proof of claim identifying $118,436.82 of unpaid pre-petition real estate taxes for the Project (the "Pre-Petition Real Estate Taxes"). *See*, POC No. 1. The Trustee intends to pay the Pre-Petition Real Estate Taxes under

the provisions of a plan of reorganization to be formulated and filed with the Bankruptcy Court for approval.

27.    The Trustee has paid all real estate taxes that came due after the Petition Date for the Project. At the time of the closing of each Residential Unit, the Trustee intends to pay any post-petition taxes that are due through the closing date for the respective Residential Unit being sold.

E.    **Post-Petition Financing – The Lender's First Loan**

28.    On August 17, 2018, the Trustee filed the Motion for Entry of Final Order Authorizing (I) Trustee to Obtain Secured Post-petition Financing Pursuant to §§105, 361, 364(C)(1) and 364(D)(1) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 4001, (II) Trustee to Enter into the Loan Documents; (III) Granting an Allowed Super Priority Administrative Expense Claim With Priority Over Any and All Administrative Expenses of the Kind Specified in Bankruptcy Code Section 503(B) or 507(B); (IV) Granting a Lien on All Assets of the Estate (Except for the Excluded Assets) Senior to All Other Liens (Except for the Permitted Liens) Pursuant to Section 364(D)(1) of Bankruptcy Code; (V) Approving the Release of Liens Agreement Between the Trustee and Prudential Bank Pursuant to Federal Rule of Bankruptcy Procedure 9019; and (VI) Granting Related Relief (the "First Financing/Approval Motion") [D.I. 342].

29.    The First Financing/Approval Motion sought, *inter alia*, (i) post-petition financing in the amount of $4,700,000 on a revolving basis from BKRE Investments LLC, an Ohio limited liability company (the "Lender", also at times referred to as "BKRE") in accordance with the terms of the Loan Documents (as defined in the First Financing/Approval Motion) and (ii) approval of the Release of Liens Agreement (the "Release of Liens Agreement")

between the Trustee and Prudential.

30.    As set forth in the First Financing/Approval Motion:

(a)    The liens being granted to the Lender to secure the loan shall prime and be senior to the Existing Borough Judgment, Existing Judgement of Bohler Engineering, the Existing Judgments of Former Prospects and the Existing Judgment of McElderry Drywall Inc.

(b)    The Borough of Bristol and Bohler Engineering advised the Trustee that they would not object to the Existing Borough Judgment and Existing Judgment of Bohler Engineering being primed by the lien to be granted to the Lender to secure the Loan.

(c)    The liens securing unpaid real estate taxes shall remain senior to the liens being granted to the Lender to secure the Loan.

31.    The Trustee and Prudential entered into the Release of Liens Agreement whereby, *inter alia*, Prudential (i) consented to the Trustee obtaining the $4,700,000 loan from Lender to complete Phase 1 of the Project, (ii) release of certain of Prudential's liens in exchange for the release payments, (iii) subordination of certain Prudential mortgages, and (iv) related relief.  The Release of Liens Agreement was approved by the Bankruptcy Court.  A copy of the Release of Liens Agreement recorded with the Bucks County recorder of deeds is attached hereto as Exhibit "B" and made a part hereof.

32.    The Release of Liens Agreement provides, *inter alia*, as follows:

(a)    Prudential's Consent to Loan.  Subject to the mandatory release payments set forth therein, Prudential consents to the Loan, Trustee entering into the Loan Agreement and the granting of senior claims and liens to Lender to secure the Loan that will be senior and with priority over Prudential's existing liens arising from the Existing Mortgages of Prudential, and reservation of rights of Trustee, Debtor and Prudential as set forth in the Release of Liens Agreement.

(b)    Release payments to RDA.  Mandatory release payment of $12,350 to RDA at the time of closing on the sale of each Residential Unit in Phase 1 of the Project in accordance with, and in full satisfaction of the Prudential obligations with respect to each unit, under the Existing Cross-Subordination Agreement to be applied to reduce the principal balance of

the Existing RDA Loan and to release the RDA lien on the Residential Unit sold.

