IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| ISLAND VIEW CROSSING II, L.P. | : | BANKRUPTCY NO. 17-14454(ELF) |
| | : | |
| Debtor | : | |
| | : | |

_____

_____

## DISCLOSURE STATEMENT WITH RESPECT TO
## PLAN OF LIQUIDATION PROPOSED
## BY KEVIN O'HALLORAN, AS CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY
## ESTATE OF ISLAND VIEW CROSSING II, L.P.

_____

***[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION
OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED
UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED
STATES BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT  IS BEING
SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY
THE UNITED STATES BANKRUPTCY COURT]***

**KARALIS PC**
**Aris J. Karalis**
**1900 Spruce Street**
**Philadelphia, PA 19103**
**(215) 546-4500**
**Attorneys for Kevin O'Halloran,**
**the Chapter 11 Trustee**

**Dated:   April 19, 2021**

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION DATED APRIL 19, 2021 PROPOSED BY KEVIN O'HALLORAN, AS CHAPTER 11 TRUSTEE FOR THE BANKRUPTCY ESTATE OF ISLAND VIEW CROSSING II, L.P. (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERM THEREOF AND APPLICABLE LAW, THE "**PLAN**"). THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATIONS OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND HOLDERS OF INTERESTS IN THE DEBTOR ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT WITH RESPECT TO THE FINANCIAL PROJECTIONS SET FORTH IN **EXHIBIT A** ATTACHED HERETO (THE "**PROJECTIONS**") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED THEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE TRUSTEE DOES NOT UNDERTAKE ANY OBLIGATION TO, AND DOES NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE TRUSTEE DOEW NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT OR COMPLETE A OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE TRUSTEE, MAY DIFFER FROM ACTUAL RESULTS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO THE CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED  AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSABLE IN ANY NOT-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR OR IN THIS CHAPTER 11 CASE.

[Remainder of Page Intentionally Left Blank]

## TABLE OF CONTENTS

ARTICLE I – INTRODUCTION.................................................................................. 1

ARTICLE II – OVERVIEW OF THE PLAN............................................................ 2

    2.1    General Structure of the Plan ................................................ 2
    2.2    Summary of Treatment of Claims and Interests under the Plan................ 2

ARTICLE III – PLAN VOTING INSTRUCTIONS AND PROCEDURES ..................... 9

    3.1    Notice to Holders of Claims and Interests.................................... 9
    3.2    Voting Rights .......................................................... 10
    3.3    Solicitation Materials .................................................. 10
    3.4    Voting Procedures, Ballots and Voting Deadline ..................... 11
    3.5    Confirmation Hearing and Deadline for Objections to Confirmation....... 12

ARTICLE IV – GENERAL INFORMATION CONCERNING THE DEBTOR ............ 12

    4.1    Overview .............................................................. 12
    4.2    Summary of Debtor's Assets............................................ 14
    4.3    Summary of Debtor's Debt Structure................................... 15
            4.3.1    Prudential Construction Loan.................................. 15
            4.3.2    The Disputed Steeple Run Collateral Mortgage............. 15
            4.3.3    The Disputed IVC-Durham Loan............................. 15
            4.3.4    The Disputed Calnshire Collateral Mortgage................. 16
            4.3.5    The Pre-Petition Secured Property Tax Claim .............. 16
            4.3.6    The RDA Loan Claim ...................................... 16
            4.3.7    Pre-Petition Judgment Claims .............................. 16
            4.3.8    Priority Non-Tax Claims ................................... 17
            4.3.9    General Unsecured Claims .................................. 17
    4.4    Events Leading to the Commencement of the Chapter 11 Case ............ 17

ARTICLE V – THE CHAPTER 11 CASE .................................................. 18

    5.1    The Debtor in Possession ............................................. 18
    5.2    The Cases of the Affiliated Debtors .................................. 18
    5.3    Retention of Professionals............................................ 19
            5.3.1    Professionals retained by the Debtor........................ 19
            5.3.2    Professionals retained by the Interim Trustee .............. 19
            5.3.3    Professionals retained by the Trustee....................... 19
    5.4    Motions and other Filings in the Bankruptcy Case ..................... 19
            5.4.1    Removal of the Debtor's Lender Liability Action
                     to the Bankruptcy Court ................................... 19
             5.4.2    Prudential's Motion to Convert Case to Chapter 7, or in the
                     alternative to appoint a chapter 11 Trustee ................. 19
            5.4.3    Debtor's Motion for Debtor in Possession Financing.......... 20

5.5     The Trustee .................................................................................. 20
        5.5.1   Election of Trustee for the Chapter 11 Case ................................. 20
        5.5.2   Trustee's Decision to Develop, and Sell Residential Units in
                Phase 1 and to Prosecute the Trustee's Actions against
                Prudential .................................................................................. 20
        5.5.3   Trustee's Motion to approve Post-Petition Financing, the
                Prudential Release of Liens Agreement and the Prudential
                Subordination Agreements ........................................................ 21
        5.5.4   PA Act 2 Final Approval by DEP for Phase 1 ............................. 22
        5.5.5   Trustee's Motion for Financing as an Administrative
                Expense .................................................................................... 22
        5.5.6   Trustee's Sale of Residential Units, the COVID-19
                Pandemic, Revised Projections and Monthly Operating
                Reports ...................................................................................... 23
        5.5.7   The Trustee's Actions against Prudential ................................... 25
        5.5.8   Summary of Amounts Due Claims Secured by Liens on the
                Real Estate ................................................................................ 26

ARTICLE VI – SUMMARY OF PLAN ......................................................... 26

6.1     Overall Structure of the Plan ................................................... 27
6.2     Funding for the Plan ................................................................ 27
6.3     Classification and Treatment of Claims and Interests ............................ 28
        6.3.1   Treatment of Unclassified Claims under the Plan ....................... 29
                6.3.1.1 Administrative Claims ..................................................... 29
                6.3.1.2 Priority Tax Claims ......................................................... 30
                6.3.1.3 Post-Petition Lender ....................................................... 30
        6.3.2   Treatment of Classified Claims and Interests under the Plan ....... 31
                6.3.2.1   Class 1: Tax Claim Bureau Claim .................................. 31
                6.3.2.2   Class 2: RDA Claim ..................................................... 32
                6.3.2.3   Class 3: Prudential Construction Loan Claim ............... 33
                6.3.2.4   Class 4: Disputed Prudential IVC-Durham Loan
                          Claim ...................................................................... 36
                6.3.2.5   Class 5: Disputed Steeple Run Collateral
                          Mortgage Claim ....................................................... 38
                6.3.2.6   Class 6: Disputed Calnshire Collateral Mortgage
                          Claim ...................................................................... 40
                6.3.2.7   Class 7: Pre-Petition Judgment Claims ........................ 43
                6.3.2.8   Class 8: Priority Non-Tax Claims ................................. 44
                6.3.2.9   Class 9: General Unsecured Claims .............................. 44
                6.3.2.10  Class 10: Limited Partner Interests in the Debtor ......... 45
                6.3.2.11  Class 11: General Partner Interest in the Debtor ........... 46

6.4     Reservation of Rights Regarding Claims ................................................. 46
6.5     Allowed Claims, Distribution Rights and Objections to Claims ............. 47
        6.5.1   Allowance Requirement ............................................................. 47
        6.5.2   Timing of Distributions ............................................................. 47

| | 6.5.3 | Making of Distributions | 47 |
| | 6.5.4 | Failure to Negotiate Checks/Unclaimed Distributions | 48 |
| | 6.5.5 | Objection Procedures | 49 |
| | 6.5.6 | Late Filed Claims | 49 |
| 6.6 | | Disposition of Executory Contracts and Unexpired Leases | 49 |
| | 6.6.1 | Bar Date for Claims for Rejection Damages | 49 |
| | 6.6.2 | Treatment of Rejection Claims | 50 |
| 6.7 | | Means for Implementation of the Plan | 50 |
| | 6.7.1 | Retained Estate | 50 |
| | 6.7.2 | Development, Construction, Marketing, and Sale of the Real Property | 50 |
| | 6.7.3 | Sale of Real Property Free and Clear of the Claim Interests | 51 |
| | 6.7.4 | Powers and Duties of Trustee | 51 |
| | 6.7.5 | Corporate Action | 52 |
| | 6.7.6 | Continued Existence | 53 |
| | 6.7.7 | Management | 53 |
| | 6.7.8 | Closing of the Chapter 11 Case | 53 |
| 6.8 | | Confirmation and/or Consummation | 54 |
| | 6.8.1 | Requirements for Confirmation of the Plan | 54 |
| | 6.8.2 | Conditions to Confirmation Date and Effective Date | 55 |
| 6.9 | | Effects of Confirmation | 56 |
| | 6.9.1 | Vesting of Assets | 56 |
| | 6.9.2 | Injunction | 56 |
| | | 6.9.2.1  Continuation of Automatic Stay | 56 |
| | | 6.9.2.2  Claims and Interests | 56 |
| | 6.9.3 | Exculpation and Limitation of Liability | 56 |
| | 6.9.4 | Other Documents and Actions | 57 |
| | 6.9.5 | Preservation of Insurance | 57 |
| | 6.9.6 | Guaranties | 57 |
| | 6.9.7 | Section 1146 Exemption | 57 |
| | 6.9.8 | No Successor Liability | 57 |
| 6.10 | | Retention of Jurisdiction | 58 |
| 6.11 | | Modification of Plan | 60 |

ARTICLE VII – CERTAIN RISK FACTORS TO BE CONSIDERED ........................ 60

| 7.1 | General Considerations | 61 |
| 7.2 | Certain Bankruptcy Considerations | 61 |
| 7.3 | Claims Estimations | 61 |
| 7.4 | Conditions Precedent to Consummation | 61 |
| 7.5 | Inherent Uncertainty of Financial Projections | 61 |
| 7.6 | Tax Consequences of the Plan upon Holders of Claims and Interests | 62 |

ARTICLE VIII – FEASIBILITY OF THE PLAN AND BEST INTERESTS OF
CREDITORS ............................................................................................................ 62

iii

8.1     Feasibility of the Plan ............................................................. 62
8.2     Acceptance of the Plan ........................................................... 62
8.3     Best Interests Test ................................................................. 63
8.4     Liquidation Analysis .............................................................. 63
8.5     Application of "Best Interests" of Creditors Test ..................... 64
8.6     Confirmation Without Acceptance of All Impaired Classes:  The
        "Cramdown" Alternative........................................................ 64

ARTICLE    IX  –  ALTERNATIVES    TO    CONFIRMATION    AND
CONSUMMATION OF THE PLAN ................................................ 65

9.1     Alternative Plan(s)................................................................. 66
9.2     Liquidation under Chapter 7................................................... 66

ARTICLE X – THE SOLICITATION; VOTING PROCEDURES ................................ 66

10.1    Parties in Interest Entitled to Vote ......................................... 66
10.2    Classes Entitled to Vote to Accept or Reject the Plan ............. 67
10.3    Solicitation Order ................................................................. 67
10.4    Waivers of Defects, Irregularities, Etc. .................................. 67
10.5    Withdrawal of Ballots; Revocation ......................................... 67
10.6    Voting Rights of Disputed Claimants ...................................... 68
10.7    Further Information; Additional Copies................................... 68

RECOMMENDATION AND CONCLUSION ............................................. 69

# ARTICLE I
# INTRODUCTION

Kevin O'Halloran, chapter 11 trustee (the "<u>Trustee</u>") in the above-referenced chapter 11 case (the "<u>Chapter 11 Case</u>") for Island View Crossing II, L.P. (the "<u>Debtor</u>"), respectfully submits this Disclosure Statement (as may be amended, the "<u>Disclosure Statement</u>") pursuant to section 1125 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") for use in the solicitation of votes on the Chapter 11 Plan of Liquidation dated April 19, 2021 (as may be amended, the "<u>Plan</u>"). Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan.  In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise provided.

The Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its reasons for seeking protection and reorganization under chapter 11 and significant events that have occurred during the Chapter 11 Case.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  In addition, the Disclosure Statement discusses the confirmation process and voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By order entered on _____, 2021, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtor to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtor and its business, other than that contained in this Disclosure Statement, the Plan, and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan.  In this Chapter 11 Case, only Class 1 (Tax Claim Bureau Secured Claim), Class 2 (RDA Secured Claim), Class 3 (Prudential Construction Loan Secured Claim), Class 7 (Pre-Petition Judgment Claims), Class 9 (General Unsecured Claims), Class 10 (Limited Partner Interests) and Class 11 (General Partner Interests) are Impaired and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims and Holders of Interests in these Classes are entitled to vote to accept or reject the Plan. Claims in Class 8 (Priority Non-Tax Claims) are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan.  Claims in Class 4 (IVC-Durham Loan Claim), Class 5 (Steeple Run Collateral Mortgage Claim), and Class 6 (Calnshire Collateral Mortgage Claim), represent Disputed Claims not entitled to vote to accept or reject the Plan unless the respective Claim is Allowed by a Final Order prior to the Voting Record Date.

## ARTICLE II
## OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtor. The Plan designates nine (9) Classes of Claims and two (2) classes of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

### 2.1    General Structure of the Plan

The Plan contemplates the liquidation of the Debtor and the resolution of all outstanding Claims against, and Interests in, the Debtor. Subject to the specific provisions set forth in the Plan, all Claims and Interests will be satisfied by cash payments to be issued by the Trustee.

The Trustee has estimated the ultimate distributions that will be made in respect of Allowed Claims and Interests. However, as explained more fully in Section VII entitled "Certain Risk Factors to be Considered," because of inherent uncertainties, many of which are beyond the Trustee's control, including (i) the vagaries of the real estate market and how it may impact the development, construction and sale of Phase 1 or Phase 2 of the Real Property and (ii) the determination by a Final Order of the Trustee's Actions against Prudential, there can be no guaranty that the actual performance and results will meet the Trustee's estimates. The Trustee nonetheless believes that if the Plan is not consummated, it is likely that Holders of Claims and Interests against the Debtor's estate will receive less than they would if the Plan is confirmed because dismissal of the Chapter 11, or the granting of relief from stay to the Holders of Secured Claims and subsequent foreclosure of their mortgage liens, will not result in a higher distribution to any Class of Claims or Interests. Similarly, if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, liquidation of the Debtor's assets will not result in a higher distribution to any Class of Claims or Interests.

### 2.2    Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtor under the Plan. For certain Classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Trustee's review of the Debtor's books and records and Claims filed to date in the case, and may include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether

2

the estimated percentage recoveries shown in the table below will actually be realized by the Holders of Allowed Claims in such Classes.

In addition to the classified Claims summarized below, Administrative Claims (including Professional Fee Claims, the Trustee Commission, and Claims of the Post-Petition Lender in connection with the Post-Petition Loan) and Priority Tax Claims are not classified and excluded from the below chart. The treatment of Administrative Claims under the Plan is summarized below in Section 6.3.1.

The Trustee may object to the number and the amount of Claims in the following Classes and reserves all applicable rights to further object to any Claim. Notwithstanding anything otherwise contained in the Plan or herein, the Trustee and his Professionals reserve all rights to surcharge Prudential's collateral pursuant to section 506(c) of the Bankruptcy Code.

| SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claims/ Interests | Summary of Plan Treatment of Claims and Interests | Amount | Projected Recovery Under the Plan |
| 1 | Tax Claim Bureau Claim | Class 1 is Impaired under the Plan and therefore the Holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.<br><br>The Holder of the Class 1 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, monthly payments over a term commencing on or as soon as reasonably practicable after the later of the (i) Effective Date, and (ii) a date agreed to by the Trustee and the Holder of the Class 1 Claim, and ending on the third anniversary of the Effective Date.<br><br>See section 6.3.2.1 for a more detailed explanation of the Plan treatment provided to Class 1. | $118,437 | 100% |
| 2 | RDA Claim | Class 2 is Impaired under the Plan and therefore the Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.<br><br>The Holder of the Class 2 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, payments over a term commencing on or as soon as reasonably practicable after the later of the (i) Effective Date, and (ii) a date agreed to by the Trustee and the | $1,981,000 | 100% |

3

| | | | | |
|---|---|---|---|---|
| | | Holder of the Class 2 Claim, and ending on the August 1, 2023.<br><br>See section 6.3.2.2 for a more detailed explanation of the Plan treatment provided to Class 2. | | |
| 3 | Prudential Construction Loan Claim | Class 3 is Impaired under the Plan and therefore the Holder of the Class 3 Claim is entitled to vote to accept or reject the Plan.<br><br>In the Trustee's Actions against Prudential, the Trustee is seeking to inter alia subordinate this Class 3 Claim to all creditors in the Chapter 11 Case.  If the Class 3 Claim is subordinated or any other relief in connection with the Trustee's Actions against Prudential is awarded in favor of the Trustee by a Final Order, to the extent that any provision of the Plan conflicts with or is any way inconsistent with said Final Order, the terms and provisions of said Final Order shall govern and control.  Except as may be otherwise ordered by a Final Order of the Bankruptcy Court, the Class 3 Claim holds a valid, perfected enforceable Lien on the Real Property subordinate to the Permitted Senior Liens that secure the Allowed Class 1 Claim and the Allowed Class 2 Claim, and the Liens that secure the Post-Petition Loan including the Post-Petition Loan Mortgage, but senior to all other Liens on the Real Property.<br><br>Prudential executed and delivered to the Trustee the Prudential Subordination Agreements which inter alia authorize the Trustee to utilize the proceeds from the sale of the residential units at the Project and/or sale of the Project that secures Claims held by Prudential to pay the Permitted Claims under any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  Likewise, under the Prudential Release of Liens Agreement and subject to the payment of the release prices set forth in the Prudential Release of Liens Agreement (and detailed in the Plan), the Trustee may utilize the remaining proceeds from the sale of the residential | $4,092,444 | 100% |

| | | | | |
|---|---|---|---|---|
| | | units at the Project to fund the Plan including payment of the Permitted Claims.  The Trustee has also preserved all rights to recover from the Real Property securing the Prudential Allowed Class 3 Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such Real Property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code.<br><br>Payment of Class 3 Claim.  The Holder of the Class 3 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, payments over a term commencing on or as soon as reasonably practicable after the later of the (i) Effective Date, (ii) the date on which such Class 3 Claim becomes Allowed, and (iii) a date agreed to by the Trustee and the Holder of the Class 3 Claim, and ending on the third Anniversary of the Effective Date.<br><br>See section 6.3.2.3 for a more detailed explanation of the Plan treatment provided to Class 3. | | |
| 4 | Disputed IVC-Durham Loan Claim | The Class 4 Claim is Disputed and not entitled to vote to accept or reject the Plan unless it is Allowed by a Final Order prior to the Voting Record Date.<br><br>See section 6.3.2.4 for a more detailed explanation of the Plan treatment provided to Class 4. | $1,400,000 (Disputed) | 00% |
| 5 | Disputed Steeple Run Collateral Mortgage Claim | The Class 5 Claim is Disputed and not entitled to vote to accept or reject the Plan unless it is Allowed by a Final Order prior to the Voting Record Date.<br><br>See section 6.3.2.5 for a more detailed explanation of the Plan treatment provided to Class 5. | $3,911,250 (Disputed) | 00% |

