**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
----------------------------------------------  x
In re                                       :          Chapter 11
                                            :
                                            :
ISLAND VIEW CROSSING II, L.P.,              :          Case No. 17-14454 (ELF)
                                            :
            Debtor.                         :
                                            :
                                            :
                                            :
----------------------------------------------  x
```

**MOTION OF STRADLEY RONON STEVENS & YOUNG, LLP FOR
AN ORDER ALLOWING ADMINISTRATIVE EXPENSE PURSUANT
TO SECTIONS 503(b)(3)(D) AND 503 (b)(4) OF THE BANKRUPTCY CODE**

Stradley Ronon Stevens & Young, LLP ("**Stradley**"), hereby submits this motion for

approval and allowance of an administrative expense claim for its substantial contribution to the

bankruptcy estate pursuant to 11 U.S.C §§ 503(b)(3)(D) and 503(b)(4) (the "**Motion**"). In support

of this motion, Stradley respectfully represents as follows:

**Jurisdiction and Venue**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 503(b)(3)(D)

and 503(b)(4) of the Bankruptcy Code, Bankruptcy Rule 9014, and Rule 9014-3 of the Local Rules

for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Local**

**Rules**").

**Background**

**A. The Bankruptcy Case**

4.       On June 30, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").[1]

5.       This chapter 11 bankruptcy case (this "**Chapter 11 Case**") was commenced, *inter alia*, for the Debtor to obtain new construction financing to complete the development of the Debtor's townhouse and condominium project (the "**Project**") in Bristol Borough, Pennsylvania, despite certain disputes that had arisen between the Debtor and its pre-petition construction lender, Prudential Savings Bank ("**Prudential**").[2]

6.       As a result of these disputes, Prudential stopped funding the Project without cause, and on March 31, 2016, the Debtor, with Stradley as its counsel, commenced a lender liability lawsuit against Prudential in the Court of Common Pleas of Philadelphia County seeking in excess of $27 million in damages resulting from Prudential's improper and impermissible attempts to either (i) coerce the Debtor and its affiliates into accepting changes to their written loan documents

---

[1] At or around the same time, certain affiliated entities of the Debtor, State Street Associates, LP, Calnshire Estates, LLC, and Steeple Run, L.P. (collectively, the "**Affiliated Debtors**") also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Those cases were subsequently converted to cases under chapter 7 of the Bankruptcy Code and have not been administratively joined with this case.

[2] The portion of the Project relating to the construction of the townhouses is generally referred to as "Phase 1" and the portion of the Project relating to the construction of the condominiums is generally referred to as "Phase 2."

4786324v.3

and force them to begin a fire sale liquidation of their assets; or (ii) put the Debtor out of business and foreclose upon its and its affiliates' assets (the "**Lender Liability Action**").

**B.  Stradley's Pre-Petition Representation of the Debtor and Removal of the Lender Liability Action to this Court**

7.      Prior to the bankruptcy and in addition to the Lender Liability Action, Stradley defended the Debtor and its affiliates in over 26 separate legal actions instituted against them by Prudential after the Lender Liability Action was filed.

8.      Commencing November 2015, the Debtor engaged Stradley because of concerns that its relationship with its construction lender was becoming adversarial, as those at Prudential who previously handled the relationship with the Debtor and its affiliates were fired, laid off and/or retired.

9.      Stradley was initially retained to provide advice and counsel to the Debtor concerning its relationship with Prudential and the many threats and demands being made by Prudential. Although the engagement began as an attempt by Prudential to force a workout or restructuring of the construction loan, the engagement grew over time, becoming more of a general representation of the Debtor and its affiliates in connection with a wide array of litigation instituted or caused by Prudential, including institution of the Lender Liability Action.

10.      Among other things, Stradley successfully had Prudential held in contempt of court for its use of armed guards in an attempt to take over the Project without a court order and in violation of a stay order; successfully opposed Prudential's attempt to obtain a preliminary injunction allowing it to take over the Project; and had numerous confessed judgments stricken

and many others opened and stayed – all attempts by Prudential to obtain ownership and control of the Project and the Debtor's other assets to the detriment of the Debtor's other creditors.

11.      Stradley also assisted the Debtor in its efforts to obtain the critical financing needed to maintain and recover the value in the Project for all creditors, and ultimately, to plan for the Chapter 11 Case because new financing could not be obtained except in conjunction with the rights and protections afforded under the Bankruptcy Code.

12.      Following the Debtor's filing of this Chapter 11 Case, on July 18, 2017, Prudential removed the Lender Liability Action to this Court.[3]

13.      Throughout this Chapter 11 Case and particularly in the first year of the case, Prudential continued to pursue what it was attempting to accomplish pre-petition – to paralyze development of the Debtor's townhouse and condominium development project and take control of the Debtor's assets – in order to pay itself to the detriment of other creditors.

