**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **CHAPTER 11** |
| | : | |
| **ISLAND VIEW CROSSING II, L.P.** | : | **BANKRUPTCY NO. 17-14454(ELF)** |
| | : | |
| Debtor | : | |
| | : | |

**MOTION OF KEVIN O'HALLORAN, CHAPTER 11 TRUSTEE, FOR ENTRY OF AN
ORDER DETERMINING: (A) THE VALUE OF THE DEBTOR'S REAL PROPERTY,
(B) THE AMOUNT OF PRUDENTIAL SAVINGS BANK'S SECURED CLAIM
PURSUANT TO 11 U.S.C. § 506(a), (C) THE AMOUNT OF PRUDENTIAL'S
INTEREST, FEES, COSTS OR OTHER CHARGES PURSUANT TO 11 U.S.C. § 506(b),
(D) THE AMOUNT OF THE BANKRUPTCY ESTATE'S SURCHARGE OF
PRUDENTIAL'S COLLATERAL  PURSUANT TO 11 U.S.C. § 506(c), (E) THE
TRUSTEE'S ENTITLEMENT TO USE THE PROCEEDS FROM THE SALE OF
RESIDENTIAL UNITS IN PHASE 1 (AFTER PAYMENT OF THE RELEASE PRICES
SET FORTH IN THE PRUDENTIAL RELEASE OF LIENS AGREEMENT) TO PAY
PERMITTED CLAIMS UNDER THE PLAN, (F) THE ESTATE'S ENTITLEMENT TO
RELIEF UNDER THE EQUITIES OF THE CASE EXCEPTION
PURSUANT TO § 552(b)(1), AND (G) GRANTING RELATED RELIEF**

Kevin O'Halloran, Chapter 11 Trustee (the "Trustee") for the estate of Island View

Crossing, II, L.P. (the "Debtor"), by and through his counsel, Karalis PC, hereby moves this Court

for the entry of an order determining: (a) the value of the Real Property, [1] (b) the amount of the

secured claim of Prudential pursuant to 11 U.S.C. § 506(a), (c) the amount of Prudential's interest,

fees, costs or other charges pursuant to 11 U.S.C. § 506(b), (d) the amount of the Estate's surcharge

of Prudential's collateral  pursuant to 11 U.S.C. §506(c), (e) the Trustee's entitlement to use the

proceeds from the sale of residential units in Phase 1 (after payment of the Release Prices set forth

in the Prudential Release of Liens Agreement) to pay Permitted Claims under the Plan, (f) the

bankruptcy estate's entitlement to relief under the equities of the case exception pursuant §

552(b)(1), and (g) granting related relief (the "Motion"), and in support thereof, respectfully avers

---

[1] Each capitalized term used in this Motion but not otherwise defined herein has the meaning ascribed to such term
in the Plan.

as follows:

## PRELIMINARY STATEMENT

1.    The Trustee files this Motion pursuant to section 506 of chapter 11 of title 11 of the Bankruptcy Code and Bankruptcy Rule 3012 to ensure a prompt, effective confirmation ("Confirmation") of the Trustee's Chapter 11 Plan of Liquidation dated April 19, 2021 (the "Plan").  The Confirmation hearing was scheduled to occur on July 21, 2021 but as a result of the objections filed to confirmation of the Plan, it has been changed to a pretrial conference scheduled to commence at 9:00 a.m. on July 21, 2021.

2.    By this Motion, the Trustee identifies matters that need to be addressed in order to determine the secured claims of Prudential, including (a) the value of the Debtor's real property, [2] (b) the amount of Prudential's secured Claim pursuant to 11 U.S.C. § 506(a), (c) the amount of Prudential's interest, fees, costs or other charges pursuant to 11 U.S.C. § 506(b), (d) the amount of the Estate's surcharge of Prudential's collateral  pursuant to 11 U.S.C. §506(c), (e) the Trustee's entitlement to use the proceeds from the sale of residential units in Phase 1 (after payment of the Release Prices set forth in the Prudential Release of Liens Agreement) to pay Permitted Claims under the Plan, (f) the Estate's entitlement to relief under the equities of the case exception pursuant to § 552(b)(1), and (g) granting related relief.

3.    These are significant matters that should be resolved before the hearing on Confirmation of the Plan.  The resolution of these matters will provide clarity to all stakeholders and pave an efficient path forward to Confirmation.

4.    The Trustee files this motion to present these fundamental matters before the Court to have the Court schedule a hearing in advance of the Confirmation Hearing to address these

---

[2] The Trustee is in the process of retaining an appraiser to appraise the Real Property and to be available to provide expert testimony at the time of hearing on this Motion.

matters, and for the entry of an Order approving the relief requested herein.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and rule-based predicates for the relief requested herein are section 506 of the Bankruptcy Code and Bankruptcy Rule 3012.

## BACKGROUND

**A.     Chapter 11 Case General Background.**

8.      On June 30, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

9.      On August 4, 2017, Prudential filed a Motion to Convert the Chapter 11 Case to a Case under Chapter 7, or in the alternative to appoint a chapter 11 Trustee (the "Motion to Appoint Trustee").  The Debtor opposed the Motion to Appoint Trustee.

10.     On August 21, 2017, the Debtor filed a motion for entry of a final order authorizing the Debtor to:  (i) obtain post-petition financing pursuant to sections 364 and 363 of the Bankruptcy Code, (ii) enter into various loan documents, (iii) grant liens on property of the estate senior to all other liens pursuant to section 364(d)(1) of the Bankruptcy Code and (iv) modify the automatic stay to implement the financing (the "DIP Financing Motion").  On September 4, 2017, the Debtor amended the DIP Financing Motion.  The DIP Financing Motion was opposed by Prudential and the RDA.

11.     After numerous days of consolidated hearings on the Motion to Appoint Trustee and the DIP Financing Motion, by order dated December 18, 2017, the Bankruptcy

Court denied the Debtor's DIP Financing Motion and Prudential's request to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code but granted the Motion to Appoint Trustee.

12.     On December 21, 2017, the United States Trustee filed an Application for an Order Approving the Appointment of Christine C. Shubert as the interim Chapter 11 Trustee which application was approved pursuant to a Court Order entered on the same day.  Thereafter the creditors of the Debtor's estate elected the Trustee.

13.     On January 30, 2018 (the "Appointment Date"), the United States Trustee for Region 3 filed its Report of Undisputed Election which provided, *inter alia*, that the Trustee was elected to serve as the trustee in the Chapter 11 Case.

B.     **Debtor's Designation of Prudential Claims as Disputed and Proofs of Claim Filed.**

14.     The Debtor listed Prudential on its Bankruptcy Schedule D: Creditors Who have Claims secured by Property as holding four (4) disputed secured claims as follows:

| Creditor | Describe Lien | Designation | Amount of Claim | Value of Collateral that supports this Claim |
|----------|---------------|-------------|-----------------|----------------------------------------------|
| Prudential Savings Bank | Second mortgage | Disputed | $3,546,000.00 | $22,000,000.00 |
| Prudential Savings Bank | Third mortgage | Disputed | $1,324,000.00 | $22,000,000.00 |
| Prudential Savings Bank | Fourth mortgage | Disputed | $3,604,000.00 | $22,000,000.00 |
| Prudential Savings Bank | Fifth mortgage | Disputed | $2,361,000.00 | $22,000,000.00 |

15.     By Order of the Bankruptcy Court, the "Bar Date" to file Proofs of Claim (other than those of governmental units) was October 11, 2017.

16.     On October 11, 2017, Prudential filed proofs of claim in the Chapter 11 Case for only two (2) of its four (4) disputed secured claims as follows:

4

| Claim No. | Date Filed | Creditor | Designation | Amount | Nature of collateral that secures claim | Basis for Claim |
|---|---|---|---|---|---|---|
| 23-1 | 10/11/17 | Prudential Savings Bank | Secured | 4,092,443.58 | Real Estate | Development Construction Loan Agreement dated 11/26/14 (original amount of $5,541,468) |
| 24-1 | 10/11/17 | Prudential Savings Bank | Secured | 1,470,569.25 | Real Estate | Loan agreement dated 9/20/13 among Debtor, Island View Properties, Inc., Renato J. Gualtieri, and Americorp Homes, Inc. under a note in the original principal amount of $1,400,000. |

17.     Since Prudential filed no proof of claim on account of its Class 5 (Disputed Steeple

Run Collateral Mortgage Claim) or Class 6 (Disputed Calnshire Collateral Mortgage Claim) it has

no unsecured claim in the Chapter 11 Case against the Debtor.   See, Fed. Bankr. P. 3002(a).

**C.      Summary of the Prudential Liens recorded against the Debtor's Real Property**.

18.     The Construction Loan.  The Debtor's proposed development of Phase 1 including

the site improvements for the Real Property was to be financed by Prudential.   On or about

November 26, 2014, Prudential made the Prudential Construction Loan available to the Debtor in

an amount up to $5,541,468 to finance the site improvements and vertical construction in Phase 1,

which was secured by the Prudential Construction Loan Mortgage.  As of the Petition Date, the

amount due Prudential on account of the Prudential Construction Loan was $4,092,443.58.   The

Trustee in the Trustee's Actions against Prudential is seeking to, *inter alia*, subordinate the

Prudential Construction Loan Claim to all creditors in the Chapter 11 Case.

