**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |
|---|---|
| **In re:** | : |
|  | : |
|  | :  **CHAPTER 11** |
| **ISLAND VIEW CROSSING II, L.P.,** | : |
|  | :  **BANKRUPTCY NO. 17-14454 (ELF)** |
| **Debtor.** | : |
|  | : |

---

**OBJECTIONS OF PRUDENTIAL SAVINGS BANK TO MOTION OF STRADLEY
RONON STEVENS & YOUNG, LLP FOR AN ORDER ALLOWING
ADMINISTRATIVE EXPENSE PURSUANT TO SECTIONS 503(b)(3)(D) AND 503(b)(4)
OF THE BANKRUPTCY CODE**

Prudential Savings Bank ("Prudential") a secured creditor of the Debtor, Island View

Crossing II, L.P. ("Island View" or the "Debtor")[1], by and through its undersigned counsel,

Obermayer Rebmann Maxwell & Hippel LLP, hereby files these Objections to the Motion of

Stradley Ronon Stevens & Young, LLP ("Stradley") for an Order Allowing Administrative

Expense pursuant to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code

("Administrative Claim"), and in support thereof, Prudential states as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A),

(b) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and/or 1409.

3.      The statutory predicates related to the relief sought in the Administrative Claim

are sections 503(b)(3)(D) and 503(b)(4) of the United States Bankruptcy Code, 11 U.S.C. §§101

*et seq.* (the "Bankruptcy Code"); Fed. R. Bankr. P. 9014; and L.B.R. 9014.

---

[1] At the Petition Date, this Court determined that Prudential was fully secured on its $4,000,000.00 second position
lien in determining an equity cushion existed.  See Order on Prudential's Trustee Motion. [D.I. 141]

## II.      SUMMARY OF THE ARGUMENT IN OPPOSITION

4.      Having previously filed a $1,680,625.69 proof of claim for unpaid costs and legal fees purportedly rendered to the Debtor prepetition and a Final Fee Application seeking payment of $365,200.64 incurred during a brief seven-months before being replaced as special litigation counsel for the Debtor ("Fee Application") [D.I. 755], Stradley has now filed an Administrative Claim seeking priority payment of $211,450.00 for supposed "substantial contributions" allegedly made to the estate while acting in a self-described role as "creditor" and outside of its court-approved role as § 327(e) special litigation counsel for the Debtor.

5.      Typically, creditors are not entitled to reimbursement of their fees and costs incurred in connection with a debtor's bankruptcy. However, in extremely limited situations — which are not present here — administrative expenses may be awarded under § 503(b)(3)(D) of the Bankruptcy Code for the "actual, necessary expenses" incurred by a "creditor. . . in making a substantial contribution in a case." Section 503(b)(4) provides for the allowance of "reasonable compensation for professional services rendered by an attorney. . . of an entity who expense is allowable under" section 503(b)(3). These provisions are governed in this District by the Third Circuit's decision in *Lebron v. Mechem Financial, Inc.*, 27 F.3d 937 (3d Cir. 1994).

6.      As will be discussed in greater detail below, Stradley's Administrative Claim should be denied because it has not demonstrated that it is even eligible to file the Administrative Claim as a "creditor" given its role in this case as § 327(e) special litigation counsel. Second, Stradley failed to demonstrate that its claim falls within the language of the statute since it acted on its own behalf and incurred no outside attorney's fees that are subject to recovery. Stradley has not made a showing that it made a "substantial contribution" in this case as a "creditor," its claims of

having provided an actual and demonstrable benefit being largely speculative, and has not

overcome the presumption in the Third Circuit that they acted in their own self-interest.

7.      Prudential, not Stradley, took decisive action to remove the Debtor's principal

Renalto Gualtieri ("Gualtieri"), whose mismanagement and fraud were miring the development

project, which led to the appointment of a Chapter 11 Trustee. The Administrative Claim is an

improper attempt by Stradley to elevate its subsequent efforts to replace the Interim Trustee — in

furtherance of its own self-interest and that of its other client Gualtieri — to an administrative

expense. Prudential objects to the Administration Claim extent that any approved sums would be

paid from Prudential's collateral as it has not agreed to subordinate its liens to the claims of any of

the Debtor's professionals.

### III.      RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

#### A.      Prudential's Secured Debt.

8.      Prudential is the prepetition secured lender to the Debtor, its principal Gualtieri,

and Americorp Homes, Inc., pursuant to a series of substantial secured loan transactions ("Island

View Loan Documents"), as evidenced by its timely filed proofs of claim, to Island View to

construct a Planned Unit Community, consisting of two phases, along the Delaware River in

Bristol Borough, PA, formerly known as Island View Crossing (now known as "Radcliffe Court

on the Delaware") (the "IVC Project" or "Project").

9.      The Debtor defaulted under the Island View Loan Documents due to, *inter alia*,

failing to pay amounts due, personal judgments being entered against Gualtieri, and failing to

maintain requisite insurance coverages leading to the issuance of a Notice of Default.

**B.    Stradley's Prepetition Representation of Debtors and Gualtieri in the Lender Liability Action.**

10.    On behalf of its clients Gualtieri and the Debtor, Stradley filed a lender liability action against Prudential on March 31, 2016, in the Philadelphia County Court of Common Pleas, captioned as *Island View Properties, Inc. et al. v. Prudential Savings Bank*, Case No. 160303161 (the "Lender Liability Action"), asserting claims against Prudential on its alleged improper conduct as lender.

**C.    The Bankruptcy Filing and Appointment of a Chapter 11 Trustee.**

11.    On June 30, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for Chapter 11 relief with this Court, commencing the above-captioned proceeding. The Lender Liability Action was removed to this Court on July 18, 2017 ("Removal Date").

12.    As of the Petition Date, the Debtor had a number of incomplete units at the IVC Project, which were in varying stages of completion.  Prudential had advanced up to $135,000.00 per each unit.

13.    It was abundantly clear to Prudential at the onset of this case that a successful reorganization would be impossible if Stradley's client Gualtieri remained in control of the operations of the Debtor and the Project as a result of his gross mismanagement, incompetence, fraud and malfeasance.

