**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re: | : |
|  | : |
|  | : **CHAPTER 11** |
| **ISLAND VIEW CROSSING II, L.P.,** | : |
|  | : **BANKRUPTCY NO. 17-14454 (ELF)** |
| Debtor. | : |
|  | : |

**MOTION OF PRUDENTIAL BANK FOR A SUPER-PRIORITY ADMINISTRATIVE
CLAIM UNDER 11 U.S.C. §§ 503(b) and 507(b) FOR THE POST-PETITION
DIMINUTION OF COLLATERAL AND FOR EXPEDITED
CONSIDERATION AND LIMITED NOTICE**

Prudential Savings Bank ("Prudential") a secured creditor of the Debtor, Island View

Crossing II, L.P. ("Island View" or the "Debtor"),[1] by and through its undersigned counsel,

Obermayer Rebmann Maxwell & Hippel LLP, hereby files this Motion for the entry of an order

(a) granting it a Super-priority Administrative Claim Under 11 U.S.C. §503(b) and 507(b) for the

Post-petition Diminution of its Collateral, (b) granting expedited consideration and limited notice,

and (c) granting related relief (the "Motion"), and in support thereof, Prudential states as follows:

**I.    JURISDICTION**

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

2.    Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and/or 1409.

3.    The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 363, 364,

503(b) and 507(b).

---

[1] At the Petition Date, this Court determined that Prudential was fully secured on its $4,000,000.00 second position
lien in determining an equity cushion existed.  See Order on Prudential's Motion to Convert. [D.I. 141].

## II.    <u>PRELIMINARY STATEMENT</u>

4.    Prudential is the Debtor's primary prepetition secured lender for the Debtor's

development project known as Island View Crossings (the "<u>IVC Project</u>"). The Debtor's own

valuations throughout much of his case have indicated that Prudential had a substantial equity

cushion on its secured loans at the Petition Date. This Court also concluded that with respect to

Prudential's Construction Loan, there was a substantial but inadequate equity cushion to support

the Debtor's DIP Loan request. As will be discussed in detail below, Prudential, in the Release of

Liens Agreement, consented to the Debtor's post-petition financing and the subordination of its

liens, thus enabling the IVC Project to continue in exchange for adequate protection consisting,

*inter alia,* of release prices to be paid upon the closing of each residential unit in Phase I of the

IVC Project and, most importantly, an agreed Maturity Date for the payment of the remaining

balance of the Prudential Construction Loan.

5.    However, the Trustee's operations have impaired the substantial equity cushion

that creditors and Prudential relied upon. The Debtor has filed a Plan that impermissibly seeks to

unilaterally extend the Maturity Date of the Prudential Construction Loan from March of 2022,

without Prudential's consent which, if permitted by the Court, would jeopardize the prospect of

full payment on its secured claim. Further, even if the Trustee and the Debtor were permitted to

unilaterally breach a post-petition agreement setting the Maturity Date, the Plan does not address

the potentially substantial  administrative claim of Prudential, which is sure to occur if the

Trustee follows through with his stated intent in the Plan to unload Phase II of the Project in a

fire sale.[2] Administrative claims will arise if the Trustee does not sell the IVC Project for

---

[2] It is important to note that Prudential had been requesting from Trustee's counsel, for weeks in advance of the
Disclosure Statement hearing to see projections from the Trustee that showed an ability to pay back the Prudential
Construction loan, only to receive them on the eve of approval of the Disclosure Statement.  Though Trustee's

substantially more than the $6,000,000.00 he has listed as the value in the Disclosure Statement for Phase II.[3]

6.       The Plan, by seeking to extend the Maturity Date on the Prudential Construction Loan, impermissibly attempts a *de facto* surcharge of Prudential's collateral for the payment of the administrative "carve out" which, in this case, will exceed the amounts borrowed by the Trustee from BKRE, or in excess of $4,000,000.00 (the Trustee, his advisor and counsel fees to date and as projected), making it such that the administrative fees are, in reality, coming out of the collateral of Prudential and not the "carve out".  Indeed, the Trustee's requested extension is merely a sham and artifice to allow more money to be removed from the Debtor's estate before the obligation to pay Prudential has occurred.

7.       The Collateral upon which Prudential asserts its liens has decreased in value during this case from being over secured at the Petition Date to an anticipated position of being fully secured as of the Effective Date of the Plan. Indeed, at the end of the development of Phase I, Prudential is left with only its Collateral. Phase II was neither approved nor improved. Simply put, none of the money spent on Phase I increased the value of Phase II.  It easy to see how this occurred as the Trustee's most recent Monthly Operating Report shows losses of nearly $4,000,000.00 over the time of his administration. The Trustee's plan to extend the Maturity Date is intended to saddle Prudential with these losses by changing Prudential's claim from fully secured to unsecured.  The Trustee concedes that moving the Maturity Date will not result in payments to Prudential on its $1,570,000.00 claim remaining at the beginning of Phase II.