(c)    <u>Release Payments to Prudential</u>.  Mandatory release payment of $25,000 to Prudential at the time of closing on the sale of each of the first 35 Residential Units in Phase 1 of the Project and $45,000 to Prudential at the time of closing on the sale of each of the remaining 38 Residential Units in Phase 1 of the Project which will be applied to reduce the principal balance of the Existing Prudential Construction Loan as set forth in the proof of claim filed by Prudential as secured in the Bankruptcy Case identified on the Bankruptcy Court's claim register as claim no. 23 in the amount of $4,092,443.58.

(d)    <u>Balance of Existing Prudential Construction Loan</u>.  The unpaid balance due under the Existing Prudential Construction Loan shall be due and payable to Prudential on the last business day of the forty-second (42nd) month after the entry of a final order approving the Loan (the "Existing Prudential Construction Loan Maturity Date").

(e)    <u>Subordination of Steeple Run Collateral Mortgage</u>.  Concurrent with the execution of the Release of Liens Agreement, Prudential shall deliver to Trustee (in recordable form) a subordination agreement of the Steeple Run Collateral Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims (as defined in the Release of Liens Agreement) in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  The Subordination Agreement will also provide that at the time of each closing on the sale of a Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of this mortgage to the Trustee without any charge or payment. The Trustee/Debtor preserves its claim to void or otherwise invalidate the Steeple Run Collateral Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

(f)    <u>Subordination of Calnshire Collateral Mortgage</u>.  Concurrent with the execution of this Agreement, Prudential shall deliver to Trustee (in recordable form) a subordination agreement of the Calnshire Collateral Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the

Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court. The Subordination Agreement will also provide that at the time of each closing on the sale of each Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of this mortgage to the Trustee without any charge or payment. The Trustee/Debtor preserves its claim to void or otherwise invalidate the Calnshire Collateral Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

(g)     <u>Subordination of IVC-Durham Mortgage</u>. Concurrent with the execution of this Agreement, Prudential shall deliver to Trustee (in recordable form) a subordination agreement of the IVC-Durham Mortgage subordinating the liens and claims of this mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each Residential Unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the Residential Units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court. The Subordination Agreement will also provide that at the time of each closing on the sale of each Residential Unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of this mortgage to the Trustee without any charge or payment. The Trustee/Debtor preserves its claim to void or otherwise invalidate the IVC-Durham Mortgage and Prudential likewise preserves all of its claims and defenses to any such claim.

(h)     <u>Permitted Claims</u>. Permitted Claims is defined in the Release of Liens Agreement to mean: claims arising from (i) the Loan, (ii) allowed Administrative Claims, (iii) allowed Priority Tax Claims, (iv) allowed secured claims, (v) allowed Priority Non-Tax Claims, and (vi) allowed general unsecured claims excluding claims held by insiders (as that term is defined by the Bankruptcy Code and applicable case law); provided however, allowed fee claims of counsel retained by the Debtor are specifically excluded.

(i)     <u>Release of Clubhouse and Common Elements</u>. In addition to the above releases and subordination of Existing Mortgages of Prudential, Prudential shall deliver to Trustee (in recordable form) for no charge or payment, a release of its liens arising from (i) the Steeple Run Collateral Mortgage, (ii) the Calnshire Collateral Mortgage, and (iii) the IVC-Durham Mortgage in connection with the clubhouse (to be designed and built) and the common elements at the Project at the time that the Trustee is legally obligated to, and in fact conveys said clubhouse and common elements to the applicable master association, homeowners' association and/or

condominium association for the Project as set forth in the Release of Liens Agreement.

(j)    <u>Existing Letters of Credit Issued by Prudential</u>.  Prudential represents that the Borough Letter of Credit and the Aqua Letter of Credit are irrevocable and it will not cancel either letter of credit without the prior written consent of the Trustee.  Prudential further agrees that it will take no action that will cause the Borough or Aqua of Pennsylvania to draw monies under either letter of credit.  Any advances made by the Prudential after the date of the Release of Liens Agreement (the "Advances") to the Borough under the Borough Letter of Credit (not to exceed the undrawn balance of $1,231,087.02) or to Aqua of Pennsylvania under the Aqua Letter of Credit (not to exceed the undrawn balance of $30,000.00) shall constitute an allowed claim under the Existing Prudential Construction Loan and will increase the principal amount due under the Existing Prudential Construction Loan by the amount of the advance but will not impact or change the release prices set forth above; provided, however the Prudential must deliver written notice to Trustee and his counsel no later than five (5) business days before it makes any advance under the Borough Letter of Credit or the Aqua Letter of Credit.  Advances, if any, by Prudential as set forth above shall be due and payable on the Existing Prudential Construction Loan Maturity Date, as set forth in the Release of Liens Agreement, and not subject to challenge, deduction or setoff.