| 6 | Disputed Calnshire Collateral Mortgage Claim | The Class 6 Claim is Disputed and not entitled to vote to accept or reject the Plan unless it is Allowed by a Final Order prior to the Voting Record Date.<br><br>See section 6.3.2.6 for a more detailed explanation of the Plan treatment provided to Class 6. | $5,136,000 (Disputed) | 00% |
| 7 | Pre-Petition Judgment Claim | Class 7 is Impaired under the Plan and therefore the Holders of the Class 7 Claims are entitled to vote to accept or reject the Plan.<br><br>Class 7 Payment Fund.  As soon as reasonable practicable after the Effective Date: (a) after the Retained Estate has been fully liquidated, (b) after full payment of the Allowed Administrative Claims including Professional Fee Claims and Trustee Commission, (c) after full payment of all post Effective Date fees, costs, and obligations including professional fees and Trustee commissions incurred in connection with the administration of the Retained Estate including the development, construction, marketing, and sale of the Real Property, the prosecution of the Trustee Actions against Prudential to the entry of a Final Order and collection thereof, and the disposition of any other assets, (d) after full payment of the Post-Petition Loan Claim, (e) after full payment of Allowed Priority Tax Claims, and (f) after full payment of the Class 1 Claim, Class 2 Claim, Class 3 Claim, Class 4 Claim, Class 5 Claim, and Class 6 Claim, to the extent that the Claims in these classes are Allowed, the Trustee shall (i) deposit the remaining Cash, if any, up to the amount of the Allowed Class 7 Claims into the Class 7 Payment Fund, and (ii) deposit the remaining Cash, if any, up to the amount of the accrued interest at 3.0% per annum on the Allowed Class 7 Claims from the Effective Date through the date the Class 7 Payment Fund is funded; provided, however none of the proceeds collected by, or paid to the Trustee, from the Trustee's Actions against Prudential or the State Street Receivable will be deposited into the Class 7 Payment Fund.<br><br>Payment of the Class 7 Claims.  Each Allowed Class 7 Claim shall be treated on a pari passu basis with each other Allowed Class 7 Claim irrespective | $219,329 | Unknown |

| | | of the date when the respective pre-petition judgment held by each Holder of Allowed Class 7 Claims was entered against the Debtor. Each Holder of an Allowed Class 7 Claim shall receive Cash in an amount equal to such Holder's Pro Rata share of the Class 7 Payment Fund, with such share to be calculated based on the Allowed amount of such Holder's Class 7 Claim relative to the total amount of Allowed Class 7 Claims. Such payment of Cash shall be made on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date on which such Class 7 Claim becomes Allowed, (iii) ten (10) business days after the date on which the Allowed Amount of all Class 7 Claims have been determined by Final Order and the Class 7 Payment Fund has been funded by the Trustee; and (iv) such later date as may be agreed upon by the Trustee and the Holder of such Class 7 Claim.<br><br>See section 6.3.2.7 for a more detailed explanation of the Plan treatment provided to Class 7. | | |
|---|---|---|---|---|
| 8 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtor becomes an Allowed Priority Non-Tax Claim, or (iii) such other date as may be ordered by the Bankruptcy Court.<br><br>See section 6.3.2.8 for a more detailed explanation of the Plan treatment provided to Class 8. | $17,800 | 100% |
| 9 | General Unsecured Claims | Class 9 is Impaired under the Plan and therefore the Holders of the Class 9 Claims are entitled to vote to accept or reject the Plan.<br><br>Class 9 Unsecured Creditor Fund. As soon as reasonable practicable after the Effective Date: (a) after the Retained Estate has been fully liquidated, (b) after full payment of the Allowed Administrative Claims including Professional Fee Claims and Trustee Commission, (c) after full | $3,166,651 | Unkown |

7

payment of all post Effective Date fees, costs, and obligations including professional fees and Trustee commissions incurred in connection with the administration of the Retained Estate including the development, construction, marketing, and sale of the Real Property, the prosecution of the Trustee Actions against Prudential to the entry of a Final Order and collection thereof, and the disposition of any other assets, (d) after full payment of the Post-Petition Loan Claim, (e) after full payment of Allowed Priority Tax Claims, and (f) after full payment of Allowed Class 1 Claim, Class 2 Claim, Class 3 Claim, Class 4 Claim, Class 5 Claim, Class 6 Claim, Class 7 Claims, and Class 8 Claims, to the extent that the Claims in these classes are Allowed, the Trustee shall (i) deposit the remaining Cash, if any, up to the amount of the Allowed Class 9 Claims into the Class 9 Unsecured Creditor Fund, and (ii) deposit the remaining Cash, if any, up to the amount of the accrued interest on the Allowed Class 9 Claims at the Federal Rate from the Effective Date to the date the Class 9 Unsecured Creditor Fund is funded.

Payment of Class 9 Claims. Each Holder of an Allowed Class 9 General Unsecured Claim shall receive Cash in an amount equal to such Holder's Pro Rata share of the Class 9 Unsecured Creditor Fund, with such share to be calculated based on the Allowed amount of such Holder's Class 9 Claim and, if applicable, post-petition interest as set forth above relative to the total amount of Allowed Class 9 Claims. Such payment of Cash shall be made on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date on which such Class 9 Claim becomes Allowed, (iii) ten (10) business days after the date on which the Allowed Amount of all Class 9 Claims have been determined by Final Order and the Class 9 Creditor Fund has been funded by the Trustee, and (iv) such later date as may be agreed upon by the Trustee and the Holder of such Class 9 Claim.

See section 6.3.2.9 for a more detailed explanation of the Plan treatment provided to Class 9.

| 10 | Limited Partner Interests | Class 10 is Impaired under the Plan and therefore the Holders of the Class 10 Interests are entitled to vote to accept or reject the Plan.<br><br>See section 6.3.2.10 for a more detailed explanation of the Plan treatment provided to Class 10.<br>. | | Unknown |
| 11 | General Partner Interests | Class 11 is Impaired under the Plan and therefore the Holder of the Class 11 Interest is entitled to vote to accept or reject the Plan.<br><br>See section 6.3.2.11 for a more detailed explanation of the Plan treatment provided to Class 11. | | Unknown |

THE TRUSTEE BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR AND THUS <u>STRONGLY RECOMMENDS</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

## ARTICLE III
## PLAN VOTING INSTRUCTIONS AND PROCEDURES

### 3.1     Notice to Holders of Claims and Interests

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN ITS ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized by the Trustee or the Bankruptcy Court to distribute any information concerning the Debtor other than the information contained herein.

### 3.2    Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by the plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. In this Chapter 11 Case, under the Plan, only the Holders of the Class 1 Tax Claim Bureau Secured Claim, the Class 2 RDA Secured Claim, the Class 3 Prudential Construction Loan Secured Claim, the Class 7 Pre-Petition Judgment Claims, the Class 9 General Unsecured Claims, the Class 10 Limited Partner Interests and the Class 11 General Partner Interests are entitled to vote to accept or reject the Plan. Claims in Class 8 are Unimpaired by the Plan and are conclusively presumed to have accepted the Plan

Only Holders of Allowed Claims in the voting Classes are entitled to vote on the Plan. A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtor. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.  The Holders of Claims in the Class 4 IVC-Durham Loan Claim, the Class 5 Steeple Run Collateral Mortgage Claim, and the Class 6 Calnshire Collateral Mortgage Claim, represent Disputed Claims not entitled to vote to accept or reject the Plan unless the respective Claim is Allowed by a Final Order prior to the Voting Record Date.

Holders of Allowed Claims in the voting Classes may vote on the Plan only if they are Holders as of the Voting Record Date, which Voting Record Date is _____, 2021.

### 3.3    Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Trustee, through its counsel, will only send to the Holders of Claims in Class 1,  Class 2, Class 3, Class 7,  and Class 9 and Holders of Interests in Class 10 and Class 11 copies of (a) the Disclosure Statement and Plan, (b) the Order Approving (I) Disclosure Statement; (II) Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtor's Chapter 11 Plan; and (III) Related Notice and Objection Procedures (the "Order Approving Disclosure Statement"), (c) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (d) ballot (and return envelope) to be used in voting to accept or to reject the Plan and (e) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim or Interest that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

Karalis PC
1900 Spruce Street
Philadelphia, PA 19103
Attn: Aris J. Karalis, Esquire
(215) 546-4500

3.4      **Voting Procedures, Ballots and Voting Deadline**

The Holder of the Class 1 Tax Claim Bureau Secured Claim has the right to vote on the Plan in Class 1.  The Holder of the Class 2 RDA Secured Claim has the right to vote on the Plan in Class 2.  The Holder of the Class 3 Prudential Construction Loan Secured Claim has the right to vote on the Plan.  The Holders of the Class 7 Pre-Petition Judgment Claims have the right to vote on the Plan in Class 7.  The Holders of the Class 9 General Unsecured Claims have the right to vote on the Plan in Class 9.  The Holders of the Class 10 Limited Partner Interests have the right to vote on the Plan in Class 10.  The Holders of the Class 11 General Partner Interests have the right to vote on the Plan in Class 11.

All parties entitled to vote should read the Disclosure Statement, Plan, and their Exhibits in their entirety. After carefully reviewing such documents, each party should complete its Ballot, including its vote with respect to the Plan, and return it as described in, and by the deadline given in, the instructions contained in the Ballot.

If a Class 1, Class 2, Class 3, Class 7, or Class 9 Creditor or a Class 10 or Class 11 Interest does not receive all of the Solicitation Materials, they are encouraged to contact counsel to the Trustee at the address given in Section 3.3 above.

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS CONTAINED IN THE BALLOT AND <u>RECEIVED</u> NO LATER THAN _____, 2021 AT 5:00 P.M. PREVAILING EASTERN TIME.

**Ballots should be returned to:**

Karalis PC
1900 Spruce Street
Philadelphia, PA 19103
Attn: Aris J. Karalis, Esquire
(215) 546-4500

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED OR E-MAILED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID. DO NOT RETURN ANY DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are also available in a pdf format by contacting Aris J. Karalis at Karalis PC, 215-546-4500. If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

Karalis PC
1900 Spruce Street
Philadelphia, PA 19103
Attn: Aris J. Karalis, Esquire
(215) 546-4500

For further information and general instruction on voting to accept or reject the Plan, see Article X of this Disclosure Statement and the instructions accompanying your ballot.

THE TRUSTEE URGES ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM TO COUNSEL TO THE TRUSTEE BY THE VOTING DEADLINE.

### 3.5    Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for _____, 2021 at _____ A.M., (prevailing Eastern time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must be filed and served on or before _____, 2021.

### ARTICE IV
### GENERAL INFORMATION CONCERNING THE DEBTOR

### 4.1    Overview

The Debtor was formed as a Pennsylvania limited partnership on June 30, 2003, by its then general and limited partners which acquired the Real Property from the RDA. On or about September 22, 2011, the former general and limited partners of the Debtor sold all of their interests in the Debtor to Island View Properties, Inc. which became the Debtor's general partner, and Renato J. Gualtieri ("Gualtieri"), who became the Debtor's sole limited partner. Gualtieri was also the sole shareholder of Island View Properties Inc. At the time of the 2011 sale of the partnership interests, the Debtor owned the Real Property subject to the outstanding RDA Loan in the amount of $2,500,000 secured by the RDA Mortgages. Upon information and belief, in 2014, Gualtieri sold 1% limited partnership interests in the Debtor to each of the following friends and family members: (i) Antonio and Lesa Gualtieri (his brother and sister-in-law); (ii) Francesco Gualtieri (his father,

now deceased); and (iii) Nancy Maychuk (his girlfriend).

The Debtor's principal assets are (a) the Real Property which is a 17.5 acre parcel of land located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania, wherein Phase 1 is approved for fourteen (14) buildings containing a total of 73 townhouses ("Phase 1") and Phase 2 is approved for six (6) buildings containing a total of 96 condominium units ("Phase 2"), (b) the Trustee's Actions against Prudential comprised of (i) the Lender Liability Action commenced pre-petition by the Debtor against Prudential, and (ii) the Avoidance and Subordination Action filed by the Trustee against Prudential that has been consolidated for all purposes with the Lender Liability Action, and (c) the State Street Receivable.

The Real Property was part of a former World War I shipbuilding facility on the Delaware River.  The Real Property required remediation in order for it to comply with the Pennsylvania Land Recycling and Environmental Remediation Standards Act ("PA Act 2").  The remediation required, and the resulting liability relief provided by PA Act 2, is specific to the contamination identified at each site.  Prior to the Petition Date, the Debtor had retained Penn Environmental & Remediation, Inc. ("Penn E&R") to evaluate the Real Property in terms of residential land use and to implement any remedial actions, if any, needed to demonstrate attainment of either the statewide health or site-specific standards based on a residential use scenario.  With the assistance of Penn E&R and approval of the Pennsylvania Department of Environmental Protection (the "DEP"), a cleanup plan for the remediation of soils to meet PA Act 2 was prepared for the Real Property.  As of the Petition Date, the Debtor had commenced and completed most of the remediation for the Real Property; but there were still a number of additional remediation activities and reports that needed to be performed and completed in order to obtain final approval under PA Act 2 from the DEP for Phase 1.   As a result, the Trustee retained Penn E&R to oversee the completion of the remaining remediation work for Phase 1 and to prepare a final report to obtain final approval under PA Act 2 for Phase 1.

Prior to the Petition Date, the Debtor had commenced the Lender Liability Action against Prudential, and was thereafter involved with its affiliates in defending numerous foreclosure actions and confessions of judgments commenced by Prudential against the Debtor and its affiliates.  After the Debtor filed the Lender Liability Action, the Debtor was unable to obtain new financing to resume construction in Phase 1.  The Debtor filed the Chapter 11 Case with the intention to stay all the legal proceedings pending against it, and to obtain approval of new financing to resume construction at the Real Property.  However, the Debtor was unable to obtain approval of its proposed financing and the Bankruptcy Court granted the motion filed by Prudential to appoint a chapter 11 trustee for the Chapter 11 Case.

Since the Trustee's appointment, the Trustee determined that the best means by which to maximize the value of the Debtor's Real Property for the Creditors of the Debtor's Estate would be to complete: (i) the construction of the 73 residential units in Phase 1, (ii) construction of the necessary site improvements required in order to be able to market and sell the residential units in Phase 1, and (iii) the remaining remediation work and reports required to obtain the final approval of the DEP under PA Act 2 for Phase 1.

The Trustee also continues to investigate the development, completion and/or sale of Phase 2 at the Real Property in whole or in part.   In order to proceed with the completion of Phase 1, the Trustee sought and obtained Bankruptcy Court approval of the Post-Petition Loan.   The Trustee

has commenced vertical construction of the buildings in Phase 1 and as of the date of this Disclosure has sold 36 (of the 73) residential units in Phase 1 and closed and settled 23 of these residential units.

### 4.2    **Summary of Debtor's Assets**

The Debtor filed its Schedules with the Bankruptcy Court that list the assets which are either owned by the Debtor or in which the Debtor has an interest.

The Debtor's principal assets are as follows:

- The Real Property which includes both Phase 1 and Phase 2;

- The Lender Liability Action filed pre-petition against Prudential. The Debtor has described the Lender Liability Action as having a value in the range of $25,000,000 to $27,000,000 (See section 5.5.7 below for more information);

- The Avoidance and Subordination Action filed by the Trustee against Prudential. By Order dated December 6, 2018, the Avoidance and Subordination Action was consolidated for all purposes with the pending Lender Liability Action (See section 5.5.7 below for more information); and

- The State Street Receivable arises from the settlement agreement among the Trustee, Prudential, Penn Community Bank and One State Street Associates, LP ("State Street"), an Affiliate, whereby a prepetition unsecured receivable was reduced to a $45,000 secured note payable to the Trustee on behalf of the Debtor's Estate, secured by mortgages against real property owned by State Street. The Trustee expects that the State Street Receivable plus accrued interest will be paid in full.

Other assets include cash in bank accounts generated after the Appointment Date from the Trustee's sale of units in Phase 1, insurance policies, and an office trailer at the Real Property.

The Schedules filed by the Debtor may be reviewed on the Bankruptcy Court electronic case filing system. Information on the Debtor's assets is also available in the Liquidation Analysis attached hereto as Exhibit B.

The Trustee has not ordered an appraisal report for the Real Property, but both the Debtor and Prudential ordered appraisal reports for the Real Property shortly after the Petition Date which were presented to the Bankruptcy Court at the hearings held on the Debtor's motion for approval of debtor-in-possession financing (See section 5.4.3 below for more information). The Bankruptcy Court in its oral bench opinion issued on December 18, 2017, in connection with hearing on the Debtor's motion for approval of debtor-in-possession financing indicated that the Debtor's own appraiser opined that the present value of the Real Property is $17.8 million while Prudential offered expert testimony that the present value of the Real Property is $11,940,000. The Court further indicated that it believes the value of the Project falls somewhere between the two appraisals.

Assuming the value of the Real Property is an amount equal to the average of the two appraisals presented to the Bankruptcy Court, the approximate value of the Real Property at that time would have been $14,870,000.

### 4.3    Summary of Debtor's Debt Structure

#### 4.3.1    Prudential Construction Loan

The Debtor's proposed development of Phase 1 including the site improvements for the Real Property was to be financed by Prudential.  On or about November 26, 2014, Prudential made the Prudential Construction Loan available to the Debtor in an amount up to $5,541,468 to finance the site improvements and vertical construction in Phase 1, which was secured by the Prudential Construction Loan Mortgage.  As of the Petition Date, the amount due Prudential on account of the Prudential Construction Loan was $4,092,443.58.  The Trustee in the Trustee's Actions against Prudential is seeking to inter alia subordinate the Prudential Construction Loan Claim to all creditors in the Chapter 11 Case.

Prudential also entered into the Subdivision Financial Security Agreement dated March 4, 2015 and related agreements by and among Bristol Borough, Bristol Borough Water & Sewer Authority, Prudential and the Debtor (the "Subdivision Site Improvement Agreement") for the installation of the public improvements required for development of the Real Property.  In accordance with the Subdivision Site Improvement Agreement, Prudential issued the Bristol Borough Letter of Credit in the original amount of $2,091,381.19.  As of the Petition Date the undrawn balance under the Bristol Borough Letter of Credit had been reduced to $1,231,087.02. As a result of site improvement work performed by the Trustee at the Project, Bristol Borough issued certificate of completion No. 7 dated February 10, 2020 in the amount of $143,381.70 less a ten percent (10%) retention by the Borough, which authorized the Borough to reduce the deposit of this project by the sum of ($129,043.53) pursuant to the site improvement security agreement.[1]

#### 4.3.2    The Disputed Steeple Run Collateral Mortgage

Contemporaneous with Gualtieri's acquisition of all the Interests in the Debtor, Prudential and the Debtor entered into the Steeple Run Collateral Mortgage dated September 20, 2011 concerning a loan in the amount of $3,911,250 from Prudential to Steeple Run, L.P.  The Steeple Run Collateral Mortgage was recorded against the Debtor's Real Property.  No portion of this loan was paid to, or for the benefit of, the Debtor.  The Trustee in the Trustee's Actions against Prudential is seeking to inter alia avoid the Steeple Run Collateral Mortgage and to subordinate this Claim to all creditors in the Chapter 11 Case.

#### 4.3.3    The Disputed IVC-Durham Loan

On or about September 20, 2013, Prudential, as lender, and the Debtor, Island View

---

[1] Prudential had also issued a letter of credit in the amount of $293,445.50 to Aqua Pennsylvania, Inc. for a water main extension to provide water to the Real Property (the "Aqua Letter of Credit").  By letter dated February 7, 2020, Aqua has confirmed to the Trustee that the original letter of credit issued by Prudential Savings Bank, LOC #IVC-2, was released in its entirety and returned to Gualtieri of Americorp on October 18, 2017.