## C. Stradley's Roles at the Outset of this Chapter 11 Case

14.      As noted above, prior to the Petition Date, Stradley represented the Debtor and certain affiliates generally, including providing strategic counsel with respect to the Debtor's

---

[3] After the Lender Liability Action was removed to this Court, Stradley continued to represent the Debtor's principal, Ron Gualtieri, and certain non-debtor affiliates (collectively, the "**Non-Debtor Affiliates**") in related state court proceedings. However, most of those proceedings were stayed as a result of the bankruptcy petitions being filed. In late 2018 and/or early 2019, Stradley filed motions to withdraw as counsel in the various state court proceedings which motions ultimately were granted. Stradley no longer represents the Debtor, the Affiliated Debtors or the Non-Debtor Affiliates in any capacity.

4

decision to file this Chapter 11 Case. Ultimately, the Debtor retained Smith Kane Holman to represent it in this Chapter 11 Case.

15.    Due to the bitterly fought legal proceedings and Prudential's overly aggressive and inappropriate litigation tactics, the Debtor and its affiliates incurred substantial legal fees to Stradley that they were unable to pay. As a result, Stradley is the Debtor's largest general unsecured creditor.

16.    On September 21, 2017, Stradley filed a proof of claim (#14 on the Claims Docket) asserting an unsecured claim against the Debtor in the amount of $1,680,625.69 (the "**Stradley Claim**").

17.    Due to Stradley's history of representing the Debtor since 2015, by the time the bankruptcy was commenced Stradley had accumulated a wealth of knowledge concerning the Debtor and its affiliates, their operations, their relationships with Prudential, and the facts, circumstances and documents relating to the Lender Liability Action and other state court proceedings.

18.    Accordingly, on September 6, 2017, the Debtor filed an application requesting authority to employ Stradley as its special litigation counsel in order to continue prosecution of the Lender Liability Action subsequent to its removal by Prudential to this Court [Dkt. No. 66] (the "**Employment Application**"). On September 27, 2017, the Court granted the Employment Application *nunc pro tunc* to July 18, 2017 [Dkt. No. 78].

4786324v.3

19.     Thereafter, Stradley diligently continued its prosecution of the Lender Liability Action on behalf of the Debtor.[4]

20.     On August 4, 2017, Prudential, as part of its continuing attempts to liquidate the Debtor to the detriment of Debtor and its other creditors, filed a motion seeking to dismiss this case or convert it to one under chapter 7 of the Bankruptcy Code or, in the alternative, the appointment of a chapter 11 trustee [Dkt. No. 34] (the "**Motion to Convert**").  The primary thrust of Prudential's motion was that the case should be converted to a case under chapter 7 of the Bankruptcy Code because the Debtor had no ability to reorganize.

21.     On August 21, 2017, Stradley filed a response in opposition to Prudential's motion, outlining Prudential's ongoing strategy and improper attempts to take control of and liquidate the Project for its own benefit. Among other things, Stradley noted that if Prudential's request to convert or dismiss the bankruptcy were successful, it would extinguish any chance that the Debtor's creditors would have to receive any meaningful distribution from the significant value remaining in the Project.

22.     On December 18, 2017, this Court entered an Order granting in part and denying in part the Motion to Convert [Dkt. No. 141]. Among other things, the Court ordered the U.S. Trustee to appoint a chapter 11 trustee in this case.

---

[4] Concurrently with the filing of this motion, Stradley is filing a separate fee application for reimbursement of its costs and fees as special litigation counsel to the Debtor.

**D. The Interim Trustee is Appointed and Stradley Requests a Creditor Election to Select a Permanent Trustee**

23.     On December 21, 2017, the U.S. Trustee appointed Christine Shubert to act as the chapter 11 trustee and this Court entered an Order appointing Ms. Shubert as trustee on an interim basis pursuant to 11 U.S.C. § 1104(b)(1) (the "**Interim Trustee**").

24.     Stradley understood that if there was to be any hope of recovery for the Debtor's unsecured creditors, the Project would need to be completed and sold and the Lender Liability Action would have to be diligently pursued.

25.     Stradley also immediately recognized that the complexities of this case would require a chapter 11 trustee with significant turnaround expertise and significant experience handling difficult and complex cases — someone who would be well-equipped to promptly and diligently pursue the pending Lender Liability Action and to fully evaluate the status of the Project, take over management of the Project, and oversee the remediation and construction work through to completion and sale.

26.     However, based on early discussions between Michael Cordone, at that time a partner at Stradley[5] who was overseeing Stradley's involvement in this Chapter 11 Case, and the Interim Trustee and her counsel, it was apparent that the Interim Trustee simply was looking to sell the stalled Project "as-is" and showed no interest in getting up to speed on or diligently prosecuting the Lender Liability Action. It was clear that the Interim Trustee was pursuing a quick

_____

[5] Mr. Cordone retired from Stradley around the end of 2018.

sale of the Project and was entertaining offers that would be insufficient even to satisfy the Debtor's secured debts.

27.     Concerned with the Interim Trustee's apparent strategy, Stradley realized that action was needed if there was to be any hope of a recovery for creditors other than the Debtor's secured creditors and also understood that as the single largest unsecured creditor, Stradley was uniquely positioned to right the ship and put this case on a track that would provide the best hope for such a recovery.