19.     The Subdivision Site Improvement Agreement.  Prudential also entered into the

Subdivision Financial Security Agreement dated March 4, 2015 and related agreements by and

among Bristol Borough, Bristol Borough Water & Sewer Authority, Prudential and the Debtor (the "Subdivision Site Improvement Agreement") for the installation of the public improvements required for development of the Real Property.   In accordance with the Subdivision Site Improvement Agreement, Prudential issued the Bristol Borough Letter of Credit in the original amount of $2,091,381.19.  As of the Petition Date the undrawn balance under the Bristol Borough Letter of Credit had been reduced to $1,231,087.02.   As a result of site improvement work performed by the Trustee at the Project, Bristol Borough issued certificate of completion No. 7 dated February 10, 2020 in the amount of $143,381.70 less a ten percent (10%) retention by the Borough, which authorized the Borough to reduce the deposit of this project by the sum of ($129,043.53) pursuant to the site improvement security agreement.[3]  The obligations of Prudential under the Bristol Borough Letter of Credit is not secured by a lien on the Debtor's Real Property.

20.    The Disputed Steeple Run Collateral Mortgage.  Contemporaneous with Gualtieri's acquisition of all the Interests in the Debtor, Prudential and the Debtor entered into the Steeple Run Collateral Mortgage dated September 20, 2011 concerning a loan in the amount of $3,911,250 from Prudential to Steeple Run, L.P.  The Steeple Run Collateral Mortgage was recorded against the Debtor's Real Property.  No portion of this loan was paid to, or for the benefit of, the Debtor. The Trustee in the Trustee's Actions against Prudential is seeking to, *inter alia*, avoid the Steeple Run Collateral Mortgage and to subordinate this Claim to all creditors in the Chapter 11 Case. As set forth above, Prudential filed no proof of claim in the Chapter 11 Case with respect to the Steeple Run Collateral Mortgage.

21.    The Disputed IVC-Durham Loan.  On or about September 20, 2013, Prudential, as

___

[3] Prudential had also issued a letter of credit in the amount of $293,445.50 to Aqua Pennsylvania, Inc. for a water main extension to provide water to the Real Property.  By letter dated February 7, 2020, Aqua has confirmed to the Trustee that the original letter of credit issued by Prudential Savings Bank, LOC #IVC-2, was released in its entirety and returned to Gualtieri of Americorp on October 18, 2017.

6

lender, and the Debtor, Island View Properties, Inc. and Americorp Homes, Inc., each as co-borrower, entered into the IVC-Durham Loan in the amount of $1,400,000 which loan was advanced to reduce the balance due on a certain loan from Prudential to Durham Manor, LLC, an affiliate of the Debtor, and for the payment of costs and expenses associated with the closing of the IVC-Durham Loan.  Only $280,829.84 of the IVC-Durham Loan was paid to the Debtor, the balance of this loan was not paid to, or for the benefit of, the Debtor.  The Trustee in the Trustee's Actions against Prudential is seeking to, *inter alia*, avoid the IVC-Durham Mortgage, recover transfers arising in connection therewith and to subordinate this Claim to all creditors in the Chapter 11 Case.

22.    <u>The Disputed Calnshire Collateral Mortgage</u>.    On or about May 30, 2014, Prudential and the Debtor entered into the Calnshire Collateral Mortgage dated May 30, 2014 concerning a loan in the amount of $5,136,000 from Prudential to Calnshire, L.P. and Durham Manor LLC.  The Calnshire Collateral Mortgage was recorded against the Debtor's Real Property. No portion of this loan was paid to, or for the benefit of, the Debtor.  The Trustee in the Trustee's Actions against Prudential is seeking to, *inter alia*, avoid the Calnshire Collateral Mortgage and to subordinate this Claim to all creditors in the Chapter 11 Case.  As set forth above, Prudential filed no proof of claim in the Chapter 11 Case with respect to the Calnshire Collateral Mortgage.

23.    All of the above Prudential mortgage liens are junior and subordinate to the following Liens: (a) the unpaid pre-petition real estate taxes due the Bucks County Tax Claim Bureau; (b) the RDA Mortgages that secure the unpaid pre-petition loans due the RDA; and (c) the Post-Petition Loan Mortgage that secures the Post-Petition Loan.

**D.    <u>The Trustee's Actions against Prudential.</u>**

24.    <u>The Lender Liability Action</u>.  After a change in the Debtor's relationship manager

at Prudential, and a change in management at Prudential in November of 2015, disputes arose between the Debtor and Prudential that ultimately resulted in: (a) Prudential ceasing to fund advances under the Prudential Construction Loan resulting in the cessation of construction of the residential units that had been started in Phase 1, (b) the cessation of site improvements and (c) the commencement of various litigation among the Debtor, Gualtieri, the general partner of the Debtor and Prudential, including on March 31, 2016, the Lender Liability Action (a $27 million dollar lender liability claim) being filed by the Debtor and its Affiliates against Prudential in the Court of Common Pleas, Philadelphia County, and Prudential filing more than twenty-six (26) separate lawsuits against the Debtor and its Affiliates, (e.g. foreclosure cases and confessions of judgment complaints) and nine (9) counterclaims in the Lender Liability Action.

25.    <u>Removal of the Lender Liability Action to Bankruptcy Court</u>.  On or about July 18, 2017, Prudential removed the Lender Liability Action to the Bankruptcy Court where it is presently pending.  The Debtor did not oppose the removal of the Lender Liability action from the state court to the Bankruptcy Court.

26.    <u>The Avoidance and Subordination Action</u>.  On December 3, 2018, the Trustee commenced the Avoidance and Subordination Action in the Bankruptcy Court against Prudential. In the Avoidance and Subordination Action, the Trustee seeks to avoid and recover constructive fraudulent transfers and to equitably subordinate Prudential's rights below those of other creditors. The Bankruptcy Court consolidated the Lender Liability Action and the Avoidance and Subordination Action into a single adversary proceeding which is collectively referenced as the "<u>Trustee's Actions against Prudential</u>".

27.    <u>The Motions for Summary Judgment</u>.  After the parties completed discovery, the Trustee and Prudential filed motions for summary judgment.  The Trustee's motion for summary

judgment seeks the avoidance of the IVC-Durham Loan, the Steeple Run Collateral Mortgage and the Calnshire Collateral Mortgage and the recovery of more than $1.1 million in fraudulent transfers related to the IVC-Durham Loan.  Prudential's motion for summary judgments seeks the dismissal of all of the Trustee's claims in the consolidated adversary proceeding.  The parties have fully briefed the summary judgment motions.

**E.        The Debtor's Real Property.**

28.       The Debtor owns the real property located at 1600 Radcliffe Street, Bristol Borough, Bucks County, Pennsylvania, which is a residential subdivision of approximately 17.51 acres, wherein "Phase 1" is currently approved for fourteen (14) buildings containing a total of 73 townhouses and certain site improvements and "Phase 2" is currently approved for six (6) buildings containing a total of 96 condominiums units and certain site improvements and all improvements thereon and all rights, licenses, permits and approvals relating thereto (collectively, the "Real Property" and at times also referred to as the "Collateral").

29.       The Real Property was part of a former World War I shipbuilding facility on the Delaware River.  The Real Property required remediation in order for it to comply with the Pennsylvania Land Recycling and Environmental Remediation Standards Act ("PA Act 2").  The remediation required, and the resulting liability relief provided by PA Act 2, is specific to the contamination identified at each site.  Prior to the Petition Date, the Debtor had retained Penn Environmental & Remediation, Inc. ("Penn E&R") to evaluate the Real Property in terms of residential land use and to implement any remedial actions, if any, needed to demonstrate attainment of either the statewide health or site-specific standards based on a residential use scenario.  With the assistance of Penn E&R and approval of the Pennsylvania Department of Environmental Protection (the "DEP"), a cleanup plan for the remediation of soils to meet PA Act 2 was prepared for the Real Property.

9

30.    As of the Petition Date, the Debtor had commenced and completed most of the remediation for the Real Property but there were still a number of additional remediation activities and reports that needed to be performed and completed in order to obtain final approval under PA Act 2 from the DEP for Phase 1.    As a result, the Trustee retained Penn E&R to oversee the completion of the remaining remediation work for Phase 1 and to prepare a final report to obtain final approval under PA Act 2 for Phase 1.

31.    As of the Petition Date, there was no active construction at the Real Property. Vertical Construction had stopped since the summer of 2016 and construction of the site improvements had ceased since the end of 2016.  As of the Petition Date, the Debtor had twelve (12) residential units at different stages of completion that were sitting in Phase 1.  These units remained unfinished for over two (2) years until the Trustee was able to restart construction in Phase 1 in October 2018.   The Debtor's Bankruptcy Schedule A/B: Part 1 reflects that the Debtor only had $2.01 in its bank accounts.