14.    The Project had been stalled for over a year prior to the Petition Date and the Debtor was neither operating nor generating revenue. The Debtor, through such inactivity, allowed permits and approvals to lapse, further diminishing the value of the Debtor's assets. It was apparent that the Debtor would be unable to procure the additional financing necessary to complete the Project with Gualtieri in continued control of the Debtor's operations and finances.

4

15.    Gualtieri misused and misappropriated funds held by the Debtor, including deposits placed by would-be home buyers, depleting the Project of assets. This led to multiple lawsuits for the misappropriation of consumer deposits and subsequent judgments against Gualtieri, further stigmatizing the Project.

16.    The Debtor's Schedules reveal that Island View, under Gualtieri's control, which had no ability to generate cash except for misappropriating draws from Prudential and security deposits from potential purchasers, actually loaned almost $800,000.00 to insiders. Island View Schedule B [D. I. 31].

17.    The limited improvements to the Island View Property that existed as of the Petition Date were jeopardized by Gualtieri's failure to protect the partially-completed construction from damage from the elements. Further, Gualtieri failed to maintain adequate insurance on the Project as required under the Island View Loan Documents, jeopardizing Prudential's security interests.

18.    Guatlieri's additional misdeeds include, but are not limited to, the failure to perform the work required under the Island View Loan Documents, failing to ensure that work on the Project was performed in a competent manner, failing to pay subcontractors and material suppliers, misappropriation of loan advances made by Prudential required to be applied to the Island View Project, and failing to obtain required permits and approvals necessary for the Project to progress.

19.    Stradley, as Gualtieri's counsel, refused to allow the Debtor to account to Prudential for the misused moneys, refused to reveal Gualtieri's misuse of the loan proceeds, of which it was undoubtedly aware, and prevented those facts from being uncovered until trial on the Debtor's Motion for Post-Petition Financing.

5

20.     Knowing that the prospects of reorganization and the success of the Project were imperiled by Gualtieri remaining in control of the Debtor and the Project, Prudential, on August 4, 2017, filed a Motion for an Order Converting Chapter 11 Bankruptcy Cases to Chapter 7 or in the Alternative Appointing a Chapter 11 Trustee (the "Trustee Motion") [D.I. 34].

21.     Stradley vigorously opposed the Trustee Motion and the removal of its client Gualtieri, filed papers in opposition and provided testimony from one of its lawyers Michael Cordone, solely in an effort to keep Gualtieri in control of the Debtor.

22.     Stradley in its Administrative Claim mischaracterizes the Trustee Motion by claiming that its "primary thrust" was for conversion to Chapter 7 and that Stradley's response to the Trustee Motion "outlin[ed] Prudential's ongoing strategy and improper attempts to take control of and liquidate the Project for its own benefit." See, Administrative Claim, ¶¶ 20-21. However, in reality, Prudential's primary objective was not for the dismissal or conversion of the case — only the removal of Gualtieri. Prudential repeatedly conveyed its position that it did not object to the completion of the Project and that its serious issues were with Gualtieri's continued involvement with the Debtor.

23.     On December 18, 2017, the Bankruptcy Court entered an Order on the Trustee Motion (the "Trustee Order") [D.I. 141], authorizing the Office of the United States Trustee to appoint a Chapter 11 Trustee in the Debtor's bankruptcy case pursuant to 11 U.S.C. § 1104(a)(2). Gualtieri was removed as the person in control of the Debtor in Possession and Christine Shubert, a long-standing panel trustee in the Eastern District of Pennsylvania with over thirty (30) years of experience, was appointed on December 21, 2017 as interim Chapter 11 Trustee of the Debtor (the "Interim Trustee" or "Shubert").

6

24.     Schubert is a respected and experienced attorney who was fully capable of fulfilling her role as an independent Chapter 11 Trustee and maximizing the value of the estate for the benefit of creditors.

25.     There is no basis for Stradley's insinuation that Shubert lacked independence, was somehow corrupt or was unwilling to maximize the value of the Project for creditors. Shubert was picked from the wheel by the Office of the United States Trustee ("UST").  Neither Obermayer, Prudential, or anyone on their behalf had anything to do with her appointment.  No contact was made to influence that decision by the UST.

26.     Upon her appointment, Shubert began investigating the affairs of the Debtor.

27.     Out of an apparent concern that Shubert's investigations might reveal damaging transactions involving Gualtieri or itself, Stradley immediately began maneuvering for the replacement of Shubert in favor of someone with whom it had a familiar relationship.

28.     On December 22, 2017 — the day after Shubert's appointment — Stradley and creditor Premium Excavating, LLC filed separate requests to convene a meeting of creditors to elect a Chapter 11 Trustee ("Trustee Election"). [D.I. 149, 153]. Prudential objected to Stradley's vote in the Trustee Election because of its relationship with Gualtieri and certain preferential transfers believed to have been received by Stradley.

29.     Stradley's assertions that a replacement Chapter 11 Trustee was needed because Shubert was "looking to sell the stalled Project 'as is' and showed no interest in getting up to speed on or diligently prosecuting the Lender Liability Action" ring hollow in light of its maneuvering in making a request for a Trustee Election on the next day after her appointment. See, Administrative Claim, ¶ 26.

30.     Stradley had filed a proof of claim on September 21, 2017, docketed as Claim No. 14-1, asserting an unsecured claim against the Debtor in the amount of $1,680,625.69 for prepetition "fees and costs for legal services rendered" by Stradley from "November 2015 through the Petition Date." ("Prepetition Fee Claim"). On January 10, 2018, Shubert filed an objection to Stradley's Prepetition Fee Claim (the "Stradley Claim Objection") asserting that due to the lack of attached documentation it was not possible to determine or establish the legal liability of the Debtor to pay for legal services also provided to Gualtieri, other affiliated Debtors (State Street Associates, LP, Calnshire Estates, LLC and Steeple Run, L.P.), and the non-debtor affiliates in the Lender Liability Action and related litigation action. [D.I. 178].

31.     While Stradley claims its prepetition representation of the Debtor was on an hourly fee engagement, circumstances strongly suggest that it was, in reality, a contingency engagement. Stradley had been Gualtieri's long-time counsel and purportedly undertook the Lender Liability Action, which promised to be vigorously litigated, for a paltry $5,000.00 retainer. Then, according to Stradley's Prepetition Fee Claim, a massive unpaid fee of $1.68 Million was generated over the course of approximately two years during which time not a single payment was made to Stradley.