---

counsel had asked Prudential not to object to the Disclosure, Prudential had no idea that the Trustee would post such a low value for the IVC Project, having continuously indicating a value of over $22,000.000.00.

[3] It is unknown why the Trustee picked this figure, apparently out of thin air, as the values shown in his most recent MOR, are $22,000,000.00 for the entire facility.  Intuitively, the Trustee's position makes no sense, and further, the low number is limiting, and likely to attract bidders to bid the lower number.

8.      The actions of the Trustee in failing to maximize the value of Phase II while, at the same time, incurring exorbitant administrative expenses through his professionals, has prejudicially impacted Prudential's equity cushion. Accordingly, Prudential is entitled to a super-priority administrative claim for the diminution of the value of its Collateral securing its claim during the pendency of this case.

## III.    RELEVANT BACKGROUND

### A.    Background of the IVC Project.

9.      The Debtor is a Pennsylvania limited partnership with its principal asset located at 1600 Radcliffe Street, Bristol Borough, PA 19007 (the "Property").

10.     The IVC Project currently consists of a substantial residential development and was commonly referred to as Island View Crossing, but was re-branded by the Trustee and is now known as Radcliffe Court on the Delaware

11.     The IVC Project consists of 73 townhouses in Phase I, which are in varying stages of construction, and three (3) condominium buildings in Phase II, with 96 condominium units slated for development.

12.     The IVC Project was previously controlled by the Debtor's principal, Renalto Gualtieri ("Gualtieri").

13.     Though Gualtieri purchased the Property at a price below its fair market value, the Property needed substantial site work before vertical construction could begin.

14.     Indeed, as a result of the historical uses of the Property as a World War I shipbuilding facility, the IVC Project had significant industrial issues that required remediation, including the (i) removal of enormous amounts of concrete and steel that were the foundation of the former shipbuilding facility and its surrounding parking lots, (ii)

removal of underground storage tanks, (iii) supply of vast amounts of clean fill, and (iv) re-grading the entire IVC Project Property.

15.     Gualtieri misused Prudential's money advances under its loan documents, misrepresented and understated expenses, stole consumer money, and misrepresented to the Court and the Trustee the shovel readiness of the Property for development.

**B.    The Prudential Debt.**

16.     Prudential is the prepetition secured lender to the Debtor and loaned substantial amounts, evidenced by its timely filed proofs of claim, to Island View to construct the IVC Project. On September 20, 2013, Prudential entered into a Loan Agreement (the "Island View Loan Agreement"), pursuant to which Prudential made a loan to the Debtor, Island View Properties, Inc., Renato J. Gualtieri, and Americorp Homes, Inc. (the "Borrowers") under a promissory note (the "Island View Note") in the principal amount of One Million Four Hundred Thousand Dollars ($1,400,000.00).

17.     As security for the Island View Note, on or about September 20, 2013, Island View executed and delivered to Prudential a Mortgage and Security Agreement (the "Island View Mortgage") providing, *inter alia*, the Island View Property as security for the loan.  The Island View Mortgage was recorded by the Recorder of Deeds for Bucks County, Pennsylvania, on September 27, 2013, under instrument number 2013080879.  The Island View Loan Agreement, the Island View Note and the Island View Mortgage are collectively referred to as the "Island View Loan Documents."

18.     On November 26, 2014, Prudential entered into a Development Construction Loan Agreement pursuant to which Prudential granted the Prudential Construction Loan to Island View under a promissory note of the same date for a loan in the principal amount of Five

Million Five Hundred Forty-One Thousand and Four Hundred Sixty-Eight Dollars

($5,541,468.00) ("Prudential Construction Loan").

19.     As security for the Prudential Construction Loan, on or about November 26,

2014, Island View executed and delivered to Prudential an Open-End Mortgage and Security

Agreement (the "Second Island View Mortgage") providing, *inter alia*, the Island View Property

as security for the loan.  The Second Island View Mortgage was recorded by the Recorder of

Deeds for Bucks County, Pennsylvania, on January 7, 2015, under instrument number

2015001098.

20.     As additional security for the Prudential Construction Loan, on or about

November 26, 2014, Island View executed and delivered to Prudential an Assignment of Rents,

Leases and Agreements of Sale (the "Island View Assignment"), assigning all leases, rents and

agreements of sale on the Island View Property.

21.     Pursuant to the Island View Loan Agreement and Prudential Construction Loan,

Prudential provided the Debtor with funds to construct certain site improvements (the

"Improvements") in accordance with certain plans and specifications (the "Plans and

Specifications") at the IVC Project.

22.     Specifically, the Plans and Specifications required the Debtor to construct a

Planned Unit Community along the Delaware River in Bristol Borough pursuant to the

Pennsylvania Uniform Planned Community Act.

23.     The Debtor defaulted under the Island View Loan Documents due to, *inter alia*,

(i) the Debtor failing to pay all amounts owed under the Island View Loan Documents, (ii)

certain personal judgments being entered against Gualtieri, and (iii) the Debtor failing to

maintain the insurance coverages required thereunder.