33.    On September 12, 2018, this Honorable Court approved the First Financing/Approval Motion and the Release of Liens Agreement [D.I. 352] and the closing in connection with this financing from the Lender was concluded on or about September 26, 2019.

34.    The Trustee has drawn the full amount of $4,700,000 under the First Financing/Approval Motion in order to fund the cost of the improvements and other expenses associated with the Project.

35.    As set forth above, the Trustee has, *inter alia*, constructed five (5) buildings in Phase 1 containing a total of 26 Residential Units at different stages of completion.  Twelve of the 26 units are 100% complete and available for sale.

36.    The net proceeds from the sale of the completed Residential Units after payment of the release prices required by the Release of Liens Agreement and the Lender's loan

documents and normal and customary closing costs will be used to fund the construction of additional Residential Units in Phase 1 which are being marketed for sale.

**F.    Post-Petition Financing– The Lender's Second Loan**

37.    On December 20, 2019, the Trustee filed the Motion for Entry of Final Order Authorizing Trustee (i) to obtain from the Lender unsecured post-petition financing as an administrative expense (the "Second Loan") pursuant to §§ 105 and 364(b) of the Bankruptcy Code of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. and Federal Rule of Bankruptcy Procedure 4001; (ii) to enter into the Promissory Note; and (iii) granting related relief (the "Second Financing/Approval Motion") [D.I. 422].

38.    The Second Financing/Approval Motion sought, *inter alia*, (i) unsecured post-petition financing from the Lender in the amount of $443,352; provided however, only $200,000.00 of the amount of the Second Loan will be advanced to the Borrower upon Bankruptcy Court approval and the balance ($243,352.00) of the Second Loan will be advanced to Borrower only at such time as the Additional Condition (as defined in the Second Financing/Approval Motion) is satisfied in the sole and absolute discretion of Lender, (ii) authority to enter into the promissory note with Lender and (iii) related relief.

39.    On January 27, 2020, this Honorable Court entered an Interim Order granting the Second Financing/Approval Motion to the extent of $200,000.00 on an interim basis. A further hearing to consider approval of the balance of the Second Loan was scheduled for February 12, 2020. [D.I. 435]. The hearing to consider approval of the balance of the Second Loan has been continued.

**G.    First Sale Motion**

40.    On January 17, 2020, the Trustee filed the Motion for Entry of an Order under

11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 Authorizing the Sale of Certain Residential Units in Phase 1 Free and Clear of all Liens, Claims, and Interests, and for Related Relief (the "First Sale Motion") [D.I. 430].

41.     The First Sale Motion, as supplemented, requested authority to sell three (3) Residential Units in Phase 1 (Lot Nos. 41, 44, 1nd 47) free and clear of all liens, claims, and interests.

42.     On February 12, 2020, this Honorable Court entered an Order granting the First Sale Motion [D.I. 443].

## RELIEF REQUESTED

43.     By this Motion, the Trustee requests that this Honorable Court enter an order (i) authorizing and approving the sale of a Residential Unit in Phase 1 that is currently subject to an agreement of sale (the "Under-Contract Residential Unit") to the buyer free and clear of all liens, claims and interests on substantially the same terms and conditions set forth in the agreement of sale and this Motion, (ii) authorizing procedures for the approval of future sales of Residential Units in Phase 1 free and clear of all liens, claims and interests (individually, a "Remaining Residential Units", and collectively, the "Remaining Residential Units"), (iii) limiting notice of future sales of Remaining Residential Unit(s), and (iv) for related relief.

44.     Presently, the Trustee has one Under-Contract Residential Unit.  Attached as Exhibit "C" and made a part hereof is a Schedule of the Under-Contract Residential Unit that details, *inter alia*, the applicable lot number, property address, name of the Buyer and the purchase price offered.

45.     The Trustee may receive additional agreements of sale for Remaining Residential Units prior to the hearing date on this Motion.  In such case, the Trustee will supplement this

Motion and the notice of this Motion by adding the additional agreement(s) of sale as additional exhibits to this Motion and will provide supplemental notice to all creditors and parties in interest of the additional agreements of sale to be considered as part of this Motion at the hearing.