Properties, Inc. and Americorp Homes, Inc., each as co-borrower, entered into the IVC-Durham Loan in the amount of $1,400,000 which loan was advanced to reduce the balance due on a certain loan from Prudential to Durham Manor, LLC, an affiliate of the Debtor, and for the payment of costs and expenses associated with the closing of the IVC-Durham Loan. Only $280,829.84 of the IVC-Durham Loan was paid for the benefit of the Debtor, the balance of this loan was not paid to, or for the benefit of, the Debtor. The Trustee in the Trustee's Actions against Prudential is seeking to inter alia avoid the IVC-Durham Mortgage, recover transfers arising in connection therewith and to subordinate this Claim to all creditors in the Chapter 11 Case.

### 4.3.4    The Disputed Calnshire Collateral Mortgage

On or about May 30, 2014, Prudential and the Debtor entered into the Calnshire Collateral Mortgage dated May 30, 2014 concerning a loan in the amount of $5,136,000 from Prudential to Calnshire, L.P. and Durham Manor LLC. The Calnshire Collateral Mortgage was recorded against the Debtor's Real Property. No portion of this loan was paid to, or for the benefit of, the Debtor. The Trustee in the Trustee's Actions against Prudential is seeking to inter alia avoid the Calnshire Collateral Mortgage and to subordinate this Claim to all creditors in the Chapter 11 Case

As set forth above and in the Plan, the Trustee only recognizes Prudential as the Holder of only one Allowed Claim arising from the Prudential Construction Loan (the Class 3 Claim under the Plan); provided however, pending the determination of the Trustee's Actions against Prudential, this Class 3 Claim may be subordinated to all creditors in the Chapter 11 Case. All the remaining Claims of Prudential are Disputed: (i) the Class 4 Claim (IVC-Durham Loan Claim), (ii) the Class 5 Claim (Steeple Run Collateral Mortgage Claim), and (iii) the Class 6 Claim (Calnshire Collateral Mortgage Claim) all of which are subject to claims for inter alia avoidance and subordination and with respect to the IVC-Durham Loan Claim, the recovery of transfers arising in connection therewith. Further, the Trustee has additional claims against Prudential that are set forth in the Lender Liability Action against Prudential.

### 4.3.5    The Pre-Petition Secured Property Tax Claim

The Bucks County Tax Claim Bureau is the Holder of the Allowed Pre-Petition Secured Property Tax Claim for unpaid pre-petition property taxes in the amount of $118,436.82 as of the Petition Date. This Claim is secured and senior to all the recorded mortgages on the Real Property. The Tax Claim Bureau is classified as the Holder of an Allowed Class 1 Claim.

### 4.3.6    The RDA Loan Claim

The RDA is the holder the Allowed RDA Loan Claim in an amount of $1,981,000 as of the Petition Date that is secured by a first lien arising from the RDA Mortgages on the Real Property. The RDA is the Holder of an Allowed Class 2 Claim.

### 4.3.7    Pre-Petition Judgment Claims

There are five (5) Holders of pre-petition judgements as follows: (i) the Borough Judgment in the amount of $56,239.22, (ii) the Bohler Engineering Judgment in the amount of

16

$48,853.63, (iii) the Caione Judgment in the amount of $30,990.00, (iv) the Ranganathan Judgment in the amount of $49,980.00; and (v) the McElderry Drywall Judgment in the amount of $33,266.00. These pre-petition judgment claims in the aggregate total the amount of $219,328.85 as of the Petition Date and are classified as Class 7 Claims under the Plan.

All of the Liens that arise from the Class 7 pre-petition judgments are junior to: (a) the Liens that secure the Post-Petition Loan, (b) the Liens held by the Holder of the Class 1 Claim, (c) the Liens held by the Holders of the Class 2 Claim, (d) the Liens held by the Holders of Class 3, 4, 5, and 6 Claims, to the extent Allowed.

### 4.3.8  Priority Non-Tax Claims

The Trustee's review of Priority Non-Tax Claims is ongoing.  Based on information presently available, the Priority Non-Tax Claims are estimated to be approximately $17,800.00.

### 4.3.9  General Unsecured Claims

Based on a reconciliation of the Claims listed on the bankruptcy schedules filed by the Debtor and the proofs of claim filed by Creditors, the General Unsecured Claims total $3,166,651.  These claims include two (2) claims of Insiders scheduled by the Debtor, Calnshire Estates, LLC ("Calnshire"), an Affiliated debtor whose Chapter 11 case was converted to a case under Chapter 7, in the amount of $175,519.28, and Americorp Construction, Inc. ("Americorp"), an entity which upon information and belief is owned and controlled by Gualtieri.  The Trustee has not determined if an objection to these Claims will be filed or, if the Schedules filed by the Debtor may be amended.

Prior to the Appointment Date, Prudential alleged that (i) a number of the Claims filed by Creditors or scheduled by the Debtor as general unsecured claims in this Chapter 11 Case may not be valid claims against the Debtor because the Debtor may not be contractually or otherwise liable to these Creditors for the Claims asserted against the Estate and (ii) that these Claims are the obligation of Americorp.  The Trustee will investigate the allegations raised by Prudential before the Claims Objection Deadline to determine what actions is warranted.  The Trustee's review of the General Unsecured Claims to date has been limited and therefore the Trustee has not determined the objections to Claims, if any, that he may file on or before the Claims Objection Deadline.

### 4.4    **Events Leading to the Commencement of the Chapter 11 Case**

After the Debtor obtained the Prudential Construction Loan in November 2014, it began developing the Real Property.  The Debtor advised that it encountered and had to remove more subsurface concrete and steel than its engineers and professionals had estimated.

After a change in the Debtor's relationship manager at Prudential, and a change in management at Prudential in November of 2015, disputes arose between the Debtor and Prudential that ultimately resulted in:  Prudential ceasing to fund advances under the Prudential Construction Loan resulting in the cessation of construction of the residential units that had been started in Phase 1; the cessation of site improvements; and the commencement of various litigation among the

Debtor, Gualtieri, the general partner of the Debtor and Prudential, including on March 31, 2016, the Lender Liability Action (a $27 million dollar lender liability claim) being filed by the Debtor and its Affiliates against Prudential in the Court of Common Pleas, Philadelphia County, and Prudential filing more than 26 separate lawsuits against the Debtor and its Affiliates, (e.g. foreclosure cases and confessions of judgment complaints) and nine counterclaims in the Lender Liability Action.

Vertical construction at the Real Property stopped in the summer of 2016 and construction of the site improvements at the Real Property ceased by the end of 2016. At the time the Lender Liability Action was commenced, the Debtor had twelve residential units under construction in Phase 1, at different stages of completion. These units remained unfinished for over two and one-half years until October of 2018 when the Trustee was able to restart construction in Phase 1.

The Debtor reported that after Prudential stopped releasing advances under the Prudential Construction Loan for work performed, combined with the inability to generate any cash flow from the sale of residential units in Phase 1, the Debtor's operations were impaired which prevented completion of the residential units under construction and resulted in numerous collection lawsuits being filed against the Debtor. In the fall of 2016, the Debtor began its search for alternative financing that would allow construction to resume and to refinance one or more of the Existing Mortgages of Prudential. After months of searching and speaking with numerous traditional and non-traditional lenders, the Debtors and their loan brokers found a few non-traditional lenders that were willing to make a construction loan to the Debtor for it to re-start construction of Phase 1, provided they were granted a first lien mortgage on the Real Property.

On June 30, 2017, the Debtors and certain Affiliates filed their bankruptcy cases as part of their joint strategy of seeking approval of post-petition financing for the Debtor to resume construction in Phase 1 as a means by which the Debtor and its Affiliates could jointly generate cash flow sufficient to repay their respective debts.

## ARTICLE V
## THE CHAPTER 11 CASE

### 5.1    The Debtor in Possession

On June 30, 2017 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continued in the management and operation of its businesses and property as a debtor in possession until December 18, 2017, when the Bankruptcy Court directed the appointment of a chapter 11 trustee. No creditors committee has been appointed in the Chapter 11 Case.

### 5.2    The Cases of the Affiliated Debtors

On the Petition Date, three Affiliates of the Debtor, also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Affiliates were Steeple Run, LP ("Steeple Run"), Calnshire, , and State Street.

On December 18, 2017, the Bankruptcy Court converted the chapter 11 cases of Calnshire and Steeple Run to cases under Chapter 7 of the Bankruptcy Code. On May 8,

2019, the Bankruptcy Court approved the settlement agreement among Prudential, the Trustee and Penn Community Bank whereby the State Street Receivable was reduced to a Note payable to the Trustee and secured by mortgages recorded against the real properties owned by the State Street Debtor. Thereafter, by Order dated May 29, 2019, the Bankruptcy Court dismissed the chapter 11 case of State Street.

### 5.3    Retention of Professionals

#### 5.3.1    Professionals retained by the Debtor

The Debtor retained Smith Kane Holman, LLC as its counsel. The Debtor also retained Stradley Ronon Stevens & Young, LLP ("Stradley") as special litigation counsel in connection with the Debtor's Lender Liability Action effective as of July 18, 2017.

#### 5.3.2    Professionals retained by the Interim Trustee

On December 21, 2017, Christine Shubert, was appointed as the interim trustee for the Debtor. The interim trustee retained Fox Rothschild LLP as her counsel. The interim trustee also retained Bederson LLP as her accountants.

#### 5.3.3    Professionals retained by the Trustee

The Trustee retained (a) Karalis PC as his general bankruptcy counsel, (b) Kaufman, Coren & Ress, P.C., as his special litigation counsel with respect to the Trustee's Actions against Prudential, and (c) Kaplin Stewart Meloff Reiter & Stein, PC as his special counsel to prepare the public offering statement for Phase 1 and to address any zoning or related land use matters with respect to the development of Phase 1. The Trustee also retained Newbridge Management LLC as his financial advisors and Long and Foster Real Estate as his real estate broker to market and sell the residential units in Phase 1.

### 5.4    Motions and other Filings in the Bankruptcy Case

#### 5.4.1    Removal of Debtor's Lender Liability Action to the Bankruptcy Court

On or about July 18, 2017, Prudential removed the Lender Liability Action to the Bankruptcy Court where it is presently pending. The Debtor did not oppose the removal of the Lender Liability action from the state court to the Bankruptcy Court.

#### 5.4.2    Prudential's Motion to Convert Case to Chapter 7, or in the alternative to appoint a chapter 11 Trustee

On August 4, 2017, Prudential filed a Motion to Convert the Chapter 11 Case to a Case under Chapter 7, or in the alternative to appoint a chapter 11 Trustee (the "Motion to Appoint Trustee"). The Debtor opposed the Motion to Appoint Trustee. By Order dated December 18, 2017, the Bankruptcy Court granted the Motion to Appoint Trustee, in part, directing the appointment of a chapter 11 trustee in the Chapter 11 Case.

19

### 5.4.3   Debtor's Motion for Debtor in Possession Financing

On August 21, 2017, the Debtor filed a motion for entry of a final order authorizing the Debtor to:  (i) obtain post-petition financing pursuant to sections 364 and 363 of the Bankruptcy Code, (ii) enter into various loan documents, (iii) granting liens on property of the estate senior to all other liens pursuant to section 364(d)(1) of the Bankruptcy Code and modifying the automatic stay to implement the financing (the "DIP Financing Motion").  On September 4, 2017, the Debtor amended the DIP Financing Motion.  The DIP Financing Motion was opposed by Prudential and the RDA.

After numerous days of hearings to consider the Motion to Appoint Trustee and the DIP Financing Motion, by order dated December 18, 2017, the Bankruptcy Court denied the Debtor's DIP Financing Motion and Prudential's request to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code but granted the Motion to Appoint Trustee and directed the appointment of a chapter 11 trustee.

### 5.5   **The Trustee**

#### 5.5.1   Election of Trustee for the Chapter 11 Case

On December 22, 2017, Creditor Stradley filed a request to convene a meeting to elect a chapter 11 trustee.  On January 10, 2018, the interim trustee filed an objection to Claim Number 14 filed by Stradley.  On January 17, 2018, the interim trustee withdrew her objection to Claim Number 14 filed by Stradley.

On January 16, 2018, Creditor Stradley filed an emergency motion to inter alia estimate Stradley's Claim for voting purposes or rule on the objection to its Claim prior to vote on the election of a chapter 11 trustee ("Stradley's Motion to Estimate Claim for Voting").  The interim trustee file a reply and Prudential filed an objection to Stradley's Motion to Estimate Claim for Voting.  By Order dated January 26, 2018, Stradley's Motion to Estimate Claim for Voting was granted and was amended by Order dated January 29, 2018 to provide an "end note" to the order, that for purposes of the election, Stradley does not have an interest materially adverse to the interest of creditors entitled to distribution as described in section 702(a)(1) of the Bankruptcy Code.

On January 30, 2018 (the "Appointment Date"), the United States Trustee filed a Report of Undisputed Election whereby Kevin O'Halloran was appointed as the chapter 11 trustee in this Chapter 11 Case

#### 5.5.2   Trustee's Decision to Develop, and Sell Residential Units in Phase 1 and to Prosecute the Trustee's Actions against Prudential.

After his appointment, the Trustee met and consulted with: (i) on behalf of the Debtor, Gualtieri, Debtor's counsel, and Debtor's proposed lender, (ii)  numerous key Creditors in this Chapter 11 Case, including the RDA, Prudential, Stradley, the Borough of Bristol, and a few of the pre-petition judgment holders, (iii) numerous persons and entities that had expressed an interest in purchasing the Real Property, and (iv) numerous other professionals, including land planning professionals, environmental consultants, engineers, real estate

brokers, and independent counsel experienced in prosecuting lender liability actions.

Thereafter, the Trustee in his business judgment determined that the best means by which to maximize the value of the Real Property for the benefit of all Creditors was to proceed with the development and sale of residential units in Phase 1, to continue to explore all options to maximize the value of Phase 2, and to complete the remediation activities and the report required to obtain final PA Act 2 approval from the DEP for Phase 1. The Trustee also determined that retention of special litigation counsel was appropriate for the continued prosecution of the Lender Liability Action and the commencement of additional Causes of Actions against Prudential identified by the Trustee's bankruptcy counsel.

In order to proceed with development and sale of Phase 1 and to fund the costs that would be incurred for the development of Phase 1, the Trustee also determined that he would require a post-petition loan in the amount of $4,700,000.

5.5.3    Trustee's Motion to approve Post-Petition Financing, the Prudential Release of Liens Agreement and the Prudential Subordination Agreements.

By late July 2018, the Trustee and the Post-Petition Lender agreed upon the terms and conditions for the Post-Petition Loan. Also by the end of July 2018, the Trustee and Prudential had agreed upon the Prudential Release of Liens Agreement and the Prudential Subordination Agreements which are very significant agreements in the Chapter 11 Case because they provide the terms by which Prudential agreed inter alia to: (i) consent to the approval of the Post-Petition Loan, (ii) the release of all of its Liens arising from the Existing Mortgages of Prudential at the time of closing on the sale of each residential unit in Phase 1 in exchange for the payment of the fixed release prices set forth therein, (iii) extend the maturity date of the unpaid balance due under the Prudential Construction Loan Mortgage to the last business day of the 42nd month after the Post-Petition Financing Order becomes a Final Order (March 31, 2022), and (iv) subordinate all the liens and claims arising from the Calnshire Collateral Mortgage, the Steeple Run Collateral Mortgage and the IVC-Durham Mortgage to the Permitted Claims so as to allow the Trustee to use the proceeds from sale of the Residential Units in Phase 1 and/or sale of Phase 1 to pay the Permitted Claims.

On August 17, 2018, the Trustee filed a motion for entry of Final Order authorizing (I) Trustee to obtain secured post petition financing pursuant to §§105, 361, 364(c)(1) and 364(d)(1) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 4001, (II) Trustee to enter into the Loan Documents; (III) granting an allowed super priority administrative expense claim with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Section 503(b) or 507(b); (IV) granting a Lien on all assets of the Estate (except for the Excluded Assets) senior to all other Liens (except for the Permitted Liens) pursuant to Section 364(d)(1) of Bankruptcy Code; (V) approving the Release of Liens Agreement between the Trustee and Prudential pursuant to Federal Rule of Bankruptcy Procedure 9019; and (VI) granting related relief.

By Order dated September 12, 2018, the Bankruptcy Court inter alia approved (i) the Post-Petition Loan in the amount of $4,700,000 with BKRE Investments LLC ("Post-Petition Lender") secured by a valid and perfected first priority lien on the Real Property subordinate only to the Permitted Liens, and (ii) the Prudential Release of Liens Agreement and the

Prudential Subordination Agreements. The Liens that secure the Post-Petition Loan shall continue unaltered and in full force and effect until the Post-Petition Loan has been paid in full in Cash. In addition, pursuant to Bankruptcy Code Section 364(c)(1) the Post-Petition Loan is also secured by an allowed administrative expense claim with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b).

The Prudential Release of Liens Agreement, the Calnshire Mortgages Subordination Agreement, the IVC-Durham Mortgage Subordination Agreement, and the Steeple Run Collateral Mortgage Subordination Agreement have all been signed by authorized representatives of Prudential and the Trustee and have been recorded with the recorder of deeds for Bucks County against the Real Property.

The advances under the Post-Petition Loan have been utilized to inter alia fund the costs to resume the construction, marketing and sale of the residential units in Phase 1, the construction of site improvements, the costs to complete the remediation items required to obtain final PA Act 2 approval from the DEP for Phase 1 and the Professional Fee Claims incurred by the Professionals retained by the Trustee and approved by the Bankruptcy Court.

### 5.5.4    PA Act 2 Final Approval by DEP for Phase 1

Shortly after the Post-Petition Loan was approved in September 2018, the Trustee began the remediation work at the Real Property required by the DEP and he retained Penn E&R to complete the environmental reports needed to obtain the final approval from the DEP under PA Act 2 for Phase 1. On October 9, 2019, final PA Act 2 approval for Phase 1 was received from the DEP and on December 16, 2019 the DEP issued the environmental covenant for Phase 1 (the "Environmental Covenant"). On or about December 17, 2019 the Trustee had the Environmental Covenant recorded against the Real Property.

During 2019, the Trustee had received fifteen (15) non-binding reservation agreements for the purchase of residential units in Phase 1. After the Trustee obtained final PA Act 2 approval the Trustee was able to proceed with the completion of the public offering statement for Phase 1, the conversion of the non-binding reservation agreements to binding agreements of sale, and to expand his marketing and sale of the residential units in Phase 1.

The final DEP approval for Phase 1 took substantially longer than the Trustee had anticipated and resulted in no residential units being sold during the 2019 calendar year. The Trustee's original projections for the completion of Phase 1 have been extended by one year due to the additional period of time that was required to obtain final DEP approval for Phase 1 under PA Act 2.

### 5.5.5    Trustee's Motion for Financing as an Administrative Expense

Since the Trustee was not able to sell and close on any of the residential units he had constructed in Phase 1 during 2019, the Trustee did not realize any of the revenue projected from the sale of residential units during 2019, and the balance of available funds under the Post-Petition Loan were not adequate to continue fund the operations in Phase 1 during the winter of 2020. Therefore, the Trustee needed bridge financing to cover expenses from January 2020 until March 2020.