28.     Accordingly, Stradley began pursuing a strategy to replace the Interim Trustee with an outside, neutral party with significant turnaround experience and expertise that would be willing and capable of, among other things, developing and moving the Project forward to completion.

29.     Based on prior experience with Kevin O'Halloran, an extremely qualified and accomplished turnaround expert, attorneys at Stradley believed him to be one of the "best in the business" — with substantial experience handling difficult cases such as this — and someone who is thoughtful, an excellent negotiator, exceedingly ethical, and appropriately cost-conscious. Stradley was confident that if anyone could competently pursue the Lender Liability Action while simultaneously taking control of and turning around the Project in order to obtain a recovery for unsecured creditors, it was Mr. O'Halloran.

30.     On December 21, 2017, Stradley filed a request to convene  a meeting of creditors to elect a chapter 11 trustee [Dkt. No. 149] and on December 27, 2017, the U.S. Trustee filed a *Notice of Meeting of Creditors for the Purpose of Electing a Trustee* [Dkt. No. 157], scheduling the meeting for January 11, 2018, at 1:00 p.m. (the "**Creditor Election**").

**E. The Interim Trustee and Prudential Attempt to Disenfranchise Stradley and Other Unsecured Creditors**

31.    At 5:36 p.m. on January 10, 2018, the Interim Trustee filed an objection to Stradley's proof of claim seeking to disallow and expunge Stradley's proof of claim on spurious grounds, alleging that Stradley's claim failed to include documentation establishing the validity of the claim.

32.    In fact, beginning less than 24 hours prior to the Creditor Election and continuing until a few hours before the Creditor Election, the Interim Trustee and Prudential filed a series of objections to numerous claims filed against and scheduled by the Debtor. In all, the Interim Trustee and Prudential collectively objected to 15 claims valued in excess of $2.476 million, more than 80% of the amount of unsecured claims filed against and scheduled by the Debtor.

33.    Astoundingly, among the 15 objections filed by the Interim Trustee and Prudential against more than 80% of the existing unsecured claims, which objections were filed in a less-than-24-hour period, there was zero duplication or overlap between the objections filed by the Interim Trustee and those filed by Prudential.

34.    As a result, Stradley was forced to file the *Emergency Motion of Creditor Stradley Ronon Stevens & Young, LLP to: (a) Estimate Its Claim for Voting Purposes or Rule on the Objection to Its Claim Prior to the Vote on the Election of a Chapter 11 Trustee; and (b) Shorten Time and Expedite Hearing on this Motion* [Dkt. No. 214] (the "**Estimation Motion**").

35.    On January 11, 2018, all parties in attendance at the Creditor Election agreed to postpone the election until January 29, 2018.

9

36.     As explained in the Estimation Motion, the addendum to the Stradley Claim plainly explained that "[a] summary of charges is attached to this Addendum. The detailed bills for the services provided relate to ongoing litigation and are privileged and confidential, but have been provided to the Debtor." *See* Estimation Motion [Dkt. No. 214], at ¶10.

37.     Prior to filing her objection, the Interim Trustee had almost three weeks to investigate the Stradley Claim and even longer if her objection was not intended simply to disenfranchise Stradley. Further, the Interim Trustee ignored an offer from Stradley to discuss the status of the case by telephone prior to the Creditor Election.

38.     Instead, the Interim Trustee simply filed her objection without sufficient inquiry and notwithstanding the fact that the Debtor (and, therefore, the Interim Trustee) had access to all relevant documents. In fact, at the time she filed the objection, the Interim Trustee had not even requested or obtained control of the Debtor's books and records or any of its assets, making the claim objections her first official act, aside from hiring professionals.

39.     As noted in the Estimation Motion, given the timing and apparent coordination between the Interim Trustee and Prudential, the objections to the Stradley Claim and other claims strongly suggested that the Interim Trustee and Prudential were seeking to disenfranchise unsecured creditors by converting their otherwise allowed claims into disputed claims in order to deny them their voting rights under 11 U.S.C. § 1104(b) and Fed. R. Bankr. BP. 2007.1.

40.     A day after Stradley filed the Estimation Motion, the Interim Trustee withdrew her objection. However, thereafter the Interim Trustee filed a reply to the Estimation Motion [Dkt. No. 226], setting forth a new bases for objecting to Stradley's participation in the Creditor Election,

10

arguing that Stradley was ineligible to vote because it was purportedly an insider of the Debtor

and held interest somehow adverse to the Debtor's other similarly situated creditors.

41.     Prudential also responded to the Estimation Motion, also asserting that Stradley's

interests are somehow adverse to those of Debtor's similarly situated unsecured creditors [Dkt.

No. 227].

**F.  The Court Rejects the Effort to Disenfranchise Stradley and Kevin O'Halloran Is
    Appointed the Permanent Chapter 11 Trustee**

42.     Following a hearing, on January 26, 2018, this Court issued an Order [Dkt. No.

229], which was subsequently amended [Dkt. No. 234] (as amended, the "**Estimation Order**"),

granting the Estimation Motion and, as further detailed in a well-reasoned end note to the

Estimation Order, holding that Stradley does not have an interest materially adverse to the interests

of other creditors and is not an insider of the Debtor.