**F.    The Trustee's Decision to Develop and Sell Residential Units in Phase 1**.

32.    After his appointment, the Trustee met and consulted with: (i) on behalf of the Debtor,  Gualtieri, Debtor's counsel, and Debtor's proposed lender, (ii)  numerous key Creditors in the  Chapter 11 Case, including the RDA, Prudential, Stradley, the Borough of Bristol, and a few of the pre-petition judgment holders, (iii) numerous persons and entities that had expressed an interest in purchasing the Real Property, and (iv) numerous other professionals, including land planning professionals, environmental consultants, engineers, real estate brokers, and independent counsel experienced in prosecuting lender liability actions.

33.    Thereafter, the Trustee in his business judgment determined that the best

means by which to maximize the value of the Real Property for the benefit of all creditors was to proceed with the development and sale of residential units in Phase 1, to continue to explore all options to maximize the value of Phase 2, and to complete the remediation activities and the report required to obtain final PA Act 2 approval from the DEP for Phase 1.

34.    The Trustee also determined that retention of special litigation counsel was appropriate for the continued prosecution of the Lender Liability Action and the commencement of additional Causes of Actions against Prudential identified by the Trustee's bankruptcy counsel.

35.    Prudential and other creditors in the Chapter 11 Case consented to and supported the Trustee's construction and sale of the 73 residential units in Phase 1.

36.    In order to proceed with development and sale of Phase 1 and to fund the costs that would be incurred for the development of Phase 1, the Trustee determined that he would require a post-petition loan in the amount of $4,700,000.

**G.    Trustee's Motion to approve Post-Petition Financing, the Prudential Release of Liens Agreement and the Prudential Subordination Agreements.**

37.    By late July 2018, the Trustee and the Post-Petition Lender agreed upon the terms and conditions for the Post-Petition Loan.

38.    Also by the end of July 2018, the Trustee and Prudential had agreed upon the terms for the Prudential Release of Liens Agreement and the Prudential Subordination Agreements which are very significant agreements in the Chapter 11 Case because they provide the contractual terms by which Prudential agreed, *inter alia*, to: (a) consent to the approval of the Post-Petition Loan and (b) the release of all of its Liens arising from the Existing Mortgages of Prudential at the time of closing on the sale of each residential unit

in Phase 1 subject to  the payment of the fixed release prices set forth therein.

39.    Prudential agreed that the Trustee was permitted to use the balance of the proceeds from the sale of Phase 1 residential units to complete the remaining residential units in Phase 1 and to pay the Permitted Claims under his Plan.  This agreement also provided for an extension of the maturity date of the unpaid balance due under the Prudential Construction Loan Mortgage to the last business day of the 42nd month after the Post-Petition Financing Order becomes a Final Order (March 31, 2022) and  Prudential also subordinated all of its liens and claims arising from the Calnshire Collateral Mortgage, the Steeple Run Collateral Mortgage and the IVC-Durham Mortgage to the Permitted Claims so as to allow the Trustee to use the proceeds from sale of the Residential Units in Phase 1 and/or sale of Phase 1 to pay the Permitted Claims.

40.    On August 17, 2018, the Trustee filed a motion for entry of a Final Order authorizing (I) Trustee to obtain secured post petition financing pursuant to §§105, 361, 364(c)(1) and 364(d)(1) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 4001, (II) Trustee to enter into the Loan Documents; (III) granting an allowed super priority administrative expense claim with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Section 503(b) or 507(b); (IV) granting a Lien on all assets of the  Estate (except for the Excluded Assets) senior to all other Liens (except for the Permitted Liens) pursuant to Section 364(d)(1) of Bankruptcy Code; (V) approving the Release of Liens Agreement between the Trustee and Prudential pursuant to Federal Rule of Bankruptcy Procedure 9019; and (VI) granting related relief.

41.    By Order dated September 12, 2018, the Bankruptcy Court, *inter alia*, approved (a) the Post-Petition Loan in the amount of $4,700,000 with BKRE Investments

LLC secured by a valid and perfected first priority lien on the Real Property subordinate only to the Permitted Liens and (b) the Prudential Release of Liens Agreement. The Liens that secure the Post-Petition Loan shall continue unaltered and in full force and effect until the Post-Petition Loan has been paid in full in Cash. In addition, pursuant to Bankruptcy Code Section 364(c)(1) the Post-Petition Loan is also secured by an allowed administrative expense claim with priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b).

42.     The Prudential Release of Liens Agreement, the Calnshire Mortgage Subordination Agreement, the IVC-Durham Mortgage Subordination Agreement, and the Steeple Run Collateral Mortgage Subordination Agreement have all been signed by Prudential and the Trustee and have been recorded with the recorder of deeds for Bucks County against the Real Property.

43.     The advances under the Post-Petition Loan have been utilized to, *inter alia*, fund the costs to preserve the Collateral, to resume the construction, marketing and sale of the residential units in Phase 1, the construction of site improvements, the costs to complete the remediation items required to obtain final PA Act 2 approval from the DEP for Phase 1, payment of post-petition real estate taxes, and payment of the Professional Fee Claims incurred by the Professionals retained by the Trustee and approved by the Bankruptcy Court.

**H.    DEP Final Approval Pursuant to PA Act 2 for Phase 1.**

44.     After the Post-Petition Loan was approved in September 2018, the Trustee began the remediation work at the Real Property required by the DEP to comply with provisions of PA Act 2 and he retained Penn E&R to complete the environmental reports needed to obtain the final DEP approval for Phase 1. On October 9, 2019, final PA Act 2 approval for Phase 1 was received from the DEP and on December 16, 2019 the DEP issued the environmental covenant for Phase 1

(the "Environmental Covenant").    On or about December 17, 2019 the Trustee had the

Environmental Covenant recorded against the Real Property.

45.    During 2019, the Trustee had received fifteen (15) non-binding reservation

agreements for the purchase of residential units in Phase 1.  After the Trustee obtained final PA

Act 2 approval the Trustee was able to proceed with the completion of the public offering statement

for Phase 1, the conversion of the non-binding reservation agreements to binding agreements of

sale, and to expand his marketing and sale of the residential units in Phase 1.

46.    The final DEP approval for Phase 1 took substantially longer than the Trustee had

anticipated and resulted in no residential units being sold during the 2019 calendar year.  This

delay caused the Trustee's original projections for the completion of Phase 1 to be extended by

approximately one year to March 31, 2022.[4]

**I.     Trustee's Motion for Financing as an Administrative Expense.**

47.    Since the Trustee was not able to sell and close on any of the residential units he

had constructed in Phase 1 during 2019, the Trustee did not realize any of the revenue projected

from the sale of residential units during 2019.  By December 2019, the balance of available funds

under the Post-Petition Loan were not adequate to continue fund the operations in Phase 1 during

the winter months of 2020.  Therefore, the Trustee needed bridge financing to cover expenses from

January 2020 until March 2020.

48.    For these reasons, the Trustee on December 20, 2019, filed a Motion for entry of a

Final Order authorizing Trustee to obtain an unsecured loan from the Post-Petition Lender as an

Administrative Expense Claim (the "Second Post-Petition Loan").  The Second Post-Petition Loan

was for a total amount of $443,352 payable in two advances: (a) the 1st Advance of $200,000

---

[4] The original projection provided an estimated completion date for Phase 1 within thirty (30) months after September
30, 2018 (the projected date of non-appealable order approving the Post-Petition Loan), or March 31, 2021.

would pay costs incurred to winter seal the buildings in Phase 1 and (b) the 2nd Advance of $243,352 would only be made in the sole and absolute discretion of the Post-Petition Lender to fund costs to complete four (4) residential units in building number 3 in Phase 1 which would have given the Trustee the added advantage of having four (4) additional units completed during the winter of 2020 and would have allowed the Project to be completed sooner.

49.     The terms of this loan were also very favorable to the Estate, it was an unsecured, administrative claim, with a 1-year maturity date with interest at 9.25% per annum until paid; provided, however, if the Trustee repaid this loan on or before the maturity date, the Second Post-Petition Loan would accrue no interest.  The Post-Petition Lender also made the 2nd Advance contingent on its sole and absolute discretion because it did not want to fund the 2nd Advance if the RDA or Prudential were going to file objections.

50.     The RDA advised promptly that it had no opposition to this loan.  However, Prudential took the Trustee's request under advisement and eventually objected to the Second Post-Petition Loan.

51.     By an interim Order dated January 27, 2020, the Second Post-Petition Loan was approved to the extent of $200,000.00.  A further hearing to consider approval of the balance of the Second Post-Petition Loan was scheduled for February 12, 2020 but was continued due to the objection filed by Prudential to the approval of the 2nd Advance.   When Prudential would not agree to withdraw its objection, the Post-Petition Lender elected not to proceed with the 2nd Advance of $243,352.  By Final Order dated March 19, 2020, the interim advance of $200,000 was made final.