32.     On January 16, 2018, Stradley filed an Emergency Motion to (a) Estimate Stradley's Claim for Voting Purposes or Rule on the Objection to Its Claim Prior to the Vote on the Election of a Chapter 11 Trustee; and (b) Shorten Time and Expedite Hearing ("Estimation Motion"). [D.I. 214].

33.     On January 17, 2018, Shubert filed a Praecipe to Withdraw the Stradley Claim Objection. [D.I. 216]. Notwithstanding Shubert's withdrawal of the Stradley Claim Objection,

Shubert and Prudential filed respective responses in opposition to the Estimation Motion. [D.I. 226, 227].

34.     Following a hearing on January 25, 2018, the Court permitted Stradley to vote in the Trustee Election. With the ability to control the outcome of the election, Stradley replaced Shubert with its designee Kevin O'Halloran (the "Trustee" or "O'Halloran"), who was appointed as Chapter 11 Trustee on or about January 29, 2018, and continues to serve in that capacity to date.

35.     It is believed that Stradley had an existing relationship with O'Halloran from a prior case and that he was selected by Stradley, in part, because he would be beholden to the interests of Stradley and Gualtieri.

36.     These concerns were confirmed by O'Halloran's subsequent conduct in the case in refusing to follow up on the objections raised by the Interim Trustee to the Prepetition Fee Claim of Stradley, including concerns about how a $1.68 Million fee claim arose from representation begun on a single retainer payment of $5,000.00 from some entity unknown to Prudential, or more importantly, whether other affiliated debtor's legal fees (Steeple, Calnshire and One State Street) were thrown into the IVC pot of unsecured claims.

37.     Stradley's maneuverings in the Trustee Election, couched as an effort to appoint an "independent" trustee for Island View, must be gauged against the backdrop of its concerted efforts to keep its other client Gualtieri in control of the Debtor's IVC Project.

**D.     Stradley's Retention and Replacement as Special Litigation Counsel.**

38.     While the Lender Liability Action was promptly removed to this Court shortly after the Petition Date, the Debtors delayed nearly ten weeks, to September 6, 2017, to file an application with the court seeking approval to retain Stradley as § 327(e) special litigation

9

counsel *nunc pro tunc* to the Petition Date ("Retention Application") [D.I. 66]. On or about

September 27, 2017, the Court entered an Oder approving the retention of Stradley, but limiting

the retroactive effect only to the July 18, 2017 Removal Date ("Retention Order") [D.I. 78].

39.     Despite the Lender Liability Action being stayed by agreement and not resuming

substantive activity until O'Halloran's appointment as permanent Trustee on January 29, 2018,

Stradley, as revealed in its Fee Application, engaged in an inordinate amount of unnecessary and

costly document review and document preparation, comprising a significant amount of the

$365,200.64 of its Fee Application related to its services as special litigation counsel.

40.     Shortly after his appointment as permanent Trustee, O'Halloran replaced

Stradley. On March 22, 2018, O'Halloran filed an application to retain Steve Coren of Kaufman

Coren & Ress, P.C.  ("Kaufman Coren"), on a contingency-fee basis, to replace Stradley as

special counsel on the Lender Liability Action [D.I. 307] which was approved by the Court on

April 4, 2018 [D.I. 316].

41.     However, Stradley's replacement as special litigation counsel by Kaufman Coren

did not end its involvement in this case as the Administrative Claim details continued

maneuverings by Stradley to advance its own interests and those of Gualtieri.

**E.     Prudential Facilitates Debtor's Post-Petition Financing.**

42.     Prudential made concerted efforts to extend post-petition financing to the Debtor

to the enable the completion of the Project. These efforts did not ultimately result in a deal.

43.     The Trustee eventually obtained a loan from BKRE in the amount of

$4,700.000.00 (the "BKRE Loan"), which was approved by the Court on September 12, 2018

(the "BKRE Financing") [D.I. 465].

10

44.     At the same time the Court approved the BKRE Financing, the Court approved

Prudential's Release of Liens Agreement ("Release of Liens Agreement"), through which,

Prudential subordinated (i) its liens to those of BKRE and (ii) its liens on the Steeple and

Calnshire/Durham Collateral mortgages to unsecured non-insider creditors in exchange for (i)

the payment of certain release prices to be paid to Prudential for the release of liens on

completed townhouses, the clubhouse and common elements, (ii) the fixing of a maturity date for

the payment of the prepetition construction loan that was part of the Island View Loan

Documents, and (iii) the full retention of Prudential's rights as a secured creditor.[2]

### F.     Stradley's Administrative Claim.

45.     On the heels of filing its Fee Application seeking payment of $365,200.64 of costs

and fees incurred during the seven-month period during which Stradley served as § 327(e)

special litigation counsel for the Debtor in the Lender Liability Action before being replaced by

Kaufman Coren, Stradley has now filed an Administrative Claim seeking an additional

$211,513.10 for purported actions taken outside of its court-approved role as special counsel for

which it claims it made a "substantial contribution" to the estate warranting payment of a priority

administrative claim pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

See, Fee Application, [D.I. 755]. Stradley claims "costs" of $63.10 allegedly attributable to its

asserted contributions to the estate. See, Administrative Claim, ¶ 74 and Exhibit B.

46.     By its own admission, "Stradley has worn several hats during the pendency of this

case" See, Administrative Claim, ¶ 64 [D.I. 755]. These roles include approved § 327(e) special

litigation counsel for the Debtor in the Lender Liability Action, representation of Gualtieri and

---

[2] Which includes a right to interest and attorney's fees recoverable under the Island View Loan Documents.

OMC\4828-1876-9650.v3-8/30/21

certain of his affiliates in that and other litigation, and now, for purposes of this Administrative

Claim, acting as a self-described "creditor" in pursuing its own Prepetition Fee Claim.