24.      On October 11, 2016, Prudential issued a Notice of Default to Island View for failing, among other things, to maintain the insurance coverage required by the Island View Loan Documents.

**C.      The Debtor's Chapter 11 Filing.**

25.      On June 30, 2017 (the "Petition Date"), Island View filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court").

26.      As of the Petition Date, the Debtor had a number of incomplete units at the IVC Project, which were in varying stages of completion.  Prudential had advanced up to $135,000.00 per each unit.

27.      On August 4, 2017, Prudential filed its Motion to Convert, to Dismiss or to Appoint a Chapter 11 Trustee with respect to the Debtor and its affiliates (the "Prudential Trustee Motion"). See Island View Dkt. No. 34.

28.      On August 21, 2017, the Debtor filed a Motion for Entry of a Final Order Authorizing the Debtor to (I) Obtain Post-Petition Financing Pursuant to Sections 364 and 363 of the Bankruptcy code, (II) Enter Into Various Loan Documents, and (III) Granting Liens on Property of the Estate Senior to all Other Liens Pursuant to Section 364(d)(1) of Bankruptcy Code and Modifying the Automatic Stay to Implement the Financing Terms (the "DIP Motion") seeking post-petition financing wherein the Debtor sought to prime the liens of Prudential with a new loan from Commonwealth Capital pursuant to Section 364(d) (1). See Island View Dkt. No. 55.

29.      Prudential filed opposition to the Trustee's DIP Motion on October 13, 2017. See Island View Dkt. No. 100.

30.     The parties conducted a six (6) day consolidated trial on the Prudential Trustee Motion and the Debtor's DIP Motion.

31.     On December 18, 2017, this Court entered a combined Order on the Prudential Trustee Motion and the DIP Motion ("Trustee Order"). See Island View Dkt. No. 141.  The Trustee Order denied the DIP Motion and Gualtieri was removed as the person in control of the Debtor in Possession. Christine Shubert was appointed as interim Chapter 11 Trustee of the Debtor (the "Interim Trustee").

32.     In the Court's oral bench ruling on the DIP Motion and Prudential Trustee Motion, the Court noted that there was not a sufficient 25% equity cushion to permit the DIP financing request.  The Court noted that Prudential's valuation of $11,000,000.00, which was based upon an immediate liquidation of the IVC Project and the stalled nature of the IVC Project was too low, and that the Debtor's estimation of $17,000,000.00 was too high.

33.     The Debtor and the Trustee continue to reflect a value of the IVC Project at between $20,000,000.00 and $22,000,000.00.

34.     Stradley Ronan ("Stradley"), which was then counsel to the Debtor (and simultaneously Ron Gualtieri, the Debtor's principal), filed an Emergency Motion for a Trustee Election on January 16, 2018. See Island View Dkt. No. 214.

35.     Following a contested election where Prudential objected to Stradley's vote because of its relationship with Gualtieri and certain preferential transfers believed to have been received by Stradley, the Court permitted Stradley to vote in the Trustee election, which resulted in sufficient votes to replace the Interim Trustee with Kevin O'Halloran.

36.     Mr. O'Halloran was appointed as Chapter 11 Trustee on or about January 29, 2018 (the "Appointment Date").

37.    Since the Appointment Date, the Trustee has been administering the assets of the

Debtor, has restarted the IVC Project and has sold in the ordinary course, nearly half of the

townhouse units. Unfortunately, in the process he has managed to lose nearly $4,000,000.00.

38.    Delays occasioned by Gualtieri's misrepresentations with respect to the ACT II

clean-up of the Property and expenses arising from additional work required, resulted in a

situation where the Trustee spent substantially more than was budgeted.

39.    The COVID-19 pandemic further delayed construction, causing the Trustee to run

out of money in the winter of 2019, and necessitating additional borrowings from BKRE.

**D.    The Trustee's Use of Funds.**

40.    It is apparent that Gualtieri substantially understated the amount and character of the

work that was contemplated by the IVC Project. The Trustee exceeded the original budgeted

amounts for site work and improvements by more than $1,000,000.00.

41.    The original budget projections for professional fees and expenses were less than

$3,000,000.00.

42.    The Trustee's budget now reveals that he is spending in excess of $4,000,000.00

on himself, his accountants and his lawyers. Trustee's counsel fees are twice the amount

originally projected.

43.    Through poor oversight and management, the Trustee has grossly exceeded the

construction budget. As a result of these runaway costs, and despite obtaining higher prices for

individual units, the Debtor has or will lose money on a net basis for Phase I of the IVC Project.

E.    **The Post-Petition BKRE Financing and the Court's Findings on Value.**

44.    Prudential tried in vain to lend money to the Trustee to complete the IVC Project. The negotiations were unsuccessful, and the Trustee procured a loan from BKRE in the amount of $4,700.000.00 (the "BKRE Loan").