46.    The Trustee also expects to receive additional agreements of sale for the Remaining Residential Units after the hearing date on this Motion and therefore requests approval of the procedures set forth below regarding future sales of the Remaining Residential Units.

## BASIS FOR RELIEF REQUESTED

### I.    Sale of Under-Contract Residential Unit

47.    As set forth above, the construction and sale of the Under-Contract Residential Unit in Phase 1 is the best way for the Trustee to preserve and maximize the value of the assets of the Debtor's estate for the benefit of all constituencies.

48.    The Trustee desires to sell the Under-Contract Residential Unit to the buyer identified in the agreement of sale (the "Buyer") free and clear of all liens, claims, and interests pursuant to the terms and conditions of the agreement of sale for the Under-Contract Residential Unit (the "Sale Agreement").   A copy of the Sale Agreement is attached hereto and made a part hereof as Exhibit "D".

49.    The Sale Agreement provides, *inter alia*, that title to the Residential Unit shall be conveyed by a special warranty deed and shall be good and marketable and such as will be insured by a reputable title company at regular rates and free and clear of any and all liens (statutory or otherwise), claims, mortgages, and encumbrances except for the permitted encumbrances as set forth in the Sale Agreement. *See*, paragraph 6 of the Sale Agreement.

16

Absent an Order from the Bankruptcy Court authorizing the sale of the Under-Contract Residential Unit free and clear of all interests, the Trustee will not be able to close on the sale of the Residential Unit.

50.    The Sale Agreement is also contingent, *inter alia*, upon Bankruptcy Court approval. *See*, paragraph 18 of the Sale Agreement.

51.    Pursuant to 11 U.S.C. § 363 the Trustee requests that the sale of the Under-Contract Residential Unit be free and clear of any and all liens, claims, community interests, security interests, mortgages, conditions, encumbrances, pledges, restrictions, charges, indentures, loan agreements, options, rights of first refusal, offsets, recoupments, rights of recovery, judgments, orders and decrees of any court or governmental entity, interests, successor, products, tax and other liabilities and claims against the Trustee, Debtor or its property, of any kind or nature, whether secured or unsecured, choate, or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, disputed or undisputed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, known or unknown (collectively, the "Interests") except for the Permitted Exceptions (as defined in the Sale Agreement)[3].

52.    The Interests shall attach to the proceeds of the sale described herein, to the extent and with the priorities provided under applicable non-bankruptcy law, as such laws may be modified by the Bankruptcy Code.

---

[3] (a) existing restrictions, conditions and easements, especially those set forth in the Declarations of Covenants and Restrictions for Radcliffe Court Homeowners Association; (b) restrictions, conditions, covenants, and easements, if any, required to be placed on the Property including under Pennsylvania Act 2; (c) restrictions, conditions, and easements created by Seller at or prior to settlement hereunder and reasonably necessary for the development by Seller of the Property and adjoining properties; (d) the possibility of the filing of mechanics' liens or municipal liens; (e) zoning ordinance and any other act, ordinance, or regulation affecting the use of an improvement to said Property; (f) easements with respect to public or private sewers, storm sewer or surface water courses; and (g) agreements and easements with telephone, gas, water, catv, electric and other public utility companies (collectively, the "Permitted Exceptions").

53.    The purchase price for the Under-Contract Residential Unit constitutes the highest and best offer that the Trustee has received for said Residential Unit and shall constitute a purchase in good faith for fair value within the meaning of Section 363(m) of the Bankruptcy Code and *In Re Abbots Dairies of Pennsylvania, Inc.*, 788 F.2d 142 (3rd Cir. 1986).

54.    The sale of the Under-Contract Residential Unit shall be free and clear of all Interests and is in the best interest of the estate and is necessary in order to allow the Trustee to close on the sale of the Under-Contract Residential Unit.

(a)    **The Trustee has Complied with 11 U.S.C. § 363**

55.    By this Motion, the Trustee seeks the entry of an Order by the Court authorizing the sale of the Under-Contract Residential Unit free and clear of the Interests.