For these reasons, the Trustee on December 20, 2019, filed a Motion for entry of a Final Order authorizing Trustee to obtain an unsecured loan from the Post-Petition Lender as an Administrative Expense Claim (the "Second Post-Petition Loan"). The Second Post-Petition Loan was for a total amount of $443,352 payable in two advances, (a) the 1st Advance of $200,000 to the Trustee to pay costs incurred to winter seal the buildings in Phase 1; and (b) the 2nd Advance of $243,352 would only be made in the sole and absolute discretion of the Post-Petition Lender to fund costs to complete four (4) residential units in building number 3 in Phase 1 which would have given the Trustee the added advantage of having four (4) additional units completed during the winter of 2020 and allowed the project to be completed sooner. The terms of this loan were also very favorable to the Estate, it was an unsecured, administrative claim, with a 1-year maturity date with interest at 9.25% per annum until paid; provided, however, if the Trustee repays this loan on or before the maturity date, the Second Post-Petition Loan would accrue no interest. The Post-Petition Lender also made the 2nd Advance contingent on its sole and absolute discretion because it did not want to fund the 2nd Advance if the RDA or Prudential were going to object. The RDA advised promptly that it had no opposition to this loan. Prudential took the Trustee's request under advisement and eventually objected to the Second Post-Petition Loan.

By an interim Order dated January 27, 2020, the Second Post-Petition Loan was approved to the extent of $200,000.00. A further hearing to consider approval of the balance of the Second Post-Petition Loan (the 2nd Advance)was scheduled for February 12, 2020 but continued due to the objection filed by Prudential to the approval of the Second Post-Petition Loan. When Prudential would not agree to withdraw its objection, the Post-Petition Lender elected not to proceed with the 2nd Advance of $243,352. By Final Order dated March 19, 2020, the interim advance of $200,000 was made final.

The Trustee repaid the Second Post-Petition Loan before its Maturity Date and hence the Estate received the benefit of this $200,000 unsecured loan for one year without interest. However, due to Prudential's objection to the 2nd Advance, the Estate lost all the benefits of (a) having four (4) additional units completed during the winter of 2020 before the COVID-19 Pandemic caused the shutdown of construction in March 2020, (b) the completion of Phase 1 sooner, and (c) the Estate's availability of an additional $243,352 of financing for the period of a year without interest.

### 5.5.6    Trustee's Sale of Residential Units, the COVID-19 Pandemic, Revised Projections and Monthly Operating Reports

On January 17, 2020, the Trustee filed his first motion to approve the sale of the first three residential units in Phase 1. By Order dated February 12, 2020, the sale of the first three units in Phase 1 were authorized.

On February 24, 2020, the Trustee filed a second motion to approve the sale of a 4th unit in Phase 1 and the procedures for the approval of future sales of residential units in Phase 1. By Order dated March 19, 2020, the Bankruptcy Court approved (i) the sale of the 4th residential unit and (ii) the procedures for the future sales of residential units in Phase 1.

However, as a result of the COVID-19 crisis and the related orders of the Governor of Pennsylvania, the Trustee was directed to shutdown construction and close the sales office in Phase during March 2020. Construction was suspended from the middle of March 2020 through September 2020. During this period, the sales team operated virtually and was active in

communicating by phone and email with prospective buyers. Marketing in both print and social media continued with a video of the Project and the interior of units available for viewing. However, the COVID-19 pandemic had a significant impact on the prime selling seasons of spring and summer of 2020 resulting in substantially reduced sales anddelays in concluding sales transactions.

Even though the Trustee implemented cost cutting measures to reduce expenses, including the suspension of the construction manager for a full six months, there were other obligations that had to be maintained and could not be reduced including, payroll, insurance, security, interest, utilities, UST fees, general maintenance of the Project, and other related expenses. The financial consequence of the COVID-19 crisis upon the Estate was substantial in that it delayed the completion and sale of the remaining units in Phase 1 by an additional year, while carrying costs during this period were approximately $1,000,000.

In total, the completion of Phase 1 has been delayed by approximately two (2) years beyond the Trustee's original projections, one year arising from the time period that passed to obtain final approval from the DEP under PA Act 2 for Phase 1, and an additional year arising from the COVID-19 crisis. The Trustee has revised his original projections utilized at the time the Post-Petition Loan was approved accordingly. The Trustee's revised Projections are attached to this Disclosure Statement as Exhibit "A" and made a part hereof.

As a result, under the Plan the Trustee is seeking to extend the final payment or maturity date of below stated Claims as follows:

- Class 1 – Claim of Tax Claim Bureau to the end of the third anniversary of the Effective Date;
- Post-Petition Loan from September 19, 2021 to December 31, 2023;
- Class 2 (RDA Secured Claim) from August 1, 2022 to August 1, 2023; and
- Class 3 (Prudential Construction Loan Claim) from March 31, 2022 to the end of the third anniversary of the Effective Date.

As of the filing of this Disclosure Statement, the Trustee has resumed construction in Phase 1, has sold 36 residential units in Phase 1 and has closed and settled on 23 of these residential units. These sales breakdown as follows:

- during 2019 there were no sales;
- during 2020 there were 23 signed purchase and sale contracts and 18 of these contracts closed during 2020;
- from January 2021 through the period ending April 19, 2021, there were 13 signed purchase and sale contracts and the remaining 5 residential units sold during 2020 closed during this period. The 13 purchase and sale contracts signed during 2021 have closing dates scheduled for later this year.

The Trustee estimates that the construction of the remaining residential units in Phase 1 would be completed by June 2023 and sold and settled by August 2023. The Trustee continues to explore all strategic options as to the development or sale of Phase 2 in whole or in part.

Each month after the Appointment Date, the Trustee filed a Monthly Operating Report

with the Bankruptcy Court that contains among other information: (i) a schedule of cash receipts and disbursements, (ii) a statement of operations, (iii) a balance sheet, and (iv) a statement of unpaid post-petition debts.  These monthly operating reports may be reviewed on the Bankruptcy Court electronic case filing system.

### 5.5.7    The Trustee's Actions against Prudential

On December 3, 2018, the Trustee commenced the Avoidance and Subordination Action in the Bankruptcy Court against Prudential.  In the Avoidance and Subordination Action, the Trustee seeks to avoid and recover constructively fraudulent transfers and to equitably subordinate Prudential's rights below those of other creditors.  The Bankruptcy Court consolidated the Lender Liability Action and the Avoidance and Subordination Action into a single adversary proceeding which is collectively referenced as the Trustee's Actions against Prudential.

After the parties completed discovery, the Trustee and Prudential filed motions for summary judgment.  The Trustee's motion for summary judgment seeks the avoidance of the IVC-Durham Loan, the Steeple Run Collateral Mortgage and the Calnshire Collateral Mortgage, and the recovery of more than $1.1 million in fraudulent transfers related to the IVC-Durham Loan.  Prudential's motion for summary judgments seeks the dismissal of all of the Trustee's claims in the consolidated adversary proceeding.  The parties have fully briefed the motions and, as of the date of this Disclosure Statement, they both remain pending before the Bankruptcy Court.

The Plan is not conditioned upon any particular outcome in the Trustee's Actions against Prudential.  However, the final adjudication of the Trustee's Actions against Prudential will determine (i) the status of Disputed Prudential Claims in Classes 4, 5, and 6 (and in Class 3 if the Prudential Construction Loan Claim is subordinated) and (ii) the amount of monies to be awarded to, or recovered by, the Debtor's Estate and therefore will impact the amount of the distributions to the following Creditors and Interests: (a) Holders of General Unsecured Claims in Class 9, (c) Holders of Limited Partner Interests in the Debtor in Class 10, and the (d) the Holder of General Partner Interest in the Debtor in Class 11.  The final adjudication of this litigation is not expected to reduce the estimated recovery to the Holders of Claims in Class 1, Class 2, or the repayment of the Post-Petition Loan but may impact the funds available for the payment of Allowed Professional Fee Claims.

On September 24, 2020, the Trustee and Prudential participated in a mediation in connection with the Trustee's Actions against Prudential to see if a settlement could be reached but without success.  As of the date of this Disclosure Statement, the Trustee and Prudential have been unable to reach a settlement of the Trustee's Actions against Prudential.  As a result, it is anticipated that Prudential will oppose confirmation of the Trustee's Plan.

### 5.5.8    Summary of Amounts Due Claims secured by Liens on the Real Property

The following is a summary of the estimated amounts due as of the date of this Disclosure Statement to the Holders of Allowed Claims secured by Liens on the Real Property with all such claims being set forth in their order of priority for payment:

| Claimant | Amount |
|---|---|
| Class 1 – Claim of the Tax Claim Bureau | $   118,437 |
| Class 2 – Claim of RDA | $ 1,111,950 |
| Unclassified:  Post-Petition Loan Claim | $ 5,676,738[2] |
| Class 3 - Prudential Construction Loan Claim | $ 3,517,444[3] |
| Class 4 – Disputed IVC-Durham Loan Claim | $          00[4] |
| Class 5 – Disputed Steeple Run Collateral Mortgage  Claim | $          00[4] |
| Class 6 – Disputed Calnshire Collateral Mortgage  Claim | $          00[4] |
| Class 7 – Pre-Petition Judgment Claims | $ |
| • Borough Judgment | $    56,239 |
| • Judgment of Bohler Engineering | $    48,854 |
| • Judgment of McElderry Drywall Inc. | $    33,266 |
| • Caione Judgment | $    30,990 |
| • Ranganathan Judgment | $    49,980 |
| **Total** | $10,643,898 |

## ARTICLE VI
## SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS

---

[2] Includes accrued interest.

[3] In the Trustee's Actions against Prudential, the Trustee is seeking to inter alia subordinate this Class 3 Claim to all creditors in the Chapter 11 Case.

[4] These claims are reflected at zero because:

(i)  in connection with the Steeple Run Collateral Mortgage, the IVC-Durham Mortgage, and the Calnshire Collateral Mortgage, Prudential has subordinated the liens and claims of these mortgages for priority, distribution and payment purposes to all Permitted Claims (as defined in the Plan) so that the Trustee may utilize the proceeds from the sale of each Residential Unit in Phase 1 and/or Phase 1 to pay the Permitted Claims in full from the proceeds of sale of the Residential Units in Phase 1 and/or sale of Phase 1as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court (See section 5.5.3 above).  The Prudential Subordination Agreements also provide that so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of these mortgages to the Trustee without any charge or payment.

(ii)  in the Trustee's Actions against Prudential, the Trustee is seeking to inter alia avoid the IVC-Durham Mortgage, the Steeple Run Collateral Mortgage and the Calnshire Collateral Mortgage, recover transfers arising in connection therewith and to subordinate these Claims to all creditors in the Chapter 11 Case.  The final adjudication of the Trustee's Actions against Prudential will determine whether the Liens held by these claimants may share in the Net Phase 2 Sales Proceeds (as defined in the Plan) but will not alter the terms of the Prudential Subordination Agreements as to the distribution of the proceeds from the sale of residential units in Phase 1 under the Plan.

DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### 6.1    Overall Structure of the Plan

Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria, in accordance with the provisions of the Bankruptcy Code.

If the Plan is confirmed by the Bankruptcy Court and consummated: (a) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims, and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Trustee will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

### 6.2    Funding for the Plan

The Trustee intends to fund the Plan through (i) Cash on hand in the deposit accounts of the Trustee, (ii) proceeds from the prosecution of the Trustee's Actions against Prudential, (iii) proceeds from the operation of the Debtor's business including the development, construction, marketing, sale or liquidation of residential units in Phase 1 and/or Phase 2, (iv) proceeds from the sale of Phase 1 or Phase 2, in whole or in part, (v) the collection or liquidation of the State Street Receivable; (vi) any other funds received by the Trustee after the Effective Date and (vi) if necessary, obtain credit and borrow money (secured by the assets of the Retained Estate) for the purpose of making such required Plan payments.

6.3    **Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), do not need to be classified and the Holder of the DIP Loan Claim which also does not need to be classified). The Trustee is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Trustee believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Trustee's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Trustee intends, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Trustee believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of its Claims and Interests, taking into account the differing nature and priority of such Claims and Interests and the fair value of the Debtor's assets.

In the event any Class rejects the Plan, the Trustee will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests. Although the Trustee believes that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

28

### 6.3.1    Treatment of Unclassified Claims under the Plan

#### 6.3.1.1 Administrative Claims

An Administrative Claim is a Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of the Chapter 11 Case asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving or operating the Debtor's Estate or operating the Debtor's business, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor up to the Appointment Date or by the Trustee thereafter in the ordinary course of operations, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; and (b) any fees or charges assessed against the Debtor's Estate under section 1930 of title 28 of the United States Code.

Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for in the Plan, each Holder of an Allowed Administrative Claim (including Allowed Professional Fee Claims and the Trustee Commission) shall receive from the Trustee in full satisfaction, settlement, release, and extinguishment of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, (iii) the date on which unencumbered funds become available to pay the Allowed Administrative Claim; or (iv) a date agreed to in writing by the Trustee and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Trustee, or as the Bankruptcy Court may order, provided that an Administrative Claim representing a liability incurred in the ordinary course of business by the Trustee may be paid in the ordinary course of business.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date by the Trustee.

Except for Kaufman, Coren & Ress, P.C. ("KCR") retained by the Trustee as his special litigation counsel and approved by Bankruptcy Court Order dated April 4, 2018, final applications for (i) Professional Fee Claims for compensation for services rendered and reimbursement of expenses incurred by Professionals from the Petition Date through the Effective Date, and (ii) the Trustee Commission from the Appointment Date through the Petition Date, shall be filed no later than thirty (30) days after the Effective Date or such later date as the Bankruptcy Court may approve. Such applications shall be served on: (a) the Trustee, (b) Aris J. Karalis at Karalis PC, 1900 Spruce Street, Philadelphia, PA 19103, counsel to the Trustee; and (c) the Office of the United States Trustee. Applications that are not timely filed will not be considered by the Court. KCR shall file its final application for its Professional Fee Claim for compensation for services rendered and reimbursement of expenses incurred within thirty (30) days after the date that the Trustee's Actions Against Prudential have been determined by a Final Order.

29

Professional fees incurred by the Trustee after the Effective Date for the administration of the Chapter 11 Case, the Plan and the Retained Assets shall be paid by the Trustee after his review and approval of the respective invoices and, thereafter, can be paid without further Order of the Court.  For services rendered by the Trustee after the Effective Date, the Trustee shall be paid a commission at the rate of three (3%) percent upon all moneys disbursed or turned over after the Effective Date to parties in interest (excluding the Debtor), but including all Holders of Claims under the Plan, and all disbursements made in connection with the operation of the Debtor's business until all the Retained Assets have been fully liquidated, plus reimbursement of his reasonable expenses.

The Trustee has estimated that the aggregate amount of the Professional Fee Claims (excluding any contingent fee and costs awarded to KCR) in this Chapter 11 Case may total as much as $4,160,692, as follows: (i) $168,276 prior to the Appointment Date for the Debtor's Professionals, (ii) $21,035 for the interim trustee and her professionals, and (iii) $3,971,381for the Trustee and his Professionals.  These amounts are estimates and subject to review and approval of the Bankruptcy Court.

### 6.3.1.2 Priority Tax Claims

A Priority Tax Claim is defined under the Plan as any Claim accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtor that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  The Trustee estimates that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $0.00 pending the outcome of claims reconciliation.

Priority Tax Claims are Unimpaired. Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Trustee in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed, and (iii) a date agreed to by the Trustee and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Trustee or as the Bankruptcy Court may order. Prior to the Effective Date, the Trustee shall have the right to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

### 6.3.1.3 Post-Petition Lender

The Post-Petition Lender is defined in the Plan as BKRE Investments LLC the entity that provided the Post-Petition Loan to the Trustee which allowed him to resume the development, marketing, construction and sale of residential units in Phase 1.  The rights of the Post-Petition Lender are set forth in Section 4.4 of the Plan and this Claim is unimpaired and will be paid in full. As of the Effective Date, the Post-Petition Loan and the Post-Petition Lender's legal, equitable, and contractual rights thereunder shall continue unaltered, in full force and effect until paid in full in Cash; provided that the Post-Petition Lender and the Trustee may agree to extend the maturity date of the Post-Petition Loan or to such other terms and conditions as may be agreed upon in writing by the Post-Petition Lender and the Trustee.   Notwithstanding anything to the contrary contained

herein, the Liens that secure the Post-Petition Loan shall continue unaltered and in full force and effect until the Post-Petition Loan has been paid in full in Cash.

Upon the occurrence of the Effective Date, the Maturity Date of the Post-Petition Loan shall be extended from September 19, 2021 to December 31, 2023 and the Confirmation Order shall so provide. Subject to the Trustee's compliance with the provisions of the Post-Petition Construction Loan and Security Agreement including the payment of the required release prices to the Post-Petition Lender set forth therein, the Post-Petition Lender shall release its Lien on each residential unit being sold in Phase 1 at the time of closing of each said residential unit. At the time of the closing on the sale of Phase 2, and subject to payment of Cash, in an amount equal to the entire balance of the unpaid principal and interest owed to the Post-Petition Lender under the Post-Petition Loan, the Post-Petition Lender shall release its Lien on Phase 2.

As of the date of this Disclosure Statement, the balance due the Post-Petition Lender is approximately $5,676,738.

### 6.3.2    Treatment of Classified Claims and Interests under the Plan.

The treatment and consideration to be received by Holders of Allowed Claims or Allowed Interests pursuant to the Plan shall be in full satisfaction, settlement, release, and extinguishment of their respective Claims against or Interests in the Debtor's Estate, except as otherwise provided in the Plan or the Confirmation Order. No distribution will be made and no rights will be retained on account of any Claim or any Interest that is not Allowed.

### 6.3.2.1    Class 1: Tax Claim Bureau Claim

The Class 1 Tax Claim Bureau Claim is Impaired. The Tax Claim Bureau Claim is defined under the Plan as the Pre-Petition Secured Property Tax Claim held by the Tax Claim Bureau for unpaid pre-petition property taxes in the amount of $118,436.82 as of the Petition Date, and is treated as a fully secured claim. The Class 1 Claim holds valid, perfected enforceable Liens on the Real Property up to the Allowed secured amount of the Claim senior to all other Liens on the Real Property. On the Effective Date the Tax Claim Bureau shall be deemed to hold an Allowed Class 1 Claim.

Payment of Claim. The Holder of the Class 1 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, monthly payments over a term commencing on or as soon as reasonably practicable after the later of the (i) Effective Date, and (ii) a date agreed to by the Trustee and the Holder of the Class 1 Claim, and ending on the third anniversary of the Effective Date.

These payments shall be in an amount determined as follows: (i) for the first thirty five (35) months following the Effective Date, equal monthly payments of principal and interest ($1,905.54), calculated with respect to the secured amount of the Allowed Class 1 Claim at a fixed rate of 9.0% (the statutory rate); and amortized over a seven-year period from the commencement of such payments; and (ii) a balloon payment in the amount of the entire balance of the unpaid principal and interest owed shall be made on the third anniversary of the Effective Date;; or (iii) notwithstanding, the foregoing, the entire balance of the unpaid principal and interest owed to the Holder of Class 1 Claim shall be due and payable at the time of the closing on the sale of Phase 2,

or any individual residential unit in Phase 2; or (iv) such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder of the Class 1 Claim and the Trustee.  The Class 1 Claim may be prepaid, in whole or in part, at any time without any prepayment penalty or fee.

Retention of Liens.  Until payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 1 Claim, the Holder of the Allowed Class 1 Claim shall retain its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit in Phase 1, the Lien securing the Class 1 Claim against said residential unit shall be deemed released without any charge or payment to the Holder of the Class 1 Claim, and provided further that at the time of the closing on the sale of Phase 2, the Liens securing the Class 1 Claim against Phase 2 shall be released subject to the payment of the unpaid principal and interest owed to the Holder of the Allowed Class 1 Claim.

Deficiency Claim.  The Holder of the Class 1 Secured Claim is treated as a fully secured claim and therefore holds no General Unsecured Claim.

Extinguishment of Liens.  Upon payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 1 Claim, the Liens securing the Class 1 Allowed Secured Claim shall be extinguished and shall effect a full and final satisfaction of such Claim.