43.     On January 29, 2018, the Creditor Election was held and the only three creditors to

vote (including Stradley) who collectively held 56.43% of the amount of claims under 11 U.S.C.

§ 702(a)(1), voted to elect Mr. O'Halloran to serve as the permanent chapter 11 trustee in this case

(the "**Trustee**").

44.      Stradley was the driving force behind the nomination and election of Mr.

O'Halloran to act as the permanent chapter 11 trustee.

45.     Stradley, recognizing that its cooperation could prove vital to the Trustee's success

in this Chapter 11 Case, in the weeks and months following his appointment, spent significant time

and resources meeting and corresponding with the Trustee and his professionals to share the wealth

of knowledge and information that Stradley possessed with respect to the Lender Liability Action,

11

the Project, and this Chapter 11 Case. In addition, over the ensuing months Stradley worked

cooperatively with the Trustee to assist the Trustee in his prosecution of the Lender Liability

Action, entering into a joint prosecution agreement (the "**Joint Prosecution Agreement**"),[6] and

sharing the vast array of documents and information that Stradley had obtained both as counsel to

the Debtor and its affiliates pre-petition and through its extensive discovery efforts as special

litigation counsel prior to the Trustee's appointment.

### G. The Trustee Pursues Completion of the Project and Proposes a Plan that Contemplates a Meaningful Distribution to the Debtor's Unsecured Creditors

46.    The appointment of Kevin O'Halloran as the Trustee has changed the entire

complexion of this case and has made it highly likely that creditors other than Prudential will

receive a distribution towards their claims.[7]

47.    After his appointment, the Trustee met and consulted with significant parties-in-

interest in this case, including representatives of the Debtor, significant creditors, numerous

persons and entities that had expressed an interest in purchasing the Project, and numerous other

professionals, including land planning professionals, environmental consultants, engineers, real

estate brokers, and independent counsel experienced in prosecuting lender liability actions.

---

[6] Although the Joint Prosecution Agreement ostensibly conferred benefits upon both the Non-Debtor Affiliates and the bankruptcy estate, because most if not all of the state court litigation for which Stradley remained counsel of record had been stayed by the bankruptcy cases, the benefits of the Joint Prosecution Agreement flowed almost exclusively to the Trustee's efforts on behalf of the bankruptcy estate.

[7] In fact, if the Trustee is ultimately successful in the Lender Liability Action, it appears there may be a potential for general unsecured creditors to be paid in full and for a potential recovery for equity holders.

4786324v.3

48.     Exercising his business judgment and significant expertise in managing complex chapter 11 cases and similar proceedings, including cases involving significant real estate assets and construction projects, the Trustee determined, as Stradley always believed, that the best means for maximizing the value of the bankruptcy estate for the benefit of all creditors was to (i) vigorously pursue the Lender Liability Action, (ii) proceed with the development and sale of residential units in Phase 1 of the Project, and (ii) continue to explore all options to maximize the value of Phase 2.

49.     On April 4, 2018, this Court entered an Oder authorizing the Trustee to retain Kaufman, Coren & Ress, P.C. as special litigation counsel to pursue the Lender Liability Action [Dkt. No. 316].

50.     In addition, the Trustee obtained a post-petition loan from BKRE Investments LLC in the amount of $4.7 million, to fund completion of Phase 1 of the Project (the "**Post-Petition Loan**").

51.     The Trustee, bringing his negotiating skills to bear, also negotiated important releases of liens and subordination agreements with Prudential pursuant to which Prudential agreed, *inter alia*, to: (i) consent to the approval of the Post-Petition Loan, (ii) the release of all of Prudential's liens arising from its existing mortgages at the time of closing on the sale of each residential unit in Phase 1 in exchange for the payment of the fixed release prices set forth therein, (iii) extend the maturity date of the unpaid balance due to Prudential under its construction loan, and (iv) subordinate all the liens and claims arising from additional mortgages Prudential held on the Project property, which mortgages are also subject to avoidance in the pending Lender Liability Action.

52.     By Order dated September 12, 2018, this Court approved the Post-Petition Loan, and the Trustee's agreements with Prudential regarding the release and/or subordination of its liens on the Project.

53.     After the Post-Petition Loan was approved in September 2018, the Trustee completed remediation work on the Project that was required by the Pennsylvania Department of Environmental Protection ("**DEP**"), retained professionals to complete the environmental reports needed to obtain final approval from the DEP, and obtained final approval from the DEP.

54.     The advances under the Post-Petition Loan have been utilized further to fund the costs to resume construction, marketing and sale of the residential units in Phase 1, the construction of site improvements, the costs to complete the remediation items required by the DEP, and the Trustee's professionals' fees.

55.     Since his appointment and resumption of construction work on the Project, notwithstanding delays caused by, among other things, the global pandemic, the Trustee has had tremendous success and has made significant progress in completing the construction of the 75 units contemplated for Phase 1.