52.     The Trustee repaid the Second Post-Petition Loan before its Maturity Date and hence the Estate received the benefit of this $200,000 unsecured loan for one year without interest.

15

53.     Unfortunately, due to Prudential's objection to the 2nd Advance, the Estate lost all the benefits of (a) having four (4) additional units completed before the COVID-19 Pandemic caused the shutdown of construction in March 2020, (b) the completion of Phase 1 sooner and (c) the Estate's availability of an additional $243,352 of financing for the period of one year without interest.

**J.     Sales of Residential Units in Phase 1; COVID-19 Pandemic.**

54.     On January 17, 2020, the Trustee filed his first motion to approve the sale of the first three (3) residential units in Phase 1.   By Order dated February 12, 2020, the sale of the first three (3) units in Phase 1 were authorized.

55.     On February 24, 2020, the Trustee filed a second motion to approve the sale of a 4th unit in Phase 1 and the procedures for the approval of future sales of residential units in Phase 1.  By Order dated March 19, 2020, the Bankruptcy Court approved (i) the sale of the 4th residential unit and (ii) the procedures for the future sales of residential units in Phase 1.

56.     However, as a result of the COVID-19 crisis and the related orders of the Governor of Pennsylvania, the Trustee was directed to shutdown construction and the sales office in Phase 1 in the middle of March 2020.  Construction was suspended from March 2020 through September 2020.  During this period, the sales team operated virtually and was active in communicating by phone and email with prospective buyers.  Marketing in both print and social media continued with a video of the site and the interior of units available for viewing.  However, the COVID-19 pandemic had a significant impact on the prime selling seasons of spring and summer of 2020 and resulted in substantial delays in concluding sales.

57.     Even though the Trustee implemented cost cutting measures to reduce expenses, including the suspension of the construction manager for a full six (6) months, there were other

16

obligations that had to be maintained and could not be reduced including, insurance, security, interest, utilities, general maintenance of the Project and UST fees. The financial consequence of the COVID-19 crisis upon the Estate was substantial in that it delayed the completion and sale of the remaining units in Phase 1 by an additional year and resulted in the Estate incurring carrying costs during this period of approximately $1,000,000.

58.    In total, the completion of Phase 1 has been delayed by at least two (2) years beyond the Trustee's original projections, approximately one year arising from the time period that passed to obtain final approval from the DEP under PA Act 2 for Phase 1 and an additional year arising from the COVID-19 crisis. The Trustee has revised his original financing projections accordingly. The Trustee's revised Projections estimate a completion date of Phase 1 by August 30, 2023 and are attached to the Disclosure Statement as Exhibit "A".[5]

59.    As of the filing of this Motion, the Trustee has resumed construction in Phase 1 and has sold 51 residential units in Phase 1 (70% of the Phase 1 residential units) and has closed and settled on 29 of these residential units as of July 16, 2021.

60.    These sales breakdown to date are as follows:

- during 2019 there were no sales;
- during 2020 there were 23 units sold and 18 of these contracts closed;
- during 2021 through the date of this Motion, there were 28 additional units sold; and the Trustee has closed on a cumulative total of 29 units

**K.    The Trustee's Plan and Disclosure Statement.**

61.    On April 20, 2021, the Trustee filed the Plan, a Disclosure Statement dated April 19, 2021 with respect to the Plan (the "Disclosure Statement"), and a Motion for the Entry of an Order Approving (a) the Disclosure Statement, (b) Procedures for Solicitation and Tabulation of

---

[5] Based on the 2021 sales results to date which the Trustee continues to monitor, the actual completion date of Phase 1 may be sooner.

Votes to accept or reject the Plan, and (c) related notice and objection procedures.

62.     The Plan provides for the development, completion and/or sale of Phase 1 and Phase 2 of the Debtor's real property, in whole or in part, by the Trustee and distribution of the proceeds under the provisions of the Plan in resolution of all outstanding claims against, and interests in, the Debtor.

63.     Section 3.3.2 of the Plan states that:

> <u>Prudential Release of Liens Agreement, Subordination Agreements, and Surcharge of Prudential Collateral</u>.  Prudential executed and delivered to the Trustee the Prudential Subordination Agreements which <u>inter alia</u> authorize the Trustee to utilize the proceeds from the sale of the residential units at the Project and/or sale of the Project that secures Claims held by Prudential to pay the Permitted Claims under any plan proposed by the Trustee and confirmed by the Bankruptcy Court. **Likewise, under the Prudential Release of Liens Agreement and subject to the payment of the release prices set forth in the Prudential Release of Liens Agreement (and detailed below), the Trustee may utilize the remaining proceeds from the sale of the residential units at the Project to fund this Plan including payment of the Permitted Claims**.  **Notwithstanding anything otherwise contained herein, the Trustee preserves all rights to recover from the Real Property securing the Prudential Allowed Class 3 Claim the reasonable, necessary costs and expenses of preserving, or disposing of, such Real Property to the extent of any benefit to the Holder of such Claim, including the payment of all ad valorem property taxes with respect to the Real Property pursuant to section 506(c) of the Bankruptcy Code. (emphasis added)**.

64.     On May 26, 2021, this Honorable Court entered an Order approving the Trustee's Disclosure Statement that, *inter alia*, fixed the last day to vote as July 2, 2021.

65.     The Report of Plan Voting filed on July 7, 2021 in connection with the Plan, states, *inter alia*, that:

> (a)     four (4) classes of claims under the Plan, Class 1 (Tax Claim Bureau Claim), Class 2 (RDA Claim), Class 7 (Pre-Petition Judgment Claims), and Class 9 (General Unsecured Claims) all of which are impaired voted to accept the Plan.  Class 8 (Priority Non-Tax Claims), which are not impaired, are deemed to have accepted the Plan pursuant to §1126(f) of the Bankruptcy Code.  Therefore, in total, five (5) classes of claims have accepted the Plan;

and

(b)    Class 3 (Prudential Construction Loan Claim), which is impaired voted to reject the Plan.  Class 10 (Limited Partner Interests) and Class 11 (General Partner Interest), which are impaired, did not vote and therefore have not accepted the Plan.  Therefore, in total one (1) class of claims voted to reject the Plan and two (2) classes of interests have not accepted the Plan.

66.    Three (3) objections to Confirmation of the Plan were received from: (a) Prudential, (b) RDA and (c) Bonnie Finkel, the chapter 7 trustee for the estate of Calnshire Estates LLC.

67.    Accordingly, Confirmation of the Plan would be pursuant to 11 U.S.C. §1129(b) of the Bankruptcy Code.

**L.**    **The Prudential Release of Liens Agreement and Subordination Agreements.**

68.    <u>Prudential Release of Liens Agreement</u>.  As set forth above, by Order dated September 12, 2018, this Court approved the Prudential Release of Liens Agreement.  As a result, on September 24, 2018, the Trustee and Prudential entered into that agreement, and recorded it against the Real Property in the land records at Instrument No. 2018053794.  A copy of the recorded Prudential Release of Liens Agreement is attached hereto as Exhibit "A" and made a part hereof.

69.    Subject to the payment of the release prices set forth in the Prudential Release of Liens Agreement, Prudential agreed that the Trustee is permitted to utilize the remaining proceeds from the sale of the residential units in Phase 1 to complete the remaining residential units in Phase 1 and to pay the Permitted Claims under the Plan.

70.    Permitted Claims are defined as the claims arising from: (a) the Post-Petition Loan, (b) Allowed Administrative Claims including Professional Fee Claims and Trustee Commission, (c) Allowed Priority Tax Claims, (d) Allowed Secured Claims including Class 1, Class 2, and Class 7, (e) Allowed Priority Non-Tax Claims, and (f) Allowed General

Unsecured Claims excluding claims held by Insiders (as that term is defined by the Bankruptcy Code and applicable case law); provided however, the allowed Professional Fee Claim of counsel retained by the Debtor is specifically excluded as set forth in the Prudential Release of Liens Agreement. *See,* Section 1.68 of the Plan.

71.    Calnshire Collateral Mortgage Subordination Agreement.  In accordance with the Release of Liens Agreement, the Trustee and Prudential entered into that certain subordination agreement dated September 24, 2018 but effective September 26, 2018 and recorded against the Real Property in the land records on September 28, 2018 at Instrument No. 2018053795 whereby Prudential, *inter alia*, subordinated the liens and claims of the Calnshire Collateral Mortgage for priority, distribution and payment purposes to all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each residential unit at the Project and/or the Project to pay the Permitted Claims in full from the proceeds of sale of the residential units at the Project and/or sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy Court.  This subordination agreement also provides that at the time of each closing on the sale of each residential unit at the Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of the Calnshire Collateral Mortgage to the Trustee without any charge or payment.  The Trustee preserved his claim to void or otherwise invalidate the Calnshire Collateral Mortgage and Prudential likewise preserved all of its claims and defenses to any such claim.  A copy of the recorded Calnshire Collateral Mortgage Subordination Agreement is attached hereto as Exhibit "B" and made a part hereof.