47.     Specifically, Stradley seeks administrative expense compensation for the

following five categories outside of its role as special § 327 litigation counsel that it asserts

conferred a "substantial contribution" to the estate:

> (i)     $64,174.50 (98.5 hours) for its efforts to pursue the Trustee election to
> replace Shubert with O'Halloran as permanent Trustee ("Trustee Election
> Claim");
>
> (ii)    $48,035.50 (74.8 hours) for its efforts to defend and obtain estimation of
> its Prepetition Fee Claim through the Estimation Motion ("Estimation
> Claim");
>
> (iii)   $23,517.00 (35.1 hours) for numerous meetings, communications and
> sharing of information to assist O'Halloran with transitioning into his role
> as permanent Trustee ("Transition Assistance Claim");
>
> (iv)    $41,192.00 (84.7 hours) for sharing discovery, documents and other
> information related to the Lender Liability Action obtained by Stradley
> prior to its replacement by Kaufman Coren ("Document Production
> Claim"); and
>
> (v)     $34,531.00 (73.8 hours) for prosecuting the Lender Liability Action
> during the time period from the Petition Date to the date Stradley was
> approved as special counsel ("Pre-retention Claim").

See, Administrative Claim, ¶ 67 [D.I. 755].

48.     As will be discussed in greater detail below, none of these actions conferred a

"substantial benefit" to the estate warranting the award of an administrative claim. First, Shubert,

an experienced and long-standing panel trustee, was fully capable of fulfilling the role as Chapter

11 Trustee and was in the process of investigating transactions involving Gualtieri (and possibly

Stradley), when Stradley, acting it its own self-interest and that of Gualtieri, maneuvered to

replace Shubert in favor of someone with whom it had a familiar relationship. The

Administrative Claim is built upon a foundation of speculation and it is not possible to

definitively conclude that a more favorable outcome for estate resulted from the Trustee Election or Stradley's frantic attempts through the Estimation Motion to vote its massive, but disputed, Prepetition Fee Claim for a trustee amenable to its particular interests and those of its other client Gualtieri. Thus, the Trustee Election Claim and the Estimation Claim had no significant overall benefit to the estate. Second, for the same reasons, the Transition Assistance Claim was gratuitous and was undertaken for the individual benefit of Stradley and its client Gualtieri. O'Halloran, described by Stradley as a turnaround expert, should be perfectly capable of "getting up to speed" on the case without the extensive assistance claimed by Stradley. Third, Kaufman Coren was retained on a contingency fee basis and the estate, and its creditors, should not have to pay for Stradley's Document Production Claim usurping Kaufman Coren's responsibility to marshal documents relevant to the Lender Liability Action. Furthermore, the rules of professional conduct impose independent duties upon Stradley to cooperate with and provide the file to replacement counsel. Finally, the Debtor delayed nearly ten weeks after the Petition Date to file the Retention Application requesting the *nunc pro tunc* retention of Stradley to the Petition Date. However, the Bankruptcy Court, in the Retention Order, limited the retroactive effect of Stradley's appointment to the July 18, 2017 Removal Date of the Limited Liability Action. Stradley should not be granted administrative expense compensation in its Pre-retention Claim time periods that were specifically denied in the Retention Order. Further, the Limited Liability Action was stayed by the Debtor's bankruptcy filing and remained that way by agreement until O'Halloran's appointment, so Prudential questions whether there was even a need for Stradley to engage in extensive work either prior to or following its approved retention as special § 327(e) counsel in this case.

OMC\4828-1876-9650.v3-8/30/21

## IV.    **APPLICABLE LEGAL STANDARD**

49.    Section 503 of the Bankruptcy Code provides that certain administrative expenses shall be allowed after notice and a hearing. 11 U.S.C. § 503(b). Administrative expenses may include the "actual, necessary expenses, other than compensation and reimbursement specified in [§ 503(b)(4)], incurred" by "a creditor. . . in making a substantial contribution in a case under chapter 9 or 11 of this title . . . ." 11 U.S.C. § 503(b)(3)(D). A creditor awarded administrative priority of an "actual, necessary expense" incurred by making a substantial contribution under § 503(b)(3)(D) may also seek reimbursement for professional fees of its attorneys under § 503(b)(4) which provides for "reasonable compensation for professional services rendered by an attorney. . . of an entity whose expense is allowable under. . . [§ 503(b)(3)(D)], based on the time, the nature, the extent, and the value of such services. . . ." 11 U.S.C. § 503(b)(4).

50.    Section 503(b)(3)(D) has two purposes: (1) to encourage creditors to participate meaningfully in the reorganization process; and (2) to minimize fees and administrative expenses and thereby maximize creditor recoveries. *Lebron*, 27 F.3d at 944.

### A.    **Substantial Contribution is Narrowly Construed.**

51.    The Code does not define "substantial contribution" or set forth criteria to be used in determining whether a substantial contribution has been made in a case. *Leidos Eng'g, LLC v. Kior, Inc. (In re Kior, Inc.)*, 567 B.R. 451, 458 (D. Del. 2017).  However, in recognition that the allowance of administrative claims comes at the expense of creditor recoveries, "a well-developed body of case law teaches that the sort of contribution that reaches the **substantial threshold is exceedingly narrow**." *In re RS Legacy Corp.*, No. 15-10197 (BLS), 2016 Bankr. LEXIS 854 at *10 (Bankr. D. Del. Mar. 17, 2016) (emphasis added); *In re Oxford Homes*, 204 B.R. 264, 268 n.16 (Bankr. D. Me. 1997) ("Although the section is designed to encourage

meaningful creditor participation . . . , its substantial contribution requirements foster **tight judicial oversight** to maximize distributions to creditors") (emphasis added); *In re Spansion Inc.*, No. 09-10690 (KJC), 2014 Bankr. LEXIS 2175 at *4-5 (Bankr. D. Del. May 14, 2014) (Courts have **narrowly tailored** instances under which a creditor can be paid from the estate for assisting the overall reorganization) (emphasis added).

### B.    Heavy Burden of Proof.

52.    The applicant seeking allowance bears the burden to prove by a preponderance of the evidence that it made a substantial contribution. *See, In re Buckhead Am. Corp.*, 161 B.R. 11, 15 (Bankr. D. Del. 1993) ("[C]reditors. . . have the burden of proving by a preponderance of the evidence that they made the requisite substantial contribution).