45.    On or about August 17, 2018, the Trustee filed a Motion for Entry of Final Order Authorizing (I) Trustee to Obtain Secured Postpetition Financing Pursuant to §§105, 361, 364(C)(1) and 364(D)(1) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 4001, (II) Trustee to Enter into the Loan Documents; (III) Granting an Allowed Super Priority Administrative Expense Claim With Priority Over Any and All Administrative Expenses of the Kind Specified in Bankruptcy Code Section 503(B) or 507(B); (IV) Granting a Lien on All Assets of the Estate (Except for the Excluded Assets) Senior to All Other Liens (Except for the Permitted Liens) Pursuant to Section 364(D)(1) of Bankruptcy Code; (V) Approving the Release of Liens Agreement Between the Trustee and Prudential Bank Pursuant to Federal Rule of Bankruptcy Procedure 9019; and (VI) Granting Related Relief ("BKRE DIP Financing Motion"). See Island View Dkt. No. 341.

46.    On September 12, 2018, this Court entered its order granting the BKRE DIP Financing Motion (the "BKRE DIP Financing Order").  See Island View Dkt. No. 352.

F.    **Prudential's Subordination and the Post-Petition Release of Liens Agreement.**

(i).    **Rights of Prudential under the Release of Liens Agreement.**

47.    At the same time the Court approved the BKRE DIP Financing Motion, the Court approved Prudential's Release of Liens Agreement ("Release of Liens Agreement"). A copy of the Release of Liens Agreement is attached hereto as Exhibit "A".

48.     Prudential's subordination obligations under the Release of Liens Agreement consist of (i) Prudential subordinating all of its liens to those of BKRE, and (ii) subordinating its liens on its Steeple and Calnshire/Durham Collateral mortgages to unsecured non-insider creditors.

49.     The Release of Liens Agreement provides, *inter alia,* for payment of release prices to Prudential (See Paragraphs 2.1 and 2.2 of the Release of Liens Agreement) at the rate of $25,000.00 for each of the first 38 townhomes and $45,000.00 for each the next 35 ("Release Prices"), and for Prudential to release its liens on the "clubhouse and common elements" ("Clubhouse"), and for the full retention of Prudential's rights as a secured creditor.[4] The BKRE DIP Financing Motion specifically references the "adequate protection" to be provided to Prudential. See Island View Dkt. No. 341 (BKRE DIP Financing Motion), p. 3.  It is irrefutable that the Release Prices and the Maturity Date were given to Prudential as a mechanism of assuring adequate protection of Prudential's Construction Loan liens.

50.     At present, the Prudential Construction Loan with interest, principal and attorney's fees exceeds $6,000,000.00 with continually accruing interest. Prudential reserved all rights as secured creditor in the Release of Liens Agreement.

**(ii).    Prudential's right to payment in full of its principal on the agreed Maturity Date of Prudential Construction Loan.**

51.     Also contained in the Release of Liens Agreement is the Trustee's agreement to fully pay the Prudential Construction Loan, and to fully advance for vertical construction at the IVC Project by a date which is 42 months after the Effective Date of the Order on the BKRE Financing, calculated to be March 12, 2022 (the "Maturity Date").  See Exhibit "A" at ¶ 2.4.

---

[4] Which includes a right to interest and attorney's fees recoverable under the Island View Loan Documents.

52.    Despite the fixing of the Maturity Date through the court-approved Release of Liens Agreement, the Trustee's Plan fails to pay the Prudential Construction Loan as contractually obligated and seeks to delay payment to Prudential on the Prudential Construction Loan until after the Trustee pays himself and his professionals more than $4,000,000.00 (nearly as much as the BKRE Loan and potentially more if the Trustee's projections again fall short), rendering payment to Prudential contingent on the amounts realized from Phase II of the IVC Project.

53.    The Trustee has indicated that a sale of Phase II for $6,000,000.00 or will not be sufficient pay the entire Prudential Construction Loan claim.

54.    Accordingly, it is clear that the Trustee is attempting to impose a surcharge on Prudential.

55.    The Release of Liens Agreement requires that Prudential Construction Loan and all remaining amounts owed to Prudential be repaid in full on the refinance date of March 12, 2022.  The Maturity Date is fixed and absolute and is not dependent or contingent on the sales of housing units, escalating administrative expenses, or any other operational issues the Trustee may have faced.

56.    Prudential gave up substantial rights in the Release of Liens Agreement in order to obtain the Maturity Date for the Prudential Construction Loan, including: (i) subordinating to the BKRE Financing, (ii) not requesting the current payment of post-petition interest accruing in the case, (iii) releasing its lien on the Clubhouse; and (iv) and subordinating its secured but subordinated claims to allow certain non-insider/non-Debtor retained unsecured creditors to be paid first in exchange for adequate protection which includes the fixing of the Maturity Date and the Release Prices to be paid upon the sale closing of the respective units in Phase I.