56.    Section 363(b) of the Bankruptcy Code authorizes a trustee to sell assets outside of the ordinary course of business.[4]  As a general rule, a trustee must show that each of the following elements have been met before a § 363(b) sale may be approved: (i) that a sound business reason exists for the proposed transaction; (ii) the sale has been proposed in good faith; (iii) the sale price is fair and reasonable; and (iv) that accurate and reasonable notice has been provided of the transaction.  *See, Stroud Ford, Inc.*, 163 B.R. 730 (Bankr. M.D. Pa. 1993).  Here, the proposed sale of the Property meets each of these four (4) factors.

(i)    **The proposed sale is supported by sound business reasons.**

57.    Courts have made it clear that a trustee's showing of a sound business justification need not be exhaustive, but rather a trustee is "simply required to justify the proposed disposition with sound business reasons." *See, In re Baldwin United Corp.*, 43 B.R.

---

[4] Although the Debtor's ordinary course of business is to construct and sell Residential Units, the Trustee is not able to close on the sale of the Under-Contract Residential Unit, or to deliver good and marketable title insurable by a reputable title company without an Order of the Bankruptcy Court authorizing the sale free and clear of all liens, claims and interests.

898, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case. *See*, *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also*, *Industrial Valley Refrig. & Air Conditioning Supplies, Inc.*, 77 B.R. 15 (Bankr. E.D.Pa. 1987) (adopting *Lionel* reasoning). When considering whether a trustee has demonstrated a sound business justification for a proposed sale of assets under § 363(b) of the Bankruptcy Code, a court "should consider all salient factors pertaining to the proceeding." *See*, *Lionel*, 722 F.2d at 1071. In evaluating these and other pertinent factors, the court should bear in mind that the overriding goal is "to further the diverse interests of the trustee, creditors and equity holder, alike." *See*, *Id.*

58.    The Trustee believes, and therefore avers, that there is good and sufficient business justification for the Trustee to sell the Under-Contract Residential Unit and is in the best interest of the estate for this Court to grant the Motion.

59.    Accordingly, as the foregoing discussion demonstrates, the Trustee believes that the sale of the Under-Contract Residential Unit is justified by sound business reasons and is necessary to preserve and maximize the return to the estate.

(ii)    **The sale has been proposed in good faith.**

60.    "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings." *See*, *In re Abbotts Dairies Pennsylvania, Inc.*,788 F.2d 143, 147 (3d Cir. 1986). "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *See*, *Id.*

61.    The proposed sale of the Under-Contract Residential Unit is an arms-length transaction to an independent third party.

62.    The Trustee has no relationship with the Buyer of the Under-Contract Residential Unit.

> **(iii)    The Purchase Price for the Under-Contract Residential Unit is fair and reasonable.**

63.    The Trustee believes the purchase price for the Under-Contract Residential Unit is fair and reasonable.

64.    The Under-Contract Residential Unit was marketed, shown to prospective buyers, and the offer accepted by the Trustee for the Under-Contract Residential Unit is the highest and best offer received to date for the Under-Contract Residential Unit.

> **(iv)    Accurate and reasonable notice of the sale will be provided.**

65.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction.  *See*, Fed.R.Bankr.P. 6004(f)(1).

66.    Pursuant to Bankruptcy Rule 6004, notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. *See*, Fed.RBankr.P. 2002(c)(1).  Moreover, notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property.

67.    The Trustee submits that the Notice attached to this Motion meets all of the above requirements.   The Notice describes the Under Contract Residential Unit being sold, the purchase price, fixes a deadline for objecting to the sale and provides notice of the hearing date scheduled to consider approval of the sale.

(v)    **The Requirements of 11 U.S.C. § 363(f)**

68.    Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See*, 11 U.S.C. § 363(f).

69.    As set forth in this Motion, the Under-Contract Residential Unit is encumbered by various mortgages, judgments, and other liens.

70.    Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to warrant approval of the proposed sale of the homes. *See, Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d. Cir. 2000) (discussing how section 363(f) authorizes the sale of a debtor's assets free and clear of all liens, claims and interests if "any one of [the] five prescribed conditions" is met); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) (stating that a court may approve a sale "free and clear" provided at least one of the subsections of 363(f) is met). *See also, In re DVI Inc.*, 306 B.R. 496, 503 (Bankr. D. Del. 2004) (providing that the debtor could

sell the subject property free and clear of liens if it met the requirements of a single subsection of section 363(f)).