Voting.  Class 1 is impaired by the Plan and may vote to accept or reject the Plan.

### 6.3.2.2    Class 2:  RDA Claim

The Class 2 Claim is Impaired.  The RDA Claim is the Claim of the RDA that arises from the pre-petition RDA Loan in the original principal amount of $2,500,000.00 provided by the RDA to the Debtor for the acquisition of the Real Property.  The Class 2 Claim is Impaired and consists of the Secured Claim held by the RDA arising from the unpaid balance of the RDA Loan in the amount of $1,981,000 as of the Petition Date plus accrued interest thereafter.  The Class 2 Claim holds a valid, perfected enforceable Liens on the Real Property subordinate only to the Class 1 Claim but senior to all other Liens on the Real Property.  On the Effective Date the RDA shall be deemed to hold an Allowed Class 2 Secured Claim.

Payment of Claim.  The Holder of the Class 2 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, payments over a term commencing on or as soon as reasonably practicable after the later of the (i) Effective Date, and (ii) a date agreed to by the Trustee and the Holder of the Class 2 Claim, and ending on the August 1, 2023.

These payments shall be as follows:  (i) at the time of closing on the sale of each residential unit in Phase 1 or Phase 2, a payment of $12,350.00 to be applied by the RDA to reduce the principal balance of the RDA Loan and to release the RDA Lien on the residential unit being sold; (ii) a payment of $117,000 on August 1, 2021 to be applied by the RDA to reduce the principal balance of the RDA Loan; (iii) a payment of $117,000 on August 1, 2022 to be applied by the RDA to reduce the principal balance of the RDA Loan;  (iv) following the Effective Date and until August 1, 2023, quarterly payments of interest-only payments calculated at the contract rate of interest set

forth in the RDA Loan on the Allowed secured amount of the Class 2 Claim; and (v) a balloon payment in the amount of the entire balance of the unpaid principal and interest owed shall be made on August 1, 2023; or (vi) notwithstanding, the foregoing, the entire balance of the unpaid principal and interest owed to the Holder of Class 2 Claim shall be due and payable at the time of the closing on the sale of Phase 2; or (vii) such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder of the Class 2 Claim and the Trustee.

The Class 2 Claim may be prepaid, in whole or in part, at any time without any prepayment penalty or fee. Following the Effective Date, all existing terms of the RDA Loan, RDA Mortgages and related documents shall be modified by the terms of the Plan; in the event of any conflict between the terms of the RDA Loan, RDA Mortgages and related documents and the Plan, the terms of the Plan shall control.

Retention of Liens. Until payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 2 Claim, the Holder of the Allowed Class 2 Claim shall retain its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit in Phase 1 or Phase 2, the Liens securing the Class 2 Claim against said residential unit in Phase 1 or Phase 2 shall be released subject to the payment of the release price in the amount of $12,350.00 as set forth above, and provided further that at the time of the closing on the sale of Phase 2, the Liens securing the Class 2 Claim against Phase 2 shall be released subject to the payment of the unpaid principal and interest owed to the Holder of the Allowed Class 2 Claim.

Deficiency Claim. The Holder of the Allowed Class 2 Claim is treated as a fully secured claim and therefore holds no General Unsecured Claim.

Extinguishment of Liens. Upon payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 2 Claim, the Liens securing the Allowed Class 2 Claim shall be extinguished and shall effect a full and final satisfaction of such Claim.

Voting. Class 2 is impaired by the Plan and may vote to accept or reject the Plan.

6.3.2.3        **Class 3: Prudential Construction Loan Claim**

The Prudential Construction Loan Claim is a Claim that arises from the Prudential Construction Loan that had a balance due as of the Petition Date in the amount of $4,092,443.58 plus accrued interest thereafter but only to the extent that such Claim is a fully secured claim as determined by section 506 of the Bankruptcy Code.5   In the Trustee's Actions against Prudential, the Trustee is seeking to inter alia subordinate this Class 3 Claim to all creditors in the Chapter 11 Case. If the Class 3 Claim is subordinated or any other relief in connection with the Trustee's Actions against Prudential is awarded in favor of the Trustee by a Final Order, to the extent that any provision of the Plan conflicts with or is any way inconsistent with said Final Order, the terms and provisions of said Final Order shall govern and control. Except as may be otherwise ordered by a Final Order of the Bankruptcy Court, the Class 3 Claim holds a valid, perfected enforceable

---

5 Prudential Filed a proof of claim (POC # 23-1) in the Chapter 11 Case in connection with the Class 3 Claim in the amount of $4,092,443.58 as of the Petition Date, designated as a Secured Claim.

Lien on the Real Property subordinate to (i) the Permitted Senior Liens that secure the Allowed Class 1 Claim and the Allowed Class 2 Claim, and (ii) the Liens that secure the Post-Petition Loan including, the Post-Petition Loan Mortgage, but senior to all other Liens on the Real Property.

<u>Prudential Release of Liens Agreement, Subordination Agreements, and Surcharge of Prudential Collateral</u>.    Prudential executed and delivered to the Trustee the Prudential Subordination Agreements which <u>inter alia</u> authorize the Trustee to utilize the proceeds from the sale of the residential units at the Project and/or sale of the Project that secures Claims held by Prudential to pay the Permitted Claims under any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  Likewise, under the Prudential Release of Liens Agreement and subject to the payment of the release prices set forth in the Prudential Release of Liens Agreement (and detailed below), the Trustee may utilize the remaining proceeds from the sale of the residential units at the Project to fund the Plan including payment of the Permitted Claims.  Notwithstanding anything otherwise contained herein, the Trustee preserves all rights to recover from the Real Property securing the Prudential Allowed Class 3 Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such Real Property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code.

<u>Payment of Class 3 Claim</u>.    The Holder of the Class 3 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, payments over a term commencing on or as soon as reasonably practicable after the later of the (i) Effective Date, (ii) the date on which such Class 3 Claim becomes Allowed, and (iii) a date agreed to by the Trustee and the Holder of the Class 3 Claim, and ending on the third Anniversary of the Effective Date.

These payments shall be as follows:

(a)    At the time of closing on the sale of each of the first thirty-five (35) residential units in Phase 1, a payment of twenty-five thousand Dollars ($25,000.00) to Prudential which will be applied to reduce the principal balance of the Prudential Construction Loan as set forth in the Prudential Proof of Claim No. 23-1 in the amount of $4,092,443.58 and to release all the Liens arising from the Existing Mortgages of Prudential on the residential unit being sold.  These payments to the Holder of the Allowed Class 3 Claim: (i) commenced at the time of the closing on the sale of the first residential unit in Phase 1 and continued thereafter to be paid at the time of the closing of each residential unit sold in Phase 1, (ii) have been applied to reduce the principal balance of the Allowed Class 3 Claim, and (iii) will continue after the Effective Date to be paid and applied as set forth herein;

(b)    At the time of closing on the sale of each of the remaining thirty-eight (38) residential units in Phase 1, a payment of forty-five thousand Dollars ($45,000.00) to Prudential which will be applied to reduce the principal balance of the Prudential Construction Loan as set forth in the Prudential Proof of Claim No. 23-1 in the amount of $4,092,443.58 and to release all the Liens arising from the Existing Mortgages of Prudential on the residential unit being sold;

(c)    At the time of closing on the sale of Phase 2, the Holder of Allowed Class 3 Claim will receive the Net Phase 2 Sales Proceeds from the sale of Phase 2, if any, up to the amount of the balance of the unpaid principal and interest of the Allowed Class 3 Claim;

(d)     If Phase 2 has not been sold and the Net Phase 2 Sales Proceeds distributed on or before March 31, 2022, commencing on April 1, 2022, monthly interest-only payments calculated at a fixed rate of interest of 5.0% per annum on the unpaid secured amount of the Allowed Class 3 Claim until Phase 2 is sold and the Net Phase 2 Sales Proceeds distributed; and

(e)     no later than the third anniversary of the Effective Date**,** the Trustee shall sell and conclude the closing on the sale of Phase 2 and distribute the Net Phase 2 Sales Proceeds, if any, up to the amount of the balance of the unpaid principal and interest of the Allowed Class 3 Claim; or

(f)     such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder of the Class 3 Claim and the Trustee.

<u>Right to Credit Bid for Purchase of Phase 2</u>.   In the event that the sale of Phase 2 does not result in the unpaid principal and interest of the Allowed Class 3 Claim being paid in full at the time of closing of Phase 2, then, in such instance, the Holder of the Allowed Class 3 Claim may exercise the right to submit to the Trustee a credit bid for the purchase of Phase 2 free and clear of all Liens and Claims set forth in the Plan subject to the following conditions:

(a)     the Holder of the Allowed Class 3 Claim may submit a credit bid to the Trustee up to the unpaid principal and interest of the Allowed Class 3 Claim at the time of any sale of Phase 2; provided, however, the credit bid shall be (a) subordinate to the Permitted Senior Liens and the Post-Petition Loan Mortgage (which is the same extent validity and priority of these Liens that exists as of the date of the Plan) and (b) contingent upon payment in Cash at the time of closing on sale of Phase 2: (i) the balance of the unpaid principal and interest of the Permitted Senior Liens, (ii) the balance of the unpaid principal and interest of the Post-Petition Loan Mortgage and (iii) the reasonable, necessary costs and expenses of preserving or disposing of Phase 2 including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code as allowed by the Bankruptcy Court, if any, or as may be agreed upon in writing by the Holder of the Class 3 Claim and the Trustee; and

(b)     if the Holder of the Allowed Class 3 Claim is the successful bidder for the purchase of Phase 2 then, at the time of the closing on the sale of Phase 2, the Holder of the Allowed Class 3 Claim shall be required as a condition precedent to closing, to pay in Cash:  (i) the balance of the unpaid principal and interest of the Permitted Senior Liens, (ii) the balance of the unpaid principal and interest of the Post-Petition Loan Mortgage and (iii) the reasonable, necessary costs and expenses of preserving or disposing of Phase 2 including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code as allowed by the Bankruptcy Court, if any, or as may be agreed upon in writing by the Holder of the Class 3 Claim and the Trustee.  All the liens, claims and interests on Phase 2 shall attach to the proceeds of sale to the same extent, validity, and priority as existed on the date of the closing of Phase 2.

The Class 3 Claim net of the Permitted Claims may be prepaid, in whole or in part, at any time without any prepayment penalty or fee.  Following the Effective Date, all existing terms of the Prudential Construction Loan, the Prudential Construction Mortgage, the Prudential Release of

Liens Agreement, the Prudential Subordination Agreements, and related documents shall be modified by the terms of the Plan; in the event of any conflict between the terms of the Prudential Construction Loan, the Prudential Construction Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements and related documents thereto and the Plan, the terms of the Plan shall control

Retention of Liens.  Until payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 3 Claim, the Holder of the Allowed Class 3 Claim shall retain its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit at the Project and/or sale of the Project in whole or in part, the Liens securing the Class 3 Claim against said residential unit at the Project or the Project, shall be released subject to the payment of the required release price set forth above; and provided further that at the time of the closing on the sale of Phase 2, the Liens securing the Allowed Class 3 Claim against Phase 2 shall be released subject to the distribution of the Net Phase 2 Sale Proceeds as set forth in the Plan.

Deficiency Claim.  To the extent that the Allowed Class 3 Claim is not paid in full, the deficiency shall be treated as an Allowed Class 9 General Unsecured Claim under the Plan

Extinguishment of Liens.  Upon payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 3 Claim less the amount of the Permitted Claims, the Lien securing the Class 3 Allowed Secured Claim shall be extinguished and shall affect a full and final satisfaction of such Claim..

Voting.  Class 3 is impaired by the Plan and may vote to accept or reject the Plan.

6.3.2.4        **Class 4:  Disputed Prudential IVC-Durham Loan Claim**

The Class 4 Claim arises from the IVC-Durham Loan and is Disputed and Impaired. In the Trustee's Actions against Prudential, the Trustee is seeking to inter alia avoid the IVC-Durham Mortgage, recover transfers arising in connection therewith and to subordinate this Claim to all creditors in the Chapter 11 Case.  Therefore, unless the Class 4 Claim is Allowed by a Final Order of the Bankruptcy Court the Class 4 Claim will not receive any distribution under the Plan.
In addition, if the Class 4 Claim is Disallowed, avoided, subordinated or any other relief in connection with the Trustee's Actions against Prudential is awarded in favor of the Trustee by a Final Order, to the extent that any provision of the Plan conflicts with, or is any way inconsistent with, said Final Order, the terms and provisions of said Final Order shall govern and control.

**ONLY TO THE EXTENT THAT THE CLASS 4 CLAIM IS ALLOWED IN WHOLE OR IN PART BY A FINAL ORDER OF THE BANKRUPTCY COURT, THEN WILL THE BELOW STATED PROVISIONS APPLY TO THE PORTION OF THE CLASS 4 CLAIM THAT IS ALLOWED**.

Amount of the Class 4 Claim and Priority.  If Allowed, the Class 4 Claim shall consist of the Secured Claim held by Prudential arising from the IVC-Durham Loan (limited to the amount and extent Allowed by Final Order of the Bankruptcy Court) as of the Petition Date plus accrued interest thereafter but only to the extent that such Claim is a fully secured claim as determined by

36

section 506(a)(1) of the Bankruptcy Code.  To the extent Allowed and except as may be otherwise ordered by the Bankruptcy Court, the Class 4 Claim may hold a valid, perfected enforceable Lien on the Real Property subordinate to the Permitted Senior Liens that secure the Allowed Class 1 Claim, and the Allowed Class 2 Claim, the Liens that secure the Post-Petition Loan Claim, the Liens that secure the Allowed Class 3 Claim, and the payment of the other Permitted Claims, but senior to all other Liens on the Real Property**.**

Prudential Release of Liens Agreement and Subordination Agreements.  In accordance with the Prudential Release of Liens Agreement, Prudential executed and delivered to the Trustee the Prudential Subordination Agreements which inter alia authorize the Trustee to utilize the proceeds from the sale of the residential units at the Project and/or sale of the Project which secures Claims held by Prudential (including the Class 4 Claim) to pay the Permitted Claims in full under any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  Notwithstanding anything otherwise contained herein, the Trustee preserves all rights to recover from the Real Property securing the Prudential Class 4 Allowed Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such Real Property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code.

Payment of Class 4 Claim.  At the time of each closing on the sale of each residential unit at the Project and/or the sale of the Project, and so long and to the extent that the Permitted Claims have not been paid in full, the Holder of the Class 4 Claim shall deliver to the Trustee a release of the Liens of the IVC-Durham Mortgage without any charge or payment as provided by the terms of the IVC-Durham Mortgage Subordination Agreement;

If any portion of the Class 4 Claim is allowed as a Secured Claim by a Final Order of the Bankruptcy Court, the Holder of the Class 4 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, at the time of closing on the sale of Phase 2, the Net Phase 2 Sales Proceeds from the sale of Phase 2, if any, after payment in full of the Allowed Class 3 Claim, up to the amount of the unpaid principal and interest owed, if any, on the Allowed Class 4 Claim; or such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder of the Class 4 Claim and the Trustee.

The Class 4 Claim to the extent it is Allowed less the amount of the Permitted Claims may be prepaid, in whole or in part, at any time without any prepayment penalty or fee.  Following the Effective Date, all existing terms of the IVC-Durham Loan, the IVC-Durham Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements and related documents thereto shall be modified by the terms of the Plan; in the event of any conflict between the terms of the IVC-Durham Loan, the IVC-Durham Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements and related documents thereto, the terms of the Plan shall control.

Retention of Liens.  Until payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 4 Claim (but only to the extent Allowed by Final Order of the Bankruptcy Court) less the Permitted Claims, the Holder of the Allowed Class 4 Claim shall retain its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit at the

Project and/or sale of the Project in whole or in part, the Liens securing the Class 4 Claim against said residential unit at the Project or the Project, shall be deemed released without any charge by, or payment to, the Holder of the Class 4 Claim as set forth above, and provided further that at the time of the closing on the sale of Phase 2, the Liens securing the Class 4 Claim against Phase 2 shall be released subject to the distribution of the Net Phase 2 Sale Proceeds as set forth in the Plan.

Deficiency Claim.  The terms of the Prudential Subordination Agreements inter alia allow the Trustee to pay the Permitted Claims from the proceeds of the sale of the residential units at the Project and/or the sale of the Project and receive a release of the Liens that secure the Disputed Class 4 Claim without any payment to the Holder of the Disputed Class 4 Claim until the Permitted Claims are paid.  The Holder of the Class 4 Claim shall hold no General Unsecured Claim.

Extinguishment of Liens.  Upon payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 4 Claim (but only to the extent Allowed by Final Order of the Bankruptcy Court), less the amount of the Permitted Claims, the Liens securing the Class 4 Claim shall be extinguished and shall affect a full and final satisfaction of such Claim.

Voting.  The Class 4 Claim is Disputed and not entitled to vote to accept or reject the Plan unless it is Allowed by a Final Order prior to the Voting Record Date.

6.3.2.5      <strong>Class 5:   Disputed Steeple Run Collateral Mortgage Claim</strong>

The Class 5 Steeple Run Collateral Mortgage Claim arises from the Steeple Run Collateral Mortgage that purports to secure the loan obligation of the Debtor's Affiliate, Steeple Run, L.P. ("Steeple Run") to Prudential ("Steeple Run Loan") and is Disputed and Impaired.

Except for the collateral mortgage, there is no note or other instrument from the Debtor to evidence any obligation due from the Debtor's Estate to Prudential on account of the Class 5 Claim or the Steeple Run Loan.   In the Trustee's Actions against Prudential, the Trustee is seeking to inter alia avoid the Steeple Run Collateral Mortgage and to subordinate this Claim to all creditors in the Chapter 11 Case.  Therefore, unless the Class 5 Claim is Allowed by a Final Order, the Class 5 Claim will not receive any distribution under the Plan and any Liens arising from the Steeple Run Collateral Mortgage against the Real Property shall be void in accordance with section 506(d) of the Bankruptcy Code.

In addition, if the Class 5 Claim is Disallowed, avoided, subordinated or any other relief in connection with the Trustee's Actions against Prudential is awarded in favor of the Trustee by a Final Order, to the extent that any provision of the Plan conflicts with, or is any way inconsistent with, said Final Order, the terms and provisions of said Final Order shall govern and control.

If the Class 5 Claim survives the claims asserted against it in the Trustee's Actions against Prudential, this Disputed Class 5 Claim may still be Disallowed if Prudential does not procure by a Final Order an allowed deficiency claim against Steeple Run and the Debtor in accordance with the provisions of the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S.A. § 8103.  Since Prudential is in the process of foreclosing on its mortgage recorded against that certain real property ("Steeple Run Property") owned by Steeple Run which secures the Steeple Run Loan, unless Prudential files with the applicable court of common pleas a deficiency petition within six months of the sale of the

Steeple Run Property and prosecutes such petition to a Final Order in accordance with the provisions of the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S.A. § 8103, there is an irrebuttable presumption that Prudential was paid in full on account of the Steeple Run Loan which effectively discharges any amount due under the Class 5 Claim.

**ONLY TO THE EXTENT THAT THE CLASS 5 CLAIM IS ALLOWED IN WHOLE OR IN PART BY A FINAL ORDER OF THE BANKRUPTCY COURT, THEN WILL THE BELOW STATED PROVISIONS APPLY TO THE PORTION OF THE CLASS 5 CLAIM THAT IS ALLOWED**.