56.     As of late June, it is Stradley's understanding that the Trustee had entered into contracts for the sale of approximately 51 of the 75 units in Phase 1 and had closed on approximately 37 of those sales, resulting in substantial funds being made available for the benefit of the Debtor's creditors.

4786324v.3

57.    Further, the Trustee continues to consider all options for Phase 2, including the potential development of Phase 2 by the Trustee, as well as a potential sale of Phase 2 to parties interested in completing the development.

58.    Regardless of how the Trustee ultimately decides to proceed with respect to Phase 2, it is apparent that the Trustee's ability to right the ship and complete the construction of Phase 1, including already selling a majority of the residential units, has dramatically increased the value of Phase 2, in turn increasing the likelihood of a meaningful distribution to the Debtors' unsecured creditors.

59.    It goes without saying that Mr. O'Halloran and his professionals deserve the vast majority of credit with respect to turning this case around – from a case that at the outset appeared likely only to provide a partial distribution to the Debtor's secured creditors into a case that now appears likely to result  in a meaningful distribution to all of the Debtor's creditors.

60.    Nevertheless, the Trustee's success in turning this Chapter 11 Case around is also due, in part, to Stradley's significant efforts (i) initially to recognize the need and fight for the appointment of a turnaround expert who was willing and capable of dealing with the complexities of this case to act as chapter 11 trustee, and (ii) subsequently to assist the Trustee in his efforts by sharing with the Trustee Stradley's vast wealth of knowledge and background information with respect to the case and Stradley's efforts to cooperatively share documents and other information in Stradley's possession.

4786324v.3

## **Relief Requested**

61.     Stradley seeks reimbursement for its time and expenses pursuant to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

62.     The aggregate amount of reimbursement requested by Stradley is $211,513.10.

63.     It is important to emphasize that Stradley is not seeking a blanket reimbursement for all of the time expended and costs incurred in connection with this bankruptcy, without regard to whether such time and expenses actually conferred a benefit upon the bankruptcy estate.

64.     Recognizing that Stradley has worn several hats during the pendency of this case, Stradley has carefully reviewed its time and expense records to ensure that it is seeking reimbursement only for those efforts and costs that it believes actually did confer a substantial contribution to the bankruptcy estate.

65.     Stradley is *not* through this application seeking reimbursement for, among other things: (i) its efforts as special litigation counsel, (i) any direct or incidental assistance Stradley may have provided to Debtor's bankruptcy counsel prior to the appointment of Mr. O'Halloran, (iii) its efforts to prepare its proof of claim, (iv) time spent objecting to and preparing for the hearings on Prudential's Motion to Convert, (v) time spent in connection with the Affiliated Debtor's bankruptcy cases, (vi) time spent working on non-bankruptcy state court litigation, or (vii) time spent preparing this Motion.

66.     Stradley is seeking reimbursement only for a limited amount of costs and for the value of the time and effort put forth by its professionals and paraprofessionals which conferred a direct and substantial benefit upon the bankruptcy estate.

4786324v.3

67.     The areas for which Stradley seeks reasonable compensation can be separated generally into five categories:

(i)     Stradley's efforts to pursue the Creditor Election and to nominate and obtain the appointment of Mr. O'Halloran as the permanent chapter 11 trustee ("**Category 1**");

(ii)    Stradley's efforts to defend and obtain estimation of its claim in order to ensure its participation in the Creditor Election and prevent a usurpation of the Creditor Election by the Interim Trustee and/or Prudential ("**Category 2**");

(iii)   Stradley's efforts in the weeks and months after Mr. O'Halloran's appointment, through numerous meetings, communications, and information sharing, to assist Mr. O'Halloran with his transition into his role as the chapter 11 trustee ("**Category 3**"); and

(iv)    Stradley's specific efforts to share discovery documents and other information in connection with the Lender Liability Action, including preparing the Joint Prosecution Agreement and reviewing, preparing, and producing tens of thousands of pages of documents obtained by Stradley prior to the Trustee's appointment and engagement of his own special litigation counsel ("**Category 4**").

(v)     Stadley's efforts in prosecuting the Lender Liability Action, but only for the time period running from the Petition date to July 17, 2017, the day prior to Stradley's appointment as special litigation counsel ("**Category 5**").

68.     For its efforts under the above Category 1, Stradley is requesting reimbursement in the amount of $64,174.50, representing 98.5 hours expended by its professionals and paraprofessionals.

69.     For its efforts under the above Category 2, Stradley is requesting reimbursement in the amount of $48,035.50, representing 74.8 hours expended by its professionals and paraprofessionals.

70.     For its efforts under the above Category 3, Stradley is requesting reimbursement in the amount of $23,517.00, representing 35.1 hours expended by its professionals and paraprofessionals.

17

71.    For its efforts under the above Category 4, Stradley is requesting reimbursement in the amount of $41,192.00, representing 84.7 hours expended by its professionals and paraprofessionals.