72.    IVC-Durham Mortgage Subordination Agreement.  In accordance with the Release of Liens Agreement, the Trustee and Prudential entered into that certain subordination agreement

dated September 24, 2018 but effective September 26, 2018 and recorded against the Real Property

in the land records at Instrument No. 2018053797 whereby Prudential, *inter alia*, subordinated the

liens and claims of the IVC-Durham Mortgage for priority, distribution and payment purposes to

all the Permitted Claims so that the Trustee may utilize the proceeds from the sale of each

residential unit at the Project and/or the Project to pay the Permitted Claims in full from the

proceeds of sale of the residential units at the Project and/or sale of the Project as set forth in any

plan proposed by the Trustee and confirmed by the Bankruptcy   Court. This subordination

agreement also provides that at the time of each closing on the sale of each residential unit at the

Project and/or the sale of the Project, and only so long and to the extent the Permitted Claims have

not been paid in full, Prudential will deliver a release of the lien of the IVC-Durham Mortgage to

the Trustee without any charge or payment.  The Trustee preserved his claim to void or otherwise

invalidate the IVC-Durham Mortgage and Prudential likewise preserved all of its claims and

defenses to any such claim.   A copy of the recorded IVC-Durham Mortgage Subordination

Agreement is attached hereto as Exhibit "C" and made a part hereof.

73.    Steeple Run Collateral Mortgage Subordination Agreement.  In accordance with the

Release of Liens Agreement, the Trustee and Prudential entered into that certain subordination

agreement dated September 24, 2018 but effective September 26, 2018 and recorded against the

Real Property in the land records on September 28, 2018 at Instrument No. 2018053796 whereby

Prudential, *inter alia*, subordinated the liens and claims of the Steeple Run Collateral Mortgage

for priority, distribution and payment purposes to all Permitted Claims so that the Trustee may

utilize the proceeds from the sale of each residential unit at the Project and/or the Project to pay

the Permitted Claims in full from the proceeds of sale of the residential units at the Project and/or

sale of the Project as set forth in any plan proposed by the Trustee and confirmed by the Bankruptcy

21

Court.  This subordination agreement also provides that at the time of each closing on the sale of

a residential unit at the Project and/or the sale of the Project, and only so long and to the extent the

Permitted Claims have not been paid in full, Prudential will deliver a release of the lien of the

Steeple Run Collateral Mortgage to the Trustee without any charge or payment. The Trustee

preserved his claim to void or otherwise invalidate the Steeple Run Collateral Mortgage and

Prudential likewise preserved all of its claims and defenses to any such claim.  A copy of the

recorded Steeple Run Collateral Mortgage Subordination Agreement is attached hereto as Exhibit

"D" and made a part hereof.

**M.**     **The Surcharge Costs.**

74.     By this Motion, the Trustee on behalf of the Estate also seeks authority to surcharge

the Collateral for the Surcharge Costs (as defined below).  For the reasons set forth in this Motion,

the surcharge sought in this Motion satisfies the requirements of section 506(c) of the Bankruptcy

Code.  Accordingly, the Court should approve the relief requested herein.

75.     After the Appointment Date to present, and continuing after Confirmation, the

Trustee incurred and will continue to incur significant administrative expenses in his efforts to

preserve the value of Prudential's Collateral, including the construction and sale of the remaining

residential units in Phase 1 and sale of Phase 2.  The Trustee is compiling a list of these

administrative expenses and upon completion will file the list with the Court as an exhibit to this

Motion.

**N.**     **The Equities of the Case Exception pursuant to §552 (b)(1).**

76.     By this Motion, the Trustee on behalf of the Estate also seeks authority to limit

Prudential's mortgage lien interests in the proceeds from the sale of Phase 1 residential units to the

value of the Collateral (e.g. land value of each residential unit only) before the Trustee's post-

petition addition of vertical improvements (e.g. construction of the townhome and improvements to the land) the costs of which were incurred by the Estate and which created value in the Collateral that did not exist as of the Appointment Date for the benefit of Prudential.

77.    Under the circumstances of our case, it would be inequitable to allow Prudential to claim from the Estate, the remaining proceeds from sale of the Phase 1 residential units (after payment of the Release Prices), especially since the general policy reflected in 11 U.S.C. §552(a) is to restrict the claims of prepetition secured interests to prepetition collateral and regard after acquired property as property of the estate.    The "equity exception" in 11 U.S.C. §552(b)(1) requires a bankruptcy court to balance the rights between prepetition security interests and those of creditors of the estate.

78.    For the reasons set forth in this Motion, Prudential's mortgage lien interests should be limited to the proceeds from the sale of the Phase 1 land only exclusive of the value of the post-petition improvements installed by the Trustee and the costs for all of these improvements having been incurred by the Estate.    Such a limitation of Prudential's mortgage lien interests satisfies the "equities of the case" exception pursuant to section 552(b)(1) of the Bankruptcy Code by preventing Prudential from receiving a windfall at the expense of the Estate.    Accordingly, the Court should approve the relief requested herein.

**O.    Prudential's Objection to Confirmation.**

79.    In its objection to Confirmation, Prudential asserts, *inter alia*, that:

(a)    Prudential's Construction Loan claim is $5,000,000[6] which is not supported by its own proof of claim, or the Prudential Release of Liens Agreement;

(b)    Prudential is the holder of a fully secured claim and therefore Prudential is entitled to interest, fees and costs associated with the Construction Loan but provides no detail or supporting documentation for any of these items[7];

---

[6] There is no support or explanation as to how Prudential calculated this number.

[7] Prudential raised the issue of interest, fees and costs at the time of the failed mediation held in September 2020

    (c)     Prudential asserts that the value of Phase 2 is substantially more than $6 million; and

    (d)     Prudential disputes its agreement to allow the Trustee to use the proceeds from the sale of residential units in Phase 1 (after the payment of the release prices set forth in the Prudential Release of Liens Agreement) to fund Permitted Claims under the Plan.

80.     The Trustee disagrees with the assertions made by Prudential in its objection to Confirmation.

81.     Because the parties (a) ascribe different values to the Real Property, (b) disagree upon the amount of the Prudential Secured Claim, (c) disagree as to Prudential's entitlement to interest, fees and costs pursuant to § 506(b), (d) disagree as to the Trustee's entitlement to use of the proceeds from the sale of residential units in Phase 1 (after payment of the Release Prices) to fund Permitted Claims under the Plan, (e) disagree as to the Trustee's entitlement to surcharge Prudential's collateral for the Surcharge Costs, and (f) disagree as to the Estate's entitlement to relief under the equities of the case exception pursuant to § 552(b)(1); all of these matters are critical issues with respect to Confirmation and matters that should be determined in advance of the hearing on Confirmation.

## **RELIEF REQUESTED**

82.     By this Motion, the Trustee requests that the Court determine the below-stated matters in advance of Confirmation of the Plan:

    (a)     the value of the Real Property;

    (b)     the amount of Prudential's Secured Claim pursuant to 11 U.S.C. §506(a);

    (c)     the amount of Prudential's interest, fees, costs or other charges pursuant to 11 U.S.C. §506(b);

---

regarding the Trustee's Actions against Prudential. At that time and regularly thereafter the Trustee has requested that Prudential provide documentation to support its claim for interest, fees and costs. As of the filing of this Motion, Prudential has not yet provided any supporting documentation for these claims.

(d)      the amount of the surcharge of Prudential's Collateral pursuant to 11 U.S.C. §506(c);

(e)      the Trustee's entitlement to use the proceeds from the sale of residential units in Phase 1 (after payment of the Release Prices) to fund Permitted Claims under the Plan;

(f)      the Estate's entitlement to relief under the equities of the case exception pursuant to § 552(b)(1); and

(g)      granting such other and further relief as is just and proper.

## BASIS FOR RELIEF

83.    Bankruptcy Rule 3012 provides that:

On request by a party in interest and after notice – to the holder of the claim and any other entity the court designates – and a hearing, the court may determine:

(1)      the amount of a secured claim under § 506(a) of the Code; or

(2)      the amount of a claim entitled to priority under § 507 of the Code.

*See*, Fed. R. Bankr. P. 3012.

84.    Rule 3012(b) provides that "a request to determine the amount of a secured claim may be made by motion." *See*, Fed. R. Bankr. P. 3012(b). Further, the Advisory Committee Notes to Bankruptcy Rule 3012 state that:

Pursuant to § 506(a) of the Code, secured claims are to be valued and allowed as secured to the extent of the value of the collateral and unsecured, to the extent it is enforceable, for the excess over such value. The valuation of secured claims may become important in different contexts e.g., to determine the issue of adequate protection under § 361, impairment under § 1124, or treatment of the claim in a plan pursuant to § 1129(b) of the Code.  This rule permits the issue to be raised on motion by a party in interest. The secured creditor is entitled to notice of the hearing on the motion and the court may direct that others in the case also receive such notice.

An adversary proceeding is commenced when the validity, priority, or extent of a lien is at issue as prescribed by Rule 7001. That proceeding is relevant to the basis

of the lien itself while valuation under Rule 3012 would be for the purposes indicated above.