53.    This has been described as "a heavy burden" that is "exceedingly difficult" to meet. *See, In re S & Y Enterprises, LLC,* 480 B.R. 452, 464 ("exceedingly difficult"); *In re Villa Luisa, L.L.C.,* 354 B.R. 345, 348 (Bankr. S.D.N.Y. 2006) (same); *In re Catalina Spa & R. V. Resort, Ltd.,* 97 B.R. 13, 17 (Bankr. S.D. Cal. 1989) ("heavy burden").

### C.    Requirement of an Actual and Demonstrable Benefit.

54.    A determination that a "substantial contribution" has been made justifying an award under § 503(b)(3)(D) and (d)(4) requires the applicant to establish that its efforts "resulted in an **actual and demonstrable benefit** to the debtor's estate and the creditors." *Lebron*, 27 F.3d at 944 (emphasis added), quoting, *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988).

55.    An "actual and demonstrable benefit" requires more than participation in a case, and in fact, requires more than "extensive participation." *See, In re Columbia Gas*, 224 B.R. 540, 548 (Bankr. D. Del. 1998); *accord, e.g., In re Summit Metals, Inc.*, 379 B.R. 40, 53 (Bankr. D.

Del. 2007); *In re Worldwide Direct, Inc.* 334 B.R. 112, 124 (Bankr. D. Del. 2005); *Buckhead America,* 161 B.R. at 15.

56.     Creditors are not entitled to a substantial contribution award when their actions fail to generate a "concrete, measurable monetary benefit." *In re Granite Partners, L.P.*, 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997). Courts are reluctant to reimburse fees for actions that do not result in a net benefit to the estate. *In re Grasso*, 519 B.R. 137, 143-44 (Bankr. E.D. Pa. 2014)

**D.     Third Circuit Presumption of Creditor Self-Interest.**

57.     The mere fact that a creditor's self-interested conduct has the effect of benefitting other creditors is not sufficient to establish the creditor's entitlement to reimbursement. *In re Tropicana Entertainment, LLC*, 498 Fed. Appx. 150 (3d Cir. 2012). To the extent they are motivated to action, a bankrupt's unsecured creditors will, in the furtherance of their own interests, undertake efforts that will, more often than not, benefit the greater good of the estate. *Grasso*, 519 B.R. at 140.

58.     Recognizing this dynamic, the Third Circuit has imposed certain limiting principles to administrative claim allowance, requiring that the claimed benefit must exceed that which merely results from an applicant's efforts to further its own interests:

> Inherent in the term "substantial" is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. **Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have *transcended self-protection*.**

*Lebron*, 27 F.3d at 944 (emphasis added) (citations omitted).

**E.      Third Circuit Requires Examination of Creditor's Intent.**

59.      In the Third Circuit, "the motivation of the applicant" is highly relevant to the substantial contribution inquiry. *Summit Metals*, 379 B.R. at 51. Indeed, "section 503(b) compensation has been consistently denied where the creditor seeking compensation acted primarily for its own benefit, and any benefit accruing to other creditors, the debtor or the estate was merely incidental." *Buckhead America*, 161 B.R. at 16; accord, e.g., *In re Essential Therapeutics, Inc.*, 308 B.R. 170, 174 (Bankr. D. Del. 2004).

60.      The Third Circuit has explained that "substantial contribution should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate." *Lebron*, 27 F.3d at 944.  *See also, In re Tropicana*, 498 Fed. Appx. at 152 (concluding that the Bankruptcy Court below, in applying the test in *Lebron,* properly considered fact that applicant presented no evidence suggesting that it would not have prosecuted the Trustee Motion absent the promise of reimbursement by the estate in determining that it failed to overcome the presumption that it had acted in its own self-interest).

61.      Stradley's citation of *In re Celotex Corp.*, 227 F.3d 1336, 1339 (11th Cir. 2000) for proposition that the motivation of the petitioner is not a factor in determining substantial contribution is inconsistent with established Third Circuit precedent. See, Administrative Claim, ¶ 77. Cases from the Court of Appeals for the Fifth Circuit critiquing *Lebron* and applying a more objective standard under section 503(b)(3)(D) are of no weight as *Lebron* commands that the relevant indication of self-interest is whether an action "would have been undertaken absent an expectation of reimbursement from the estate." *Lebron*, 27 F.3d at 944.

**F.**  **Evidence Required to Overcome presumption of Self-Interest.**

62.  Addressing how a creditor could overcome the presumption of self-interest, The Third Circuit in *Lebron* explained "[a] creditor should be presumed to be acting in his or her own interest unless the court is able to find that his or her actions were designed to benefit others who would foreseeably be interested in the estate." *Lebron*, 27 F.3d at 946. "In absence of such a finding, there can be no award of expenses even though there may have been an incidental benefit to the chapter 11 estate." *Id.*

63.  As a result of this presumption, "[s]omething more than mere conclusory self-serving statements regarding one's involvement in a case which allegedly resulted in a 'substantial contribution' must be presented to the Court before compensation can be allowed." *Summit Metals*, 379 B.R. at 61 (quotation omitted).

64.  To meet this heavy burden, "[c]orroborating testimony by a *disinterested* party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a 'substantial contribution.'" *Kior*, 567 B.R. at 459, quoting, *Buckhead America*, 161 B.R. at 15 (emphasis in the original); *WorldWide Direct*, 334 B.R. at 123.

65.  Holders of significant claims against the estate should not need additional incentives to advance the bankruptcy process.  *Grasso*, 519 B.R. at 140, citing, *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 294 (S.D.N.Y. 2014). As set forth above, Stradley has a large general unsecured claim against the Debtor and, as a consequence, is motivated by self interest in the outcome of the case.

### G.    Substantial Contribution Test Applied in Hindsight

66.    Moreover, "[t]he substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case. Accordingly, the applicant must show a 'causal connection' between the service and the contribution." *Worldwide Direct,* 334 B.R. at 121 (citation omitted). See also, *Kior*, 567 B.R. at 458 (holding that "[t]he substantial contribution test is applied in hindsight."). Therefore, it is improper to speculate on or consider future action or results thereof when considering a substantial contribution application. *Fenicle v. EFH Plan Adm'r Bd. (In re Energy Future Holdings Corp)*, 2019 U.S. Dist. LEXIS 14390 at *8 (D. Del. Jan. 30, 2019); *In re Asarco LLC*, 2010 WL 381264, at *9 (Bankr. S.D. Tex. Sept. 28, 2010) ("Movants' evidence on causal connection is wholly speculative. Such speculative evidence is nothing more than a conclusory and self-serving statement of what the Movants believe occurred.").