57.     Moreover, after having put up to $130,000.00 into each of the units partially constructed as of the Petition Date, Prudential left hundreds of thousands in construction dollars on the table, only to recover its release price of $25,000.00 on each of those partially constructed units.

58.     Further, though the Prudential liens on the Clubhouse were released, the Trustee never built out the Clubhouse, thus failing to deliver an amenity promised to the homeowners. Now the Trustee broadcasts that he will not build the Clubhouse and he will not be developing Phase II of the IVC Project.  The Trustee also failed to spend the $187,000.00 budgeted for plans for Phase II.

59.     Through the court-approved Release of Liens Agreement, Prudential gave up millions in exchange for the promise of payment by the Maturity Date, and that date cannot be moved as proposed in the Plan, especially considering there are sufficient available funds on March 12, 2022 to pay Prudential in full according to the Trustee's own projections.  There will not be sufficient funds if the Trustee is permitted to anticipatorily breach the Release of Liens Agreement, and pay all of his professionals, whose total fees are nearly $2,000,000.00.

**G.     The Trustee's Plan.**

60.     On or about April 20, 2021, the Trustee filed his Chapter 11 Plan of Reorganization (the "Plan"). See Island View Dkt. No. 617. The Plan calls for the Trustee to dispose of Phase II of the IVC Project by short sale and for the payment of the proceeds in order of priority and the unilateral extension of the Maturity Date.

**(i).     The Plan fails to demonstrate any effort or evaluation to maximize the value of Phase II of the IVC Project.**

61.     The Plan provides no real values, no professional opinions or any other evaluation on methods to maximize value on the sale of Phase II.

62.     There is no provision for the retention of a professional to conduct the sale.

63.     Importantly, on the eve of the hearing on the Disclosure Statement, which underpins the Trustee's Plan, the Trustee affixed a value for Phase II of the IVC Project of $6,000,000.00, which was merely a guess.

64.     The Trustee has not done anything to assess the real value of Phase II of the IVC Project, but has decided without foundation in the Plan that an immediate fire sale of Phase II best serves the interests of creditors.  His position is entirely speculative.

65.     In the DIP Motion the Debtor claimed a value for the IVC Project in excess of $17,000,000.00, which was rejected by the Court.

66.     The Trustee continues to show the value of the IVC Project in the Monthly Operating Reports as $22,000,000.00.

67.     In the Disclosure Statement underlying the Plan, the Trustee now values Phase II of the IVC Project at $6,000,000.00.  The Trustee attaches no projections, appraisals or valuations to support this claim.

> **(ii).    The Trustee's Plan impermissibly attempts to change the Maturity Date of the Prudential Construction Loan agreed to in the post-petition Release of Lien Agreement.**

68.     The Plan attempts to unilaterally extend the Maturity Date agreed to by Prudential in connection with the Release of Liens Agreement and the BKRE Financing.

69.     Instead of abiding by the terms of the Release of Liens Agreement, the Trustee seeks to extend the Maturity Date, use Prudential's collateral to pay himself and his professionals over $4,000,000.00, and push the payment obligation owed to Prudential under the Release of Liens Agreement to the Phase II sale contemplated by the Plan, which may or may not produce sufficient revenues to pay Prudential in full.

70.     With interest and attorney's fees, Prudential's secured claim is now in excess of $5,000,000.00, which is due without offset in March of 2022.

71.     The Trustee makes no provision for full payment in March of 2022 of the Prudential's secured claims in his projections or in the Plan.

72.     The potential Phase II sale and values ascribed by the Trustee present a real threat that the sale renders the Prudential Construction Loan partially unsecured. Prudential did not agree to take that risk. That is precisely why Prudential bargained for the Maturity Date in the court-approved Release of Liens Agreement.

73.     If the Property is sold for $6,000,000.00 or less, it is likely that even Prudential's Construction Loan balance of $1,507,000.00 will not be fully paid.

74.     The Trustee has effectively dissipated any equity cushion that existed for Prudential at the beginning of the case by permitting his professionals to incur rampant administrative expenses and by failing to maximize the value of Phase II. As a result of the Trustee's actions, the adequate protection extended to Prudential in connection with the BKRE DIP Financing Motion and Release of Liens Agreement will be inadequate and Prudential's once-comfortable equity cushion has been eroded and the prospects of full payment on its secured claims have been put in jeopardy.

## IV.     <u>ARGUMENT</u>

### A.     **Prudential is Entitled to a Super Priority Administrative Claim Pursuant to 11 U.S.C. §§ 507(b) and 503(b) for the Diminution of its Collateral.**

75.     As a result of the Trustee's actions in allowing the uncontrolled escalation of the administrative expenses of his professionals and by failing to maximize the value of Phase II of the IVC Project, the adequate protection that Prudential was provided in connection with the BKRE DIP Motion and Release of Liens Agreement has proven to be inadequate.