71.     With respect to each current or prospective lien, claim, encumbrance or other interest in the real estate at issue here, the Trustee can satisfy at least one of the five (5) conditions set forth in Section 363(f).

72.     For instance, Section 363(f)(3) is satisfied because the liens at issue are interests in property, and the Trustee will be selling the homes to third parties at or above the value of such property. *See e.g., In re Terrace Gardens Park P'ship*, 96 B.R. 707 (Bankr. W.D. Tex. 1989) (reasoning that property may be sold free and clear of liens when the property is sold at or above its fair value because the aggregate value of the liens on such property is the value of the property, and the holders of liens are adequately protected by having their liens attach to the proceeds of the sale).

73.     In accordance with the Release of Liens Agreement and the Lender's loan documents approved by the Bankruptcy Court, at the time of closing on the Under-Contract Residential Unit, the Trustee request authority to pay from the proceeds of sale the following:

(a)     First, the amount needed to satisfy any outstanding post-petition property taxes and post-petition municipal liens due the applicable governmental authorities;

(b)     Second, the amount needed to satisfy the real estate commissions due the Trustee's Broker, if applicable;

(c)     Third, the normal and customary closing costs including, but not limited to, transfer taxes and any recording fees;

(d)     Fourth, the sum of $12,350.00 to the Redevelopment Authority of Bucks County[5];

(e)     Fifth, to the Lender as provided in the Lender's Loan documents and the Release of Liens Agreement approved by this Court [6];

(f)     Sixth, the sum of $25,000.00 to Prudential Bank[7]; and

(g)     the balance shall be retained and utilized by the Trustee to finance the construction and completion of the Remaining Residential Units in Phase 1.

74.     The Trustee submits that the sale of the Under-Contract Residential Unit free and clear of the Interests, satisfies the statutory prerequisites of § 363(f) of the Bankruptcy Code. Accordingly, the Trustee seeks the entry of an Order authorizing the sale of the Under-Contract Residential Unit pursuant to § 363 of the Bankruptcy Code.

## II.    **Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)**

75.     Pursuant to Fed. R. Bankr. P. 6004(h), unless the Court orders otherwise, all orders authorizing the sale of an asset of the estate pursuant to Section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order. The purpose of

---

[5] The RDA's lien release price is $12,350.00 at the time of closing on the sale of each residential units in Phase 1.

[6] The Lender has no lien release price on the first fifteen (15) residential units sold in Phase 1. The Lender's lien release price is $15,000.00 at the time of closing on the sale of each of the sixteenth (16th) to the thirtieth (30th) residential units in Phase 1 and $30,000.00 at the time of closing on the sale of each of the thirty-first (31st) residential unit and for each unit thereafter. Notwithstanding the foregoing, upon the closing on the sale of residential units in Building 11 (Residential Units numbered 31, 32, 33, 34, 35 & 36), Building 12 (Residential Units numbered 25, 26, 27 28, 29 & 30), and Building 13 (Residential Units numbered 22, 23 & 24), the Lender will only release its lien on each of these residential units subject to the receipt of seventy (70%) of the Net Proceeds from the sale of each residential unit in Buildings 11, 12 and 13 to be applied to reduce the principal balance of the post-petition loan. "Net Proceeds" shall mean the proceeds from the sale of each said residential unit remaining after (i) payment of $12,350.00 to RDA in accordance with the Release of Liens Agreement to be applied to reduce the principal balance of the existing RDA loan, (ii) payment of the amount of $25,000 or $45,000 to Prudential, as applicable in accordance with the Release of Liens Agreement to be applied to reduce the principal balance of the existing Prudential construction loan in the amount of $4,092,443.58, (iii) payment of any approved broker's fee associated with the sale of the residential unit, (iv) payment of any post-petition municipal claim and post-petition real estate taxes due for the residential unit being sold, and (v) any normal and customary closing costs.

[7] Prudential's lien release price is $25,000.00 at the time of closing on the sale of each of the first thirty-five (35) residential units in Phase 1 and $45,000.00 at the time of closing on the sale of each of the remaining thirty-eight (38) residential units.

Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.

76.     The fourteen (14) day period may be eliminated to allow a sale or transaction to close immediately, particularly where there have been no objections to the sale. Accordingly, the Trustee requests that upon approval of the Under-Contract Residential Unit the fourteen (14) day period pursuant to Rule 6004(h) be waived by the Court.