Amount of the Class 5 Claim and Priority.  If Allowed, the Class 5 Claim shall consist of the Secured Claim held by Prudential arising from the Steeple Run Collateral Mortgage (limited to the amount and extent Allowed by Final Order of the Bankruptcy Court) as of the Petition Date plus accrued interest thereafter but only to the extent that such Claim is a fully secured claim as determined by section 506(a)(1) of the Bankruptcy Code.  To the extent Allowed and except as may be otherwise ordered by the Bankruptcy Court, the Class 5 Claim may hold a valid, perfected enforceable Lien on the Real Property subordinate to the Permitted Senior Liens that secure the Allowed Class 1 Claim, and the Allowed Class 2 Claim, the Liens that secure the Post-Petition Loan Claim, the Liens that secure the Allowed Class 3 Claim, the payment of the other Permitted Claims, and the Liens that secure the Allowed Class 4 Claim, but senior to all other Liens on the Real Property**.**

Prudential Release of Liens Agreement and Subordination Agreements.  In accordance with the Prudential Release of Liens Agreement, Prudential executed and delivered to the Trustee the Prudential Subordination Agreements which inter alia authorize the Trustee to utilize the proceeds from the sale of the residential units at the Project and/or sale of the Project which secures Claims held by Prudential (including the Class 5 Claim) to pay the Permitted Claims in full under any plan proposed by the Trustee and confirmed by the Bankruptcy Court. Notwithstanding anything otherwise contained herein, the Trustee preserves all rights to recover from the Real Property securing the Prudential Class 5 Allowed Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such Real Property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code.

Payment of Class 5 Claim.  At the time of each closing on the sale of each residential unit at the Project and/or the sale of the Project in whole or in part, and so long and to the extent that the Permitted Claims have not been paid in full, the Holder of the Class 5 Claim shall deliver to the Trustee a release of the lien of the Steeple Run Collateral Mortgage without any charge or payment as provided by the terms of the Steeple Run Collateral Mortgage Subordination Agreement;

If any portion of the Class 5 Claim is allowed as a Secured Claim by a Final Order of the Bankruptcy Court, the Holder of the Class 5 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, at the time of closing on the sale of Phase 2, the Net Phase 2 Sales Proceeds from the sale of Phase 2, if any, (i) after payment in full of the Allowed Class 3 Claim, and (ii) after payment in full of the Allowed Class 4 Claim, up to the amount of the unpaid principal and interest owed, if any, on the Allowed Class 5 Claim; or such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder

39

of Class 5 Claim and the Trustee.

The Class 5 Claim to the extent it is Allowed may be prepaid less the amount of the Permitted Claims, in whole or in part, at any time without any prepayment penalty or fee. Following the Effective Date, all existing terms of the Steeple Run Collateral Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements, and related documents thereto shall be modified by the terms of the Plan; in the event of any conflict between the terms of the Steeple Run Collateral Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements, and related documents thereto, the terms of the Plan shall control.

Retention of Liens.  Until payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 5 Claim (but only to the extent Allowed by Final Order of the Bankruptcy Court) less the Permitted Claims, the Holder of the Allowed Class 5 Claim shall retain its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit at the Project and/or sale of the Project in whole or in part, the Liens securing the Class 5 Claim against said residential unit at the Project or the Project, shall be deemed released without any charge by, or payment to, the Holder of the Class 5 Claim as set forth above, and provided further that at the time of the closing on the sale of Phase 2, the Liens securing the Class 5 Claim against Phase 2 shall be released subject to the distribution of the Net Phase 2 Sale Proceeds as set forth in the Plan.

Deficiency Claim.  The terms of the Prudential Subordination Agreements inter alia allow the Trustee to pay the Permitted Claims from the proceeds of the sale of the residential units at the Project and/or the sale of the Project and receive a release of the Liens that secure the Disputed Class 5 Claim without any payment to the Holder of the Disputed Class 5 Claim until the Permitted Claims are paid.  Additionally, there is no note or other contractual obligation of the Debtor to pay the Disputed Class 5 Claim beyond the portion of the Class 5 Claim that is secured in whole or in part by the Real Property and Prudential filed no proof of claim for this Class 5 Claim.  The Holder of the Class 5 Claim shall hold no General Unsecured Claim in the Chapter 11 Case.

Extinguishment of Liens.  Upon payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 5 Claim (but only to the extent Allowed by Final Order of the Bankruptcy Court) less the Permitted Claims, the Liens securing the Class 5 Allowed Claim shall be extinguished and shall affect a full and final satisfaction of such Claim.

Voting.  The Class 5 Claim is Disputed and not entitled to vote to accept or reject the Plan unless it is Allowed by a Final Order prior to the Voting Record Date.

### 6.3.2.6      Class 6:      Disputed Calnshire Collateral Mortgage Claim

The Class 6 Claim is a Disputed Claim which arises from the Calnshire Collateral Mortgage that purports to secure the loan obligation of the Debtor's Affiliate, Calnshire Estates, LLC ("Calnshire LLC") to Prudential (the "Calnshire Loan") and is Disputed and Impaired.

Except for the collateral mortgage, there is no note or other instrument from the Debtor to evidence any obligation due from the Debtor's Estate to Prudential on account of the Class 6 Claim

40

or the Calnshire Loan.  In the Trustee's Actions against Prudential, the Trustee is seeking to <u>inter alia</u> avoid the Calnshire Collateral Mortgage and to subordinate this Claim to all creditors in the Chapter 11 Case.  Therefore, unless the Class 6 Claim is Allowed by a Final Order, the Class 6 Claim will not receive any distribution under the Plan and any Liens arising from the Calnshire Collateral Mortgage against the Real Property shall be void in accordance with section 506(d) of the Bankruptcy Code.

In addition, if the Class 6 Claim is Disallowed, avoided, subordinated or any other relief in connection with the Trustee's Actions against Prudential by a Final Order is awarded in favor of the Trustee, to the extent that any provision of the Plan conflicts with, or is any way inconsistent with, said Final Order, the terms and provisions of said Final Order shall govern and control.

If the Class 6 Claim survives the claims asserted against it in the Trustee's Actions against Prudential, this Disputed Class 6 Claim may still be Disallowed if Prudential does not procure by a Final Order an allowed deficiency claim against Calnshire LLC and the Debtor in accordance with the provisions of the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S.A. § 8103.  Since Prudential is in the process of foreclosing on its mortgage recorded against that certain real property ("<u>Calnshire Property</u>") owned by Calnshire LLC which secures the Calnshire Loan, unless Prudential files with the applicable court of common pleas a deficiency petition within six months of the sale of the Calnshire Property and prosecutes such petition to a Final Order in accordance with the provisions of the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S.A. § 8103, there is an irrebuttable presumption that Prudential was paid in full on account of the Calnshire Loan which effectively discharges any amount due under the Class 6 Claim.

**ONLY TO THE EXTENT THAT THE CLASS 6 CLAIM IS ALLOWED IN WHOLE OR IN PART BY A FINAL ORDER OF THE BANKRUPTCY COURT, THEN WILL THE BELOW STATED PROVISIONS APPLY TO THE PORTION OF THE CLASS 6 CLAIM THAT IS ALLOWED**.

<u>Amount of the Class 6 Claim and Priority</u>.  If Allowed, the Class 6 Claim shall consist of the Secured Claim held by Prudential arising from the Calnshire Collateral Mortgage (limited to the amount and extent Allowed by Final Order of the Bankruptcy Court) as of the Petition Date plus accrued interest thereafter but only to the extent that such Claim is a fully secured claim as determined by section 506(a)(1) of the Bankruptcy Code.  To the extent Allowed and except as may be otherwise ordered by the Bankruptcy Court, the Class 6 Claim may hold a valid, perfected enforceable Lien on the Real Property subordinate to the Permitted Senior Liens that secure the Allowed Class 1 Claim, and the Allowed Class 2 Claim, the Liens that secure the Post-Petition Loan Claim, the Liens that secure the Allowed Class 3 Claim, the payment of the other Permitted Claims, the Liens that secured the Allowed Class 4 Claim and the Allowed Class 5 Claim, but senior to all other Liens on the Real Property**.**

<u>Prudential Release of Liens Agreement and Subordination Agreements</u>.  In accordance with the Prudential Release of Liens Agreement, Prudential executed and delivered to the Trustee the Prudential Subordination Agreements which <u>inter alia</u> authorize the Trustee to utilize the proceeds from the sale of the residential units at the Project and/or sale of the Project which secures Claims held by Prudential (including the Class 6 Claim) to pay the Permitted Claims in full under any plan proposed by the Trustee and confirmed by the Bankruptcy Court.    Notwithstanding anything

otherwise contained herein, the Trustee preserves all rights to recover from the Real Property securing the Prudential Class 6 Allowed Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such Real Property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code.

Payment of Class 6 Claim.  At the time of each closing on the sale of each residential unit at the Project and/or the sale of the Project in whole or in part, and so long and to the extent that the Permitted Claims have not been paid in full, the Holder of the Class 6 Claim shall deliver to the Trustee a release of the lien of the Calnshire Collateral Mortgage without any charge or payment as provided by the terms of the Calnshire Collateral Mortgage Subordination Agreement;

If any portion of the Class 6 Claim is allowed as a Secured Claim by a Final Order of the Bankruptcy Court, the Holder of the Class 6 Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, at the time of closing on the sale of Phase 2, the Net Phase 2 Sales Proceeds from the sale of Phase 2, if any, (i) after payment in full of the Allowed Class 3 Claim, (ii) after payment in full of the Allowed Class 4 Claim, and (iii) after payment in full of the Allowed Class 5 Claim, up to the amount of the unpaid principal and interest owed, if any, on the Allowed Class 6 Claim; or such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder of Class 6 Claim and the Trustee.

The Class 6 Claim to the extent it is Allowed may be prepaid less the amount of the Permitted Claims, in whole or in part, at any time without any prepayment penalty or fee.  Following the Effective Date, all existing terms of the Calnshire Collateral Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements, and related documents thereto shall be modified by the terms of the Plan; in the event of any conflict between the terms of the Calnshire Collateral Mortgage, the Prudential Release of Liens Agreement, the Prudential Subordination Agreements, and related documents thereto, the terms of the Plan shall control.

Retention of Liens.  Until payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 6 Claim (but only to the extent Allowed by Final Order of the Bankruptcy Court) less the Permitted Claims, the Holder of the Allowed Class 6 Claim shall retain its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit at the Project and/or sale of the Project in whole or in part, the Liens securing the Class 6 Claim against said residential unit at the Project or the Project, shall be deemed released without any charge by, or payment to, the Holder of the Class 6 Claim as set forth above, and provided further that at the time of the closing on the sale of Phase 2, the Liens securing the Class 6 Claim against Phase 2 shall be released subject to the distribution of the Net Phase 2 Sale Proceeds as set forth in the Plan.

Deficiency Claim.  The terms of the Prudential Subordination Agreements inter alia allow the Trustee to pay the Permitted Claims from the proceeds of the sale of the residential units at the Project and/or the sale of the Project and receive a release of the Liens that secure the Disputed Class 6 Claim without any payment to the Holder of the Disputed Class 6 Claim until the Permitted Claims are paid.  Additionally, there is no note or other contractual obligation of the Debtor to pay the Disputed Class 6 Claim beyond the portion of the Class 6 Claim that is secured in whole or in part by the Real Property and Prudential filed no proof of claim for this Class 6 Claim.  The Holder

of the Class 6 Claim shall hold no General Unsecured Claim in the Chapter 11 Case.

Extinguishment of Liens.  Upon payment in full of the amounts to be paid under the Plan to the Holder of the Allowed Class 6 Claim (but only to the extent Allowed by Final Order of the Bankruptcy Court) less the Permitted Claims, the Liens securing the Class 6 Allowed Claim shall be extinguished and shall affect a full and final satisfaction of such Claim.

Voting.  The Class 6 Claim is Disputed and not entitled to vote to accept or reject the Plan unless it is Allowed by a Final Order prior to the Voting Record Date.

### 6.3.2.7        Class 7: Pre-Petition Judgment Claims

Class 7 Claims are Impaired.  The Class 7 Claims arise from the Claims held by the five (5) Holders of pre-petition judgments as follows: (i) the Borough Judgment in the amount of $56,239.22, (ii) the Bohler Engineering Judgment in the amount of $48,853.63, (iii) the Caione Judgment in the amount of $30,990.00, (iv) the Ranganathan Judgment in the amount of $49,980.00; and (v) the McElderry Drywall Judgment in the amount of $33,266.00.  The Class 7 Claims in the aggregate total the amount of $219,328.85 as of the Petition Date.  Each Class 7 Claim is junior and subordinate in priority to the Liens that secure the Post-Petition Loan Claim, Class 1 Claim, Class 2 Claim, Class 3 Claim, Class 4 Claim, Class 5 Claim, and Class 6 Claim to the extent Allowed.  Each Holder of an Allowed Class 7 Claim shall receive in full satisfaction, settlement, release and extinguishment of such Claim its Pro Rata share of the Class 7 Payment Fund.

Class 7 Payment Fund.  As soon as reasonable practicable after the Effective Date: (a) after the Retained Estate has been fully liquidated, (b) after full payment of the Allowed Administrative Claims including Professional Fee Claims and Trustee Commission, (c) after full payment of all post Effective Date fees, costs, and obligations including professional fees and Trustee commissions incurred in connection with the administration of the Retained Estate including the development, construction, marketing, and sale of the Real Property, the prosecution of the Trustee Actions against Prudential to the entry of a Final Order and collection thereof, and the disposition of any other assets, (d) after full payment of the Post-Petition Loan Claim, (e) after full payment of Allowed Priority Tax Claims, and (f) after full payment of the Class 1 Claim, Class 2 Claim, Class 3 Claim, Class 4 Claim, Class 5 Claim, and Class 6 Claim, to the extent that the Claims in these classes are Allowed, the Trustee shall (i) deposit the remaining Cash, if any, up to the amount of the Allowed Class 7 Claims into the Class 7 Payment Fund, and (ii) deposit the remaining Cash, if any, up to the amount of the accrued interest at 3.0% per annum on the Allowed Class 7 Claims from the Effective Date through the date the Class 7 Payment Fund is funded; provided, however none of the proceeds collected by, or paid to the Trustee, from the Trustee's Actions against Prudential or the State Street Receivable will be deposited into the Class 7 Payment Fund.

Payment of the Class 7 Claims.  Each Allowed Class 7 Claim shall be treated on a pari passu basis with each other Allowed Class 7 Claim irrespective of the date when the respective pre-petition judgment held by each Holder of Allowed Class 7 Claims was entered against the Debtor. Each Holder of an Allowed Class 7 Claim shall receive Cash in an amount equal to such Holder's Pro Rata share of the Class 7 Payment Fund, with such share to be calculated based on the Allowed amount of such Holder's Class 7 Claim relative to the total amount of Allowed Class 7 Claims.

Such payment of Cash shall be made on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date on which such Class 7 Claim becomes Allowed, (iii) ten (10) business days after the date on which the Allowed Amount of all Class 7 Claims have been determined by Final Order and the Class 7 Payment Fund has been funded by the Trustee; and (iv) such later date as may be agreed upon by the Trustee and the Holder of such Class 7 Claim.

Retention of Liens.  Subject to the provisions of Section 3.7.1 above, each Holder of an Allowed Class 7 Claim shall retain her/his/its Liens against the Real Property to the same extent and priority as exists on the Confirmation Date; provided however, that at the time of each closing on the sale of each residential unit at the Real Property and/or the Real Property in whole or in part, all Liens securing each Class 7 Claim shall be deemed released without any charge by, or payment to, each Holder of a Class 7 Claim.

Deficiency Claim.  To the extent that the amount of the Class 7 Payment Fund is not adequate to pay the Allowed Class 7 Claims in full, the deficiency due each Holder of an Allowed Class 7 Claim shall be treated as an Allowed General Unsecured Claim under the Plan.

Extinguishment of Liens.  Upon the creation and distribution of the Class 7 Payment Fund on a Pro Rata basis to the Holders of the Class 7 Allowed Claims as set forth in the Plan, all Liens arising from the Class 7 Claims shall be extinguished.  If there are insufficient funds to create the Class 7 Payment Fund, then all Liens arising from the Class 7 Claims shall be extinguished.

Voting.  Class 7 is Impaired by the Plan and may vote to accept or reject the Plan.

### 6.3.2.8        **Class 8:  Priority Non-Tax Claims**

Class 8 Priority Non-Tax Claims are Unimpaired.  Each Holder of an Allowed Class 8 Priority Non-Tax Claim shall receive, in the discretion of the Trustee, in full satisfaction, settlement, release, and extinguishment of such Claim:  (a) the amount of such unpaid Allowed Claim in cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which Class 8 Priority Non-Tax Claim becomes Allowed, (iii) a date agreed to by the Trustee and the Holder of such Class 8 Priority Non-Tax Claim; or (b) such other treatment on such other less favorable terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Trustee.  Class 8 is not Impaired and therefore is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 6.3.2.9        **Class 9:  General Unsecured Claims**

Class 9 General Unsecured Claims are Impaired.  Each Holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release and extinguishment of such Claim, its Pro Rata share of the Class 9 Unsecured Creditor Fund.

Class 9 Unsecured Creditor Fund.  As soon as reasonable practicable after the Effective Date: (a) after the Retained Estate has been fully liquidated, (b) after full payment of the Allowed Administrative Claims including Professional Fee Claims and Trustee Commission, (c) after full payment of all post Effective Date fees, costs, and obligations including professional fees and Trustee commissions incurred in connection with the administration of the Retained Estate

including the development, construction, marketing, and sale of the Real Property, the prosecution of the Trustee Actions against Prudential to the entry of a Final Order and collection thereof, and the disposition of any other assets, (d) after full payment of the Post-Petition Loan Claim, (e) after full payment of Allowed Priority Tax Claims, and (f) after full payment of Allowed Class 1 Claim, Class 2 Claim, Class 3 Claim, Class 4 Claim, Class 5 Claim, Class 6 Claim, Class 7 Claims, and Class 8 Claims, to the extent that the Claims in these classes are Allowed, the Trustee shall (i) deposit the remaining Cash, if any, up to the amount of the Allowed Class 9 Claims into the Class 9 Unsecured Creditor Fund, and (ii) deposit the remaining Cash, if any, up to the amount of the accrued interest on the Allowed Class 9 Claims at the Federal Rate from the Effective Date to the date the Class 9 Unsecured Creditor Fund is funded.

Payment of Class 9 Claims.  Each Holder of an Allowed Class 9 General Unsecured Claim shall receive Cash in an amount equal to such Holder's Pro Rata share of the Class 9 Unsecured Creditor Fund, with such share to be calculated based on the Allowed amount of such Holder's Class 9 Claim and, if applicable, post-petition interest as set forth (above) relative to the total amount of Allowed Class 9 Claims.  Such payment of Cash shall be made on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date on which such Class 9 Claim becomes Allowed, (iii) ten (10) business days after the date on which the Allowed Amount of all Class 9 Claims have been determined by Final Order and the Class 9 Creditor Fund has been funded by the Trustee, and (iv) such later date as may be agreed upon by the Trustee and the Holder of such Class 9 Claim.

General Provisions.  Except as set forth above, no interest or other similar post-petition charges will be paid on account of Allowed Class 9 General Unsecured Claims.

Voting.  Class 9 is Impaired by the Plan and may vote to accept or reject the Plan.