72.    For its efforts under the above Category 5, Stradley is requesting reimbursement the amount of $34,531.00, representing 73.8 hours expended by its professionals and paraprofessionals.

73.    In total, Stradley is seeking $211,450.00 as reimbursement for the time expended by its professionals and paraprofessionals, which efforts conferred a substantial benefit upon the bankruptcy estate. Attached hereto as **Exhibit A** are redacted, itemized invoices detailing the time expended by Stradley professionals and paraprofessionals which Stradley submits provided a substantial contribution to the bankruptcy estate.[8]

74.    In addition, Stradley is requesting reimbursement of $63.10, for costs it incurred that are attributable to its contributions to the estate.[9] These costs were necessary and reasonable and can be attributed to travel, postage, duplicating, and courier services. Attached hereto as

---

[8] The redactions reflect time entries which may be privileged and which Stradley, conservatively and upon careful review, determined were not relevant to this Motion. Such time entries reflect work performed either on behalf of Stradley's clients or on behalf of Stradley itself as a creditor in this Chapter 11 Case and which, in Stradley's estimation, primarily benefited either Stradley's clients or Stradley itself, and did not confer a significant enough contribution to the bankruptcy estate to justify reimbursement.

[9] Stradley incurred significantly more costs in connection with its efforts and the corresponding benefits conferred upon the bankruptcy estate described in this Motion. However, out of an abundance of caution and to ensure that it is only seeking reimbursement for reasonable and necessary costs that resulted in a direct benefit to the estate, Stradley has carefully reviewed its expense reports and is requesting reimbursement only for those expenses that can be tied directly and exclusively to Stradley's efforts described in this Motion.

18

**Exhibit B** is an itemized list of the reasonable and necessary costs for which reimbursement is requested.

<u>Argument</u>

75.     Pursuant to 11 U.S.C. § 503(b)(3)(D), a creditor may recover from a debtor's estate any "actual, necessary expenses . . . incurred . . . in making a substantial contribution" to the debtor's case.

76.     "Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging meaningful creditor participation in the reorganization process and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." *Lebron v. Mechem*, 27 F.3d 937, 944 (3d Cir. 1994) (internal quotation marks and citations omitted).

77.     Because most activities of a creditor or other interested party that make a substantial contribution to the estate will also benefit such party, mere self-interest cannot preclude reimbursement. *See id.*; *see also In re Celotex Corp.*, 227 F.3d 1336, 1339 (11th Cir. 2000) ("[T]he motive of the petitioner should not be a factor in determining whether a substantial contribution has been made in the bankruptcy proceeding.").

78.     The purpose of Subsection 503(b)(3)(D) is to encourage and reward conduct that benefits the estate as a whole. *See id.* "[S]ervices that confer a significant and demonstrable benefit upon the reorganization process which have not been rendered solely on behalf of a creditor's own interest should be compensated." *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989).

79.     A creditor's efforts pursuing the appointment of an independent chapter 11 trustee may constitute a substantial contribution to the case. *See In re Deval Corporation*, 592 B.R. 587, 600 (E.D. Pa. 2018) (noting that "the appointment of a chapter 11 trustee is designed to foster and enhance the progress of a chapter 11 case"). *See also In re Living Hope Southeast, LLC*, 509 B.R. 649, 659-60 (Bankr. E.D. Ark. 2014) (awarding substantial contribution to party in interest where party and her counsel were the "primary catalysts" in pursuing the appointment of a chapter 11 trustee); *In re On Tour, LLC*, 276 B.R. 407, 418 (Bankr. D. Md. 2002) (holding creditor's fees in connection with securing trustee were recoverable); *In re Catalina Spa & R.V. Resort, Ltd.*, 97 B.R. 13, 18 (Bankr. S.D. Cal. 1989) (awarding creditor substantial contribution claim for efforts toward appointment of trustee); *In re Humphreys Pest Control Co., Inc.*, No. 82-05539S, 1990 WL 191859, at *3 (Bankr. E.D. Pa. Nov. 30, 1990) (law firm's efforts in seeking appointment of trustee were compensable).

80.     In addition, a creditor's attorneys can recover "compensation for professional services rendered" to a creditor as long as the creditor's expenses are themselves "allowable under [11 U.S.C. § 503(b)(3)(D)]." *See* 11 U.S.C. § 503(b)(4). Reimbursement is limited to the "actual, necessary expenses incurred by such attorney." *Id.*

81.     To justify a fee award, an attorney must show by a preponderance of the evidence that he or she "made a substantial contribution to the [debtor's] estate." *Lebron*, 27 F.3d at 943; *see also Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) (holding that burden of proof is on administrative expense claimant).

82.     A substantial contribution is one that "result[s] in an actual and demonstrable benefit" to the estate as a whole. *Lebron*, 27 F.3d at 943. "Services which substantially contribute to a case are those which foster and enhance the progress of reorganization." *Id.* at 944.