*See*, Fed. R. Bankr. P. 3012 Adv. Comm. Notes.

85.    As contemplated by Rule 3012, the Trustee moves under Rule 3012 to determine, *inter alia*, the secured portion of the Prudential Claims, in order to determine the treatment of such claims in the Plan for purposes of Section 1129(b) of the Bankruptcy Code.  *See, e.g.*, *In re Heritage Highgate, Inc.* 679 F. 3d 132, 142 (3d Cir. 2012) (a secured creditor's collateral should be valued at its fair market value at the time of plan confirmation rather than based on any future disposition or use of the collateral).

## I.    Section 506(a)(1) of the Bankruptcy Code.

86.    Section 506(a)(1) of the Bankruptcy Code provides as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

*See*, 11 U.S.C. § 506(a)(1).

87.    Thus, section 506(a) divides allowed claims into two classes: "secured and unsecured portions, with the secured portion[s] of the claim[s] limited to the value of the collateral." *See*, *In re Heritage Highgate, Inc.*, 679 F.3d at 140 (*citing Associates Commercial Corp. v. Rash*, 520 U.S. 953, 961 (1997)). To the extent a secured claim exceeds the value of the collateral, it is deemed to be unsecured.  *See*, *Id*.

## II.    Section 506(b) of the Bankruptcy Code.

88.    Section 506(b) of the Bankruptcy Code provides as follows:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsections (c) of this section, is greater that the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement of State statute under which such claim arose.

*See*, 11 U.S.C. § 506(b).

89.    Thus, section 506(b) provides that only if an allowed secured claim is secured by property the value of which, after any recovery under subsection 506(c), is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under its loan agreement or state statute under which such claim arose.

90.    However, in order to determine Prudential's claim under section 506(b), the Court must also determine the amount of the Estate's 506(c) claim against Prudential's Collateral (the "Surcharge Costs").

91.    Thus, assuming that Prudential's claim is fully secured by property the value of which, after any recovery under subsection 506(c), is greater than the amount of the claim, only then can there be allowed any reasonable fees, costs or charges provided for under the Prudential loan documents.

### III.    Section 506(c) of the Bankruptcy Code.

92.    Section 506(c) of the Bankruptcy Code provides as follows:

> The trustee may recover property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

*See*, U.S.C. § 506(c).

93.     Thus, section 506(c) provides that a trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

94.     The Trustee did not waive the estate's right to surcharge under § 506(c) of the Bankruptcy Code.  Such waivers are typically set forth in an order providing for the trustee/debtor to obtain financing or use cash collateral.  *See*, Local Bank. R. 4001-1(c)(3) requiring the highlighting of "provisions that seek to waive rights the estate may have under § 506(c)".

**A.     The Estate May Recover the Surcharge Costs from Prudential's Collateral**.

95.     A trustee "may surcharge a secured creditor's claim under § 506(c) when the secured creditor either directly or impliedly consents to the expense."  *See*, *In re Mach., Inc.,* 287 B.R. 755, 767 (Bankr. E.D. Mo. 2002).  *See also*, *U.S. I.R.S. v Boatmen's First Nat. Bank of Kansas City*, 5 F. 3d 1157, 1159 (8th Cir. 1993), rev'd on other grounds; *In re Annett Ford, Inc*. 64 B.R. 946, 947 (D. Neb. 1986).

96.     Alternatively, a trustee may surcharge collateral under section 506(c) if it demonstrates that (a) the expenditures are reasonable and necessary to the preservation or disposal of the property and (b) the expenditures provide a direct benefit to the secured creditors who retain a lien on the collateralized property.  *See, e.g. In re Lockwood Corp.*, 223 B.R. 170, 175 (B.A.P. 8th Cir. 1998)*; In re C.S. Assocs.*, 29 F.3d 903, 906 (3d Cir. 1994).  *See also*, *Equibank, N.A. v Wheeling-Pittsburgh Steel Corp.,* 884 F.2d 80, 84 (3d Cir. 1989) ("[s]ection 506(c)… mandates two-step inquiry:  (1) it must be determined whether the [costs] are reasonable, necessary costs and expenses of preserving or disposing of the property, and (2) whether they benefit the secured creditors.").

97.     Section 506(c) of the Bankruptcy Code is "equitable in origin, preventing a windfall to a secured creditor at the expense of the trustee or debtor in possession by shifting the costs of preserving or disposing of a secured party's collateral from the bankruptcy estate to the secured party." *See*, *Boatmen's*, 5 F.3d at 1159*; In re Towne, Inc.* 536 F. App'x 265, 268 (3d Cir. 2013) (Section 506(c) is "designed to allow a claimant who has expended funds to preserve or dispose of secured collateral to recover those funds from the secured creditor who directly benefitted from them, thus "prevent[ing] a windfall to the secured creditor at the expense of the claimant.*'")(quoting In re Visual Indus.,* 57 F.3d 321, 324 (3d Cir. 1995) (citation omitted)). Ultimately, whether expenses are "reasonable, necessary, and have benefitted the secured party are factual issues that rest with the sound discretion of the trial judge." *See*, *In re Orfa Corp. of Philadelphia,* 170 B.R. 257, 272 (E.D. Pa. 1994) (*quoting In re Mechanical Maintenance, Inc.,* 128 B.R. 382, 389 (E.D. Pa 1991) (listing cases)).

98.     Here, Prudential requested the appointment of a trustee and after the Trustee's appointment, encouraged the Trustee to complete the construction and sale the residential units in Phase 1. Prudential was not only aware of the Trustee's efforts to construct and sell units in Phase 1, Prudential agreed to the Prudential Release of Liens Agreement whereby Prudential agreed that subject to the payment of the Release Prices at the closing of each unit in Phase 1, the Trustee could use the remaining proceeds to complete Phase 1 and pay the Permitted Claims under the Plan.

99.     To allow Prudential to enter into the Prudential Release of Liens Agreement and to now renege on its agreement that subject to the payment of the Release Prices the Trustee can use the remaining proceeds to, *inter alia*, pay the Permitted Claims under the Plan would give Prudential an unjust windfall. Likewise, to allow Prudential to consent to the construction and sale of the residential units in Phase 1, and benefit from the Trustee's efforts without allowing the

Trustee to surcharge the Collateral would give Prudential an unjust windfall. *See*, *In re Koester*, 2103 WL 1867713 at *3 (Bankr. D.N.J. Apr. 22, 2013) (surcharging collateral to prevent a windfall to secured creditor "without shouldering any of the costs."); *In re Domistyle, Inc.* 811 F.3d 691, 699-700 (5th Cir. 2015) ("[T]he rationale … is to prevent unjust enrichment: a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost.") (internal quotation marks omitted); *C.S. Assocs.* 29 F.3d at 907 (requiring surcharge expenses to "maximize return on debt" for benefit of secured creditor) (citations omitted).  Simply put, it is unfair to require "the general estate and unsecured creditors to bear the cost of protecting what is not theirs." *See*, *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982).  As such, Prudential has already consented to the required surcharge and it should be approved.

**B.    The Surcharge Costs are Reasonable and Necessary because they Preserve the Value of the Collateral.**

100.    Even if Prudential had not consented to the Surcharge Costs, all of the Surcharge Costs are reasonable and necessary to preserve the value of the Collateral.  An expenditure is necessary where the movant demonstrates that the expenditure preserved or increased the value of the collateralized property. *See*, *C.S. Assocs.*, 29 F.3d at 906 ("[O]ur decisions have clarified that to recover expenses under §506(c), a claimant must demonstrate that the [] expenditures are reasonable and necessary to the preservation of diposal of property …")*(citing In re Glasply Marine Indus.*, 971 F.2d 391, 394 (9th Cir. 1992) ("to satisfy the benefits prong…[the claimant] 'must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral.'") (some citations omitted)*; Koester,* 2103 WL 1867713 at *3) (the expenditures must "preserve or increase the value of the collateral"); *C.S. Assocs.*, 29 F.3d at 906*; Domistyle*, 811 F.3d at 699-700 (holding an expense must be incurred primarily to preserve or dispose of the

encumbered property); *In re Parque Foretal*, 949 F.2d 504 (1st Cir. 1991)(approving security expenses as the reasonable and necessary costs of preserving property where property was susceptible to vandalism); *In re Isaac Cohen Clothing Corp.*, 39 B.R. 199 (Bankr. S.D.N.Y. 1984) (holding that storage costs were necessary to preserve the creditor's equipment collateral).