67.    The evidence must establish that, "**absent [the applicant]'s efforts, a different outcome would have been produced in the case**." *Summit Metals*, 379 B.R. at 52 (emphasis added). It is insufficient to "reason[] from sequence to consequence, assuming a causal connection simply because one event follows another[, as that] is speculation not proof." *Granite Partners*, 213 B.R. at 452.

68.    Courts have examined several factors to determine whether an applicants' efforts have amounted to a substantial contribution, including: whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct benefit upon the estate; and whether services were duplicative of services performed by others, and whether the applicant would have been motivated to act absent an expectation of

19

reimbursement from the estate precluding compensation. See, *Spansion*, 2014 Bankr. LEXIS at

*5-6. An application of these factors to the Administrative Claim will discussed below.

# V.    <u>ARGUMENT</u>

### A.    Stradley has Failed to Establish an Actual and Demonstrable Benefit to the Estate.

69.     Because administrative expenses come at the cost to creditors, "substantial

contribution" is narrowly construed and an applicant bears a heavy burden in demonstrating that

its actions resulted in an actual and demonstrable benefit to the estate worthy of priority status.

70.     Stradley has failed to demonstrate that its actions in connection with the Trustee

Election Claim, Estimation Claim, Transition Assistance Claim, Document Production Claim

and Pre-retention Claim, which were in furtherance of its own self interest and that of Gualtieri,

conferred an "actual and demonstrable" benefit to the estate warranting administrative expense

priority.

71.     Stradley's taking credit for "changing the entire complexion of the case" and

making it "highly likely that creditors. . . receive a distribution" by securing the appointment of

O'Halloran through the Estimation Motion and Trustee Election are flat out wrong. Prudential

was the catalyst for reviving the moribund Project by recognizing that the Project and, by

extension, the bankruptcy were doomed if he remained in control of the Debtor and by

proactively filing the Trustee Motion which successfully led to the appointment of Shubert as

Interim Trustee and the removal of Gualtieri from control over the Debtor. Shubert is a

sophisticated and experienced panel trustee who was fully capable of fulfilling her duties as

Interim Trustee and successfully maximizing the assets of the estate for the benefit of its

creditors, including the investigation of transactions to Gualtieri and, perhaps, Stradley. Her

independence should be unquestioned as she was randomly selected from the UST "wheel."

Stradley's efforts through the Estimation Motion and Trustee Election to replace Shubert for

O'Halloran were primarily done to install someone familiar who might be friendly to the

interests of Stradley's and Gualtieri.

72.    Stradley cites a string of cases for the proposition that a creditor's effort to obtain

the appointment of a chapter 11 trustee may constitute a substantial contribution to a case. See,

Administrative Claim, ¶ 79. However, the application of these cases to Stradley fails on both

legal and factual grounds. First, none of these cases involve the actions of a retained estate

professional seeking additional administrative expense compensation for making substantial

contributions while acting in a "side role" as creditor. Stradley's lack of citation to any cases

where the estate professionals also sought additional administrative expense substantial

contribution compensation is quite telling. Second, it was Prudential's efforts through the Trustee

Motion that resulted in the removal of Gualtieri and the appointment of an Interim Trustee,

clearing the way for the resumption of the Project. The Trustee Election orchestrated by Stradley

merely sought to replace the qualified Shubert with O'Halloran and was done in the self interest

of Stradley and its client Gualtieri to install a trustee favorable to their particular interests.

73.    If Stradley was, in fact, making such a "substantial contribution" to the estate as it

now claims, why was Stradley so quickly replaced as counsel by O'Halloran with Kaufman

Coren, which was retained on a contingency fee to prosecute the Lender Liability Action. It is

clear that Stradley's results were not worth the significant costs being imposed upon the estate.

74.    With respect to the Document Production Claim and Pre-retention Claim,

Stradley did not provide any actual and demonstrable benefit. First, there was no need to engage

in extensive work since the Lender Liability Action was stayed by agreement as of the Petition

Date and did not resume substantive activity until O'Halloran's appointment. Second, the cost of

the inordinate and unnecessary amount of time spent doing document review and production that Stradley now seeks compensation for in both its Fee Application as well as in its Document Production Claim conferred no benefit to the estate. Stradley usurped the job of document review and marshaling that should have been performed by Kaufman Coren at no direct cost to the estate since it was retained on contingency. It was Kaufman Coren's responsibility to collect the documents from prior counsel, organize them and produce them. Nowhere was it disclosed that Kaufman Coren would be essentially co-counsel with Stradley for this arrangement. Stradley is effectively seeking to recover from the estate for work that Kaufman Coren was obligated to do without charge.

75.      In fact, the only post-petition document production received by Prudential from the Trustee was made through special counsel Kaufman Coren.

76.      Stradley did nothing more than it was obligated to do by turning over files after their employment terminated.  See RPC 1.16(d).  The remainder of the work, if any, was gratuitous or done for the benefit of Gualtieri. Pennsylvania RPC 1.16(d) required Stradley's cooperation in turning over its files to the Trustee for his contingency lawyers to review.  How Stradley believes it is entitled to a fee recovery under § 503(b) when it was no longer retained by the Trustee and successor counsel was working on contingency at no direct cost to the estate amounts to end run of the retention rules of section 327.

77.      The alleged benefits to the estate claimed by Stradley are largely speculative and have not yet come to fruition and, as such, cannot form the basis of a substantial contribution request.  "The substantial contribution test is applied in hindsight, and scrutinizes the actual benefit to the case." *Worldwide Direct,* 334 B.R. at 121 (citation omitted). Therefore, it is

improper to speculate on or consider future action or results thereof when considering a substantial contribution application. *Fenicle v. EFH*, 2019 U.S. Dist. LEXIS 14390 at *8.