76.     11 U.S.C. § 507(b) grants a super-priority administrative claim of secured

creditors that arise due to failure of the trustee or debtor-in-possession to provide adequate

protection for the secured claimant's interests. 11 U.S.C. § 507(b). The super-priority of § 507(b)

is intended to compensate the secured claimant for the difference between the adequate

protection provided by the debtor or trustee and any actual decrease in the value of the collateral

occurring during the pendency of the bankruptcy action.

77.     Section 507(b) provides that if the trustee provides adequate protection under

sections 362, 363 or 364(d) of the interest of a holder of a claim secured by a lien on property of

the debtor and if, notwithstanding adequate protection, the creditor has a claim allowable under

section 507(a)(2) arising from the stay of action against such property under section 362, from

the use, sale or lease of such property under section 363, or from the granting of a lien under

section 364(d), then the creditor's claim shall have priority over every other claim allowable

under section 507(a)(2). 4 Collier on Bankruptcy ¶ 507.14 (16th 2021).

78.     More simply, this priority claim is for the loss or shortfall not covered by

adequate protection. 4 Collier on Bankruptcy ¶ 507.14 (16th 2021). Section 507(b) of the

Bankruptcy Code "provides that when adequate protection has been given to a secured creditor

and later proves to be inadequate, the creditor becomes entitled to a super-priority

administrative expense claim to the extent that the proffered adequate protection was

insufficient." Bonapfel v. Nalley Motor Trucks (In re Carpet Ctr. Leasing Co., Inc.), 991 F.2d

682, 685 (11th Cir. 1993).

79.     A super-priority claim may be awarded where adequate protection fails. Matter of

Plunkett, 191 B.R. 768, 780 (Bankr. N.D. Ill. 1995). "It is an attempt to codify a statutory fail-

safe system in recognition of the ultimate reality that protection previously determined the

'indubitable equivalent' . . . may later prove inadequate." <u>Bank of N.Y. Trust Co. NA v. Pac.</u>

<u>Lumber Co. (In re Scopac)</u>, 624 F.3d 274, 282 (5th Cir. 2010), quoting, <u>In re Carpet Ctr. Leasing</u>

<u>Co., Inc.</u>, 4 F.3d 940, 941 (11th Cir. 1993) (internal quotation marks and citations omitted).

80.     Adequate protection may come in a number of forms, including a seemingly

sufficient equity cushion. <u>Baybank-Middlesex v. Ralar Distributors, Inc.</u>, 69 F.3d 1200, 1203

(1st Cir. 1995). Thus, a super-priority may be awarded where an equity cushion erodes to the

point where the creditor's claim is jeopardized. <u>In re Kids Creek Partners</u>, L.P., 220 B.R. 963,

970 (Bankr. N.D. Ill. 1998). Super-priority claims have been awarded to creditor in exchange for

creditor's release of a lien. Id.

### (i).     Establishing the right to a super-priority claim under Section 507(b).

81.     Prudential bears the burden of establishing its right to a claim under § 507(b).

<u>Ford Motor Credit Co. v. Dobbins</u>, 35 F.3d 860, 866 (4th Cir. 1994).

82.     Section 507(b) provides:

> If the trustee, under section 362, 363, or 364 of this title, provides
> adequate protection of the interest of a holder of a claim by a lien
> on property of the debtor and if, notwithstanding such protection,
> such creditor has a claim allowable under subsection (a)(1) of this
> section arising from the stay of action against such property
> under section 362 of this title, from the use, sale, or lease of such
> property under section 363 of this title, or from the granting of a
> lien under section 364(d) of this title, then such creditor's claim
> under such subsection shall have priority over every other claim
> allowable under such subsection.

11 U.S.C. § 507(b).

83.     Section 507(b) must be read in combination with Section 507(a) and Section

503(b) which state in relevant part:

> The following expenses and claims have priority in the following
> order: ". . . (1) First, administrative expenses allowed under section
> 503(b) of this title." 11 U.S.C. Sec. 507(a)(1). "After a notice and a

> hearing, there shall be allowed administrative expenses . . .
> including . . . the actual and necessary costs and expenses of
> preserving the estate . . ." 11 U.S.C. § 503(b).

In re J.F.K. Acquisitions Group, 166 B.R. 207, 211 (Bankr. E.D.N.Y. 1994).

84.     In order for a claim to have super-priority status under Section 507(b), a creditor

must satisfy the following three requirements. First, the Court must have directed the debtor to

provide adequate protection under §362, 363 or 364. Second, the claim must be allowable

under § 507(a)(1), and by reference, § 503(b). Third, such adequate protection must have failed

to preserve the creditor's interest in the collateral. See, In re Mary Holder Agency, Inc., Case No.

11-34280 (MBK), 2012 Bankr. LEXIS 4452, *4 (Bankr. D.N.J., September 24, 2012) (citations

omitted). See also, 4 Collier on Bankruptcy ¶ 507.14[1] (16th 2021).

### a.    Prudential received adequate protection in connection with the BKRE DIP Motion and Release of Liens Agreement.

85.     To establish the first element, the trustee must have affirmatively provided

adequate protection to the creditor under one of the three relevant sections of §§ 362, 363 or 364.