**III.   Proposed Procedure for Authority to Sell the Remaining Residential Units in Phase 1 Free and Clear of the Interests**

77.     The Trustee seeks authority establish procedures to approve future sales after the hearing date on this Motion of the Remaining Residential Units free and clear of the Interests.

78.     The Trustee believes that title insurers will not issue policies of title insurance to purchasers of the Remaining Residential Units absent an Order from the Bankruptcy Court authorizing such sale free and clear of the Interests.

79.     As such, the Trustee proposes the following procedures (collectively, the "Procedures") in connection to obtaining approval of future sales of the Remaining Residential Units free and clear of the Interests:

(a)     No less than twenty-one (21) days prior to the proposed closing on the sale of a Remaining Residential Unit, the Trustee shall file with this Court and serve a notice of proposed sale of the Residential Unit(s) (the "Sale Notice") and a proposed form of Order (in substantially the same form of the Order approving this Motion) via ecf transmission, e-mail, or regular mail upon (i) the Office of the United States Trustee; (ii) all parties requesting notice under Fed. R. Bankr. P. 2002; and (iii) all parties holding secured claims. The proposed Sale Notice is attached hereto as Exhibit "A" and made a part hereof.

(b)    Any party-in-interest shall have fourteen (14) days from the date of the

Sale Notice to file a response to the proposed sale set forth in the Sale Notice with this Court

and serve a copy upon Trustee's counsel.

(c)    If no response is filed within fourteen (14) days after service of the Sale

Notice, the Trustee shall certify the same to the Court and request the entry of the Order

authorizing the sale of the Remaining Residential Unit(s).

(d)    If a response is filed to a Sale Notice, and such dispute cannot be resolved

consensually by the Trustee and the objecting party, the Trustee will contact the Court to obtain a

hearing date and time to consider the Sale Notice and the response thereto.  The Trustee shall

serve a Notice of Hearing in connection with the Sale Notice and the response thereto via ecf

transmission, e-mail, or regular mail upon (i) the Office of the United States Trustee; (ii) all

parties requesting notice under Fed. R. Bankr. P. 2002; (iii) all parties holding secured claims

informing them of the upcoming sale, and (iv) the person(s) that filed the response to the Sale

Notice.

80.    The Trustee also requests that (i) notice of the Sale Notice and (ii) notice of any

hearing in connection with a Sale Notice be limited to the parties identified in paragraphs 79 (a)

and 79 (d) above.

81.    The Trustee believes that the proposed Procedures for the approval of future sales

of Residential Units in Phase 1 are compliant with general motion practice set forth in Local

Bankruptcy Rule 9014-3 and will provide an expedient and cost effective procedure to deal with

obtaining court approval of the sale of the Remaining Residential Units in Phase 1.

82.    The above stated procedures for the approval of the sale of the Remaining

Residential Units will also allow the Trustee to sell the Remaining Residential Units in Phase 1

25

and facilitate his administration of this bankruptcy estate for the benefit of the Debtor and all creditors of its estate.

## NOTICE

83.    Notice of this Motion has been given to the following parties, or their counsel, if known: (i) the Office of the U.S. Trustee; (ii) any person or entity that has requested service pursuant to Bankruptcy Rule 2002; and (iii) all of the Debtor's creditors.  The Trustee submits that no other or further notice need be provided.

**WHEREFORE,** the Trustee respectfully requests that this Honorable Court enter an Order granting the relief requested herein and for such other and further relief as this Honorable Court deems just.

**Respectfully submitted,**

**KARALIS PC**

By:    /s/ Aris J. Karalis
      ARIS J. KARALIS
      ROBERT W. SEITZER
      1900 Spruce Street
      Philadelphia, PA 19103
      (215) 546-4500
      akaralis@karalislaw.com
      rseitzer@karalislaw.com
      Attorneys for the Trustee

Dated: February 24, 2020

# **EXHIBITS**

| | |
|---|---|
| Exhibit "A" | Title Report |
| Exhibit "B" | Release of Liens Agreement |
| Exhibit "C" | Schedule of Under-Contract Residential Unit |
| Exhibit "D" | Sale Agreement with Robert J. Phal for Lot 11 |
| Exhibit "E" | Sale Notice |