6.3.2.10        **Class 10:  Limited Partner Interests in the Debtor**

Class 10 is impaired.  The Interests of each Holder of a Class 10 Limited Partner Interest shall remain equal to the Interest each held as of the Petition Date.  No distributions shall be made to any Holder of a Class 10 Limited Partner Interest on account of their Interest unless and until all assets in the Retained Estate have been fully liquidated and then only after all Claims of the Debtor and its Estate have been paid in full including but not limited to (a) full payment of the Allowed Administrative Claims including Professional Fee Claims and Trustee Commission, (b) full payment of all post Effective Date fees, costs, and obligations including professional fees and Trustee commissions incurred in connection with the administration of the Retained Estate including the development, construction, marketing, and sale of the Real Property, the prosecution of the Trustee Actions against Prudential to the entry of a Final Order and collection thereof, and the disposition of any other assets, (c) full payment of the Post-Petition Loan Claim, (d) full payment of Allowed Priority Tax Claims, and (e) full payment of Allowed Class 1 Claim, Class 2 Claim, Class 3 Claim, Class 4 Claim, Class 5 Claim, Class 6 Claim, Class 7 Claims, Class 8 Claims, and Class 9 Claims, to the extent that the Claims in these classes are Allowed (the "Senior Claims").

Each Holder of an Allowed Class 10 Interest shall receive Cash in an amount equal to such Holder's Interest in the Debtor multiplied by the remaining Cash, if any, after all Senior Claims (as defined above) are paid in full.  Such payment of Cash, if any, shall be made on or a

soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which the Class 10 Interest becomes Allowed, (iii) ten (10) business days after the latest of (a) the date on which all assets in the Retained Estate have been fully liquidated and (b) the date after all Senior Claims (as defined above) of the Debtor and its Estate have been paid in full, and (iv) such later date as may be agreed upon by the Trustee and the Holder of such Class 10 Interest.

Voting. Class 10 is Impaired by the Plan and may vote to accept or reject the Plan.

### 6.3.2.11    **Class 11:  General Partner Interest in the Debtor**

Class 11 is impaired.   The Interest of the Holder of the Class 11 General Partner Interest shall remain equal to the Interest it held as of the Petition Date.   No distributions shall be made to the Holder of the Class 11 General Partner Interest on account of its Interest unless and until all assets in the Retained Estate have been fully liquidated and then only after all of the Senior Claims (as defined above) have been paid in full and the distributions to the Holders of Class 10 Limited Partner Interests have been paid in full.

The Holder of the Allowed Class 11 Interest shall receive Cash in an amount equal to such Holder's Interest in the Debtor multiplied by the remaining Cash, if any, after all Senior Claims (as defined above) are paid in full and the distributions to Holders of Class 10 Limited Partner Interests have been paid in full.   Such payment of Cash, if any, shall be made on or a soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which the Class 11 Interest becomes Allowed, (iii) ten (10) business days after the latest of (a) the date on which all assets in the Retained Estate have been fully liquidated, (b) the date after all Senior Claims (as defined above) of the Debtor and its Estate have been paid in full, and (c) the date after all the distributions to the Holders of Class 10 Limited Partner Interests have been paid in full, and (iv) such later date as may be agreed upon by the Trustee and the Holder of such Class 11 Interest.

Voting. Class 11 is Impaired by the Plan and may vote to accept or reject the Plan.

### 6.4  **Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing will affect the Trustee's rights, claims, and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.  The Trustee specifically reserve all rights, remedies, claims, defenses and Causes of Action including, but not limited to, (i) the Trustee's Actions against Prudential which includes the Lender Liability Action and the Avoidance and Subordination Action which has been consolidated for all purposes with the Lender Liability Action, (ii) any Causes of Action whether arising before or after the Petition Date, (iii) to recover from property securing an Allowed Secured Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code, and (iv) the Trustee's right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of Confirmation Date or the Effective Date.  The Trustee shall determine, in his sole discretion, whether to prosecute any of the Causes of Actions.  No Entity may rely on the absence of a specific reference in the Plan, or

the Disclosure Statement to any Cause of Action against them as any indication that the Trustee will not pursue any and all available Causes of Action against them. The Trustee expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.

### 6.5    Allowed Claims, Distribution Rights and Objections to Claims

#### 6.5.1    *Allowance Requirement*

Only Holders of Allowed Claims are entitled to receive distributions under the Plan. An Allowed Administrative Claim is a Claim or any portion thereof that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtor prior to the Appointment Date or the Trustee thereafter in the ordinary course of business during the Chapter 11 Case and as to which there is no dispute as to the Debtor's liability, or that has become Allowed by failure to object pursuant to Section 8.4 of the Plan. An Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) of (a) any Claim against the Debtor that has been listed by the Debtor in the Schedules, as such Schedules may have been amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Effective Date the Trustee has not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

#### 6.5.2    *Timing of Distributions*

Except as specifically set forth in the Plan, distributions of Property will be made to Holders of Allowed Claims in accordance with Article III of the Plan. If a Claim is not an Allowed Claim as of the applicable distribution date, distributions will be made only if and when the Claim is Allowed, and then in accordance with Article III of the Plan, and in each case, subject to Article VIII of the Plan. Distributions to be made as of the Effective Date on account of Claims that are Allowed as of the Effective Date and are entitled to receive distributions under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter. Distributions to be made after the Effective Date shall be made on dates to be established by the Trustee pursuant to the terms of the Plan, taking into account the establishment of reserves for Disputed Claims and the Trustee's right to defer distributions if the amount of the Cash to be distributed on a particular date is insufficient to justify the costs of effectuating the distribution.

#### 6.5.3    *Making of Distributions*

Distributions to Holders of Allowed Claims will be made in accordance with Article III of the Plan. If any dispute arises as to the identity of a Holder of an Allowed Claim who is to

receive any distribution, the Trustee shall, as appropriate and in lieu of making such distribution to such Holder, delay such distribution until the disposition thereof shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

Distributions to Holders of Allowed Claims shall be made by the Trustee: (a) at the last known address of such Holder or (b) at the addresses set forth in any written notices of address changes delivered to the Trustee.  If any Holder's distribution is returned as undeliverable, the Trustee shall treat such distribution as Unclaimed Property pursuant to Section 7.7 of the Plan unless and until the Trustee is notified of such Holder's then current address, at which time such distribution shall be made to such Holder without interest.  The Holders of Allowed Claims in respect of distributions that become Unclaimed Property but do not deliver written notices of address changes to the Trustee on or before the entry of the Final Decree shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtor, the Estate, or the Trustee.

### 6.5.4    *Failure to Negotiate Checks/Unclaimed Distributions*

Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance.  Any amounts returned to the Trustee in respect of such non-negotiated checks shall be held by the Trustee.  Requests for reissuance for any such checks shall be made directly to the Trustee by the Holder of the Allowed Claim with respect to which such check originally was issued.  All amounts represented by any voided check will be held until, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made prior to, the earlier of: (a) one (1) month after the date on which the check is voided; or (b) the date on which the Bankruptcy Court enters the Final Decree.  Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Section 7.7 of the Plan, and such Holder of Claims in respect of void checks that become Unclaimed Property shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtor, the Estate, or the Trustee.

All Unclaimed Property must be claimed, or in the case of a distribution made in the form of a check, must be negotiated, prior to the date on which the Bankruptcy Court enters the Final Decree.  All Unclaimed Property will be retained by the Trustee and either (a) distributed in accordance with the priorities set forth in the Plan; or (b) if the Trustee concludes that the costs of making a further distribution exceeds the likely benefit to the Holders of Allowed Claims, such Unclaimed Property shall be deposited with the registry of the Bankruptcy Court. All full or partial payments made by the Trustee and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtor's Estate pursuant to the Plan.  Nothing contained in the Plan shall require the Trustee to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Debtor and any Claims filed in the Chapter 11 Case.  Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Section 7.7 will be forever barred, expunged and enjoined from asserting such Claim in any manner against the Debtor, the Debtor's Estate, or the Trustee.

### 6.5.5    *Objection Procedures*

Unless otherwise ordered by the Bankruptcy Court, the Trustee shall have the exclusive right to File objections to Claims (except those specifically Allowed by the Plan), on and after the Effective Date, but not later than the Claims Objection Deadline, and shall serve a copy of each objection and notice of hearing upon the Holder of the Claim to which the objection is made as soon as practicable.  The Claims Objection Deadline may be extended by order of the Bankruptcy Court.  An objection to any Claim shall be deemed properly served on the Holder thereof if the Trustee effects service in any of the following manners:  (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rules of Bankruptcy Procedure 7004; (b) by first class mail, postage prepaid on the signatory on the proof of claim or other representative identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Case.

### 6.5.6    *Late Filed Claims*

No objection shall be filed with respect to any proof of claim filed after the Bar Date, and the Holder of any such late filed proof of claim shall receive no distribution under the Plan, except as specifically ordered by the Bankruptcy Court following a motion by such Claimant, after notice to the Trustee, counsel for the Trustee, and such parties as the Court may direct, and a motion and hearing thereon.  Any such motion shall be filed on or before the Effective Date or the Holder of such Claims shall be forever barred and all such Claims shall be discharged. Nothing herein shall constitute a waiver by the Debtor or the Trustee of any counterclaims, setoffs, or of any defenses with respect to such late filed proofs of claim, including defenses as to the timeliness of the filing of such proofs of claim.

### 6.6    **Disposition of Executory Contracts and Unexpired Leases**

Except for the Subdivision Site Improvements Agreement which will be deemed automatically assumed and vested in the Retained Estate on the Effective Date in accordance with the provisions and requirements of §§ 365 and 1123 of the Bankruptcy Code, each executory contract and unexpired lease to which the Debtor is a party shall be deemed automatically rejected by the Debtor as of the Confirmation Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date, or (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections on the Effective Date, pursuant to §§ 365 and 1123 of the Bankruptcy Code.

### 6.6.1    *Bar Date for Claims for Rejection Damages*

If the rejection by the Debtor (pursuant to the Plan or otherwise) of any executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor or the Trustee, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Trustee within thirty (30) days after service of the earlier of (a) notice of the Confirmation Order, or (b) such other notice or order that the executory contract

49

or unexpired lease has been rejected; provided, however, that the foregoing requirement to file a Proof of Claim shall not be applicable to any such Claim that was previously allowed by Final Order of the Bankruptcy Court.

### 6.6.2    *Treatment of Rejection Claims*

The Bankruptcy Court shall determine any objections Filed in accordance with Section 8.3 of the Plan at a hearing held on a date to be determined by the Bankruptcy Court.  Subject to any statutory limitations, including, but not limited to the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be Impaired and treated as Class 9 Claims in accordance with Article III of the Plan.

### 6.7    **Means for Implementation of the Plan**

### 6.7.1    *Retained Estate*

The Retained Estate shall not be revested in the Debtor on or after the Confirmation Date or the Effective Date, but shall continue to vest and remain Property of the Retained Estate free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise specifically provided in the Plan.  The Retained Estate shall continue to be administered by the Trustee.  The Retained Estate shall continue to be subject to the jurisdiction of the Bankruptcy Court following Confirmation Date and the Trustee's administration of the Retained Estate shall continue until the Retained Estate and remaining Property have been fully liquidated and the proceeds distributed by the Trustee to (i) Holders of Allowed Claims, (ii) if applicable, Holders of Allowed Interests, or (iii) otherwise disposed of by the Trustee in accordance with the terms of the Plan and Confirmation Order on or after the Effective Date.  The automatic stay under section 362 of the Bankruptcy Code shall continue after the Effective Date in full force and effect as to the Retained Estate and as to all Creditors and Claimants for the term of the Plan, until the Retained Estate and remaining Property have been fully liquidated and the proceeds distributed by the Trustee under the Plan.

### 6.7.2    *Development, Construction, Marketing, and Sale of the Real Property*

After the Confirmation Date, the Trustee shall be authorized to take any and all actions necessary to continue to develop, construct, market and sell residential units in Phase 1 and Phase 2, including without limitation the sale of Phase 1 or Phase 2 of the Real Property in whole or in part.   This authority shall include but not be limited to: (i) develop, construct, complete, market and sell the 14 approved buildings in Phase 1 containing a total of 73 residential units, (ii) complete the site improvements in Phase 1, (iii) complete the site improvements in Phase 2 that are required as a condition precedent to the Trustee being able to construct, sell and settle on the units in Phase 1, and (iv) construct any additional improvements in Phase 1 or Phase 2 as may be determined by the Trustee to be necessary to complete and sell the residential units in Phase 1 of the Real Property. The Trustee shall also continue to investigate: (i) the development of Phase 2 of the Real Property which is approved for six (6) buildings containing a total of 96 condominium units, (ii) the amendment or modification of the approvals for Phase 2 of the Real Property to townhomes, or combination of townhomes and condominiums (which may result in fewer than the 96

condominiums presently allowed in Phase 2), or any other permitted use, (iii) the completion of the site improvements in Phase 2 as required as a condition precedent to the Trustee being able to construct, sell or close on the sale of residential units in Phase 2; and (iv) all options available to monetize Phase 2 of the Real Property including the sale of Phase 2 in whole or in part.  The Trustee may sell Phase 1 or Phase 2 in whole or in part, if the Trustee determines in his business judgment that a sale in whole or in part of Phase 1 or Phase 2 will maximize the value of the Retained Estate.

### 6.7.3    *Sale of Real Property Free and Clear of the Claim Interests*

The Confirmation Order shall authorize the Trustee to sell the Retained Estate including the individual residential units in Phase 1 and Phase 2, and/or the sale of Phase 1 and/or Phase 2 of the Real Property in whole or in part.  Each sale of a residential unit in Phase 1 or Phase 2 of the Real Property, or any sale of Phase 1 or Phase 2 of the Real Property, in whole or in part, shall be under sections 105(a), 363, 1123(b)(4), 1129(b)(2)(A), 1145 and 1146(a) of the Bankruptcy Code and shall be free and clear of any and all liens, claims, community interests, security interests, mortgages, conditions, encumbrances, pledges, restrictions, charges, indentures, loan agreements, options, rights of first refusal, offsets, recoupments, rights of recovery, judgments, orders and decrees of any court or governmental entity, interests, successor, products, tax and other liabilities and claims against the Trustee, Debtor, the Debtor's Estate, or the Retained Estate including the Real Property, of any kind or nature, whether secured or unsecured, choate, or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, disputed or undisputed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, known or unknown (collectively, the "Claim Interests") except: (a) existing restrictions, conditions, easements, especially that set forth in the Declarations of Covenants and Restrictions for Radcliffe Court Homeowners Association; (b) restrictions, conditions, covenants, and easements, if any, required to be placed on the Real Property including under PA Act 2; (c) restrictions, conditions, and easements created by the Trustee at or prior to settlement hereunder and reasonably necessary for the development of the Real Property and adjoining properties; (d) the possibility of the filing of mechanics' liens or municipal liens; (e) zoning ordinance and any other act, ordinance, or regulation affecting the use of an improvement to said Real Property; (f) easements with respect to public or private sewers, storm sewer or surface water courses; and (g) agreements and easements with telephone, gas, water, catv, electric and other public utility companies (collectively, the "Permitted Exceptions"); and any such Claim Interests which existed prior to the closing shall attach to the proceeds of the sale in the same order and priority as existed before the sale under applicable non-bankruptcy law, as such laws may be modified by the Bankruptcy Code, the Plan, and subject to any claims and defenses that the Trustee may possess with respect thereto with said Claim Interests to attach to the proceeds of sale.  The transfers of the residential units at the Real Property, or any sale of Phase 1 or Phase 2 of the Real Property, in whole or in part, to any respective buyer(s) shall constitute a legal, valid and effective transfers and shall vest the respective buyer(s) with all right, title and interest of the Trustee in and to the land and improvements transferred (e.g. any residential unit at the Real Property, or Phase 1 or Phase 2 of the Real Property, in whole or in part), free and clear of all Claim Interests.  The proceeds of sale will be distributed to, and utilized by, the Trustee in accordance with the provisions of the Plan.

### 6.7.4    *Powers and Duties of Trustee*

The Trustee shall administer the Retained Estate and continue the operations of the Debtor's business as set forth in the Plan until the Retained Estate is fully liquidated, and shall be responsible

51

for, among other things, making distributions required under the Plan, the Class 7 Payment Fund, if applicable, and the Class 9 Unsecured Creditor Fund under the Plan.  From and after the Effective Date and continuing until the Retained Estate is fully liquidated and all proceeds therefrom have been distributed under the Plan, the Trustee shall:  (a) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Case and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court; (b) have the authority to act on behalf of the Debtor in all adversary proceedings and contested matters pending or to be filed by the Trustee in the Bankruptcy Court and in all actions and proceedings pending or to be filed by the Trustee elsewhere; (c) have the authority to execute and deliver all necessary documents to transfer and sell individual residential units at the Real Property, or to transfer and sell the Real Property in whole or in part for a fair and reasonable purchase price pursuant to the terms and conditions of sale agreements that are acceptable to the Trustee, and entered into in good faith, (d) have the authority to issue, execute, deliver, file, and record, as appropriate, such other documents as may be necessary to evidence and consummate the sale of any of the assets that comprise the Retained Estate, including individual residential units at the Real Property, or to transfer and sell the Real Property in whole or in part, and (e) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors, or other agents) as he deems appropriate.   The reasonable and necessary fees and actual and necessary expenses of such professionals and the Trustee shall be paid by the Trustee upon each monthly submission of a fee statement to the Trustee in accordance with the following procedures.  The Trustee shall have ten (10) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional seeking compensation.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution.  The uncontested portion of each invoice shall be paid within thirty (30) days after its delivery to the Trustee to the extent of available funds in the Retained Estate. The Trustee shall also have the specific authority to wind-down and dissolve the Debtor (but is not directed or required to do so) once the Retained Estate has been fully liquidated, distributed and/or otherwise disposed of by the Trustee pursuant to the Plan.

### 6.7.5   *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for the Trustee to take or to cause to be taken all corporate/partnership actions necessary or appropriate to consummate and implement the provisions of the Plan, including without limitation, the dissolution of the Debtor after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including without limitation, the execution and delivery of: (i)  purchase and sale agreements for residential units in Phase 1 and/or Phase 2; (ii) purchase and sale agreements for Phase 1 or Phase 2 in whole or in part; (iii)  all necessary documents to transfer and sell (a) the residential units in Phase 1 or Phase 2, and/or (b) Phase 1 or Phase 2 in whole or in part; (iv) to issue, execute, deliver, file, and record, as appropriate, such other documents as may be necessary evidencing and consummating the sale of the respective real property described above; and (v) to receive and distribute the sale proceeds from the sale of the

Real Property under the Plan.

### 6.7.6   *Continued Existence*

From and after the Effective Date, the Debtor's Estate shall continue in existence for the purposes of (i) the development, construction, marketing and sale of residential units at the Real Property including without limitation the sale of  Phase 1 or Phase 2 at the Real Property in whole or in part, (ii) winding up the Debtor's affairs, (iii) liquidating, by conversion to Cash, or other methods, all remaining Property, (iv) enforcing and prosecuting claims, interests, rights and privileges of the Debtor, including, without limitation, the prosecution or settlement of the Trustee's Actions against Prudential, and any other Causes of Action, (v) resolving Disputed Claims, (vi) administering the Plan and (vii) filing appropriate tax returns.  All of the foregoing actions shall be taken by the Trustee or his authorized agents.

### 6.7.7   *Management*

After the Appointment Date, the Trustee managed (a) the development, construction, marketing and sale of residential units at the Real Property including investigating the sale of Phase 1 and/or Phase 2 in whole or in part, (b) the completion of Site Improvements at the Real Property, (c) the Trustee's Actions against Prudential, (d) the negotiation of the settlement that created note and mortgages that secure the State Street Receivable, and (e) other administrative matters related to the Debtor's business and the Chapter 11 Case.  On and after the Effective Date, the Trustee shall continue to manage all of the above matters in connection with the Retained Estate and shall also manage all other matters arising under and in connection with the Plan including distributions under the Plan.  For services rendered by the Trustee after the Effective Date, the Trustee shall be paid a commission at the rate of three (3%) percent upon all moneys disbursed or turned over after the Effective Date to parties in interest, excluding the Debtor, but including all Holders of Claims under the Plan, and all disbursements made in connection with the operation of the Debtor's business until all the Retained Assets have been fully liquidated, plus reimbursement of his reasonable expenses.