83.     "The substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case." *Leidos Eng'g, LLC v. KiOR, Inc. (In re KiOR  Inc.)*, 567 B.R. 451, 458 (D. Del. 2017) (internal quotation marks omitted). There must be a causal connection between the services rendered and the "actual and demonstrable benefit" to the debtor's estate. *Id.*; *see also Matter of DP Partners*, 106 F.3d 667, 673 (5th Cir. 1997).

84.     As some courts have noted, a literal reading of 11 U.S.C. §§ 503(b)(3) and (b)(4) could imply that an applicant requesting a claim under section 503(b)(4) must also have an allowable claim under section 503(b)(3); however, "[c]ourts have, for the most part, rejected such a narrow view and have employed a more practical interpretation of the statute." *In re R.L. Adkins Corp.*, 505 B.R. 770, 775 (Bankr. N.D. Tex. 2014).

85.     Although the Third Circuit has indicated in *dicta* that section 503(b)(4) authorizes an award of legal fees "only in situations coming within the scope of § 503(b)(3)," *see Lebron*, 278 F.3d at 943, it is clear that a creditor who makes a substantial contribution to a case may obtain actual, necessary expenses incurred in making such a contribution and that such expenses include attorneys' fees.   Regardless, Stradley is entitled to reimbursement for its efforts because (i) Stradley is itself the creditor and its substantial contribution claim is premised on the value of time expended by its professionals and paraprofessionals, not on fees incurred and owed to outside counsel, and (ii) as more particularly described herein, Stradley is also requesting reimbursement for out-of-pocket expenses falling within the scope of section 503(b)(3).

86.     In determining whether to order reimbursement for a substantial contribution, courts have identified several non-exclusive factors, including (i) whether the party's efforts conferred a benefit on the estate, generally, or all parties in the bankruptcy; (ii) whether the services conferred a direct benefit upon the estate; (iii) whether the services were duplicative of other parties' efforts, and (iv) whether the services were provided primarily for the benefit of the party or would have been provided absent an expectation of reimbursement. *See In re Grasso*, 519 B.R. 137, 140 (Bankr. E.D. Pa. 2014); *see also In re Spansion Inc.*, Bky. No. 09-10690, 2014 WL 128632, at *2 (Bankr. D. Del. May 14, 2014)).

87.     Here each of these factors supports a substantial contribution claim by Stradley.

88.     First, it is undeniable that Mr. O'Halloran's appointment as the permanent chapter 11 trustee conferred a direct and substantial benefit upon the estate and that benefit was provided to the estate, generally, and not primarily to Stradley, satisfying both the first and second factors above. As more particularly discussed herein, Mr. O'Halloran's appointment changed the entire tenor of this case. Where previously there was a substantially stalled construction project, an absence of funding to resume the Project, and no obvious plan for a successful exit from chapter 11, Mr. O'Halloran's guiding hand (i) ensured the diligent prosecution of the Debtor's Lender Liability Claims, (ii) enabled the completion of remediation work and resumption of the construction work on the Project to the extent that Phase 1 is nearing completion and the Trustee has already sold a majority of the residencies in Phase 1, resulting in a significant increase in the value of Phase 2, and (iii) has culminated in the proposal of a chapter 11 plan that envisions meaningful distributions not just to the Debtor's secured creditors but to all of the Debtor's creditors. It was Stradley's efforts which led to the appointment of Mr. O'Halloran but the benefits

22

resulting from his expert handling of this case have extended to the estate, generally, and not primarily to Stradley.

89.    Second, Stradley's efforts were not duplicative of other parties' efforts. Here, there was no creditors' committee or other party willing to take on the active and engaged role that Stradley did with respect to this case. Further, there was no other party, once Mr. O'Halloran was appointed, who was in an equivalent position to assist the Trustee in the meaningful way that Stradley did by sharing with the Trustee Stradley's knowledge and experience during his transition into the role of chapter 11 trustee and by assisting his diligent prosecution of the Lender Liability Action through cooperative efforts to share documents and other information.[10]

90.    Third, at the time Stradley was endeavoring to obtain the appointment of Mr. O'Halloran as the permanent chapter 11 trustee, any expectation of eventual reimbursement for its efforts only could be described as speculative. It would have been unreasonable for Stradley to assume that it would someday be reimbursed for its efforts. Instead, Stradley, as the largest general unsecured creditor, simply was intent on placing this case back on a track that might someday result in some form of distribution to the Debtor's unsecured creditors, generally, which would, in turn, benefit Stradley. Stradley's efforts, although obviously motivated by a hope of someday recouping a portion of its claim, conferred a benefit upon the estate, generally, and not primarily upon Stradley. Most important to the analysis  here is that Stradley undertook significant efforts which did, in fact, confer a significant and direct benefit upon the bankruptcy estate. *See Lebron*,

---

[10] Although there was one other creditor, Premium Excavating, LLC ("**Premium**") who requested an election, Premium was merely following Stradley's lead as evidenced by the fact that Premium's request [Dkt. No. 153], filed approximately four hours after Stradley's [Dkt. No. 149], was almost identical to Stradley's request, and that Premium filed joinders to other submissions filed by Stradley in this case [*see* Dkt. Nos. 52 and 165].