101.    Courts have measured reasonableness based upon what one would "normally incur in procuring a similar service in a standard commercial setting (and also allowing for any additional difficulties introduced by the bankruptcy setting)." *See*, *In re Trenge*, 127 B.R. 552 (E.D. Pa. 1991) (*citing In re North County Place*, 92 B.R. 437, 449-50 (Bankr. C.D. Cal. 1988))*; In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260-61 (9th Cir. 2000) (finding reasonableness and necessity of the debtor's incurred expenses are measured against the benefits obtained for the secured creditor and the amount [of expenses] that the secured creditor would have necessarily incurred through foreclosure and disposal of the property)*; Orfa Corp.*, 170 B.R. at 272 n.16 (concluding that costs that secured a party would have incurred in foreclosure are reasonable)*; In re Phoenix Pipe and Tube, L.P.*, 174 B.R. 688, 690 (E.D. Pa. 1994) (affirming bankruptcy court's finding that expenses were reasonable because services performed and rates requested post-petition were in line with pre-petition rates).

102.    Certain classic examples of expenditures that courts have found to be both reasonable and necessary include: (i) insurance costs, (ii) workers' compensation expenses; (iii) payroll of employees; (iv) maintenance and repair costs; (v) post-petition administrative taxes. *See*, *In re Strategic Labor, Inc.*, 467 B.R. 11, 22 (Bankr. D. Mass. 2012) ("[I]f a secured creditor has a lien on all or virtually all, of a debtor's assets, the debtor is engaged in ongoing business operations, and the debtor's continued operations preserve or enhance the value of the secured creditor's collateral, items that may qualify as 'necessary expenses chargeable against the

collateral include the debtor's payroll costs, insurance costs, workers' compensation expenses, and post-petition administrative taxes."); *Visual Indus.*, 57 F.3d at 324-25 (*citing 3 Collier on Bankruptcy* ¶ 506.56-57 (Henry J. Sommer & Alan N. Resnick, eds. 15th ed. 1994) (collecting cases).  *See also*, *In re Senior-G&A Operating Co.*, 957 F.2d 1290 (5th Cir. 1992) (approving maintenance and repair costs associated with reworking oil well as reasonable and necessary); *Matter of Trim-X, Inc.*, 695 F.2d 296 (7th Cir. 1982) (holding that utility, maintenance and security expenses incurred by trustee in between appointment and abandonment of underlying collateral were necessary costs, but remanding for determination of reasonableness).

103.    Here, the Surcharge Costs easily satisfy these standards.  All of the Surcharge Costs were and will be incurred pursuant to the Trustee's efforts to construct, preserve and sell the 73 residential units in Phase 1 and to preserve and sell Phase 2 all of which comprise the Collateral. Thus, the Surcharge Costs incurred by the Trustee have been and continue to be necessary to preserve the Collateral.

### C.    <u>The Surcharge Costs Directly Benefit Prudential</u>.

104.    The Surcharge Costs also afford a direct benefit to Prudential.  Expenses may be surcharged against collateral under section 506(c) when they directly benefit the collateral.  *See*, *C.S. Assocs.*, 29 F.3d at 906 (requiring a debtor to "demonstrate a direct benefit to the secured creditor" to recover a section 506(c) surcharge).  A benefit primarily to or direct benefit for the secured creditor, however, does not mean solely for the such creditor.  *See*, *Domistyle*, 811 F..3d at 698 *(rejecting that "**primarily** means **solely**")(emphasis in original).*  Ultimately, whether the benefit is direct or not is safeguarded by its necessity.  *See*, *Id.*

105.    In applying the foregoing standards, courts have found that costs similar to the Surcharge Costs directly benefit secured creditors.  *See*, *Koester, 2013 WL 1867713, at \*3*

32

(approving insurance, storage and cleanup costs as directly benefitting creditor because such costs preserved and increased value of underlying collateral); *In re Senior-G & A Operating Co., Inc.*, 957 F2d 1290, 1300 (5th Cir. 1992) (approving maintenance and repair costs as primarily benefitting the secured creditor); *In re Phoenix Pipe and Tube, L.P.*, 174 B.R. at 692 (finding that payroll expenses, CEO salary and other employee and administrative expenses directly benefited secured creditor because "[a] company does not run itself."); *Domistyle*, 811 F.3d at 701 (finding that trustee's "stewardship" of property was a direct and quantifiable benefit inuring to the secured creditor).

106.    Courts have found that real estate taxes, payroll taxes, federal taxes, storage and insurance costs, broker's/auctioneer's fees and costs and tax return costs provide a direct benefit to a debtor's estates. *See*, *e.g.*, *Boatmen's*, 5 F.3d 1157; *Koester*, 2013 WL 1867713 at *8 (stating that clean-up, storage and insurance costs directly benefitted the property's first lien lender because the lender would "reap the benefit of [the trustee's] actions taken to preserve the collateral and conduct a sale without shouldering any of the costs.").

107.    Here, the Surcharge Costs have and will continue to provide a direct benefit to Prudential and its interests in the Collateral.  Without incurring such costs, the Trustee would likely have received substantially reduced returns on the sale of residential units in Phase 1, potential liability associated with trespass and vandalism, among other things, each of which would result in the loss of value of the Collateral.  Prudential would bear most, if not all, of such losses.  Accordingly, the Surcharge Costs have directly benefited and will continue to benefit Prudential by increasing its recovery on account of its security interests in the Collateral including, the residential units in Phase 1 and the sale of Phase 2.

108.    Courts allow trustees to recover the Surcharge Costs if, among other things, such expenses were necessary, reasonable, and of direct and primary benefit to the secured creditor. *See*, *In re McLean Industries, Inc.*, 84 B.R. 340, 350 (Bankr. S.D.N.Y. 1988).

109.    There is no question that completion and sale of the residential units in Phase 1 have and will continue to yield higher returns on the Collateral than the alternative – a fire sale of Phase 1 without the remaining site improvements installed or final DEP approval under PA Act 2, or the completion of the 73 residential units in Phase 1, or a fire sale of Phase 2 without a substantial portion of Phase 1 having been completed and sold.   Of course, liquidating and preserving the Collateral through a chapter 11 process has incremental costs.

110.    Here the Surcharge Costs include, among others: (a) services of environmental consultants and contractors retained to obtain final DEP approval for Phase 1 under the provisions of PA Act 2, (b) personnel and payroll costs, including oversight, security and landscaping expenses, (c) insurance, (d) real estate taxes and transfer taxes, (e) installation of site improvements required to allow for the construction of residential units in Phase 1 and the issuance of applicable permits, (f) vertical construction of the residential units in Phase 1, (g) construction management fees, (h) costs to maintain a sales office, model homes, marketing materials, website, repairs, maintenance, utilities and other operational expenses, (i) brokers' fees, (j) fees and costs of professionals retained by the Trustee, and (k) the Trustee's commissions.  The Trustee is preparing a summary of the Surcharge Costs that the Trustee anticipates will be (a) outstanding as of the Confirmation of the Plan and (b) incurred following Confirmation, in connection with the Trustee's continuing preservation and liquidation of the Collateral.  The summary will also include a summary of the Surcharge Costs that were incurred and paid as of June 30, 2021.

34

111.    The Surcharge Costs will be calculated by including only those charges which were reasonably necessary, and of direct and primary benefit to Prudential.  Specifically, the Surcharge Costs will include the actual expenses directly related to (and incurred to preserve) the Collateral.

112.    None of the Surcharge Costs were avoidable, these expenses were necessary for the preservation, build out and sale of the residential units in Phase 1.  *See*, *Matter of Iberica Mfg., Inc.*, 180 B.R. 707, 713 (Bankr. D.P.R. 1995) ("Necessary expenses are those unavoidably incurred").  From professional services to remediating the Real Property, constructing site improvements, and resuming vertical construction, the Trustee had no choice but to incur the Surcharge Costs to preserve, construct and sell the residential units in Phase 1 in a manner that would (and did) maximize the value for all stakeholders.  *See, e.g., In re Felt Mfg. Co., Inc.*, 402 B.R. 502, 524 (Bankr. D.N.H. 2009) (hiring a turnaround management firm was "necessary" because "the services were incurred to preserve the going concern value of the business and its assets on which the [creditor] had its entire lien").  Failing to incur any of these costs would have resulted in not only a loss in the Collateral's value, but a complete inability for the Trustee to complete and sell the 73 residential units in Phase 1.

113.    These expenses were also reasonable.  All of the Surcharge Costs were in "sensible proportion" to the value received by Prudential.  *See*, *In re Ceron*, 412 B.R. 41, 52 (Bankr. E.D.N.Y. 2009) (reasonable expenses "should be in some sensible proportion to the value of the benefit to be received"); *Compton Impressions*, 217 F.3d at 1260 (internal citations omitted) *(citing In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 727 (Bankr. N.D. Ill. 1988)) (measuring reasonableness against "the amount that the secured creditor would have necessarily incurred through foreclosure and disposal of the property").

114.    Equally as important, these expenses all of which were incurred in order to build and sell the residential units in Phase 1, were to the direct and primary benefit of Prudential.  *See*, *In re Flagstaff Foodservice Corp.,* 762 F. 2d 10, 12 (2d Cir. 1985) (*citing Brookfield Production Credit Ass'n. v. Borron*, 738 F.2d 951, 951 (8th Cir. 1984)) (Debtors must show that 506(c) expenses were "primarily for the benefit of the creditor and that creditor directly benefited from the expenditure."); *In re Kohl,* 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009) ("A secured creditor is interpreted as having received a benefit if the expense preserved the value of its collateral").  None of the residential units in Phase 1 could have been completed or sold had the Trustee not taken the actions he did in order to preserve and sell the Collateral of Prudential.