78. Whether the Lender Liability Action has any value to the estate remains entirely speculative at this point. Without a settlement or a recovery following a final ruling, it is unclear whether Stradley's role in in the Lender Liability Action (with respect to its Document Production and Pre-retention Claims) provided any, let alone substantial, contribution to the case.

79. Additionally, Stradley asserts that O'Halloran's appointment has resulted in a resumption of the work on Phase I and has culminated in the "proposal of a plan that **envisions** meaningful distributions . . . to the Debtor's creditors." See, Administrative Claim, ¶ 88. The mere possibility of future success is not an "actual and demonstrable benefit" as required by the Bankruptcy Code. Moreover, as the substantial contribution test is applied in hindsight it is improper to consider future action or results thereof when considering a substantial contribution application.

80. Stradley opines that "the **likely outcome** of this Chapter 11 Case, absent its intervention" would have been the immediate sale of the Project "in its diminished state" without recovery to unsecured creditors. See, Administrative Claim, ¶ 100 (bold added). This is pure speculation. There is no indication that Shubert would not have obtained the same results for creditors by an immediate liquidation, it now appearing that the Trustee lost money on Phase I of the Project. In fact, in hindsight, it could be argued that a sale of the IVC Project outright, at the $22,000.000.00 figure the Debtor and Trustee continue to carry on their books, would have been the far better, faster and more efficient way to resolve the Project, and may have generated more

23

for creditors than the actual buildout, and the $4,000,000.00 in administrative expenses that go along with it.

81.    Stradley has failed to establish that, "absent [its] efforts, a different outcome would have been produced in the case." *Summit Metals*, 379 B.R. at 52. As previously discussed, Shubert is a highly-respected and sophisticated lawyer with a depth of experience successfully serving as trustee in commercial bankruptcy cases. Other than its self-serving conclusions and conjecture, Stradley has failed to make a credible argument that the estate derived a tangible benefit resulting from O'Halloran's replacement of Shubert.

82.    Creditors are not permitted to obtain a substantial contribution award when their actions fail to generate a "concrete, measurable monetary benefit." *Granite Partners,* 213 B.R. at 447. Stradley has not demonstrated that its actions have increase the monetary benefits to unsecured creditors in the Chapter 11 Case. The actual economic value of its limited "contributions" outside of its approved role as § 327(e) special litigation counsel is entirely speculative and may well be $0.

83.    As an estate professional, Stradley should have alerted the Court in advance that it intended to venture beyond the boundaries of the Retention Order and that it intended to take action unrelated to the Lender Liability Action for which it would demand separate compensation for under § 503(b)(3)(D) and (d)(4).

**B.    Stradley Fails to Rebut the Presumption of Self Interest.**

84.    In addition to failing to meet its burden to establish that its actions resulted in an actual and demonstrable benefit to the Debtor's estate, Stradley is required, but has failed, to provide the Bankruptcy Court with evidence to rebut the presumption that its actions were primarily in its own interest. *Lebron*, 27 F.3d at 944.

24

85.     The administrative expense statute as it relates to substantial contribution claims is designed to encourage creditors to take action benefitting the entire estate beyond what it would have done acting solely in self interest. Third Circuit precedent commands that "substantial contribution" reimbursement is not available to creditors that engage in activities designed primarily to serve their own interests, which may confer incidental benefit to the estate, that "**would have been undertaken absent an expectation of reimbursement from the estate.**" *Lebron*, 27 F.3d at 944 (emphasis added).

86.     Stradley concedes in its Administrative Claim that its actions for which it now seeks compensation were not performed with an expectation of reimbursement. At the time that Stradley was maneuvering to replace Shubert with O'Halloran through its Estimation Motion and Trustee Election, "**any expectation of eventual reimbursement for its efforts** could be described as **speculative**. It would have been **unreasonable for Stradley to assume that it would someday be reimbursed for its efforts**." Administrative Claim, ¶ 90 (emphasis added). Further, Stradley states that once O'Halloran was installed as permanent Trustee, it had "no ongoing obligation to assist **nor an expectation that it would be reimbursed for its efforts**." Administrative Claim, ¶ 91 (emphasis added).

87.     Stradley acted in its self-interest to maximize recovery of its massive Prepetition Fee Claim and not with the expectation of reimbursement required to overcome the presumption of self-interest and sustain substantial contribution claim in the Third Circuit. Stradley acknowledges that its efforts in installing O'Halloran as permanent Trustee were "obviously motivated by a hope of someday recouping a portion of its [prepetition fee] claim." Administrative Claim, ¶ 90. Courts are reluctant to award substantial contribution claims to holders of significant claims against the estate since they should not need additional incentives to

25

advance the bankruptcy process. *Grasso*, 519 B.R. at 140 (citations omitted). Stradley's very words confirm that it acted in its own self-interest to maximize the value of its claim and that it was not motivated by an expectation of reimbursement for whatever actions that conferred benefit to the estate. Third Circuit holds that the benefit the estate receives as an incident to a creditor's pursuit of its own interests—and which would have been undertaken absent an expectation of reimbursement from the estate—is not a substantial contribution. *See Lebron*, 27 F.3d at 944. Accordingly, Stradley has failed to rebut the presumption in the Third Circuit that it acted in self-interest and, for this reason alone, the Administrative Claim should be denied.

### C.   Stradley's Efforts Were Duplicative.

88.   Stradley claims that its efforts were not duplicative since there was no creditors committee or any other party in the position to assist the Trustee with sharing of knowledge and information about the Lender Liability Action. See, Administrative Claim, ¶ 89. However, that assertion does not bear the weight of scrutiny.  Stradley was not acting in the place of a representative, but in duplication of the roles of the Trustee, Debtor's counsel and special counsel Kaufman Coren.

89.   O'Halloran, as described by Stradley, is an experienced turnaround expert, and should have been capable of getting himself and his professionals "up to speed" without the extensive assistance claimed by Stradley in the Transition Assistance Claim and the Document Production Claim.

90.   Much of the post-petition production made after O'Halloran's appointment was largely duplicative. The Document Production should have been undertaken by Kaufman Coren under its contingency fee arrangement at no direct cost to the estate.