86.     "Adequate protection" is a term of art in bankruptcy practice, defined in 11 U.S.C.

§ 361 and applied in §§ 362(d) and 363(e); in short, it is a payment, replacement lien, or other

relief sufficient to protect the creditor against diminution in the value of his collateral during the

bankruptcy. Scopac, 624 F.3d at 278.

87.     The Bankruptcy Code does not define adequate protection, but it does provide a

non-exclusive list of examples in § 361. Section 361(1) states that adequate protection may be

provided by:

> (1) requiring the trustee to make a cash payment or periodic
> cash payments to such entity, to the extent that the stay
> under section 362 of this title, use, sale, or lease under section
> 363 of this title, or any grant of a lien under section 364 of this title

> results in a decrease in the value of such entity's interest in such
> property[.]

11 U.S.C. § 361(1).

88.     Adequate protection is a method of maintaining a creditor's interest in secured

collateral subject to post-petition use by the debtor. "Where adequate protection becomes

inadequate or otherwise fails and the use nonetheless continues, Section 507(b) comes into play

by covering the creditor's unprotected interest by according it priority administrative expense

status." J.F.K. Acquisitions, 166 B.R. at 212, quoting, In re Mutschler, 45 Bankr. 494, 496

(Bankr. D.N.D. 1984)).

89.     Here, in exchange for the Trustee's continued use of Prudential's collateral in

connection with the further development of the IVC Project and in connection with the BKRE

DIP Motion and Release of Liens Agreement, Prudential received adequate protection, including

the fixing of the Maturity Date and the Release Prices to be paid upon closing of the individual

residential units of Phase I. Accordingly, the first requirement of establishing a claim under

Section 507(b) is satisfied.

**b.      Prudential's claim is allowable under § 507(a)(1).**

90.     The second element of establishing priority under section 507(b) is that the

creditor must have a claim allowable under Section 507(a)(2). Section 507(a)(2) grants priority

to administrative expenses allowed under Section 503(b). Section 503(b)(1) provides that the

actual, necessary costs and expenses of preserving the estate are entitled to be allowed as

administrative expenses. 4 Collier on Bankruptcy ¶ 507.14[1][b] (16th 2021).

91.     Determining whether a creditor has an administrative claim is a two-prong test:

(1) the expense must have arisen from a post-petition transaction between the creditor and the

trustee (or debtor-in-possession) and (2) the transaction must have substantially benefited the

estate. <u>Mary Holder Agency</u>, 2012 Bankr. LEXIS 4452, at *6, citing, <u>In re DAK Indus., Inc.</u>, 66

F.3d 1091, 1094 (9th Cir. 1995); <u>In re Jartran, Inc.</u>, 732 F.2d 584, 871 (7th Cir. 1984) (To be an

"actual and necessary" cost of preserving the estate, an expenditure must benefit the estate as a

whole); <u>In re Pinnacle Brands, Inc.</u>, 259 B.R. 46, 51 (Bankr. D. Del. 2001). In other words, there

must be some net benefit to the estate or a preservation of the status quo after the costs to the

creditor and the benefits to the estate are taken into account. <u>Kids Creek</u>, 220 B.R. at 970.

92.     Expenses fall within § 503(b)(1)(A) if they arise out of a transaction between the

debtor and the creditor, and "'to the extent that the consideration supporting the claimant's right

to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the

business.'" <u>In re Mammoth Mart, Inc.</u>, 536 F.2d 950, 953 (1st Cir. 1976). Agreements entered

into by the debtor-in-possession or trustee and supported by consideration beneficial to the

debtor-in-possession, are actual and necessary to preserve the estate, and therefore a claim for

damages arising from a debtor-in-possession's breach of a post-petition agreement gives rise to

an administrative expense claim for the full amount of the damages provided for in the

contract. See, <u>Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)</u>, 78 F.3d 18, 26 (2d

Cir. 1996) ("[P]ostpetition claims. . . arising, for example, . . . from contracts entered into by the

trustee or debtor-in-possession are entitled to administrative  expense priority."); <u>In re Airlift</u>

<u>International, Inc.</u>, 761 F.2d 1503, 1509 (11th Cir. 1985) (holding that breach of post-

petition contract gives rise to an administrative expense claim under section 503(b)).

93.     The Release of Liens Agreement, which enabled the BKRE Financing, was

entered into post-petition and, by the Trustee's own admission, was intended to be beneficial to

the estate. Thus, Prudential's claims arising from the diminution of its collateral during this case

as well as those arising from the Trustee's anticipatory breach of the Maturity Date are administrative claims.

**c.    The adequate protection has failed to preserve Prudential's interest in the collateral.**

94.    A creditor is entitled to section 507(b) priority only to the extent that the claim arose from the stay of action against property under section 362, from the use, sale or lease of property pursuant to section 363, or from the granting of a lien under section 364(d). 4 Collier on Bankruptcy ¶ 507.14[1][c] (16th 2021). Determining the extent to which the claim is attributable to one of those items will vary from case to case. Id.