### 6.7.8   *Closing of the Chapter 11 Case*

When: (i) the Trustee's Actions against Prudential and all other Causes of Action have been determined by a Final Order, (ii) all Disputed Claims filed against the Debtor have been Allowed or Disallowed, (iii) all Real Property has been constructed, sold, or liquidated and converted into Cash (other than Property that is abandoned), and such Cash has been distributed in accordance with the Plan, (iv) all other assets in the Retained Estate have been liquidated, or (v) at such earlier time as the Trustee deems appropriate, the Trustee may seek authority from the Bankruptcy Court to close the Chapter 11 Case, dissolve the Debtor, and discharge himself from all further duties in connection with the Debtor, the Retained Estate or the Plan, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and applicable state law; provided however, once the matters set forth in subsections (i) and (ii) above have been concluded but before the matters set forth in subsections (iii) and (iv) above have been concluded, the Trustee may request that this Chapter 11 Case be closed for administrative convenience and to minimize administrative costs while the Retained Assets and Plan continue to be administered and such request may be subject to *inter alia* the entry of an order providing that the automatic stay of § 362(a) of the Code remains in full force and effect as to all Creditors and Claimants for the term of the Plan, until the Retained Estate and remaining

Property have been fully liquidated and the proceeds distributed by the Trustee under the Plan and further, subject to the Trustee reserving all rights under section 350(b) of the Bankruptcy Code to request that the Bankruptcy Court reopen the Chapter 11 Case at a later date to allow the Trustee to request the entry of an order discharging him from all further duties and such request constituting cause under section 350(b) of the Bankruptcy Code to reopen the Chapter 11 Case.

## 6.8    Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### 6.8.1    *Requirements for Confirmation of the Plan*

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Trustee has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Trustee on behalf of the Estate or by a Person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code. See Section 8.3 below.

- The Plan provides that with respect to Administrative Claims and Priority Non-Tax Claims, each Holder of such Claim will receive (a) the amount of such unpaid Claim in Cash on or as soon as practicable after the later of the (i) the Effective Date, (ii) the date on which such Claim becomes Allowed, and/or (iii) a date agreed to by the Trustee and the Holder of such Claim; or (b) such other treatment on such terms and conditions, as may be agreed upon in writing by the Trustee and such Holder, or as the Bankruptcy Court may order.

- The Plan provides that with respect to Priority Tax Claims, each Holder of such

Claim will receive on account of such Claim deferred cash payments, over a period not exceeding five years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the Allowed Amount of such Claim, except to the extent that the Holder of any such Claim has agreed to a different treatment.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by Insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor. See Section 8.1 below.

The Trustee believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Trustee has complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Trustee must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to such class. The Trustee does not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, the Trustee believes it will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting class.

### 6.8.2   *Conditions to Confirmation Date and Effective Date*

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part by the Trustee, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing, except as otherwise set forth in the Plan.

The condition precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, is that the form and substance of the Confirmation order shall be acceptable to the Trustee.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order, in form and substance acceptable to the Trustee, shall have been entered and become a Final Order; (b) the Trustee shall have received any authorizations, consents, and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained (this condition may be waived in writing by the Trustee); and (c) no order of a court shall have been entered and shall remain in effect restraining the Debtor, acting by and through the Trustee or the Trustee, from consummating the Plan.

6.9 **Effects of Confirmation**

### 6.9.1 *Vesting of Assets*

The Retained Estate shall not be revested in the Debtor on or after the Confirmation Date or the Effective Date, but shall continue to vest and remain Property of the Retained Estate free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise specifically provided in the Plan. The Retained Estate shall continue to be administered by the Trustee. The Retained Estate shall continue to be subject to the jurisdiction of the Bankruptcy Court following Confirmation Date and the Trustee's administration of the Retained Estate shall continue until the Retained Estate and remaining Property have been fully liquidated and the proceeds distributed by the Trustee to (i) Holders of Allowed Claims, (ii) if applicable, Holders of Allowed Interests, or (iii) otherwise disposed of by the Trustee in accordance with the terms of the Plan and Confirmation Order on or after the Effective Date. The automatic stay under section 362 of the Bankruptcy Code shall continue after the Effective Date in full force and effect as to the Retained Estate and as to all Creditors and Claimants for the term of the Plan, until the Retained Estate and remaining Property have been fully liquidated and the proceeds distributed by the Trustee under the Plan.

### 6.9.2 *Injunction*

#### 6.9.2.1 Continuation of Automatic Stay

The automatic stay under section 362 of the Bankruptcy Code shall continue after the Effective Date in full force and effect as to the Retained Estate and as to all Creditors and Claimants for the term of the Plan, until the Retained Estate and remaining Property have been fully liquidated and the proceeds distributed by the Trustee under the Plan.

#### 6.9.2.2 Claims and Interests

No Holder of a Claim against the Debtor, or an Interest in the Debtor may, on account of such Claim, or Interest seek or receive any payment or other distribution from, or seek recourse against, the Debtor, the Trustee, or the Retained Estate, except as expressly provided in the Plan.

### 6.9.3 *Exculpation and Limitation of Liability*

The Plan contains standard exculpation provisions applicable to certain of the key parties in interest with respect to conduct in the Chapter 11 Case. Specifically, the Plan provides that none of the Debtor, the Debtor's Estate, the Retained Estate, or the Trustee shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Case, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the

Plan or the administration of the Debtor or this Chapter 11 Case, provided, however, that the foregoing exculpation shall not (i) apply to any act of gross negligence or willful misconduct, (ii) not affect the liability of the Debtor or the Estate to any Creditor in connection with any Allowed Claim under the Plan; or (iii) shall the foregoing affect the liability of any party with respect to any act or omission that occurred prior to the Petition Date.

### 6.9.4   *Other Documents and Actions*

The Trustee is authorized to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan including, but not limited to, issuing, executing, delivering, and recording documents that release Liens on the Real Property on behalf of those Creditors whose Liens have been extinguished by the Plan.

### 6.9.5   *Preservation of Insurance*

Except as necessary to be consistent with the Plan, the Plan shall not diminish or impair the enforceability of insurance policies that may cover Claims against the Debtor, the Trustee, or any other Person or Entity.

### 6.9.6   *Guaranties*

Notwithstanding the existence of guaranties, if any, by the Debtor of obligations of any Person, Entity or Entities, and the Debtor's joint obligations with another Person, Entity or Entities with respect to the same obligations, all Claims against the Debtor based upon any such guaranties shall be satisfied and released in the manner provided in the Plan and the Holders of Claims shall be entitled to only one distribution with respect to any given obligation of the Debtor.

### 6.9.7   *Section 1146 Exemption*

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the execution, delivery or recording of an instrument of transfer under the Plan, or the transfer or sale of any Real Property or other Property of or to the Debtor, or the Trustee, or the Estate, or the Retained Estate, shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. All the transfers of Real Property including individual residential units in Phase 1 or Phase 2, or Phase 1 or Phase 2 in whole or in part pursuant to the Plan or Confirmation Order shall constitute and be deemed to be "transfers under a plan" within the purview of section 1146(a) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes in accordance with such section. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.

### 6.9.8   *No Successor Liability*

Except as otherwise expressly provided in the Plan, the Trustee does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtor or any other party relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, on, or alter the

Effective Date. The Trustee is not and shall not be, successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Trustee shall assume the obligations specified in the Plan and the Confirmation Order.

6.10    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Case to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

- classify, re-classify or establish the priority or secured or unsecured status of any Claim (whether filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim or Interest pursuant to the Plan;

- grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

- determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

- ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

- construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Debtor in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

- determine and resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

- hear any application of the Trustee to modify the Plan after the Effective Date pursuant to section 1127 of the Bankruptcy Code and the Plan or modify this Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

- determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

- enter a final decree closing the Chapter 11 Case;

- determine and resolve any and all controversies relating to the rights and obligations of the Trustee in connection with the Chapter 11 Case;

- allow, disallow, determine, liquidate, reduce, re-classify or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

59

- permit the Trustee, to the extent provided for in the Plan, to recover all assets of the Debtor and Property of its Estate, wherever located;

- hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtor or the Debtor's Estate arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Case, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, filed or commenced after the Effective Date that may be commenced by the Trustee thereafter, including Avoidance Actions, proceedings with respect to the rights of the Debtor to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Trustee may have; and

- hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtor, including with respect to the matters set forth above, nothing in the Plan shall prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

6.11    **Modification of Plan**

The Trustee may modify the Plan at any time prior to the Confirmation Date, or after the Confirmation Date and before substantial consummation of the Plan, provided that the Trustee complies with Section 1127 of the Bankruptcy Code. Further, the Trustee may, so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

## ARTICLE VII
## CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes 1, 2, 3, 4, 5, 6, 7, and 9 and the Holders of Interests in Class 10 and 11 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

60

7.1     **General Considerations**

The Plan sets forth the means for satisfying the Claims against the Debtor. See Section 6.3 of this Disclosure Statement entitled "Classification and Treatment of Claims and Interests" for a description of the treatments of each class of Claims and Interests.

7.2     **Certain Bankruptcy Considerations**

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, (see Section 8.1), and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtor liquidated. See Section 8.4) Although the Trustee believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Exhibit B for a liquidation analysis of the Debtor.

7.3     **Claims Estimations**

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amounts of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.

7.4     **Conditions Precedent to Consummation**

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the liquidation completed.

7.5     **Inherent Uncertainty of Financial Projections**

The Projections set forth in Exhibit A hereto have been prepared by the Trustee in consultation with his financial advisors and cover the projected operations of the Trustee through the completion and sale of all the residential units in Phase 1 estimated to occur on or about September 2023.  These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, resolution of COVID-19 concerns, realization of sales and construction costs as budgeted.

Although the Projections are presented with numerical specificity and are based on assumptions considered reasonable by the Trustee, the assumptions and estimates underlying the

Projections are subject to inherent uncertainties, many of which are beyond the Trustee's control, including (i) business, economic and competitive uncertainties and contingencies, (ii) the vagaries of the real estate market and how it may impact the development, construction and sale of Phase 1 or Phase 2 of the Real Property, in whole or in part, and (iii) the determination of the Trustee's Actions against Prudential by a Final Order.

Accordingly, the Projections are only the Trustee's educated, good faith estimates and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections which variations may be material and may increase over time. The projected financial information contained herein should not be regarded as a guaranty by the Trustee, the Trustee's advisors or any other Person that the Projections can or will be achieved. However, the Trustee believes that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

7.6     **Tax Consequences of the Plan upon Holders of Claims and Interests.**

All holders of Claims and Interests should consult with their own tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any federal, state, local or non-U.S. tax laws, and of any change in applicable tax laws.

## ARTICLE VIII
## FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

8.1     **Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor's Estate.

To support its belief in the feasibility of the Plan, the Trustee has prepared and relied upon the Projections with respect to the Trustee's construction and sale of the residential units in Phase 1 which are annexed to this Disclosure Statement as Exhibit A.

8.2     **Acceptance of the Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan.  Thus, Holders of Claims in each of Class 7 and 9 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance.  Holders of Claims who fail to vote are not counted as accepting or rejecting the Plan.

8.3     **Best Interests Test**

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor could be liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of its collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the chapter 7 trustee, asset disposition expenses, all unpaid administrative expenses incurred by the Debtor (including, the chapter 11 trustee), in its chapter 11 case that are allowed in the chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of interests.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

8.4     **Liquidation Analysis**

For purposes of the best interest test, in order to determine the amount of liquidation value available to Creditors, the Trustee, with the assistance of his financial advisors concludes that, in the event of a liquidation of the assets of the Debtor's Estate under chapter 7, the value from any sale of the Debtor's assets would be distributed to either the Post-Petition Lender in repayment of the Post-Petition Loan or to Holders of Allowed Class 1 (Secured Claim of Tax Claim Bureau), Allowed Class 2 (Secured Claim of RDA) and/or Allowed Class 3 (Secured Claim of Prudential Construction Loan) and no other Holder of a Claim, including unpaid

Administrative Priority Claims incurred during the administration of the Chapter 11 Case (other than the Post-Petition Loan), would receive a distribution.  This is because proceeds from such a liquidation would likely not exceed the aggregate amount of: (i) the Post-Petition Loan in the amount of $5,493,654, (ii) the Class 1 Secured Claim in the amount of $118,437, (iii) the Class 2 Secured Claim in the amount of $846,750, plus (iv) the Class 3 Secured Claim in the amount of $3,217,444.   Under such circumstances, the Trustee reasonably believes that: (a) the Estate would likely not be supported by post-petition financing, (b) the Estate would face an enhanced risk that Post-Petition Lender, and the Holders of the Class 1, Class 2 and/or Class 3 Claims may obtain stay relief to conduct sheriff's sale(s) of the Real Property.   Given the foregoing assumptions, the Trustee would not be able to maximize the value by maintaining the Real Property and completing and selling residential units at the Real Property, or paying administrative expense claims and certain priority claims, and as a result, there would be no distribution to Holders of Class 9 General Unsecured Claims.   Additionally, the Prudential Subordination Agreements <u>only allow for the subordination of the Existing Mortgages of Prudential to provide for the payment of the Permitted Claims under a confirmed Chapter 11 Plan</u>.  If the Chapter 11 Case is converted to Chapter 7, the Prudential Subordination Agreements will not enforceable against Prudential and do not provide for, or allow, a chapter 7 trustee to pay the Permitted Claims from the portion of the proceeds from the sale of the Real Property that are encumbered by the Liens arising from the Existing Mortgages of Prudential.  As a result, the Trustee reasonably believes that Holders of Allowed Claims against the Debtor especially the Holders of the Permitted Claims, will likely recover more under the Plan than in the event of a liquidation of the Debtor's assets under a Chapter 7.

### 8.5    Application of the "Best Interests" of Creditors Test

It is impossible to determine with certainty the value each Holder of a Claim will receive under the Plan as a percentage of any Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Trustee, in consultation with his financial advisors, believes that the financial disclosures and projections contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Trustee believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### 8.6    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In the event any Class of Impaired Claims rejects the Plan, the Trustee may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Trustee believes the Plan does not discriminate unfairly with respect to the Claims in Classes 1, 2, 3, 4, 5, 6, 7, and 9, and the Interests in Classes 10 and 11.

A plan is "fair and equitable" as to holders of secured claims that reject the plan if the plan provides that:

(i)     (a) each holder of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (b) each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii)    for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (i) or (iii) of this paragraph; or

(iii)   for the realization by such holders of the indubitable equivalent of such claims.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of Interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Trustee believes that it could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Classes 1, 2, 3, 4, 5, 6, 7, and 9, and the Interests in Classes 10 and 11.

## ARTICLE IX
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Trustee believes that the Plan affords creditors the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans, or (b) liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

9.1     **Alternative Plan(s)**

If the requisite acceptances are not received or if the Plan is not confirmed, the Trustee, or any other party in interest could attempt to formulate and propose a different plan or plans. Such a plan or plans might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets.

The Trustee believes that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

9.2     **Liquidation under Chapter 7**

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtor. As set forth in the liquidation analysis above, it is, however, possible to predict that the Post-Petition Lender and the Holders of the Secured Claims in Class 1, Class 2, and Class 3 would assert that they hold liens on and security interests in substantially all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims.

The Trustee further believes that a liquidation under Chapter 7 would cause a substantial diminution in the Debtor's Estate given the additional administrative expense involved in the appointment of a chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee.  To the extent the Debtor's Estate is not administratively insolvent in a chapter 7 liquidation, the assets available for distribution to Creditors would likely be reduced by additional chapter 7 administrative expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation.

## ARTICLE X
## THE SOLICITATION; VOTING PROCEDURES

10.1    **Parties in Interest Entitled to Vote**

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any

66

distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

10.2    **Classes Entitled to Vote to Accept or Reject the Plan**

Holders of Claims in Class 1, Class 2, Class 3, Class 7 and Class 9, and Holders of Interests in Class 10 and Class 11 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan, therefore, the Holders of Claims in such Unimpaired Classes are not entitled to vote to accept or reject the Plan. Class 8 is deemed to have accepted the Plan, therefore, none of the Holders of Claims in such Class are entitled to vote to accept or reject the Plan.

10.3    **Solicitation Order**

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, or by making written request upon the Debtor's counsel.

10.4    **Waivers of Defects, Irregularities, Etc.**

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the counsel to the Trustee's counsel prior to the Voting Deadline. The Trustee reserves the absolute right to contest the validity of any such withdrawal. The Trustee also reserves the right to seek rejection of any and all ballots not in proper form. The Trustee further reserves the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

10.5    **Withdrawal of Ballots; Revocation**

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the counsel to the Trustee at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the counsel to the Trustee in a timely manner via regular mail, overnight courier or hand delivery at the address set forth in Section 3.4 above. As stated above, the Trustee expressly reserves the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the counsel to the Trustee will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the counsel to the Trustee prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the counsel to the Trustee prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

10.6    **Voting Rights of Disputed Claimants**

Prudential as the Holder of the Disputed Claims in Classes 4, 5, 6 and 7 whose Claims are designated by the Debtor as "Disputed", for which no Proofs of Claim were filed, and which the Trustee seeks to <u>inter alia</u> avoid and equitably subordinate in the Trustee's Actions against Prudential (collectively, the <u>"Disputed Claimants"</u>) are not permitted to vote on the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have its Claims temporarily Allowed for voting purposes (a <u>"Rule 3018 Motion"</u>). Any such Rule 3018 Motion must be filed and served upon the Trustee's counsel no later than the Voting Deadline. The ballot of any creditor filing such a motion will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing. Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Trustee and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Confirmation Hearing, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Trustee's right to object to any Proof of Claim after the Distribution Record Date.

10.7    **Further Information; Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), you may obtain documents by contacting counsel to the Debtor at:

Karalis PC
1900 Spruce Street
Philadelphia, PA 19103
Attn: Aris J. Karalis, Esquire
215-546-4500

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Trustee believes that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Trustee urges all Holders of Claims in voting Classes to vote to ACCEPT the Plan, and to complete and return its ballots so that they will be RECEIVED on or before _____ p.m. prevailing Eastern time, on _____.

[signatures follow]

KEVIN   O'HALLORAN   AS   CHAPTER   11
TRUSTEE FOR THE BANKRUPTCY ESTATE OF
ISLAND VIEW CROSSING II, LP

By:_____
      Kevin O'Halloran

Dated:_____

KARALIS PC

By:_____
      Aris J. Karalis, Esquire
      1900 Spruce Street
      Philadelphia, PA 19103
      (215) 546-4500

      *Counsel to the Trustee*

Dated:_____

[SIGNATURE PAGE TO DISCLOSURE STATEMNT WITH RESPECT TO CHAPTER 11
PLAN OF LIQUIDATION PROPOSED BY KEVIN O'HALLORAN, AS CHAPTER 11
TRUSTEE FOR THE BANKRUPTCY ESTATE OF ISLAND VIEW CROSSING II, LP]

# <u>EXHIBITS TO DISCLOSURE STATEMENT</u>

Exhibit A        Projections
                 (to be supplied before the hearing to consider approval of the Disclosure
                 Statement)


Exhibit B        Liquidation Analysis
                 (to be supplied before the hearing to consider approval of the Disclosure
                 Statement)