4786324v.3

27 F.3d at 944 ("Most activities of an interested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement."); *see also Celotex*, 227 F.3d at 1339 ([I]t is difficult to imagine a circumstance in which a creditor will not be motivated by self-interest in a bankruptcy proceeding. To impose an altruism requirement on the ability to obtain administrative expenses under § 503(b)(3)-(4) would effectively render the section meaningless as to creditors.").

91.    Further, once Mr. O'Halloran was actually appointed, Stradley had only a limited stake in assisting with his transition into the role of chapter 11 trustee. Certainly, once Mr. O'Halloran retained his own special litigation counsel, supplanting Stradley in that role, Stradley had no ongoing obligation to assist nor an expectation that it would be reimbursed for its efforts.

92.    Nevertheless, Stradley did assist the Trustee, expending significant time and effort coordinating with the Trustee and sharing Stradley's information, knowledge, documents and work product.

93.    As summarized by Prudential in its Motion to Convert, as of late 2017:

> The Island View Project has been dormant for well over a year with no construction activity where no units are completed. What limited improvements to the Island View Property that exist have no value in that Island View is unable to complete the Island View Project and failed to protect the limited improvements from the elements.
>
> . . .
>
> Island View has been left to sit fallow for over a year and during that time, any assets it has have declined in value while the hard assets remaining on the property were left to waste and will likely have to be demolished in order to use the real property.

*See* Motion to Convert [Dkt. NO. 34], at ¶¶ 113, 118.

24

94.    Obviously, Prudential, through self-interest or otherwise, held a dim view of the prospects for completion of the Project, notwithstanding the fact that it was Prudential's bad faith conduct, in part, which caused the Project to languish.

95.    Stradley strongly disagreed with Prudential's position and believed that under the guidance of the appropriate person, the Project could be utilized to reap a meaningful benefit for all of the Debtor's creditors.

96.    Accordingly, Stradley undertook the significant efforts described herein to secure the appointment of Mr. O'Halloran as the permanent chapter 11 trustee and to assist him in that role once appointed.

97.    Stradley's efforts in this regard were not fairly appreciated in all corners. As a result of Stradley's request for the Creditor Election, Stradley faced significant opposition from the Interim Trustee and Prudential necessitating efforts by Stradley to prepare and file the Estimation Motion and defend and preserve its claim and its entitlement to participate in the election of the permanent trustee.

98.    Because Stradley's efforts in this regard were necessary to ensure the validity of the Creditor Election and secure the appointment of Mr. O'Halloran, Stradley deserves to be fairly compensated for these efforts as well.

99.    Given Stradley's position as the largest general unsecured creditor, absent Stradley's efforts, it is unlikely that Kevin O'Halloran or anyone else with his substantial turnaround and restructuring expertise ever would have been appointed in this case.

4786324v.3

100.     To the contrary, by all accounts the likely outcome of this Chapter 11 Case, absent Stradley's intervention, is that the Project promptly would have been sold off in its diminished state for a correspondingly diminished sale price, and no creditors other than the Debtor's secured creditors would have realized any recovery.

101.     Simply put, it is impossible to overstate the importance of Mr. O'Halloran's involvement in this case to the bankruptcy estate and its creditors, and Stradley's efforts were the primary catalyst for Mr. O'Halloran's appointment as the permanent chapter 11 trustee.

102.     Further, having secured his appointment, Stradley did not sit passively by but instead worked with Mr. O'Halloran to further ensure his success in this case first by informally sharing its knowledge and information regarding the Chapter 11 Case and the Lender Liability Action during his transition into the role of chapter 11 trustee, and subsequently by entering into the Joint Prosecution Agreement and formally sharing discovery documents, strategies, and other information that Stradley had obtained or developed during its pre- and post-petition representation of the Debtor and its affiliates.

103.     As a result, Stradley deserves to be reimbursed for its efforts and for its substantial contribution to the bankruptcy estate.

**NOTICE**

104.     In accordance with Local Rule 9014-2(g) this Motion will be served upon the Debtor, Debtor's counsel, the office of the United States Trustee, the Chapter 11 Trustee, and all parties requesting notice pursuant to L.R. 2002.

26

105.   Stradley submits that good and sufficient notice of this Motion has been provided and that no other or further notice is necessary.

## **NO PRIOR REQUEST**

106.   No prior request for the relief requested herein has been made to this Court or any other court in connection with the Chapter 11 Case.

WHEREFORE, Stradley respectfully requests that this Court enter an Order in the form submitted herewith allowing administrative expenses in favor of Stradley in the aggregate amount of $211,513.10.


Dated: July 12, 2021                    /s/ Daniel M. Pereira
     Philadelphia, Pennsylvania          STRADLEY RONON STEVENS & YOUNG, LLP
                                   Gretchen M. Santamour, Esq.
                                   Daniel M. Pereira, Esq.
                                   2005 Market Street, Suite 2600
                                   Philadelphia, PA 19103
                                   Tel: (215) 564-8000
                                   Fax: (215) 564-8120
                                   gsantamour@stradley.com
                                   dpereira@stradley.com

4786324v.3