115.    There can be no reasonable dispute that each of the Surcharge Costs was incurred for the purpose of preserving the value of the Collateral.  Expenses associated with resuming and completing the remediation, site improvements, vertical construction and sale of the residential units in Phase 1, permitted the Trustee to preserve and enhance the Collateral as requested by Prudential to allow the residential units to be sold.  These efforts and positive results in building and selling Phase 1 have also enhanced the sale value of Phase 2.  Absent these and the other 506(c) Surcharges, the value of Prudential's Collateral would have diminished.

116.    The Trustee's actions in the Chapter 11 Case (which are ongoing) were a direct and primary benefit to Prudential as follows:

(a)    Preservation of the Collateral;

(b)    the completion of the remediation work required to obtain final Act 2 approval for Phase 1;

(c)    the completion of the additional site improvements required in order to allow the sale and closing of residential units in Phase 1;

(d)    payment of release prices to Prudential at the time of the closing on the sale of each residential units in Phase 1 totaling $725,000 as of July 16, 2021.

The total amount of the release prices to be paid to Prudential for the closing on the sale of the 73 residential units in Phase 1 will be $2,585,000;

(e)    the reduction in the letter of credit posted by Prudential to Bristol Borough as security for the Subdivision Site Agreement in excess of $143,000;[8]

(f)    the resumption of vertical construction in Phase 1 including the completion, sale and closing of 29 residential units as of July 16, 2021 with an additional 22 residential units under construction that have been sold and closings scheduled;

(g)    as of July 16, 2021, the Trustee has sold 70% of the Phase 1 residential units and is nearing completion of the sale and construction of the remaining residential units in Phase 1;

(h)    an increase in the value of Phase 2 resulting from the success achieved in Phase 1; and

(i)    the proposal of a Plan of Liquidation that will provide for the sale of Prudential's remaining collateral and distribution of the proceeds in accordance with the Release of Liens Agreement and Plan.

117.    The equities weigh in favor of the award of the Surcharge Costs against the Collateral in favor of the Estate.

118.    In this case, Prudential requested the appointment of the Trustee. Prudential should not be permitted to reap the benefits of actions taken by the Trustee without paying the costs for such actions. Where the holder of a secured claim has sought the appointment of a chapter 11 trustee or conversion of the case to a chapter 7, "courts are likely to find that the holder has impliedly consented to recovery by the trustee of a wider range of costs and expenses than would normally be allowable under section 506(c)." *See*, 4 COLLIER ON BANKRUPTCY, ¶ 506.043a (15th rev. ed. 1996).

119.    The purpose behind section 506(c) is to "prevent unjust enrichment" and "a windfall to a secured creditor at the expense of the estate." *See*, *Domistyle*, 811 F. 3d at 696 ("A

---

[8] As the Trustee completes additional site improvements that are required under the Subdivision Site Agreement, the Trustee will request additional reductions in the amount of the letter of credit issued by Prudential.

secured creditor should not reap the benefit of actions taken to preserve the secured creditor's

collateral without shouldering the cost.") (internal quotation marks and citations omitted).

120.    Allowing Prudential to benefit from the Trustee's efforts in preserving its collateral

without paying its fair share in any of the associated costs would provide Prudential an end run

around the equitable principles inherent in the Bankruptcy Code and, specifically, section 506(c).

**IV.    Prudential Agreed to Allow the Trustee to Utilize the Proceeds from the Sale of Residential Units in Phase 1 (after Payment of the Release Prices) to Pay Permitted Claims Under the Plan.**

121.    Prudential consented to and supported the Trustee's decision to build out and sell

the 73 residential units in Phase 1.

122.    Pursuant to the provisions of the Prudential Release of Liens Agreement and the

Prudential Subordination Agreements, Prudential subordinated the Existing Mortgages of

Prudential to both the Post-Petition Loan and to the proceeds from the sale of residential units in

Phase 1 (subject to the payment of the Release Prices) so that the Trustee could use the proceeds

to complete Phase 1 and fund the payment of the Permitted Claims under the Plan.

123.    Prudential's objection to Confirmation seems to disavow its contractual

commitments to the Trustee set forth in the Prudential Release of Liens Agreement and the

Prudential Subordination Agreement and should not be allowed by this Court.

**V.     The "Equities of the Case" Exception in Section 552(b)(1) limits Prudential's Security Interests in the Proceeds from the Sale of Phase 1 Residential Units to the Value of the Pre-Petition Land before the Trustee's Construction of the Post-Petition Improvements.**

124.    As set forth above, the Trustee on behalf of the Estate also requests that this Court

limit Prudential's mortgage lien interests in the proceeds from the sale of the Phase 1 residential

units to the value of the Collateral (e.g. land value only) exclusive of the value of the Trustee's

post-petition additions of vertical improvements (e.g. construction of the townhomes and

improvements to the land) that were incurred by the Estate for each residential unit in Phase 1 and which enhanced the value of the Collateral for the benefit of Prudential.  The limitation of Prudential's mortgage lien interests to the proceeds from the sale of the Phase 1 land only (exclusive of the value of the post-petition improvements installed by the Trustee and costs incurred by the Estate) satisfies the equities of the case exception pursuant to section 552(b)(1) of the Bankruptcy Code.

125.   Bankruptcy Code section 552(b) provides the "equities of the case" exception whereby this Court can preclude Prudential from benefiting from the increase in the value of its Collateral arising from the Trustee's efforts to preserve, build and sell residential units in Phase 1 whereby all the costs of such efforts were incurred by the Estate and without Prudential paying for the benefit it received.

126.   Pursuant to the "equities of the case" exception in 11 U.S.C. §552(b)(1), the Trustee asserts that all of Prudential's interests in proceeds from the sale of residential units in Phase 1 should be limited to the value of the Phase 1 land being sold with each Phase 1 residential unit, exclusive of the value for the vertical improvements constructed post-petition by the Trustee (e.g. construction of the townhomes and improvements to the land) the costs of which were incurred by the Estate.   The reasoning is simple, it was the post-petition efforts of the Trustee that constructed the improvements that increased the value of the Collateral and all the costs for these improvements were incurred by the Estate without Prudential reimbursing the estate for the benefits it received.   Section 552(b)(1) provides compensation to the estate for the expenses the estate incurs in increasing the value of a secured creditor's pre-petition collateral because absent doing so, the secured creditor would obtain a windfall at the expense of the estate.

127.   The "equites of the case" exception in Section 552(b)(1) allows the estate to benefit

from the recovery of proceeds of the Collateral that arises from work performed by the Trustee

and costs incurred by the Estate. *See, In re Photo Promotion Associates,* 61 B.R. 936, 939 (Bankr.

S.D.N.Y. 1986).

128.    Courts have explained that the "equities of the case" provision in Section 552(b)(1)

is intended to prevent secured creditors from receiving windfalls and to allow the bankruptcy court

broad discretion in balancing the interests of secured creditors against the general policy of the

Bankruptcy Code. *See, In re Patio & Porch Sys., 194 B.R. 569, 575 (Bankr. D. Md. 1996).*

129.    Here, the Trustee did not waive the "the equities of the case" exception under

§552(b)(1) of the Bankruptcy Code. Such waivers are typically set forth in an order providing for

the trustee/debtor to obtain financing or use cash collateral. Like a waiver of rights under section

506(c), the waiver of rights under Bankruptcy Code section 552(b)(1) is also common and

therefore the local rules of many bankruptcy courts require the highlighting of provisions that seek

to affect the court's power to consider the "equities of the case". *See,* Local Bank. R. 4001-1(c)

(10) requiring the highlighting of "provisions that seek to affect the court's power to consider the

equities of the case under 552(b)(1)".

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order

granting this Motion and determining:

(a)    the value of the Real Property;

(b)    the amount of the Prudential's secured claim pursuant to 11 U.S.C. §506(a);

(c)    the amount of Prudential's interest, fees, costs or other charges pursuant to 11
U.S.C. §506(b);

(d)    the amount of the surcharge of Prudential's collateral pursuant to 11 U.S.C.
§506(c);

(e)    the Trustee's entitlement to use the proceeds from the sale of residential units in
Phase 1 (after payment of the Release Prices as set forth in the Prudential Release

of Liens Agreement) to fund Permitted Claims under the Plan;

(f)     the Estate's entitlement to relief under the equities of the case exception pursuant to § 552(b)(1); and

(g)     granting such other and further relief as is just and proper.

**Respectfully submitted,**

**KARALIS PC**

By:     /s/ Aris J. Karalis
        ARIS J. KARALIS
        ROBERT W. SEITZER
        1900 Spruce Street
        Philadelphia, PA 19103
        (215) 546-4500
        akaralis@karalislaw.com
        rseitzer@karalislaw.com

        *Attorneys for the Trustee*

Dated: July 20, 2021