### D.    Lack of Objective Evidentiary Support.

91.    In support of the Administrative Claim, Stradley offers only self-serving conclusions and its own time sheets, Stradley did not offer any objective evidence in support of its substantial contribution claims such as a corroborating declaration from a disinterested party. "Corroborating testimony by a *disinterested* party attesting to a claimant's instrumental acts has proven to be a decisive factor in awarding compensation to activities which otherwise might not constitute a 'substantial contribution.'" *Kior*, 567 B.R. at 459 and 455  (Denying request for substantial contribution administrative claim where the movant submitted no evidence in support of its application other than its attorneys' time records) (citations omitted).

### E.    Stradley's Cited Case Law Does not Support its Administrative Claim.

92.    Stradley does not cite any cases where a special counsel retained under § 327(e) who also holds a prepetition claim may assume the mantle of a "creditor" to claim additional fees in addition to those claimed under § 330 for making a "substantial contribution" to the estate through actions beyond the boundaries of the Retention Order.

93.    Stradley's assertion in its Administrative Claim (¶¶ 77, 90) that the motive of the petitioner is not a factor in determining whether substantial contribution has been made and its citation of *In re Celotex,* 227 F.3d 1336 (11th Cir. 2000) from the Eleventh Circuit conflicts with established Third Circuit Precedent. See *Lebron*, 27 F.3d at 944, Administrative Claim, ¶ 77, 90.

### F.    Stradley's Administrative Claim Falls Outside of the Statute.

90.    Stradley asserts that a creditor's attorneys can recover compensation for "professional services rendered' to a creditor under section 503(b)(4) as long as the creditor's expenses are themselves "allowable under [11 U.S.C. § 503(b)(3)(D)]." See, Administrative Claim, ¶ 80.  A creditor must first establish that it has made a substantial contribution in

accordance with section 503(b)(3)(D) before any request for reimbursement for attorney's fees

may be considered. See, *Lebron*, 27 F.3d at 943 (observing that §503(b)(4) "authorizes awards of

legal and accounting fees only in situations coming within the scope of §503(b)(3) [.]")

Stradley's attempt to bootstrap itself into the statute by claiming a "cost" of $63.10 must fail.

See, Administrative Claim, Exhibit B.

91.    The plain reading of the language of sections 503(b)(3)(D) and 503(b)(4) provides

that "a creditor" may receive payment of its "actual, necessary expenses" incurred in making a

"substantial contribution" in a case and may "receive reasonable compensation for professional

services rendered by an attorney. . . of an entity whose expense is allowable under [§

503(b)(3)(D)]" and "reimbursement for actual necessary expenses incurred by such

attorney. . . ." It is clear that the statute requires a creditor first demonstrating an allowable

expense before seeking allowance of reimbursement for the costs and expenses of an attorney.

92.    Here, was Stradley the "attorney . . . of the entity whose expense is allowable

under § 503(b)(3)(D)? Stradley the "creditor" and Stradley the "attorneys" are one in the same. It

is clear that the statute does not contemplate such a situation. Stradley did not have an attorney-

client relationship with itself with respect to pursuing its claim for unpaid fees. The most natural

reading of § 503(b)(4) would suggest that a request for compensation for professional services

may only be made by the entity holding an expense allowable under § 503(b)(3)(D) and only

**<u>after</u>** actual payment to the attorneys has been made.

93.    Further, Stradley did not incur or pay or any professional attorney fees. Stradley

acknowledges this, conceding that its substantial contribution claim "is premised on the value of

time expenses by its professionals and paraprofessionals, not on fees incurred and owed to

outside counsel." See, Administrative Claim, ¶ 83. This expenditure was overhead for Stradley

and it did not incur an actual expense for "professional services rendered by an attorney."

94.     Tellingly, Stradley does not cite any cases in its Administrative Claim where a

substantial contribution application was approved under sections 503(b)(3)(D) and 503(b)(4) for

a law firm acting in acting in furtherance of its own claim that performed its own legal work.

> **G.     Any Fee Awarded to Stradley May not Come out of
> Prudential's Cash Collateral.**

95.     At the time the Court approved the BKRE Financing, the Court approved

Prudential's Release of Liens Agreement (the "Release of Liens Agreement") which paved the

way for the Debtor's post-petition financing.  Prudential gave up substantial rights in the Release

of Liens Agreement in order to to obtain the Maturity Date for the Prudential Construction Loan,

including: (i) subordinating to the BKRE Financing, (ii) not requesting the current payment of

post-petition interest accruing in the case, (iii) releasing its lien on the Clubhouse; and (iv) and

subordinating its secured but subordinated claims to allow certain non-insider/non-Debtor

retained unsecured creditors to be paid first.

96.     However, Prudential did not consent to the subordination of its cash collateral

interests to allow for the payment of the Debtor's professionals, including Stradley.

97.     There are no unencumbered moneys to pay this claimed administrative expense.

98.     Stradley's Administrative Claim, to the extent allowed by this Court, may not be

paid out of the collateral of Prudential.  Prudential made clear in its Release of Liens Agreement

that it will not subordinate, carve out or pay any fees of any professional hired by the Debtor.

Prudential therefore objects to any of its collateral being used to pay Stradley on its

Administrative Claim.

## VI.  **RESERVATION OF RIGHTS**

99.     Prudential reserves the right to supplement and/or amend this Objection on any

grounds based upon information discovered from the Debtor, the Trustee, Stradley or any other

source.

## VII.  **CONCLUSION**

WHEREFORE, for the foregoing reasons, Prudential respectfully requests that this Court

enter an Order denying or appropriately reducing the amount costs and fees requested by

Stradley in its Administrative Claim on the grounds set forth herein and requests such other and

further relief as is just and equitable.

Respectfully submitted,


Dated: August 30, 2021          BY:     */s/ Edmond M. George*
                                        Edmond M. George, Esquire
                                        Michael D. Vagnoni, Esquire
                                        OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                        Centre Square West
                                        1500 Market Street, Suite 3400
                                        Philadelphia, PA 19102
                                        Telephone – (215) 665-3000
                                        Facsimile – (215) 665-3165


                                        *Counsel to Prudential Savings Bank*

OMC\4828-1876-9650.v3-8/30/21