95.    Under Section 363, if the trustee used the secured creditor's collateral during the case, the trustee believed that the use was of necessary benefit to the estate. The same rationale applies when the trustee has granted an equal or priming lien under Section 364(d). 4 Collier on Bankruptcy ¶ 507.14[1][b] (16th 2021).

96.    With respect to the use of property under Section 363, the logical measure of the claim is the loss in value attributable to the trustee's use of the property. When the trustee has granted a lien under Section 364(d), the measure of the claim will be determined by the diminution in the value of the creditor's interest in the estate's interest in the property in question. 4 Collier on Bankruptcy P 507.14[1][c][i] and [iii].

97.    The holder of a secured claim that has diminished in value during the pendency of the case is entitled to a super-priority claim under § 507(b) for the amount of such diminution less what had been received as adequate protection payments. See, J.F.K. Acquisitions, 166 B.R. at 208 (super-priority administration expense claim to the extent previously awarded adequate protection payments are insufficient to cover the decline in value).

98.    Here, at the onset of this case and based on the Debtor's own valuations in the

DIP Motion and the findings of the Bankruptcy Court in connection with the Trustee Order,

Prudential was clearly an over-secured creditor. The actions of the Trustee in failing to maximize

the value of Phase II while, at the same time, incurring exorbitant administrative expenses

through his professionals have prejudicially impacted Prudential's equity cushion. The adequate

protection afforded to Prudential in connection with the Release of Liens Agreement have

proven to be inadequate. The Trustee, through his proposed Plan, seeks to unilaterally extend the

Maturity Date and has anticipatorily breached the Release of Liens Agreement. Accordingly,

Prudential is entitled to a super-priority administrative claim for the diminution of the value of its

Collateral during the pendency of this case pursuant to Sections 507(b) and 503(b) of the

Bankruptcy Code.

**B.    <u>Request For Expedited Relief</u>**

99.    In accordance with L.B.R. 5070-1(g), and 9014-1, Prudential seeks expedited

consideration of the Motion. Prudential requests approval of the request for expedited

consideration pursuant to L.B.R. 9014-2.

100.    Pursuant to L.B.R. 5070-1(g)(3), this request for expedited consideration may be

stated as part of the Motion.

101.    Prudential respectfully submits that expedited consideration of the Motion is

necessary to protect the interests of Prudential.

102.    The Motion is being filed in advance of the Court's determination of the value of

the property securing Prudential's claim, and Prudential must be permitted to file a super-priority

claim in the amount of the diminution of the value of the property.

103.    Prudential respectfully requests that an expedited hearing be scheduled on the

Motion on December 16, 2021 to coincide with hearings already scheduled in this matter on that

date, and further requests that the notice period be reduced accordingly.

104.    Prudential further believes that an expedited hearing will not prejudice the Debtor,

Trustee or any party in interest.

105.    Contemporaneously with the filing of the Motion, a copy was forwarded to Debtor,

the United States Trustee, and all parties requesting notice pursuant to Federal Rule of Bankruptcy

Procedure 2002 via electronic means, facsimile, hand delivery, or next day mail.

106.    Counsel to Prudential has provided notice as required by L.B.R. 5070-1(g)(1).  As

of the filing of this Motion, not party has opposed expedited consideration of the Motion.

107.     Prudential is seeking to shorten notice of this Motion such that it will be heard on

the earliest date that can be accommodated by the Court.

108.    Furthermore, Prudential also seeks to limit notice and requests: (a) that this Court

permit notice of the hearing to be served facsimile, next day mail or by electronic means

including the Court's CM/ECF system, upon (i) the Office of the United States Trustee; (ii)

Debtor; and (iii) all parties who have timely filed requests for notice in this proceeding under

Bankruptcy Rule 2002; and (b) that this Court limit the notice period accordingly. Prudential

believes that such notice is sufficient under the circumstances for the expedited hearing.

109.    Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P.

9006(c)(2) and the rules listed therein.

## IV.    <u>RESERVATION OF RIGHTS</u>

110.     Prudential reserves its rights to raise further argument in support of its Motion.

4854-7004-9029 v2-12/1/21

V.    <u>**CONCLUSION**</u>

111.    For the reasons set forth above, this Court should grant Prudential's Motion to the

extent of the diminution in the value of its Collateral during the pendency of this case as

determined by this Court and grant Prudential such other further relief as is just and equitable.


Respectfully submitted,


Dated: <u>December 1, 2021</u>        BY:  <u>*/s/ Edmond M. George*</u>
                                                Edmond M. George, Esquire
                                                Michael D. Vagnoni, Esquire
                                                OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                                Centre Square West
                                                1500 Market Street, Suite 3400
                                                Philadelphia, PA 19102
                                                Telephone – (215) 665-3000
                                                Facsimile – (215) 665-3165

                                                *Counsel to Prudential Savings Bank*